## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

| | | |
|---|---|---|
| Krysti Merchant, as Personal Representative for the Estate of Cory Merchant, Deceased, | ) ) ) ) | Case No. |
| Plaintiff, | ) ) | Complaint |
| vs. | ) ) | **Jury Trial Demanded** |
| Billy Woods, Sheriff of Marion County, Florida, in his official capacity; Deputy Justin Kosinski; Deputy Joseph Miller; Sergeant Jerome Dukes; | ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

## <u>COMPLAINT</u>

For her Complaint, Plaintiff Krysti Merchant as personal representative for the estate of decedent Cory Merchant, by and through her attorneys, states and alleges as follows:

## INTRODUCTION

1.  On November 7, 2021, at approximately 1:10 a.m., an inmate at the Marion County Jail, Eric Lutterloah, struck Cory Merchant several times, causing him to fall to the ground.

2.  Upon falling to the ground, Cory Merchant struck his head on the concrete, causing him to become unresponsive and bleed out on the floor of the Marion County Jail's Gulf Pod.

3.  Despite their knowledge that a violent attack was likely to occur in Gulf Pod and that Mr. Lutterloah was a violent offender who had been in an altercation a week earlier and was a threat to Cory Merchant, Defendants did nothing to prevent Mr. Lutterloah's attack on Cory Merchant.

4.  Cory Merchant died on November 13, 2021, from complications relating to his injuries.

5.  At the time of his death, Cory Merchant was a pretrial detainee who had maintained his innocence regarding the crimes of which he was accused, was awaiting trial, and had not been convicted.

6.   At the time of Cory Merchant's death, the Marion County Jail, particularly Gulf Pod, was an extremely violent jail in which fights, assaults, and batteries were frequent and often resulted in injury to other inmates.

7.   The Marion County Sheriff's Office maintains a widespread custom of failing to prevent and intervene in violent altercations between inmates and failing to discipline inmates who commit assault and battery in the jail.

8.   Detainees awaiting trial at the Marion County Jail constantly fear for their lives due to the frequency of violent altercations between inmates.

9.   The Marion County Sheriff's Office maintains numerous widespread customs that not only fail to reduce inmate-on-inmate violence at the Marion County Jail, but actively perpetuate and even encourage the occurrence of such violence.

10.   Mr. Lutterloah was returned to general population almost immediately after his deadly attack on Cory Merchant.

11.   Within two months of Mr. Merchant's death, Mr. Lutterloah was able to attack another inmate in general population, breaking his jaw so badly that the other inmate needed a feeding tube.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343.

13. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Eighth Amendment to the U.S. Constitution.

14. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

15. Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Middle District of Florida. Moreover, upon information and belief, all parties reside in this Judicial District and it is where Defendants conduct their business.

16. All conditions precedent to this lawsuit have occurred, been performed, or been waived. Specifically, Plaintiff has complied with all applicable pre-suit notice provisions of section 768.28, Florida Statutes, for her claims under the Florida Wrongful Death Act (FWDA).

## PARTIES

17. Plaintiff Krysti Merchant is the duly appointed personal representative of the Estate of Cory Merchant, having been so appointed by the probate division of the Circuit Court for Marion County, Florida, on April 3, 2023.

18. At all times relevant, Plaintiff Krysti Merchant is and was a resident of Marion County, Florida.

19. Plaintiff—as personal representative of the Estate of Cory Merchant—is entitled and empowered under the Florida Wrongful Death Act and otherwise to recover for Cory Merchant's survivors, beneficiaries, and estate, all damages allowed pursuant to the FWDA's provisions and otherwise at law for the federal claims.

20. Tommie Phillip Vester Merchant is also a sibling of Cory Merchant's and is entitled and empowered to recover damages allowed pursuant to the FWDA's provisions.

21. At all times relevant, Cory Merchant was a prisoner confined in the Marion County Jail (MCJ), a jail owned and operated by the Marion County Sheriff's Office (MCSO) in Marion County, Florida.

22. Plaintiff brings this action on behalf of the Estate and individually on behalf of herself, as Cory Merchant's survivor. At all times relevant, Plaintiff is a "survivor" as defined in section 768.18, Florida Statutes.

23. Tommie Phillip Merchant is also a "survivor" as defined in section 768.18, Florida Statutes.

24. At all times relevant, Cory Merchant was a detainee subject to the custody and control of MCSO, including by and through its employees and agents.

25. At all times relevant, Defendant Sheriff Billy Woods was and is the elected Sheriff of Marion County, Florida. As the constitutional officer elected in accordance with Chapter 30, Florida Statutes, and Article VIII, section 1, of the Florida Constitution, Defendant Woods is tasked with implementing, ratifying, and approving the policies and practices of the MCSO. Defendant Billy Woods and/or his subordinates were at all times material the final policymakers for MCSO with respect to the MCJ.

26. Defendant Sheriff Woods is sued in his official capacity and is subject to suit for negligence and wrongful death pursuant to section 768.28, Florida Statutes, as well as Plaintiff's constitutional claims.

27. At all times relevant, Deputy Justin Kosinski was employed by MCSO to provide security and correctional services to MCJ, including the protection, supervision, custody, care, and control of detainees. Kosinski is being sued in his individual capacity.

28. At all times relevant, Deputy Joseph Miller was employed by MCSO to provide security and correctional services to MCJ, including the protection, supervision, custody, care, and control of detainees. Miller is being sued in his individual capacity.

29. At all times relevant, Sergeant Jerome Dukes was employed by MCSO to provide security and correctional services to MCJ, including the protection, supervision, custody, care, and control of detainees. Dukes is being sued in his individual capacity.

30. At all times material and relevant, Defendants were acting under color of law.

## **FACTS**

31. The Marion County Sheriff's Office ("MCSO") maintains, operates, and controls the Marion County Jail ("MCJ") in Ocala, Florida.

32. MCJ's employs a dorm system of housing in which 50 to 100 detainees are housed in a single cavernous room.

33. MCJ is divided into pods, which are named according to the Radiotelephony Spelling Alphabet (Alpha, Bravo, Charlie, Delta, Echo, Foxtrot, and Gulf).

34. Each pod is divided into four dorms housing 50 to 100 detainees in a single cavernous room.

35. Each pod includes a "rover area," in which officers are staffed to surveil the four dorms within the pod.

36. At all times relevant, approximately 280 detainees were housed in a pod at any given time, but the rover area was typically staffed with only two officers.

37. Guards who were tasked with supervising pods in the rover's area had other duties as well, such as picking up trays from the kitchen for the pod, and when they would engage in those other tasks, there would be only one guard left to supervise all four dorms in their pod.

38. Trustees are in inmates in the MCJ with special privileges who help guards with various tasks around the jail.

39. Guards in the rover's area of different pods frequently spent time joking around with each other or the trustees rather than supervising inmates, and engaging in unprofessional behavior such as watching YouTube videos when they were supposed to be surveilling the dorms and making fart noises over the intercom.

40. Guards in the rover's area of different pods frequently were distracted by their computers or the trustees.

41. Cory Merchant was a detainee housed in Gulf-Pod.

42. At the time of the attack on Corry Merchant, his dorm in Gulf Pod housed several individuals who were previously convicted of violent sex crimes, including Eric Lutterloah, mixed in with non-violent offenders.

43. MCJ's dorm-style housing raises significant safety issues in the administration of a jail that were not addressed prior to Cory Merchant's death and have not been since.

44. MCJ's dorm-style housing creates an issue of lack of and/or limited visibility of the detainees housed in the dorms.

45. MCJ's dorms, including Gulf Pod, are lined with approximately 80 bunk beds (to house 280 detainees), which block sight lines within the dorms and prevent officers from clearly observing inmate activity.

46. MCJ houses over 1,300 inmates per day.

47. The number of inmates housed in each MCJ dorm at one time presents significant security problems.

48. The number of inmates housed in each MCJ dorm at one time compared to the amount of deputies assigned to supervise them presents significant security problems.

49. Inmates in each MCJ dorm, including Gulf Pod, are often idle.

50. The idleness of inmates in each MCJ dorm, including Gulf Pod, heightens the potential for disruptive and potentially violent behavior.

51. Cory Merchant was a docile inmate.

52. Terry Place, a former detainee who was housed in Gulf Pod with Cory Merchant, has testified via affidavit that Cory Merchant was one of the single most docile individuals in Gulf Pod.

53. Cory Merchant never initiated a violent altercation with another inmate.

54. Cory Merchant often attended bible study in the jail.

55. Cory Merchant was often harassed and attacked by other inmates in the MCJ and Gulf Pod.

56. It is the MCSO's responsibility to adequately staff the MCJ with security staff.

57. Adequate staffing of the MCJ is necessary to ensure the safety of the individuals housed in the dorms, including Gulf Pod.

58. It is the responsibility of MCSO deputies to supervise inmates.

59. Inmates and correctional staff alike know that Gulf Pod is one of the most violent sections of the jail.

60. MCSO requires its Detention Deputies to "[t]horoughly know, understand and comply with Florida State Statutes pertaining to county detention facilities, the Florida Model Jail Standards, and accreditation standards."

61. MCSO requires its Detention Deputies to "[b]e responsible for the reception, custody, control and release of inmates."

62. MCSO requires its Detention Deputies to "[m]aintain order and discipline within the facility, enforcing all inmate rules and regulations, and reporting all violations promptly, in writing, to a Corrections Custody Supervisor."

63. MCSO requires its Detention Deputies to "[b]e constantly alert and security conscious in order to prevent escapes, introduction of contraband or other violations."

64. MCSO requires its Detention Deputies to "[s]tand guard, observe inmates and take required action in emergencies."

65. MCSO requires its Detention Deputies to "[t]ake periodic counts of inmates, as per the Post Orders or Operations Directive."

66. MCSO requires its Detention Deputies to "[r]espond to emergencies in the jail such as fires, fights, riots, or other emergency, as directed.

67. MCSO requires its Detention Deputies to "[b]e alert for conditions or situations, which inhibit efficient operation of the Agency or the Corrections Bureau, and make recommendations for solutions."

68. MCSO's formal policies, as documented in the Marion County Jail Inmate Rules and Regulations Handbook, classify assault, attempted assault, battery, and attempted battery as Class A violations of facility rules and regulations.

69. Class A violations of facility rules and regulations are considered the most severe, according to the Marion County Jail Inmate Rules and Regulations Handbook.

70. Class A violations of facility rules and regulations are subject to the highest level of discipline compared to other violations, according to the Marion County Jail Inmate Rules and Regulations Handbook.

71. Class A violations of facility rules and regulations carry a potential disciplinary penalty of "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," according to the Marion County Jail Inmate Rules and Regulations Handbook.

72. Despite MCSO's formal policies purporting to consider assault, attempted assault, battery, and attempted battery among the most serious violations of facility rules and regulations subject to the highest level of discipline, MCSO

and its correctional staff almost never disciplined inmates who committed such violations.

73. Despite MCSO's formal policies purporting to consider assault, attempted assault, battery, and attempted battery among the most serious violations of facility rules and regulations subject to the highest level of discipline, MCSO and its correctional staff consistently fail to address such incidents.

74. Despite MCSO's formal policies purporting to consider assault, attempted assault, battery, and attempted battery among the most serious violations of facility rules and regulations subject to the highest level of discipline, MCSO and its correctional staff fail to implement procedures assuring the adequate supervision of inmates.

75. Despite MCSO's formal policies purporting to consider assault, attempted assault, battery, and attempted battery among the most serious violations of facility rules and regulations subject to the highest level of discipline, MCSO and its correctional staff fail to implement procedures assuring the adequate supervision of particularly violent inmates.

76. Despite MCSO's formal policies purporting to consider assault, attempted assault, battery, and attempted battery among the most serious violations of

facility rules and regulations subject to the highest level of discipline, MCSO and its correctional staff fail to implement procedures assuring the adequate supervision of particularly violent pods and dorms.

### a. MCSO has maintained a widespread custom and practice of failing to supervise inmates and prevent violent attacks for years.

77. On February 4, 2018, Defendant Miller informed his lieutenant that he "was having difficulty with cell checks."

78. Upon review of this report, the Lieutenant found that Defendant Miller along with Deputy Savage were late conducting checks a total of six times on one shift.

79. Upon review of this report, the Lieutenant found that Defendant Miller along with Deputy Savage were found to have violated MCSO policies, but they did not receive any discipline.

80. In October 2018, an independent monitor released a report titled "Analysis of Security and Operational Functions," which detailed the ways in which MCSO's policies and procedures were leading to the introduction and distribution of contraband, diminished safety and security within the facility, and inmate and staff injury or death.

81. In developing the 2018 Analysis of Security and Operational Functions, the independent monitor conducted a review of policies that pertained to internal and external movement of inmates, perimeter security, employees, vendor and volunteer access to the facilities, and search procedures.

82. The 2018 Analysis of Security and Operational Functions outlined areas in which weaknesses pertaining to the scope of the project were identified and provided recommendations to improve correctional practices as they relate to inmate safety and security in the MCJ.

83. The 2018 Analysis of Security and Operational Functions noted "common themes" which related to the introduction and spread of contraband at MCJ, including "insufficient staffing, unsupervised inmate movement, inadequate or conflicting policies, and processes that are not addressed in policy."

84. The 2018 Analysis of Security and Operational Functions noted that MCSO was not utilizing a system to handle inmate requests and grievances.

85. The 2018 Analysis of Security and Operational Functions fount the staffing levels at the MCJ to be "woefully low."

86. On November 10, 2018, an independent monitor found that the Marion County Jail had a suicide rate of 63.8 deaths per 100,000 inmates—a rate that is higher than that of county jails of varying size throughout the United States.

87. On November 10, 2018, an independent monitor found that MCJ's high frequency of suicide was, in part, attributable to concerns relating to observation of suicidal inmates and staffing deficiencies.

88. On March 8, 2019, David Dillberg and approximately ten other inmates staged a walkout in their Pod of the MCJ, in which they protested the rampant violence in the MCJ.

89. On March 21, 2019, David Dillberg went before the Marion County Board of Commissioners and MCSO Major Bowen and explained that he and approximately ten other inmates had been complaining for three to four weeks to jail personnel that they were in fear of injury and death due to violence by other inmates.

90. On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that he and approximately ten other individuals had complained frequently of their fear regarding violence

within the jail, but never received contact from a Sergeant regarding their concerns.

91.  On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that on March 8, 2019, he and approximately ten other individuals left their dorm as a group during medication call, and asked for asylum, safety, and to be moved to another housing unit.

92.  On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that when he and approximately ten other individuals expressed their concern regarding inmate violence during the March 8, 2019, medication call, their requests were refused and met with riot spray.

93.  On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that inmate safety was a serious, chronic, jail-wide issue.

94.  On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that he had personally been jumped while in jail and had lost a tooth.

95. On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that he had personally witnessed several serious injuries, including one in which a man was hospitalized with a severe head injury.

96. On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that after witnessing another inmate be hospitalized with a severe head injury, he had to mop the excess blood from the floor.

97. On March 21, 2019, David Dillberg shared with the Marion County Board of Commissioners and MCSO Major Bowen that after witnessing another inmate be hospitalized with a severe head injury, the perpetrator was never removed from the cell.

98. On March 22, 2019, former Marion County bail-bondswomen Cathee Wyckoff sent an email to the Marion County Board of Commissioners recounting the March 21, 2019, County Commission Meeting and reiterated her own concerns about safety in the jail.

99. Neither the Marion County Board of Commissioners, Sheriff Woods, nor Major Bown took steps to address the concerns noted by Dillberg and others in March 2019.

100. The County Board of Commissioners makes policy decisions regarding the MCSO and MCJ and was aware of the chronic inmate-on-inmate violence issues at MCJ.

101. Sheriff Billy Woods was aware of matters brought to the attention of the County Board of Commissioners as they relate to the MCSO and MCJ.

102. Sheriff Billy Woods was aware of the complaints made by Dillberg at the March 21, 2019 County Board Meeting.

103. Sheriff Billy Woods was aware of the incident involving David Dillberg and other

104. On July 30, 2019, two inmates, Juan Pagan-Ayala and Cecil Eugene Wryals, beat and sexually assaulted another inmate for approximately fifteen minutes while two other inmates stood watch and no MCSO staff member intervened.

105. The attack by Pagan-Ayala and Wryals was partly captured on surveillance video.

106. The attack by Pagan-Ayala and Wryals was in view of the MCSO deputies on duty, but the officers failed to intervene.

107. The attack by Pagan-Ayala and Wryals was in view of the MCSO deputies on duty, but the deputies' failure to adequately supervise the dorm allowed the victim to be physically and sexually violated for an entire fifteen minutes.

108. The victim of the July 30, 2019, attack was transported to a hospital with a swollen black eye, a swollen right hand, missing teeth, and broken ribs.

109. No MCSO deputy was disciplined for failing to intervene in the June 30, 2019 attack.

110. No MCSO deputy was disciplined for failing to supervise on the day of the June 30, 2019 attack.

111. On March 24, 2020, Deputy Courtney Washington witnessed inmate John McDowell strike Cory Merchant in the face with a closed fist.

112. John McDowell only received a Disciplinary Report for his attack on Cory Merchant and was not moved from Gulf Pod or otherwise separated from other inmates.

113. McDowell did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation as punishment for the attack.

114. On March 31, 2021, Defendant Kosinski received a note saying that MCJ Inmate John Servo was attacked by a gang in Gulf Pod.

115. Upon review of the dorm's video footage, investigators found that MCJ Inmates Blake Arron, Chauncey Johnson, Reshaud Mcfadden, Jamale Whitaker, Fritz Mcgee, Victor Colding, Xavier Laforutune, Terrence Byners, and Jackeith Boyd had attacked Servo, causing redness around his neck, abrasions, and cuts on his face.

116. Neither Defendant Kosinski nor any other MCSO agent or employee noticed the attack on Servo until Servo himself made them aware after the fact because Defendant Kosinski had not been supervising the inmates in Gulf Pod.

117. Neither Defendant Kosinski nor any other MCSO agent or employee attempted to stop or otherwise intervene in the attack.

118. Neither Defendant Kosinski nor any other MCSO agent or employee was disciplined for failure to intervene on the attack or failure to protect Servo.

119. Servo's attackers received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation as punishment for the attack.

120. On December 1st, 2012, prior to Billy Woods becoming Sheriff, Defendant Kosinski received a Letter of Reprimand that stated the following:

> "Officer Kosinski, on December 1st, 2012, you were assigned as a F-Pod Officer. At approximately 0445 hours, Inmate Malcolm Barnett reported to you that he had been battered by another inmate and was in need of medical attention. You then witnessed the inmate being ordered to return to his bunk and you neglected to ensure medical attention was received. You also failed to initiate an incident report or report the incident to a supervisor. Inmate Barnett then sought medical attention from the following shift and ended up housed in the infirmary due to the severity of his injuries.

Operational Directive1068.04 (A) states "Actions or lack of actions on the part of any employee which are prejudicial to the proper performance of the functions of the Agency are considered dereliction of duty, and are cause for disciplinary action up to and including dismissal. Dereliction of duty includes, but is not limited to:" (3) Failure to properly document incidents required by law or rules and regulations of the Agency, and (7) Neglect of duty.

This Letter of Reprimand is a direct result of your failing to adhere to Operational Directive 1068.04(A), (3) by failing to initiate an incident report pertaining to this incident, (7) by not ensuring the inmate received timely medical attention, and by not informing a supervisor of the situation. In the future, I strongly recommend that you keep yourself familiar with the Policies and Procedures of the Marion County Sheriff's Office and always consider the consequences of your actions and inactions."

121. On April 11, 2020, Cory Merchant filed an Inmate Request Form, in which he requested the MCSO place "keep-aways" on three other inmates Derick Beard, Kenya Franklin, and Michale Young, "[d]ue to incidents" on April 10, 2020 and April 11, 2020.

122. No MCSO agent or employee took any reasonable steps to protect Merchant from his reported fear of being subjected to violence by other inmates.

123. On June 29, 2020, Inmate Walter Summers hit Cory Merchant in Gulf Pod, causing him to go to the infirmary.

124. After Cory Merchant informed MCSO deputies that Inmate Summers had attacked him, the two inmates were placed back into Gulf Pod together.

125. On April 11, 2021, Cory Merchant filed an Inmate Request Form stating, "I have been trying to get keep aways on several inmates […]" and listed Zachary Maketis, Benjamin Martin, and Anthony Warren.

126. MCSO agents and employees never placed "keep aways" on any inmate from Cory Merchant.

127. On May 7, 2021, Sergeant Dukes listened to a phone call by Cory Merchant to the Marion County Crime Stoppers Hotline stating that he believed everyone in his dorm was going to hurt him if he went to sleep.

128. Neither Defendant Dukes nor any other MCSO agent or employee followed up, investigated, or took otherwise reasonable steps to address Cory Merchant's May 7, 2021 phone call or who was making Cory fear for his life.

> **b. Given the conditions existing in the MCJ in the months preceding Cory Merchant's death, it was plainly foreseeable that a violent attack was likely to occur.**

129. In the three months prior to Cory Merchant's death, dozens of fights, altercations, and attacks occurred in Gulf Pod, making it plainly foreseeable that a violent attack—like the one that killed Cory Merchant—was likely to occur.

130. Terry Place, a former detainee in Gulf Pod who was housed in the same section as Cory Merchant, testified via affidavit that fights occurred in Gulf Pod approximately four to five times per week.

131. Guards themselves encouraged fighting between inmates.

132. In March of 2023, an inmate, whose name is unknown, approached the door of Echo Pod's rover area and begun to bang on the door.

133. MCSO Deputies Nelson and McClure initially ignored the inmate.

134. The unnamed inmate continued to bang on the door.

135. After the inmate continued to bang on the door, one of the officers looked at the other and said, "should we let him in?"

136. The other officer said "Yeah, I guess."

137. The unnamed inmate explained that another inmate was going to kill him.

138. The deputies asked him about why an inmate was trying to kill him.

139. The unnamed inmate responded "nothing, they're trying to say I owe them money."

140. The deputies respond that the next time the unnamed inmate should pay up.

141. Deputies Nelson and McClure did not investigate the unnamed inmate's allegations or take any steps to protect the unnamed inmate.

142. Steven Murphy, a former detainee and trustee at the jail, testified via affidavit that he witnessed the incident described in ¶¶ 132-141 and that similar occurrences were common.

143. Steven Murphy, a former detainee and trustee at the jail, testified via affidavit that he often heard conversations between guards where they said things like, "I heard [so-and-so] inmate got his ass beat last night," and "Oh, we had another fight last night."

*August 8, 2021, Tyler Langston*

144. On August 8, 2021, MCJ Inmate Tyler Langston stepped out of Gulf Pod to inform Deputy John Frye that he had been "jumped."

145. Langston was escorted to the infirmary upon notifying Frye of the attack.

146. Langston was attacked at 12:13 a.m., during lockdown, while in his bunk.

147. Officer Frye reviewed the camera footage and saw that MCJ Inmates Ladeldrick Brown, Christopher Graves, Brandon Barnes, and Ryan Robert left their bunks during lockdown, approached Inmate Langston in his bunk, and punched him repeatedly.

148. Following the attack on August 8, 2021, Brown, Graves, and Barnes were rehoused in Gulf Pod, in the same open-dorm section as Cory Merchant.

149. Brown, Graves, and Barnes received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

150. No MCSO agent or employee learned of the attack on Langston until after Langston notified Officer Frye.

151. No MCSO agent or employee learned of the attack on Langston until after Langston notified Officer Frye because no MCSO agent or employee had been supervising the inmates.

152. No MCSO agent or employee attempted to stop or otherwise intervene in the attack on Langston.

153. Neither Deputy Frye nor any other MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod on August 8, 2021.

154. Neither Deputy Frye nor any other MCSO agent or employee was disciplined for failing to intervene in the fight in Gulf Pod on August 8, 2021.

*August 15, 2021, Derek Wright and David Woods*

155. On August 15, 2021, Deputy James "was alerted to an altercation" in Gulf Pod.

156. After learning of the altercation, Deputy James "observed multiple inmates dispersing from an apparent fight," and saw that MCJ Inmates Derek Wright and David Woods were bleeding.

157. Upon reviewing the footage of the altercation, Officer James saw that he could not identify all the inmates in the altercation.

158. No inmate, including Woods and Wright, were disciplined for the altercation occurring on August 15, 2021.

159. No inmate, including Woods and Wright, received a disciplinary report, "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," nor any other discipline consistent with a Class A Rule Violation.

160. Neither Deputy James nor any other MCSO employee or agent was disciplined for failing to supervise the inmates in Gulf Pod on August 15, 2021.

161. Neither Deputy James nor any other MCSO employee or agent was disciplined for failing to intervene in the August 15, 2021 fight.

### *August 19, 2021, Cory Merchant*

162. On August 19, 2021—approximately two and a half months before Cory Merchant's death—MCSO deputies heard banging on the door in the pod where Cory Merchant was housed.

163. Upon entering the section, inmates were yelling "man down."

164. MCSO Deputies Potts and Nelson arrived and found Cory Merchant
unresponsive.

165. No MCSO agent or employee conducted an investigation into the cause of
Cory Merchant's condition.

166. No MCSO agent or employee was adequately supervising Cory Merchant's
Pod at the time, so the deputies were not able to respond to the incident
until other inmates informed them of Cory Merchant's condition by banging
on the door.

167. No inmate involved in the August 19, 2021, incident, in which Cory
Merchant was found unresponsive, received "[t]hirty (30) days in
disciplinary confinement (DC), and/or loss of all Meritorious Gain
Time/Work Time, and/or loss of all or some privileges," or any other
discipline consistent with a Class A Rule Violation.

168. No MCSO agent or employee was disciplined for failing to supervise Gulf
Pod on August 19, 2021.

169. No MCSO agent or employee was disciplined for failing to respond to the emergency affecting Cory Merchant on August 19, 2021.

170. Eric Lutterloah was incarcerated at MCJ and present in Gulf Pod on August 19, 2021, when Cory Merchant experienced the "man down" emergency.

*August 24, "Unconscious/Not Alert"*

171. On August 24, 2021, emergency medical services were required at the jail to an inmate's "Unconscious/Not Alert" according to a call log[1] recording calls from the MCJ requesting emergency services between January 1, 2017, and September 25, 2023.

172. There is no incident report or other document created by MCSO agents or employees documenting the occurrence which necessitated the August 24, 2021 call for emergency medical services.

173. No inmate involved in the August 24, 2021 "Assault/Sexual Assault" received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of

---

[1] The call log referenced in ¶¶ 171, 174, 211, 220, 257 contains omissions and inaccuracies regarding serious medical emergencies that occurred at the MCJ as a result of inmate-on-inmate violence, including Eric Lutterloah's attack on Cory Merchant on November 7, 2021, which required medical services to be called but is not logged as an Assault or Traumatic Injury in the call log. The call log necessarily omits all inmate-on-inmate violence of which MCSO, Sheriff Woods, and MCSO deputies were aware but for which emergency medical services were not requested.

all Meritorious Gain Time/Work Time, and/or loss of all or some privileges,"

or any other discipline consistent with a Class A Rule Violation.

### August 29, "Traumatic Inj/Not Alert"

174. On August 29, 2021, emergency medical services were required at the jail for

an inmate's "Traumatic Inj[ury]/Not Alert" according to a call log recording

calls from the MCJ requesting emergency services between January 1, 2017,

and September 25, 2023.

175. There is no incident report or other document created by MCSO agents or

employees documenting the occurrence which necessitated the August 29,

2021, call for emergency medical services.

176. No inmate involved in the August 29, 2021 "Traumatic Inj[ury]/Not Alert"

received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of

all Meritorious Gain Time/Work Time, and/or loss of all or some privileges,"

or any other discipline consistent with a Class A Rule Violation.

### September 8, 2021, Vonkeith Barnes and Scott King

177. On September 8, 2021, Scott King approached MCSO Deputy Joe Phillips

and informed him that he had been involved in a fight with MCJ Inmate

Vonkeith Barnes.

178. Officer Phillips' report of the fight contained no details about who caused the fight to occur and what the injuries were.

179. No MCSO agent or employee learned of the "fight" between King and Barnes until King informed Officer Phillips.

180. No MCSO agent or employee learned of the "fight" between King and Barnes until King informed Officer Phillips because no MCSO agent or employee was supervising the inmates in Gulf Pod.

181. No MCSO agent or employee attempted to stop or otherwise intervene in the fight between King and Barnes.

182. Barnes and King received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

183. No MCSO agent or employee was disciplined for failing to supervise Gulf Pod on September 8, 2021.

184. No MCSO agent or employee was disciplined for failing to intervene in the physical altercation that occurred between King and Barnes in Gulf Pod on September 8, 2021.

*September 10, David Eaton*

185. On September 10, 2021, Inmate Randy Cuntiz struck MCJ Inmate David Eaton multiple times in Gulf Pod.

186. MCJ Inmate David Eaton suffered bruising on the left side of his face due to the attack.

187. Cuntiz received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

188. No MCSO agent or employee was disciplined for failing to supervise inmates on September 10, 2021.

*September 10, Travis Harpst*

189. On September 10, 2021, Inmate Travis Harpst was approached by three other inmates, Vernon Smith, Deshaun Bonner, and Joelle Hankes, in Gulf Pod.

190. Harpst began to back up towards the wall as the three inmates approached him.

191. Smith then attacked Harpst, punching him repeatedly about the head and upper body.

192. Harpst attempted to flee, at which time Bonner reached out and took hold of Harpst's canteen bag directly below his hand, attempting to take it from him as he attacked.

193. Smith followed Harpst, continuing to follow him as he fled toward the section door, punching him in the back and head as he went.

194. No MCSO agent or employee noticed Smith, Bonner, and Hankes' attack on Harpst or any of the events immediately preceding the attack, until after it had occurred.

195. No MCSO agent or employee noticed Smith, Bonner, and Hankes' attack on Harpst or any of the events immediately preceding the attack, until after it had occurred because no MCSO agent or employee was supervising the inmates in Gulf Pod.

196. No MCSO agent or employee made any attempt to stop or otherwise intervene in Smith, Bonner, and Hankes' attack on Harpst or any of the events immediately preceding the attack.

197. No MCSO agent or employee learned of the attack until at least three days later.

198. Due to the attack, Harpst suffered bruising around both eyes and lacerations to both lips.

199. No inmate involved in the attack on Harpst received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

200. No MCSO agent or employee was disciplined for failing to supervise inmates on September 10, 2021.

201. No MCSO agent or employee was disciplined for failing to intervene in the attack on Harpst that occurred on September 10, 2021.

*September 10, 2021, Anthony Erksine and Randall Pfettsccher*

202. On September 10, 2021, MCJ Inmates Randal Pfesttscher and Anthony Erskine were attacked by multiple other inmates.

203. No MSCO agent or employee learned about the attack on Erskine or Pfettscher until Erksine notified a deputy.

204. No MSCO agent or employee learned about the attack on Erskine or Pfettscher until Erksine notified a deputy because no MCSO agent or employee was supervising the inmates in Gulf Pod at the time.

205. Erksine received multiple facial bruises due to the attack.

206. No MCSO agent or employee investigated the attack on Erksine and Pfettscher.

207. No inmate involved in the attack on Erksine and Pfettscher received any discipline, including "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or

some privileges," or any other discipline consistent with a Class A Rule Violation.

208. No MCSO agent or employee made any attempt to stop or otherwise intervene in the attack on Erksine and Pfettscher

209. No MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod on September 10, 2021.

210. No MCSO agent or employee was disciplined for failing to intervene in the attack on Erksine and Pfettscher in Gulf Pod on September 10, 2021.

### *September 12, 2021, "Assault/Sexual Assault"*

211. On September 12, 2021, emergency medical services were required at the jail to an inmate's "Assault/Sexual Assault," according to a call log recording calls from the MCJ requesting emergency services between January 1, 2017, and September 25, 2023.

212. There is no incident report or other document created by MCSO agents or employees documenting the occurrence which necessitated the September 12, 2021 call for emergency medical services.

213. No inmate involved in the September 12, 2021 "Assault/Sexual Assault" received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

*September 25, 2021, Bronck Price and Frank Rogers*

214. On September 25, 2021, MCJ Inmates Bronck Price and Frank Rogers engaged in a physical altercation that resulted in Price receiving a nosebleed and Rogers receiving a scratch to the right cheek.

215. After the fight between Price and Rogers, Price was moved to Bravo Pod, another dorm-style section of housing at MCJ.

216. After the fight between Price and Rogers, Rogers was returned to Gulf Pod.

217. Price and Rogers received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

218. No MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod on September 25, 2021.

219. No MCSO agent or employee was disciplined for failing to intervene in the attack on Erksine and Pfettscher in Gulf Pod on September 25, 2021.

### September 30, 2021, "Assault/Sexual Assault"

220. On September 30, 2021, emergency medical services were required at the jail to an inmate's "Assault/Sexual Assault," according to a call log recording calls from the MCJ requesting emergency services between January 1, 2017, and September 25, 2023.

221. There is no incident report or other document created by MCSO agents or employees documenting the occurrence which necessitated the September 30, 2021 call for emergency medical services.

222. No inmate involved in the September 30, 2021 "Assault/Sexual Assault" received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

### October 4, 2021, Orona-Saez

223. On October 4, 2021, MCJ Inmate Orona-Seaz knocked on the door of Gulf Pod to alert the supervising MCSO deputy that he had been struck in the face by MCJ Inmate Damen Bolinger.

41

224. Bolinger received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation as punishment for his attack on Mr. Orona-Saez.

225. After the attack, Orona-Saez was placed in an infirmary cell, but Bolinger was cleared to return to the same dorm-style pod.

226. No MCSO agent or employee learned of Bolinger's attack on Orona-Saez until Orona-Saez himself alerted a deputy.

227. No MCSO agent or employee learned of Bolinger's attack on Orona-Saez until Orona-Saez himself alerted a deputy because no MCSO agent or employee was supervising the inmates in Gulf Pod at the time.

228. No MCSO agent or employee intervened in the attack on Orona-Saez.

229. No MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod on October 4, 2021.

230. No MCSO agent or employee was disciplined for failing to intervene in Bolinger's attack on Orona-Saez in Gulf Pod on October 4, 2021.

*October 8, 2021, Kenneth Maxwell*

231. On October 8, 2021, MCJ Inmate Joseph Smith struck MCJ Inmate Kenneth Maxwell in the face several times with closed fists, pushed him on the floor, and continued striking him.

232. Smith did not receive a disciplinary report for attacking Maxwell nor did he receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation as punishment for his attack on Mr. Padilla-Diaz.

233. After the attack, Smith was rehoused in Foxtrot Pod, another dorm-style pod.

234. No MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod on October 8, 2021.

235. No MCSO agent or employee was disciplined for failing to intervene in Smith's attack on Maxwell in Gulf Pod on October 8, 2021.

*October 9, 2021, Jimmy Gray*

236. On October 9, 2021, MCJ Inmate CJ Mullins approached MCJ Inmate Jimmy Gray in Gulf Pod, threw food from his tray across the day room area, then struck Mr. Gray three times.

237. After being attacked by Mullins, Gray suffered injuries warranting transport to the infirmary.

238. Defendant Kosinski was on duty and tasked with monitoring Gulf Pod on the morning of Mullins' attack on Gray.

239. Neither Defendant Kosinski nor any other MCSO agent or employee noticed Mullins' attack Gray, or any of the events immediately preceding the attack, until after it had occurred when MCSO agents reviewed camera footage of the pod.

240. Neither Defendant Kosinski nor any other MCSO agent or employee attempted to stop or otherwise intervene in Mullins' attack on Gray.

241. Mullins received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain

Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

242. Neither Defendant Kosinski nor any other MCSO agent or employee was disciplined for failing to supervise in relation to the October 9, 2021 incident involving CJ Mullins.

243. Neither Defendant Kosinski nor any other MCSO agent or employee was disciplined for failing to intervene in the October 9, 2021, incident involving CJ Mullins.

### *October 18, John Brinson and Sylvester Johnson*

244. On October 18, 2021, two MCSO officers heard yelling coming from Gulf Pod, entered the dorm, and found two MCJ inmates, John Brinson and Sylvester Johnson, in a physical altercation.

245. Upon hearing fighting in the cell, Deputy Schweitzer called for assistance.

246. Deputy Schweitzer could not intervene in the fight until another Deputy arrived.

247. Once Deputy Thomas arrived, he and Deputy Schweitzer entered Gulf Pod, and the inmates stopped fighting.

248. Brinson and Johnson were returned to housing in an open-dorm section.

249. Brinson and Johnson received a disciplinary report but did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

250. No MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod in relation to the October 18, 2021, incident involving Brinson and Johnson.

### November 1, John Goodall

251. On November 1, 2021, six days prior to Eric Lutterloah's attack on Cory Merchant, emergency medical services were required at the jail due to an inmate's "Assault/Sexual Assault," according to a call log recording calls from the MCJ requesting emergency services between January 1, 2017, and September 25, 2023.

252. On November 1, 2021, inmate John Goodall was found lying on the floor of Gulf Pod after another inmate punched him.

253. John Goodall suffered a black eye and head injury that required him to be taken to the infirmary after the November 1, 2021, attack.

254. No MCSO agent or employee became aware that another inmate was attacking John Goodall until after Mr. Goodall had already sustained his injuries, and the attack was over.

255. No MCSO agent or employee was disciplined for failing to supervise inmates in Gulf Pod in relation to the November 1, 2021, incident involving Goodall.

256. No MCSO agent or employee was disciplined for failing to intervene to stop the November 1, 2021, incident involving Goodall.

### *November 5, "Traumatic Injury"*

257. On November 5, 2021, two days prior to Eric Lutterloah's attack on Cory Merchant, emergency medical services were required at the jail due to an inmate's "Traumatic Injury," according to a call log recording calls from the MCJ requesting emergency services between January 1, 2017, and September 25, 2023.

258. There is no incident report or other document created by MCSO agents or employees documenting the occurrence which necessitated the November 5, 2021 call for emergency medical services.

259. No inmate involved in the November 5, 2021 "Traumatic Injury" received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

260. November 5, 2021, was a Friday.

### c. MCSO and its deputies allowed Eric Lutterloah to terrorize Gulf Pod without fear of intervention or retribution.

261. Eric Lutterloah, the inmate who attacked and killed Cory Merchant, had a reputation for extreme violence and unpredictability in the MCJ.

262. Eric Lutterloah is 5'11" and approximately 200 pounds.

263. Prior to the relevant incarceration at Marion County Jail, Mr. Lutterloah had been convicted of a violent sexual battery and was facing new charges for kidnapping and sexual battery.

264. Eric Lutterloah was so notorious for violence in the jail that MCSO deputies would deputize him to deal with disobedient or unruly inmates in Gulf Pod.

265. Terry Place, a former inmate that the Marion County Jail, has testified via affidavit that on multiple occasions, he witnessed an MCSO deputy encouraging Lutterloah to be violent towards other inmates.

266. Lutterloah would frequently pick fights and engage in violence against other inmates.

267. Terry Place, a former inmate at the Marion County Jail, has testified via affidavit that on multiple occasions, he witnessed another guard saying to Lutterloah, "take care of business, Lutterloah," in reference to another inmate.

268. Approximately one week before Cory Merchant was killed, Eric Lutterloah escalated a verbal altercation and attacked another inmate, Benjamin Furr, causing a fat lip and facial laceration.

269. No Defendant or other agent of MCSO, including Defendants, subjected Eric Lutterloah to any discipline consistent with a Class A Violation, such as disciplinary confinement, loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privilege, after he attacked Mr. Furr.

270. No Defendant or other agent of MCSO, including Defendants, subjected any of the inmates who attacked Cory Merchant prior to his death to any discipline consistent with a Class A Violation, such as disciplinary confinement, loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges.

### d. There is a policy and practice at MCSO of failing to enforce "lockdown."

271. MCSO implements a policy requiring inmates to remain in their bunk during a period called "lockdown," which occurs from approximately 10 p.m. to 5:30 a.m.

272. MCSO's policy regarding lockdown states as follows: "Each night at approximately 9:45 P.M., "Lockdown" will be announced by a Detention Deputy. By 10:00 P/M. you are ordered to stand by your assigned cell/bunk. The Detention Deputy's will conduct a headcount at this time and secure you in your cell. All cell lights must be off by 10:00 P.M. Inmates in open by housing are to be on their bunk by 10:00 P.M. No inmates are to get off their bunk during lockdown except to use the bathroom. All lights will be turned off and excessive noise will not be tolerated. Lights are turned on at

approximately 5:30 A.M. At this time, you are to get ready for breakfast with starts at approximately 6:00 A.M."

273. There is a custom and practice amongst MCSO correctional staff of failing to enforce lockdown.

274. There is a custom and practice amongst MCSO correctional staff of allowing inmates to mill around their open dorms during lockdown without supervision.

275. There is a custom and practice amongst MCSO correctional staff of disregarding their duty to supervise inmates during lockdown and instead engage in recreational activities while on duty, such as watching YouTube videos on the MCSO computer.

276. In the months preceding his death, the inmates in Cory Merchant's dorm of Gulf Pod engaged in what MCJ inmates referred to as Friday Night Fight Nights.

277. Friday Night Fight Nights were a weekly event in which, after the inmates in Cory Merchant's dorm went on lockdown, they would engage in physical altercations with one another.

278. Each Friday Night Fight Night would involve at least two inmates engaging in a physical and violent altercation with one another.

279. MCSO deputies, including Defendants, were aware of Friday Night Fight Nights and did not attempt to stop them or otherwise intervene.

280. Terry Place, a former detainee housed in Gulf Pod with Cory Merchant, testified that MCSO deputies usually did not make any effort to stop Friday Night Fight Nights, and the few times that the did involved them coming into the pod, telling the inmates to stop, the leaving.

281. On the few occasions that an MCSO deputy did tell the inmates to stop fighting on Friday Night Fight Nights, the inmates would resume their fighting after the deputy left and would not receive any discipline.

282. Inmates were able to engage in Friday Night Fight Nights without discipline despite such activity requiring them to commit Class A Rule Violations.

283. The only times that any inmate was disciplined for engaging in Friday Night Fight Nights was after a fight escalated to such severity that emergency medical services needed to be called.

284. No inmate involved in Friday Night Fight Nights received "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation.

285. Inmates were able to engage in Friday Night Fight Nights without discipline despite such activity requiring them to violate lockdown rules.

### e. Cory Merchant's death

286. On November 7, 2021, at approximately 1:10 a.m., inmates living in Gulf Pod were supposed to be on lockdown, meaning that they were not supposed to leave their bunks except to use the bathroom.

287. Despite Gulf Pod being on lockdown, multiple inmates were meandering throughout the pod, out of their bunks around 1:08 a.m. on November 7, 2021.

288. Defendants Kosinski, Miller, and Savage knew that inmates were walking around Gulf Pod when they were supposed to be on lockdown in their bunks on November 7, 2021, including at approximately 1:08 a.m.

289. Defendants Kosinski, Miller, and Savage allowed inmates to walk around Gulf Pod when they were supposed to be on lockdown in their bunks on November 7, 2021, including at approximately 1:08 a.m.

290. Defendants Kosinski, Miller, and Savage did nothing to enforce lockdown on November 7, 2021, including at approximately 1:08 a.m.

291. One of the inmates out of their bunks during lockdown on November 7, 2021, including at approximately 1:08 a.m., was Eric Lutterloah.

292. At approximately 1:08 a.m. on November 7, 2021, Eric Lutterloah approached Cory Merchant and initiated a verbal altercation.

293. At approximately 1:08 a.m. on November 7, 2021, despite being required to oversee Gulf Pod and having the ability to see and hear into the pod, Defendants Kosinski, Miller, and Savage did nothing to intervene in the verbal altercation initiated by Lutterloah.

294. At approximately 1:09 a.m. on November 7, 2021, Lutterloah escalated his verbal altercation with Merchant to the physical, striking Merchant in the facial area.

295. Defendants Kosinski, Miller, and Savage did nothing to intervene in the physical altercation initiated by Lutterloah.

296. At approximately 1:09 a.m. on November 7, 2021, Lutterloah struck Merchant at least two more times.

297. Upon being struck by Lutterloah a third time, Merchant fell to the floor, hit his head on the concrete, and began to bleed out.

298. Upon Merchant falling to the floor, Defendants Kosinski, Miller, and Savage did not leave the rover's area.

299. Upon Merchant falling to the floor, Defendants Kosinski, Miller, and Savage did enter Merchant's dorm.

300. Nearby inmates heard Merchant's skull crack when it hit the concrete.

301. After Merchant fell to the floor, many other inmates got out of their bunks.

302. Inmates continued to walk around the dorm and observe Cory Merchant, who lay on the floor, between 1:09 a.m. and 1:11 a.m.

303. As Merchant bled out on the floor, another inmate ran to the rover's area, knocked on the door, and pleaded Defendants Kosinski and Miller to assist.

304. It was not until an inmate went and spoke to Defendant Kosinski at approximately 1:11 a.m. that and MCSO agent or employee entered Gulf Pod to assist in the attack on Cory Merchant.

305. Defendant Kosinski walked slowly from the rover's area with no sense of urgency towards the area where Merchant lay, bleeding out.

306. Defendant Kosinski did not render medical attention to Merchant.

307. Defendant Kosinski radioed for backup and medical personnel.

308.  At approximately 1:14 a.m., other officers and medical personnel arrived, but entered Gulf Pod with little sense of urgency, walking slowly toward the dying Cory Merchant.

309. At approximately 1:15 a.m., Merchant was carried out on a stretcher and taken to the hospital.

310. Merchant remained in the hospital unresponsive for several days until he finally passed away on November 13, 2021.

### f. MSCO's deputies engage in wanton violence of their own, fostering the widespread custom and culture of unnecessary violence throughout the jail.

311. Terry Place, a former inmate at MCJ, testified via affidavit that approximately three months before Cory Merchant was killed, he witnessed MCSO Deputy push an inmate so hard in Gulf-Alpha that the inmate was flung across the table.

312. Steven Murphy, a former inmate at MCJ, testified via affidavit that he witnessed Sergeant Dukes, threaten inmates with physical violence often.

313. Sergeant Jerome Dukes pepper-sprayed an inmate without provocation on at least one occasion.

314. Sergeant Dukes frequently came into Gulf Pod and threatened to kill all the inmates.

315. Sergeant Dukes would frequently say to inmates "I am a military veteran and I have no problem killing you," and other iterations to that effect.

316. On October 5, 2016, an elderly inmate filed a complaint that Dukes punched him in the chest, causing bruising.

317. Defendants had a duty and responsibility to protect inmates at MCJ, including Cory Merchant, from violence at the hands of other prisoners.

   g. *Excessive violence continues to plague the Marion County Jail, even after it caused Cory Merchant's death.*

318. After Lutterloah killed Cory Merchant, he was returned to Gulf Pod.

319. Within two months of killing Cory Merchant, Eric Lutterloah attacked another inmate named Chucky.

320. Eric Lutterloah attacked Chucky so severely that he broke Chucky's jaw.

321. Eric Lutterloah attacked Chucky so severely that Chucky required a feeding tube.

322. After Cory's death, inmate Frank Calabria told investigators that "it is not uncommon for fights to occur, and it is common for the inmates to clean up afterwards."

323. On November 8, 2021, the day after the attack on Cory Merchant, Inmate Daunte Pruitt attacked Inmate Padilla-Diaz by striking him in the upper back then proceeding to body slam him, causing Mr. Padilla-Diaz to hit the back of his head on the floor, blead onto the concrete, and be carried out by a stretcher.

324. No MCSO agent or employee noticed Pruitt attacking Padilla-Diaz until other inmates alerted the deputy on duty that the attack had just occurred.

325. No MCSO agent or employee stopped or otherwise intervened in Pruitt's attack on Padilla-Diaz.

326. Pruitt did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation as punishment for his attack on Mr. Padilla-Diaz.

327. Immediately after attacking Padilla-Diaz in a dorm-style pod, Pruitt was placed back into a dorm-style pod.

328. No MCSO employee or agent was disciplined for failing to protect Padilla-Diaz.

329. No MCSO employee or agent was disciplined for failing to stop or intervene in the attack on Padilla-Diaz.

330. On November 14, 2021, one day after Cory Merchant's death, inmates Kenneth Duerson and David Pollard were permitted to leave their bunks during lockdown.

331. While out of their bunks during lockdown, Duerson and Pollard struck Van Edwards in his sleep, causing him to bleed from his right ear.

332. Duerson and Pollard did not receive "[t]hirty (30) days in disciplinary confinement (DC), and/or loss of all Meritorious Gain Time/Work Time, and/or loss of all or some privileges," or any other discipline consistent with a Class A Rule Violation as punishment for his attack on Mr. Padilla-Diaz.

333. No MCSO employee or agent was disciplined for failing to protect Edwards.

334. No MCSO employee or agent was disciplined for failing to stop or intervene in the attack on Edwards.

**Count 1: 42 U.S.C. 1983, Fourteenth Amendment Due Process Rights**
*against Defendants Kosinski, Miller & Dukes*

335. Plaintiff incorporates and re-alleges paragraphs 1 through 334 above as if fully set forth herein.

336. Cory Merchant, as well as the other detainees at MCJ, had a constitutional right to be protected from the constant threat of violence from physical assault by other inmate.

337. Defendants Kosinski, Miller, and Dukes knew that, at the time of Cory Merchant's death, the following conditions, independently and collectively, posed a substantial risk of serious harm to inmates at MCJ, including Cory Merchant:

    i.    Inmate-on-inmate violence occurred regularly throughout the MCJ.

    ii.    Inmate-on-inmate violence in the MCJ was often severe enough to require medical attention.

    iii.    MCJ dorms, including Gulf Pod, were not adequately staffed.

    iv.    The layout of the MCJ dorms, including Gulf Pod, limited each correctional officer's visibility of the occurrences inside the pods.

    v.    Deputies responsible for supervising inmates were routinely failing to do so.

    vi.    Deputies responsible for supervising inmates were overtly ignoring their duties to supervise the inmates in order to engage in unprofessional behavior, such as watching YouTube videos on shift.

    vii.    Supervising deputies' failures to supervise inmates was allowing violence to occur in the jail without intervention.

viii.    Inmates who were attacking other inmates, engaging in physical altercations, or otherwise causing violence in the jail were not appropriately disciplined, allowing inmates to continue to perpetuate violence without fear of repercussion.

ix.    Inmates who were attacking other inmates, engaging in physical altercations, or otherwise causing violence in the jail were not moved into disciplinary confinement, allowing inmates to continue to perpetuate violence without fear of repercussion and remain in dorms with approximately eighty other inmates.

x.    Deputies who were failing to supervise and protect inmates were not disciplined for violence occurring on their watch.

xi.    Eric Lutterloah, despite his history of violence, was housed in open-dorm housing where he was able to attack other inmates.

xii.    Deputies were not adequately supervising inmates with particularly violent tendencies, such as Eric Lutterloah.

xiii.    Deputies were not adequately protecting inmates from others with particularly violent tendencies, such as Eric Lutterloah.

    xiv.    Deputies were not enforcing lockdown protocol, allowing inmates to

            roam around the open dorm in the evening without repercussion.

338. At the time of Cory Merchant's death, Defendants Kosinski, Miller, and

Savage were aware that the inmate-on-inmate violence posed a substantial

risk of serious harm at MCJ.

339. The substantial risk of serious harm to inmates, including Cory Merchant, at

the hands of other inmates was obvious at MCJ due to the extensive history

and pervasive occurrence of inmate-on-inmate violence throughout the

facility.

340. Defendants Kosinski, Miller, and Dukes consciously disregarded, recklessly

disregarded, was deliberately indifferent to, and/or was callously indifferent

to the conditions posing a substantial risk of harm to inmates at MCJ,

including Cory Merchant, in the following ways:

    i.    Failing to supervise Gulf Pod on the night of Cory Merchant's death.

    ii.    Failing to adequately protect Cory Merchant from inmate-on-inmate

        violence in Gulf Pod.

iii. Failing to adequately protect Cory Merchant from particularly violent inmates in the jail, such as Eric Lutterloah.

iv. Failing to intervene in the altercation which caused Cory Merchant's death.

v. Allowing Lutterloah to strike Merchant multiple times in Gulf Pod.

vi. Failing to stop the attack on Marchant as it was occurring, or attempt to do so.

vii. Failing to timely request backup and medical personnel when the attack was occurring.

viii. Unjustifiably delaying a response to Merchant's need for medical attention after Lutterloah's attack.

341. Defendants Kosinski, Miller, and Dukes' conscious disregard, reckless disregard, deliberate indifference, and/or callous indifference towards the conditions posing a substantial risk of harm to inmates at MCJ directly and proximately caused Cory Merchant's death.

342. Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

343. WHEREFORE, Plaintiff demands judgment against Defendants Kosinski, Miller, and Dukes for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

**Count 2: 42 U.S.C. 1983, Fourteenth Amendment Due Process Rights (*Monell*)**
*against Sheriff Billy Woods, in his official capacity*

344. Plaintiff incorporates and re-alleges paragraphs 1 through 334 above as if fully set forth herein.

345. Cory Merchant, as well as the other detainees at MCJ, had a constitutional right to be protected from the constant threat of violence from physical assault by other inmate.

346. Sheriff Billy Woods knew that, at the time of Cory Merchant's death, the following conditions, independently and collectively, posed a substantial risk of serious harm to inmates at MCJ, including Cory Merchant:

  i.   Inmate-on-inmate violence occurred regularly throughout the MCJ.

65

ii.   Inmate-on-inmate violence in the MCJ was often severe enough to require medical attention.

iii.  MCJ dorms, including Gulf Pod, were not adequately staffed.

iv.   The layout of the MCJ dorms, including Gulf Pod, limited each correctional officer's visibility of the occurrences inside the pods.

v.    Deputies responsible for supervising inmates were routinely failing to do so.

vi.    Deputies responsible for supervising inmates were overtly ignoring their duties to supervise the inmates in order to engage in unprofessional behavior, such as watching YouTube videos on shift.

vii.  Supervising deputies' failures to supervise inmates was allowing violence to occur in the jail without intervention.

viii. Inmates who were attacking other inmates, engaging in physical altercations, or otherwise causing violence in the jail were not appropriately disciplined, allowing inmates to continue to perpetuate violence without fear of repercussion.

ix.    Inmates who were attacking other inmates, engaging in physical

altercations, or otherwise causing violence in the jail were not

moved into disciplinary confinement, allowing inmates to continue

to perpetuate violence without fear of repercussion and remain in

dorms with approximately eighty other inmates.

x.    Deputies who were failing to supervise and protect inmates were

not disciplined for violence occurring on their watch.

xi.    Eric Lutterloah, despite his history of violence, was housed in open-

dorm housing where he was able to attack other inmates.

xii.    Deputies were not adequately supervising inmates with particularly

violent tendencies, such as Eric Lutterloah.

xiii.    Deputies were not adequately protecting inmates from others with

particularly violent tendencies, such as Eric Lutterloah.

xiv.    Deputies were not enforcing lockdown protocol, allowing inmates to

roam around the open dorm in the evening without repercussion.

347. At the time of Cory Merchant's death, Sheriff Billy Woods was aware that the inmate-on-inmate violence posed a substantial risk of serious harm at MCJ.

348. The substantial risk of serious harm to inmates, including Cory Merchant, at the hands of other inmates was obvious at MCJ due to the extensive history and pervasive occurrence of inmate-on-inmate violence throughout the facility.

349. Sheriff Billy Woods consciously and/or recklessly disregarded and was deliberately and/or callously indifferent to the conditions posing a substantial risk of harm to inmates at MCJ.

350. Sheriff Billy Woods took no reasonable measures to reduce inmate-on-inmate violence.

351. Sheriff Billy Woods failed to take reasonable measures to abate the substantial risk of harm to inmates posed by inmate-on-inmate violence, including the following:

    i.    Ensure MCSO deputies adequately supervised inmates and intervened in instances of inmate-on-inmate violence.

ii.   Discipline officers who failed to supervise inmates.

iii.   Train officers to properly supervise inmates.

iv.   Ensure deputies protect inmates from violence.

v.   Train deputies to protect inmates from violence.

vi.   Discipline officers who fail to protect inmates from violence.

vii.   Ensure deputies discipline inmates for physically attacking other inmates.

viii.   Train deputies to discipline inmates for physically attacking other inmates.

ix.   Discipline deputies who fail to discipline inmates that have physically attacked other inmates.

x.   Ensure deputies move violent individuals out of open-dorm housing.

xi.   Train deputies to move violent individuals out of open-dorm housing.

xii.   Discipline deputies who fail to move violent individuals out of open-dorm housing.

xiii.   Ensure particularly violent inmates were not housed in settings that allowed them to attack other inmates, such as open-dorm sections with inadequate supervision.

xiv.   Train deputies to house particularly violent inmates in settings that allow them to attack other inmates, such as open-dorm sections with inadequate supervision.

xv.   Discipline deputies who fail to house particularly violent inmates in settings that allow them to attack other inmates, such as open-dorm sections with inadequate supervision.

xvi.   Ensure officers intervene in violent altercations.

xvii.   Train officers to intervene in violent altercations.

xviii.   Discipline officers who fail to intervene in violent altercations.

xix.   Enforce lockdown procedures and ensure inmates remain in their bunks during lockdown hours.

xx.    Train deputies to enforce lockdown procedures and ensure inmates remain in their bunks during lockdown hours.

xxi.    Discipline deputies who fail to enforce lockdown procedures and ensure inmates remain in their bunks during lockdown hours.

xxii.    Appropriately classify and segregate inmates who had recently engaged in violence against other inmates.

xxiii.    Train officers to appropriately classify and segregate inmates who had recently engaged in violence against other inmates.

xxiv.    Discipline officers who fail to appropriately classify and segregate inmates who had recently engaged in violence against other inmates.

xxv.    Ensure deputies maintain order and discipline within the facility, enforce all inmate rules and regulations, and report all violations promptly, in writing, to a Corrections Custody Supervisor.

xxvi.    Train deputies to maintain order and discipline within the facility, enforce all inmate rules and regulations, and report all violations promptly, in writing, to a Corrections Custody Supervisor.

xxvii.   Discipline deputies to maintain order and discipline within the facility, enforce all inmate rules and regulations, and report all violations promptly, in writing, to a Corrections Custody Supervisor.

xxviii.   Ensure deputies are constantly alert and security conscious in order to prevent escapes, introduction of contraband or other violations.

xxix.   Train deputies to be constantly alert and security conscious in order to prevent escapes, introduction of contraband or other violations.

xxx.   Discipline deputies who fail to remain alert and security conscious in order to prevent escapes, introduction of contraband or other violations.

xxxi.   Ensure deputies stand guard, observe inmates and take required action in emergencies.

xxxii.   Train deputies to stand guard, observe inmates and take required action in emergencies.

xxxiii.   Discipline deputies who fail to stand guard, observe inmates and take required action in emergencies.

xxxiv.   Ensure deputies respond to emergencies in the jail such as fights or other emergencies.

xxxv.   Train deputies to respond to emergencies in the jail such as fights or other emergencies.

xxxvi.   Discipline deputies who fail to respond to emergencies in the jail such as fights or other emergencies.

xxxvii.   Ensure deputies are alert for conditions or situations, which inhibit efficient operation of the Agency or the Corrections Bureau, and make recommendations for solutions.

xxxviii.   Train deputies to be alert for conditions or situations, which inhibit efficient operation of the Agency or the Corrections Bureau, and make recommendations for solutions.

xxxix.   Discipline deputies who fail to be alert for conditions or situations, which inhibit efficient operation of the Agency or the Corrections Bureau, and make recommendations for solutions.

xl.   Ensure deputies respond to reports of violence and inmate's requests for "keep-aways" against other inmates.

xli.     Train deputies to respond to reports of violence and inmate's

requests for "keep-aways" against other inmates.

xlii.    Discipline deputies who fail to respond to reports of violence and

inmate's requests for "keep-aways" against other inmates.

xliii.   Implement a policy classifying and segregating inmates based on

their likelihood for violence.

xliv.    Take any other reasonable measure which could have abate the

excessive violence present throughout the MCJ.

352. Sheriff Billy Woods implemented the following unofficial customs and

practices throughout MCJ:

i.      MCSO deputies are not required to supervise MCJ inmates during

their shift.

ii.     MCSO deputies are not required to keep a watchful eye on the

dorms to which they are assigned and the inmates within them.

iii.    MCSO deputies are not responsible for preventing inmate-on-

inmate violence.

iv.   MCSO deputies are not responsible for reducing inmate-on-inmate violence.

v.   MCSO deputies are not required to maintain safety and security amongst the inmates in their custody.

vi.   MCSO deputies may ignore incidents of violence in the MCJ.

vii.   MCSO deputies may ignore substantial risks of violence between inmates during their shifts.

viii.   MCSO deputies are not required to protect inmates from substantial risks of violence between inmates during their shifts.

ix.   An MCSO deputy who witnesses an incident of physical violence is not required to intervene.

x.    An MCSO deputy who witnesses an incident of physical violence and fails to intervene is not subject to discipline.

xi.   If an MCJ inmate causes physical violence to occur, they may receive a disciplinary report, but will not actually be subject to discipline.

xii.   If an MCJ inmate causes physical violence to occur, they will be returned to an open-dorm section with other inmates.

xiii.   MCSO deputies are permitted to watch YouTube videos on their computer and engage in other recreational activities while on shift in lieu of supervising individuals in their custody.

xiv.   MCSO deputies are not responsible for the custody and control of inmates.

xv.   MCSO deputies are not required to maintain order and discipline within the facility, enforce all inmate rules and regulations, and report all violations promptly, in writing, to a Corrections Custody Supervisor.

xvi.   MCSO does not require its deputies to be constantly alert and security conscious in order to prevent escapes, introduction of contraband or other violations.

xvii.   MCSO does not require its deputies to stand guard, observe inmates and take required action in emergencies.

xviii.   MCSO does not require its deputies to respond to emergencies in the jail such as fights or other emergencies.

xix.    MCSO does not require its deputies to be alert for conditions or situations, which inhibit efficient operation of the Agency or the Corrections Bureau, and make recommendations for solutions.

353. Sheriff Billy Woods' failure to implement reasonable measures to abate the substantial risk of violence throughout the MCJ, including those described in ¶ 352 and its subsections directly and proximately caused Cory Merchant's death.

354. The widespread customs described in ¶ 352 and its subsections directly and proximately caused Cory Merchant's death.

355. Sheriff Billy Woods' conscious disregard, reckless disregard, deliberate indifference, and/or callous indifference to the conditions at the MCJ posing a substantial risk of harms to inmates directly and proximately caused Cory Merchant's death.

356. Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

357. WHEREFORE, Plaintiff demands judgment against Defendant Woods for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

### Count 3: Wrongful Death—Willful and Wanton

*against Defendants Kosinski, Miller, Dukes.*

358. Plaintiff incorporates and re-alleges paragraphs 1 through 334 above as if fully set forth herein.

359. At all times relevant, Defendants Kosinski, Miller, and Dukes had the following duties:

    i.    Supervise MCJ inmates.

    ii.    Protect inmates, including Cory Merchant, from violence.

    iii.    Protect inmates, including Cory Merchant, from the attacks by inmates known to be particularly violent, such as Eric Lutterloah.

    iv.    Intervene in physical altercations that threatened the safety of inmates and security of the jail.

    v.    Enforce jail policies, including the requirement that inmates stay in their bunks during lockdown.

vi.     Be responsible for the custody and control of inmates.

vii.    Maintain order and discipline within the facility, enforce all inmate rules and regulations, and report all violations promptly, in writing, to a Corrections Custody Supervisor.

viii.   Be constantly alert and security conscious to prevent escapes, introduction of contraband or other violations.

ix.     Stand guard, observe inmates and take required action in emergencies.

x.      Respond to emergencies in the jail such as fights or other emergencies.

xi.     Be alert for conditions or situations, which inhibit efficient operation of the Agency or the Corrections Bureau, and make recommendations for solutions.

360.    On the night of Cory Merchant's death, Defendants Kosinski, Miller, and Dukes breached the duties described in the preceding paragraph.

361.    Because Defendants Kosinski, Miller, and Dukes breached the duties described in ¶ 359 and its subsections, Eric Lutterloah and Cory Merchant

were not being supervised and were out of their bunks during lockdown, during which time Lutterloah was able to walk over to Merchant, strike him multiple times, and cause injuries so severe they culminated in Merchant's death, without any Defendant intervening.

362. Because Defendants Kosinski, Miller, and Dukes breached the duties described in ¶ 359 and its subsections, Lutterloah was able to strike Merchant multiple times without officer intervention.

363. Because Defendants Kosinski, Miller, and Dukes breached the duties described in ¶ 359 and its subsections, Lutterloah was able to strike Merchant multiple times without fear of officer intervention or discipline.

364. Defendants Kosinski, Miller, and Dukes breached their duties in a manner exhibiting wanton and willful disregard for Cory Merchant's health and safety.

365. Defendants Kosinski, Miller, and Dukes' breaches of the duties described in ¶ 359 and its subsections directly and proximately caused Cory Merchant's death.

366. Cory Merchant's death was a foreseeable consequent of the breaches of duty committed by Defendants Kosinski, Miller, and Dukes.

367. Wherefore, Plaintiff seeks to recover lost support and services, medical expenses, mental pain and suffering, and loss of earnings.

## Count 4: Wrongful Death—Negligence

*against Sheriff Billy Woods, in his official capacity*

368. Plaintiff incorporates and re-alleges paragraphs 1 through 334 above as if fully set forth herein.

369. Sheriff Billy Woods is responsible for the acts and omissions that caused Cory Merchant's death.

370. Sheriff Billy Woods had a duty to take reasonable measures to reduce inmate-on-inmate violence.

371. Sheriff Billy Woods had a duty to take reasonable measures to protect inmates from the substantial risk of harm posed by the rampant inmate-on-inmate violence at MCJ.

372. Sheriff Billy Woods failed to take reasonable measures to reduce inmate-on-inmate violence at MCJ or take reasonable measure to protect inmates from

the substantial risk of harm posed by the rampant inmate-on-inmate violence at MCJ.

373. Sheriff Billy Woods' failure to take reasonable measures to reduce inmate-on-inmate violence at MCJ or take reasonable measure to protect inmates from the substantial risk of harm posed by the rampant inmate-on-inmate violence at MCJ directly and proximately caused Cory Merchant's death.

374. Cory Merchant's death was a foreseeable consequence of Sheriff Billy Woods' failure to take reasonable measures to reduce inmate-on-inmate violence at MCJ or take reasonable measure to protect inmates from the substantial risk of harm posed by the rampant inmate-on-inmate violence at MCJ.

375. Wherefore, Plaintiff seeks to recover lost support and services, medical expenses, mental pain and suffering, and loss of earnings.

## **Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Krysti Merchant hereby demands a jury trial of all issues capable of being determined by a jury.

**Prayer for Relief**

WHEREFORE, Plaintiff Krysti Merchant, as personal representative for the

estate of Cory Merchant, prays for judgment against Defendants, damages,

attorneys' fees, disbursement, and any other and further relief as this Court

deems just and equitable.

**ROMANUCCI & BLANDIN**

/s/ Sam Harton

Bhavani Raveendran (*pro hac vice pending*)
(Illinois ARDC No. 6309968)
Sam Harton (*pro hac vice pending*)
(Illinois ARDC No. 6342112)
321 N. Clark St.
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: braveendran@rblaw.net
Email: sharton@rblaw.net

**SLATER LEGAL**

/s/ James M. Slater

James M. Slater (FBN 111779)
Slater Legal PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
james@slater.legal
Tel: (305) 523-9023