**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

KRYSTI MERCHANT, as Personal
Representative for the Estate of
Cory Merchant, Deceased,

     Plaintiff,

v.                              Case No. 5:23-cv-00661
                                 **DISPOSITIVE MOTION**

BILLY WOODS, Sheriff of Marion
County, Florida, in his official
Capacity; Deputy JUSTIN KOSINSKI;
Deputy DELLUN MILLER; Sergeant
JEROME DUKES;

     Defendants.

_____/

<u>**DEFENDANT, BILLY WOODS', MOTION FOR SUMMARY JUDGMENT**</u>

Defendant, BILLY WOODS, Sheriff of Marion County, Florida, in his official

Capacity (**"Sheriff Woods"**), through his undersigned attorneys, pursuant to Rule

56, Fed. R. Civ. P., hereby files his Motion for Summary Judgment, and states:

<u>**INTRODUCTION**</u>

1.    On December 8, 2023, Plaintiff, KRYSTI MERCHANT, as Personal

Representative for the Estate of Cory Merchant, Deceased (**"Plaintiff"**), filed her

First Amended Complaint against Sheriff Woods alleging (1) that Sheriff Woods'

policies and customs caused the assault on Cory Merchant (**"Merchant"**) in

violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C.

§ 1983 and (2) wrongful death under Florida law.

2.    For the reasons argued herein, Sheriff Woods is entitled to summary judgment as a matter of law on Counts II and IV.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  An issue of fact is "genuine" only if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id*.  The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts.  *Id*. at 325.  In determining whether a genuine dispute of material fact exists, the court must read the record and the evidence presented in the light most favorable to the non-moving party.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

## STATEMENT OF FACTS

On November 7, 2021, Eric Lutterloah ("**Lutterloah**"), at approximately 1:09

a.m., within in a span of less than 30 seconds, arose from his bunk, walked over to the next bunk, talked to Merchant, and then punched Merchant three times in the face, which caused Merchant to fall to the ground and strike the back of head.  Exh. 1, Jail Surveillance Video, 01:08:48-01:09:15; Exh. 2, Incident Report #210005382; Exh. 3, FIBRS Incident Report.  Merchant died on November 13, 2021, due to complications from blunt head trauma as a result of Lutterloah's assault.  Exh. 4, Autopsy Report and Certification of Death.  Both Lutterloah and Merchant were pretrial detainees inside the Marion County Jail at the time of the incident as neither had been convicted of the criminal charges that caused their incarceration.  Doc. 20, First Amended Complaint, ¶¶ 5, 193.  As of the date of this Motion, Lutterloah is awaiting trial for the charge of manslaughter, a second-degree felony, due to his assault and the death of Merchant.  Exh. 5, Information, 2021-CF-004457; Exh. 6, Probable Cause Affidavit, 2021-CF-004457.

    1.    Marion County Jail

The Marion County Jail is located in Ocala, Marion County, Florida, and exists for the detention of persons charged with or convicted of a felony or misdemeanor criminal offense.  Exh. 7, Mission Statement, #6001.00; § 951.23, Fla. Stat.  Pursuant to Florida law, the Marion County Jail is required to adopt and establish policies that are consistent with the Florida Model Jail Standards.  § 951.23, Fla. Stat.  The Marion County Jail has consistently met the requirements

promulgated by the Florida Model Jail Standards.   Exh. 8, FMJS Annual Jail Inspection, 2020; Exh. 9, Hough Deposition, 30/14-32/23.  The Marion County Jail has also achieved Excelsior status by the Florida Corrections Accreditation Commission.   Exh. 10, FCAC Assessment Report, 2021; Exh. 17, Hough Expert Report, P. 8, 11, 15-16, 20, 24-26.

At the time of Merchant's assault, the Marion County Jail had an average inmate count of 1,834 for the month of November, 2021, with a yearly average of 1,715.  Exh. 11, Monthly/Yearly Averages, 1984-2024.  The maximum capacity of the Marion County Jail is 1,924 inmates.  Exh. 12, Sheriff Woods' Answers to Interrogatories, # 15.  The Marion County Jail consists of 11 separate housing units. Id.  At the time of the incident, Merchant and Lutterloah were housed in Gulf Pod, Section Alpha, which contained other male inmates charged with, or awaiting transport to prison for, felony sexual offenses.  Exh. 13, Peterson Deposition, 26/19-27/13.  Gulf Pod had a maximum capacity of 256 inmates.  Exh. 14, Nix Deposition, 35/1-35/4.

2.    Sheriff Woods' Booking and Classification Policies

Every inmate booked into the Marion County Jail is classified according to the Sheriff's Office policy to segregate inmates to ensure the safety and security of the individual inmates and the smooth operation of the jail facility.  Exh. 13, Peterson Deposition, 31/23-32/22, 33/19-45/6; Exh. 15, Classification of Inmates,

#6766.00; Exh. 9, Hough Deposition, 80/22-82/7. During booking, the Sheriff's Office will make an initial classification determination on where an inmate can be housed by taking into consideration various factors, such as the current charges, the inmate's behavior during the booking process, criminal history, physical and mental health problems, and known past enemies. Exh. 13, Peterson Deposition, 45/9-50/15; Exh. 15, Classification of Inmates, #6766.10. Generally, inmates charged with felony sex offenses are placed within a housing section with other inmates similarly charged because these inmates are potentially vulnerable and may need protection from other inmates. Id. It is typical and customary for correctional facilities to house sex offenders in the same housing section. Exh. 9, Hough Deposition, 50/13-54/3. However, this rule is not absolute. Exh. 15, Classification of Inmates, #6766.15. If, for example, an inmate had prior sexual offenses while in jail, have a history of assaultive felony violent convictions, are charged with other crimes in addition to the sex offense, such as murder or other serious assaultive felony crimes, or if they have medical or mental health issues, the inmate may be placed within another housing section to fit the inmate's needs and jail security. Id, #6766.25, 6766.40; Exh. 13, Peterson Deposition, 52/21-54/6, 73/1-74/25. Further, an inmate's classification is not static because the classification staff will reassess an inmate's risk of victimization or abusiveness based upon any additional, relevant information received by the jail since the

initial classification at intake and booking.  <u>Exh. 15</u>, Classification of Inmates, #6766.15.  If, for example, an inmate batters another inmate, the inmate will be rehoused.  <u>Exh. 13</u>, Peterson Deposition, 61/20-63/17.  Further, the inmate handbook provides procedures for inmates to appeal the housing assignment provided by classification.  <u>Exh. 16</u>, Inmate Handbook, P. 13, ¶ 19.  Inmates can also fill out a request form seeking a "keep away" from another inmate, which the Sheriff's Office will then investigate and keep with the inmate's file.  <u>Exh. 13</u>, Peterson Deposition, 63/19-64/5, 65/2-67/19; <u>Exh. 23</u>, Keep Away Inmates, #7060.

### 3.    <u>Sheriff Woods' Inmate Supervision and Discipline Policies</u>

Following booking and classification, inmates are placed within their housing section with other inmates.  <u>Exh. 15</u>, Classification of Inmates, #6766.00. In the G-Pod, Section Alpha, where Merchant and Lutterloah were housed on the date of the assault, the housing section consisted of open, dormitory-style housing with bunk beds and housed around 80 inmates.  <u>Exh. 13</u>, Peterson Deposition, 24/19-24/20.  Dormitory-style housing is utilized across the United States and Florida.  <u>Exh. 17</u>, Hough Expert Report, P. 22, ¶ 13.  In the Marion County Jail, individual cells are used for higher security inmates.  <u>Exh. 18</u>, McNeely Deposition, 86/4-89/11.  Within the Gulf Pod, which consists of four, separate housing sections, the inmates are supervised by at least two, and sometimes, three

correctional deputies.  Id., 29/4-29/10; Exh. 19, Dukes Deposition, 39/15-39/21, 97/19-97/21.  When needs arise, one of the correctional deputies may be called to temporarily relieve another correctional deputy in another section or area, but inmates are never left unsupervised as at least one correctional officer must be present to supervise the inmates in Gulf Pod.  Id., 123/12-123/19; Exh. 20, Gulf Pod Post Order.

Correctional deputies continuously monitor the inmates through video surveillance located in the rover station, through windows that can view into the housing sections, and by physical presence within the housing sections.  Exh. 14, Nix Deposition, 29/17-33/9; Exh. 21, Kosinski Deposition, 22/16-23/10; Exh. 19, Dukes Deposition, 42/10-44/24.  At approximately 10:00 p.m., the correctional deputies prepared Gulf Pod go on "lockdown."  Exh. 21, Kosinski Deposition, 16/19-16/23; Exh. 19, Dukes Deposition, 85/3-85/19; Exh. 20, Gulf Pod Post Order; Exh. 22, Headcount of Inmates, #6164.00.  The correctional deputies conduct a "head count" of the inmates in all the housing sections within Gulf Pod. Id.  Once completed, the correctional officers dim the lights and inmates are required to remain in their assigned bunk until the next morning.  Exh. 16, Inmate Handbook, P. 13; Exh. 20, Gulf Pod Post Order.  Although there is some discretion allowed for inmates to leave their assigned bunk area, correctional deputies should, and do, instruct the inmates to return their bunk area if the correctional

deputies believe the inmates are interfering with the safety of the other inmates and the jail.  Exh. 21, Kosinski Deposition, 51/16-54/14; Exh. 19, Dukes Deposition, 86/24-88/5.

Approximately every hour throughout the night, a correctional deputy enters each housing section with Gulf Pod to conduct a "security check" of the inmates.  Exh. 21, Kosinski Deposition, 23/11-23/25; Exh. 23, Miller Deposition, 22/4-22/8; Exh. 22, Headcount of Inmates, #6164.00; Exh. 20, Gulf Pod Post Order. The "security check" requires that the correctional deputy walk through the bunk areas and observe each inmate.  Exh. 18, McNeely Deposition, 70/5-72/6. Correctional deputies are subject to discipline for failing to monitor the inmates, including any failures to conduct security checks.  Id., 68/6-69/9.  Supervisory deputies are required to ensure that the correctional deputies maintain a daily activity log that documents routine, such as security checks, and emergency situations each shift.  Id., McNeely Deposition, 92/16-; Exh. 24, Supervision of Inmates – Jail, #6011.10.  They are also required to visit each housing section, such Gulf Pod, at least one time during their shift.  Id.

Inmates are subject to disciplinary confinement if they assault another inmate or violate a rule of the Marion County Jail.  Exh. 16, Inmate Handbook, P. 14; Exh. 19, Dukes Deposition, 66/21-67/10; Exh. 9, Hough Deposition, 62/10-64/25; Exh. 25, Disciplinary Procedures, Inmates, #6632.00.  If a correctional

deputy personally observes an inmate fight, they will intervene and draft an incident report for investigators to review and refer to the State Attorney's Office for criminal charges. Exh. 21, Kosinski Deposition, 78/10-79/25; Exh. 23, Miller Deposition, 55/3-55/16, 57/7-57/25; Exh. 19, Dukes Deposition, 76/10-78/4. If a correctional deputy does not observe an altercation, but an inmate later advises of the assault, the correctional deputy is required to review video surveillance, draft an incident report, and forward to the investigators for their review. Id. Extremely violent inmates, or inmates that continuously violate jail rules, can be subject to lengthier, or even permanent, confinement within the higher security housing section. Exh. 13, Peterson Deposition, 54/1-54/6, 73/1-73/22, 81/24-82/22 ; Exh. 18, McNeely Deposition, 110/10-110/15; Exh. 14, Nix Deposition, 22/18-24/18. Further, "keep aways" could be placed in the involved inmates to ensure they do not have any further interaction with each other. Exh. 13, Peterson Deposition, 63/19-64/5; Exh. 26, Keep Away Inmates, Courthouse, #7060.00.

    4.   Sheriff Woods' Deputy Training and Discipline Policies

Sheriff Woods implemented training policies specific to his employees at the Marion County Jail. Exh. 27, Detention Training, #6136.00; Exh. 19, Dukes Deposition, 78/5-78/13, 80/12-80/16, 82/16-84/23, 92/23-102/10, 120/1-120/10; Exh. 14, Nix Deposition, 22/9-22/17; Exh. 18, McNeely Deposition, 80/11-80/22, 125/12-126/9. In addition to courses established by the Florida Department of

Law Enforcement's Criminal Justice Standards and Training Commission, Sheriff Woods offered in-service and supervisory/management training.  Exh. 27, Detention Training, #6136.00.  All new correctional officers are required to receive training on a variety of jail policies and procedures to include security procedures, use of force and defensive tactics, inmate rules and regulation, the rights and responsibilities of inmates, sexual abuse/assault awareness, prevention, response, and reporting procedures, communication skills, and the code of conduct and ethics of the Sheriff's Office.  Id.  In addition to this new employee training, all jail administrative and managerial staff must receive forty-hours of additional training during their first year of employment and at least twenty-four hours of management training each year.  Id.  Certified employees, i.e., detention officer with certification, receive annual training concerning the use of force, defense tactics, and sexual abuse/assault awareness, prevention, response, and reporting procedures, among other topics.  Id.  This training is consistent with the requirements of the Florida Model Jail Standards and Florida Corrections Accreditation Commission.  Id.; Exh. 19, Dukes Deposition, 108/5-109/8; Exh. 18, McNeely Deposition, 133/16-135/11; 141/14-141/25; Exh. 8, FMJS Annual Jail Inspection, 2020; Exh. 10, FCAC Assessment Report, 2021.

In addition to training, Sheriff Woods has implemented policies concerning the discipline of his employees.  Exh. 28, Discipline Policy, #3350.00.  The actions

the Sheriff's Office may take against an employee who violates a policy can be considered non-punitive, e.g., counseling, training, oral reprimand, or punitive, e.g., written reprimand, demotion, suspension, termination.  Id.  Supervisors are responsible for disciplining their employees under their supervision and, if the supervisor fails to do so, the supervisor could be disciplined for dereliction of duty.  Id.; Exh. 18, McNeely Deposition, 44/24-45/22, 59/4-62/3, 68/6-69/9, 93/10-93/14, 99/22-100/22, 101/15-102/14, 127/4-127/6, 120/3-120/11.  Further, Sheriff Woods has policies specific to employees in the Marion County Jail to include a conduct policy that describes how correctional officers must conduct themselves in their interactions with inmates.  Exh. 29, Employee Regulations – Jail, #6091.00.

### MEMORANDUM OF LAW

1.    No custom or policy of Sheriff Woods caused or was the "moving force" of any alleged constitutional violation.

Officials cannot be held liable pursuant to 42 U.S.C. § 1983 solely on the basis of *respondeat superior* or vicarious liability.  *Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009) (citations omitted).  Rather, supervisory defendants, such as Sheriff Woods, can only be liable if they participate in the violation or if their actions caused the violation.  *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).  Plaintiff has not alleged that Sheriff Woods participated in the alleged violations.  Instead, Plaintiff's allegations are based on a policy or custom of Sheriff Woods that

allegedly created a substantial risk of serious harm to Merchant that caused Lutterloah to assault Merchant. When alleging a claim against a sheriff based on an official policy, a plaintiff must identify either (1) "an officially promulgated policy, or (2) an unofficial custom or practice shown through the repeated acts of the final policymaker of the entity." *Crenshaw v. Lister*, 509 F. Supp. 2d 1230, 1237 (M.D. Fla. 2007) (*citing Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003)). "Plaintiff must identify the policy or custom which caused his injury so that liability will not be based on an isolated incident, *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (citations omitted), and the policy or custom must be the moving force of the constitutional violation." *Crenshaw*, 509 F. Supp. 2d at 1237 (*citing Grech*, 335 F.3d at 1330). Thus, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell*, 392 F.3d at 1289; *see also Desimone v. Flagler Cnty.*, 682 F. Supp. 3d 1085, 1095-96 (M.D. Fla. 2023).

As an initial matter, Sheriff Woods cannot be liable if the individual Defendants, i.e., Deputy Kosinski, Deputy Miller, and Sergeant Dukes, did not commit a constitutional violation. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). As argued in their respective Motions for Summary

Judgment, none of the individual defendants committed acts or omissions that created a "substantial risk of serious harm" to Merchant.  Nor did the individual defendants act with "deliberate indifference," assuming that their acts or omissions violated a constitutional right that was clearly established on November 7, 2021.  Finally, the individual defendants' acts or omissions did not cause Lutterloah's assault.  Rather, Lutterloah's assault was spontaneous and unexpected and each individual defendant responded appropriately under the circumstances.  *See also* Defendant, Jerome Dukes', Motion for Summary Judgment; Defendants, Justin Kosinski's and Dellun Miller's, Motion for Summary Judgment.  Thus, if the individual defendants are not liable to Plaintiff under 42 U.S.C. § 1983, neither is Sheriff Woods.

As it relates to Sheriff Woods, Plaintiff has alleged that various conditions inside the Marion County Jail, e.g., segregation of sex offender inmates, past inmate-on-inmate assaults, dormitory-style housing, nighttime security checks, and inmates being outside their bunk at lockdown, created a substantial risk of serious harm to Merchant that caused Merchant's assault and death.  However, correctional facilities are known to be dangerous places, with some inmates being more dangerous than others.  *See Farmer*, 511 U.S. at 858 (Thomas, J. concurring) ("Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another.").  Violent incidents

13

among inmates are "inevitable" in such an environment.  *Id.; see also Purcell ex. rel.*
*Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1320, n.4 (11th Cir. 2005) (holding
that gambling and fights over card games not sufficient to find jail administrators
liable for beating death of an inmate who attackers believed took their money);
*Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (violence among inmates
must have resulted in so many incidents or injuries that such incidents or injuries
were "the norm or something close to it.") (*quoting Purcell*, 400 F.3d at 1322).  But
the Constitution does not mandate that Sheriff Woods foresee and prevent all
potential danger.  Instead, Sheriff Woods had a constitutional obligation to
guarantee inmates' safety through "reasonable measures."  *See Farmer*, 511 U.S. at
832; *see also* Exh. 9, Hough Deposition, 83/8-84/4.

As it relates to the classification policy of segregating inmates charged with
"sex offense" crimes, neither Merchant nor Lutterloah were improperly classified
or classified in a manner that created a substantial risk of serious harm to
Merchant.  Simply because Merchant was accused of sexual battery with a minor
and Lutterloah was charged with sexual battery and kidnapping does not make
one a potential victim and the other a potential aggressor necessitating separation
from each other or other inmates.  The record evidence in this case does not
support "a strong likelihood, rather than a mere possibility," that Lutterloah
presented a substantial risk of serious harm to Merchant.  *See Nelson*, 89 F.4th at

1296 (citation omitted); *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) ("this objective standard embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . , but must be balanced against competing penological goals") (citations omitted).  Merchant and Lutterloah resided together in Gulf Pod for the majority of Lutterloah's incarceration in the Marion County Jail prior to Lutterloah's assault on Merchant.  Exh. 30, Lutterloah Housing Movements Classification Report; Exh. 31; Merchant Housing Movements Classification Report.  Yet there were no documented disagreements between Merchant and Lutterloah.  Exh. 32, Peterson Affidavit.  In fact, until Lutterloah struck Merchant on November 7, 2021, Lutterloah had no prior instances of any other known disagreements with inmates in Gulf Pod despite having resided in Gulf Pod since his booking into the Marion County Jail on June 10, 2020, a period of 515 days, excluding Lutterloah's 8 days spent in another housing section.  Exh. 30, Lutterloah Housing Movements Classification Report; Exh. 31; Merchant Housing Movements Classification Report.  Thus, there is no evidence that Lutterloah posed a substantial risk of harm to Merchant or any other inmate within the Marion County Jail at the time of Lutterloah's assault.  Nor can Plaintiff cite to any evidence to indicate that Sheriff Woods' policy of generally housing inmates charged with "sex offenses" with each other made Gulf Pod more dangerous for Merchant.  After all, Sheriff Woods' classification policy did not dictate that all

inmates charges with "sex offenses" must be placed together under all circumstances.  Instead, the policy allowed movement to other housing sections based on the needs of the inmates and the jail.  And if a particular inmate was known by the jail to be violent, or have prior instances of misconduct, the jail could and did place those inmates into a different housing section.

Further, Sheriff Woods instituted policies to ensure that inmates, such as Merchant, could request "keep aways" from other inmates.  Merchant was well aware of this procedure as he requested "keep aways" from various inmates while Merchant was housed in the Foxtrot Pod.  Exh. 33, Merchant Incident Reports. Inmates could also appeal their classification and request that they be housed in a section the inmates believed more appropriate.  Although the Marion County Jail ultimately could decide to reject the appeal to another housing section, there is no indication in the record that Sheriff Woods' policies ignored these requests or denied them when the safety and security of the inmates and the jail depended on appropriately classifying inmates.

As it relates to Sheriff Woods' policy to conduct hourly "security checks," the Constitution does not demand more frequent checks.  In *Cagle v. Sutherland*, a correctional officer violated a consent decree from previous litigation that required hourly cell checks.  334 F.3d 980, 985 (11th Cir. 2003).  The correctional officer let one hour and forty minutes elapse between cell checks and during that time an

inmate committed suicide. *Id.* at 989. The 11th Circuit observed that the consent decree "did not establish a constitutional right to hourly jail checks" and the correctional officer did not exhibit deliberate indifference by allowing such a time elapse between the checks. *Id. Cagle*, then, suggests that even hourly cell checks are not constitutionally required. *See also Grochowski v. Clayton Cty.*, 961 F.3d 1311, 1320 (11th Cir. 2020) (*citing Cagle*, 334 F. 3d at 989). Regardless, the jail's policy mandated hourly checks and described how they were to be conducted. Further, the testimony of each employee deposed in this case, including the individually sued correctional officers, testified that hourly checks were completed unless an emergency or similar situation inside the jail dictated otherwise. Further, if a correctional office failed to complete the security checks pursuant to policy, disciplinary procedures could be instituted against the correctional officer under Sheriff Woods' discipline policy. There is also no evidence in the record that supervising officers, such as Sergeant Dukes, ignored his responsibility to ensure that his subordinates completed the security checks pursuant to policy. In fact, Sergeant Dukes corrected Deputy Miller on how he was to complete security checks when he was alone in the Gulf Pod.

During "lockdown" in Gulf Pod, Sheriff Woods' policy required that inmates stay in their assigned bunk throughout the night. There is no evidence that Sheriff Woods was aware that certain correctional officers exercised discretion

to allow inmates to move around in Gulf Pod provided that the inmates did not interfere with the security and safety of the jail. Nor is there any evidence that this discretion caused the assault on Merchant. It was not Lutterloah that violated the "lockdown" rule given to inmates as Merchant left his assigned bunk area and engaged in a conversation with another inmate. Further, even assuming that this discretion was exercised on a widespread basis, there is no evidence in the record to suggest that this caused more violence to occur between inmates during "lockdown" or that this caused Lutterloah to assault Merchant because he was given an opportunity to do so knowing that correctional deputies would allow him to get up from his bunk to strike Merchant. The assault on Merchant occurred spontaneously, without warning, or prior knowledge by any correctional deputy.

    2.    <u>Sheriff Woods is not liable for Plaintiff's death under Florida law</u>.

    A.    *Lutterloah's assault on Merchant was not reasonably foreseeable.*

Plaintiff alleged that Sheriff Woods had a duty to take reasonable measures to reduce inmate-on-inmate violence and to protect inmates from the substantial risk of harm of inmate-on-inmate violence, but failed to do so and Merchant's death was a foreseeable consequence of that failure. *See* <u>Doc. 20</u>, ¶¶ 368-374.

"A jailer must exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably

18

anticipate." *Spann v. State, Department of Corrections*, 421 So. 2d 1090, 1092 (Fla. 4th DCA 1982) (*quoting* 60 Am. Jur. 2D Penal & Correctional Institutions § 23). Thus, "[i]t is clear that corrections officers have a duty to use reasonable care to insure [sic] the safety of inmates during their incarceration." *Ferguson v. Perry*, 593 So. 2d 273, 277 (Fla. 5th DCA 1992). However, "[t]o find that a custodian breached the duty of reasonable care, a plaintiff must show the injury to have been a reasonably foreseeable consequence of the custodian's negligence." *Dep't of Health & Rehab. Servs. v. Whaley*, 574 So. 2d 100, 103-04 (Fla. 1991).

Based on the record evidence, Deputy Kosinski, Deputy Miller, and Sergeant Dukes did not breach any duty to exercise reasonable care during their supervision of the inmates on November 7, 2021. There is no evidence in the record that they failed to conduct the hourly security checks. Exh. 36, Daily Log Report. There is no evidence in the record that they observed other inmates, including Merchant, out of their bunks at the time of Lutterloah's assault. There is no evidence that they observed Lutterloah confront and assault Merchant in time to prevent to assault. Exh. 23, Miller Deposition, 40/7-41/15; Exh. 21, Kosinski Deposition, 58/24-59/9; 71/18-71/25; Exh. 37, Dukes Affidavit. And there is no evidence that they knew of any disagreement between Lutterloah and Merchant that would cause them to separate them or supervise them in a manner differently that what the Sheriff's Office required under their policies. Exh. 21,

Kosinski Deposition, 72/1-72/15; Exh. 23, Miller Deposition, 98/18-98/21, 99/8-100/5; Exh.   , Dukes Deposition, 129/24-130/3.  Further, there is no support in the record that, even assuming that the assault was foreseeable, that it was preventable as the assault itself took only several seconds and three punches.  Thus, since Sheriff Woods' correctional deputies could not reasonably anticipate and prevent the assault committed by Lutterloah, Sheriff Woods cannot be liable for Merchant's death under Florida law.

While the record evidence does not support the assertion that Sheriff Woods failed to implement "reasonable measures" to prevent inmate-on-inmate violence, Sheriff Woods cannot be liable under Florida law for his discretionary policy decisions.  Discretionary functions involve "an exercise of executive or legislative power such that a court's intervention by way of tort law would inappropriately entangle the court in fundamental questions of policy and planning." *City of Freeport v. Beach Cmty. Bank*, 108 So. 3d 684, 690 (Fla. 1st DCA 2013) (*quoting Mosby v. Harrell*, 909 So. 2d 323, 328 (Fla. 1st DCA 2005)).  *See Gualtieri v. Bogle*, 343 So. 3d 1267, 1276 (Fla. 2d DCA 2022) (dismissing with prejudice claim that the sheriff "failed to adequately prepare [the deputy] on how to safely encounter and interact with individuals during a traffic stop, as well as failing to properly prepare [the deputy] on the proper use and escalation of force" because the sheriff entitled to sovereign immunity); *see also Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313,

1331 (S.D. Fla. 2015) (applying Florida law and dismissing with prejudice under sovereign immunity where the plaintiff alleged that "County was negligent in failing to adequately train its police officers to employ safe, reasonable and necessary techniques designed to prevent encounters with potential suspects from becoming volatile or dangerous" and "failing to adequately train its police officers to employ safe, reasonable, and necessary techniques designed to de-escalate encounters with potential suspects before, during, and after the commission of a minor crime" because the "omissions that give rise to Plaintiffs' negligent training and supervision claim are 'discretionary' governmental functions from which the County is immune to tort liability") (internal citations omitted).  Thus, the record evidence does not support the conclusion that Sheriff Woods' policies caused the assault by, for example, failing to meet the Florida Model Jail Standards, but, even it had been shown in the record, Sheriff Woods has sovereign immunity under Florida law to implement the policies under his discretionary authority.

      B.    *Neither Plaintiff nor Tommie Phillip Merchant are survivors under Florida's Wrongful Death Act.*

When a person dies from harm caused by another person, Florida's Wrongful Death Act applies. [1] *Sheffield v. R.J. Reynolds Tobacco Co.*, 329 So. 3d 114,

---

[1] Plaintiff and Tommie Merchant are also not entitled to "survivor" damages under 42 U.S.C. § 1983. *See Estate of Gilliam v. City of Prattville*, 639 F.3d 1041, 1045 (11th Cir. 2011) ("§ 1983 does not provide for the survival of civil rights actions. Due to this deficiency…the state law of the forum applies as long as it is not inconsistent with the Constitution and the laws of the United States."); *see also Mucciolo v. Boca Raton Reg'l Hosp., Inc.*, 824 F. App'x 639, 644 (11th Cir. 2020) ("when death

120 (Fla. 2021); *see* §§ 768.16-768.26, Fla. Stat.  The Wrongful Death Act is not a continuation of a personal injury action because that claim dies at the person's death.  *Id.*; *see* § 768.20, Fla. Stat. ("When a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate.").  Section 768.21, Fla. Stat., describes damages recoverable in a wrongful death action:

> *(1) Each survivor may recover the value of lost support and services from the date of the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value. In evaluating loss of support and services, the survivor's relationship to the decedent, the amount of the decedent's probable net income available for distribution to the particular survivor, and the replacement value of the decedent's services to the survivor may be considered. In computing the duration of future losses, the joint life expectancies of the survivor and the decedent and the period of minority, in the case of healthy minor children, may be considered.*

"Survivor" is defined as "the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters. It includes the child born out of wedlock of a mother, but not the child born out of wedlock of the father unless the father has recognized a responsibility for the child's support." § 768.18, Fla. Stat. The Wrongful Death Act further defines "support" as "contributions in kind as

---

is the result of a personal injury, the law of Florida essentially substitutes a statutory wrongful death action for the personal injury action."); *Ortiz v. Burlein*, 2023 WL 11823630, at *3 (M.D. Fla. 2023) ("When a personal injury to the decedent results in death, no action for the personal injury shall survive…But under the survival statute…personal injury actions in which the personal injury is not also the cause of death [may be brought].").

well as money," and "services" as "tasks, usually of a household nature, regularly performed by the decedent that will be a necessary expense to the survivors of the decedent [and] [t]hese services may vary according to the identity of the decedent and survivor and shall be determined under the particular facts of each case." § 768.18, Fla. Stat.  Thus, blood relatives, including brothers and sisters, are entitled to damages under the Wrongful Death Act when partly or wholly dependent on the decedent for support or services as defined in the statute.

Plaintiff here has identified two survivors that may be entitled to damages: (1) Krysti Merchant, who was Cory Merchant's sister, and (2) Tommie Phillip Merchant, who was Cory Merchant's brother.  *See* Doc. 20, ¶¶ 20, 22, 23. Merchant's parents are deceased and Merchant was neither married nor had children.  Exh. 34, Krysti Merchant Deposition, 9/6-9/9, 10/13-11/4, 23/10-23/13. However, there is no evidence that Cory Merchant provided either "support" or "services" to Krysti Merchant or Tommie Merchant "from the date of [Cory Merchant's] injury to [] his death, with interest," or that Cory Merchant would provide any "future loss of support and services [to Krysti Merchant or Tommie Merchant] from the date of death and reduced to present value." § 768.21(1), Fla. Stat.

Krysti Merchant last spoke to Cory Merchant in August of 2021.  Exh. 34, Krysti Merchant Deposition, 45/17-48/6.  Tommie Merchant last spoke to Cory

Merchant sometime in 2018 prior to their mother's stroke.  Exh. 35, Tommie Merchant Deposition, 28/24-29/21, 55/10-56/19.   In terms of support, Cory Merchant sent money a couple of times to Tommie Merchant while Tommie Merchant was incarcerated in the Florida Department of Corrections, but Cory Merchant last sent any money probably before their mother's stroke in 2018.  Id., 30/10-31/4.   For Krysti Merchant, Cory Merchant never provided financial support to her.  Exh. 34, Krysti Merchant Deposition, 22/23-23/9.

For services, Cory Merchant lived with Krysti Merchant from approximately 2011 to 2013 and babysat Krysti Merchant's child.  Id., 19/2-19/20, 22/2-22/14, 23/6-23/9.  Cory Merchant did not provide any services for Tommie Merchant while he was Cory Merchant was alive and Tommie Merchant did not expect to have any future expenses as a result of Cory Merchant's death.  Exh. 35, Tommie Merchant Deposition, 52/23-53/11, 56/21-57/12.

Thus, as it relates to Plaintiff's wrongful death action against Sheriff Woods, neither Krysti Merchant nor Tommie Merchant are "survivors," and there is no evidence that Merchant had any loss of earnings, medical, or funeral expenses to allow recovery for Merchant's estate, and summary judgment should be granted for Sheriff Woods related to these damages.  Exh. 34, Krysti Merchant Deposition, 71/23-74/6, 83/20-86/12; *see also* § 768.21(6), Fla. Stat.

**WHEREFORE**, Defendant, BILLY WOODS, Sheriff of Marion County,

Florida, in his official Capacity, respectfully requests an Order granting summary judgment for Sheriff Woods and against Plaintiff on Counts II and IV of Plaintiff's First Amended Complaint.

Dated: June 27, 2025

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to counsel for Plaintiff, James M. Slater, Esquire, Slater Legal, PLLC, 113 South Monroe Street, Tallahassee, Florida 32301, Sam Harton, Esquire, Romanucci and Blandin, 321 North Clark Street, Chicago, Illinois 60654.

/s/ Bruce R. Bogan
Bruce R. Bogan, Esquire
Fla. Bar No. 599565
Brandon T. Byers, Esquire
Fla. Bar. No. 0119492
Hilyard, Bogan & Palmer, P.A.
Post Office Box 4973
Orlando, FL 32802-4973
Telephone: 407-425-4251
Facsimile: 407-841-8431
Email: bbogan@hilyardlawfirm.com
       bbyers@hilyardlawfirm.com
Attorneys for Defendant, Sheriff Woods