1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                        OCALA DIVISION

3   KRYSTI MERCHANT, as          .   Case No. 5:23-cv-00661
    Personal Representative,      .
4   for the                      .
          Estate of             .
5   Cory Merchant, Deceased       .

6   Plaintiff,                    .   May 28, 2025
                                  .   1:00 PM EST – 5:07 PM EST
7        v.                       .
                                  .
8   BILLY WOODS, Sheriff of       .
    Marion County, Florida        .
9   in his official capacity;     .
    Deputy Justin Kosinski,       .
10  Deputy Joseph Miller,         .
    Sergeant Jerome Dukes,        .
11                                .
         Defendants.              .
12   . . . . . . . . . . . . . .  .

13

14              VIDEOCONFERENCE-ZOOM DEPOSITION
                OF RICHARD HOUGH, SR., CPP, CCHP

15  APPEARANCES:

16  For the Plaintiffs:      Romanucci & Blandin, LLC

17                           By: Sam Harton, Esquire

18                           321 North Clark Street
                             Suite 900
19                           Chicago, Illinois 60654
                             (312) 458-1000
20
    For the Defendants:      Hilyard, Bogan & Palmer, P.A.
21                           By: Bruce R. Bogan, Esquire
                             105 East Robinson Street
22                           Suite 201
                             Orlando, Florida 32802
23                           (407) 425-4251

24

25



1                                    INDEX

2                                                           Page

3

4

5    WITNESSES FOR THE                 Direct    Cross

6    PLAINTIFFS:

7

8    RICHARD HOUGH, SR., CPP, CCHP       4       100

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Richard Hough, Sr., CPP, CCHP 05/28/2025

| EXHIBITS | Marked Received |
|----------|-----------------|
| 66       | 11              |
| 19       | 67              |
| 64       | 69              |
| 65       | 77              |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                  P R O C E E D I N G S
 2        (Thereupon, the following proceedings were held at
 3   12:00 PM)
 4   Thereupon,
 5               RICHARD HOUGH, SR., CPP, CCHP,
 6        was called as witness and after having been first
 7   duly sworn, was examined, and testified as follows:
 8                    DIRECT EXAMINATION
 9   BY MS. HARTON:
10        Q    Dr. Hough, I'm assuming you've given
11   depositions before.
12        A    I have.
13        Q    Okay.  Let's just go over some of the ground
14   rules.  Obviously very important to give verbal answers.
15   Yes's and no's, explanations, but not uh-uh, ah-uh's,
16   shaking the head, nodding the head, understood?
17        A    Yes.
18        Q    Okay.  There may be times where the attorneys
19   object.  Unless they instruct you not to answer for some
20   sort of privilege, you understand that you have to
21   answer the question, correct?
22        A    Yes.
23        Q    Okay.  And you know, obviously this is not
24   like a normal conversation where we sort of anticipate
25   what other people are going to say.  You need to let me
```

Richard Hough, Sr., CPP, CCHP 05/28/2025

1   finish my question before you start giving your answer.

2   And I need to let you give your full answer before I

3   start giving my next question, I'm going to do my best

4   if you promise me to do your best.  Is that fair?

5        A    Absolutely.

6        Q    Okay.  A few things that are specific to this

7   case, in these corrections cases, the words inmates and

8   detainees and prisoners kind of get used

9   interchangeably; although, they all have, you know, kind

10  of more specific meanings in the field of corrections.

11       But I hope that throughout the day I might use the

12  word detainee.  That's probably the proper word for most

13  of the people that we're going to be speaking about

14  today.

15       But I'm probably also going to use the word inmates

16  because that's how a lot of policies refer to the people

17  in the Marion County Jail.

18       So can we just get on the same page that if I say

19  detainee or inmate, I'm talking about people who are in

20  the custody of Marion County Jail or some other

21  corrections facility.  Is that fair?

22       A    Yes.

23       Q    Okay.  And if there's some sort of material

24  distinction that needs to be made as far as detainees or

25  inmates.  As far as the question that I'm asking, you



 1    can feel free to make that distinction, okay?

 2        A    Sure.

 3        Q    Okay.  And then have you -- what have you

 4    reviewed in anticipation for your deposition today?

 5        A    I don't remember which parts.  I've gone back

 6    through my report sometime in the last few days.

 7        I know there was a lot of documents in this case.

 8    So prior to my report all of the materials I was

 9    furnished.

10        But like I said, as far as leading up to here, I

11    think I looked back through maybe a couple of the

12    policies and glanced at, I think a couple of the

13    deposition transcripts.

14        But I've been on the road for the last two weeks,

15    so I'm not -- I'm not -- I'm not sure which ones I did

16    look at.

17        Q    Okay.  And did you meet with the attorneys for

18    Marion County?

19        A    Spoke with Mr. Bogan briefly.

20        Q    Okay.  For about how long?

21        A    Oh, let's say about 30 minutes.

22        Q    Okay.  And where are you today?

23        A    In Johnson City, Tennessee.

24        Q    Okay.  Are you at your your home office?  Your

25    your actual office?

Richard Hough, Sr., CPP, CCHP 05/28/2025

1      A    Correct.  My home office.

2      Q    Okay.  Is anyone else in the room with you?

3      A    No.

4      Q    Okay.  Do you have any documents in front of

5  you?

6      A    A copy of my report.

7      Q    Okay, great.  Is that the full report with all

8  the appendices and everything?

9      A    Yes.

10      Q    Great.  And a few questions that I have to ask

11  that are a little bit rude, but do you have any felonies

12  in your background?

13      A    I do not.

14      Q    Okay.  When I was researching you there's a

15  Supreme Court of Ohio case that deals with a Richard M.

16  Hough, who was convicted of, I believe it was a

17  vehicular manslaughter.  I assume that it's not you

18  today.

19      A    That is not me.

20      Q    Different Richard M. Hough.  Understood.

21  So, another kind of rude question.  Is there any

22  sort of reason why you would not be able to testify

23  fully and truthfully today?

24  You took some sort of medication.  You didn't get

25  enough sleep last night.  You're suffering from some



1    sort of illness.

2        A    No.

3        Q    Okay.  You were retained by Mr. Bogan and his

4    firm, Hilyard, Bogan and Palmer, correct?

5        A    Yes.

6        Q    And how many times have they retained you?

7        A    I would probably estimate over the last 10

8    years, maybe 10 or so times.  That came up recently in

9    another case with another firm.  So that's what sticks

10    out in my mind.

11        Q    Okay.  Do you have any other clients that you

12    do expert work for that you've been retained that many

13    times?

14        A    I'm sure.  Yeah.

15        Q    Okay.  What kind of cases were you retained by

16    Hilyard, Bogan and Palmer?

17        A    I think that each would be either a police

18    practices or a corrections practices case.  Probably on

19    behalf of the Florida Sheriff's Risk Management Fund, I

20    think is the as the client.  I can't -- I can't recall

21    any that that would not be the case.

22        Q    As you're thinking back to those cases that

23    Hilyard, Bogan and Palmer has retained you on, are you

24    just considering those that they've retained you to

25    disclose a report and/or testify, or are you also



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    considering those that they've retained you to consult

2    on?

3        A    I don't believe they have utilized me as a

4    consulting expert in any of those cases.  I think all of

5    those would have been as a retained, disclosed

6    testifying expert.

7        Q    And Hilyard, Bogan and Palmer is not the only

8    law firm that has retained you in their representation

9    of the client, the Florida Risk Management Fund.

10   Correct.

11       A    Oh, right.

12       Q    Right.  So, sorry, is it the Florida Sheriffs

13   Risk Management Fund?  Is that the correct --

14       A    I, I believe I'm saying their title correctly.

15   I believe that's right.

16       Q    And your understanding is why -- don't you

17   just tell me what your understanding of the Florida

18   Sheriff Risk Management Fund is.

19       A    Kind of there in the name, just the collective

20   insurance entity that the various of the 60 or so

21   sheriff's offices within the State of Florida can or do

22   participate in for their liability coverage and

23   representation.

24       Q    They provide insurance to the the various

25   sheriff's departments throughout Florida, right?



1      A    I can't, you know, speak to, you know, all of

2   their functions.  But that's where typically a check

3   comes from after I submit an invoice.  So yes, to my

4   knowledge, that covers it.

5      Q    And how many times have you been retained to

6   provide a report, consult, provide testimony in any case

7   for the Florida Sheriff's Risk Management fund?

8      A    I don't know.  Of course, the Rule 26 part of

9   my report will cover the last three or four years,

10   whatever is required in terms of testimony, but I don't

11   know how many times I've been retained by by the Fund.

12      Q    Is it more than 15?

13      A    We're all based on kind of what we just said

14   about how many over the past decade, perhaps for this

15   firm, I'd say yes, but I won't do much more of a

16   guessing game than that.

17      Q    Okay.  How much of your income comes from

18   expert witness work, what percentage?

19      A    I would say over the last, probably averaging

20   over the last three years, 65 percent.  Maybe 70

21   percent.

22           MS. HARTON:  Okay.  You have provided a report

23       in this case.  Let's just get this out of the way

24       and enter it into the record.  I've labeled it

25       Exhibit 66 and you've got a copy of it in front of



 1      you.

 2          (Thereupon, Plaintiff's Exhibit 66 was marked for

 3  identification.)

 4  BY MS. HARTON:

 5      Q    Let's see.  So this is the this is the first

 6  page of your report.

 7          That looks correct, right?

 8      A    Yes, that looks correct.

 9      Q    All right.  And then if I go all the way down

10  to the bottom, it's a total of 60 pages with the last

11  page being blank.  It's a total of 60 pages including

12  the appendices, right?

13      A    That sounds right.

14      Q    All right.  Is there anything that I have

15  throughout this depo, as I'm showing you the the report,

16  that's different from the report you have in front of

17  you, you're going to let me know, right?

18      A    Yes.

19      Q    Okay.  I'm going to go down to Exhibit 66,

20  Appendix A.  These are the documents that you reviewed,

21  right?

22      A    That would be correct.

23      Q    Okay.  Have you reviewed any other materials

24  in addition to the ones listed in this disclosure?

25      A    I don't recall what.  Perhaps I've been

1  forwarded since the date of the report, February 5th.

2  So it's entirely possible, but I don't.  I'm not sure.

3      Looking at that, I know the electronic folder

4  strikes me it had a lot, but I know some of that may

5  have been in sub folders.

6      Q   You've been forwarded other depositions that

7  have been taken throughout discovery that you didn't

8  have when you disclosed this report?

9      A   I think that would be correct.  I see McNeely,

10 Miller.

11     I'm not sure, but prior to issuing the report, this

12 would be the list.

13     Q   Did anything that you may have reviewed, after

14 you disclosed this report, none of that changed your

15 opinions, right?

16     A   Correct.

17     Q   So you list all the materials that you've

18 reviewed here.  You've reviewed every single one of

19 these documents listed in these five pages, right?

20     A   At some point in the in the process, yes.  As

21 you flip through those -- I nothing comes up that I

22 would not have, for some reason, reviewed in this.

23     Q   Tell me about your your review process.  Are

24 there, you know, some documents that you kind of paid

25 more attention to than others, some that you kind of



1    recognized as not being relevant and skimmed through?

2    Tell me about your process.

3         A    As I think, somewhere within the report I talk

4    about the methodology of looking at, on any of these

5    cases, if you call me up tomorrow and say, hey, you

6    know, I've got a case, maybe you could look at it.

7         I'm going to start with everything that you do

8    furnish to me and then once, kind of digesting that and

9    that's all the documents to kind of look at that balance

10   against what are existing documents either within the

11   field in this case corrections or law enforcement

12   depending on the matter.  Any, perhaps, guidance or

13   recommended or advised models or policies that are out

14   there.

15        I usually, I'm sure in the report refer to the

16   American Correctional Association, American Jail

17   Association.  In this case, of course, looking at the

18   Florida Model Jail Standards and the Florida

19   Accreditation Commission for Corrections.

20        Those would be the two guiding ones in this case,

21   and look to determine within the scope of whatever I've

22   been asked to review, whether there is some departure

23   from standards, and if I'm able to render an opinion

24   regarding whether that bears on any aspects of the case

25   or not.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1      Q    We said earlier that there were a lot of
2  documents in this case, right?

3      A    Yes.

4      Q    Did you read every single word of every single
5  document or were there some that you skimmed through?

6      A    I don't know.  You've used that term skim
7  twice.  I think if we were to pull up each and every one
8  of the documents to remember back to whenever I received
9  any of those, I would have to literally look at each of
10  those to determine, you know, how many pages in each.

11      And is it potentially that in any one of the
12  documents some aspect of it didn't get as full of
13  reading as somewhere else.  I certainly wouldn't sign on
14  for the benefit of your presentation to the jury that I
15  skimmed the materials.  No.

16      Q    Okay.  In this case, there were some written
17  interrogatories that were answered by Marin County and
18  some of the other defendants in this case.  I'm not
19  seeing those on your appendix.  Do you recall reviewing
20  any written interrogatories?

21      A    Independently sitting here?  No, I don't
22  recall.

23      Q    Okay.  So your fee schedule is the next
24  appendix.  You have a -- just kind of going through the
25  highlights here.  You've got an initial retainer of



1    $3,000, another retainer prior to disclosure for 2.5

2    thousand, sorry, $2,500.  And then you charge 375 per

3    hour and then you've got some other fees pertaining to

4    travel.  And then of course a fee for this deposition of

5    $1,800.

6         Is that all accurate kind of how I summarized that?

7         A    Yes, that seems right.

8         Q    How how much?  Have you invoiced for today, as

9    we sit here today?

10        A    I don't believe it's any more than that

11   initial $5,500.  I don't recall any other invoice at

12   this point.

13        Q    Okay.  How many hours have you spent on the

14   case?

15        A    Post retainer, I think it is approximately

16   somewhere between seven and nine.  But until I

17   determined that an issue an invoice, I'm not positive.

18        Q    Seven to nine total hours on this case you've

19   spent?

20        A    Post retainer, meaning it would have been a

21   minimum or up to 15 hours is covered by the initial

22   retainers and so that anything after that.  So then

23   probably, therefore, you know, in the area of 25 or so

24   hours.

25        Q    Okay.  Let's go through your CV, which is



1   appendix C. First I want to start -- you've got two

2   masters in public administration.  Can you tell me why

3   you have two?

4       A    Sure.  The second one, as you see from the

5   University of South Florida, is all but thesis.  I had

6   completed all but three courses before being accepted to

7   Harvard.

8       Went off, did the master's degree at Harvard, came

9   back, didn't like the idea of leaving three courses

10  hanging.  None of these courses are repeats.  In other

11  words, it's a completely different curriculum, still

12  arriving at public administration, public management.

13      Q    So you took.  Sorry, I might be confused here.

14  You took all of your -- almost all of your master's

15  courses until you had three left at University of South

16  Florida.  And then did you take those additional three

17  courses at Harvard, those last three?

18      A    No, I took those at USF, once I returned from

19  Harvard.

20      Q    Okay.  So then how many courses did you take

21  at Harvard?

22      A    I think it was 10.

23      Q    Okay.  And did you do a thesis while you were

24  there?

25      A    I'm trying to remember there was a major



1  paper.  I don't recall if they termed it as thesis.

2  It's been a while.

3       Q    Le me go through some of your positions.  I'll

4  start start sort of at the bottom here.

5       You started a started your career in law

6  enforcement as a patrol officer for the Bradenton Beach

7  Police Department, right?

8       A    That is correct.

9       Q    Okay.  Then you -- you went to -- why'd you

10 switch from Bradenton Beach to Longboat Key?

11      A    Larger agency.

12      Q    Okay.  And you became a department training

13 officer and then a senior patrol officer, right?

14      A    That's correct.

15      Q    Okay.  Did you do it -- when you were at those

16 two police departments did you do any corrections work

17 or were you just sort of on patrol?

18      A    No, those were as patrol officers.

19      Q    Right.  So then when's your first position

20 that you start getting into corrections?

21      A    That would be.  That would be 1991 where you

22 see the entry there under the Manatee County Sheriff's

23 Office.

24      Actually, that's not true because -- let's take a

25 look here.  As administrative division commander at the



1   Manatee Sheriff's Office, which was 1989.  Part of that

2   division included all training for the agency.  But

3   then, yeah, I see the next one above that 1991 when I

4   returned then started a corrections and a law

5   enforcement academy for the Sheriff's office.

6       That's one of the statewide training academies.  So

7   in the 1989, probably, time frame, but then 1991 is when

8   I took over the corrections bureau at that agency.

9       Q    Well, what had you done in corrections besides

10  -- what is -- tell me what this law Enforcement and

11  Corrections Academy coordinator position was.

12      A    That's overall in charge of all training for

13  all entry level corrections deputies as well as law

14  enforcement deputies.

15      Q    And you became the coordinator of that.  But

16  it looks to me like prior to that position you had no

17  corrections experience whatsoever, it was all patrol.

18      A    In terms of working as a corrections officer,

19  that's correct.  During the period of time as policy

20  advisor that would also have included some aspects of

21  written policy.

22      I was part of the agency's General Orders Review

23  Committee.  We were going through, at the time, national

24  accreditation, which was for law enforcement.

25      It had some some implications with corrections, but



1    largely not.  So, yeah, I'd say 89, 90, 91 is where

2    really any substantial involvement began.

3        Q    You weren't a corrections officer or doing any

4    corrections administration, right?

5        A    Not until then.

6        Q    Not until 1991?

7        A    Correct.  Well, it depends on, let's see, when

8    the academy started.  Yeah, that sounds right.  1991

9    sounds right.

10       Q    Okay.  The deputy chief corrections bureau

11   CERT commander; what's a CERT commander?

12       A    Correctional emergency response team.

13       Q    Okay.  This was at the Manatee County

14   Sheriff's Office.  I assume that that Manatee County

15   Sheriff's Office had some sort of regime by which it

16   classified inmates and housed inmates according to their

17   classifications, right?

18       A    Sure.  Yes.

19       Q    Okay.  What was your role in terms of

20   participating in the classification of inmates or

21   participating in developing policies related to

22   classifications of inmates at Manatee County?

23       A    I was director of corrections, and so within

24   the overall bureau, which I think was three divisions at

25   the time, the development of all policies were under and



1  modeled the same thing we did at the department in

2  creating a corrections general orders review committee,

3  because we also undertook national accreditation for

4  corrections, specifically at that time.  So leading the

5  the team that researched and wrote all policies for the

6  corrections component was all part of me.

7      I taught that at some point in the Academy as well,

8  along with, I'd have to look at the curriculum, but most

9  topics within corrections in the State of Florida at

10  some point or another.  Put myself through the academy

11  while we were running our first corrections academy to

12  become cross certified as a correctional officer at that

13  at that time also.

14      Q    I don't think I heard you say anything about

15  classifications.  And I'm sorry if I just missed it, but

16  what specifically did you do in this position from 1991

17  to 1995 at Manatee County that had to do with

18  classification of inmates?

19      A    Yeah.  On two points there, one as being in

20  charge of the entire corrections bureau.  That was a

21  section that reported up through the chain to me.

22      And having taught the section on classifications in

23  the correctional academy.

24      Q    And just to be clear, you said you were --

25  this is your deputy chief corrections bureau, and I



1   think you said that at that point you were in charge of

2   that jail, right?  Is that a fair characterization?

3       A    Yeah, there were four correctional facilities,

4   but that is correct that I was in charge of all four of

5   them.

6       Q    You were in charge of all four jails, even

7   though you had never worked as a correctional officer or

8   a correctional sergeant?

9       A    Correct.  Or lieutenant or captain or a major

10  or corporal.  That's correct.

11      Q    And how did you -- explain to me how you made

12  that jump from, you know, you had all this this

13  experience in policing, jumping over to corrections.

14  And not only jumping over to corrections, being in

15  charge of four correctional facilities.

16      A    Nothing particularly unusual.  That was the

17  Sheriff's assignment to build the first juvenile boot

18  camp in the state, to build a new correctional facility,

19  to create the correctional academy and to revise/revamp

20  the recruitment and hiring of corrections, and as noted,

21  there, leadership of those divisions within the agency.

22      Q    In your education section, there aren't dates

23  next to when you got your degrees.  When did you get

24  your master of public administration at USF?

25      A    Well, the Harvard one was '91, so I'll have to



1   figure the split.  When I got back I probably completed

2   the coursework there.  I would say either 1993 or '94.

3   That's that's a guess.  It's a quarter of a century ago.

4   But I think that's about right.

5        Q    What about Saint Leo University?

6        A    Late 80s.

7        Q    So, did you get this position, as being in

8   charge of these four jails, in Manatee County after you

9   graduated from Harvard?

10       A    That is correct, yes.

11       Q    So, next you become -- you go to the Santa

12  Rosa County, Florida Sheriff's Office.

13       Sorry.  I'll go back down for you.

14       So, it says 1995 to 1998 you were at Santa Rosa

15  County, Florida Sheriff's Office and you started there

16  as a corrections bureau administrator, right?

17       A    That is correct.  Yeah.  I see there, there we

18  go.  '95.  Correct.

19       Q    And now what do you do at -- as a corrections

20  bureau administrator how is that job different from your

21  your past job at Manatee County?

22       A    It wasn't really much different at all.

23       Q    You were still in charge of a jail?

24       A    Correct.  The corrections operation also

25  included work release center, but, yeah, essentially.



1    And building another jail.

2        Q    And what -- did Santa Rosa County have a

3    regime by which it classified inmates and house those

4    inmates according to their classifications?

5        A    Yes.

6        Q    Okay.  What was your role in helping develop

7    those classification policies at Santa Rosa?

8        A    Those had already been developed in Santa

9    Rosa.  So, once again I was in charge of corrections

10   that would have reported up through the chain of command

11   to me.

12       Q    Okay, so so both at Manatee County and Santa

13   Rosa, they already had these sort of classification

14   regimes in place when you got there, right?

15       A    Each had a classification unit in existence;

16   that is correct.

17       Q    And did you participate in any policy changes,

18   procedural changes as it related to the classification

19   of inmates?

20       A    Well, I've already testified at Santa Rosa or

21   excuse me, at Manatee, yes, that's correct.

22       At Santa Rosa I can't recall specifically whether

23   that was part of the overall set of correctional

24   policies and procedures that I directed the rewrite of.

25   We were working on going towards state accreditation



Richard Hough, Sr., CPP, CCHP 05/28/2025

1   when I left and went to the Department of Juvenile

2   Justice.

3   Q    So I want to go back to Manatee County.  Sorry.

4        You participated in policy changes related to

5   classifications.

6        A    Correct.  All the policies of the entire

7   bureau.

8        Q    And do you remember what you changed about the

9   classification policies in Manatee County?

10       A    Oh, golly.  No.  25 years ago.  I don't.  I

11   don't remember that.

12       Q    Okay.  What about --

13       A    Actually, that would have been like 30 years

14   ago.

15       Q    Right.  And same answer for Santa Rosa County.

16   You know that you changed some policies, but you're not

17   sure to what extent you changed the policy about

18   classifications, right?

19       A    I would say that's accurate.  Yes.

20       Q    Okay.  And that's the last time -- and when

21   you leave Santa Rosa County in 1998, that's the last

22   time you work in adult corrections, right?

23       A    Correct.  For adult corrections.  That was it.

24       Q    Okay.  So the the only time that you've worked

25   from adult adult corrections was from 1991 at Manatee



1   County to 1998, in Santa Rosa County, right?

2        A    That sounds right.  Other than 30 years of

3   consulting in it.  But I believe that would be correct.

4        Q    Okay.  And then you go work for five years in

5   the Florida Department of Juvenile Justice, right?

6        A    Correct.  In the detention services.

7        Q    Those are all minors, people under 18, right?

8        A    Yes, they are.

9        Q    Why'd you laugh?

10       A    Because they have a higher assault rate on

11  officers than all state agencies in the State of Florida

12  combined.  It's much more challenging population for

13  anybody who knows anything about corrections.

14       Q    And in the Juvenile Justice Department did you

15  participate in developing policies/procedures for any of

16  the facilities or the department at large?

17       A    As noted on the -- my CV there, I created the

18  Statewide Juvenile Detention Officer Training Program to

19  train correctional officers within the facilities across

20  the State of Florida at the regional level for the two

21  detention centers, that at different times I was in

22  charge of.

23       Also led the effort to develop the new policies for

24  one that was the Okaloosa Regional Juvenile Detention

25  Center and some rewrites for the other detention center.



1    Q    And so those are -- so you helped develop a

2    training program.  Did you do anything else in terms of

3    developing policies and procedures for the Department of

4    Juvenile Justice?

5    A    In the final, I think it was about six months

6    or so of the time I was there I worked on, as part of a

7    small working group as a subject matter expert on use of

8    force, use of force policy, tactical procedures, all of

9    which resulted in rewritten or newly created policy for

10   that state agency, yes.

11   Q    Did any of those policies, procedures or

12   training that you helped develop have to do with

13   classifications?

14   A    Not in that final period, no.

15   Q    What about the training that you developed

16   before that final period?  Did any of those trainings

17   have to do with classifying juveniles?

18   A    The state already had in place the statewide

19   system for that.  So I don't remember, other than hiring

20   70 new people who'd never been correctional officers

21   before and overseeing their training, I don't think I

22   wrote anything on classification that would have been

23   new for the State of Florida at that point.

24   Q    I want to ask the same questions as it

25   pertains to supervision of monitoring of inmates.  At



1  any of those three departments where you were in charge

2  of their corrections facilities did you participate in

3  the development of policies, procedures or training

4  relating to the monitoring and supervision of inmates?

5      A    All three agencies, yes.

6      Q    And can you -- we can go, you know, one-by-

7  one.  But can you recall the specifics of any of those

8  policies, procedures, or trainings that you developed

9  related to supervision and monitoring of inmates?

10     A    I would not be able to recall for any of those

11 three agencies specific examples of what within those

12 topic areas that I may have changed or modified.

13     Q    And same question for inmate-on-inmate

14 violence.  Do you remember the specifics of any

15 policies, procedures, trainings that you developed at

16 any of those three agencies.

17     A    That would be contained within the supervision

18 and management that we just discussed?

19     Q    Okay.  And you don't recall any particular

20 change that you made, said, hey, I think this would be a

21 good idea to implement anything like that?

22     A    Not -- not as such, no.

23     Q    Okay.  Now, we've said the term

24 classifications a few times, and I kind of explained

25 what I meant, but I just want to make sure we're on the



1  same page.  When I'm talking about classifications in

2  terms of corrections what do you understand that to

3  mean?

4      A    Well, probably more important to understand

5  what you mean so that the questions get an appropriate

6  response from me.

7      Generally, within the correctional field, including

8  whether it's detention centers, jails or prisons, for

9  that matter, you are with the staff to the extent you

10  have the staff to accomplish this.

11      Trying to determine an appropriate housing

12  location, to the extent you have varied housing.  And

13  where to place individuals that may be most appropriate

14  for their particular needs and for the security of the

15  facility.

16      Q    And why is it important to have a

17  classifications regime and process at any jail?

18      A    Well, as I just said, when you consider

19  housing as well as what programs you either have

20  available to offer to the inmate population, those are

21  some of your, you know, guiding things.

22      So the good order of the facility is kind of an

23  umbrella term to think about, you know, how well a place

24  can be run when you have a group of incarcerated humans.

25      Q    And one of the reasons for classifications is



1    that some people pose a higher risk of -- higher

2    security risk to the officers and to other inmates.  And

3    so it's important that the jail classifies them

4    according to that known risk, right?

5        A    Risk, to the extent that risk can be

6    determined is one aspect of classification.  It's in the

7    mix.  Yes.

8        Q    Let's talk about your report now.  I'm going

9    to go up to page 10.

10       Okay.  And I want to point your attention to this

11   first paragraph, and take a minute to read it if you

12   need to, and let me know when you're ready for me to ask

13   you a question.

14       And if you --

15       A    The one under spontaneous assault?

16       Q    No, just the first, the top, the first

17   paragraph.

18       A    Okay.

19       Q    And if you want to read on the the version

20   that you have printed out, that's totally fine too.

21       A    Yeah, it's –

22       Q    Whatever you prefer.

23       Okay, I can actually just take this down then and

24   then we can just --

25       A    That's fine.

Richard Hough, Sr., CPP, CCHP 05/28/2025

1      Q    Well, maybe I can.

2      A    I do see the paragraph.  Yes.

3      Q    Okay, so that last sentence you say, "For the

4   instant matter the law and administrative code as

5   enacted by Florida Legislature is the actual standard

6   that agencies in Florida must meet."

7      Do you see that?

8      A    I do.

9      Q    Okay.  So by the "instant matter" you're

10  talking about this case that we're here about, which is

11  Merchant versus Wood's case involving the death of Cory

12  Merchant in the Marion County Jail, right?

13     A    Correct.

14     Q    Okay.  So what is the basis for your opinion

15  that the law and administrative code as enacted by the

16  Florida Legislature is the actual standard by which to

17  assess the incident matter in this case involving Cory

18  Merchant?

19     A    And again, putting the entire paragraph in

20  context, Mr. Adee refers to something that is not in

21  any.

22          THE COURT REPORTER:  I'm sorry, who?

23          THE WINTESS:  A-D-E-E.  Expert for the

24     Plaintiff.

25          He references a document that is not guiding

Richard Hough, Sr., CPP, CCHP 05/28/2025

1          for the State of Florida.  What is guiding for the

2          State of Florida is the Florida Model Jail

3          Standards as well as, to a certain extent, the

4          Florida Commission for the Accreditation of

5          Corrections since Marion County has gone through

6          that voluntary process to achieve state level

7          accreditation.

8     BY MS. HARTON:

9          Q    Yeah.  And so what's the basis for your

10    opinion that the law and administrative code as enacted

11    by the Florida Legislature is the standard by which to

12    assess this case.

13         A    The Florida Model Jail Standards are the

14    standards that jails within the State of Florida have to

15    abide by.  I'm not sure how else to to put that.  And

16    Marion does.

17         Q    Okay.  And those standards -- those are the

18    standards that –

19         Sorry.  You said, "and Marion does."?

20         A    "Does."  The Marion County Sheriff's Office

21    Jail Facility adheres to the Florida Model Jail

22    Standards as well as the Florida Commission for the

23    Accreditation of Corrections.

24         Q    Okay.  And so, those standards, the Florida

25    Model Jail Standards and the Florida Committee for



 1    Accreditation –

 2         Sorry, remind me what that FCAC stands for again.

 3         A    Florida Commission for the Accreditation of

 4    Corrections.

 5         Q    Right.  So I'm going to refer to them as FMJS

 6    or Florida Model Jail Standards.  And the FCAC.

 7              THE COURT REPORTER:  I'm sorry, just a little

 8         bit slower.

 9    BY MS. HARTON:

10         Q    Yes.  The Florida Model Jail Standards and the

11    Florida Committee for Accreditation of Corrections.

12         Those two standards provide the foundation for all

13    of your opinions, right?

14         A    Well, no.

15         Q    Okay.  Can you explain?

16         A    Well, you just took me back to 30 years ago on

17    the CV.  I have a 45 year career including, obviously,

18    many things we didn't discuss that form the basis of my

19    opinions as well as what are -- what is the academic

20    literature showing us, what other things, to include

21    some of the items referred to by Mr. Adee.

22         The universe of those items form the basis of how I

23    would evaluate any case or analyze it.

24         Q    So these -- so in this paragraph, you sort of

25    fault Mr. Adee for relying too heavily on these National



1   Institute of Corrections and Sheriffs Guide Resources.

2   But those those are sources by which you can draw some

3   sort of guidance as to how to run corrections, right?

4        A    That's that's that's too broad of a statement.

5   Mr. Adee is applying it specifically in this case.  And

6   and I, yes, I say this in a variety of places in the

7   report, is to presenting that as though this is guiding

8   in a legal sense that anybody, any state or territory

9   within the US would have to follow that document, which

10  they do not.

11       So that's the point to be made here is that the

12  Florida Model Jail Standards, the FMJS and the FCAC

13  Standards are those that a Florida jail, if they're

14  accredited, but the Florida Model Jail Standards,

15  regardless.

16       Those are the ones that you have to abide by,

17  others may provide guidance, commentary.  I make the

18  point in the report that the document Mr. Adee refers to

19  is an informational one for new sheriffs, new

20  corrections director sometimes.

21       It was created 20 some years ago.  So it is not

22  something that's a requirement for any of the 3100 jails

23  in the U.S. that has to follow.

24       Q    What's your basis for what you later included

25  in opinion that Mr. Adee is using these -- the Sheriff's



1    Resource Guide and this National Institute of

2    Corrections Guide; what's your basis for the opinion

3    that he's saying that those are mandatory or carry any

4    sort of force of law?

5        A    Which opinion of mine are you referring to

6    specifically?

7        Q    I mean, we can get into it.  We can get into

8    it later.  But you say --

9        A    Well, you're asking me a specific question.

10   So my basis for an opinion on his opinion is not what

11   I'm here for.

12       My opinions rest on the analysis that I did, but

13   it's certainly also within my purview to point out when

14   I think something is inaccurately stated.

15       Q    Okay.  But so if you go to opinion 19, page

16   24, opinion 19 of your report.  I'll let you get there.

17   Let me know when you're ready.

18       A    I'm there.

19       Q    You say plaintiffs practices expert Mr. Adee

20   recites several non guiding documents that discuss

21   sundry jail issues.  What non guiding documents are you

22   referring to?

23       A    Well, we just referred to the one.

24       Q    The Sheriff's Guide?

25       A    Correct.



1    Q    And the National Institute of Corrections?

2    A    Correct.

3    Q    Why are they not guiding?  Don't -- go ahead.

4    A    They they bear no weight of law nor regulatory

5    guidance or authority.  They are commentary by the

6    National Institute of Corrections on certain aspects of

7    certain operations of correctional facilities that may

8    be helpful to understand the environment and how things

9    might be run, but they do not direct how a sheriff in

10   the State of Florida must do things.

11   Q    Okay.  And so what are the things that direct

12   what -- how a sheriff must do things?

13   A    Well, I've already testified to that twice.

14   Here's a third time.  Florida Model Jail Standards and

15   the Florida Commission for the Accreditation of

16   Corrections.

17       There are, of course, statutes that come into play.

18   But the Florida Model Jail Standards were developed

19   considering all of the statutes that touch on county

20   level correctional facilities and operations.

21   Q    And it's -- and the Florida Model Jail

22   Standards and the -- the Florida Florida Model Jail

23   Standards and the Florida Commission for Accreditation

24   of Corrections, those provide standards that carry the

25   authority of law?



1          MR. BOGAN:  Object to form.

2          THE WITNESS:  As I said, the Florida Model

3      Jail Standards are mandatory for jails in the State

4      of Florida to follow.

5          What I said about FCAC is that because Marion

6      County undertook the voluntary accreditation, that

7      if they do not adhere to the standards at the

8      prescribed level that that they must they are at

9      risk of not being reaccredited.

10  BY MS. HARTON:

11      Q    So in addition to the Florida Model Jail

12  Standards and any standards required by the FCAC, jails

13  in Florida are also required to meet the standards set

14  forth by the United States Constitution, right?

15      A    That is correct.

16      Q    Okay.  Is it your opinion that those standards

17  that we just discussed, the Florida Model Jail Standards

18  and any standards set forth by the FCAC that those are

19  reflective of the constitutional minimum standards?

20          MR. BOGAN:  Object to form.

21          THE WITNESS:  Well, of course, as I note in my

22      report, I don't -- I'm not in a position to offer

23      legal conclusions.  I can speak at length in

24      regards to the training of correctional

25      professionals and how much of that training



1    incorporates case law, constitutional law,

2    statutory law in regards to how officers are

3    trained.

4          So to -- I have no reason in the record of

5    this case, nor in anything since Florida's

6    Accreditation Commission has existed, that would

7    indicate that that body did not reflect or take

8    into account constitutional law as directed by the

9    Florida Legislature and in creating those

10   standards.  So, no legal opinion on my part.  But

11   yes, it appears that the statewide accreditation

12   reflects law.

13   BY MS. HARTON:

14      Q    Florida state law or constitutional law or

15   both?

16      A    As I said, my view would be that both are

17   contained within the Florida Model Jail Standards when

18   they created those.

19      Q    Okay.

20      A    Again, that's not a legal conclusion.  You're

21   -- you're inquiring paths to a state level accreditation

22   and what was set up since that's directed by the Florida

23   legislature.

24      Q    But you understand that this case is being

25   brought against the Sheriff for constitutional



1   violations.  You understand that, right?

2       A    I do.

3       Q    Okay.  And you say that for the instance

4   matter, the law and administrative code as enacted by

5   the Florida Legislature is the actual standard that

6   agencies in Florida must meet.

7       So, my question is, is it your opinion that these

8   Florida standards that you've cited multiple times, the

9   Florida Model Jail Standards and those set forth by the

10  FCAC, are the only standard by which we can understand

11  whether there was a constitutional violation in this

12  case?

13      A    Well, again, you're you're calling for a legal

14  conclusion that isn't within the purview of an expert.

15      I'll take you back to what I testified to seven or

16  eight minutes ago, which was the context of that

17  paragraph juxtaposing Mr. Adee's offering of a 20 year

18  old document meant to familiarize new sheriffs about

19  responsibilities in a jail as opposed to actual

20  standards in the State of Florida that direct what

21  sheriff and a jail must do.

22      Not some exclusive statement that keeps out the

23  U.S. Constitution or perhaps federal case law decision

24  made somewhere.  So not -- by all means ask more.  I'm

25  not entirely sure --



1    Q    Let me let me ask you this question.

2    A    Go ahead.

3    Q    Well, what is the basis for your understanding

4  that these -- the law and administrative code as enacted

5  by the Florida Legislature is any more useful in helping

6  us understand what the constitutional minimal standards

7  are than the National Institute of Corrections or the

8  Sheriff's Guide?

9    A    Yeah.  One's required.  One's not.  I'm

10  failing to understand why --

11    Q    Required by the State of Florida, right?

12    A    Correct.  There's no -- let me finish,

13  counselor.  Remember the golden rule.

14      There's no jail within the State of Florida that

15  has to do anything that the National Institute of

16  Correction says.  They all have to do what the Florida

17  Model Jail Standards say.  What is not clear about that?

18    Q    What about the -- what is your basis for the

19  use of the Florida Model Jail Standards as a way to

20  understand what is required by the Constitution?

21    A    Okay, you just pulled that one out of air or

22  left field or something.  I never said in this report

23  that the Florida Model Jail Standards or FCAC is the

24  pathway into the U.S. Constitution.

25      Your question was going off the fact that your



1  expert offered up a 20 year old NIC document as

2  something that directs what sheriffs in Florida do, and

3  it doesn't.  That's the point in that paragraph.  We can

4  keep doing the gymnastics, but that's that was what I

5  said in the paragraph.

6      And when you're ready, we'll we'll take a break so

7  I could get some coffee.

8      Q    Can I -- just want to finish this line of

9  questioning.

10     A    One more question then I need to get up and

11 take a break.  But that's fine.

12     Q    Is it is it your opinion that if a jail

13 complies with Florida law, they have met Constitutional

14 minimal standards?

15         MR. BOGAN:  Object to form.

16         THE WITNESS:  I appreciate, I guess, what you

17     think, I guess, you're going for, I guess, which is

18     to keep getting me to say something that's not

19     within my purview, which is a legal conclusion.

20         So I don't offer an opinion besides the

21     protracted monologue I just gave a couple of

22     minutes ago in regards to the legislature of the

23     State of Florida, set up the Florida model Jail

24     Standards, Commission and Committee that put

25     together the Florida Model Jail Standards, which



 1        are required by Florida law to be followed by

 2        sheriffs and jails.

 3             And you might wish to depose somebody from

 4        that commission to speak as to whether, or to what

 5        degree they believe, it comports with the United

 6        States Constitution, or if there's a case to be

 7        made that I haven't seen for the court to take up

 8        that the Florida Model Jail Standards, as long as

 9        they've been in effect, somehow now deviate from

10        the US Constitution in some way.  I guess that's

11        not for me to say.  I'll try to explain that better

12        to the jury when you ask me.

13   BY MS. HARTON:

14        Q    Well, can you explain it as best to the jury

15   today, since this is my deposition, where I'm going to

16   find out what you're going to tell the jury?

17        A    Well, I, well, I just did.  We're going to go

18   with asked and answered about four times on that.

19        Q    Well, no, you just said that maybe you can

20   answer it better in front of the jury and then you're

21   not going to explain to me what you're going to say to

22   the jury?

23        A    Well, upon reflection, I mean, maybe -- maybe

24   something will occur to me, but I think by then at trial

25   there will have been enough objections and maybe a



Richard Hough, Sr., CPP, CCHP 05/28/2025

1  sidebar that the court's going to tell you to move on,

2  counselor.  So that's -- I'm not holding something back.

3      I'm trying to figure out dog on bone, what's what

4  you're doing here with the paragraph and and again,

5  trying to get me after this many years to say something

6  that would what Daubert me by saying I some legal

7  conclusion that I can't draw.  None of that's going to

8  make it before the jury.

9          MS. HARTON:  Let's take a break.

10          THE WITNESS:  Great idea.

11      (Brief recess taken.)

12  BY MS. HARTON:

13      Q    I want to go to the end of your report where

14  you list all of your opinions.

15      I want you to go to number five.  It's on page 18

16  of your report.

17      A    Okay.

18      Q    Let me know when you're there.

19      A    I'm at number five.

20      Q    Okay.  So, in the middle of that paragraph,

21  you -- I'll just read the whole thing.

22      "Persons who arrive at a short term jail facility

23      have motivations and lives that are complex and

24      largely unknown to staff, even after assessments,

25      admission and ongoing contact."

1          And then you say,

2              "Troubled individuals are not inclined to

3          share details of their lives even when asked direct

4          questions."

5          What's your basis for that second sentence?

6          A    Oh, my.  A sentence out of the entire report.

7    The basis for that sentence.  Well, it stands on its

8    own.

9          First of all, is that troubled individuals don't

10   share everything.  People who are in a correctional

11   facility, typically, kind of by definition, have had

12   something go wrong in their personal existence.

13         Otherwise they they wouldn't be there.  So when

14   you're asking information or assessing individuals, much

15   the same way, I don't know, the the medical drama House

16   was based upon the fact that everyone are shading

17   sometimes, even if they don't know it, the information

18   they're providing to you.

19         So that the whole paragraph, since it isn't a

20   faithful reading to pluck out one sentence out of there,

21   the paragraph gets at the point that you don't know

22   about what's inside the mind of any individual member of

23   your inmate population, but that regardless of these

24   various troubles, complications, stressors that each and

25   every one of us deals with that doesn't mean that



1  someone's going to act out at any particular moment or

2  be violent.

3       Q    Dr. Hough, you wrote this report, right?

4       A    Yes, I did.  Why would you ask?

5       Q    Of course you wrote it, right?  And so --

6       A    Of course I did.  Why would you ask?

7       Q    And you wrote and you wrote every sentence in

8  this report, right?

9       A    I sure did.

10      Q    And there's a reason why you included each and

11  every sentence of this report, right?

12      A    Oh, that's a broad question when you're -- I

13  don't know if you're filing a motion or you're

14  particular writing process.  Me, I've written many books

15  and many reports.

16      So as I'm working through something, why a

17  particular sentence at a moment applies to something?

18  Gosh, I'm not sure.

19      Again, that's something I'll try to relate to the,

20  you know, the jury when repeating that about this one

21  sentence.  But follow up with what your point is and

22  I'll try to answer it.

23      Q    I want to, I mean, you included every single

24  sentence in this as a support for your opinions about

25  this federal litigation that you have been retained to



1    testify in.

2        And so, I want to know for each -- for these

3    sentences where you are, you are making claims about

4    what troubled individuals do or do not do.

5        I want to know what's your basis for troubled --

6    you say troubled individuals are not inclined to share

7    details of their lives even when asked direct questions.

8    How do you know that?  What do you have some sort of

9    research?  Some sort of study?

10               MR. BOGAN:  Ojection form.

11               THE WITNESS:  I object to that form, too, just

12        as a person objecting that you just narrated into

13        the record rather than -- that was all testimony --

14    BY MS. HARTON:

15        Q    You are not a lawyer.  You have -- you're --

16        A    You're right, I'm not.  And you want to let me

17    respond.  I'll respond.  I'm not a fact witness,

18    counselor.

19        So, I'll provide my response.  You're being

20    ridiculous asking me about this sentence and coming up

21    saying, what's my basis for making that that comment?

22        Well, I don't know, my education, my training, my

23    experience to say, and I think it might resonate with

24    the jury, that troubled individuals are not inclined to

25    share details of their lives even when asked direct



1    questions within that paragraph about life stressors.

2       And you don't know all there is to know about

3    people who come in to a jail facility.  That's that's

4    the paragraph.  That's the point.

5       Q    Sorry.  Go ahead.

6       A    No, no, I apologize.  I'm getting a little

7    frustrated because I'm not sure if you're just trying to

8    use up the four hours or you really are trying to get to

9    a point that I want to try to help you reach.  So I'll

10   try to answer it more.  Go ahead.

11      Q    For the record, I get seven hours.

12      A    Not today you don't.

13      Q    And are you saying – Yes, I do.  I absolutely

14   do.

15      A    No.  This was for a four hour block of time

16   from one to five, and I've got an appointment at 5:30.

17   So, no, this isn't going seven hours if that's what

18   you're trying to say.  But if that's not your point,

19   maybe bring it back to what your question is.

20      Q    Dr. Hough, are you saying that I'm being

21   ridiculous because I'm asking you the basis that you

22   have for this sentence in your report?

23      A    Well, I both apologized and pointed out that

24   I'm getting frustrated.  I think it is ridiculous to

25   keep asking me about this particular sentence.  So, if I



1  can understand better what you hope to glean from this,

2  as opposed to a strategy or a technique that you utilize

3  with people who you depose.  I'm going to -- I answered

4  the best I can several times now.

5      Q    I don't think you have.  You've not provided

6  me the basis for the -- for your opinion in this

7  particular sentence.

8           MR. BOGAN:  Object to form.

9           THE WITNESS:  Yeah, the sentence doesn't stand

10     alone.  It's within that opinion.  I've explained

11     the opinion.  You've asked and I've answered

12     several times.

13          MS. HARTON:  You have not provided me the

14     basis for this opinion.

15          MR. BOGAN:  Object to form.

16  BY MS. HARTON:

17      Q    Let's go with let's go with the whole

18  paragraph.  Then what's the basis for this whole

19  paragraph?  Number five on page 18.

20      A    Again, I've answered that repeatedly that you

21  don't know all about people who you have in your

22  facility.

23      Q    That's the basis for this opinion?

24          MR. BOGAN:  Object to form.

25          THE WITNESS:  The whole report and evaluation

1          and the work is the basis for the opinion.  My, as

2          I said, education, experience, training, how

3          analysis such as this is conducted about a

4          spontaneous assault with no ability to predict that

5          it was going to occur, that's all the point here

6          about not knowing that someone's going to be

7          violent.  Everyone has the capacity for violence.

8     BY MS. HARTON:

9          Q    Again, do you have any research, publication,

10    any authority to back up anything that you just said?

11              MR. BOGAN:  Object to form.

12              THE WITNESS:  No.  My career and teaching

13         college for, I don't know, 35 years, and teaching

14         correctional officers for 40 years, and people in

15         the topics of corrections, and human behavior

16         within a criminal justice context and environment.

17    BY MS. HARTON:

18         Q    Throughout this report there's a few times

19    where you reference statistics on, for example, the

20    rates of homicides and jails versus the community.  On

21    page 18, opinion six you talk about suicide rates and

22    just providing that context.

23         But my question is, you are you are not a

24    statistician, correct?

25         A    My job title and employment, I'm not employed



Richard Hough, Sr., CPP, CCHP 05/28/2025

1  somewhere as a statistician.  I'm a professor of

2  criminal justice who works with statistics every day.

3  I'm not, again, I -- your distinction eludes me.

4       Q    Okay.  Understood.

5       Okay.  I want to go to opinion nine.  That is on

6  page 19.

7       You say,

8            "There was no indication that facility

9       classification was utilized improperly or

10      incorrectly.  Both Cory Merchant and Eric Lutterloh

11      were appropriately classified as to security and

12      the needs of the facility.

13           Cory Merchant had previously been arrested and

14      convicted for domestic violence, battery.  Neither

15      fight that Merchant may have been involved in were

16      with Eric Lutterloh.

17           The information regarding the two fights

18      included one that Merchant initiated and the other

19      an officer, only observed after the fact that

20      Merchant had a black eye.

21           Cory Merchant denied there had been a fight.

22      None of this indicates that Merchant would be

23      classified as a vulnerable inmate."

24      Did I read all that right.

25      A    I believe you did, yes.



1    Q    Okay.  You talk about how Cory was

2    appropriately, Cory and Eric were appropriately

3    classified as to the security and the needs of the

4    facility.  What's the basis for that opinion?

5        A    The classification general order that exists

6    for Marion County Sheriff's Office.  The testimony of

7    the two 30(b) witnesses, the general practices within

8    corrections, specifically within jails across the United

9    States, the actual classification decision tree, the

10   north point levels schema that is used by the Marion

11   County Sheriff's Office to classify levels for the

12   inmates.

13       So, yeah, the fact that as charged sex offenders,

14   both were housed in the same location is typical and

15   customary of county correctional facilities.

16       Q    You said, "appropriately classified."

17   Appropriately classified according to what?

18       A    I just listed those.

19       Q    So, appropriately classified according to the

20   jail's own policies?

21       A    I listed that as one part of it.

22       We're missing something here.  You you seem to just

23   keep repeating some of the things I've already answered

24   at length about the policies, about the 30(b) witnesses,

25   both the captains, about what's common routine in county



1    facilities across the U.S.  The fact that it's very

2    normal that you place sex offenders in the same housing

3    area.

4         In fact, that's one of those things contained

5    within the Florida Model Jail Standards is that a

6    prohibition would be a violent felon with a misdemeanor.

7    But there's nothing that says don't put sex offenders in

8    the same housing unit or classify them differently.

9         So, all of all of those things would certainly be

10   part of, I hope, responsive to your question.

11        Q    Right.  You said, "very normal that you place

12   sex offenders in the same" place.  Very normal according

13   to what, the Florida Model Jail Standards?

14             MR. BOGAN:  Object to form.

15             THE WITNESS:  Well, and I appreciate that this

16        is your method, I read it in some of your other

17        depositions of, I don't know, picking out these

18        sentences.  To what end?  I'm not sure.  But there

19        is nothing that says don't put sex offenders

20        together.

21             What you will find, as I have found in many

22        years of looking at correctional cases, is that

23        this is the norm.  It is absolutely typical to put

24        sex offenders in the same housing unit.

25             One, I don't recall if it was Captain Peterson



1        or McNealy talking about, you know, one of the

2        reasons for that is protection of the inmate

3        sometimes from other inmates who may not regard

4        those who have committed sex offenses well.

5              Because, again, a group of humans within any

6        particular facility all have their own individual

7        thoughts and ways of looking at things, you know,

8        which goes back to opinion five that we just talked

9        about a few minutes ago.

10   BY MS. HARTON:

11       Q    Okay.  You said you said, "the norm."  This is

12   the norm.  This is very normal.  You keep you keep

13   saying these things.

14       But I need to understand where you're getting that

15   from.  Is it from the Florida Model Jail Standards?  Is

16   it from the National Institute of Corrections?  Where

17   are you getting that from?

18             MR. BOGAN:  Object to form.

19             THE WITNESS:  Well, yeah, as I just explained

20        a couple minutes ago, the Florida Model Jail

21        Standards.  I already testified to this.  I'm sorry

22        if you forgot it or somehow missed it.

23              They don't specifically state that.  The

24        prohibition would be violent felons with

25        misdemeanors, women separated from men, juveniles



1  separated from both.

2       No, not the National Institute of Corrections,

3  unless I went back through, you know, many, many

4  decades of whether they comment that, yeah, it's

5  normal that you're going to put those two sex

6  offenders -- that you're going to put sex offenders

7  in the same place.  It's up to each individual

8  sheriff.

9       So, my experience over 45 years within

10  criminal justice and dealing with various of these

11  issues, along with what's out there in literature

12  and practices, which is why an hour ago I said to

13  the extent a facility has either the housing to

14  separate people out, which many don't, that you

15  come up with, this is the basis of where

16  classification came from, is that you have to have,

17  or it's beneficial a lot of times, to have some way

18  to break it up.

19       Because you can't, in the case of, like,

20  Marion that may have, I don't know today if they

21  have 1800/2000 inmates.  I'm not sure where they're

22  at, but no county in the U.S. could afford to build

23  a jail facility with 3000 or 2000, you know,

24  separate jail cells to kind of match what their

25  inmate population is.



1          So, the idea that it's normal to have sex

2      offenders gather together, that is from my

3      expertise as a corrections consultant.

4  BY MS. HARTON:

5      Q    Okay.  You said it's up to each individual

6  sheriff.  And you said a lot there.  So I'm just hoping

7  that you can help me understand exactly what you meant

8  by, "It's up to each individual sheriff."

9      A    If that's a question, yeah, let's try to pull

10 that out of what you asked me to follow up on that I

11 tried to help you with.  And that is, that it is up to

12 each individual sheriff how classification will be

13 accomplished in their Florida jail.  That is correct.

14     Q    Let's go to opinion 13.  Let me know when

15 you're ready.

16     A    I'm there.

17          MR. BOGAN:  Okay.

18 BY MS. HARTON:

19     Q    I want to you.  I'm just going to read the

20 kind of first half of the paragraph and then and then we

21 can talk about it.  The complaint states, and is

22 subsequently parroted by Mr. Adee,

23          "A number of unremarkable aspects of housing

24      at Marion County Jail that are the same as jails

25      and prisons across the United States.  Dormitory



1    housing is utilized.  There are far more inmates

2    than officers.  Dorms are lined with bunks.

3    Inmates are often idle."

4    Then you say,

5         "The spontaneous assault of an inmate on

6    another inmate was not a reasonably foreseeable

7    outcome of entering the Marion County Jail."

8    Do you see that?

9    A    I do.

10    Q    Okay.  That second sentence, what is your

11 basis for the opinion that this assault was not

12 reasonably foreseeable?

13    A    Well, I appreciate the wordplay there about

14 where's the absence of evidence or evidence of absence.

15    The a spontaneous assault is by its nature

16 spontaneous.  And so being in a jail, any jail, whether

17 it's Cook County, Illinois or Marion County, Florida

18 doesn't create some foreseeability that someone's going

19 to just spontaneously punch somebody else.

20    So the sentence, again, within within the

21 paragraph, the sentence stands by itself is that there

22 is no literature, there is no social science

23 documentation that being in a particular jail causes

24 someone to assault somebody else just spontaneously like

25 this.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1       Q    So, is it your opinion that all spontaneous

2    assaults within a jail are unforeseeable?

3            MR. BOGAN:  Object to the form.

4            THE WITNESS:  The use of the term "spontaneous

5       assault" is that, yes, you cannot foresee that

6       there's going to be on, you know, a particular day

7       at a particular time somebody is going to punch

8       another person.

9            Yeah, that is by its nature and what we, you

10      know, think of when we talk about the elbow test.

11      The fact that, you know, you could even have a

12      correctional officer there, the same as on the

13      street, if you have a law enforcement officer

14      present and if someone wants to punch another

15      person, many of those people are going to do

16      exactly that.  It is absolutely not foreseeable.

17   BY MS. HARTON:

18      Q    But you're not saying that it is -- it is

19   never foreseeable that one inmate might attack another

20   inmate, right?

21           MR. BOGAN:  Object to form.

22           THE WITNESS:  The question was about

23      spontaneous assault.

24           MS. HARTON:  I know.  I'm asking.  I'm asking

25      a --



1          THE WITNESS:  Let me finish.  Let me finish.

2          Eric Lutterloh spontaneously assaulted Cory

3     Merchant.  If, and the basis sometimes of an

4     assault charge, if you see somebody and they have

5     certain physical posturing and they say, I'm going

6     to come and I'm going to hit you and then they

7     proceed to attempt to do that.  Okay.

8          And they're moving towards the individual.

9     There, there, there, now we have something where we

10    can go, okay, if something doesn't change the

11    dynamic of what's going on right now that we're all

12    seeing because it's being, you know, announced and

13    there's action.  That would be something we could

14    call foreseeable but not a spontaneous assault.

15         Cory Merchant told one of the officers, "If I

16    see you on the street, I'm going to beat your ass

17    with a baseball bat."  Well, okay.

18         I mean, so we got a  foreseeability that if

19    Mr. Merchant were near a baseball bat and he saw

20    that officer outside of the facility, we could have

21    a problem there.  But in this case, no.

22  BY MS. HARTON:

23    Q    Yeah.  So.  Okay.  So.

24    I see what you're trying -- what you're saying, and

25  I'm just trying to kind of unpack this sentence a little



1  bit because it's an important sentence.  And, what about

2  this assault, what evidence have you reviewed?

3       Or strike that.  Let me take a step back.

4       A    Sure.

5       Q    What sort of -- so I think we can both agree

6  then, that there are some assaults that happen in a jail

7  that are absolutely foreseeable and some that are

8  spontaneous and not foreseeable, right?  We're on the

9  same page there?

10      A    No, I don't think we're on the same page

11  there.  If you want to split that out to where you're

12  putting words in my mouth on some particular assault

13  that is foreseeable.

14      I think if you want to go with my example, sure,

15  like one inmates on one side, and one's on the other,

16  it's like I'm coming and I'm going to hit you and they

17  start moving towards them.  Yes, I would go with you on

18  that.  But again, the sentence is about a spontaneous

19  assault and it's not reasonably foreseeable.

20      Q    Right.

21      A    It stands alone.

22      Q    Let's take a step away from the sentence.

23  Let's just talk about jails in general.

24      A    Sure.

25      Q    Some inmate-on-inmate assaults are



1    foreseeable.  Some are not, right?

2        A    The the kind of simplistic hypothetical I

3    gave, which I'm not too familiar with actually

4    occurring, would be one that I offer up as a

5    hypothetical that illustrates for the jury how you can

6    have that sucker punching, which is a spontaneous

7    assault, is what generally occurs in a jail.

8        Now, I'll violate one of those rules.  I'll keep

9    talking.  I'll try to help her.

10       Two inmates are playing basketball on the rec yard,

11   and one of them feels the other one cheated, or they're

12   all worked up and they bump chests and somebody shoves.

13   We've got a narrow window of foreseeability here.  That

14   one might might strike the other.  So I think I've.

15       I think we got around to, yes, I think there are

16   some limited interactions that are specific that could

17   be somewhat in -- within a very narrow frame of probably

18   seconds foreseeable.

19       Q    And, you would agree with me that if an

20   inmate-on-inmate assault does become foreseeable,

21   reasonably foreseeable, to a corrections officer or any

22   other correctional employee, they have a responsibility

23   to take all reasonable measures to prevent that assault

24   from happening, right?

25            MR. BOGAN:  Object to form.



1          THE WITNESS:  All right.  Let me unpack that.

2          So, I've already made the point that

3     reasonable foreseeability of mutual combat, or an

4     assault, whether in any location, we'll stick with

5     corrections.  If there is someone aware, a

6     correctional officer, or staff member.

7          If someone's aware of it and in that, as I

8     stated with my two examples, mere seconds.  If

9     within those seconds something could be done within

10     safety for the staff and policy that some action

11     should be put in motion and we can color in, add in

12     brushstrokes there, that you want to ask me about.

13     But that would be my answer.

14  BY MS. HARTON:

15     Q    Yeah, we've talked a lot about these kind of

16  foreseeable assaults.  Kind of reacting in the moment.

17  Right?

18     There are things that corrections officers can do

19  to react in the moment when they kind of feel a fight is

20  about to happen, right?

21     A    Well, I made reference to the well-known elbow

22  test, and you and I are correctional officers, and Mr.

23  Byers is standing there as an inmate, and he's about to

24  punch somebody else.

25     And he doesn't care that we're standing there, and



Richard Hough, Sr., CPP, CCHP 05/28/2025

1  he goes to do it.  If somehow we have Hollywood movie

2  esque reaction ability that could catch his arm in

3  midswing, sure.

4      Or we see an argument occurring and it hasn't

5  gotten physical yet and we can call some officers to go

6  into the dormitory.

7      There are things that you're going to want, as I

8  said, to put in motion as opposed to the instant matter

9  where you have somebody go over and punch somebody else

10 a couple times.  That's not one of those circumstances.

11     So, I think we're agreeing, you know, in principle

12 that, you know, in some limited circumstances, if you

13 have an ability, there are things you might be able to

14 do.  Maybe that's the answer.  I'm not sure.

15     Q    Okay.  Yeah.  I mean, the thing that I'm just

16 trying to get at is that there are things that officers

17 can do in some scenarios to prevent inmate-on-inmate

18 violence before it's about to happen or as it's

19 happening, right?

20     A    Yeah.  What's your – look, I appreciate this,

21 but you've asked that three different ways.  At some

22 point in this deposition you'll recognize that it's not

23 my first deposition.

24     I've answered it two or three times, four maybe

25 now,  and that it's an incredibly narrow set of



Richard Hough, Sr., CPP, CCHP 05/28/2025

1   circumstances with an even narrower time frame that in a

2   spontaneous assault that by its nature is spontaneous,

3   ergo a sucker punch where, you know, if it's in the chow

4   hall, it's in the rec yard, it's, you know, in the dorm

5   like this, and somebody takes their opportunity to punch

6   somebody else without announcing it or in this case, no

7   previous friction that was known between these two

8   inmates, eccetera, it's not reasonably foreseeable.  The

9   examples I gave might get into reasonably foreseeable.

10       Q    Right.  And so, are there any things, actions

11  that correctional administrators could or should take in

12  order to mitigate the risk that these spontaneous

13  assaults happen, anything that correctional

14  administrators can do?

15            MR. BOGAN:  Object to form.

16            THE WITNESS:  As, at the Marion County Jail,

17       and the Marion County Sheriff's Office, things

18       they've specifically done to set expectations as

19       opposed to perhaps mitigate risk of a spontaneous

20       assault.

21            So to the extent that in those human inmates

22       who have been given a copy of the inmate rules and

23       regulations and been asked to sign for it.

24            Especially in this case, we have two

25       individuals, Lutterloh and Merchant, who it's not a



1   novel experience being in a correctional facility,

2   who know, first of all, you can't hit people.

3   That's illegal.

4        You can't hit people because it's against the

5   rules.  There's disciplinary consequences which

6   were in evidence in the record in this particular

7   case.  There's criminal consequences.  There could

8   be housing segregation, immediate kind of

9   consequences.

10       So there's, yeah, there are those things that

11  are in place that were in place at the time of the

12  assault on Cory Merchant by the Marion County Jail

13  leadership and the sheriff that did indicate don't

14  hurt somebody else, don't steal commissary like

15  Cory Merchant did.  Don't do other things.

16       Don't call the correctional officer a "fat

17  ass" and "fuck you" like Cory Merchant did.  All of

18  those things, there's rules that say don't do that.

19  And yet, spontaniously, Cory Merchant did all those

20  things.  And in this case, Eric Lutterloh

21  spontaneously punched Cory Merchant.

22       Why?

23       We don't we don't know why that is.

24       So yeah, I mean, all across the world, not

25  just all across Florida or Illinois, you know,



1        where you are, there's good-hearted, hard-working

2        correctional folks who set these expectations and

3        attempt to keep these things from occurring.  But

4        that doesn't respect the agency of the human animal

5        who just takes it upon themselves to punch

6        somebody.

7   BY MS. HARTON:

8        Q    You said that, there are things that they can

9   do to attempt these spontaneous assaults from occurring.

10       Could -- is one of those --

11       A    You're going to turn that into a compound

12   sentence?  No, I didn't.

13       I listed the things that they have done and that

14   they are doing every day: policies, disciplinary

15   responses, criminal investigation, movement of housing.

16       Yes, those are things they've done to set

17   expectations for all behavior.  Which would include

18   under all behavior not to spontaneously assault

19   somebody.  Yes.

20       Q    What did you – sorry.  You said, "movement of

21   housing."  What did you mean by that?

22       A    Getting put into single cell or administrative

23   segregation for violating facility rules, like things

24   that would cause disorder, such as attacking another

25   inmate.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1      Q      Would you agree that making sure that people

2   who are classified as a high security risk are not

3   housed with people who are classified as a low security

4   risk is one way to mitigate the risk of inmate-on-inmate

5   violence?

6      A      No.

7      Q      Okay.  Why not?

8      A      Well, you're throwing around some terms there

9   as if they meant the same thing in those 3100 different

10  jails.  They don't.

11     Again, certainly, I'll defer to the 30(b) witnesses

12  and the fact witnesses.  High risk, again, one of the

13  captains, I think, explained this to you in his

14  deposition, could mean that there's a mental health

15  issue, could mean that there's a medical issue, could

16  mean there's security risk, but would never assault or

17  attack anybody or we wouldn't foresee that they would

18  assault or attack somebody.

19     So having someone thus classified high risk in a

20  housing area with someone not classified high risk is

21  not some kind of automatic bird whistle, you know, for

22  the jury to sit up and go high risk, medium, low risk,

23  can't be together.  No that's that's that's not

24  accurate.

25     Q      I think I said high security risk.



1        A    You did.

2        Q    And so I'm not referring to to any sort of

3   medical issues.  I'm specifically referring to people

4   who have been classified as a high risk to the security

5   of the facility.

6        Would you agree with me that classifying people --

7   that someone who is classified.

8        Sorry.  Let me just go back.

9        Would you agree with me that one way to mitigate

10  the risk of spontaneous assaults is to not put people

11  who are classified as a high security risk with people

12  who are classified as a low security risk?

13       A    Well, I mentioned, you know, for instance --

14       Q    It's a yes or no question.  It's really a very

15  simple question.

16       A    Don't cut me off, counselor.  I don't do yes

17  or no questions.  I'm not a fact witness.  So I

18  appreciate again what you want.  I'm not here to give

19  you what you want.

20       I'm a social scientist.  I'm a criminologist.  I'm

21  trying to give you -- excuse me.  I'm trying to give the

22  court and the jury the benefit of why we have expert

23  witnesses.

24       So, what I was about to say was, an escape risk

25  would be a high security risk person trying to



Richard Hough, Sr., CPP, CCHP 05/28/2025

1   semantically then connect this to someone who you

2   somehow might know is going to assault somebody on

3   Wednesday at 4:00, which doesn't exist, is a different

4   thing.

5        Florida Model Jail Standards said, I said this to

6   you, separate female felons, female misdemeanors, if you

7   can, non-sentence, sentence, adult felons, adult

8   misdemeanants, if you can.  A third of the jails in the

9   U.S. house fewer than 50 people.  So there is not some

10  one size fits all as far as that goes.

11       So, no high security risk, as you said, is not

12  something where you would just automatically, first of

13  all, be able to just house in an individual cell or with

14  someone else deemed high security risk because that may

15  cover different things.

16       And that, again, that's up to the sheriff.  That's

17  up to each, you know, in the 67 counties in Florida,

18  that's up to each agency.

19       (Brief recess.)

20          MS. HARTON:  I'm going to show you some

21       interrogatories.

22       (Thereupon, Plaintiff's Exhibit 19 was marked for

23  identification.)

24  BY MS. HARTON:

25       Q    This is Exhibit 19.



Richard Hough, Sr., CPP, CCHP 05/28/2025

 1          Can you see this document?

 2          A    I see something labeled.  Well, now I see page

 3     one.  I don't know if I have seen this, but I do see it,

 4     yes.

 5          Q    It is labeled, "Defendant Billy Woods Answers

 6     to Interrogatories."  You see that?

 7          A    I do.

 8          Q    Okay.  Billy Woods is the Sheriff of Marion

 9     County, fight?

10          A    I don't know if he currently is or not.

11          Q    Okay.  He was at the time of Cory Merchant's

12     death, right?

13          A    That's my understanding.

14          Q    Okay.  And this first question asks, you know,

15     it's asking who the person answering this interrogatory

16     is.  And the answer here is, "Marissa Duquette, General

17     Counsel of the Marin County Sheriff's Office."  Do you

18     see that?

19          A    I do.

20          Q    Okay.  And at the very end of this document,

21     Marissa Duquette, General Counsel, Marin County

22     Sheriff's Office, signs off on these interrogatories.

23     Do you see that?

24          A    I do see her name again.

25          Q    I'm going to go up to interrogatory number 14.

 1   The question here is,

 2        "Identify and explain any and all training the

 3   Marin County Sheriff's Office provides to its agents

 4   including documentation of what training, if any, was

 5   received by defendant correctional officers, including

 6   frequency of training, length of training, whether

 7   training was optional or mandatory, and whether and when

 8   retraining --

 9        I'm sorry, I'm looking at the wrong thing.

10        Can we take a break for a minute?

11             MR. BOGAN:  Sure.

12        (Brief recess.)

13   BY MS. HARTON:

14        Q    I think it might be helpful for us to lay some

15   foundation first.  You're familiar with the numerical

16   system that Marion County uses to classify its inmates,

17   right?

18        A    I don't know with so many in my head from so

19   many places, I certainly don't have that memorized.  We

20   can pull up one of their policies on classification.

21   And look, I wouldn't want to do a memory test on it.

22   That wouldn't be good.

23             MS. HARTON:  Let's pull up Exhibit 64.

24        (Thereupon, Plaintiff's Exhibit 64 was marked for

25   identification.)



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    BY MS. HARTON:

2        Q    Do you see this document?

3        A    I do.

4        Q    Is this a document that you reviewed before

5    writing your report?

6        A    Oh, I don't remember if it was before or

7    after.

8        Again, with the number of documents in this case,

9    I'm not sure.  Is it the general order?  We'd have to

10   just go back and look.

11       Q    Does this look like a general order?

12       Sorry.  I just want to make -- I'm not -- I want to

13   make sure that you see the document that I have up.

14       A    My question was, was it in the general order?

15   So, to ask me a memory question, no.  You're going to

16   have to show me what the -- what it's from.  And look,

17   I'm not going to play a game with you.

18       Q    I genuinely -- okay.

19       At the top it says classification here, right?  You

20   see that?

21       A    Yeah.

22       Q    Okay.  We're on Zoom, so I genuinely want to

23   make sure that you're seeing the thing that I'm showing

24   you.

25       A    I see that, but then you said, "Did I see it



1    before I wrote the report?"  And we need to know what it

2    came from.  Is it part of the classification general

3    order?  To which you replied, "Does it look like a

4    general order?"  I don't know.  Is it?

5         I'm asking you a question.  I look a lot of cases.

6    Let's just try to be fair and get through the deposition

7    without too much strife here.  I'm not trying to be

8    difficult.

9         Q    Are you done?

10        A    Okay, fine.  That's great.  All right.  You be

11   that way.

12        Q    Okay.

13        A    Tell me where it came from, counselor.

14   Where's this document from?

15        Q    Doctor, I am trying to talk about the

16   document.  Give me one second.  Okay.

17        Do you see it at the top here it says, "Eric Thanal

18   Lutterloh."

19        A    I do see that.

20        Q    Okay.  So, this is Mr. Lutterloh's

21   classification page that shows how he was classified

22   when he was booked into the into the jail.  It says,

23   "Booking Date 6/4/2020."  And then it's got this matrix

24   down here.  Do you see that?

25        A    I do.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    Q    Okay.  And now looking at this, do you

2  recognize this matrix that they have at the bottom?

3    A    I recognize having seen this and it must have

4  obviously been in Mr. Lutterloh's file, his jail file.

5    Q    Okay.  You referenced that you -- I think

6  before we got to the document, you referenced that there

7  are, you know, other jails, other cases that you've seen

8  different numerical classification regimes; is that

9  fair?

10    A    Yes.

11    Q    Okay.  Does this look like one that you've

12  seen in other jails, or is this one that is kind of

13  unique to what Marion County came up with?

14    A    Across the 3100 jails and 3000, you know, plus

15  when we add in the prisons and everything, I couldn't

16  characterize and then give you a citation to whether

17  this is -- I certainly don't find it to be unique as a

18  decision tree as to whether -- I can't recall anybody

19  right now that I would say, oh, that's like such and

20  such county uses.  I couldn't tell you.

21    Q    It's pretty typical.  According to industry

22  standards for jails to use decision trees like this to

23  classify inmates according to a number of risk factors,

24  right?

25    A    I think that's fair.  Whether they use the



1    graphic or they just kind of use their listing of the

2    factors that they'll either do with a weighting, as in

3    weights, to assign the classification, yes.

4        Q    Okay.  And here with Mr. Lutterloh, he is

5    classified as a high/medium; do you see that?

6        A    I see that on that date it says high/medium.

7        Q    Okay.  And there's nine different

8    classifications here; high to to very low, right?

9        A    Okay.  Okay.

10       Q    Do you understand that, based on the record

11   that you reviewed to reflect the numerical

12   classification regime at Marion County Jail, where highs

13   are number one and very lows are number nine and

14   everything else in between is is graded that way?

15       A    I didn't memorize or commit any of that since

16   I know both sides would have access to a 30(b) witness

17   to explain, at any given point in time, what their

18   specific security classification codes were.  But I'm

19   recognizing what you're showing me.

20       Q    You didn't think that was important, for this

21   deposition, to know the specific classification --

22   numerical classification regime they have at Marion

23   County?

24       A    Well, I clearly didn't say that, did I?

25       Q    So, it is important to this deposition to know



1    what the classification regime is, right?

2              MR. BOGAN:  Object to form.

3              THE WITNESS:  Well, of course it's important

4        to know, as it was important for the Florida Model

5        Jail Standards that the agency have one, have a

6        classification scheme.

7              Again, 67 counties in Florida, each and every

8        one gets to do it the way they want.  So whether in

9        jail cases in any other states that I'm working at

10       the moment or other counties within the State of

11       Florida, jail cases that I'm working on at the

12       moment, whether I remember on a given day, say when

13       you ask me a question, no, it would be really

14       important to say, are they basing it on the kind of

15       normal things you do?

16             They are.

17             And do they have classifications that do split

18       it apart?

19             They do.

20             And did both of the inmates involved here go

21       through a classification process?

22             They did.

23             So that would be important for me.

24    BY MS. HARTON:

25        Q    Okay.  So, if I represented to you that these



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    -- that high classification was a one in their

2    classification regime in the highest security risk and

3    very low is a nine; the very lowest security risk.

4    You'd have no reason to disagree with me, right?

5              MR. BOGAN:  Object to form.

6              THE WITNESS:  No.  If that's what you're

7         presenting is accurate, I would have no reason to

8         think you were setting up a trick question.

9    BY MS. HARTON:

10        Q    And here it looks like Mr. Lutterloh was

11   classified as a three, a high/medium right?

12        A    On that date, and that's what it looks like,

13   high/medium.

14        Q    Okay.  Are you aware of his classification

15   changing at any point during his incarceration?

16        A    I'm not aware of one, no.

17        Q    Okay.  And this document is kind of weird to

18   deal with.  So we're going to try to get through it.

19        But the second page, maybe I can do this.  I know

20   this is kind of small, but it might be easier to

21   navigate.

22        Okay, so, the second page at the top, it says,

23   "Eric Lutterloh" and it has a bunch of questions,right?

24        A    I see the four questions, yes.

25        Q    Okay.  The first question is, "Is the current

Richard Hough, Sr., CPP, CCHP 05/28/2025

1    offense an assault of felony?"

2         And it says, "Yes," right?

3    A    I see that.

4    Q    Okay.  And we go back to this tree.  There's a

5    "yes" on that first block, right?

6    A    Yes.

7    Q    Okay.  Then the next three questions asked

8    about Eric Lutterloh are "nos" right?

9    A    Yeah.  "Prior assault or felony convictions?"

10   "No."

11   "Escape."

12   "No."

13   "Known institutional behavior problems?"

14   "No."

15   Q    Okay.  And so the next three blocks on his

16   little diagram are "nos".  And then it has some kind of

17   spitting out to this high/medium three.  You see that?

18   A    I do.

19   Q    Okay.  So we can kind of see how these

20   questions are correlating with the map on the first

21   page, right?

22   A    It appears that way.

23   Q    Okay.

24   A    I'd certinly defer to the 30(b) witness on

25   explaining it.

Richard Hough, Sr., CPP, CCHP 05/28/2025

 1          MS. HARTON:  Okay.  And then the next page,

 2      I'm going to show you this, is Exhibit 65.

 3      (Thereupon, Plaintiff's Exhibit 65 was marked for

 4  identification.)

 5  BY MS. HARTON:

 6      Q    Sorry.  The next exhibit I'm going to show you

 7  is Exhibit 65.  And this is a similar document.  It

 8  says, "classification" at the top.  And then it says,

 9  "Cory Merchant."  You see that?

10      A    I do.

11      Q    Okay, so this is the same type of record, but

12  this is Cory Merchant's classification document as

13  opposed to Eric Lutterloh's right?

14      A    Okay.

15      Q    Okay.  And then you see, kind of, he's got the

16  same diagram here, except he is classified as a

17  "medium/pre" a "number five."  Do you see that?

18      A    Yes.

19      Q    Okay.  Let me go to the next page.

20      He's got a different set of questions.  And it

21  says, "Is the current offense and assault or felony?"

22  Do you see that?

23      A    I do.

24      Q    And that says, "no."  Right?

25      A    Yes.



1      Q    And so, from there he's he's asked a number of

2   other questions that Eric Lutterloh was not asked,

3   right?

4      A    Correct.

5      Q    And the only question that he answers yes to

6   is whether he's likely prison bound.  Do you see that?

7      A    That is what the classification person

8   indicated.  Yes.

9      Q    I'm sorry that it keeps blinking blue.  I

10  don't know why it's doing that.

11      So, in your expertise what does someone likely

12  being prison bound have to do with their classification?

13      A    Security risk.  If someone has a pretty good

14  indication they're going to go off to prison they might

15  be more motivated to either try to get out in some way.

16      They perhaps could be, perhaps, have thoughts of

17  self-harm.  But it is definitely a security

18  consideration because that's balanced against someone,

19  say, in a minimum security who is perhaps going to do 30

20  days in the county jail on a misdemeanor conviction.

21      Q    Yeah.  And then same question for this top

22  question that both Cory and Eric Lutterloh answered,

23  which is or were designated to have answered.

24      It says, "Is the current offense an assaultive

25  felony?"  Why is that question relevant to classifying



1    an inmate in your expertise?

2        A    Well, it would come down to why is it that the

3    Marion County Sheriff's Office included that as a

4    question there and that would be for someone from their

5    staff to answer.

6        Q    You can't tell me as an expert in corrections

7    why it would be important to ask an inmate whether or

8    not their current offense is an assaultive felony?

9        A    Well, I appreciate this –

10           MR. BOGAN:  Object to form.

11           THE WITNESS:  Yeah.  The second opportunity to

12       answer on behalf of the Marion County Sheriff's

13       Office.  But of course, I'm not here to answer for

14       the sheriff's office.

15           In terms of, again, the fact that they have a

16       classification policy and these questions and the

17       matrix that they go through, that's from my

18       standpoint, the important aspect of why they have

19       it.

20           As to what I seem to recall, and I will defer

21       to the two captains and others who you've already

22       spoken with, who can give you factual information,

23       is the fact that there are a variety of things they

24       take into account, as evidenced here in this list,

25       as well as on the graphic that you've shown me,



1    that they take into account and come up with a

2    final where are they going to be placed.

3          And, by the way, that the inmate has the

4    ability to appeal that for whatever reason.

5          So, why on the assaultive felony, it's one

6    more aspect of it.  But assaultive felony would

7    certainly not mean therefore, 24 hours a day, or 16

8    hours a day, when they're awake, they're going to

9    assault somebody every other minute.  So, yeah,

10   it's one data point.  That's why it's in there.

11   BY MS. HARTON:

12       Q    Yeah.  It's a data point that helps you as a

13   correctional administrator understand what about that

14   person?

15       A    Just overall level of where should they be

16   housed?  Did they commit armed robberies?  Did they

17   commit a spree shooting?

18       Things that may or may not have relevance inside of

19   the facility, but that are logical questions to find out

20   just more information.

21       I appreciate that, you know, maybe it would be

22   interesting on your part to know, does that immediately

23   trigger or indicate that somebody is going to be all one

24   thing all the time?

25       So, I would have to tell you no, that's not what



1    assaultive felony means.  It's a data point within a

2    pretty, looks like, comprehensive classification

3    process.

4         Q    It's one data point to consider in determining

5    where to house someone so that they can be housed

6    safely, right?

7         A    Where to house someone.  I can't sign on to

8    house safely.

9         Q    Why not?

10        A    Well, there's no requirement or statutory

11   language that states you're guaranteeing, ensuring,

12   insuring, making absolutely positive that no one,

13   including officers and staff, are going to get injured

14   while they're inside of a correctional facility.

15        So, to have you kind of tail on there with the part

16   how safely, all of this is certainly, you know, attempts

17   to have good order in a facility and do the best that is

18   possible to keep an early facility and to have people,

19   you know, be there until they move on to whatever's

20   next.

21        Q    That question about the --  Sorry.  Let me.

22        You've worked in a few different jails, all with

23   classification systems, and you've consulted with dozens

24   of jails, all with different classification systems,

25   right?



1        A    Yes.

2        Q    Okay.  Do they all ask questions, like the one

3   that we just discussed, about whether the current

4   offense that they -- that individuals facing is some

5   sort of assaultive felony or violent crime or something

6   of that effect?

7        A    As far as I can recall, most of the ones that

8   I've seen, and certainly in agencies where I've

9   personally work, and, again, in cases that I've worked

10  on, have a question in regards to current charges.

11       And then, as with Marion, once you pass that

12  initial pre-booking and move on to primary

13  classification within that, I think it's a 72 hour

14  period, that will likely involve more.

15       What do we know about an individual's prior

16  history?  Because by then someone will have been able to

17  hopefully run an actual criminal history by database

18  check.

19       Q    Okay.  And all those data points, that

20  information, is helpful to correctional administrators

21  in determining a number of things about those inmates,

22  their security risk, their suicide risk, all sorts of

23  important things that go into how they're housed, right?

24       A    They can all be helpful for some of those

25  things.  I make a point in the report that suicide, much



1    like spontaneous assault, is in this case, can't be

2    predicted with specificity.

3         Q    Right.  But there's a reason why you ask

4    questions that get you those data points, right?

5         A    Yes.  Because of reasonably doing the things

6    that can be done to run a correctional facility as well

7    as it can be when dealing with a group of humans.

8         Q    I want to go to page 13 of your report.

9    Are you at page 13?

10        A    Yes.

11        Q    Okay.  Under that graph you've got there, you

12   say, "Confrontations are an issue in the general public

13   and incarcerated populations.  The Marion County Jail

14   put in place components of a policy reasonably designed

15   to guide staff in addressing fights or violence by

16   inmates."

17        I want to stop there.  Can you explain to me what

18   you meant by, "the Marion County Jail put in place

19   components of a policy reasonably designed," etcetra.

20   Can you just kind of explain that sentence a little more

21   to me?

22        A    Sure.  You have the inmate handbook, which

23   goes over the rules and violations and disciplinary

24   policy for the inmates.  You have the policy on

25   supervision of inmates.  That's for the officers.  Both



Richard Hough, Sr., CPP, CCHP 05/28/2025

1   of those go together to address issues about behavior to

2   include fights or violence by inmates.

3        Q    Okay.  Is there a reason why you said

4   "components of a policy?"

5        A    Well, I just named two.  One is the handbook

6   for the inmates.  The other is policies for the

7   officers.  There's the disciplinary component for the

8   inmates.  So components in the sense of it's not just

9   one item.

10       Q    And just so that I'm clear, components, you've

11   got one component for the inmate.  Sort of imposing

12   rules on the inmates so that they know how they're

13   supposed to behave.

14       And is the other component rules and structures for

15   the officers so that they know how to react and

16   anticipate any issues that may arise on their shift?

17       A    Well, that's a whole bunch more that you added

18   in there.  Yes, I did say that one other component was

19   the policy on supervision of inmates.

20       Q    Okay.  Would you include the classification

21   policy as a component that's part of guiding staff and

22   addressing fights or violence by inmates?

23       A    That would be very broad.  And you would

24   immediately say, well, show me where in the

25   classification policy it uses the word fights or



1  violence.

2      So, again, they have an adequate classification

3  policy.  They have an adequate supervision of inmates

4  policy.

5      Q   It's not really where I was trying to go with

6  it.  I guess I'm just -- in your in your expertise as a

7  law enforcement expert and a corrections expert you

8  would agree that having a classifications policy in

9  place is an important component in running a jail in a

10 way that guides staff to address fights and violence by

11 inmates, right?

12     A   Well, what we said about two hours and 15

13 minutes ago was that classifications policy, part of the

14 point and why having a policy is required by the State

15 of Florida, is it's for the good order and security of a

16 facility.

17     I appreciate the fact that you want to attach some

18 way of foreseeing or attaching it to the word, fights or

19 violence.  It's broader than that, that it is about the

20 overall order of the facility, not specific to just

21 trying to address inmate violence.

22     Q   But one of the things that a classifications

23 policy does is help the jail prevent inmate-on-inmate

24 violence, among other things.  But one of the things is

25 preventing inmate-on-inmate violence, right?



Richard Hough, Sr., CPP, CCHP 05/28/2025

1          A      I'm not sure if I, since this is now memory

2    test, if I can recall a specific section within the

3    classification policy at Marion County that says, and in

4    addition to whatever is at the beginning of the policy,

5    this will address violence in the facility.

6          So, since we both understand your role and the fact

7    that I'm trying to faithfully answer what I know of from

8    the materials in the record.

9          You've shown that I need to be really careful in

10   how I how I phrase things.  So I've testified to what

11   the classifications policy, in my view, is for both the

12   Marion County Sheriff's Office and at the other 3100,

13   you know, county jails in the U.S.

14         Q      Yeah.  And I'm not asking you to do a memory

15   test on the Marion County policy.  I'm not asking about

16   the Marion County policy right now.

17         I am asking about your expertise on

18   classifications, policies generally as a corrections

19   expert.  So I'll ask my question again and -- I'm sorry

20   if I put it in the wrong context last time.

21         In your expertise as a law enforcement corrections

22   expert, is it important to have a classification policy

23   because it, among other things, helps the jail prepare

24   for and anticipate and prevent mitigate the risk of

25   inmate-on-inmate violence?



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    I can rephrase this if that was a long --

2    A    Well, we get to the end part here.

3    So, for instance, the Marion County policy on

4  classification doesn't use the word violence anywhere in

5  the policy because it's not a violence policy.  It's a

6  classification policy.

7    And so, again, your dogged attempt to keep asking

8  this in a way that attaches the classification policy

9  coming out of my mouth to say that somehow addresses

10  violence or fighting.  I don't know.

11    I guess this is how you were trained, that you just

12  keep asking in different kind of ways.  It's not like I

13  haven't seen that in 45 years over, and over, and over

14  again.  But that's not what their policy was for.

15  That's not what specifically classifications for.

16    It's do you have people who need to be housed in

17  certain ways to get the medical care, to make them more

18  accessible to programs for mental health, to put the

19  felons away from the misdemeanants unless you have non-

20  violent felons?  It's not.  It's not.

21    And this is how I'm going to have to, you know,

22  express it to try to be a benefit to the jury and

23  understanding the context.  It's -- and this is all

24  going to go back to what the, probably what the fact

25  witnesses say.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1        But I, from my standpoint, yeah, as an expert in

2    corrections and in this area, it's about how do you

3    appropriately house them.  Not, you know, policy doesn't

4    cover all things.  No one policy covers all things.

5    Maybe that helps, I don't know.

6        Q    Yeah.  And and in your experience and your

7    **expertise, how you house people is important in your**

8    **efforts as a correctional administrator to mitigate the**

9    **risk of inmate-on-inmate violence?**

10       A    You got -- you got to mitigate inmate-on-

11   inmate violence.  In this case it's about spontaneous

12   assault, which is not impacted by whether one or the

13   other inmate, you know, understands the classification

14   policy.

15       It's about in the moment somebody made the decision

16   to punch somebody else.  This policy is not implicated

17   in that, but for the fact that both inmates, Lutterloh

18   and Merchant were appropriately classified as sexual

19   crime individuals and housed in a place, you know, with

20   similar charged individuals.

21       So, I, you know, I think I've answered this as

22   many, both two hours ago and now, the best I can, or

23   certainly as repeatedly as I can.

24       Q    So, it's your opinion that the way that these

25   **inmates were classified in this case has nothing to do**



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    with the inmate-on-inmate violence that occurred?

2            MR. BOGAN:  Object to form.

3            THE WITNESS:  I didn't issue that opinion,

4       obviously.

5            You just narrated something and asked if

6       that's my -- that's one of those ones I get so

7       tired of, having an attorney narrate something and

8       then say that's your opinion.

9            This was, Eric Lutterloh, spontaneously sucker

10      punched Cory Merchant.  That's not only my opinion,

11      that's what the record clearly reflects.

12           The fact that both were classified into the

13      same housing area was appropriate, that it met

14      Florida Model Jail Standards.  It met the Florida

15      Corrections Accreditation Commission.  And that it

16      is normal as we discussed, that this occurs.

17           So, I'm not sure how how I can say more about

18      that.

19   BY MS. HARTON:

20      Q    I want to go back to that interrogatory.

21      Okay.  So this is the interrogatory I showed you

22   earlier.  This is Exhibit 19.  I'm going to point you

23   actually to interrogatory number 15.  The question was,

24           "Q   Describe in detail the housing layout at

25      the Marion County Jail, including how many housing



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    units there are, the names for each housing unit,

2    any special designations assigned to any unit such

3    as medical units, segregation units, booking units,

4    the inmate capacity and the number of bunks per

5    unit.  Whether each housing unit contains cells or

6    is dorms style."

7    Okay.  And then the answer was,

8         "A   The Marion County Jail housing is as

9    shown below."

10    And then there's a few pages where it explains how

11 people are classified, or sorry, how people are housed.

12 And you see that it says, for example, "Bravo Pod

13 Section B.  It will house male, medium security inmates,

14 with the custody level four and five."

15    You see that?

16    A    I do see that.

17    Q    Okay.  And then it houses in section C and D

18 of Bravo.  It houses high/medium security inmates of the

19 custody level three.  Right?

20    A    I see that.

21    Q    And then the next section, "E, it will house

22 male, medium security inmates, in the custody level four

23 or 5."

24    A    I see that.

25    Q    Okay.  And then it's the same thing down in

 1    Delta Pod where it says that, "Medium security inmates

 2    with a custody level four and five will be housed

 3    together in these section A through D of Delta Pod."

 4         Do you see that?

 5         A    Yes.

 6         Q    Okay.  And then section E and F "Will house

 7    male felony inmates with sexual offenses.  Right?

 8         A    Yes.

 9         Q    And in those sexual offense pods, there's no

10    distinction as to what their custody level is, right?

11         A    Right.  I don't see it on here.  That's

12    correct.

13         Q    Okay.  And then the next pod, Echo Pod,

14    they've got some more sections with custody level four

15    and five.  You see that?

16         A    I do.

17         Q    Another section with custody level six through

18    nine.  You see that?

19         A    Yes.

20         Q    Okay.  And then, section B and C of Gulf Pod

21    custody level four and five.  You see that?

22         A    Yes.

23         Q    And then, again, another section where they're

24    housing all the male inmates with sexual offenses in

25    Gulf Alpha.  Right?



1       A     Yes.

2       Q     Okay.  And so, it kind of based on this looks

3   like generally these male inmates are are being housed

4   with the -- the threes are housed together, the fours

5   and fives are housed together and then the sixes through

6   nines are housed together.  Do you agree with that?

7       A     Again, for whatever period of time that the

8   defendant replied and provided this information

9   responsive to your request for interrogatory, it

10  generally appears that.

11      I have no reason to doubt what you're showing me.

12  I can't speak to what the captain's did.  And I can tell

13  you that if one of those dorms collapsed today they

14  would have to further mix inmates and there would be

15  nothing unlawful or inappropriate as long as they

16  covered it in the classification policy.

17      So I take this as what it is and go ahead.

18      Q     But if they were to mix threes, twos and

19  threes with fours, fives, sixes, you would have no issue

20  with that?

21          MR. BOGAN:  Object to form.

22          THE WITNESS:  Again, I didn't say that.  The

23       reality is that if they covered in their

24       classification policy what the logic was of who

25       could be housed where and that it doesn't violate



Richard Hough, Sr., CPP, CCHP 05/28/2025

1        the Florida Model Jail Standards that I mentioned
2        earlier that has some specific things, don't mix
3        men and women, don't mix juveniles with adults,
4        etcetera, then that would be a decision for the
5        Marion County Sheriff's Office to make.
6               MS. HARTON:  Okay.  I'm about done.  I have a
7        few more questions, but I think we'll be a lot
8        quicker if we take five minutes for me to go
9        through my outline X some things out, come back.
10       I'll just be more efficient that way.  Does that
11       sound good to everyone?
12              THE WITNESS:  Yep.
13       (Brief recess.)
14  BY MS. HARTON:
15       Q    Okay.  Thanks.  Have you ever done a security
16  check in a job before?
17       A    Yes.
18       Q    Okay.  When did you do security checks?
19       A    I think the last time for security check, the
20  end of 2023 I did about eight of the juvenile detention
21  centers across the State of Florida for an adult
22  facility, which, well, for an adult facility.
23       I don't know the last time that I would have done
24  an actual security check, probably at least 10 years ago
25  would be my estimate.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1    Q    And when you conducted those security checks

2  in those juvenile facilities, what did you do?  Did you

3  sort of go into the areas where the juveniles were and

4  do a round to account for their wellness and safety?

5    We -- I think we might be talking about different

6  things.

7    A    We are.  Although it did include being in the

8  housing units, interacting with the juvenile inmates and

9  talking, you know, to them.  But, yeah, I think --

10    Q    Yeah.  Why don't you go ahead and tell me what

11  you what saying, what you thought you meant as a

12  security check.

13    A    Yeah.

14    Q    This is why it's important to lay a foundation

15  for things, I apologize.

16    A    No.  No.  No.  No.  I saw where we both went

17  there.  So kind of writ large, a security check of an

18  entire facility, you know, is kind of that where you're

19  looking at the locking systems, you're looking at any

20  equipment and devices you're looking at, you know,

21  whether they're, you know, generator actually runs.

22    But it's also being inside, talking to the

23  corrections officers, talking to the inmates.  So, yeah,

24  it was that at, like, eight facilities across the state.

25    Q    Okay.  But just going back to my original



1    question, you know, when I say security checks, I'm

2    referencing sort of the rounds that a correctional

3    officer does on a shift as they do in Marion County

4    during lockdown every hour, where they're going into the

5    into the dorm and they're kind of accounting for the

6    well-being of each inmate.  Right.  You understand what

7    I mean now by security check?

8        A    Sure.  Yeah.  And, again, like I said, that's

9    other than that component within what I was doing as the

10   statewide corrections expert for the Florida Department

11   of Juvenile Justice two years ago, for a three year

12   period, it would probably be about 10 years before that

13   for a strictly adult facility.

14       Q    You've never had to diffuse a violent

15   situation between two inmates before, right?

16       A    Oh, yes.  Yes, I absolutely have.  As a

17   director of corrections at two different counties in

18   Florida, I was a very hands on individual.  Spent lots

19   of time on all three shifts with my folks, including my

20   folks being the citizens who were incarcerated.

21       And yeah, it came up a number of times where

22   because of the great length of experience in defusing

23   fraught and charged situations, that I was right there

24   doing that.  Yeah.

25       Q    So, I'm assuming in some instances back when



1    you were working in corrections facilities, you had to

2    use force on inmates before, right?

3         A    Certainly as a law enforcement officer.

4    Trying to think in corrections, I'm going to say there

5    may have been a couple of instances.  Nothing comes to

6    mind.  Definitely can recall separating inmates who were

7    fighting.  But that doesn't rise to the level of what's

8    considered use of force.

9         Q    Okay.

10        A    But, I mean, I've taught defensive tactics for

11   37 years in Florida corrections and law enforcement

12   academies, so.

13        Q    Okay.  Are you aware of, I mean, you

14   referenced it earlier.  You're aware of what a Daubert

15   challenge is, right?

16        A    I am.

17        Q    Okay.  Are you aware of any cases that have

18   excluded you, excluded any of your opinions, through a

19   Daubert challenge or any other evidentiary challenge?

20        A    I can think of, I believe, two that would

21   count.  There was there was one, this was a law

22   enforcement case.

23        First of all, none in corrections but the law

24   enforcement case I'm thinking of, it was an investigator

25   had done an investigation and charged somebody with real



1  estate fraud.

2       And in my report I talked about how officers, law

3  enforcement officers, are trained in developing probable

4  cause.

5       And I don't think, you know, this -- it never

6  reached trial, but the judge said if we get there, you

7  can't speak ultimately about probable cause, which I was

8  well aware of.  But so that got entered as, because the

9  court read one of my opinions out of 20 some, to go to

10 that.

11      And the other one was a case, also law enforcement.

12 It was a lethal use of force.  An officer involved

13 shooting.  And I want to say it was about three years

14 ago.  And every opinion of the plaintiff's expert was

15 struck.  And in my case, again, two.

16      One was an opinion where I spoke about the

17 scientific research regarding touch DNA and about the

18 CSI effect.  And the court said you can't talk about

19 those two things.

20      And then that same day granted summary judgment to

21 the defendant.  So the law firm didn't go back and offer

22 that I'd written, or had more information in those two

23 areas.

24      Those are the only two instances that that I'm

25 aware of.



Richard Hough, Sr., CPP, CCHP 05/28/2025

1        Q    That one that you were just referring to, the
2   DNA issue, was that the Vannucci case, if you remember
3   correctly?
4        A    Maybe.
5        Q    That's okay.
6        A    I'm not positive.  So I don't want to mislead
7   you.  It was South Florida.
8        Q    Okay.  I want to go down to the cases that
9   you've testified on.
10       Okay.  Actually, since you have it in front of you,
11  why don't you just go to the witness list and go through
12  it.
13       A    I'm trying to get it there.  And yes, I'm
14  there.
15       Q    Okay.  Could you just take a minute to go
16  through those and just let me know of any of those which
17  ones you believe you had any sort of successful Daubert
18  challenge against you?
19            MR. BOGAN:  Object to form.
20            THE WITNESS:  I mean, the two I just told you
21       about were the only two I have any knowledge that
22       anybody's --
23            MS. HARTON:  Yeah.
24            THE WITNESS:  -- been successful.  So the
25       answer would be none.

1  BY MS. HARTON:

2      Q    Yeah, I guess I was just trying to see if any

3  -- if looking through your case list would help jog your

4  memory as to the names of those cases.

5      A    Oh, well, like I said, the first one that had

6  to do with just the admonition, don't speak about

7  ultimate probable cause, never went to trial.  And it

8  would have been more than three years ago, or four years

9  ago.  So it wouldn't be on here anyway.

10      The shooting one, yeah.  Let me -- I'll try, but I

11  don't know.  I don't even know if I was deposed, so it

12  wouldn't be here.  But let me see if we can see it.

13      See, so I see Vannucci listed there on page 57.

14  But, again, I don't know that that was it.  I see there

15  was a deposition in that case, so.

16      Q    Okay.

17      A    It had already fallen off, I think.

18      Well, no, I guess it was a one month in by the time

19  I think I issued this report, but I don't remember.

20  Yeah.

21      Q    You're not aware of a decision in the case

22  Kates versus Nocco in the Middle District of Florida,

23  Tampa division.  You were retained as an expert in that

24  case.  Do you recall that case?

25      A    I don't.



1        Q    Okay.  And you weren't aware that in 2023, a

2   judge struck a number of your opinions because he deemed

3   them legal conclusions?

4            MR. BOGAN:  Object to form.

5            THE WITNESS:  No, I'm not aware of that.  Do

6        you have what case that was?

7   BY MS. HARTON:

8        Q    Yeah.  Kates versus Nocco.

9        A    Oh, that was it.  Oh, okay.

10       Q    Yeah.  I can give you the case number.  It's a

11  case –

12       A    How do you spell Kates?

13       Q    K-A-T-E-S.

14       A    K-A-T-E-S.  Okay.

15   I know that Chris Nocco is a Sheriff in Florida,

16  so.  Okay.  No, I'm not aware of that.

17           MS. HARTON:  All right.  Okay.  That's all

18       I've got.

19                     CROSS-EXAMINATION

20  BY MR. BOGAN:

21       Q    I just have a couple quick questions for you,

22  Dr. Hough.

23   I want to go back.  This goes back a couple hours

24  ago.  The questions involving the Florida Model Jail

25  Standards.  And I just I just want to be clear, it's not

1  your opinion that you're not going to testify that the

2  Florida Model Jail Standards is going to determine

3  whether a constitutional violation occurred in this

4  case?

5      A    No, I am not.

6      Q    Okay.  Of course I don't know.  I mean, I

7  think you testified to this, but you have no reason to

8  believe that the Florida Model Jail Standards are

9  unconstitutional or have been held to be

10  unconstitutional?

11          MS. HARTON:  Object to form.

12          THE WITNESS:  No, I have no such information.

13  BY MR. BOGAN:

14      Q    Okay.  And I think, you know, I think the

15  reason -- you may have testified to this.  And I

16  apologize.  I just want to make it clear for the record.

17  I think the reason that you cited to the Florida Model

18  Jail Standards, as well as the FCAC, is because these

19  standards help inform the policies of, in this specific

20  case, involving the Marion County Sheriff's Office?

21          MS. HARTON:  Object to form.

22          THE WITNES:  And that is correct.  Yes.

23  BY MR. BOGAN:

24      Q    And, I think, you also testified this as well

25  and it's within your report.  But what you've observed



1  in these policies is that they are consistent with the

2  Florida Model Jail Standards, the FCAC, as well as other

3  correctional facilities in Florida and the United

4  States?

5          MS. HARTON:  Object to form.

6          THE WITNESS:  That is correct.

7          MR. BOGAN:  You know, that's all the questions

8      I have.  Thank you, doctor.

9          MS. HARTON:  All right.  You should have

10     plenty of time to get to your appointment, doctor.

11         THE COURT REPORTER:  Ms. Harton, can I have

12     the exhibit?

13         MS. HARTON:  Yes.  I will.  I think I used a

14     few.  I'll just email them all to you.  What's your

15     email?

16         THE COURT REPORTER:  Yeah, let me put it in

17     the chat.

18         MR. BOGAN:  Just while we're here, I have 66,

19     19, 64 and 65.

20         MS. HARTON:  Yep.  I like to pre-label them

21     all for the case.

22         THE COURT REPORTER:  And does anyone need the

23     transcript?

24         MR. BOGAN:  I do not need it at this time,

25     but we may be ordering it.



1         MS. HARTON:  Yeah, I'll go ahead and order it.

2         MR. BOGAN:  And I'll when I -- when Bruce gets

3      back, I'll speak with him and we may very well order

4      it as well.  But at this point we'll hold off.

5         All right.  Well thanks, guys.

6

7      (Thereupon, the deposition was concluded at 5:07 PM

8   with reading and signing having not been waived.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    CERTIFICATE OF OATH

2

3    THE STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE:

5

6        I, the undersigned authority, hereby certify that

7    DR. RICHARD HOUGH appeared before me via Zoom on May 28,

8    2025, and was duly sworn.

9        WITNESS my hand and official seal on this, June 12,

10   2025.

11

12                    _____

13                    MICHELE ANZIVINO,

14                    Notary Public-State of Florida

15                    My commission # HH37658

16                    Expires 03/19/2027

17

18

19

20

21

22

23

24

25



1                    REPORTER'S CERTIFICATE

2

3    THE STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE:

5

6         I, MICHELE ANZIVINO, Court Reporter and Notary

7    Public, certify that I was authorized to and did report

8    the deposition of DR. RICHARD HOUGH; the transcript is a

9    true and complete record of my notes.

10        I further certify that I am not a relative,

11   employee, attorney, or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorney or counsel with the action, nor am I

14   financially interested in the action.

15        DATED on this 12th day of June 2025.

16

17                      _____

18                      MICHELE ANZIVINO,

19                      Notary Public-State of Florida

20                      My commission # HH37658

21                      Expires 03/19/2027

22

23

24

25



**$**

**$1,800**
15:5
**$2,500**
15:2
**$3,000**
15:1
**$5,500**
15:11

**1**

**10**
8:7,8 16:22 29:9
93:24 95:12
**12:00**
4:3
**13**
54:14 83:8,9
**14**
68:25
**15**
10:12 15:21 85:12
89:23
**16**
80:7
**18**
25:7 42:15 47:19
48:21
**1800/2000**
53:21
**19**
34:15,16 49:6 67:22,
25 89:22 102:19
**1989**
18:1,7
**1991**
17:21 18:3,7 19:6,8
20:16 24:25
**1993**
22:2
**1995**
20:17 22:14
**1998**
22:14 24:21 25:1

**2**

**2.5**
15:1
**20**
33:21 38:17 40:1
97:9
**2000**
53:23
**2023**
93:20 100:1
**24**
34:16 80:7
**25**
15:23 24:10
**26**
10:8

**3**

**30**
6:21 24:13 25:2
32:16 78:19
**30(b)**
50:7,24 65:11 73:16
76:24
**3000**
53:23 72:14
**3100**
33:22 65:9 72:14
86:12

**35**
48:13
**37**
96:11
**375**
15:2

**4**

**40**
48:14
**45**
32:17 53:9 87:13
**4:00**
67:3

**5**

**5**
90:23
**50**
67:9
**57**
99:13
**5:30**
46:16
**5th**
12:1

**6**

**6/4/2020**
71:23
**60**
9:20 11:10,11
**64**
69:23,24 102:19
**65**
10:20 77:2,3,7
102:19
**66**
10:25 11:2,19
102:18
**67**
67:17 74:7

**7**

**70**
10:20 26:20
**72**
82:13

**8**

**80s**
22:6
**89**
19:1

**9**

**90**
19:1
**91**
19:1 21:25
**94**
22:2
**95**
22:18

**A**

**A-D-E-E**
30:23
**abide**
31:15 33:16
**ability**
48:4 61:2,13 80:4

**absence**
55:14
**absolutely**
5:5 46:13 51:23
56:16 58:7 81:12
95:16
**academic**
32:19
**academies**
18:6 96:12
**academy**
18:5,11 19:8 20:7,
10,11,23 21:19
**accepted**
16:6
**access**
73:16
**accessible**
87:18
**accomplish**
28:10
**accomplished**
54:13
**account**
37:8 79:24 80:1 94:4
**accounting**
95:5
**accreditation**
13:19 18:24 20:3
23:25 31:4,7,23
32:1,3,11 35:15,23
36:6 37:6,11,21
89:15
**accredited**
33:14
**accurate**
15:6 24:19 65:24
75:7
**achieve**
31:6
**act**
44:1
**action**
57:13 60:10
**actions**
62:10
**actual**
6:25 30:5,16 38:5,19
50:9 82:17 93:24
**add**
60:11 72:15
**added**
84:17
**addition**
11:24 36:11 86:4
**additional**
16:16
**address**
84:1 85:10,21 86:5
**addresses**
87:9
**addressing**
83:15 84:22
**Adee**
30:20 32:21,25 33:5,
18,25 34:19 54:22
**Adee's**
38:17
**adequate**
85:2,3
**adhere**
36:7
**adheres**
31:21
**administration**
16:2,12 19:4 21:24
**administrative**
17:25 30:4,15 31:10
38:4 39:4 64:22

**administrator**
22:16,20 80:13 88:8
**administrators**
62:11,14 82:20
**admission**
42:25
**admonition**
99:6
**adult**
24:22,23,25 67:7
93:21,22 95:13
**adults**
93:3
**advised**
13:13
**advisor**
18:20
**afford**
53:22
**agencies**
25:11 27:5,11,16
30:6 38:6 82:8
**agency**
17:11 18:2,8 21:21
26:10 64:4 67:18
74:5
**agency's**
18:22
**agents**
69:3
**agree**
58:5 59:19 65:1
66:6,9 85:8 92:6
**agreeing**
61:11
**ah-uh's**
4:15
**ahead**
35:3 39:2 46:5,10
92:17 94:10
**air**
39:21
**Alpha**
91:25
**American**
13:16
**analysis**
34:12 48:3
**analyze**
32:23
**and/or**
8:25
**animal**
64:4
**announced**
57:12
**announcing**
62:6
**answering**
68:15
**answers**
4:14 68:5 78:5
**anticipate**
4:24 84:16 86:24
**anticipation**
6:4
**anybody's**
98:22
**apologize**
46:6 94:15 101:16
**apologized**
46:23
**appeal**
80:4
**appears**
37:11 76:22 92:10
**appendices**
7:8 11:12
**appendix**
11:20 14:19,24 16:1

**applies**
44:17
**applying**
33:5
**appointment**
46:16 102:10
**appropriately**
49:11 50:2,16,17,19
88:3,18
**approximately**
15:15
**area**
15:23 51:3 65:20
88:2 89:13
**areas**
27:12 94:3 97:23
**argument**
61:4
**arise**
84:16
**arm**
61:2
**armed**
80:16
**arrested**
49:13
**arrive**
42:22
**arriving**
16:12
**asks**
68:14
**aspect**
14:12 29:6 79:18
80:6
**aspects**
13:24 18:20 35:6
54:23
**ass**
57:16 63:17
**assault**
25:10 29:15 48:4
55:5,11,15,24 56:5,
23 57:4,14 58:2,12,
19 59:7,20,23 60:4
62:2,20 63:12 64:18
65:16,18 67:2 76:1,9
77:21 80:9 83:1
88:12
**assaulted**
57:2
**assaultive**
78:24 79:8 80:5,6
81:1 82:5
**assaults**
56:2 58:6,25 60:16
62:13 64:9 66:10
**assess**
30:17 31:12
**assessing**
43:14
**assessments**
42:24
**assign**
73:3
**assigned**
90:2
**assignment**
21:17
**Association**
13:16,17
**assume**
7:17 19:14
**assuming**
4:10 95:25
**attach**
85:17
**attaches**
87:8

**attaching**
85:18
**attack**
56:19 65:17,18
**attacking**
64:24
**attempt**
57:7 64:3,9 87:7
**attempts**
81:16
**attention**
12:25 29:10
**attorney**
89:7
**attorneys**
4:18 6:17
**authority**
35:5,25 48:10
**automatic**
65:21
**automatically**
67:12
**averaging**
10:19
**awake**
80:8
**aware**
60:5,7 75:14,16
96:13,14,17 97:8,25
99:21 100:1,5,16

**B**

**back**
6:5,11 8:22 14:8
16:9 22:1,13 24:3
32:16 38:15 42:2
46:19 48:10 52:8
53:3 58:3 66:8 70:10
76:4 87:24 89:20
93:9 94:25 95:25
97:21 100:23
**background**
7:12
**balance**
13:9
**balanced**
78:18
**baseball**
57:17,19
**based**
10:13 43:16 73:10
92:2
**basing**
74:14
**basis**
30:14 31:9 32:18,22
33:24 34:2,10 39:3,
18 43:5,7 45:5,21
46:21 47:6,14,18,23
48:1 50:4 53:15
55:11 57:3
**basketball**
59:10
**bat**
57:17,19
**battery**
49:14
**Beach**
17:6,10
**bear**
35:4
**bears**
13:24
**beat**
57:16
**began**
19:2
**beginning**
86:4



**behalf**
8:19 79:12

**behave**
84:13

**behavior**
48:15 64:17,18
76:13 84:1

**beneficial**
53:17

**benefit**
14:14 66:22 87:22

**Billy**
68:5,8

**bird**
65:21

**bit**
7:11 32:8 58:1

**black**
49:20

**blank**
11:11

**blinking**
78:9

**block**
46:15 76:5

**blocks**
76:15

**blue**
78:9

**body**
37:7

**Bogan**
6:19 8:3,4,16,23 9:7
36:1,20 40:15 45:10
47:8,15,24 48:11
51:14 52:18 54:17
56:3,21 59:25 62:15
69:11 74:2 75:5
79:10 89:2 92:21
98:19 100:4,20
101:13,23 102:7,18,
24

**bone**
42:3

**booked**
71:22

**booking**
71:23 90:3

**books**
44:14

**boot**
21:17

**bottom**
11:10 17:4 72:2

**bound**
78:6,12

**Bradenton**
17:6,10

**Bravo**
90:12,18

**break**
40:6,11 42:9 53:18
69:10

**briefly**
6:19

**bring**
46:19

**broad**
33:4 44:12 84:23

**broader**
85:19

**brought**
37:25

**brushstrokes**
60:12

**build**
21:17,18 53:22

**building**
23:1

**bump**
59:12

**bunch**
75:23 84:17

**bunks**
55:2 90:4

**bureau**
18:8 19:10,24 20:20,
25 22:16,20 24:7

**Byers**
60:23

---

## C

**call**
13:5 57:14 61:5
63:16

**called**
4:6

**calling**
38:13

**camp**
21:18

**capacity**
48:7 90:4

**captain**
21:9 51:25

**captain's**
92:12

**captains**
50:25 65:13 79:21

**care**
60:25 87:17

**career**
17:5 32:17 48:12

**careful**
86:9

**carry**
34:3 35:24

**case**
5:7 6:7 7:15 8:9,18,
21 10:6,23 13:6,11,
17,20,24 14:2,16,18
15:14,18 30:10,11,
17 31:12 32:23 33:5
37:1,5,24 38:12,23
41:6 53:19 57:21
62:6,24 63:7,20 70:8
83:1 88:11,25 96:22,
24 97:11,15 98:2
99:3,15,21,24 100:6,
10,11 101:4,20
102:21

**cases**
5:7 8:15,22 9:4 13:5
51:22 71:5 72:7
74:9,11 82:9 96:17
98:8 99:4

**catch**
61:2

**CCHP**
4:5

**cell**
64:22 67:13

**cells**
53:24 90:5

**center**
22:25 25:25

**centers**
25:21 28:8 93:21

**century**
22:3

**CERT**
19:11

**certified**
20:12

**certinly**
76:24

**chain**
20:21 23:10

**challenge**
96:15,19 98:18

**challenging**
25:12

**change**
27:20 57:10

**changed**
12:14 24:8,16,17
27:12

**changing**
75:15

**characterization**
21:2

**characterize**
72:16

**charge**
15:2 18:12 20:20
21:1,4,6,15 22:8,23
23:9 25:22 27:1 57:4

**charged**
50:13 88:20 95:23
96:25

**charges**
82:10

**chat**
102:17

**cheated**
59:11

**check**
10:2 82:18 93:16,19,
24 94:12,17 95:7

**checks**
93:18 94:1 95:1

**chests**
59:12

**chief**
19:10 20:25

**chow**
62:3

**Chris**
100:15

**circumstances**
61:10,12 62:1

**citation**
72:16

**cited**
38:8 101:17

**citizens**
95:20

**City**
6:23

**claims**
45:3

**classification**
19:20 20:18 23:7,13,
15,18 24:9 26:22
29:6 49:9 50:5,9
53:16 54:12 69:20
70:19 71:2,21 72:8
73:3,12,18,21,22
74:1,6,21 75:1,2,14
77:8,12 78:7,12
79:16 81:2,23,24
82:13 84:20,25 85:2
86:3,22 87:4,6,8
88:13 92:16,24

**classifications**
19:17,22 20:15,22
23:4 24:5,18 26:13
27:24 28:1,17,25
73:8 74:17 85:8,13,
22 86:11,18 87:15

**classified**
19:16 23:3 49:11,23
50:3,16,17,19 65:2,
3,19,20 66:4,7,11,12
71:21 73:5 75:11
77:16 88:18,25
89:12 90:11

**classifies**
29:3

**classify**
50:11 51:8 69:16
72:23

**classifying**
26:17 66:6 78:25

**clear**
20:24 39:17 84:10
100:25 101:16

**client**
8:20 9:9

**clients**
8:11

**code**
30:4,15 31:10 38:4
39:4

**codes**
73:18

**coffee**
40:7

**collapsed**
92:13

**collective**
9:19

**college**
48:13

**color**
60:11

**combat**
60:3

**combined**
25:12

**command**
23:10

**commander**
17:25 19:11

**comment**
45:21 53:4

**commentary**
33:17 35:5

**commissary**
63:14

**commission**
13:9 31:4,22 32:3
35:15,23 37:6 40:24
41:4 89:15

**commit**
73:15 80:16,17

**committed**
52:4

**committee**
18:23 20:2 31:25
32:11 40:24

**common**
50:25

**community**
48:20

**complaint**
54:21

**completed**
16:6 22:1

**completely**
16:11

**complex**
42:23

**complications**
43:24

**complies**
40:13

**component**
20:6 84:7,11,14,18,
21 85:9 95:9

**components**
83:14,19 84:4,8,10

**comports**
41:5

**compound**
64:11

**comprehensive**
81:2

**conclusion**
37:20 38:14 40:19
42:7

**conclusions**
36:23 100:3

**conducted**
48:3 94:1

**Confrontations**
83:12

**confused**
16:13

**connect**
67:1

**consequences**
63:5,7,9

**consideration**
78:18

**considered**
96:8

**consistent**
102:1

**Constitution**
36:14 38:23 39:20,
24 41:6,10

**constitutional**
36:19 37:1,8,14,25
38:11 39:6 40:13
101:3

**consult**
9:1 10:6

**consultant**
54:3

**consulted**
81:23

**consulting**
9:4 25:3

**contact**
42:25

**contained**
27:17 37:17 51:4

**context**
30:20 38:16 48:16,
22 86:20 87:23

**conversation**
4:24

**convicted**
7:16 49:14

**conviction**
78:20

**convictions**
76:9

**Cook**
55:17

**coordinator**
18:11,15

**copy**
7:6 10:25 62:22

**corporal**
21:10

**correct**
4:21 7:1 8:4 9:10,13
11:7,8,22 12:9,16
17:8,14 18:19 19:7
21:4,9,10 22:10,17,
18,24 23:16,21 24:6,
23 25:3,6 30:13
34:25 35:2 36:15
39:12 48:24 54:13
78:4 91:12 101:22
102:6

**Correction**
39:16

**correctional**
13:16 19:12 20:12,
23 21:3,7,8,15,18,19
23:23 25:19 26:20
28:7 35:7,20 36:24
43:10 48:14 50:15
51:22 56:12 59:22
60:6,22 62:11,13
63:1,16 64:2 69:5

**conclusion**
80:13 81:14 82:20
83:6 88:8 95:2 102:3

**corrections**
5:7,10,21 8:18
13:11,19 17:16,20
18:4,8,9,11,13,17,
18,25 19:3,4,10,23
20:2,4,6,9,11,20,25
21:13,14,20 22:16,
19,24 23:9 24:22,23,
25 25:13 27:2 28:2
31:5,23 32:4,11
33:1,3,20 34:2 35:1,
6,16,24 39:7 48:15
50:8 52:16 53:2 54:3
59:21 60:5,18 79:6
85:7 86:18,21 88:2
89:15 94:23 95:10,
17 96:1,4,11,23

**correctly**
9:14 98:3

**correlating**
76:20

**Cory**
30:11,17 49:10,13,
21 50:1,2 57:2,15
63:12,15,17,19,21
68:11 77:9,12 78:22
89:10

**Counsel**
68:17,21

**counselor**
39:13 42:2 45:18
66:16 71:13

**count**
96:21

**counties**
67:17 74:7,10 95:17

**county**
5:17,20 6:18 14:17
17:22 19:13,14,22
20:17 22:8,12,15,21
23:2,12 24:3,9,15,21
25:1 30:12 31:5,20
35:19 36:6 50:6,11,
15,25 53:22 54:24
55:7,17 62:16,17
63:12 68:9,17,21
69:3,16 72:13,20
73:12,23 78:20 79:3,
12 83:13,18 86:3,12,
13,15,16 87:3 89:25
90:8 93:5 95:3
101:20

**couple**
6:11,12 40:21 52:20
61:10 96:5 100:21,
23

**courses**
16:6,9,10,15,17,20

**coursework**
22:2

**court**
7:15 30:22 32:7 41:7
66:22 97:9,18
102:11,16,22

**court's**
42:1

**cover**
10:9 67:15 88:4

**coverage**
9:22

**covered**
15:21 92:16,23

**covers**
10:4 88:4

**CPP**
4:5

**create**
21:19 55:18



created
25:17 26:9 33:21
37:18
creating
20:2 37:9
crime
82:5 88:19
criminal
48:16 49:2 53:10
63:7 64:15 82:17
criminologist
66:20
cross
20:12
**CROSS-**
**EXAMINATION**
100:19
CSI
97:18
current
75:25 77:21 78:24
79:8 82:3,10
curriculum
16:11 20:8
custody
5:20 90:14,19,22
91:2,10,14,17,21
customary
50:15
cut
66:16
CV
15:25 25:17 32:17

**D**

data
80:10,12 81:1,4
82:19 83:4
database
82:17
date
12:1 71:23 73:6
75:12
dates
21:22
Daubert
42:6 96:14,19 98:17
day
5:11 49:2 56:6 64:14
74:12 80:7,8 97:20
days
6:6 78:20
deal
75:18
dealing
53:10 83:7
deals
7:15 43:25
death
30:11 68:12
decade
10:14
decades
53:4
decision
38:23 50:9 72:18,22
88:15 93:4 99:21
deemed
67:14 100:2
defendant
68:5 69:5 92:8 97:21
defendants
14:18
defensive
96:10
defer
65:11 76:24 79:20
definition
43:11

defusing
95:22
degree
16:8 41:5
degrees
21:23
Delta
91:1,3
denied
49:21
department
17:7,12 20:1 24:1
25:5,14,16 26:3
95:10
departments
9:25 17:16 27:1
departure
13:22
depending
13:12
depends
19:7
depo
11:15
depose
41:3 47:3
deposed
99:11
deposition
6:4,13 15:4 41:15
61:22,23 65:14 71:6
73:21,25 99:15
depositions
4:11 12:6 51:17
deputies
18:13,14
deputy
19:10 20:25
**Describe**
89:24
designated
78:23
designations
90:2
designed
83:14,19
detail
89:24
details
43:3 45:7,25
detainee
5:12,19
detainees
5:8,24
detention
25:6,18,21,24,25
28:8 93:20
determine
13:21 14:10 28:11
101:2
determined
15:17 29:6
determining
81:4 82:21
develop
23:6 25:23 26:1,12
developed
23:8 26:15 27:8,15
35:18
developing
19:21 25:15 26:3
97:3
development
19:25 27:3
deviate
41:9
devices
94:20
diagram
76:16 77:16

differently
51:8
difficult
71:8
diffuse
95:14
digesting
13:8
direct
4:8 35:9,11 38:20
43:3 45:7,25
directed
23:24 37:8,22
director
19:23 33:20 95:17
directs
40:2
disagree
75:4
disciplinary
63:5 64:14 83:23
84:7
disclose
8:25
disclosed
9:5 12:8,14
disclosure
11:24 15:1
discovery
12:7
discuss
32:18 34:20
discussed
27:18 36:17 82:3
89:16
disorder
64:24
distinction
5:24 6:1 49:3 91:10
District
99:22
division
17:25 18:2 99:23
divisions
19:24 21:21
DNA
97:17 98:2
doctor
71:15 102:8,10
document
14:5 30:25 33:9,18
38:18 40:1 68:1,20
70:2,4,13 71:14,16
72:6 75:17 77:7,12
documentation
55:23 69:4
documents
6:7 7:4 11:20 12:19,
24 13:9,10 14:2,8,12
34:20,21 70:8
dog
42:3
dogged
87:7
domestic
49:14
don't
46:12 66:16 68:10
dorm
62:4 95:5
dormitory
54:25 61:6
dorms
55:2 90:6 92:13
doubt
92:11
dozens
81:23
drama
43:15

draw
33:2 42:7
duly
4:7
Duquette
68:16,21
dynamic
57:11

**E**

earlier
14:1 89:22 93:2
96:14
early
81:18
easier
75:20
eccetera
62:8
Echo
91:13
education
21:22 45:22 48:2
effect
41:9 82:6 97:18
efficient
93:10
effort
25:23
efforts
88:8
elbow
56:10 60:21
electronic
12:3
eludes
49:3
email
102:14,15
emergency
19:12
employed
48:25
employee
59:22
employment
48:25
enacted
30:5,15 31:10 38:4
39:4
end
42:13 51:18 68:20
87:2 93:20
enforcement
13:11 17:6 18:5,10,
14,24 56:13 85:7
86:21 96:3,11,22,24
97:3,11
ensuring
81:11
enter
10:24
entered
97:8
entering
55:7
entire
20:20 24:6 30:19
43:6 94:18
entity
9:20
entry
17:22 18:13
environment
35:8 48:16
equipment
94:20
ergo
62:3

Eric
49:10,16 50:2 57:2
63:20 71:17 75:23
76:8 77:13 78:2,22
89:9
escape
66:24 76:11
esque
61:2
essentially
22:25
estate
97:1
estimate
8:7 93:25
etcetera
93:4
etcetra
83:19
evaluate
32:23
evaluation
47:25
evidence
55:14 58:2 63:6
evidenced
79:24
evidentiary
96:19
**EXAMINATION**
4:8
examined
4:7
examples
27:11 60:8 62:9
excluded
96:18
exclusive
38:22
excuse
23:21 66:21
exhibit
10:25 11:2,19 67:22,
25 69:23,24 77:2,3,
6,7 89:22 102:12
exist
67:3
existed
37:6
existence
23:15 43:12
existing
13:10
exists
50:5
expectations
62:18 64:2,17
experience
18:17 21:13 45:23
48:2 53:9 63:1 88:6
95:22
expert
8:12 9:4,6 10:18
26:7 30:23 34:19
38:14 40:1 66:22
79:6 85:7 86:19,22
88:1 95:10 97:14
99:23
expertise
54:3 78:11 79:1 85:6
86:17,21 88:7
explain
21:11 32:15 41:11,
14,21 69:2 73:17
83:17,20
explained
27:24 47:10 52:19
65:13
explaining
76:25

explains
90:10
explanations
4:15
express
87:22
extent
24:17 28:9,12 29:5
31:3 53:13 62:21
eye
49:20

**F**

facilities
21:3,15 25:16,19
27:2 35:7,20 50:15
51:1 94:2,24 96:1
102:3
facility
5:21 21:18 28:15,22
31:21 42:22 43:11
46:3 47:22 49:8,12
50:4 52:6 53:13,23
57:20 63:1 64:23
66:5 80:19 81:14,17,
18 83:6 85:16,20
86:5 93:22 94:18
95:13
facing
82:4
fact
39:25 43:16 45:17
49:19 50:13 51:1,4
56:11 65:12 66:17
79:15,23 85:17 86:6
87:24 88:17 89:12
factors
72:23 73:2
factual
79:22
failing
39:10
fair
5:4,21 21:2 71:6
72:9,25
faithful
43:20
faithfully
86:7
fallen
99:17
familiar
59:3 69:15
familiarize
38:18
fat
63:16
fault
32:25
FCAC
32:2,6 33:12 36:5,
12,18 38:10 39:23
101:18 102:2
February
12:1
federal
38:23 44:25
fee
14:23 15:4
feel
6:1 60:19
feels
59:11
fees
15:3
felon
51:6
felonies
7:11



**felons**
52:24 67:6,7 87:19, 20

**felony**
76:1,9 77:21 78:25 79:8 80:5,6 81:1 82:5 91:7

**female**
67:6

**fewer**
67:9

**field**
5:10 13:11 28:7 39:22

**fight**
49:15,21 60:19 68:9

**fighting**
87:10 96:7

**fights**
49:17 83:15 84:2,22, 25 85:10,18

**figure**
22:1 42:3

**file**
72:4

**filing**
44:13

**final**
26:5,14,16 80:2

**find**
41:16 51:21 72:17 80:19

**fine**
29:20,25 40:11 71:10

**finish**
5:1 39:12 40:8 57:1

**firm**
8:4,9 9:8 10:15 97:21

**fits**
67:10

**fives**
92:5,19

**flip**
12:21

**Florida**
8:19 9:9,12,17,21,25 10:7 13:18 16:5,16 20:9 22:12,15 25:5, 11,20 26:23 30:5,6, 16 31:1,2,4,11,13, 14,21,22,24,25 32:3, 6,10,11 33:12,13,14 35:10,14,15,18,21, 22,23 36:2,4,11,13, 17 37:9,14,17,22 38:5,6,8,9,20 39:5, 11,14,16,19,23 40:2, 13,23,25 41:1,8 51:5,13 52:15,20 54:13 55:17 63:25 67:5,17 74:4,7,11 85:15 89:14 93:1,21 95:10,18 96:11 98:7 99:22 100:15,24 101:2,8,17 102:2,3

**Florida's**
37:5

**FMJS**
32:5 33:12

**folder**
12:3

**folders**
12:5

**folks**
64:2 95:19,20

**follow**
33:9,23 36:4 44:21 54:10

---

**force**
26:8 34:4 96:2,8 97:12

**foresee**
56:5 65:17

**foreseeability**
55:18 57:18 59:13 60:3

**foreseeable**
55:6,12 56:16,19 57:14 58:7,8,13,19 59:1,18,20,21 60:16 62:8,9

**foreseeing**
85:18

**forgot**
52:22

**form**
32:18,22 36:1,20 40:15 45:10,11 47:8, 15,24 48:11 51:14 52:18 56:3,21 59:25 62:15 74:2 75:5 79:10 89:2 92:21 98:19 100:4 101:11, 21 102:5

**forwarded**
12:1,6

**found**
51:21

**foundation**
32:12 69:15 94:14

**fours**
92:4,19

**frame**
18:7 59:17 62:1

**fraud**
97:1

**fraught**
95:23

**free**
6:1

**frequency**
69:6

**friction**
62:7

**front**
7:4 10:25 11:16 41:20 98:10

**frustrated**
46:7,24

**fuck**
63:17

**full**
5:2 7:7 14:12

**fully**
7:23

**functions**
10:2

**fund**
8:19 9:9,13,18 10:7, 11

**furnish**
13:8

**furnished**
6:9

---

**G**

**game**
10:16 70:17

**gather**
54:2

**gave**
40:21 59:3 62:9

**general**
18:22 20:2 50:5,7 58:23 68:16,21 70:9, 11,14 71:2,4 83:12

---

**generally**
28:7 59:7 86:18 92:3,10

**generator**
94:21

**genuinely**
70:18,22

**give**
4:14 5:2 66:18,21 71:16 72:16 79:22 100:10

**giving**
5:1,3

**glanced**
6:12

**glean**
47:1

**golden**
39:13

**golly**
24:10

**good**
27:21 28:22 69:22 78:13 81:17 85:15 93:11

**good-hearted**
64:1

**Gosh**
44:18

**graded**
73:14

**graduated**
22:9

**granted**
97:20

**graph**
83:11

**graphic**
73:1 79:25

**great**
7:7,10 42:10 71:10 95:22

**ground**
4:13

**group**
26:7 28:24 52:5 83:7

**guaranteeing**
81:11

**guess**
22:3 40:16,17 41:10 85:6 87:11 99:2,18

**guessing**
10:16

**guidance**
13:12 33:3,17 35:5

**guide**
33:1 34:1,2,24 39:8 83:15

**guides**
85:10

**guiding**
13:20 28:21 30:25 31:1 33:7 34:20,21 35:3 84:21

**Gulf**
91:20,25

**gymnastics**
40:4

---

**H**

**half**
54:20

**hall**
62:4

**handbook**
83:22 84:5

**hands**
95:18

---

**hanging**
16:10

**happen**
58:6 60:20 61:18 62:13

**happening**
59:24 61:19

**hard-working**
64:1

**Harton**
4:9 10:22 11:4 31:8 32:9 36:10 37:13 41:13 42:9,12 45:14 47:13,16 48:8,17 52:10 54:4,18 56:17, 24 57:22 60:14 64:7 67:20,24 69:13,23 70:1 74:24 75:9 77:1,5 80:11 89:19 93:6,14 98:23 99:1 99:6,14 98:23 99:1 100:7,17 101:11,21 102:5,9,11,13,20

**Harvard**
16:7,8,17,19,21 21:25 22:9

**head**
4:16 69:18

**health**
65:14 87:18

**heard**
20:14

**heavily**
32:25

**held**
4:2 101:9

**helped**
26:1,12

**helpful**
35:8 69:14 82:20,24

**helping**
23:6 39:5

**helps**
80:12 86:23 88:5

**hey**
13:5 27:20

**high**
65:2,12,19,20,22,25 66:4,11,25 67:11,14 73:8 75:1

**high/medium**
75:5 76:11,13

**higher**
25:10 29:1

**highest**
75:2

**highlights**
14:25

**highs**
73:12

**Hilyard**
8:4,16,23 9:7

**hiring**
21:20 26:19

**history**
82:16,17

**hit**
57:6 58:16 63:2,4

**holding**
42:2

**Hollywood**
61:1

**home**
6:24 7:1

**homicides**
48:20

**hope**
5:11 47:1 51:10

**hoping**
54:6

---

**Hough**
4:5,10 7:16,20 44:3 46:20 100:22

**hour**
15:3 46:15 53:12 82:13 95:4

**hours**
15:13,18,21,24 46:8, 11,17 80:7,8 85:12 88:22 100:23

**house**
23:3 43:15 67:9,13 81:5,7,8 88:3,7 90:13,21 91:6

**housed**
19:16 50:14 65:3 80:16 81:5 82:23 87:16 88:19 90:11 90:22 92:3,4,5,6,25

**houses**
90:17,18

**housing**
28:11,12,19 51:2,8, 24 53:13 54:23 55:1 63:8 64:15,21 65:20 89:13,24,25 90:1,5,8 91:24 94:8

**human**
48:15 62:21 64:4

**humans**
28:24 52:5 83:7

**hurt**
63:14

**hypothetical**
59:2,5

---

**I**

**idea**
16:9 37:21 42:10 54:1

**identification**
11:3 67:23 69:25 77:4

**Identify**
69:2

**idle**
55:3

**illegal**
63:3

**Illinois**
55:17 63:25

**illness**
8:1

**illustrates**
59:5

**immediately**
80:22 84:24

**impacted**
88:12

**implement**
27:21

**implicated**
88:16

**implications**
18:25

**important**
4:14 28:4,16 29:3 58:1 73:20,25 74:3, 4,14,23 79:7,18 82:23 85:9 86:22 88:7 94:14

**imposing**
84:11

**improperly**
49:9

**inaccurately**
34:14

**inappropriate**
92:15

---

**incarcerated**
28:24 83:13 95:20

**incarceration**
75:15

**incident**
30:17

**inclined**
43:2 45:6,24

**include**
32:20 64:17 84:2,20 94:7

**included**
18:2,20 22:25 33:24 44:10,23 49:18 79:3

**including**
11:11 28:7 32:17 69:4,5 81:13 89:25 95:19

**income**
10:17

**incorporates**
37:1

**incorrectly**
49:10

**incredibly**
61:25

**independently**
14:21

**indication**
49:8 78:14

**individual**
43:22 52:6 53:7 54:5,8,12 57:8 67:13 95:18

**individual's**
82:15

**individuals**
28:13 43:2,9,14 45:4,6,24 62:25 82:4 88:19,20

**industry**
72:21

**inform**
101:19

**information**
43:14,17 49:17 79:22 80:20 82:20 92:8 97:22 101:12

**informational**
33:19

**initial**
14:25 15:11,21 82:12

**initiated**
49:18

**injured**
81:13

**inmate**
5:19 28:20 43:23 49:23 52:2 53:25 55:5,6 56:19,20 60:23 62:22 64:25 79:1,7 80:3 83:22 84:11 85:21 88:11, 13 90:4 95:6

**inmate-on-**
88:10

**inmate-on-inmate**
27:13 58:25 59:20 61:17 65:4 85:23,25 86:25 88:9 89:1

**inmates**
5:7,15,25 19:16,20, 22 20:18 23:3,4,19 26:25 27:4,9 29:2 50:12 52:3 53:21 55:1,13 58:15 59:10 62:8,21 69:16 72:23 74:20 82:21 83:16, 24,25 84:2,6,8,12, 19,22 85:3,11 88:17,

---



25 90:13,18,22 91:1,
7,24 92:3,14 94:8,23
95:15 96:2,6
inquiring
37:21
inside
43:22 80:18 81:14
94:22
instance
38:3 66:13 87:3
instances
95:25 96:5 97:24
instant
30:4,9 61:8
Institute
33:1 34:1 35:1,6
39:7,15 52:16 53:2
institutional
76:13
instruct
4:19
insurance
9:20,24
insuring
81:12
interacting
94:8
interactions
59:16
interchangeably
5:9
interesting
80:22
interrogatories
14:17,20 67:21 68:6,
22
interrogatory
68:15,25 89:20,21,
23 92:9
investigation
64:15 96:25
investigator
96:24
invoice
10:3 15:11,17
invoiced
15:8
involve
82:14
involved
49:15 74:20 97:12
involvement
19:2
involving
30:11,17 100:24
101:20
issue
15:17 65:15 83:12
89:3 92:19 98:2
issued
99:19
issues
34:21 53:11 66:3
84:1,16
issuing
12:11
item
84:9
items
32:21,22
it's
16:11 22:3 29:21
34:13 66:14 88:11
I'd
76:24
I'll
17:3 34:16
I'm
30:22 45:16 67:20

J

jail
5:17,20 13:16,18
21:2 22:23 23:1
28:17 29:3 30:12
31:2,13,21,25 32:6,
10 33:12,13,14
34:2 35:14,18,21,
22 36:3,11,17 37:17
38:9,19,21 39:14,17,
19,23 40:12,23,25
41:8 42:22 46:3
51:5,13 52:15,20
53:23,24 54:13,24
55:7,16,23 56:2 58:6
59:7 62:16 63:12
67:5 71:22 72:4
73:12 74:5,9,11
78:20 83:13,18 85:9,
23 86:23 89:14,25
90:8 93:1 100:24
101:2,8,18 102:2
jail's
50:20
jails
21:6 22:8 28:8 31:14
33:22 36:3,12 41:2
48:20 50:8 54:24
55:25 65:10 67:8
72:7,12,14,22 81:22,
24 86:13
job
22:20,21 48:25
93:16
jog
99:3
Johnson
6:23
judge
97:6 100:2
judgment
97:20
jump
21:12
jumping
21:13,14
jury
14:14 41:12,14,16,
20,22 42:8 44:20
45:24 59:5 65:22
66:22 87:22
justice
24:2 25:5,14 26:4
48:16 49:2 53:10
95:11
juvenile
21:17 24:1 25:5,14,
18,24 26:4 93:20
94:2,8 95:11
juveniles
26:17 52:25 93:3
94:3
juxtaposing
38:17

K

K-A-T-E-S
100:13,14
Kates
99:22 100:8,12
Key
17:10
kind
5:8,9 7:21 8:15 9:19
10:13 12:24,25 13:8,
9 14:24 15:6 27:24
28:22 43:11 53:24
54:20 57:25 59:2

60:15,16,19 63:8
65:21 72:12 73:1
74:14 75:17,20
76:16,19 77:15
81:15 83:20 87:12
92:2 94:17,18 95:5
knowing
48:6
knowledge
10:4 98:21

L

labeled
10:24 68:2,5
language
81:11
large
25:16 94:17
largely
19:1 42:24
Larger
17:11
Late
22:6
laugh
25:9
law
9:8 13:11 17:5 18:4,
10,13,24 30:4,15
31:10 34:4 35:4,25
37:1,2,8,12,14 38:4,
23 39:4 40:13 41:1
56:13 85:7 86:21
96:3,11,21,23 97:2,
11,21
lawyer
45:15
lay
69:14 94:14
layout
89:24
Le
17:3
leadership
21:21 63:13
leading
6:10 20:4
leave
24:21
leaving
16:9
led
25:23
left
16:15 24:1 39:22
legal
33:8 36:23 37:10,20
38:13 40:19 42:6
100:3
legislature
30:5,16 31:11 37:9,
23 38:5 39:5 40:22
length
36:23 50:24 69:6
95:22
Leo
22:5
lethal
97:12
Let's
11:5 15:25 29:8
level
18:13 25:20 31:6
35:20 36:8 37:21
80:15 90:14,19,22
91:2,10,14,17,21
96:7
levels
50:10,11

liability
9:22
lieutenant
21:9
life
46:1
limited
59:16 61:12
lined
55:2
list
12:12,17 42:14
79:24 98:11 99:3
listed
11:24 12:19 50:18,
21 64:13 99:13
listing
73:1
literally
14:9
literature
32:20 53:11 55:22
litigation
44:25
lives
42:23 43:3 45:7,25
location
28:12 50:14 60:4
lockdown
95:4
locking
94:19
logic
92:24
logical
80:19
long
6:20 41:8 87:1 92:15
Longboat
17:10
looked
6:11
lot
5:16 6:7 12:4 14:1
53:17 54:6 60:15
71:5 93:7
lots
95:18
low
65:3,22 66:12 73:8
75:3
lowest
75:3
lows
73:13
Lutterloh
49:10,16 57:2 62:25
63:20 71:18 73:4
75:10,23 76:8 78:2,
22 88:17 89:9
Lutterloh's
71:20
Lutterloh's
72:4 77:13

M

made
5:24 21:11 27:20
33:11 38:24 41:7
60:2,21 88:15
major
16:25 21:9
make
6:1 27:25 33:17 42:8
70:12,13,23 82:25
87:17 93:5 101:16
making
45:3,21 65:1 81:12

male
90:13,22 91:7,24
92:3
management
8:19 9:9,13,18 10:7
16:12 27:18
Manatee
17:22 18:1 19:13,14,
22 20:17 22:8,21
23:12,21 24:9,9,25
mandatory
34:3 36:3 69:7
manslaughter
7:17
map
76:20
Marin
14:17 68:17,21 69:3
Marion
5:17,20 6:18 30:12
31:5,16,19,20 36:5
50:6,10 53:20 54:24
55:7,17 62:16,17
63:12 68:8 69:16
72:13 73:12,22 79:3,
12 82:11 83:13,18
86:3,12,15,16 87:3
89:25 90:8 93:5 95:3
101:20
Marissa
68:16,21
marked
11:2 67:22 69:24
77:3
master
21:24
master's
16:8,14
masters
16:2
match
53:24
material
5:23
materials
6:8 11:23 12:17
14:15 86:8
matrix
71:23 72:2 79:17
matter
13:12 26:7 28:9
30:4,9,17 38:4 61:8
Mcnealy
52:1
Mcneely
12:9
meaning
15:20
meanings
5:10
means
38:24 81:1
meant
27:25 38:18 54:7
65:9 83:18 94:11
measures
59:23
medical
43:15 65:15 66:3
87:17 90:3
medication
7:24
medium
65:22 90:13,22 91:1
medium/pre
77:17
meet
6:17 30:6 36:13 38:6
member
43:22 60:6

male
90:13,22 91:7,24
92:3
management
memorize
73:15
memorized
69:19
memory
69:21 70:15 86:1,14
99:4
men
52:25 93:3
mental
65:14 87:18
mentioned
66:13 93:1
Merchant
30:11,12,18 49:10,
13,15,18,20,21,22
57:3,15,19 62:25
63:12,15,17,19,21
77:9 88:18 89:10
Merchant's
77:12
Merchant's
68:11
mere
60:8
met
40:13 89:13,14
method
51:16
methodology
13:4
middle
42:20 99:22
midswing
61:3
Miller
12:10
mind
8:10 43:22 96:6
mine
34:5
minimal
39:6 40:14
minimum
15:21 36:19 78:19
minors
25:7
minute
29:11 69:10 80:9
98:15
minutes
6:21 38:16 40:22
52:9,20 85:13 93:8
misdemeanants
67:8 87:19
misdemeanor
51:6 78:20
misdemeanors
52:25 67:6
mislead
98:6
missed
20:15 52:22
missing
50:22
mitigate
62:12,19 65:4 66:9
86:24 88:8,10
mix
29:7 92:14,18 93:2,3
model
13:18 31:2,13,21,25
32:6,10 33:12,14
35:14,18,21,22 36:2,
11,17 37:17 38:9
39:17,19,23 40:23,
25 41:8 51:5,13
52:15,20 67:5 74:4
89:14 93:1 100:24
101:2,8,17 102:2



modeled
20:1
models
13:13
modified
27:12
moment
44:1,17 60:16,19
74:10,12 88:15
monitoring
26:25 27:4,9
monologue
40:21
month
99:18
months
26:5
motion
44:13 60:11 61:8
motivated
78:15
motivations
42:23
mouth
58:12 87:9
move
42:1 81:19 82:12
movement
64:15,20
movie
61:1
moving
57:8 58:17
multiple
38:8
mutual
60:3

**N**

named
84:5
names
90:1 99:4
narrate
89:7
narrated
45:12 89:5
narrow
59:13,17 61:25
narrower
62:1
national
18:23 20:3 32:25
34:1 35:1,6 39:7,15
52:16 53:2
nature
55:15 56:9 62:2
navigate
75:21
newly
26:9
NIC
40:1
night
7:25
nines
92:6
no's
4:15
Nocco
99:22 100:8,15
nodding
4:16
non-
87:19
non-sentence
67:7
norm
51:23 52:11,12

normal
4:24 51:2,11,12
52:12 53:5 54:1
74:15 89:16
north
50:10
nos
76:8,16
note
36:21
noted
21:20 25:17
number
42:15,19 47:19
54:23 68:25 70:8
72:23 73:13 77:17
78:1 82:21 89:23
90:4 95:21 100:2,10
numerical
69:15 72:8 73:11,22

**O**

object
4:19 36:1,20 40:15
45:11 47:8,15,24
48:11 51:14 52:18
56:3,21 59:25 62:15
74:2 75:5 79:10 89:2
92:21 98:19 100:4
101:11,21 102:5
objecting
45:12
objections
41:25
observed
49:19 101:25
occur
41:24 48:5
occurred
89:1 101:3
occurring
59:4 61:4 64:3,9
occurs
59:7 89:16
offenders
50:13 51:2,7,12,19,
24 53:6 54:2
offense
76:1 77:21 78:24
79:8 82:4 91:9
offenses
52:4 91:7,24
offer
28:20 36:22 40:20
59:4 97:21
offered
40:1
offering
38:17
office
6:24,25 7:1 17:23
18:1,5 19:14,15
22:12,15 31:20 50:6,
11 62:17 68:17,22
69:3 79:3,13,14
86:12 93:5 101:20
officer
17:6,13 18:18 19:3
20:12 21:7 25:18
49:19 56:12,13
57:20 59:21 60:6
63:16 95:3 96:3
97:12
officers
17:18 25:11,19
26:20 29:2 37:2
48:14 55:2 57:15
60:18,22 61:5,16
69:5 81:13 83:25
84:7,15 94:23 97:2,3

offices
9:21
Ohio
7:15
Ojection
45:10
Okaloosa
25:24
one's
39:9 58:15
one-by-
27:6
ongoing
42:25
operation
22:24
operations
35:7,20
opinion
13:23 30:14 31:10
33:25 34:2,5,10,15,
16 36:16 37:10 38:7
40:12,20 47:6,10,11,
14,23 48:1,21 49:5
52:8 53:8 54:14
55:11 56:1 88:24
89:3,8,10 97:14,16
101:1
opinions
12:15 32:13,19
34:12 42:14 44:24
96:18 97:9 100:2
opportunity
62:5 79:11
opposed
38:19 47:2 61:8
62:19 77:13
optional
69:7
order
28:22 50:5 62:12
70:9,11,14 71:3,4
81:17 85:15,20
ordering
102:25
orders
18:22 20:2
original
94:25
outcome
55:7
outline
93:9
overseeing
26:21

**P**

pages
11:10,11 12:19
14:10 90:10
paid
12:24
Palmer
8:4,16,23 9:7
paper
17:1
paragraph
29:11,17 30:2,19
32:24 38:17 40:3,5
42:4,20 43:19,21
46:1,4 47:18,19
54:20 55:21
parroted
54:22
part
10:8 18:1,22 20:6
23:23 26:6 37:10
50:21 51:10 71:2
80:22 81:15 84:21
85:13 87:2

participate
9:22 23:17 25:15
27:2
participated
24:4
participating
19:20,21
parts
6:5
pass
82:11
past
10:14 22:21
paths
37:21
pathway
39:24
patrol
17:6,13,17,18 18:17
people
4:25 5:13,16,19 25:7
26:20 29:1 43:10
46:3 47:3,21 48:14
53:14 56:15 63:2,4
5:3,3 66:3,6,10,11
67:9 81:18 87:16
88:7 90:11
percent
10:20,21
percentage
10:18
period
18:19 26:14,16
82:14 92:7 95:12
person
45:12 56:8,15 66:25
68:15 78:7 80:14
personal
43:12
personally
82:9
Persons
42:22
pertaining
15:3
pertains
26:25
Peterson
51:25
phrase
86:10
physical
57:5 61:5
picking
51:17
place
23:14 26:18 28:13,
23 51:2,11,12 53:7
63:11 83:14,18 85:9
88:19
places
33:6 69:19
Plaintiff
30:24
plaintiff's
97:14
plaintiffs
34:19
Plaintiff's
11:2 67:22 69:24
77:3
play
35:17 70:17
playing
59:10
plenty
102:10
pluck
43:20

PM
4:3
pod
90:12 91:1,3,13,20
pods
91:9
point
12:20 15:12 20:7,10
21:1 26:23 29:10
33:11,18 34:13 40:3
43:21 44:21 46:4,9,
18 48:5 50:10 60:2
61:22 73:17 75:15
80:10,12 81:1,4
82:25 85:14 89:22
pointed
46:23
points
20:19 82:19 83:4
police
8:17 17:7,16
policies
5:16 6:12 13:13
19:21,25 20:5 23:7,
24 24:6,9,16 25:23
26:3,11 27:3,8,15
50:20,24 64:14
69:20 84:6 86:18
101:19 102:1
policies/
procedures
25:15
policing
21:13
policy
18:19,21 23:17 24:4,
17 26:8,9 60:10
79:16 83:14,19,24
84:4,19,21,25 85:3,
4,8,13,14,23 86:3,4,
11,15,16,22 87:3,5,
6,8,14 88:3,4,14,16
92:16,24
population
25:12 28:20 43:23
53:25
populations
83:13
pose
29:1
position
17:19 18:11,16
20:16 22:7 36:22
positions
17:3
positive
15:17 81:12 98:6
Post
15:15,20
posturing
57:5
potentially
14:11
practices
8:18 34:19 50:7
53:12
pre-booking
82:12
pre-label
102:20
predict
48:4
predicted
83:2
prefer
29:22
prepare
86:23
prescribed
36:8

present
56:14
presentation
14:14
presenting
33:7 75:7
pretty
72:21 78:13 81:2
prevent
59:23 61:17 85:23
86:24
preventing
85:25
previous
62:7
previously
49:13
primary
82:12
principle
61:11
printed
29:20
prior
6:8 12:11 15:1 18:16
76:9 82:15
prison
78:6,12,14
prisoners
5:8
prisons
28:8 54:25 72:15
privilege
4:20
probable
97:3,7 99:7
problem
57:21
problems
76:13
procedural
23:18
procedures
23:24 26:3,8,11
27:3,8,15
proceed
57:7
proceedings
4:2
process
12:20,23 13:2 28:17
31:6 44:14 74:21
81:3
professionals
36:25
professor
49:1
program
25:18 26:2
programs
28:19 87:18
prohibition
51:6 52:24
promise
5:4
proper
5:12
protection
52:2
protracted
40:21
provide
9:24 10:6 32:12
33:17 35:24 45:19
provided
10:22 47:5,13 92:8
providing
43:18 48:22
public
16:2,12 21:24 83:12



publication
48:9
pull
14:7 54:9 69:20,23
pulled
39:21
punch
55:19 56:7,14 60:24
61:9 62:3,5 64:5
88:16
punched
63:21 89:10
punching
59:6
purview
34:13 38:14 40:19
put
20:10 31:15 40:24
51:7,19,23 53:5,6
60:11 61:8 64:22
66:10 83:14,18
86:20 87:18 102:16
putting
30:19 58:12

**Q**

quarter
22:3
question
4:21 5:1,3,25 7:21
27:13 29:13 34:9
38:7 39:1,25 40:10
44:12 46:19 48:23
51:10 54:9 56:22
66:14,15 68:14 69:1
70:14,15 71:5 74:13
75:8,25 78:5,21,22,
25 79:4 81:21 82:10
86:19 89:23 95:1
questioning
40:9
questions
7:10 26:24 28:5 43:4
45:7 46:1 66:17
75:24 76:7,20 77:20
78:2 79:16 80:19
82:2 83:4 93:7
100:21,24 102:7
questions,right
75:23
quick
100:21
quicker
93:8

**R**

rate
25:10
rates
48:20,21
reaccredited
36:9
reach
46:9
reached
97:6
react
60:19 84:15
reacting
60:16
reaction
61:2
read
14:4 29:11,19 42:21
49:24 51:16 54:19
97:9
reading
14:13 43:20

ready
29:12 34:17 40:6
54:15
real
96:25
reality
92:23
reason
7:22 12:22 37:4
44:10 75:4,7 80:4
83:3 84:3 92:11
101:7,15,17
reasonable
59:23 60:3
reasons
28:25 52:2
rec
59:10 62:4
recall
8:20 11:25 14:19,22
15:11 17:1 23:22
27:7,10,19 51:25
72:18 79:20 82:7
86:2 96:6 99:24
received
14:8 69:5
recently
8:8
recess
42:11 67:19 69:12
93:13
recites
34:20
recognize
61:22 72:2,3
recognized
13:1
recognizing
73:19
recommended
13:13
record
10:24 37:4 45:13
46:11 63:6 73:10
77:11 86:8 89:11
101:16
recruitment
21:20
refer
5:16 13:15 32:5
reference
48:19 60:21
referenced
72:5,6 96:14
references
30:25
referencing
95:2
referred
32:21 34:23
referring
34:5,22 66:2,3 98:1
refers
30:20 33:18
reflect
37:7 73:11
reflection
41:23
reflective
36:19
reflects
37:12 89:11
regard
52:3
regime
19:15 23:3 28:17
73:12,22 74:1 75:2
regimes
23:14 72:8

regional
25:20,24
regulations
62:23
regulatory
35:4
relate
44:19
related
19:21 23:18 24:4
27:9
relating
27:4
release
22:25
relevance
80:18
relevant
13:1 78:25
relying
32:25
remember
6:5 14:8 16:25 24:8,
11 26:19 27:14
39:13 70:6 74:12
98:2 99:19
remind
32:2
render
13:23
repeatedly
47:20 88:23
repeating
44:20 50:23
repeats
16:10
rephrase
87:1
replied
71:3 92:8
report
6:8 7:6,7 8:25
10:6,9,22 11:6,15,16
12:1,8,11,14 13:3,15
29:8 33:7,18 34:16
36:22 39:22 42:13,
16 43:6 44:3,8,11
46:22 47:25 48:18
70:5 71:1 82:25 83:8
97:2 99:19 101:25
reported
20:21 23:10
REPORTER
30:22 32:7 102:11,
16,22
reports
44:15
representation
9:8,23
represented
74:25
request
92:9
required
10:10 36:12,13 39:9,
11,20 41:1 85:14
requirement
33:22 81:10
research
45:9 48:9 97:17
researched
20:5
researching
7:14
resonate
45:23
Resource
34:1
Resources
33:1

respect
64:4
respond
45:17
response
19:12 28:6 45:19
responses
64:15
responsibilities
38:19
responsibility
59:22
responsive
51:10 92:9
rest
34:12
resulted
26:9
retained
8:3,6,12,15,23,24
9:1,5,8 10:5,11
44:25 99:23
retainer
14:25 15:1,15,20
retainers
15:22
retraining
69:8
returned
16:18 18:4
review
12:23 13:22 18:22
20:2
reviewed
6:4 11:20,23 12:13,
18,22 58:2 70:4
73:11
reviewing
14:19
revise/revamp
21:19
rewrite
23:24
rewrites
25:25
rewritten
26:9
Richard
4:5 7:15,20
ridiculous
45:20 46:21,24
rise
96:7
risk
8:19 9:9,13,18 10:7
29:1,2,4,5 36:9
62:12,19 65:2,4,12,
16,19,20,22,25 66:4,
10,11,12,24,25
67:11,14 72:23 75:2,
3 78:13 82:22 86:24
88:9
road
6:14
robberies
80:16
role
19:19 23:6 86:6
room
7:2
Rosa
22:12,14 23:2,7,9,
13,20,22 24:15,21
25:1
round
94:4
rounds
95:2
routine
50:25

rude
7:11,21
rule
10:8 39:13
rules
4:14 59:8 62:22
63:5,18 64:23 83:23
84:12,14
run
28:24 33:3 35:9
82:17 83:6
running
20:11 85:9
runs
94:21

**S**

safely
81:6,8,16
safety
60:10 94:4
Saint
22:5
Santa
22:11,14 23:2,7,8,
12,20,22 24:15,21
25:1
scenarios
61:17
schedule
14:23
schema
50:10
scheme
74:6
science
55:22
scientific
97:17
scientist
66:20
scope
13:21
seconds
59:18 60:8,9
section
20:21,22 21:22 86:2
90:13,17,21 91:3,6,
17,20,23
sections
91:14
security
28:14 29:2 49:11
50:3 65:2,3,16,25
66:4,11,12,25 67:11,
14 73:18 75:2,3
78:13,17,19 82:22
85:15 90:13,18,22
91:1 93:15,18,19,24
94:1,12,17 95:1,7
segregation
63:8 64:23 90:3
self-harm
78:17
semantically
67:1
senior
17:13
sense
33:8 84:8
sentence
30:3 43:5,6,7,20
44:7,11,17,21,24
45:20 46:22,25 47:7,
9 55:10,20,21 57:25
58:1,18,22 64:12
67:7 83:20
sentences
45:3 51:18

separate
53:14,24 67:6
separated
52:25 53:1
separating
96:6
sergeant
21:8
services
25:6
set
23:23 36:13,18
37:22 38:9 40:23
61:25 62:18 64:2,16
77:20
setting
75:8
sex
50:13 51:2,7,12,19,
24 52:4 53:5,6 54:1
sexual
88:18 91:7,9,24
shading
43:16
shaking
4:16
share
43:3,10 45:6,25
sheriff
9:18 35:9,12 37:25
38:21 53:8 54:6,8,12
63:13 67:16 68:8
100:15
sheriff's
8:19 9:21,25 10:7
17:22 18:1,5 19:14,
15 21:17 22:12,15
31:20 34:24 39:8
50:6,1 62:17 68:17,
22 69:3 79:3,12,14
86:12 93:5 101:20
sheriffs
9:12 33:1,19 38:18
40:2 41:2
Sheriff's
33:25
shift
84:16 95:3
shifts
95:19
shooting
80:17 97:13 99:10
short
42:22
shoves
59:12
show
67:20 70:16 77:2,6
84:24
showed
89:21
showing
11:15 32:20 70:23
73:19 92:11
shown
79:25 86:9 90:9
shows
71:21
side
58:15
sidebar
42:1
sides
73:16
sign
14:13 62:23 81:7
signs
68:22
similar
77:7 88:20



simple
66:15
simplistic
59:2
single
12:18 14:4 44:23
64:22
sit
15:9 65:22
sitting
14:21
situation
95:15
situations
95:23
sixes
92:5,19
size
67:10
skim
14:6
skimmed
13:1 14:5,15
sleep
7:25
slower
32:8
small
26:7 75:20
social
55:22 66:20
someone's
44:1 48:6 55:18 60:7
sort
4:20,24 5:23 7:22,24
8:1 17:4,17 19:15
23:13 32:24 33:3
34:4 45:8,9 58:5
66:2 82:5 84:11 94:3
95:2 98:17
sorts
82:22
sound
93:11
sounds
11:13 19:8,9 25:2
sources
33:2
South
16:5,15 98:7
speak
10:1 36:23 41:4
92:12 97:7 99:6
speaking
5:13
special
90:2
specific
5:6,10 27:11 34:9
59:16 73:18,21
85:20 86:2 93:2
101:19
specifically
20:4,16 23:22 33:5
34:6 50:8 52:23
62:18 66:3 87:15
specificity
83:2
specifics
27:7,14
spell
100:12
spent
15:13,19 95:18
spitting
76:17
split
22:1 58:11 74:17
spoke
6:19 97:16

spoken
79:22
spontaneous
29:15 48:4 55:5,15,
16 56:1,4,23 57:14
58:8,18 59:6 62:2,
12,19 64:9 66:10
83:1 88:11
spontaneously
55:19,24 57:2 63:21
64:18 89:9
spontaniously
63:19
spree
80:17
SR
4:5
staff
28:9,10 42:24 60:6,
10 79:5 81:13 83:15
84:21 85:10
stand
47:9
standard
30:5,16 31:11 38:5,
10
standards
13:18,23 31:3,14,
17,18,22,24,25 32:6,
10,12 33:12,13,14
35:14,18,22,23,24
36:3,7,12,13,16,17,
18,19 37:10,17 38:8,
9,20 39:6,17,19,23
40:14,24,25 41:8
51:5,13 52:15,21
67:5 72:22 74:5
89:14 93:1 100:25
101:2,8,18,19 102:2
standing
60:23,25
standpoint
79:18 88:1
stands
32:2 43:7 55:21
58:21
start
5:1,3 13:7 16:1 17:4,
20 58:17
started
17:5 18:4 19:8 22:15
state
9:21 20:9 21:18
23:25 25:11,20
26:10,18,23 31:1,2,
6,14 33:8 35:10 36:3
37:14,21 38:20
39:11,14 40:23
52:23 74:10 85:14
93:21 94:24
stated
34:14 60:8
statement
33:4 38:22
states
36:14 41:6 50:9
54:21,25 74:9 81:11
102:4
statewide
18:6 25:18 26:18
37:11 95:10
statistician
48:24 49:1
statistics
48:19 49:2
statutes
35:17,19
statutory
37:2 81:10
steal
63:14

step
58:3,22
stick
60:4
sticks
8:9
stop
83:17
strategy
47:2
street
56:13 57:16
stressors
43:24 46:1
strictly
95:13
strife
71:7
strike
58:3 59:14
strikes
12:4
struck
97:15 100:2
structures
84:14
study
45:9
style
90:6
subject
26:7
submit
10:3
subsequently
54:22
substantial
19:2
successful
98:17,24
sucker
59:6 62:3 89:9
suffering
7:25
suicide
48:21 82:22,25
summarized
15:6
summary
97:20
sundry
34:21
supervision
26:25 27:4,9,17
83:25 84:19 85:3
support
44:24
supposed
84:13
Supreme
7:15
switch
17:10
sworn
4:7
system
26:19 69:16
systems
81:23,24 94:19

T

tactical
26:8
tactics
96:10
tail
81:15
takes
62:5 64:5

talk
13:3 29:8 48:21 50:1
54:21 56:10 58:23
71:15 97:18
talked
52:8 60:15 97:2
talking
5:19 28:1 30:10 52:1
59:9 94:5,9,22,23
Tampa
99:23
taught
20:7,22 96:10
teaching
48:12,13
team
19:12 20:5
technique
47:2
Tennessee
6:23
term
14:6 27:23 28:23
42:22 56:4
termed
17:1
terms
10:10 18:18 19:19
26:2 28:2 65:8 79:15
territory
33:8
test
56:10 60:22 69:21
86:2,15
testified
4:7 23:20 35:13
38:15 52:21 86:10
98:9 101:7,15,24
testify
7:22 8:25 45:1 101:1
testifying
9:6
testimony
10:6,10 45:13 50:6
Thanal
71:17
thesis
16:5,23 17:1
they're
91:23
thing
20:1 42:21 61:15
65:9 67:4 69:9 70:23
80:24 90:25
things
5:6 28:21 32:18,20
35:8,10,11,12 50:23
51:4,9 52:7,13 60:18
61:7,13,16 62:10,17
63:10,15,18,20 64:3,
8,13,16,23 67:15
74:15 79:23 80:18
82:21,23,25 83:5
85:22,24 86:10,23
88:4 93:2,9 94:6,15
97:19
thinking
8:22 96:24
thought
94:11
thoughts
52:7 78:16
thousand
15:2
threes
92:4,18,19
throwing
65:8
time
18:7,19,23 19:25
20:4,13 24:20,22,24

26:6 35:14 46:15
56:7 62:1 63:11
68:11 73:17 80:24
86:20 92:7 93:19,23
95:19 99:18 102:10,
24
times
4:18 8:6,8,13 10:5,
11 25:21 27:24 38:8
41:18 47:4,12 48:18
53:17 61:10,24
95:21
tired
89:7
title
9:14 48:25
today
5:14 6:4,22 7:18,23
15:8,9 41:15 46:12
53:20 92:13
told
57:15 98:20
tomorrow
13:5
top
29:16 70:19 71:17
75:22 77:8 78:21
topic
27:12
topics
20:9 48:15
total
11:10,11 15:18
totally
29:20
touch
35:19 97:17
train
25:19
trained
37:3 87:11 97:3
training
17:12 18:2,6,12
25:18 26:2,12,15,21
27:3 36:24,25 45:22
48:2 69:2,4,6,7
trainings
26:16 27:8,15
transcript
102:23
transcripts
6:13
travel
15:4
tree
50:9 72:18 76:4
trees
72:22
trial
41:24 97:6 99:7
trick
75:8
trigger
80:23
troubled
43:2,9 45:4,5,6,24
troubles
43:24
true
17:24
truthfully
7:23
turn
64:11
twos
92:18
type
77:11
typical
50:14 51:23 72:21

typically
10:2 43:11

U

U.S.
33:23 38:23 39:24
51:1 53:22 67:9
86:13
uh-uh
4:15
ultimate
99:7
ultimately
97:7
umbrella
28:23
unconstitutional
101:9,10
understand
4:20 28:2,4 35:8
37:24 38:1,10 39:6,
10,20 47:1 52:14
54:7 73:10 80:13
86:6 95:6
understanding
9:16,17 39:3 68:13
87:23
understands
88:13
understood
4:16 7:20 49:4
undertook
20:3 36:6
unforeseeable
56:2
unique
72:13,17
unit
23:15 51:8,24 90:1,
2,5
United
36:14 41:5 50:8
54:25 102:3
units
90:1,3 94:8
universe
32:22
University
16:5,15 22:5
unknown
42:24
unlawful
92:15
unpack
57:25 60:1
unremarkable
54:23
unusual
21:16
USF
16:18 21:24
utilize
47:2
utilized
9:3 49:9 55:1

V

Vannucci
98:2 99:13
varied
28:12
variety
33:6 79:23
vehicular
7:17
verbal
4:14



Richard Hough, Sr., CPP, CCHP 05/28/2025

version
29:19
versus
30:11 48:20 99:22
100:8
view
37:16 86:11
violate
59:8 92:25
violating
64:23
violation
38:11 101:3
violations
38:1 83:23
violence
27:14 48:7 49:14
61:18 65:5 83:15
84:2,22 85:1,10,19,
21,24,25 86:5,25
87:4,5,10 88:9,11
89:1
violent
44:2 48:7 51:6 52:24
82:5 87:20 95:14
voluntary
31:6 36:6
vulnerable
49:23

———————
W
———————

ways
52:7 61:21 87:12,17
Wednesday
67:3
weeks
6:14
weight
35:4
weighting
73:2
weights
73:3
weird
75:17
well-being
95:6
well-known
60:21
wellness
94:4
weren't
19:3
whatever's
81:19
whatsoever
18:17
when's
17:19
whistle
65:21
who'd
26:20
why'd
17:9 25:9
window
59:13
WINTESS
30:23
WITNES
101:22
witnesses
50:7,24 65:11,12
66:23 87:25
women
52:25 93:3
Wood's
30:11

Woods
68:5,8
word
5:12,15 14:4 84:25
85:18 87:4
wordplay
55:13
words
5:7 16:11 58:12
work
8:12 10:18 17:16
22:25 24:22 25:4
48:1 82:9
worked
21:7 24:24 26:6
59:12 81:22 82:9
working
18:18 23:25 26:7
44:16 74:9,11 96:1
works
49:2
world
63:24
writ
94:17
writing
44:14 70:5
written
14:16,20 18:21
44:14 97:22
wrong
43:12 69:9 86:20
wrote
20:5 26:22 44:3,5,7
71:1

———————
Y
———————

yard
59:10 62:4
year
32:17 38:17 40:1
95:11
years
8:8 10:9,20 24:10,13
25:2,4 32:16 33:21
42:5 48:13,14 51:22
53:9 87:13 93:24
95:11,12 96:11
97:13 99:8
Yes's
4:15
you'll
61:22
You're
45:16 69:15
you've
15:18

———————
Z
———————

Zoom
70:22

