

February 5, 2025

Bruce R. Bogan, Esq.
Hilyard, Bogan & Palmer, P.A.
105 E. Robinson Street, Suite 201
Orlando, FL 32801-1622

RE:     E.O. Cory Merchant v. Sheriff Billy Woods, Marion County, Florida, et al. Case No.: 5:23-cv-00661-JSM-PRL

Dear Attorney Bogan:

Following is my report regarding the materials sent to me in the above styled case. My opinions in this case are based in part upon a careful review of the documents furnished to me by your office listed in **Appendix A**. I have attached my fees policy as **Appendix B** and my current CV as **Appendix C**. During the past four years I have testified at several depositions, hearings, and trials at the state and federal court level. These are noted in **Appendix D**.

The analysis is based upon those documents and the current practices and professional standards of jails. The review of said materials, my assessment, and my report are based upon my knowledge of jail operations and corrections combined with my education, training, experience, and my ongoing research and teaching of jail, detention and corrections issues, policies, and practices to practitioners, academy recruits, and university students over several decades.

**Qualifications**

I began my career as a law enforcement officer in 1979 in the State of Florida. I have been continuously training corrections and law enforcement officers in various topics since 1980. I have specifically taught corrections procedures in Florida Basic Recruit Training Programs (academy) for more than thirty years. I have specifically taught dynamics of and responses to inmate interactions for more than thirty years to correction academy recruits, in-service corrections and juvenile detention officers, and college students. I have specifically conducted inmate medical and mental health training as an agency and academy instructor. As corrections bureau administrator for two Florida Sheriff's Offices, and superintendent for two regional juvenile detention centers, I have been responsible for the medical staff performance to the extent of my training and education, and the medical department management and contractual arrangements where those applied. I am accredited by the National Commission on Correctional Health Care (NCCHC) as a Certified Correctional Health Professional (CCHP). I have taught correctional procedures courses at the college and university level since 1989.

I have constructed and collaborated on policies for the operation of jail and detention facilities by criminal justice personnel, and I have reviewed hundreds of such policies. I have been retained as an expert in cases involving the training of corrections staff, and specifically in jail medical screening, classification procedures, suicide by inmates, and emergency medical events, and the agency policies and procedures addressing such matters. I have specifically managed correctional facilities with medical departments and staff.

I have specifically conducted numerous death investigations as a homicide detective. In my role as a professor, I created and teach the course *Homicide*. I have similarly taught the courses *Medicolegal Investigation of Death*, and *Criminal Investigations*. I am a member of the International Homicide Investigators Association (IHIA), International Association for Correctional and Forensic Psychology (IACFP), among others.

I have specifically conducted internal/professional standards investigations, I have supervised employees in the conduct of such investigations, and I have reviewed such investigations as a command-level officer. I am certified as an internal affairs investigator, and I am a member of the National Internal Affairs Investigators Association. In my various supervisory and command roles during my career I have specifically administered and approved counseling, training, and discipline up to and including termination for employees.

I have specifically written criminal justice agency policies and procedures, consulted with others on writing and revisions, and reviewed policies and procedures over the course of my career. During American Correctional Association (ACA) accreditation at one agency, I was the chief administrator and accreditation lead, as well as served on the general orders review committee for all agency policies and procedures. For another agency I instituted revisions of all corrections and law enforcement policies and procedures. At two sheriff's offices, I created and commanded the Detention Training Officer (DTO) programs responsible for training all officers in their job duties. I created the model for state-wide training of certified detention officers in the Florida Department of Juvenile Justice. I specifically teach university courses in public policy and criminal justice policy. I specifically teach university courses in criminal justice management and corrections procedures.

**Methodology**

In case analysis, as a consultant, I utilize national standards, model policies, handbooks, and guides put forth by various professional organizations and bodies of standards and guidelines such as the American Correctional Association (ACA), the American Jail Association (AJA), the National Sheriffs Association (NSA), the National Commission on Correctional Health Care (NCCHC) the Commission on the Accreditation of Law Enforcement Agencies (CALEA), National Institute of Corrections (NIC), and others. I am a member of a number of these organizations, and I have served as a Jail Committee member of the National Law Enforcement and Corrections Technology Advisory Council (NLECTAC).

As an academician and forensic criminologist with more than thirty-five years of teaching corrections and police policies and procedures, my analyses are further informed by the national and international bodies of literature from peer-reviewed academic journals, as well as government sources such as the Bureau of Justice Statistics, National Institute of Corrections, National Criminal Justice Reference Service, the Government Accountability Office, the Congressional Research Service Reports, and others. My own authorship of peer-reviewed academic journal articles, and textbooks, on criminal justice topics are components of my subject matter expertise. I am one of only two American scholars named as International Ambassador of the British Society of Criminology (BSC). In the Fall of 2019, I lectured throughout the U.K. on American police major case investigative methods.

My experience as a former officer, investigator, supervisor, command-level administrator, director of law enforcement and corrections academies, director of corrections, chief of training, and jail and detention center superintendent, together with my experience training officers over the past forty years, combine to provide substantive experience to support my qualifications to conduct such reviews and analyses. Each of these qualifications, and all these together, provide me with a broad knowledge of generally accepted practices and procedures, which I apply to analyze whether the facts in a case fall above or below those standards, articulate such standards, and explain to a jury how they apply to the facts in a specific case.

As expected of any expert accepted by the Court, my methodology follows the Supreme Court standards established in *Daubert v. Merrill Pharmaceuticals, Inc.,* (1993)[1] and *Kumho Tire Company v. Carmichael,* (1999).[2] My method in reviews is to list all case materials, an initial fact scenario- not fact finding nor credibility judgement- and to provide opinions comparing specific case facts to accepted practices, never legal conclusions nor personal opinions. As a professor teaching criminal justice and public policy, I am aware of the importance of social science research to the outcome of many such public

---

[1] 509 U.S. 579
[2] 119 S. Ct. 1167

and criminal justice policies. The empirical research methods- quantitative, qualitative, or mixed- provide useful information that can be explained to jurors. This research is open inquiry, rigorously tested (peer-review), and reported publicly for further scrutiny. I have served (and continue to) as editorial (peer) reviewer for numerous academic journals, and I sit on the editorial board of the journals *Psychology and Behavioral Sciences,* and *Homicide Studies*. I was guest editor of a special edition of this journal focused on the investigation of homicide. Review of science, like the testimony of an expert, must be the product of reliable principles and methods applied to the facts of the case.[3]

To the extent that corrections as a vocation has been examined by social science researchers and criminologists routinely since only the 1970s, the research and observations are scholarly and employ all the rigor of peer-review. The past fifty years have demonstrated the general acceptance within the social science community of the methods and theories developed. The body of scientific knowledge that I draw upon and focus through my qualifications to apply and explain, is well established. The information and analysis that I can provide to the trier-of-fact is conceptually and contextually useful and not common knowledge nor common sense. Such reference, in part, on peer-reviewed social science and other scientific literature, helps ensure the reliability required by the courts in assessing the acceptability of expert testimony.[4]

**Additional Materials**

I may amend my opinions and supplement my report as necessary based upon additional information furnished to me as well as my own research and further analysis of case factors. Some facts in this case may be disputed and I attempt to identify these while incorporating them and undisputed facts in my own case analysis. I have conducted case analysis and been proffered as an expert witness in criminal justice practices in state and federal courts since 1991. My qualifications to conduct case analysis, draw

---

[3] Federal Rules of Evidence, Rule 702
[4] Ibid.

conclusions and render expert opinions such as the ones in this report are based on my personal and

professional knowledge, education, specialized training, and ongoing research and teaching in these

areas.[5]


## Incident Summary

In the analysis of an event, there is typically inconsistency in some statements among individuals

involved. This may result from perception, intoxication, emotion, the passage of time, or other factors. An

expert witness provides analysis and observations without assigning credibility to one person or another,

as that is a responsibility for jurors. The following initial information from the various reports and

materials in the record is utilized for purposes of analysis in this matter.[6]

As noted in the First Amended Complaint:

> On November 7, 2021, at approximately 1:10 a.m., an inmate at the Marion
> County Jail, Eric Lutterloah, struck Cory Merchant several times, causing
> him to fall to the ground.[7]


From the report of Corrections Officer Justin Kosinski:

### Narrative

On 11/7/21 at approximately 0110 hours while working Gulf pod Rover, I was alerted to
an incident in Alpha section. Inmate Frank Calabria stated "man down" through the section door.
Inmate Cory Merchant was observed laying on the ground between two bunks bleeding from his
left ear. I called for medical to respond with a stretcher. Sergeant Dukes, Sergeant Konopinski,
Deputy Savage, Deputy Valdez, and Nurse J. Little responded at 0113 hours, with a stretcher and
back board. Inmate Merchant was placed on the back board. Deputy savage, Nurse Little and
myself lifted Inmate Merchant on the back board and placed him on the stretcher. Nurse Little
advised for 911 to be contacted and respond to the Jail. Inmate Merchant was transported to
Booking by Sergeant Konopinski, Sergeant Dukes, Deputy Valdez, Deputy Savage, and Nurse
J.Little.

Upon Review of the section cameras, it appears Inmate Cory Merchant and Inmate Eric
Lutterloah where in a physical altercation. Inmate Lutterloah gets out of his assigned bed
(G/Ax12) and confronts Inmate Merchant in between Bunks G/AX14 and 16. Inmate Lutterloah
appears to strike Inmate Merchant several times, causing him to fall to the ground between bunks

---

[5] Federal Rules of Evidence, Rule 702
[6] Appendix A
[7] First Amended Complaint, ¶ 1

G/A128 and 129. When Inmate Merchant fell he was no longer in view of the camera. Inmate Lutterloah appears to walk to his assigned bunk area, then walk back to Inmate Merchant a couple of times before sitting on his assigned Bunk. Inmate Merchant is assigned to bunk G/A123B, and was out of his assigned area when the disturbance started.

Inmate Lutterloah was removed from the section and rehoused in Alpha Pod on Administrative Confinement pending a disciplinary report. Sergeant Konopinski transported Inmate Lutterloah to the Infirmary and was evaluated by Nurse Sanders before being housed in confinement.[8]

Noted in the Autopsy Report from the Office of the Medical Examiner[9]:

# MEDICAL EXAMINER DISTRICTS 5 & 24
### Citrus, Hernando, Lake, Marion, Seminole & Sumter Counties
809 Pine Street
Leesburg, Florida 34748
Phone: (352) 326-5961
Fax: (352) 365-6438

### AUTOPSY REPORT

**NAME: MERCHANT, Cory**   **CASE NUMBER: 2021-2744**

**DATE OF DEATH: November 13, 2021**   **AGE: 35   SEX: Male   RACE: White**

**COUNTY: Marion**

**DATE AND TIME OF AUTOPSY: November 13, 2021 @ 0900 hours**

### AUTOPSY FINDINGS:

1. Blunt head trauma, with subscalpular hemorrhage, skull fractures, epidural, subdural, and subarachnoid hemorrhages, and cerebral contusions
   a. Cerebral edema, 1460 grams
2. Acute bronchopneumonia, with diffuse alveolar damage (right lung – 1010 grams; left lung – 820 grams)
3. Mild coronary atherosclerosis
4. Mild pulmonary anthracosis

**CAUSE OF DEATH: Complications of blunt head trauma due to assault**

**MANNER OF DEATH: Homicide**

*Wendy A. Lavezzi, M.D.*

**Wendy A. Lavezzi, M.D.**
**Deputy Chief Medical Examiner**
**Date: January 11, 2022**

---

[8] Marion County Sheriff's Office Incident Report #210005382, Officer Justin Kosinski
[9] Medical Examiner Report 2021-2744, November 13, 2021

The findings of the Deputy Chief Medical Examiner, Dr. Wendy A. Lavezzi included blunt head trauma as well as acute bronchopneumonia.[10] Dr. Lavezzi noted that Mr. Merchant's Cause of Death was "Complications of blunt head trauma due to assault." Merchant's Manner of Death was ruled as "Homicide."[11] While a Medical Examiner or Coroner (ME/C) Manner of Death is not a legal one, in cases such as the instant matter, it aligns with the criminal legal investigation and charge of Inmate Lutterloah's actions causing the death of Inmate Merchant. Inmate Lutterloah, similar to Inmate Merchant, had previously been held in the Marion County Jail. Lutterloah knew that "Battery or attempted battery, with or without a weapon," was a Class "A" violation of facility rules.[12]

## Discussion

The Marion County, Florida Jail General Orders are in alignment with the state-guidelines of the Florida Model Jail Standards.[13] This includes the inmate classification plan as required by the Florida Commission on the Accreditation of Corrections (FCAC). The Jail is accredited by FCAC. The facility is subject to annual inspection, as well as ongoing unannounced inspections to verify adherence to standards of the State of Florida.

Given several prior stays in jail by both Eric Lutterloah and Cory Merchant, the detention was not a novel experience for either man.[14] The placement of Cory Merchant through classification procedures to his assigned housing in G Pod by corrections staff is not unexpected, nor inappropriate. According to the National Institute of Corrections (NIC):

> In practice, reclassification of jail inmates tends to be a function of four factors:
> - Change in inmate status from pre-trial to sentenced,
> - The inmate's conduct while incarcerated,

---

[10] Ibid.
[11] Ibid.; PL MERCHANT 002507
[12] Marion County Jail Inmate Rules and Regulations Handbook, Prohibited Acts and Sanctions, page 16 of 29, PL Merchant 001688
[13] Florida Model Jail Standards, Chapter 6
[14] FDLE criminal history information

- Length of confinement,
- Filing of additional charges.[15]

The factors initially described in the NIC publication on Objective Classification goes on:

> Each jail should determine the factors to be used to establish an inmate's most appropriate custody level, or classification. The most common factors used are:
> - Severity of current charges/convictions;
> - Serious offense history;
> - Escape history;
> - Institutional disciplinary history;
> - Prior felony convictions;
> - Alcohol/drug abuse;
> - Stability factors (e.g., age, employment, length of residence).[16]

Plaintiff expert Mr. Paul Adee, within his report, cites several times to the U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators.[17] This document was developed twenty years ago to assist (mainly) new jail administrators in understanding many of the aspects of jail operations facing officers, supervisors, managers, and particularly, administrators.[18] Plaintiff's expert would have the Court and other readers see the excerpts as guiding for local jail administrators. They are not. A more faithful reference to this "Resource Guide" would include from the section "Using These Materials," that:

> The **materials presented in this guide are not intended to establish policy, procedure, or a standard of care for particular jails [emphasis added]**. Each jurisdiction has its own laws, standards, and guidelines regarding the topics covered herein. You, as a jail administrator, must abide by the requirements applicable to your own jurisdiction and should consult with your legal advisor before making changes in policies and procedures.[19]

---

[15] National Institute of Corrections, Objective Jail Classification Systems: A Guide for Jal Administrators, 1998
[16] National Institute of Corrections, Objective Jail Classification Systems: A Guide for Jal Administrators, 1998
[17] Report of Mr. Paul Adee, at, for example, pages 9, 10, 14, 15, 18, 19
[18] "We hope this guide will serve as a basic reference for sound correctional practice in operating a local jail, both for administrators new to the position and veteran administrators who want to improve their effectiveness." U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, P. iii
[19] .S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, P. 5

Mr. Adee also refers to the Sheriff's Guide to Effective Jail Operations, also from the National Institute of Corrections (NIC), and drawn, in part, from the previous document.[20] This document was also written for the benefit of: "…new sheriffs who are learning about their responsibilities for the jail for the first time as well as veteran sheriffs seeking to improve the effectiveness of their operations."[21] The "Sheriff's Guide" was written as a companion to the "Resource Guide." Like the Resource Guide, the Sheriff's Guide is not a standard, does not set policy for any of the more than 3,000 local jails in the United States, and does not have the effect of law. Many of the issues talked about in these guides are important, and provide new administrators who are unfamiliar with corrections, insights and ideas. For the instant matter, the law and administrative code as enacted by the Florida Legislature is the actual standard that agencies in Florida must meet.[22]

### The Spontaneous Assault

Mr. Adee also cites a trade magazine article written by a California corrections lieutenant in 2013. The passage from the article that Mr. Adee quotes is:

> The government's obligation upon incarcerating a citizen, derived from the 8th and 14th Amendments of the U.S. Constitution, is to provide reasonable protection for that person. Jails have a duty to take reasonable measures to guarantee inmates' safety from assault, suicide, fires and other facility dangers, and preventable illness. We are charged with preventing assault and the excessive use of force as well as suicide and self -harm. We must respond to serious medical and mental health needs; and we must avoid unconstitutional conditions of confinement.[23]

Mr. Adee not only added emphasis that was not in the original, but he omitted the final sentence of the paragraph, which, when added is:

---

[20] Report of Paul Adee, at, for example, p. 9
[21] Sheriff's Guide to Effective Jail Operations, Foreward
[22] "The Florida Model Jail Standards (FMJS) are minimum standards which jails across Florida must meet to ensure the constitutional rights of those incarcerated are upheld. Prior to 1996, the Florida Department of Corrections was responsible for the standards and inspection process for local county jails. Legislation was passed in 1996 that gave the authority of inspections to the local level. This change required the Florida Sheriffs Association and Florida Association of Counties to appoint individuals to serve on a Commission that would govern standards that local jails must comply with."
https://flsheriffs.org/how-we-serve/jail-services/florida-model-jail-standards/
[23] Report of Paul Adee, at p. 14

The government's obligation upon incarcerating a citizen, derived from the 8th and 14th Amendments of the U.S. Constitution, is to provide reasonable protection for that person. Jails have a duty to take reasonable measures to guarantee inmates' safety from assault, suicide, fires and other facility dangers, and preventable illness. We are charged with preventing assault and the excessive use of force as well as suicide and self -harm. We must respond to serious medical and mental health needs; and we must avoid unconstitutional conditions of confinement. The fundamental question is, "How do we uphold our obligations when managing transgender offenders?"[24]

The author was specifically writing to address the challenge of transgender inmates, not spontaneous assault between two male inmates, neither of which was known or alleged to be transgendered.

If someone is brought into the detention facility and they are fighting, they are secluded.  Solitary confinement for its own sake or as a preventive measure against violence is not called for by law, regulation, or the Florida Model Jail Standards. The presence of staff in close proximity to housing areas with visibility is more than adequate as inmates are held within a jail or detention facility. The Marion County Housing meets the Department of Detention Directive that addresses Staffing and Training, as well as the Florida Commission on Accreditation of Correction standard (FCAC 6.16). The Marion County, Florida Jail General Orders are aligned with the state-guidelines of the Florida Model Jail Standards.[25] This includes the inmate classification plan as required by the Florida Commission on the Accreditation of Corrections (FCAC).

The excerpt below explains some of the concept of a "sucker punch" or spontaneous assault:

Now some would have us believe that all such assaults are predictable and preventable. This is of course preposterous when dealing with the human animal. Moreover, no one is any one thing or behaves in one way at all times. The argument for police officers, correctional officers, probation officers, to be trained psychologists or psychiatrists, and for booking facilities to be prediction and treatment centers is beyond challenging, it is simply not possible.
**What's to stop me?**
The premise is that even with authority figures present, or what we imagine to be the socially restraining effect of others, one person may act violently toward another. Certainly all people are capable of physically violent acts. Just as clearly, certain individuals have been involved in a

---

[24] Brotheim, H. (2013). Transgender Inmates: THE DILEMMA. *American Jails, 27*(2), 40-42,45-47.
[25] Florida Model Jail Standards, Chapter 6

physically violent event. Though for many interjected into a fight, their role may have been a legitimate one such as an officer, teacher, or referee who intervened or restrained an aggressive other. Will a person who has been violent repeat the same behavior? We do not know and even if we have assessed that someone has the potential to be violent, we have no way to reliably predict when, where, or against whom.[26]

The spontaneous assault, or for that matter past fights or violence, are neither predictive of future violence by an individual, nor support for alternate classification, as though citizens in jails are either "violent" or "nonviolent." The calculus for classification of inmates is ongoing throughout a person's stay. No one is all one thing all of the time. This, for example, is also why suicide cannot be predicted.[27] Action always beats reaction, and the "elbow test" of assault even with the presence of authority figures, informs us that one person may attack others without warning or apparent reason.

There is no indication that staff, nor other inmates, were aware there might be an attack on Inmate Merchant.[28] Nor was there any information that would have suggested to correctional staff that they should consider anything in dormitory to be amiss once inmates were at lights out. Death in a county jail in the U.S. is infrequent, death from illness being the leading category.[29] In 2019, 553 jail inmates died from illness[30]; there were 734,500 people in jail that year in the U.S.,[31] meaning that at base rate, the incidence is small. Death of an inmate by *homicide* is significantly lower at just *0.03 deaths per 1,000* incarcerated people between 2008-2019.[32] "Accidents and homicides each accounted for about 2% of deaths in local jails in 2019."[33] Such death by homicide rarely occurs at the beginning of a jail stay: "The median time served for victims of homicide in jails was 30 days during 2000–19, compared to 9 days for

---

[26] Hough, R.M. "Sucker Punched," *Calibre Press* Training Network. November 13, 2018.

[27] Berman, A. L., & Canning, R. D. (2022). Proximal Risk for Suicide in Correctional Settings: A Call for Priority Research. *Psychological Services*, *19*(3), 407–412.

[28] PCSO reports and interviews

[29] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[30] Ibid.

[31] Bureau of Justice Statistics, Annual Probation Survey, Annual Parole Survey, National Prisoner Statistics program, 2009–2019; Annual Survey of Jails, 2009–2018; and Census of Jails, 2019.

[32] Adler JL, Chen W. Jail Conditions and Mortality: Death Rates Associated With Turnover, Jail Size, And Population Characteristics. Health Aff (Millwood). 2023 Jun;42(6):849-857.

[33] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

those who died by suicide."[34] "Local jails reported 10.3 million admissions in 2019."[35] With more than 10,000,000 admissions to jails in 2019, only **25** inmates died by homicide.[36] As depicted in inset Figure 1, "The adjusted homicide rate for U.S. residents in 2019 was 4 per 100,000, compared to 3 per 100,000 for local jail inmates."[37]



Figure 1

Confrontations are an issue in the general public and incarcerated populations. The Marion County Jail put in place components of a policy reasonably designed to guide staff in addressing fights or violence by inmates. According to research over more than 75 years, the issue of inmate violence may be explained in several ways. The restrictive environment of a jail or prison may cause an inmate to adapt to the absence of certain needs in what is known as "deprivation theory."[38] The "importation" perspective suggests that a person brings their characteristics with them to some extent.[39] The "situational" perspective recognizes the context and factors uniquely present in different events.[40] Of course, none of

[34] Ibid.

[35] Bureau of Justice Statistics: "Jail Inmates in 2019." (2021).

[36] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics., Table 1 Number of deaths of local jail inmates, by cause of death, 2000–2019 (Includes homicides committed by other inmates, incidental to the use of force by staff, and resulting from assaults sustained prior to incarceration.)

[37] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics., Figure 3

[38] Sykes, G. M. (1958). *The society of captives: A study of a maximum security prison*. Princeton, NJ: Princeton University Press.

[39] Irwin J. K., & Cressey, D. R. (1962). Thieves, convicts and the inmate culture. *Social Problems, 10*, 142-155.

[40] Wener, R. (2000). Design and the likelihood of prison assaults. In L. Fairweather &

these are mutually exclusive, nor meant to fully explain the spontaneous decision by one human to strike

another.

The central role of local jail officials in Marion County, Florida and elsewhere is to maintain the

temporary care, custody, and control of incarcerated individuals. The majority of the individuals placed in

jail are there for brief stays of a few hours to a few weeks for facilities of any size.[41] Yet jail staff are

called upon every shift of every day to try and care for and manage a challenged and challenging

population. The majority of jail inmates, for example, may manifest some of the behaviors across the

range of factors that behavior, though I have not reviewed empirical documentation of such behaviors

accumulated in a way that triggered a placement on any type of elevated housing watch for either inmate

involved in the instant matter. For example, younger inmates have been found to engage in more

misconduct,[42] unlike Eric Lutterloah, who was 52 at the time he decided to hit Cory Merchant. If isolated

behaviors occur by any or all the inmates in a jail, this does not create a circumstance to place everyone

into one large room and sit with them. These behaviors are spread throughout society, and arise from

families, life stressors, and the individual thought processes of the person in any setting, including,

infrequently, one who dies from an assault. The importation of a person's entire reality occurs when they

cross the threshold of a detention or correctional facility. Corrections officers will rarely know about the

myriad factors affecting a person, let alone being in a position or have an expectation of addressing these

issues.

Corrections employees receive training regarding jail policies. The use of adequate policies and

training can be of help to officers, but it cannot eliminate the risk of injury or death at the hands of a

person determined to injure another person, as with Inmate Lutterloah. While a retroactive view of staff

---

S. McConville (Eds.), *Prison architecture: Policy, design, and experience*
(pp. 49-54). Boston, MA: Architectural Press.
[41] Bureau of Justice Statistics, Jail Inmates
[42] cf. Berk, R. A., Kriegler, B., & Baek, J. (2006). Forecasting dangerous inmate misconduct: An application of ensemble
statistical procedures. *Journal of Quantitative Criminology, 22*, 131-145.; Morris, R. G., Longmire, D. R., Buffington-Vollum,
J., & Vollum, S. (2010). Institutional misconduct and differential parole eligibility among capital inmates. *Criminal Justice
and Behavior, 37*, 413-438.; Sorensen, J., & Cunningham, M. D. (2009). Conviction offense and prison violence: A
comparative study of murderers and other offenders. *Crime & Delinquency, 56*, 103-125.

decision-making is often officer-centered, this would fail to appropriately incorporate an unknown and dynamic thought process by the *subject*. As noted by Plaintiff expert in his report:

> According to the Marion County Sheriff's Daily Log for G-Pod on 11/7/21, Deputy Kosinski completed two separate security check *immediately prior to Lutterloah's attack on Merchant* [*emphasis added*] as follows: 0100-0104 check logged on 11/7/21 at 0104 hours and 0100-0109 check logged on 11/7/21 at 0119 hours.[43]

There was no obvious violation of the rules of lockdown when one or two inmates had gotten up from their bunk for some reason.[44] Discretion also comes into play when inmates may get up to use the toilet, or that an officer may not be looking into a given unit when someone is up. There was no glaring or obvious extended policy violation.

### Classification

Jails in the State of Florida utilize various classification practices as determined through the discretionary decision-making of local jail officials. The Florida Model Jail Standards[45] as well as the standards of the Florida Corrections Accreditation Commission, Inc.,[46] address the topic of Classification. The Marion County Sheriff's Office complies with and references these standards within their Detention Directives. Based on the information I reviewed; the Marion County Sheriff's Office has in place acceptable correctional management policies. Corrections practices and procedures are constrained by applicable law, policy, training, supervision by higher authority, report review, and the proper conduct of the officers who wield the authority to care for incarcerated others. I have reviewed no empirical information that a change in housing classification would have been required during the time Cory Merchant or Eric Lutterloah was in the Marion County Jail.

The two relevant subsections from the Florida Model Jail Standards that address Classification are:

---

[43] Report of Mr. Paul Adee, attributed to official MCSO logs Location G, dated 10/7/21 – 11/7/21 [sic]
[44] Dormitory video
[45] FMJS Chapter 4 Admission, Classification, and Release, 2021 edition
[46] FCAC Chapter 14 Admission, Classification, and Release

6.1      As soon as practical following admission to a detention facility, each inmate shall be classified. The classification process shall include all information available or obtainable from the social, legal, and self-reported medical history of the inmate.

6.2      The primary objective of classification is to place inmates in the type of quarters that best meet their needs and to provide reasonable protection for all inmates. Each facility shall have designated classification personnel.[47]

As to the voluntary Florida Corrections Accreditation Commission (FCAC), the relevant standard is: **14.02M**

A *written directive* provides a *classification* process which includes:
**I. Bullets**

A. Initial classification within a specified timeframe;
B. Housing;
C. Access to programs; and
D. A reclassification process.[48]

Within the chapter on inmate housing:

**15.02M**

A *written directive* requires dangerous felons to be housed separately from misdemeanants.[49]

**15.03M**

A *written directive* requires correctional officers conduct documented physical observations, at intervals not to exceed 30 minutes, of *inmates* whose behavior presents a serious threat to the safety and security of the facility or *staff*.[50]

The actual procedural determinations addressed in these two standards are those established by the relevant jail, not an outside entity nor a post-hoc attempt to construe the standards above as more than what is stated. Neither the Florida Model Jail Standards (FMJS), nor the Florica Corrections Accreditation Commission (FCAC), specify, nor can they, what the classification procedures shall be in each jail within the State of Florida.

---

[47] FMJS Chapter 4 Admission, Classification, and Release
[48] FCAC Standards, Edition 4.18, 2022
[49] FCAC Standards, Edition 4.18, 2022, no bullets
[50] Ibid., no bullets

Mr. Adee provides comments of two former inmate of the Marion County Jail.

Importantly, bureaucratic controls over the use of arrest have also been addressed by the U.S. Supreme Court as it relates to the adequate training of officers (*City of Canton v. Harris*, 1989), and agencies policy that clearly direct officers to respect Fourteenth Amendment issues arising from trained policy (*Monell v. New York City Department of Social Services*, 1978).[51] The policies, training, and supervision in place at the Marion County Sheriff's Office anticipate and guide officer response to the many circumstances in corrections work.

**Opinions**

Through my experience as a corrections officer, trainer, and administrator, corrections and law enforcement academy director, field training officer/supervisor/commander, more than forty years of teaching corrections and law enforcement procedures to academy recruits, in-service officers, and college and university students, my personal experience of conducting and supervising the conduct of corrections business including health and medical services, my ongoing research and analysis of such policies and practices, my academic and professional presentations, my authorship of various documents, my standing as a board Certified Correctional Health Professional (CCHP) of the National Commission on Correctional Healthcare (NCCHC), and based upon a reasonable degree of professional certainty, I find that:

1.  The conditions of detention of pre-adjudicated and convicted adults at the Marion County Jail are reasonable and proper under the prevailing practices of corrections including the Florida Model Jail Standards. I have reviewed nothing in the record indicating Sheriff Woods allowed or created unconstitutional policies or practices.

---

[51] 436 US 658 (1978)

2.  There was no noted deficiency in the policies and practices of Marion County Jail that would make it apparent that staff would not know how to respond in the event of a medical emergency or inmate fight. It is normal in jails of the size of Marion County to take inmates off-site for advanced medical care. Sheriff Woods utilized medical and mental health staff in the operation of the jail.

3.  Sheriff Woods has promulgated or caused to be produced policies and procedures that direct correctional operations.

4.  Sheriff Woods has caused to be maintained through procedures, logs and other documents to record incidents such as a fight between inmates or an assault on one by others.

5.  Persons who arrive at a short-term jail facility have motivations and lives that are complex and largely unknown to staff, even after assessments, admission, and ongoing contact. Troubled individuals are not inclined to share details of their lives even when asked direct questions. Life stressors are common in the general population and in correctional populations but are not equated with acting out or violence.

6.  The First Amended Complaint states: "On November 10, 2018, an independent monitor found that the Marion County Jail had a suicide rate of 63.8 deaths per 100,000 inmates—a rate that is higher than that of county jails of varying size throughout the United States."[52] In fact, the Marion County Jail contracted with Lindsay Hayes to provide technical assistance; a proactive step that is **not** the actions of an "independent monitor."[53] Misleading as that is, the First Amended Complaint utilizes the language of "rates" to present an impression having anything to do with "63.8 deaths."[54] In fact, Ms. Hayes' Report notes no suicides between 2014 and 2017, and goes on to note four suicide in 2018.

---

[52] Ibid., at ¶ 86

[53] Lindsay Hayes: "It should be noted that the determination for the need of this writer's assessment was not prompted by litigation or critical investigation of any of the four recent inmate suicides. Rather, these actions were taken through the pro-active initiative of Sheriff Woods and Major Bowen who were committed to determining what steps, if any, were necessary to improve suicide prevention practices within the Marion County Jail."; Hayes report Introduction.

[54] First Amended Complaint, ¶ 86

Using the language of rates and statistics, Ms. Hayes completes a calculation as if the jail had 100,000 inmates in it and then notes the *number* of suicide – four – would equate to the nonexistent number at a *rate* of 63.8 per the fictional number of 100,000. Note in the image below that more than 47,000 <u>actual</u> inmates had been booked into the Marion County Jail with just 4 suicides.

**SUICIDE RATE**
**WITHIN THE MARION COUNTY JAIL**
**2014 THRU 2018**

| Year | ADP* | Yearly Admissions* | Suicides | Suicide Rate** |
|---|---|---|---|---|
| 2014 | 1,375 | n/a | 0 | 0 |
| 2015 | 1,254 | 12,285 | 0 | 0 |
| 2016 | 1,123 | 10,649 | 0 | 0 |
| 2017 | 1,170 | 11,029 | 0 | 0 |
| 2018 (Nov) | 1,319 | 13,502 | 4 | 303.3 |
| 2014-2018 (Nov) | 6,271 | 47,465 | 4 | 63.8 |

*Source: Marion County Sheriff's Office
**Consistent with calculations by the U.S. Justice Department, the rate is based upon the ADP

7.     The investigations/reviews of the incident were conducted in a manner consistent with contemporary law enforcement methods. Florida Jail Standards were met.

8.     The Marion County Jail undertook an "Analysis of Security and Operation Functions Affecting the Introduction and Distribution of Contraband into the Marion County Jail." The report was dated October 15, 2018. The First Amended Complaint erroneously states: "The 2018 Analysis of Security and Operational Functions fount the staffing levels at the MCJ to be 'woefully low.'"[55] In fact, on page 30 of 32 pages, the Report attributes that finding to a staffing analysis done by the jail in 2014. The Report suggested contracting with an outside entity to conduct a new staffing analysis.[56]

9.     There was no indication that facility classification was utilized improperly or incorrectly. Both Cory Merchant and Eric Lutterloah were appropriately classified as to security and needs of the facility. Cory Merchant had previously been arrested and convicted for Domestic Violence Battery.[57] Neither fight that Merchant may have been involved in were

---

[55] First Amended Complaint, at ¶ 85
[56] 2018 Contraband Report at page 30
[57] FDLE Criminal History of Cory Merchant; PL Merchant 004722

Page 19 of 60

with Eric Lutterloah. The information regarding the two fights included one that Merchant initiated. In the other, an officer only observed after the fact that Merchant had a black eye – Cory Merchant denied there had been a fight. None of this indicates that Merchant would be classified as a vulnerable inmate.

10.    The Marion County Jail undergoes annual inspection for compliance with the Florida Model Jail Standards requirements. The independent review certifies that a jail facility meets prescribed standards in the State of Florida. Key in the process of inspection is the presence of policies and procedures that guide agency members, operations, documentation of efforts, and review by external independent authority. The policy and the procedures to be followed are based on state rules and guidelines. Such reliance on state mandatory standards and guidelines as foundational to facility police and procedure is standard within contemporary corrections.

11.    Corrections staff properly rely on medical and mental health staff for medical and mental health issues. This is normal for facilities of this size. No information in the case suggests that medical staff are unavailable to corrections staff. EMS was appropriately summoned following Inmate Lutterloah striking Inmate Merchant.

12.    Sheriff Woods promulgated or caused general orders and procedures to be produced for members of the Detention Bureau of the Marion County Jail. This is customary, expected, and standards compliant. There is nothing in the record that I have examined supporting or indicating "…Sheriff Billy Woods implemented the following unofficial customs and practices throughout MCJ:

    i. MCSO deputies are not required to supervise MCJ inmates during their shift.

    ii. MCSO deputies are not required to keep a watchful eye on the dorms to which they are assigned and the inmates within them.

iii. MCSO deputies are not responsible for preventing inmate-on inmate violence.

MCSO deputies are not responsible for reducing inmate-on-inmate violence.

v. MCSO deputies are not required to maintain safety and security amongst the inmates in their custody.

vi. MCSO deputies may ignore incidents of violence in the MCJ.

vii. MCSO deputies may ignore substantial risks of violence between inmates during their shifts.

viii. MCSO deputies are not required to protect inmates from substantial risks of violence between inmates during their shifts.

ix. An MCSO deputy who witnesses an incident of physical violence is not required to intervene.

x. An MCSO deputy who witnesses an incident of physical violence and fails to intervene is not subject to discipline.

xi. If an MCJ inmate causes physical violence to occur, they may receive a disciplinary report, but will not actually be subject to discipline.

xii. If an MCJ inmate causes physical violence to occur, they will be returned to an open-dorm section with other inmates.

xiii. MCSO deputies are permitted to watch YouTube videos on their computer and engage in other recreational activities while on shift in lieu of supervising individuals in their custody.

xiv. MCSO deputies are not responsible for the custody and control of inmates.

xv. MCSO deputies are not required to maintain order and discipline

within the facility, enforce all inmate rules and regulations, and

report all violations promptly, in writing, to a Corrections Custody

Supervisor.

xvi. MCSO does not require its deputies to be constantly alert and

security conscious in order to prevent escapes, introduction of

contraband or other violations.

xvii. MCSO does not require its deputies to stand guard, observe inmates

and take required action in emergencies.

xviii. MCSO does not require its deputies to respond to emergencies in the

jail such as fights or other emergencies.

xix. MCSO does not require its deputies to be alert for conditions or

situations, which inhibit efficient operation of the Agency or the

Corrections Bureau, and make recommendations for solutions."[58]

13.    The Complaint states, and is subsequently parroted by Mr. Adee,[59] a number of

unremarkable aspects of housing at the Marion County Jail that are the same as jails and

prisons across the United States: dormitory housing is utilized, there are far more inmates

than officers, dorms are lined with bunks, inmates are often idle. The spontaneous assault

of an inmate on another inmate was not a reasonably foreseeable outcome of entering the

Marion County Jail. In addition, corrections staff were reasonably relying on their training,

experience, and supervision. I have reviewed no empirical information of a failure to act as

expected by Detention Bureau members.

14.    The officers' actions were within law, agency policy, and contemporary training.

Importantly, bureaucratic controls over search and the use of force have also been

---

[58] First Amended Complaint, ¶ 352
[59] Report of Paul Adee, at Section G.

addressed by the U.S. Supreme Court (*City of Canton v. Harris*, 1989; *Monell v. New York City Department of Social Services*, 1978). The information in the record that I have reviewed shows no deviation from customary training and practices within corrections.

15.    Based on preparations, policies, training, and proper supervisory action, the Marion County Jail responds to supervision of inmates in a manner consistent with contemporary jail corrections practices. The deputies followed their procedures in supervising the inmates on the evening in question. Such provision of care is overseen by Marion County Sheriff Billy Woods.

16.    Marion County Jail uses acceptable correctional management methods. Corrections practices and procedures are constrained by applicable law, policy, training, supervision by higher authority, report review, and the proper conduct of the officers who wield the authority to care for incarcerated others. Staff assigned to jail duties have received training in appropriate inmate supervision. This includes the inmate welfare checks required by policy and adhered to by security staff. Two different policies of MCSO call for beginning night checks at different hours. This is not relevant since the incident occurred at 1:10 AM; two hourly checks had already been conducted.

17.    Mr. Adee asserting a "Friday Night Fight Night" within the Jail, based on the "declaration" of two inmates, provides no further documentation. This includes no records that I have been furnished identifying the source of these two declarations. Reference in the Complaint to a "widespread custom and practice" of "failing to supervise   inmates and prevent violent attacks,"[60] is without substantive evidence in the record. Merely listing various prior matters purported to establish a practice and custom is empirically unsupported. Rather, a separate and specific analysis of each of the events, and a time-series comparison to like events would be minimally necessary to try to establish any

---

[60] Complaint at p. 15 at ¶ 76

deviation from a possible norm. Further, there is no analysis offered as to how such alleged

practices were in any way connected to the instant matter.

18.    Mr. Adee states in his report fourteen "Findings."[61] Each Finding ends with "This was in

violation of the correctional standard of care and caused harm to Cory Merchant." Mr.

Adee does not articulate specifics of his analysis leading to his use of the phrase

"correctional standard of care." Where no precedent or standards at Marion County Jail are

violated, neither drops below established constitutional minimums, nor is compelling to

impose or substitute the judgement of local jail administrators. Indefinite and generalized

reference to no guiding or meaningful standard or measure cannot offer a method of

measurement. The standards of professional groups (or practices experts), while

instructive, do not substitute or supersede applicable constitutional standards.

19.    Plaintiff's practices expert Mr. Adee recites several non-guiding documents that discuss

sundry jail issues. It is unclear why he does this, as they have no relevance to required

Florida jail procedures. There are no statutory "standards." It is misleading and

meaningless to refer vaguely to "standards," when the Marion County Jail is required only

to adhere to standards established by the Florida legislature through promulgation of rules

and laws.

20.    Mr. Adee asserts inadequate supervision of staff and of inmates. There is no controlling

standard or procedure supporting a finding of "inadequate," and Mr. Adee cites to none.

21.    Sheriff Woods has instituted policies and training that address the housing and supervision of

inmates by staff. This is expected, customary, and Florida Model Jail Standards and Florida

Corrections Accreditation Commission compliant. The Marion County Jail undergoes annual

inspection for compliance with the Florida Model Jail Standards requirements, and multi-

year inspections for FCAC. The independent reviews certify that a jail facility meets

---

[61] Report by Mr. Adee, at G

prescribed standards in the State of Florida. Key in the process of inspection is the presence of policies and procedures that guide agency members, operations, documentation of efforts, and review by external independent authority. The policy and the procedures to be followed are based on state rules and guidelines. Such reliance on state mandatory standards and guidelines as foundational to facility police and procedure is standard within contemporary corrections.

22.    While the MCSO experienced staff shortages as noted in the 2019 staffing study, at no point was inmate safety and security compromised and the jail always provided sufficient staffing to cover the shifts. Prison and jail staffing shortages are common. There is not an automatic indication of safety or security compromise due to such shortages.

23.    Mr. Adee asserts deficiencies of select policies and procedures of the Jail. He fails to note that the MCSO procedures, as instituted by Sheriff Woods, are consistent with the State Model Jail Standards, which are the only mandatory standards for jails within the State of Florida. The policies instituted under Sheriff Woods also conform to the voluntary Florida Corrections Accreditation standards. Again, there are no mandatory "national standards." Mr. Adee asserts a false failure to adhere to standards that do not exist.

24.    Plaintiff's expert Mr. Adee refers to the National Institute of Corrections (NIC) guidance as if mandatory. It is not. Plaintiff's correctional expert offers no specific facts in the record to prop up a straw man of:

> As identified by the U.S. Department of Justice, National Institute of Corrections:
>
>> A core part of the shift supervisor's duties is to visit various posts throughout the shift. These visits are essential to the supervisor's knowledge of what is taking place throughout the jail, managing the shift, assessing staff performance, and providing coaching and support to individual staff.[62]

---

[62] Report of Paul Adee at page 19 of 22

25.    None of the opinions that I have offered in this matter are given as legal conclusions.
Rather, much of the language of the law, as well as statutory and case law, are utilized in
the training of law enforcement and other public safety personnel. References to terms
utilized in legal opinions and training matters are offered only as to common knowledge,
training, and policies of criminal justice entities.

26.    The Marion County Sheriff's Office is an accredited agency by the Florida Corrections
Accreditation Commission, Inc. The independent review certifies that a corrections
organization meets prescribed standards in the field. Key in the lengthy process to pursue
accreditation is the development and maintenance of the policies and procedures that guide
agency members. The Marion County Sheriff's Office has been reaccredited multiple times
for Sheriff Woods's ongoing commitment to excellence demonstrated through the agency
operations, documentation of efforts, and review by external independent authority.

Respectfully submitted,

*Richard M. Hough, Sr.*

Dr. Richard M. Hough, Sr., CPP, CCHP, SHRM-SCP

Appendix A – Documents Reviewed

1. Plaintiff Amended Complaint
2. MCJ Incident Report 210005382
3. Merchant Autopsy Report
4. 2019 Marion County Detention Center FMJS Inspection Report part 1
5. 2019 Marion County Detention Center FMJS Inspection Report part 2
6. FMJ Marion County Jail 1-17-19
7. FCAC Final Report 2021
8. Corrective Action Plan 1-22-19
9. Corrective Action Plan - Medical 2-18-19
10. FMJS Medical Part I Marion 2019
11. FMJS Medical Part II Marion 2019
12. FMJS 2021
13. FMJS - Medical Inspection 1-7-20
14. FMJS - Jail Inspection 3-10-20
15. Plaintiff Expert Report by Paul M. Adee dated 1.2.2025

**Depositions**

16. McNeely Deposition
17. Dellum Miller Deposition
18. Kosinski Deposition
19. Jerome Dukes Deposition
20. Brian Peterson Deposition

**Plaintiff Discovery Responses**

21. Plaintiff Answers to Interrogatories
22. Cory Criminal Record
23. Sprint Bill
24. Death Certificate
25. Letters of Administration

**Defendant Supplemental Discovery Responses (06.13.2024)**

26. Conclusion letter for Dukes AR17-060
27. Conclusion letter for Inmate Javonte Hall AR17-060
28. Dukes Interview re Javonte Hall Incident AR17-060
29. Barrett Interview re Javante Hall Incident AR17-060
30. Javante Hall Interview re AR17-060
31. Javante Hall Complaint AR17-060
32. Signed Letter of Conclusion re Incident AR17-060
33. Inmate Durham Video Clips
34. AR Paperwork re Inmate Joseph Durham Complaint AR 17-076
35. Joseph Durham Complaint

36. 3 Photos of Durham
37. 18 jail videos re Joseph Durham Complaint
38. 67 photos of Merchant/Lutterloah incident
39. 172 emails regarding (RRTP 9, 32)
40. Jail calls (RRTP 9, 32)
41. Letter from Cory Merchant to Kenneth Morrison & 9/20/2021 returned undeliverable envelope
42. 46 MCSO Incident reports from 3.15.2001 through 11.07.2021 involving Cory Merchant
43. 3 photos of Cory Merchant booking property
44. Disciplinary report history of Cory Merchant
45. Housing movements Report for booking 1900010514 – Merchant
46. Cory Merchant Inmate file
47. Inmate mail history of Merchant
48. Cory Merchant Inmate medical records
49. 9.23.20 Inmate request form
50. 4.11.20 Inmate request form
51. 11.24.19 Inmate request form
52. 12.15.20 Inmate Request form
53. Inspection of confinement
54. Jail call list 11.08.2019 through 7.1.2021
55. Handwritten letters
56. Incident report 16000961 re Cory Merchant medical incident
57. Merchant green team UOF 19-148
58. Ocala Police Department Incident report re laptop
59. Marion County Jail Video Sessions report
60. Dukes Training
61. Kosinski Training
62. Miller training
63. Emails re public records request – (Def RRTP 19, 31)
64. 128 MCSO Policies
65. Arrest report 12-CF-3903
66. Incident report 210004395
67. Disposal report Case 12035737
68. Incident Report 21-4010
69. Incident Report 21-4366
70. Incident Report 21-4389
71. Incident Report 21-4401
72. Incident Report 21-4426
73. Incident Report 21-4678
74. Incident Report 21-4804
75. Incident Report 21-4881
76. Incident Report 21-4896
77. Incident Report 21-5039
78. Incident Report 21-5261
79. MCSO19OFF020557 (Redacted)
80. MCSO21OFF020749 FEL PC-BONNER
81. MCSO21OFF020749 FEL PC-SMITH

82. MCSO21OFF020749 Incident Report
83. Incident Report 12-9662
84. Incident Report 20-1461
85. Incident Report 20-3047
86. Incident Report 21-1623
87. Incident Report 21-3841
88. Incident Report 21-3939
89. 4 audio interviews re incident 210917 (Reed, Bonner, Hanks, & Smith)
90. 3 G-Pod Videos from 9.10.2021
91. Victim interview re 9.10.2021Incident 120644
92. Cause and manner of death report
93. FDLE report re Dukes
94. Mandatory retraining reports – Miller, Kosinski, Dukes
95. Student records – Miller, Kosinski, Dukes
96. Training records –Miller, Kosinski, Dukes
97. Commendations – Dukes
98. MCSO Internal Investigate report re Dukes IA20-020
99. Dukes AI Complaint
100.    Interviews with Inmate Posey, Nurse Ramos, Officer Dukes, Officer Moore
101.    Jail video re Posey Complaint
102.    HR File re Dellun Miller
103.    Notice of Concluded Investigation Dukes re Posey Complaint
104.    Sheriff Woods personnel file
105.    MCSO Shift schedule Oct to Dec 2021
106.     MSJ Post A-2 on 11.06.2021
107.    Organizational chart
108.    18 Audio interviews re Merchant incident
109.    Handwritten Movement log  post Merchant incident
110.    List of policies
111.    3 Jails call audio of Cory Merchant
112.    In custody report

**Defendant Discovery Responses (11.07.2024)**

113.    Lutterloah Booking Report 2000004904
114.    Lutterloah Inmate file (2 parts)
115.    Merchant Jail Card Booking 1900010514
116.    Merchant Inmate File
117.    13800662 Inmate Monitoring Surveillance 90
118.    14865138 Inmate Monitoring 6011 90 &116
119.    Headcount Policy 6064.00
120.    Inmate Accountability – Rules and Regulations  Rev. 6.2024
121.    Keep aways report – Lutterloah
122.    20 Jail videos from date of incident
   • G-POD-A-SECTION-2021-11-07_01h05min33s172ms_7
   • G-Cam-04-Alpha Front-2021-11-07_01h12min27s516ms

- G-POD-A-SECTION-2021-11-07_01h05min33s172ms
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms.asx"
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms_1
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms_2
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms_3
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms_4
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms_5
- G-POD-A-SECTION-2021-11-07_01h05min33s172ms_6

123.     Map 004 Building 4&5 Evacuation Route 060707
124.     Daily Logs 11.06.2021 through 11.08.2021
125.     Final Report Jail Staffing Analysis Marion Co FL April 2019
126.     Average Daily Population 2016-2021
127.     MASTER Shift Schedule  JAN - MAR 2020
128.     MASTER Shift Schedule  JUL - SEP 2019
129.     MASTER Shift Schedule APR - JUN 2017
130.     MASTER Shift Schedule APR - JUN 2018
131.     MASTER Shift Schedule APR - JUN 2019
132.     MASTER Shift Schedule APR - JUN 2020
133.     MASTER Shift Schedule APR - JUN 2021
134.     MASTER Shift Schedule APR- JUN 2016
135.     MASTER Shift Schedule JAN - MAR 2018
136.     MASTER Shift Schedule JAN - MAR 2019
137.     MASTER Shift Schedule JAN - MAR 2021
138.     MASTER Shift Schedule JAN- MAR 2016
139.     MASTER Shift Schedule JAN- MAR 2017
140.     MASTER Shift Schedule JUL - SEP 2017
141.     MASTER Shift Schedule JUL - SEP 2018
142.     MASTER Shift Schedule JUL - SEP 2020
143.     MASTER Shift Schedule JUL - SEP 2021
144.     MASTER Shift Schedule JUL- SEP 2016
145.     MASTER Shift Schedule OCT - DEC 2017
146.     MASTER Shift Schedule OCT - DEC 2018
147.     MASTER Shift Schedule OCT - DEC 2020
148.     MASTER Shift Schedule OCT - DEC 2021
149.     MASTER Shift Schedule OCT- DEC 2016
150.     WORKING Shift Schedule  OCT - DEC 2019
151.     October 2021 Distribution
152.     November 2016 Distribution
153.     November 2017 Distribution
154.     November 2018 Distribution
155.     November 2019 Distribution
156.     November 2020 Distribution
157.     Marion County Sheriff Policy 6721.00 – Intake & Booking Procedures
158.     Marion County Sheriff Policy 6723.00 – Orientation of Inmates
159.     Marion County Sheriff Policy 6011.00 – Supervision of Inmates - Jail
160.     Marion County Sheriff Policy 6766.00 – Classification of Inmates

161.    Booking & Release Manual
162.    Marion County Sheriff Policy 6164.00 – Headcount of Inmates
163.    Marion County Sheriff Policy 6330.00 – Security & Control, General
164.    G Pod Post Order Rev. 01.08.2013
165.    Headcount and Security Check Logs October 7 - November 7, 2021

Other documents cited in-text.

Appendix B

## 2024 FEES AND EXPENSE POLICY/Initial Invoice

**Initial Consultation**

An initial discussion or written correspondence with counsel is beneficial to understand the nature and scope of the case. This allows me to determine whether to serve as a witness or consultant in the case. These fees and conditions are to be communicated by retaining counsel to opposing counsel as needed and to ensure payment arrangements.

**Retention**

A retainer of $3,000.00 is required in advance for case review and opinion, preparation, and to secure services and hold dates. This initial, non-refundable fee is to be applied against the first 15 hours of work performed under this agreement. The fee should be included with the initial materials for review. If after initial consultation and review you decide to disclose me as an expert witness, an additional non-refundable fee of $2,500.00 must be received by me prior to being named as an expert in the case. For grand jury and state-court cases that may not require report generation, the entire fee is due at time of retention. The combined total is $5,500.00.

It is understood that my services are as a consultant; that payment for same shall be made promptly and is not contingent upon the results of any legal action, arbitration or settlement; and, that costs incurred, or the time spent at the demand of other parties to any litigation (including depositions and expenses) will be billed to the party making the demand; but responsibility for payment is that of the client. Retainers to review files for multiple clients will be formulated to reflect the complexities of analysis of several individuals or entities in a matter.

**Direct Time**

Billed at $375.00 per hour, this includes investigations, conference, research, analysis, and reporting (both written and oral). Travel time $150 per hour. Travel fees for depositions, site visits, or court are contingent on the location of services needed and include per diem of $650.00 per day to defray lodging, meals, and ground transportation. These expenses and round-trip travel expenses, including time in transit, must be received at my office five business days prior to a scheduled deposition, site visit, or trial. Additional fees that exceed the $5,500.00 in retainers up to the point of being disclosed as expert will be billed as accrued. In such instances, an estimate of additional hours will be provided to counsel in advance of the additional work if requested.

**Depositions**

The opposing counsel is charged a flat fee of $1,800.00 if my live, telephone, or video deposition of up to four hours is taken within 15 miles of my location, payable five business days in advance. Additional hours are billed at $500 per hour or portion of an hour. Depositions at any other location requested by opposing counsel are $2,500 plus travel and per diem expenses for a four-hour deposition or any portion of a day. It is the responsibility of requesting counsel to arrange for court reporters and location for depositions. It is the responsibility of retaining counsel to communicate this cost to requesting counsel. All fees associated with depositions must be received at my office address at least five business days prior to travel or deposition.

**Trial Time**

My trial appearance fee is $4,000.00 per day, plus travel and per diem expenses. The invoiced amount must be received five business days prior to my scheduled or anticipated testimony. If a delay results in my not testifying on the scheduled date, an additional $3,000.00 fee will apply for each day or portion of a day: $2,000.00 for weekend days. If, in the five business days prior to a trial or hearing I am cancelled by counsel, per diem expenses will be refunded and 50% of the trial fee. Other travel costs may be partially refunded.

Upon receipt of your authorization and initial retainer (this agreement serves as initial invoice) I will proceed on your behalf. Fees may change 12 months after the date of the executed agreement.

Sincerely, *Dr. Richard M. Hough, Sr., Consultant*        Style of case: _____


Authorized by: _____        Date: _____



Page 1 of 1

<u>Appendix C</u>

**Dr. Richard M. Hough, Sr., CPP, CCHP, SHRM-SCP**
East Tennessee State University
Department of Criminal Justice and Criminology

ORCID: https://orcid.org/0000-0002-5106-5694

## EDUCATION

**University of West Florida**
Doctor of Education; Public Administration concentration

Dissertation Title: The Influence of Race, Gender, and Perceived Barriers of Law Enforcement
Officers on Self-Efficacy of Career Decisions

**Harvard University, John F. Kennedy School of Government**
Master in Public Administration

**Saint Leo University**
Bachelor of Arts in Public Administration, *cum laude*

**University of South Florida**
Master of Public Administration (ABT)

## BOARD CERTIFICATIONS

**Certified Protection Professional (CPP)**, ASIS International - current
**Certified Correctional Health Professional (CCHP)**, National Commission on Correctional
Health Care (NCCHC) - current
**Senior Certified Professional (SHRM-SCP)**, Society for Human Resources Management -
current

## ACADEMIC EXPERIENCE

### ACADEMIC APPOINTMENTS

**2022 – East Tennessee State University, Professor of Practice**
Department of Criminal Justice and Criminology

Courses taught: Homicide, Juvenile Justice, Corrections, Criminal Justice Management, Criminal
Investigations, The Use of Force in Criminal Justice

**2006-2021, University of West Florida, Instructor**
Joint Appointment in Department of Criminology and Criminal Justice and Department of
Administration and Law

**2006-2021, Department of Criminology and Criminal Justice**

**2006-2007, Coordinator of UWF Emerald Coast Campus**

Courses taught: Police Use of Force and Intersectionality, The Use of Force in Criminal Justice, Police in a Free Society (now Policing), Criminal Justice Management & Organization, Punishment & Society (now Corrections), Criminal Investigations, Homicide, Cold Case Investigations, Gangology, Serial Killers, Sex Crimes Investigation, Violence, Juvenile Justice, Punishment & Society (now Corrections), Race-Gender-Ethnicity & Crime, Survey of Crime and Justice Private Security, Criminology, Historical Crime, Crime and Public Policy (Graduate), Terrorism and Homeland Security (Graduate), Criminal Justice Administration (Graduate). Other courses listed below.

**2016-2021, Department of Administration and Law**
**2016-2018- MSA Coordinator, Department of Administration and Law**

Courses taught: Public Policy, Public Administration, Analytic Techniques of Public Policy (Graduate), Human Resources Management for Public Organizations (Graduate), Leadership (Graduate), Capstone (Graduate)

**2005-2006, University of South Alabama, Visiting Instructor**
Department of Political Science and Criminal Justice

Courses taught: Policies and Procedures of Corrections, Police Operations, Contemporary Policing, Race-Gender-Ethnicity & Crime, Introduction to the Offender (Criminology), Homicide, Diversity in Public Administration (UG, Graduate).

**2003-2004, University of West Florida, Instructor**
Department of Criminal Justice and Legal Studies

## HONORARY ACADEMIC APPOINTMENTS

NOTE: I was in the U.K. Fall semester 2019 on a sabbatical conducting comparative research and lecturing on police use of force and investigative practices in the U.S. and U.K.

**Academic Visitor, Cardiff University, Cardiff, Wales, Fall 2019**

**Visiting Instructor, University of Brighton, U.K., Fall 2019**

**Visiting Fellow, Edge Hill University, U.K., Fall 2019**

## ADJUNCT ACADEMIC APPOINTMENTS

**Professor, 2016- present; Associate Professor, 2007-2016**
**University of Maryland, Global Campus**
Department of Criminal Justice and Investigative Forensics

Courses taught: CJ Management (Graduate), Criminal Justice Administration, Introduction to Criminal Justice, Private Security/Introduction to Security Management (Undergraduate), Medico-Legal Investigation of Death, Criminalistics, Corrections

**Instructor, Criminal Justice Academy, 1995-2021**
George Stone Technical College, Pensacola, FL

Subjects taught**:** Patrol Procedures, Community-Oriented Policing, Human & Cultural Diversity, Ethics, Officer Survival, Investigations, Homicide and Robbery Investigations, Gangs-Extremist Groups, Defensive Tactics – Use of Force, Substance Abuse and Use by Inmates, Juvenile Inmates, Special Inmate Populations, Handling Mental Health-challenged Individuals, Baker Act. others. Served as member of the Regional Criminal Justice Advisory Committee 2014-2021.

**1999 - 2003, Instructor of Criminology and Criminal Justice**
University of West Florida, Pensacola, Florida

Courses taught: Police in a Free Society, Criminal Investigations, Punishment in Society, Police Administration.

**1996-2003, Instructor of Public Administration**, **MPA Program**
University of West Florida, Pensacola, Florida

Courses taught: The Public Administration Professional, Governmental Innovation and Re-engineering, Policy Analysis, Leadership.

**1996-2016, Faculty**
Troy University

Courses taught: Homicide, Criminal Justice Administration, Introduction to Corrections, Correctional Rehabilitation and Counseling, Correctional Management, Public Administration.

**2008-2018, Faculty**
Colorado Technical University Online

Courses taught: Police Operations, American Diversity, Forensic Criminology, Corrections, Juvenile Justice, Juvenile Delinquency, Homeland Security and Terrorism (Undergraduate), Homeland Security Strategy, Critical Infrastructure and Homeland Security, Homeland Security and Terrorism (Graduate), Criminology and Public Policy (G), Corrections Management (G), Criminal Justice Capstone (G), Special Topics in Criminal Justice (G).

**2000, Instructor**
Okaloosa-Walton Community College (now Northwest Florida State College), Public Safety Division

Course taught: Law Enforcement Ethics.

**1991 – 1995, Faculty**
Saint Leo University

Courses taught: Public Administration, Introduction to Corrections, Law Enforcement
Administration.

**1989 – 1995, Adjunct Faculty**
Manatee Community College (now Manatee-Sarasota State College)

Courses taught: Criminal Investigation, Public Administration, Juvenile Justice, Introduction to
Corrections, Policing. Served as Chairman Criminal Justice Advisory Committee 1993-95.

**1984 – 1995, Instructor**
Manatee Area Vocational-Technical Center, Criminal Justice Academy

Subjects taught: Patrol Procedures, Defensive Tactics – Use of Force, Human & Cultural
Diversity, Interpersonal Communications, Ethics, Interviews & Interrogation, Instructor
Techniques, Report Writing, Advanced Correctional Techniques for Officers, Correctional
Emergency Response Team (CERT), Train the Trainer for Detectives, Instructor Techniques,
others.

## PROFESSIONAL EXPERIENCE

**1998-2003 Florida Department of Juvenile Justice, Detention Services**

**Senior Management Analyst (former Chief of Support Services) (2002-2003)**
   Working group to develop Detention Emergency Response Teams in Juvenile Justice to address
      significant incidents. Use of Force, policy, and tactical procedures SME.
   **Detention Superintendent**, Escambia Regional Juvenile Detention Center (6 months concurrent while
      assisting in the hiring of a new superintendent) Florida Department of Juvenile Justice
   **Detention Superintendent**, Okaloosa Regional Juvenile Detention Center (**1998-2002**) Florida
      Department of Juvenile Justice
   Hired and oversaw the development and training of 70+ officers and staff for first of five prototype
      detention facilities in Florida.
   Coordinated first-ever state detention officer academy conducted remote from the state capital.
   Responsible for home-based community corrections component of Detention.
   Created a Juvenile Detention Training Officer (DTO) program adopted statewide. Training SME for
      juvenile detention officers.
   Served as subject matter expert for state-wide group developing tactical emergency response in
      facilities
   Trained Quality Assurance assessor for State of Florida, Detention Centers

**1995-1998 Santa Rosa County, Florida Sheriff's Office**

**Enforcement Bureau Administrator (1996 – 1998)**
   - Leadership through three divisions of all facets of agency law enforcement operations.
   - Lead initial efforts in pursuit of state accreditation.
   - Revamped Field Training Officer (FTO) Program.
   - Instituted agency-wide use of force training

- Instituted agency officer fitness program
- Served as Chief Defensive Tactics-Use of Force Instructor

**Corrections Bureau Administrator (1995 - 1996), CERT Commander**
- Leadership through three divisions of all facets of agency adult and juvenile corrections operations.
- Conceptual design of new sheriff's office and jail facility on all interior spaces, and functional flow. Overall project manager.
- Planner and manager of transitioning inmates to new facility.
- Created and trained Detention Training Officer program.
- Developed, trained, and led tactical unit (CERT).

**1981–1995 Manatee County, Florida Sheriff's Office**

**Deputy Chief, Corrections Bureau (1991 – 1995), CERT Commander**

Training Administrator for Sheriff's Office

Served as Chief Defensive Tactics-Use of Force Instructor

Leadership through three divisions of all facets of agency adult and juvenile corrections operations. 280 employees and 1,000 inmates.

Created and trained Detention Training Officer program.

Lead the efforts to obtain national accreditation (ACA) for Corrections Bureau.

Team member of law enforcement accreditation responsible for patrol, investigations, and narcotics divisions (CALEA)

Conceptual design of new jail facility. Overall project manager.

Project manager and trainer for first juvenile boot camp in Florida

Planner and manager of transitioning inmates to new facility.

Developed, trained, and led tactical unit (CERT).

*1990 – 1991  Leave of Absence while attending graduate school at Harvard University*
**Law Enforcement and Corrections Academy Coordinator (1991)**
**Administrative Division Commander (1989 – 1990)**
**Policy Advisor to the Sheriff (1988 – 1989)**
**Assistant to Patrol Commander (1987 – 1988)**
**Field Training Commander (1987)**
**Patrol Sergeant, Field Training Supervisor (1985 – 1986)**
**Homicide Detective (1983 – 1985)**
**Sheriff's Deputy / Field Training Officer (1981 – 1983)**

**1980–1981 Longboat Key Police Department, Longboat Key, FL**
 **Department Training Officer / Senior Patrol Officer**
**1979 Bradenton Beach Police Department, Bradenton Beach, FL**
 **Patrol Officer, Motor Officer**

**CRIMINAL JUSTICE CONSULTANT EXPERIENCE**

Retained in more than seventy state and federal cases since 1991.

    Areas of focus include:

    Criminal justice policy

    Use of Force

    Police practices

    Investigative practices

    Forensic Criminology

    Suicidology; Psychological Autopsy Investigation

    Jail and corrections practices

    Juvenile justice and detention practices

    Human Resources

    Internal Affairs

    Bias-Based Policing; Human and Cultural Diversity; Implicit Bias

    Private security practices

    Policy and program implementation & litigation support for Law Enforcement & Correctional Agencies

## CURRICULUM DEVELOPMENT

Courses created and taught for the University of West Florida, Department of Criminology and Criminal Justice.:

- Police Use of Force and Intersectionality,
- The Use of Force in Criminal Justice,
- Race, Gender, Ethnicity & Crime,
- Homicide,
- Cold Case Investigation,
- Gangology,
- Serial Killers,
- Violence,
- Sex Crimes Investigation,

Developed and taught the graduate course in Terrorism and Homeland Security.
Developed the course Public Sector Ethics for the MPA program of the University of West Florida.
Developed and taught the Leadership course and the Governmental Innovation and Re-engineering course in MPA program.
Subject Matter Expert (SME) in development of criminal justice course for NIIT Limited, a global talent development company.
Subject Matter Expert (SME) in revision and development of graduate course in Criminology & Policy

## PROFESSIONAL SERVICE

Academic:

    2022 – Member, Assistant Professor of Criminal Justice & Criminology search committee

2020 – 2021 University Growth & Development Committee
2020 – 2021 Diversity Work Group, College of Education and Professional Studies
2018 – 2019 Member, Chair of Criminology & Criminal Justice search committee
2018 – 2019 Member, Assistant Professor of Social Work search committee
2017 – 2018, Member, Police Chief search committee, University of West Florida
2017 - 2021, Advisory Board Committee, CCJ
2017 - 2021, Advisory Board Committee, MSA-PA
2016 – 2021, Graduate Admissions Committee, MSA programs
2016 – **Subject Matter Expert law enforcement** and **correctional practices for U.S. Navy'**s
"Sailor 2025" High Velocity Training Design and Technologies Project
2016 – 2021, Ed.D. Committee Supervision/membership –
2016- 2021, Dissertation Peer Reviewer for College of Education and Professional Studies,
Dean's representative
2015-2016 College of Education and Professional Studies Task Force
2015 – Member, College of Education and Professional Studies, Community Engagement steering
committee
2015-2016 Member, Master of Public Administration Task Force
2014-2015 Vice-president of Administrative Services/Chief Financial Officer search
    committee
2014 – Member, UWF Dean search committee, College of Education and
    Professional Studies
2014 – 2020 Member, University Risk and Compliance Council
2014 – 2015 Task Force on establishment of University College
2013 – 2021, Adjunct Instructor Committee, CCJ
2013 – 2015 SACS COC Compliance Certification Team member
2013-2015-member**, Board of Trustees**, University of West Florida
2013-2015 - elected **Faculty Senate President**, UWF
2012 – 2021, Graduate Admissions Committee, MSCJ program
2012 – Member, Provost search committee
2010 – Elected to three-year term, **Faculty Senate**, University of West Florida
2011-2013 Chair, Planning and Special Issues Committee, Faculty Senate
2011 – 2019 University Safety and Security Council
2012 – President's Listening Group – Budget
2010-2019 – Judge, UWF Argo Invitational Mock Trial Tournament


International, National and Regional:
2020-2024 U.S. Fulbright Specialist
2018-present named **International Ambassador**, British Society of Criminology (BSC)
2018-present ASIS International, PSC.2 Technical Committee evaluated the Conformity
        Assessment and Auditing Management Systems for Quality of Private Security Company
        Operations ANSI Standard.
2017-present *Calibre Press*, research consultant, columnist; ancillaries author for
        ***Street Survival II***
2015-present Criminal Investigation Research Network (CIRN)
2010-present Homicide Research Working Group (HRWG), **Vice-President,**
        **2018-20, Publications Committee chair, IACP Research Liaison**
1990-1996: National Law Enforcement and Corrections Technology Advisory
Council (NLECTAC) to the Department of Justice; Corrections Sub-Committee.
1987-present International Association of Chiefs of Police (IACP)

1988-1998:  **Education & Training Committee**, International Association of Chiefs of
Police
2019-2020 Technology Working Group – Policy Center - IACP
2019-2020 Confidential Informants Working Group – Policy Center - IACP
2022- Electronic Control Weapons Working Group – Policy Center - IACP

Community:

2014 – 2021, Advisory Council, George Stone Technical College, Law Enforcement and
Corrections Academies
2011 – 2017, Gulf Coast Citizen Diplomacy Council, **Board of Directors, Secretary (2012-14)**,
 2009 – 2011 Gulf Coast Citizen Diplomacy Council - member
    2010 – **Citizen Diplomat of the Year**
2010 – 2012, Education Committee **Chair**, Florida Attorney General's Task Force on Gangs,
Escambia County region
2006 Homeland Security Task Force, City of Mobile, Alabama
2003- 2017: 2008-2010 **President** Favor House of Northwest Florida Domestic
  Violence Center, **Vice-president** and board member; former Personnel
  Committee **Chair**
2007- 2009: Pace Area Chamber of Commerce
2007- 2009: Navarre Area Chamber of Commerce
1996-2006:  Navy League of Santa Rosa County Council. **President** from 1998-2002.
1987-2001:  Member, Kiwanis International
1998 **President** and Co-Founding Member Santa Rosa Sunrise Kiwanis
1996-2000: Board Member, Big Brothers Big Sisters of NW Florida:
        former Personnel Committee **Chair**
1996-2000: Board Member, Red Cross of NW Florida
1993-1995 Adopt-A-Family of Manatee County, FL
1988-1990 Cub Scouts of America, Den Leader


*Current or past member of or involvement with a number of professional organizations, including the
following*:

- International Law Enforcement Educators and Trainers Association

    (ILEETA), Staff Instructor
- American Correctional Association

- American Jail Association

- National Commission on Correctional Health Care (NCCHC); Certified Correctional

    Health Professional (CCHP)
- American Association of Suicidology; certified Psychological Autopsy Investigator

- American Psychology-Law Society; Research Committee

- National Strength and Conditioning Association

- International Homicide Investigators Association (IHIA)
- International Association for Identification (IAI)

- National Tactical Officers Association (NTOA)
- National Internal Affairs Investigators Association (NIAIA)
- Police Executive Research Forum (PERF)
- Associates Program Committee, California Emergency Management and
  Homeland Security Model Curriculum and Standards
- International Association for Correctional and Forensic Psychology (IACFP)
- CIT International
- Justice Research and Statistics Association (JRSA)
- First Judicial Circuit Law Enforcement Officers Association
- Florida Police Chiefs Association
- Florida Sheriff's Association
- Justice Research and Statistics Association (JRSA)
- Academy of Criminal Justice Science (ACJS)
- Council of Juvenile Justice Administrators (CJJA)
- Southern Criminal Justice Association (SCJA)
- American Society of Public Administration (ASPA)
- Academic Advisory Board of the Annual Editions: Drugs, Society, and
  Behavior

## AWARDS AND RECOGNITION

- **2018** *Carolyn Rebecca Block Award for Outstanding Contribution to Homicide or
  Lethal  Violence Research by a Practitioner*. Homicide Research Working Group
  (HRWG)
- **2018-2020** named **International Ambassador**, British Society of Criminology (BSC)
- **2018-19** cycle Alternate Candidate– U.S. Fulbright Scholar Program for project to
  compare police investigative methods in the U.S. and U.K.
- **2017** Certificate of Appreciation, Outstanding Contributions – International Visitor
  Leadership Program, United States Department of State
- **2016** Nominee and Finalist, Distinguished Teaching Award, University of West Florida
- **2016** Professional Achievement Award, University of Maryland University College
- **2015** Faculty Excellence in Teaching Award nominee, University of West Florida
- **2013** Educator of the Year, Community Service and Partnerships, Colorado
  Technical University
- **2011** Distinguished Service Award, FavorHouse of NW Florida
- **2009-2010** Outstanding Citizen Diplomat of the Year, Gulf Coast Citizen Diplomacy

Council

- **2009** Distinguished Teaching Award, University of West Florida

- **2007-08** Profiled in two CJ texts published; re-profiled in one 2013

- **1997** Law Enforcement Commendation Medal, S.A.R.

- **1996** Leadership Santa Rosa

- **1989** The Bradenton Herald "Rose" Award, for community work

- **1988** Leadership Manatee

- **1986** Deputy of the Month, Manatee Sheriff's Office, for saving the life of a fellow officer

- **1980** Officer of the Year, Longboat Key Police Department

## PEER-REVIEWED PUBLICATIONS

Buker, H., and Hough, R. M. Challenges, Overcoming Strategies, and Possible Considerations for the Future Implementation of Workload Based Police Patrol Staffing Analyses: A Methodological Commentary. *Police Science: Australia & New Zealand Journal of Evidence Based Policing, 7*(1), 30-39.

Hough, Richard Using Police as Mechanism of Self-Harm: Suicide by Cop and Psychological Autopsy. *Journal of Mental Health and Social Behaviors, 4*(1): 167 (2022)

Hough, Richard Administrative Evil and the Use of Deadly Force in Law Enforcement. *British Society of Criminology*, BSCN86-2021

Hough, Richard "The Investigation of Homicide", *Homicide Studies, 23*(2), 87-92, 2019. DOI: https://doi.org/10.1177/1088767919827348.

Hough, Richard, McCorkle, Kimberly, and Harper, Sarah "An Examination of Investigative Practices of Homicide Units in Florida", *Homicide Studies. 23*(2), 175-194, 2019. DOI: https://doi.org/10.1177/1088767919828421.

Hough, Richard "Mental Chronometry and Officer Training" April 2017, *Law Enforcement Executive Forum, 17*(2).

Hough, Richard "Mental Chronometry in Officer Involved Shootings" 2017, *Forensic Research & Criminology International Journal, 4*(3): 00116. DOI: 10.15406/frcij.2017.04.00116.

Hough, Richard, and Tatum, Kimberly M. "Murder Investigation and the Media: Mutual Goals" 2014, *Law Enforcement Executive Forum, 14*(3).

Hough, Richard, and Tatum, Kimberly M. "An examination of Florida policies on force continuums." *Policing: An International Journal of Police Management and Strategy*. Published, Spring, 2012.

Hough, Richard, and Tatum, Kimberly M. "Examining the Utility of the Use of

Force Continuum: TASERs and Potential Liability," July, 2009, *Law Enforcement Executive Forum*.

Crow, Matt, Hough, Richard, Mosley, Jason, Smykla, John, and Tatum, Kimberly M. "Drunk and Alone in a K-Mart Parking Lot," Nov. 2008, *Journal of Criminal Justice Education.*

Clement, Keith, Hough, Richard, Jones, Brian, Mathis, John, and Simmons, Chip. "Partnering with a Purpose," November 2007 *Police Chief, 74*(11).

Hough, R. (2005, September). "Boosting student participation through distance learning." *Best practices in electronically delivered programs and courses*, v.3 (pp. 34).

Hough, R. (1991). "How Deep is Your Bench?": Managerial and Supervisory Law Enforcement Development" *Police Chief*.

Hough, R. (1991). "Organizational Grapevine: Friend or Foe?" *Police Chief, 58*(5), pp. 49-50.

**Editorial Board,** *Homicide Studies*
**Editorial Board,** *Psychology and Behavioral Sciences*

**Guest Editor**; Special Edition on Investigations in *Homicide Studies*, 2019

Editorial Reviewer, *American Review of Public Administration*
Editorial Reviewer, *Public Integrity*
Editorial Reviewer, *Police Quarterly*
Editorial reviewer, *British Society of Criminology*
Editorial reviewer, *Policing: An International Journal of Police Management and Strategy*
Editorial reviewer, *International Journal of Sociology and Social Policy.*
Editorial reviewer, *Homicide Studies*
Editorial reviewer, *Forensic Research & Criminology International Journal*
Former editorial reviewer, *The Police Chief*

## Textbooks and book chapters

Hough, R. The criminal justice response to predatory violence, in, Predatory Violence, Springer Publishing (forthcoming)

Hough, R., McCorkle K. Homicide investigation in the U.S., in, The Routledge Handbook of Homicide Investigation (forthcoming)

Hough, R. *Criminal Investigations Today: The Essentials*. SAGE Publishing (2021).

Hough, R. *The Use of Force in Criminal Justice*. Routledge, Taylor & Francis Group (2018) (2nd ed. 2024).

Hough, R. & McCorkle, K. *American Homicide*. SAGE Publishing, 2016 (2nd ed. 2021).

Browne, D., Holloway, R., Hough, R., Martinez, M., McGovern, J. (Eds.). (2014). *Introduction to Criminal Justice*. USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Introduction to criminal justice. In Browne, D., Holloway, R., Hough, R., Martinez, M., McGovern, J. (Eds.), *Introduction to Criminal Justice* (pp. 1-19). USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Juvenile justice. In Browne, D., Holloway, R., Hough, R., Martinez, M., McGovern, J. (Eds.), *Introduction to Criminal Justice* (pp. 164-178). USA: Words of Wisdom, LLC. University Press.

Fitzgibbons, P., Hough, R., Kaminsky, I., Neumeyer, G., Newell, F., Newman, R. (Eds.). (2014). *Introduction to Corrections*. USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Legal issues in corrections. In Fitzgibbons, P., Hough, R., Kaminsky, I., Neumeyer, G., Newell, F., Newman, R. (Eds.). *Introduction to Corrections* (pp. 84-99) USA: Words of Wisdom, LLC. University Press.

Hough, R. (2014). Juvenile corrections. In Fitzgibbons, P., Hough, R., Kaminsky, I., Neumeyer, G., Newell, F., Newman, R. (Eds.). *Introduction to Corrections* (pp. 144-159) USA: Words of Wisdom, LLC. University Press.

## Published Conference Proceedings

Hough, R. (2023). "The Challenges of Investigating Suicide by Cop,"Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R. & McCorkle, K. (2016). "Investigative Practices of Homicide Units," Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R. & Tatum, K. (2015). "An Examination of Investigative Practices of Homicide Units in Florida." Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R. & Tatum, K. (2013). "Take a Breath: a Pause to Prevent Escalation." Conference Proceedings of the Homicide Research Working Group Annual Meeting.

Hough, R., & Tatum, K. (2012). "Confrontational Homicide." Conference Proceedings of the Homicide Research Working Group Annual Meeting.

## Technical Reports

Hough, R. (2023) jail population management, consequences, options in a southeastern county. Technical report for stakeholders

Buker, H. & Hough, R. (2020-21). Staffing Analysis, Pensacola Police Department

McCorkle, K., Goulette, N., Johnson, K., Hough, R. (2021) Validity study of a Florida pre-trial release instrument.

Tatum, K. & Hough, R. (2010). Escambia County Domestic Violence Fatality Review Team: Findings and Recommendations.

Hough, Richard. (2006). Total Quality Management in the Alabama Department of Youth Services, 2006. - Technical Report

## OTHER PUBLICATIONS

Hough, R. (2020, May). Back to Basics: Again. *Calibre Press*.

Hough, R. (2020, March 20). Law Enforcement: The Original Social Distancers. *Calibre Press*.

Hough, R. (2018, November 13). Sucker Punched: Spontaneous assault & the "Elbow Test." *Calibre Press*.

Hough, R. (2018, June 15). Considering the Use of Force. *Calibre Press*.

Hough, R. (2018, March). Street-Level Decision-Making. *The ILEETA Journal*.

Hough, R. (2017, November 8). Fly High or Drop It By: The challenge of investigating shipped or mailed drugs. *Calibre Press*. Retrieved from https://www.calibrepress.com/2017/11/fly-high-drop/

Hough, R. (2017, April 26). The Future of Defensive Tactics. *Calibre Press*. Retrieved from https://www.calibrepress.com/2017/04/future-defensive-tactics/

Hough, R. & Tatum, K. (2015). An Examination of Investigative Practices of Homicide Units in Florida. A research note for the *Vidocq Society Journal*.

Hough, Richard M. (2011) Homicide entry for African Americans and Criminal Justice, an encyclopedia.

Tatum, K. & Hough, R. (2010). Escambia County Domestic Violence Fatality Review Team: Findings and Recommendations. – Technical Report

Former Quarterly column contributor to Corrections.com on Security Threat Groups and Gangs.

Hough, Richard. (2007, December 24). Safety in Numbers. *Corrections Connection* Online journal

Hough, Richard. (2004, August 30). Security and Facility Management and Personnel: A Critical Connection. *Corrections Connection* Online journal

Hough, Richard. (2003, August 18). Correctional Facility Design: Can You Get There from Here? *Corrections Connection*. Online journal

Hough, Richard. (1996). Kung Fu and the Cop. *Inside Kung Fu* magazine.

Hough, Richard. (1994). Going to the Ground. *Inside Kung Fu* magazine.

Forty+ textbook and prospectus reviews.

### Manuscripts under review:

## RESEARCH IN PROGRESS

**Textbooks in progress:**

Hough, R. *The Use of Force in Criminal Justice*. Routledge, Taylor & Francis Group (2018) (2e coming 2024).

Hough, R. *Human Error and Training the Human Officer*.
Under development.

Hough, R. *Police Practices Today: The Essentials*.
Under development with proposal to SAGE Publishing.

Hough, R. *Conditions of Confinement in Juvenile Corrections*. Under development.

Hough, R. *Private Security, Public Police*. Under development.

**Other work in progress:**

Hough, R. Signs of Resistance, research project with *Calibre Press*

Hough, R. Pursuing Policy: Implementing and Explaining Vehicle and Foot Pursuit Policies

Hough, R. Drug-out Difficulties: Jail and Lock-Up Medication Challenges

Hough, R. Use of O.C. pepper spray in the juvenile detention setting. (manuscript in progress)

Hough, R. Graduate and undergraduate research with students developing and conducting research on officer movement and reaction during face-to-face interactions.

Hough, R. HOLMES and Watson: Contemporary Detectives and Technology. (manuscript in progress)

Hough, R. Murder Down the Block: Confrontational Homicide in Context.
(manuscript in progress)

**CONTINUING CRIMINAL JUSTICE EDUCATION**

Completed more than 3,000 hours of advanced and in-service training including (**sample**):
  Florida Criminal Justice Executive Institute (FDLE);
  Command School at the Institute for Police Technology and Management (IPTM);
  Advanced Threat Assessment Academy (2011, 2019) Gavin de Becker;
  Internal Affairs Investigations DLG; Constitutional Use of Force by *Calibre Press;*
  The Investigation Management and Use of Lethal and Less Lethal Force by AELE;
  Schizophrenia by Wesleyan University;
  Psychological Autopsy certification training American Association of Suicidology;
  Certificate in Investigative Psychology, John Jay College of Criminal Justice;
  Increased Civil Unrest by ASIS;

Assessing, Understanding, Managing, and Treating Chronic Suicidality hosted by the AMHCA
and AAS;
Excited Delirium Instructor by the Institute for the Prevention of In-Custody Death;
Essentials of PBSV Certificate Course – ASIS International;
Sudden Deaths Due to Natural Disease by National Association of Medical Examiners;
Human Factors in Force Encounters – VirTra.


**MEDIA**

Frequently interviewed by news media on criminal justice topics.


**CONFERENCE PRESENTATIONS**

Hough, R. & Moreale, S. Unlocking Reform: Lessons from the Pulaski County Jail Experiment
Featured in the Netflix Series Unlocked: A Jail Experiment. September 2024

Hough, Richard M. Foot Pursuit Risks and Injuries. Southern Criminal Justice Association (SCJA)
Annual Conference, September 2024

Hough, Richard M. Suicide by Cop: Instructor Development. Annual international conference of
the International Law Enforcement Educators and Trainers Association (ILEETA), March 2024.

Hough, Richard M. In (Foot) Pursuit of Justice. Southeastern Conference on Public
Administration, September 2023.

Hough, Richard M.  Problem Oriented Policing and the S.A.R.A. Model, Edinburg, Texas Police
Department, August 2023.

Hough, Richard M.  Suicide by Cop, Train-the-Trainer, Edinburg, Texas Police Department,
August 2023.

Hough, Richard M.  Foot Pursuits, Edinburg, Texas Police Department, August 2023.

Hough, Richard M. The Unintended Weaponization of CIT. Workshop, Annual conference CIT
International, August 2023.
Hough, R. (2023). "The Challenges of Classifying Suicide by Cop," Conference Proceedings of
the Homicide Research Working Group Annual Meeting.

Hough, Richard M. Challenges Classifying Suicide by Cop (SbC). Homicide Research Working
Group (HRWG) Annual Meeting, June 2023.

Hough, Richard M. Event Termination Response/Foot Pursuit; Public Policy/Public
Administration segment. Florida Political Science Association, Annual Conference, April 2023.

Hough, Richard. Law Enforcement Policy Evolution: Response to Mass Shooting. Southeastern
Conference on Public Administration. 2022 Annual conference.

Hough, Richard. Six Shootings in Sixty Minutes. 2022 International Association for Identification
annual conference. July 2022.

Hough, Richard. Officer-Involved Shooting Policies. Southeastern Conference on Public Administration. September 2021.

Hough, Richard. Shots Fired! Was that you or me? Psychological and physiological factors in police shootings. Applied Cognitive Psychology in Forensic Settings, Queen Margaret University, Edinburgh, Scotland and the Scottish Institute for Policing Research. May 2021

Hough, Richard and Squires, Peter. Comparing TASER usage in the UK and the US. British Society of Criminology annual conference, 2020 (postponed)

Hough, Richard and James, Adrian. The Detective Dilemma. British Society of Criminology annual conference, 2020 (postponed)

Hough, Richard M., McCorkle, K., and Morales, N. Challenges to Homicide Investigations. Homicide Research Working Group (HRWG) Annual Meeting, May-June 2019.

Hough, Richard M. Public Integrity 20th Anniversary Symposium, Administrative Evil and the Use of Deadly Force in Law Enforcement. American Society of Public Administration, Annual Conference, March 2019. (Invited)

Hough, Richard M. The Policy Challenges of Drug Contraband in Jails and Detention Centers; Public Policy/Public Administration segment. Florida Political Science Association, Annual Conference, March 2019.

Hough, Richard M. Comparing U.S. and U.K. Detectives. American Society of Criminology (ASC) annual meeting, November 2018

Hough, Richard M. Logistics of the Mass Shooting Scene. Homicide Research Working Group (HRWG) Annual Meeting, June 2018.

Hough, Richard M. Street-Level Decision-Making. Annual international conference of the International Law Enforcement Educators and Trainers Association (ILEETA), March 2018.

Hough, Richard M. Administrative Evil and the Use of Deadly Force in Law Enforcement. American Society of Public Administration, Annual Conference, March 2018.

Hough, Richard M. The Policy of Force. Southeastern Conference on Public Administration, Annual Conference, October 2017.

Hough, Richard M. Police Lethal Force Frequency in the Culture of the Gun. British Society of Criminology, Annual Conference, July 2017.

Hough, Richard M. Chair and Discussant: Investigative Panel; presentation - Investigative Practices in Homicide. Effective homicide investigation outcomes: What is there besides clearance? Through the eyes of the beholder: The investigator's view of the good homicide investigation. Homicide Research Working Group (HRWG) Annual Meeting, June 2017.

Hough, Richard M. The Future of Physical Techniques in Defensive Tactics. Annual international conference of the International Law Enforcement Educators and Trainers Association (ILEETA), March 2017

Hough, Richard M. Homicide Investigations: Best Practices. Annual national conference of the Parents of Murdered Children (POMC), July 2016

Hough, Richard M. Participating with Criminal Justice Agencies. Annual national conference of the Parents of Murdered Children (POMC), July 2016

Hough, Richard M. Homicide Investigations: UK and USA Research Finding - Florida Homicide Investigative Practices. British Society of Criminology, Annual Conference, July 2016

Hough, Richard M. Chair and Discussant, Young People, Violence, and Homicide: American Homicide. British Society of Criminology, Annual Conference, July 2016

Hough, Richard M. Chair and Discussant: Investigative Practices in Homicide. Homicide Research Working Group (HRWG) Annual Meeting, June 2016.

Hough, Richard M. Florida Homicide Investigation Practices: Smaller Agency Perspective. Paper presented at the Academy of Criminal Justice Sciences (ACJS) Annual Meeting, March 2016.

Hough, Richard M. Investigating Florida Murder: Law Enforcement Practices, Southern Criminal Justice Association (SCJA) Annual Conference, September 2015

Hough, Richard M. Murder down the Block. Annual national conference of the Parents of Murdered Children (POMC), July 2015

Hough, Richard M. Participating with Criminal Justice Agencies and Fatality Review Teams. Annual national conference of the Parents of Murdered Children (POMC), July, 2015

Hough, Richard M. Neighborhood Violence Dynamics – Young Men and Violence. Crime Prevention Conference: Bridging the Gap. July 2015

Hough, Richard M. An Examination of Investigative Practices of Homicide Units in Florida. Homicide Research Working Group (HRWG) Annual Meeting, June 2015.

Hough, Richard M. Confrontational Violence and Homicide. Crime Prevention Conference: Bridging the Gap. August 2014

Hough, Richard M. Take a Breath: Confrontational Violence.
Homicide Research Working Group (HRWG) Annual Meeting, June 2013

"Homicide in America: An Update." Chair and Discussant.
Southern Criminal Justice Association (SCJA) Annual Conference, September 2012

Hough, Richard M. An Examination of Confrontational Homicide.
Homicide Research Working Group (HRWG) Annual Meeting, June 2012

"I Didn't Come Here to Kill You, it Just Happened. An Examination of Homicides in a Southern Jurisdiction." Presented at the Southern Criminal Justice Association Annual Conference, October 2011.

"Developing a Model Policy: Law Enforcement Use of Force." Presented at the Southern Criminal Justice Association Annual Conference, September 2010.

"Domestic Violence Fatality Review Teams." Presentation at the Academy of Criminal Justice Sciences (ACJS) Annual Meeting, March 2009.

Hough, Richard M. Domestic Violence Community Coalitions, Southern Criminal Justice Association (SCJA) Annual Conference, September 2008, *Law Enforcement Response to DV*

"Drunk and Alone in a Kmart Parking Lot: The Pedagogy of Simulations and Contemporary Attitudes toward Drinking and Driving." Paper presented at the Academy of Criminal Justice Sciences Annual Meeting, March 2008.

Hough, Richard M. Choosing Law Enforcement, Vocational Implications for Hispanics, Southern Criminal Justice Association (SCJA) Annual Conference, September 2007

Hough, Richard M. Recruitment of Hispanic Law Enforcement Officers, Academy of Criminal Justice Science (ACJS) Annual Conference, March 2007

Hough, Richard M. Domestic Violence, 3rd Annual Conflict Resolution Conference, University of West Florida, February 2007

Hough, Richard M. Career Counseling Hispanics for Criminal Justice, Troy University Annual Psychology Conference, April 2007

Hough, Richard M.  College Cops: No Looking Back. Presented at the International Association of Chiefs of Police Annual Conference, October 1995.

Hough, Richard M. The Use of Mobile Data Terminals to Enhance Community Policing. International Association of Chiefs of Police Annual Conference, October 1990.

Presented at the inaugural meeting of the Stop Turning Out Prisoners (STOP) of Florida organization, June 1991.

Panelist with former Secretary of the Florida Department of Corrections Harry Singletary for "Jails, Prisons and Community Corrections," 1993.

Presenter for Stetson Law School's annual Chiefs of Police Training conference on "Suicide Prevention in Jails and Police Lock-ups," 1995.

Moderator and panelist for several seminars at the annual conference of the International Association of Chief s of Police.


## INVITED PRESENTATIONS (Sample)

2022 September, Dynamics of lethal and less-lethal force; suicide considerations. Defense Counsel Get-Together, Florida Sheriffs Risk Fund.

2022 July, Active Shooters & Mass Assaults: Considerations That Impact Policy and Response, Webinar for *CalibrePlus* Online Training

2022 March, Contemporary Criminal Investigation Practices, University of West Georgia

2021 October, Safety Practices for Social Work Professionals – Department of Social Work class Fall 2021, University of West Florida

2021 Police Use of Force in the U.K and the U.S., International Law Enforcement Education and Training Association, Learning Lab, Season 4

2020 December Contemporary Policing for Pensacola Rotary

2020 October Police and Race for United Church of Christ, Tallahassee, FL

2020 Selected to present in a two-part webinar series on community policing to Mexican senior police and security officials. Project funded by the U.S. Department of State Bureau of Narcotics and Law Enforcement, the Police Professionalization Exchange Program (PPEP) provides opportunities for Mexican law enforcement professionals to increase their leadership and tactical skills.

2020 Police Use of Force and Intersectionality, Campus Conversations Series, University of West Florida.

2020 *Calibre Press* Webinar – Implicit Bias.

2020 University of North Carolina, Pembroke, Police Use of Force and Race.

2020 *Calibre Press* Webinar – Impossible Position: Enforcing Gubernatorial Decrees during COVID-19.

2020 *Calibre Press* Instructor Insights vodcast: Coronavirus and Law Enforcement.

2019 4th annual Too Good To Be True: Exploring representations of crime and violence conference, Salford University, England; American Police and the Media.

2019 Liverpool John Moores University, Liverpool, England - Major Case Investigations; Police Practices; Police Use of Force.

2019 Salford University, Manchester, England - Homicide Investigations.

2019 Edge Hill University, Ormskirk, England – Police Use of Force; Major Case Investigations.

2019 Policing Discussion Group, Oxford University, Oxford, England – Legitimacy, Accountability, Police Use of Force.

2019 University of Brighton, England – comparative policing; human resources (HR) practices in policing; criminal investigations; use of force.

2019 Edinburgh University Jiu Jitsu Club, Scotland – weapons defense; police use of force (hands-on).

2019 Edinburgh Napier University, Scotland – American Criminal Justice System; Police Use of Force; Stop and Frisk

2019 Canterbury Christ Church University, England – Comparative Policing Systems; Police Use of Force.

2019 Hough, Richard M. **(Intimate partner violence and protecting the rights of women and children subject matter expert)** Conducted briefing on U.S. efforts to empower women and combat violence for **Department of State's International Visitor Leadership Program for delegation from Bangladesh, India, and Pakistan.**

2019 Hough, Richard M. **(The role of community colleges and vocational colleges in the U.S. subject matter expert)** Conducted briefing on U.S. vocational education, curriculum development, workforce development, the importance of partnerships, and on-line and distance learning for **Department of State's International Visitor Leadership Program for delegation from the People's Republic of China.**

2019 Hough, Richard M. **(Intimate partner violence and child abuse subject matter expert)** Conducted briefing on U.S. efforts to empower women and combat violence for **Department of State's International Visitor Leadership Program for one of the 2019 Women of Courage named by the Secretary of State**. Dr. Kimberly McCorkle and I briefed the honoree, Ms. Marini de Livera of **Sri Lanka**, and included six of our students so that they might benefit from the insights of the discussion and Ms. de Livera's work with women and child victims of crime.

2018 Hough, Richard 4th Amendment - Presented remarks for Constitution Day to Department of Government students and faculty, University of West Florida.

2018 Hough, Richard M. **(Gendered violence and U.S. criminal justice system subject matter expert)** Conducted briefing on U.S. police investigative methods for Police Professionalization Exchange Program for **Mexico** (PPEP), a program of the U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs (INL), through the U.S. Embassy in Mexico.

2018 Hough, Richard M. **(Intimate partner violence and policy subject matter expert)** Conducted briefing on U.S. police investigative methods for Department of State's International Visitor Leadership Program for **Japan**.

2018 Hough, Richard M. **(Intimate partner violence and child abduction subject matter expert)** Conducted briefing on U.S. efforts to empower women and combat violence for Department of State's International Visitor Leadership Program for one of the 2018 Women of Courage named by the Secretary of State. Dr. Kimberly McCorkle and I briefed the honoree, Dr. Feride Rushiti of **Kosovo**, and included eight of our students so that they might benefit from the insights of the discussion and Dr. Rushiti's work with torture victims.

2017 Hough, Richard **(homicide and investigations subject matter expert)** Interview and appearance Season Five episode of Investigation Discovery channel's series *Evil Twins*.

2017 Hough, Richard M. **(Intimate partner violence and homicide subject matter expert)**
Conducted briefing on Women's' Rights and Intimate Partner Violence and Homicide for
Department of State's International Visitor Leadership Program for 19 political and community
representatives from **Argentina, Bolivia, Chile, Cuba, Ecuador, El Salvador, Equatorial
Guinea, Guatemala, Honduras, Mexico, and Venezuela**.

2016 Hough, Richard M. **Safety in the Field**. Undergraduate and Graduate *Social Work
Leadership* and Practices classes, University of West Florida.

2016 Hough, Richard M. presentation to Capstone Criminal Justice class on how to interview for a
professional position, University of West Florida.

2015 Hough, Richard M. presentation to Public Relations class on law enforcement and public
relations, guest of President Saunders, University of West Florida.

2015 Hough, Richard M. **(Police practices subject matter expert)** Conducted U.S. State
Department wrap-up session for the National Professional Program for 11 police and community
activist representatives from **Argentina, Colombia, Ecuador, Honduras, Nicaragua, Peru, and
Venezuela**.

2015 Hough, Richard M. Murder Down the Block. Annual Conference of the Parents of Murdered
Children (POMC).

2015 Hough, Richard M. Participating with Criminal Justice Agencies and Fatality Review
Teams. Annual Conference of the Parents of Murdered Children (POMC).

2013 Hough, Richard M. Safety in the Field. Graduate *Social Work Leadership* class, University
of West Florida.

2014   Domestic Violence in the Workplace. Presented to the Department of State's International
Visitor Leadership Program Delegation from **Afghanistan** exploring Women's Economic
Empowerment.

2013   Children in the U. S. Justice System. Presented to the Department of State's International
Visitor Leadership Program Delegation from **Uruguay, Rwanda, Poland, Japan, Egypt, and
Trinidad and Tobago**.

2012   Domestic Violence and the Legal System. Presented to the Department of State's
International Visitor Leadership Program Delegation from **Afghanistan, Uzbekistan, India** and
other countries exploring Women as Political and Economic Leaders.

2012   Law Enforcement Approaches to Domestic Violence. Presented to the Department of
State's International Visitor Leadership Program Delegation from **Chile**.

2012   Innovations in U.S. Police Strategy. Presented to the Department of State's International
Visitor Leadership Program Delegation from **Moldova**.

2011 Hough, Richard M. The CSI Effect: What we can and cannot do. *Science Friday Series*, NW
Florida State College.

2011 Hough, Richard M. Session Chair and Discussant Facilitator, Homicide Research Working Group, Annual Conference.

2011 Hough, Richard M. Domestic Violence Training Forum, University of West Florida, *Threat Assessment.*

2011 Hough, Richard M. Domestic Violence, 7th Annual Conflict Resolution Conference, University of West Florida, *Workplace Violence.*

2011   Domestic Violence Fatality Review Team Report: Findings and Recommendations. Presentation to regional law enforcement agency CEO's.

2011   Domestic Violence Fatality Review Team Report: Findings and Recommendations. Presentation to the League of Women Voters.

2011   Combating Domestic Violence and Violence against Women and Children. Presented to the Department of State's International Visitor Leadership Program Delegation from **Panama**.

2011   Fatality Review Teams and Data Collection. Presented to the Department of State's International Visitor Leadership Program Delegation from **Uzbekistan** exploring Criminal Justice and Forensic Science Innovation.

2010 Fighting Gender Based Violence. Presented to Department of State's International Visitor Leadership Program Delegation from **Pakistan**.

2010 Domestic Violence and Fatality Review Teams. Conducted briefing on U.S. efforts to empower women and combat violence for **Department of State's International Visitor Leadership Program for one of the 2019 Women of Courage named by the Secretary of State; Shukria Asil, Afghanistan**.

2010 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Department of State's International Visitor Leadership Program international delegation – **Morocco**.

2010 Hough, Richard M. Domestic Violence Training Forum, University of West Florida, *Interviewing the Child Victim or Witness.*

2010 Hough, Richard M. Domestic Violence, 6th Annual Conflict Resolution Conference, University of West Florida, *Conflict Resolution at the Moment of Crisis: Police Response and Intervention*. How American law enforcement officers arrive, assess, and conduct safe interventions to deescalate potentially violent situations.

2010 Research Presentation and Training for international delegation, *Intimate Partner Violence* – **Russia**.

2010 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Presented to the Department of State's International Visitor Leadership Program international **delegation – West Bank**.

2010 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Presented to the Department of State's International Visitor Leadership Program international **delegation** – **Argentina**.

2009 Research Presentation and Training Law Enforcement and Community response to Domestic Violence for Presented to the Department of State's International Visitor Leadership Program international **delegation – Romania**.

2009 Hough, Richard M. Law Enforcement Response to Domestic Violence, 5th Annual Conflict Resolution Conference, University of West Florida.

2008 Hough, Richard M. Law Enforcement Response to Domestic Violence, 4th Annual Conflict Resolution Conference, University of West Florida.

2008 Verbal De-escalation and Conflict Resolution, FavorHouse of NW Florida.

1990-91 Guest Lecturer, twice, John F. Kennedy School of Government, Harvard University. Title: Interviewing in Social Work and Law Enforcement.

More than fifty invited presentations on various public safety topics to civic, law enforcement, and not for profit organizations.

**EXPERT WITNESS AND LITIGATION SUPPORT CONSULTANT- Past Four Years testimony;
Rule 26**

2024 Retained for Expert Witness services, State of Florida re: Police Practices; officer-involved
shooting; pursuit; report and Grand Jury presentation [Grand Jury testimony, December 2024]

2024 Retained for Expert Witness services, Andrade-Morales v. Rambosk, rebuttal re
hiring/human resources (defendant) [deposition September 2024]

2024 Retained for Expert Witness services, Pendergraft v Greer Co., OK. Case No.:  CIV-22-806-
JD Jail practices; suicide (defendant) [deposition June 2024]

2024 Retained for Expert Witness services, State of Florida re: Police Practices; use of deadly
force; report and Grand Jury presentation [Grand Jury testimony, July 2024]

2024 Retained for Expert Witness services, Talley v LaGrange P.D. Policing practices;
investigations (plaintiff) [deposition December 2024]

2023 State of Florida re: Deputy Sheriffs, Police Practices; use of deadly force [Grand Jury
testimony, January 2024]

2024 Retained for Expert Witness services, EO Scott Whitley v. Sheriff Billy Woods, Jail
Practices; suicide [deposition April 2024]

2024 Retained for Expert Witness services, E.O. Lugo v Escambia County, FL Sheriff's Office.
Police Practices; death in custody (defendant) [deposition July 2024]

2023 Retained for Expert Witness services, State of Florida v Sergio Perez, criminal case
defendant [trial testimony March 2024]

2022 Retained for Expert Witness services, Estate of Cedric Lofton (Teetz) v Sedgwick KS
Juvenile Intake and Assessment (defendant) [deposition November 2023]

2023 Retained for Expert Witness services, Davis v Orange County FL Sheriff's Office. Police
practices; arrest; use of force (defendant) [deposition October 2023]

Sandra Corbin and John Corbin v. Bill Prummell, Jr., in his official capacity as Sheriff of the
Charlotte County, Florida's Sheriff's Office et al. Case No.: 2:22-cv-00394-JES-KCD [trial
January 2025]

2023 Retained for Expert Witness services, Tsompanidis v. Tallahassee Community College,
Florida. Defensive Tactics training practices (defendant) [trial September 2023]

2023 Retained for Expert Witness services, Sexton v Bay County Florida Sheriff's Office. Police
practices; arrest, vehicle pursuit (defendant) [deposition May 2023]

2023 Retained for Expert Witness services, Lisa Vera v Orange County Florida Sheriff's Office
Police practices (defendant) [deposition March 2023]

2023 Retained for Expert Witness services, David Perez v St. John's County Florida Sheriff's Office. Police practices; narcotics arrest, use of force (defendant) [deposition October 2023]

2022 Retained for Expert Witness services, Nicole Rulli v. City of Pittsburgh, PA. Case No.: 2:20-cv-00965 Police practices; crowd control, use of force. (plaintiff) [deposition January 13, 2023]

2022 Retained for Expert Witness services, State v. Casado, regarding stand your ground (SYG) involved shooting. Office of the State Attorney, Florida's 7th Judicial Circuit. (prosecution) [deposition November 2022] [hearing November 2022]

2022 Retained for Expert Witness services, Donald Michael Outlaw v. City of Philadelphia, et al., Civil Action No.:  21-1290. Police practices; homicide investigation, investigator training (defendant) [deposition October 2022] [hearing November 2022]

2022 Retained for Expert Witness services, Ronnie Gaines v. Chip Simmons, Sheriff, Escambia County, Florida, Drake Fawcett, Emilee Bright, Brad Baker. Case No.: 3:22-cv-00635-TKW-EMT Police practices; traffic stops; presumptive drug tests (defendant) [deposition August 2022]

2022 Retained for Expert Witness services, Taylor et al. v. Sheriff Chris Nocco, Pasco County, Florida. Case No.: 8:21-cv-00555-SDM-CPT Intelligence-Led Policing (defendant) [deposition April 2022]

2021 Retained for Expert Witness services, Wade v. Miami Beach Police Department, Case No. 1:21-cv-22619-RNS. Police practices; use of force (defendant) [deposition July 2022]

2021 Retained for Expert Witness services, Altagracia Banuchi, Estate of Edward Foster v. City of Homestead and Anthony Green, Case 1:18-cv-23711-Scola Police investigative policies and practices, crime scene procedures. (defendant) [deposition March 2022]

2021 Retained for Expert Witness services, George Gerardi v. Sheriff of Lake County in his official capacity and Deputy Cleghorn, in his individual capacity, Case 5:20-cv-00517-RBD-PRL Corrections policies and practices, use of restraints. policies and practices. (defendant) [trial October 2022]

2021 Retained for Expert Witness services, Ronald Fitts v. City of Selma et al., Case Number: 2:20-CV-00322-JB-MU Police practices, K-9, policies. (defendant) [deposition October 2021]

2021 Retained for Expert Witness services, Celia Myers v. The City of Cape Coral, Florida, et al.; Case No. 2:20-CV-450-JLB-MRM Police practices; arrest; use of force. (defendant) [depositions January 2022, February 2022]

2021 Retained for Expert Witness services, Yolaisy Perez/ Estate of Lester Machado v. City of Hialeah et al., Case Number: 1:19-cv-24047-MGC Police practices; agency policies; pursuit; use of force – lethal. (defendant) [deposition September 2021]

2021 Retained for Expert Witness services, Canaan v Orange County Florida Sheriff's Office, et al. Case No.: 6:21-cv-00149-WWB-GKJ Police practices; agency policies; pursuit; use of force – lethal. (defendant) [deposition September 2022]

2021 Retained for Expert Witness services, McKinnon v. City of Sanford, Florida et al., Case Number: 6:20-cv-01358-PGB-EJK Police practices. (defendant) [deposition September 2021]

2021 Retained for Expert Witness services, Dempsey v. Sheriff Tommy Ford, et al. Case No.: 5:21-cv- 0134-TKW-MJF Inmate death; jail practices; policies; healthcare. (defendant) [deposition testimony November 2022]

2021 Retained for Expert Witness services, Keith Taig v. City of Vero Beach, Florida Case 9:21-cv-80391-DMM Police practices; criminal case investigation; sex trafficking. (defendant) [deposition August 2021]

2021 Retained for Expert Witness services, Rodriguez-Bonilla v. City of West Melbourne, Florida Case No. 6:20-cv-02235 Police practices; Baker Act; agency policies; pursuit; training. (defendant) [deposition September 2022]

2021 Retained for Expert Witness services, J.T., a minor, by and through his parents and natural guardians, Jessica Thompson and Cory Thompson v. School Board of Osceola County, Florida and Russell Gibson, Sheriff of Osceola County, Florida. Case No.: 6:19-cv-1738 Police practices; ASD juvenile Baker Act. (defendant) [deposition May 2021]

2021 Retained for Expert Witness services, Christopher Redding v. Deputy Jason Popovich. Case No: 6:21-cv-383-PGB-DCI Police practices; use of lethal force; training (defendant) [deposition April 2022]

2021 Retained for Expert Witness services, Viridiana Silva vs. City of Orlando et al., Case No.: 6:20-cv-782 Police practices; use of force – lethal. (defendant) [deposition May 2021]

2021 Retained for Expert Witness services, Estate of Cardell Vance v. Homer Deloach, Sheriff, Putnam County Sheriff's Office, et al. Case No. 3:19-cv-00999-J-39MCR Police practices; agency policies; pursuit; use of force – lethal. (defendant) [deposition May 2021]

2021 Retained for Expert Witness services, Carl Gutzmer v. David Shoar, Sheriff, St. John's Sheriff's Office Case No.: 2016-CA-001334 Police practices; IPV/DV; use of force – TASER. (defendant) [trial testimony April 2021]

2021 Retained for Expert Witness services, Clemente Javier Aguirre-Jarquin v. Dennis Lemma, Sheriff, Seminole County, et al. Case No. 20-CV-00025 Police practices; crime scene procedures, major case investigation – homicide. (defendant) [deposition March 2022]

2021 Retained for Expert Witness services, Estate of John C. Young v. David Morgan, Sheriff, Escambia County, et al. Case No. 3:20-CV-5506-MCR-EMT Police practices; agency policies; use of force – lethal. (defendant) [deposition June 2021]

2020 Retained for Expert Witness services, Andrade, Ashley Lynn v. Carmine Marceno and LCSO and John Clark; EV2018069020 Police practices; use of force. (defendant) [deposition September 2021]

2020 Retained for Expert Witness services, Russo v. City of Daytona Beach, Florida Case NO.: 2018-30906-CICI. Law enforcement practices; use of force TASER. (defendant) [hearing testimony July 2021]

2020 Retained for Expert Witness services, Sachetta v. Lake County Sheriff's Office Florida et al., Case 5:19-cv-00561-JSM-PRL, Jail death, jail practices. (defendant) [deposition September 2020]

2020 Retained for Expert Witness services, Landau, Glenn et al. v. City of Daytona Beach Florida, et al., Case No.: 6:19-CV-495-ORL-41-LRH, Investigations; police practices. (defendant) [deposition June 2020]

2020 Retained for Expert Witness services, Booker v. City of Orlando, Florida Case No.: 6:19-cv-773-Orl-37DCI. Police practices; use of force. (defendant) [deposition, April 2020]

2020 Retained for Expert Witness services, Geerts et al. v. Rutherford County, Tennessee 3:17-cv-01014. Juvenile detention practices; juvenile justice. (defendant) [deposition, May 2020]

2019 Jane Doe v. Town of Greenwich, Connecticut Det. Sgt. Reeves, and Det. Rondini. Case No.: 3:18-cv-01322-KAD. Investigations; police practices. (defendant) [deposition, May 2020]

2019 Retained for Expert Witness services, Carter v. Mina, Orlando Florida Police Department et al. Law enforcement practices; agency policies; pursuit; Intimate Partner Violence; use of force, OC/TASER. (defendant) [deposition, May 2020]

2019 Retained for Expert Witness services, Fludd v. Town of Greenwich, Connecticut. Law enforcement practices; investigations; human resources; implicit bias. (defendant) [deposition, March 2021]

2019 Retained for Expert Witness services, G.H. et al. v. Florida Department of Juvenile Justice. Juvenile detention; agency policies; pursuit; conditions of confinement; behavioral confinement. (defendant) [deposition March 2022]

2019 Retained for Expert Witness services, Baker v. City of Punta Gorda, Florida Case No.: 18-CA-840. Law enforcement practices; use of force. (defendant) [deposition, March 2020]

2019 Retained for Expert Witness services, Bush v. City of Daytona Beach, Florida Case No.: 2018-30034-CICI. Law enforcement practices; home invasion investigation. (defendant) [deposition, February 2020]

2019 Retained for Expert Witness services, Maurice Leman Jones v. Mina, in his official capacity as Sheriff of Orange County, Florida, Case No.: 2018-CA-005828-O. Law enforcement practices; vehicle stop. (defendant) [deposition, September 2022]

2019 Retained for Expert Witness services, Harris v. Rambosk et al. Case No. 2:18-cv-00017-JES-MRM, U.S. District Court, Middle District of Florida. Subject Matter Expert: Law enforcement practices; use of force. (defendant) [trial testimony December 2021]