UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO:  5:23-cv-00661


KRYSTI MERCHANT, as Personal
Representative for the Estate of
Cory Merchant, Deceased,

          Plaintiff,

vs.

BILLY WOODS, Sheriff of Marion County,
Florida, in his official capacity;
Deputy Justin Kosinski;
Deputy Dellun Miller,
Sergeant Jerome Dukes,

          Defendants.
_____/

                      All participants appearing
                      via videoconference and/or
                      teleconference

                      Friday, April 4, 2025

                      11:03 a.m. (EST) - 2:36 p.m. (EST)


VIDEOCONFERENCED

DEPOSITION OF:

PAUL M. ADEE

A P P E A R A N C E S:

    SAM HARTON, ATTORNEY AT LAW
    Romanucci and Blandin, LLC
    321 North Clark Street, Suite 900
    Chicago, Illinois    60654

        Appearing by videoconference on behalf
        of the Plaintiff

    BRUCE R. BOGAN, ATTORNEY AT LAW
    Hilyard, Bogan & Palmer, P.A.
    105 East Robinson Street, Suite 201
    Orlando, Florida    32801

        Appearing by videoconference on behalf
        of the Defendants

# I N D E X

**TESTIMONY OF PAUL M. ADEE:**

        Direct Examination - By Mr. Bogan                    5
        Cross-Examination - By Ms. Harton                  136

**CERTIFICATE OF OATH**                                     146
**CERTIFICATE OF REPORTER**                                 147

**DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION:**

    Exhibit 1 - Notice of Taking Deposition and
                duces tecum list
    Exhibit 2 - Technical Report
    Exhibit 3 - Appendix 3
    Exhibit 4 - Entire electronic file

1       The videoconferenced deposition of PAUL M. ADEE,

2    taken on behalf of the Defendants, on Friday, April 4,

3    2025, beginning at 11:03 a.m. (EST), before Candy

4    Morgan, being a Registered Professional Reporter,

5    Florida Professional Reporter, and Notary Public,

6    State of Florida at Large.

7                        - - - -

8            The attorneys and parties participating in

9    this deposition acknowledge that I, Candy Morgan, the

10   stenographer and notary public licensed in the state

11   of Florida, although not physically present with the

12   witness, have taken notice of their picture

13   identification for verification; and that I will be

14   reporting the proceedings and administering the oath

15   remotely.  This arrangement is pursuant to the Florida

16   Supreme Court Administrative Order No. AOSC-20-16 (and

17   extended by AOSC-20-23).  The parties and their

18   counsel consent to this arrangement and waive any

19   objections to this manner of reporting and my keeping

20   of this record.

21           Please indicate your agreement and/or

22   stipulation by stating your name and your agreement on

23   the record, as well as making mention of anyone else

24   present with you in the room during these proceedings.

25           So, Ms. Harton?

1          MS. HARTON:  Sam Harton for the Plaintiff and I

2     consent.

3          MR. BOGAN:  Bruce Bogan, I consent.

4          THE STENOGRAPHER:  All right.

5               Now, Mr. Adee, if you'll raise your right

6     hand, I'll put you under oath.

7               Do you solemnly swear or affirm the

8     testimony you're about to give will be the truth, the

9     whole truth and nothing but the truth, so help you

10    God?

11         PAUL MICHAEL ADEE:  I do.

12         THE STENOGRAPHER:  Thank you, sir.

13                    PAUL MICHAEL ADEE,

14  after having first been duly sworn testified as follows:

15                    DIRECT EXAMINATION

16  BY MR. BOGAN:

17    Q.   Good morning, sir.

18         Can you state your full name for the record for

19  us?

20    A.   Good morning.

21         My name is Paul Michael Adee, A-d-e-e.

22    Q.   And where are you giving the -- where are you

23  appearing at today, the address?

24    A.   I'm in my home in Plant City, Florida.

25    Q.   All right.

1            So prior to the deposition today, I know that you

2    may or may not have seen this but I need to, I guess,

3    identify, for purposes of the record, whether you were

4    provided a copy of Exhibit A that was attached to the

5    notice of taking your deposition.

6        A.    Yes, I received it this morning.

7        Q.    Okay.

8            And, again, I apologize for the lateness and so

9    what I, you know, would like to do would be to just

10   probably -- we'll mark some things that, you know, have

11   been identified, obviously, to us previously, but I want to

12   also identify if there are some things on this list that I

13   may want to get from you later.

14       A.    Sure.

15       Q.    So, first of all, I have a copy of what's been

16   previously produced to me, it's called a Technical Report,

17   and it looks like it was dated January 2nd of 2025, that

18   represents, I guess, your opinions and things that you have

19   looked at, as well as your CV and a list of the cases that

20   you have previously given testimony in.

21           So I guess my question to you -- assuming that

22   is -- well, is that the current and correct, first of all,

23   CV and list of cases that was produced in January of 2025?

24       A.    I believe I've had one more deposition since

25   then.

1        Q.    Okay.

2              And so we can add to that -- and we'll talk about

3        that in a minute -- so you've had one additional

4        deposition.

5              Have you had any trial testimony since that time?

6        A.    No, sir.

7        Q.    Okay.

8              And then, I guess it appears as though you do

9        have some additional documents which we -- I guess

10       depositions that you have reviewed and would be part of

11       your Appendix 3?

12       A.    Yes, sir.

13       Q.    Okay.  Do you have an updated Appendix 3?

14       A.    I provided that to Miss Harton prior to today.

15       Q.    Okay.

16              MR. BOGAN:  And I don't -- Sam, I don't think I

17        got that, I think I got what was just notes but I

18        didn't see an additional --

19              MS. HARTON:  I'm pretty sure in that email that I

20        sent you, I -- let me double-check -- but I sent you

21        his updated list, as well.

22              MR. BOGAN:  Okay.

23                  So, then, what we'll end up doing, then, is

24        attaching the updated appendix as a separate exhibit.

25                  So, Candy, just before we get too confusing

1    here down the road, I'm gonna mark as Exhibit No. 1

2    the Notice of Taking Deposition with the duces

3    tecum list; and, then, No. 2 will be the Technical

4    Report -- it's a composite exhibit -- which was served

5    in January -- or, excuse me, dated January 2nd of

6    2025; and then No. 3's gonna be the appendix -- the

7    supplemental appendix that, I think, Miss Harton says

8    she's already provided to me.

9            So --

10         MS. HARTON:  I'm so sorry -- sorry, Bruce, it's

11    the Appendix 3.  It's the one with the asterisks to

12    some of documents -- the new documents that I think

13    you were just looking at.

14         MR. BOGAN:  Okay.  So it's labeled Appendix 3?

15         MS. HARTON:  Yeah.

16         MR. BOGAN:  And so we'll mark it also as item No.

17    3 on the -- the exhibits here today.

18  BY MR. BOGAN:

19    Q.   And then, looking at Exhibit A to the Notice of

20  Taking Deposition, I guess, number 1, looking at -- we've

21  asked for the professional resume' or current CV.

22         Is there any changes to the CV that was pAroduced

23  previously in January?

24    A.   No, sir.

25    Q.   Okay.

```
1              And then, I guess, I need to find out, have you
2    been the author of any scientific or technical publications
3    in your field --
4         A.   No, sir.
5         Q.   -- of expert --
6              All right.  Then number 3, time records, diaries
7    and bills.
8              I know Miss Harton has sent to me here this
9    morning a number of bills that I guess her firm has
10   received from you.
11             I don't know if you've had a chance to look at
12   those, if those represent complete and up-to-date billing.
13        A.   I have not.  I assume they're up-to-date.  Our
14   billing department sends those out to the clients
15   periodically.
16        Q.   Okay.
17        A.   I don't have access to them.
18        Q.   Okay.  So the -- and we'll talk about your
19   employment here in just a second -- but -- so Robson
20   Forensic is who you are either an employee or work with and
21   they do all the billing in the case.
22        A.   That is correct.
23        Q.   Okay.
24             And so any bills that have been submitted so far
25   in the case have been through Robson Forensic.
```

```
 1        A.    That is correct.
 2        Q.    And do you work with -- or do you work off of a
 3   retainer agreement?  In other words, when you initially
 4   sign on the case, is there a retainer that you work from?
 5        A.    Yes, sir.
 6        Q.    Okay.
 7              And what's the amount of the retainer that
 8   usually is required?
 9        A.    That varies from case to case.
10        Q.    In this case, what was the retainer?
11        A.    I believe the retainer in this case was $3,000.
12              And just for clarification, I am a full-time
13   employee of Robson Forensic.
14        Q.    Okay.  Appreciate that.
15              All right.  And so then, going back to the list,
16   obviously --
17              Well, other than the bills that Robson Forensic
18   generates and is sent to the client, are there any other
19   billing records?
20        A.    No, sir.
21        Q.    And then, the -- your report, obviously, and then
22   any notes prepared, I believe Miss Harton has sent me
23   multiple emails which contain the notes that you have made
24   after reviewing the case and then, of course, we have your
25   report.
```

```
 1              Any other documents that would be responsive to
 2     our request for reports and/or notes rendered or prepared
 3     in this case?
 4          A.   I am in the process of drafting a supplemental
 5     report.  I'm waiting on additional materials, once
 6     depositions are done being taken, so it's a work in
 7     progress.
 8          Q.   Okay.
 9               And so what are you being asked to supplement?
10          A.   New information that becomes available,
11     supplement my report.
12          Q.   Supplement your report to reflect that you have
13     now had additional materials reviewed?
14          A.   Correct.
15          Q.   Okay.
16               And -- but not supplementing any new opinions or
17     providing new opinions.
18          A.   Only if the materials change my opinion, only if
19     the new materials did.
20          Q.   Okay.
21               To the extent that it -- at this point, have the
22     materials that you've reviewed in preparation of the
23     supplemental report changed your opinions?
24          A.   No, sir.
25          Q.   And when do you anticipate completing that
```

1    supplemental report?

2        A.   I'm not sure when -- when depositions are gonna

3    be done -- or taken, so I really don't know.

4        Q.   All right.

5            So in your, I guess, what you would characterize

6    as the materials that you have been provided and reviewed,

7    how do you maintain those?  Do you have one complete

8    electronic file that contains all of the materials that you

9    are -- have been provided?

10       A.   Yes, sir.  And that database is maintained by

11   Robson Forensic.

12       Q.   Okay.  So is Robson Forensic able to produce to

13   me an electronic file that contains all of the materials

14   that have been provided to you by Plaintiff's counsel?

15       A.   I don't know.  I've never been asked that

16   question, so I don't know what the answer would be to that.

17       Q.   Okay.

18            So you've never been asked in a deposition that

19   you've given so far to produce the materials that you have

20   reviewed and to support your opinions?

21       A.   Oh, I'm --

22            MS. HARTON:  Objection; that misstates his

23       testimony.

24   BY MR. BOGAN:

25       Q.   Go ahead.  You can answer.

1    A.    I've been asked for a list of materials that

2  I've -- that I have reviewed but not the actual files that

3  I've reviewed.

4    Q.    Okay.

5        So in this particular case, do you know whether

6  or not an electronic copy of the file materials can be

7  produced by Robson to me?

8    A.    I suppose they could.  It exists.

9    Q.    Okay.

10    A.    I don't know if they would.  I just don't know

11  that answer.

12    Q.    So whatever is on Appendix, I guess --

13    A.    3, I believe it is.

14    Q.    -- 3, as well as the original appendix, so I --

15  yeah.  Yeah, Appendix 3.  So, I guess -- are there two

16  Appendix 3 or is it a continuing list off the original one?

17    A.    It was a continuing list of the original one.

18    Q.    Okay.  So all -- everything should be listed on

19  the current Appendix 3; is that --

20    A.    Yes.

21    Q.    Okay.

22        And a -- if I request an electronic copy of

23  Appendix 3, you can ask for it to be produced in an

24  electronic format to me for purposes of this deposition?

25    A.    Are you asking for the entire file, the actual

 1  physical electronic documents or just the list?

 2      Q.   I'm asking for all of the electronic documents,

 3  yes.

 4      A.   I could ask, I just don't know if they would give

 5  it to you.

 6      Q.   Okay.  And -- all right.

 7      A.   I've never been asked.  I don't know the answer

 8  to that.

 9      Q.   Well, I don't think it's particularly an unusual

10  request, to be honest with you but -- so I can't think of

11  any expert deposition I've ever taken in 38 years where

12  I've never asked for a complete copy of the materials that

13  the expert has reviewed.  But in any event that doesn't

14  make it any better or worse.

15          But what I'm asking you is, what I would like to

16  have done is a copy of those materials sent to me

17  electronically and I'm going to mark, for purposes of this

18  deposition, that electronic file as Exhibit No. 4.

19          MS. HARTON:  Bruce, I'm gonna just object.  Rule

20      26 only requires a list of his -- of his documents.

21      It doesn't require him to produce to you a Dropbox

22      link of everything that's been disclosed in this case.

23          MR. BOGAN:  Well, it's a little different than

24      what is a Rule 26 disclosure.  We're now in a

25      deposition and so this is entirely separate from what

1          has to be produced during the time you disclose him as

2          an expert.  So I'm entitled to it and I think I can

3          get a copy of those documents electronically.  I don't

4          think it's all that unusual nor is it that difficult,

5          I wouldn't think, for -- if they have them stored

6          electronically, to just put them in electronic format

7          and send them to me, so that's what I'm asking to be

8          done.

9     BY MR. BOGAN:

10         Q.    So let's go on to the next thing here.

11               I'm assuming -- well, correct me -- have you --

12    outside of what's contained in what we're gonna mark as --

13               MR. BOGAN:  Did I say that was Exhibit 4, Candy?

14               THE STENOGRAPHER:  Yes, sir.

15    BY MR. BOGAN:

16         Q.    Outside of Exhibit 4, are there any other medical

17    records, hospital records, or other documents that you

18    reviewed in the case?

19         A.    No, sir.

20         Q.    And would the same go for investigative files

21    that were utilized by you in any manner --

22         A.    No, sir.

23         Q.    -- number 8?

24               Okay.

25               Number 9, does it include, also, in Exhibit 4,

1    the audio files that you reviewed?

2        A.    It would include everything.

3        Q.    Gotcha.

4            Would it also include item number 10, policies

5    and procedures of the Marion County Sheriff?

6        A.    Yes, sir.

7        Q.    And then, number 11 -- so, again, 11 would

8    encompass all of the documents that would be contained

9    within what we're calling Exhibit No. 4, your file

10   materials?

11       A.    It would contain that, as well.

12       Q.    Okay.

13            Number 12, do you have any articles that you've

14   authored or co-authored or contributed to concerning --

15   that might be applicable to this case?

16       A.    No, sir.

17       Q.    And I would assume the same would apply to any

18   publication or syllabus or other handout that you have ever

19   used during a lecture or presentation that relates to this

20   case.

21       A.    You would be correct in that assumption.

22       Q.    Okay.

23            Any tables or charts that are referred to in your

24   report?

25       A.    Only the stuff that's in my report.

```
 1        Q.   Okay.

 2             And in your report do you actually cite to any

 3   authoritative text?

 4        A.   Related to my --

 5        Q.   Yeah, any of your opinions.

 6             Yeah, I know you cite to -- I think it was the

 7   U.S. Department of Justice, if I'm not mistaken.

 8        A.   I cited several resources that I utilized in

 9   supporting my opinion.

10        Q.   Okay.

11             MS. HARTON:  I'm sorry, I was on mute but I did

12        object to the question.

13                  Object to form.

14   BY MR. BOGAN:

15        Q.   And I apologize if I misquoted it as the

16   Department of Justice.  It would have been the U.S. -- it

17   was the National Institute of Corrections.  You have

18   quoted, I think, several of the passages from that source.

19             Do you actually have the document, itself, or is

20   that something you looked up and then relied upon

21   electronically?

22        A.   I actually relied upon it electronically.

23        Q.   Okay.

24             Did you rely upon any policies and procedures

25   from the Hillsborough County Sheriff's Office in
```

```
 1    preparation of your report?
 2         A.   No, sir.
 3         Q.   Do you have copies of the Hillsborough County
 4    Sheriff's Office Corrections policies and procedures?
 5         A.   No, sir.
 6         Q.   Okay.  Going back to my list here -- so I
 7    don't -- I don't believe you've done any calculations but
 8    are there any calculations -- documents showing
 9    calculations you performed in this case?
10         A.   I think I -- I believe I provided percentages of
11    how often the watches were -- began at certain times and
12    how -- how long they took at certain times but my
13    calculations are listed -- are listed within my report.
14         Q.   Okay.
15              And there's no separate document that you
16    prepared --
17         A.   No, sir.
18         Q.   -- concerning any calculations?
19         A.   No, sir.
20         Q.   So number 17 is the list of cases and -- so
21    you've got one new cases -- one new case and I don't
22    remember --
23              Well, do you know the name of that case off the
24    top of your head?
25         A.   Off the top of my head, no, but I could look it
```

 1  up if you'd like.

 2      Q.   Okay.  Could you do that for me?  I'd appreciate

 3  it.

 4      A.   Okay.  If you're ready, it is Chantelle Maria

 5  Marler, individually, and on behalf of her minor child,

 6  HLM, versus Sheriff Mark Wood, RPSO Deputies John and Jane

 7  Does 1 through 10, Unknown Medical Service Provider and

 8  Medical Staff Members John and Jane Does 11 through 20,

 9  Case No. 1:22-cv-02460.  That's in the United States

10  District Court of West -- of the Western District of

11  Louisiana, Alexandria Division.

12      Q.   All right.

13           Can you spell the -- Chantelle's last name for

14  the court reporter?

15      A.   Yes.  M-a-r-l-e-r.

16           THE STENOGRAPHER:  Thank you.

17           THE WITNESS:  You're very welcome.

18  BY MR. BOGAN:

19      Q.   And you've given a deposition in that case?

20      A.   Yes, sir.

21      Q.   And when was that?

22      A.   Oh, I shouldn't have closed it that quickly.

23           That was February 13th of 2025.

24      Q.   All right.

25           Is that case still going on?

```
 1         A.    To the best of my knowledge, it is.

 2         Q.    All right.

 3         A.    Are we done with that?

 4         Q.    Yes, you can close it.

 5               So do you have deposition transcripts from all of

 6    the depositions that you've given?

 7         A.    I don't have any deposition transcripts.

 8         Q.    Okay.

 9               So are there any documents that are contained

10    within your prior materials that describe the scope of your

11    employment in this case?

12         A.    Other than what's in the report itself, there is

13    nothing else.

14               And there's a small paragraph in the report that

15    discusses that.

16         Q.    Number 21, I guess Robson Forensic is an entity

17    that your -- is your employer; is that what you described?

18         A.    Correct.

19         Q.    And does Robson Forensic do advertising?

20         A.    Absolutely.

21         Q.    And in what media forms do they do advertising?

22         A.    I'm not -- I'm not part of that.  I'm sure it's

23    social media, as well as direct marketing via email.

24         Q.    Okay.

25         A.    I know I've also done -- done a webinar through
```

1   Robson Forensic.  It's all on our website.

2        Q.    Okay.

3              And I was mispronouncing it.  I guess it's

4   Robson?

5        A.    Correct.

6        Q.    Does Robson Forensic do any television

7   commercials in the form of media, television broadcasts,

8   and things of that nature?

9        A.    Not that I'm aware of.

10       Q.    Have you ever appeared as an expert in your field

11  on any media -- news media formats to give an opinion about

12  a case that is being reported by the media?

13       A.    I believe I was interviewed by the -- I think the

14  Washington Post at one point regarding a case.

15       Q.    That was a written --

16       A.    It was a written article.

17       Q.    Okay.

18             And how long ago was that?

19       A.    Oh, year and a half to two years ago.  It was

20  pretty close to right after starting with Robson.

21       Q.    Okay.

22             Did you do any consulting work while you were

23  still employed at the Hillsborough County Sheriff?

24       A.    No, sir.

25       Q.    Have you ever previously worked on any cases with

1    the Romanucci & Blandin law firm?

2        A.    No, sir.

3        Q.    And how about Mr. Slater, the -- Slater Legal

4    PLLC, that firm?

5        A.    No, sir.

6        Q.    All right.

7            Can we agree that there is no document and

8    history of any fight between the decedent, Cory Merchant,

9    and Eric Lutterloah before November 7th of 2021?

10       A.    I haven't seen any.

11       Q.    Okay.  In your review of the case.

12       A.    Correct.

13       Q.    Okay.

14            And in your review of the case, did you see any

15   history of any disagreement or dispute between Cory

16   Merchant and the Defendants in this case, individually --

17   and we'll take them individually -- Deputy Miller, for

18   example?  Do you see anything in there in the history

19   between Merchant and Miller that would give you concern

20   that they had some sort of disagreement in the past?

21       A.    No, sir.

22       Q.    Did you see anything in your review of the case

23   that would suggest that Mr. Merchant and Deputy Kosinski

24   had had any sort of disagreement, dispute or reason that

25   would cause you concern in the past as to their

```
 1   relationship?

 2        A.   No, sir.

 3        Q.   And the same question for Sergeant Dukes, did you

 4   see anything in your review of the case that suggested

 5   Sergeant Dukes and Cory Merchant had had any disagreements

 6   or problems in the past before this incident?

 7        A.   No, sir.

 8        Q.   So can you see any reason whatsoever that would

 9   support an argument that they -- the Defendants in this

10   case were in any way acting in a manner that would be

11   deliberately contrary to the rights of Mr. Merchant?

12             MS. HARTON:   I'm gonna object to the form.

13   BY MR. BOGAN:

14        Q.   You can answer.

15        A.   No, sir.

16        Q.   Okay.

17             Can we agree that there is no reported or

18   documented request for a keep-away from --

19             Well, strike that.  Let me reask the question.

20             Can we agree that there is no reported request

21   for a keep-away by the decedent, Cory Merchant, against

22   Eric Lutterloah?

23        A.   Not in the materials that I reviewed.

24        Q.   Okay.

25             And can we agree, also, in the materials that
```

1   you've reviewed, that there was no report or documented

2   request by Eric Lutterloah seeking a keep-away from Cory

3   Merchant?

4       A.   Yes, sir.

5       Q.   And can we agree that, based upon your review of

6   the case, that Cory Merchant was obviously aware that he

7   could request a keep-away because he had done so in the

8   past with other inmates?

9            MS. HARTON:  Objection to the form.

10           THE WITNESS:  Yes, sir.

11  BY MR. BOGAN:

12      Q.   And, in fact, that information is also -- well,

13  before I ask you this, let me ask you this way:  Would you

14  agree with me there was documentation that reflects that

15  Cory Merchant was provided with an inmate handbook by the

16  Marion County Sheriff when he was in the facility?

17      A.   I don't recall offhand that he -- that there's

18  proof that he received one.  I'm not sure.  He may have.

19      Q.   Okay.

20           So are you aware whether or not that information

21  was contained within the Marion County Jail's inmate

22  handbook; in other words, that it describes the process

23  where you can request for a keep-away?

24      A.   I don't recall if that information's in the

25  handbook.

1    Q.   Can we agree that there -- in terms of your

2   review of the case and the documents that you've looked

3   at -- that there's no evidence of any disputes or arguments

4   between Lutterloah and Merchant before the point where

5   Lutterloah, that evening of November 7th, gets out of his

6   bunk and goes over and confronts Merchant and then they

7   begin to have some words or disagreement and a few seconds

8   later, a three-punch fight occurs?

9            MS. HARTON:  Object to the form.

10           THE WITNESS:  I don't remember if I'm supposed to

11       be -- if you asked me if we can agree on that or not.

12   BY MR. BOGAN:

13    Q.   Yeah.

14    A.   I don't recall any other incidents wherein

15   Lutterloah and Merchant had a verbal or a physical

16   altercation prior to that date.

17    Q.   Okay.

18           And nor did anybody else report, at any point

19   later during the post-incident investigation, that there

20   had been an ongoing dispute of some kind between Merchant

21   and Lutterloah before that night when they had a fight?

22    A.   I don't recall seeing anything that would

23   indicate that.

24    Q.   And in terms of the fight itself, would you agree

25   with me it was essential a three-punch fight?

1        A.    It was a -- it was -- it was quick.

2        Q.    And after the third punch, Mr. Merchant went to

3    the ground, hit his head on the concrete floor, and

4    according to the medical examiner he sustained a serious

5    head injury as a result of that.

6        A.    I'm not sure if he hit his head on the floor or

7    not.

8        Q.    Would you agree with me that the medical examiner

9    found that he had a serious head injury and that was the

10   cause of his death?

11       A.    I would agree with that.

12       Q.    You have no -- you know -- no, I guess, reason to

13   dispute that the floor caused the head injury when he hit

14   the ground.

15       A.    It may have.

16       Q.    Did you time the fight?

17       A.    I did not.

18       Q.    So would you dispute if I told you that the total

19   amount of time between the point when Lutterloah gets out

20   of his bunk and walks over to Merchant, who is already out

21   of his bunk, and they have words, the fight occurs and he

22   goes to the ground or out of -- or at least out of the

23   picture, that it's approximately 20 seconds?

24       A.    I have no reason to dispute that.

25       Q.    Okay.

```
 1              And it appears as though that this is a rather
 2    spontaneous and quick fight; would that be a fair way to
 3    characterize it?
 4              MS. HARTON:  Object to form.
 5              THE WITNESS:  That would be fair.
 6    BY MR. BOGAN:
 7         Q.   Now, in terms of housing, let me ask you
 8    this:  You're aware that, I guess, Merchant had a prior
 9    conviction for domestic battery?
10         A.   I believe I recall seeing that.
11         Q.   Okay.
12              And, in fact, he was actually coming directly
13    from the Department of Corrections to the Marion County
14    Jail after he was charged on the child sexual battery case;
15    isn't that correct?
16              MS. HARTON:  Object to form.
17              THE WITNESS:  I don't recall seeing anything that
18         indicated that he was coming from the Department of
19         Corrections to the Marion County Jail.
20    BY MR. BOGAN:
21         Q.   You don't recall that?  Okay.
22         A.   I don't recall that.
23         Q.   You're aware he was serving a Department of
24    Corrections sentence that ended in 2019?
25         A.   No, I'm not aware of that.
```

1      Q.    You're not aware of that.  Okay.

2            Would that make a difference to you in terms of

3    classification in housing?

4      A.    Not necessarily.

5      Q.    Okay.

6            And why not?

7      A.    Because I don't know what the charges were.

8      Q.    Okay.

9            Do you know, in terms of Merchant's housing at

10   the Marion County Jail, whether the entire time he was

11   there, from 2019 until November of 2021, that he was always

12   housed in the G Pod?

13     A.    I believe that's accurate.

14     Q.    So have you been provided a copy of his housing

15   log or a report that shows where he was housed the entire

16   time?

17     A.    I would have to look back through my case notes.

18     Q.    The Housing Movement Report, in other words, I

19   think is the actual correct word for it.

20     A.    I may have but I would have to look back through

21   my reports -- or my notes.

22     Q.    He was -- if I indicated to you that he was

23   placed at various times in Medical, in H -- H, B and F

24   pods, you have no reason to believe that would be

25   inaccurate at this point?

1          A.    I vaguely remember him going to Medical at

2     some -- being housed in Medical at some point, so I don't

3     have any reason to dispute that.

4          Q.    Okay.

5               And then he was placed in disciplinary

6     confinement for, I think, at least two occasions in 2021?

7          A.    I -- that may be accurate.  I -- I'd have to look

8     at my case notes.

9          Q.    Once for fighting and then the other from being

10    combative and disrespectful to the corrections officers?

11         A.    I remember seeing a report where he was written

12    up by the corrections staff.  Again, I don't have any

13    reason to dispute that.

14         Q.    Okay.

15              So Merchant's classification level at the jail in

16    2019 was what's called Medium in a pre-sentence status; is

17    that fair?

18         A.    It was a Medium 5.

19         Q.    Okay.

20              And do you disagree with that category for him?

21         A.    I do not.

22         Q.    So that Medium 5 would have been an appropriate

23    level of classification for Cory Merchant in your opinion.

24         A.    Based on what I've reviewed, yes.

25         Q.    Okay.

1           And what you have reviewed is the classification

2    paperwork that is generated for Mr. Merchant -- as well as

3    any inmate in the facility has the same type of

4    classification; is that fair?

5        A.   Yes, sir.

6        Q.   And that's -- that's according to their policies

7    and procedures of the Marion County Jail that all of the

8    inmates that are being housed and detained in the facility

9    go through a classification process.

10       A.   Yes, sir.

11       Q.   And that classification process includes

12   analyzing the inmate's not only current status but past

13   charges, as well as their past incarcerations?

14       A.    It encompasses current and past charges, current

15   and past behavior histories, anything that might lend

16   credence to where they should be housed, yes.

17       Q.   So, in terms of Eric Lutterloah, what is your

18   understanding of what his classification level was?

19       A.   He was a Medium 3.

20       Q.   Okay.

21           And --

22       A.   Which is on the upper end of that medium spectrum

23   closest to the maximum security.

24       Q.   And do you believe that Mr. Lutterloah was

25   appropriately classified as a Medium 3?

1      A.   Without analyzing their actual classification

2   system and seeing how they -- how things are given the

3   points to get him to that, I can't necessarily agree with

4   that.

5           I agree that he is -- based on his current

6   charges, is -- his security level or classification level

7   should be higher than that of Cory Merchant's.

8      Q.   Okay.

9           And it was, I guess, according to at least what

10  your --

11     A.   Yes.

12     Q.   -- understanding is, it was --

13     A.   Yes.

14     Q.   -- five numbers?  Okay.

15          So in reviewing -- and, again, I apologize -- I

16  think I have a complete list of all the documents that you

17  looked at.  I -- I don't remember if you saw the Florida

18  Model Jail Inspections for the Marion County Jail.  Is that

19  something you've reviewed?

20     A.   I don't recall that.

21          If I could look at my list, I would be able to

22  tell you.

23     Q.   Yeah.  Go right ahead.

24          MS. HARTON:  Sorry.  Bruce, did you say the Model

25      Jail Standards or the inspections?

1          MR. BOGAN:  I said the Florida Model Jail

2      Standard Inspection.

3              Well, yeah, probably just a Florida Model

4      Jail Inspection as opposed to standards.

5          MS. HARTON:  You're not referring to the

6      standards, themselves, you're referring to the

7      inspections that are related to the standards.

8          MR. BOGAN:  Correct.

9          MS. HARTON:  Okay.

10         THE WITNESS:  I don't recall seeing that and I

11     don't see it listed in my list of documents that I

12     reviewed.

13 BY MR. BOGAN:

14     Q.   Okay.

15          As somebody who's worked in the Hillsborough

16 County Jail for -- I guess, for almost 25 years or --

17     A.   30 -- 30 years.

18     Q.   -- 30 years -- okay -- you would expect that the

19 Marion County Jail would undergo, as required by Florida

20 law, an inspection of its facility on a -- on a regular

21 basis.  Would you agree with that?

22     A.   Yes, sir.

23     Q.   And that would include an inspection related to

24 whether they are in compliance with the Florida Model Jail

25 Standards, correct?

1      A.    Yes, sir.

2      Q.    Okay.

3            And, as far as you are aware, do you know, as you

4   sit here today, whether Marion County had passed the

5   Florida Model Jail's inspection in the year 2021 or the

6   year previous, 2020?

7      A.    I don't recall seeing any documents to indicate

8   one way or the other.

9      Q.    Okay.

10           Are you familiar with -- well, strike that.

11           Have you ever served as an inspector for a

12  Florida Model Jail Standards inspection?

13     A.    Yes, I have.

14     Q.    Okay.

15           And have you ever inspected the Marion County

16  Jail for a Florida Model Jail Standards inspection?

17     A.    I don't believe that I've conducted a formal

18  inspection of it.

19           I remember being in Marion County for -- I

20  believe it was either a meeting or a class related to the

21  jail standards because I attended those, as well.  But I

22  don't -- I don't believe that I've ever participated in a

23  formal inspection at that facility.

24     Q.    Okay.

25           You would agree with me that, as an inspector or

1    someone who's done an inspection in the past, that one of

2    the things that you are looking at is the policies and

3    procedures of the -- the written policies and procedures of

4    the facility under -- under the process of the Florida

5    Model Jail Standards.

6        A.   I'm making sure that they conform to or comport

7    with the Florida Model Jail Standards, themselves, which

8    may or may not be comprehensive in that particular subject

9    or it may be vague in that particular subject.  But what we

10   are looking for is that the facility actually comports with

11   what is prescribed by the jail standards.

12       Q.   And as far as jail standards that are set forth

13   in the Florida Model Jail Standards, would you agree with

14   me that includes topics such as a classification of

15   inmates?

16       A.   It does.

17       Q.   And it includes topics such as the housing and

18   the supervision of inmates in their housing units?

19       A.   It does.

20       Q.   It would include topics that include security of

21   the inmates.

22       A.   It does.

23       Q.   It would include topics that relate to the use of

24   force on inmates.

25       A.   It does.

```
1        Q.    Okay.

2              It would include policies and procedures related

3   to the supervision of corrections officers.

4        A.    It does not -- it does not have policies and

5   procedures in there.  What -- typically, what the jail

6   standard says is that there has to be a policy and

7   procedure in these different areas.  It does not tell you

8   what the policies and procedures need to be.  It's very --

9   it's typically from about a 30,000-foot view and they leave

10  it up to the agency to develop the policy itself and how

11  deep in the weeds they go.

12       Q.    It provides certain minimum standards, if I'm not

13  mistaken, doesn't it?

14       A.    It may in some instances and in some -- the

15  minimum standard may actually say you must have a policy

16  and procedure regarding tool control.  It doesn't

17  necessarily say how your policy and procedure has to be

18  laid out, it just says a very general statement that you

19  have to have a policy.  It doesn't tell you what the policy

20  is supposed to be.

21       Q.    So let me ask you this way:  Have you consulted

22  with the Florida Model Jail Standards for purposes of your

23  analysis in this case?

24       A.    I have reviewed it.  I've reviewed the November

25  14th, 2022 version that's listed as number 68 in the
```

```
 1    documents that I reviewed.

 2         Q.    Okay.

 3              And in your review of the, I guess, the '22

 4    version, did you find that, in your opinion, there were

 5    some policies and procedures of the Marion County Jail that

 6    were not in compliance with the Florida Model Jail

 7    Standards?

 8         A.    They were in compliance with the jail standards.

 9         Q.    Okay.

10              Are you aware of whether or not the Marion County

11    Jail is accredited by the Florida Corrections Accreditation

12    Commission?

13         A.    I would have to review my -- again, my list of

14    documents.

15         Q.    Okay.

16              If -- and I'll just represent to you -- I mean,

17    if you want to look it up, go ahead and look it up, but I'm

18    gonna represent to you that they are FCAC certified.

19         A.    I haven't received any documents that indicate

20    that.

21         Q.    Okay.

22              So did you review any FCAC certifications or

23    requirements for certifications in this particular case?

24         A.    As it related to how often they are to conduct

25    well-being, wellness or safety checks, yes, I did.
```

```
 1        Q.   Okay.

 2             And so -- and what did you -- what was your

 3   conclusion about well-being or safety checks as it relates

 4   to FCAC requirements?

 5        A.   If I was to opine on that, I -- that was not part

 6   of my -- my report but they were in compliance with the

 7   FCAC Standard.

 8        Q.   Okay.

 9             So FCAC Standards specifically set forth some

10   timing in terms of what your understanding for how often

11   well-being or security checks should be done?

12        A.   That's --

13             MS. HARTON:  Object to the form.

14                  (Discussion off the record)

15   BY MR. BOGAN:

16        Q.   Does the FCAC requirements set forth a specific

17   timing for conducting well-being and security checks?

18             MS. HARTON:  Object to form.

19             THE WITNESS:  It does set forth a specific

20        timing.

21   BY MR. BOGAN:

22        Q.   And what's your recollection of what the timing

23   is in FCAC?

24        A.   If my memory serves me correctly, it was either

25   10:00 p.m. or 11:00 p.m. to 6:00 a.m. -- 6:00 a.m. in the
```

```
 1   morning that hourly checks were required.
 2       Q.   All right.
 3            Does that -- well, strike that, first of all.
 4            Have you ever conducted inspections for FCAC?
 5       A.   I have not.
 6       Q.   And is the requirements for an ACA certification
 7   similar to FCAC?
 8       A.   I assume that they're pretty similar.
 9       Q.   Do you know if the standards, as it relates to
10   how often well-being checks or security checks are
11   performed, is different under the ACA than the FCAC?
12       A.   That, I don't know.
13       Q.   Okay.
14            And, I guess, similar question, have you ever
15   conducted inspections for the ACA certification?
16       A.   I have not.
17       Q.   So, in terms of the cases where you've been
18   permitted to -- well, I guess, you've not been permitted to
19   testify in a courtroom -- I want to make sure I got that
20   correct, first -- but you've never gone into a courtroom
21   anywhere and testified as an expert in corrections
22   practices and procedures.
23       A.   I have not.
24       Q.   And the -- in the three cases that you have
25   testified, were you involved in -- well, let's just take
```

```
 1    them one at a time.

 2              So this French versus Mosley Architects case,

 3    were you retained there as a corrections expert?

 4         A.   I was.

 5         Q.   And what was the general nature of the

 6    corrections field that you're talking about there?

 7         A.   I'm not permitted to discuss that based upon a

 8    confidentiality agreement that I've signed with my firm.

 9         Q.   Okay.

10              So with your firm's confidentiality agreement,

11    does that mean that you're not allowed to talk about any

12    case that you've ever given either a deposition or a report

13    on?

14         A.   That's my understanding of it, yes, sir.

15         Q.   Okay.

16              So as far as you understand, has anyone ever

17    challenged that in terms of your employer's able -- ability

18    to enforce that?

19         A.   I don't know.

20              That's way beyond my -- my level in the firm.

21         Q.   Okay.

22              So is the French case still an ongoing case?

23         A.   I don't think so but I'm not a hundred percent

24    sure.

25         Q.   All right.
```

1          And the French case was not a federal court case;
2   is that fair?
3       A.   I'd have to look at my list.  I believe it was a
4   state court case.
5       Q.   Yeah.  I mean, it looks like South Carolina Court
6   of Common Pleas, which I'm assuming must be a state court
7   case.
8       A.   Yes, sir.
9       Q.   And then Joshua Brown versus Gail Watts, same
10  question, can you tell me were you there providing
11  testimony in that deposition concerning the field of
12  corrections?
13      A.   Yes, sir.
14      Q.   And you were offered as an expert in the field of
15  corrections on what subject matter?
16      A.   Again, I cannot -- I can't tell you that based on
17  my confidentiality agreement.
18      Q.   And the same goes with this Marker -- Marler
19  case.  Obviously, that one is in federal court and there
20  you gave a deposition.  Again, were you giving opinions as
21  an expert in corrections?
22      A.   Yes, sir.
23      Q.   And what was the subject matter in the field of
24  corrections?
25      A.   I'm not able to disclose that based upon the

```
 1   confidentiality agreement that I signed.

 2        Q.   So have you ever been the subject of a Daubert

 3   motion in any of those three cases?

 4        A.   Not that I'm aware of.

 5        Q.   Okay.

 6             So you're not familiar with the fact that, I

 7   guess, in the Smith case there was a request to have your

 8   testimony limited?

 9        A.   What case?

10        Q.   In the Miranda Smith -- which is the Estate of

11   Alvis Shrewsbury and it's, I guess, a West Virginia

12   Division of Corrections and Rehabilitation.

13        A.   I'm familiar with the case.

14        Q.   And it was in federal court in Beckley, West

15   Virginia, it looks like?

16        A.   That would stand to reason.

17        Q.   So is that the one that's still going on?

18        A.   I -- I -- first of all, what -- what was -- what

19   did you find?  What type of motion was in there?

20        Q.   So I'm looking at a memo and an order that was by

21   the court where, I guess, there was a limitation of your

22   ability to give an opinion about whether the death of Mr.

23   Shrewsbury was preventable.  When I say -- yeah, I said

24   preventable.

25             And although they said you were certainly capable
```

1   of rendering opinions about customs, practices and

2   procedures, you were not permitted to give an opinion about

3   whether his death would have been preventable.

4        A.   Which is news to me.

5        Q.   Okay.

6             So -- and I'll just -- just so you know, that

7   order is dated September 13th of 2024.

8        A.   Thank you.

9        Q.   So, other than that, are you aware of any other

10  attempts to limit or prevent your testimony from being

11  given in a courtroom?

12       A.   No, sir.

13       Q.   Have you ever been sued?

14       A.   I have.

15       Q.   And how many times?

16       A.   I believe it was once and it was dismissed at

17  summary judgment.

18       Q.   And where was that?

19       A.   It would have been in Hillsborough County,

20  through -- based upon my work for the Sheriff's Office.

21       Q.   So you were sued by an inmate?

22       A.   Correct.

23       Q.   And I take it that what the inmate alleged

24  against you was not true.

25       A.   Correct.

1        Q.   And do you recall what the nature of the

2   allegations were?

3        A.   Defamation of his legal materials, if I remember

4   right.

5        Q.   Do you remember the inmate's name?

6        A.   I want to say it was Monteverde (ph).

7             It's funny how something like that sticks with

8   you 20-something years later.

9        Q.   Okay.

10            So do you remember an inmate named Ivan

11  Rodriguez?

12       A.   I do not.

13       Q.   Okay.  You're not aware that Ivan Rodriguez also

14  sued you?

15       A.   He -- that's possible.

16       Q.   Okay.

17       A.   Ivan Rodriguez.

18       Q.   So I guess the point I was gonna make is that not

19  everything that an inmate says can always be taken with

20  believability, let me just put it that way.

21            MS. HARTON:  I would object to form.

22            THE WITNESS:  Is there a question in there?

23  BY MR. BOGAN:

24       Q.   Yeah.  Would you agree with me that not

25  everything inmates say is always credible or believable?

1        A.    I agree -- I agree with that.

2        Q.    And inmates many times have motivation to do a

3   lot of things to gain advantage, privilege, whatever, in

4   the system and they will be untruthful to foster their

5   ability to make -- accomplish a gain in the system.

6        A.    Sure.

7             MS. HARTON:   Object -- object to form.

8             THE WITNESS:   I would agree with that.

9   BY MR. BOGAN:

10       Q.    Okay.

11            And the same would go -- I'm assuming, then,

12  therefore, when you're reviewing things for purposes of --

13  of evaluating a case, that you have to take into

14  consideration that everything that inmates say may not

15  always be truthful.

16            MS. HARTON:   Object to form.

17            THE WITNESS:   I would agree with that.

18  BY MR. BOGAN:

19       Q.    And that would even go in this case, right?

20       A.    I would agree with that.

21       Q.    And, in particular, when inmates come forward and

22  say that there are Friday night fights and that there are

23  things that corrections officers are doing to encourage

24  fights, you have to take that into consideration whether or

25  not it's believable or not.

```
 1            MS. HARTON:  Object to form.
 2            THE WITNESS:  I would agree with that but, in
 3        this specific instance, there is other testimony that
 4        corroborates the very nature of Friday night fights.
 5  BY MR. BOGAN:
 6        Q.   So there were only two inmates that said that,
 7  correct?
 8        A.   Two inmates and then Deputy Justin Kosinski
 9  corroborated that in his testimony.
10        Q.   Well, Deputy Kosinski didn't say there were
11  Friday night fights, he said he heard the term, correct?
12        A.   He's heard the term and he's also heard --
13  potentially heard other employees -- other officers say
14  that term, themselves.
15        Q.   Okay.  But saying a term doesn't necessarily mean
16  that it's truthful or it's happening, correct?
17            MS. HARTON:  Object to form.
18            THE WITNESS:  It would not but it corroborates
19        the inmates' -- the very -- the very notion that
20        Friday night fights occurred.
21  BY MR. BOGAN:
22        Q.   So if --
23        A.   If it didn't -- if they weren't occurring, if
24  this wasn't a thing, Deputy Kosinski wouldn't -- would
25  never have heard the term.
```

1      Q.   So did you actually speak to those two inmates?

2      A.   I have not.

3      Q.   So you haven't interviewed Terry Place?

4      A.   I have not.

5      Q.   Do you know who did interview him to get that

6   statement?

7      A.   I have no idea.

8      Q.   And the statement was presented to you in a

9   written format?

10     A.   Yes, it was.

11     Q.   And it's part of what your materials are,

12  correct?

13     A.   I believe so, yes, sir.

14          I'm looking through the materials now to find the

15  number.

16     Q.   So, in terms of Terry Place's motivation for

17  giving that testimony, do you have any idea whether or not

18  he had some particular ax to grind, reason to get back at

19  someone or the fact that he's just unhappy in the jail?

20     A.   I have --

21          MS. HARTON:  Object to form.

22          THE WITNESS:  I have no idea.

23  BY MR. BOGAN:

24     Q.   Okay.

25          So just so I'm clear, as far as the written

```
 1    policies and procedures of the Marion County Jail are

 2    concerned, in your review of this case -- and you may or

 3    may not have been, I guess, targeting that particular topic

 4    but I just want to make sure -- you didn't notice anything

 5    that you believe was contrary to the Florida Model Jail

 6    Standards or FCAC Standards as it relates to the written

 7    procedures that you reviewed in this case.

 8              MS. HARTON:  Object to form.

 9              THE WITNESS:  From a comprehensive standpoint, I

10         did not look at it in that manner; very limited in

11         scope, specifically related to the -- how often --

12         when and how often the checks were supposed to be

13         conducted.

14    BY MR. BOGAN:

15         Q.   Right.  And I think we talked about that already

16    and you found that those checks were consistent with what

17    the Florida Model Jail Standards and the FCAC required.

18         A.   Yes.  They are consistent with both of those --

19    those bodies.  They don't comply with the standard of care,

20    though.

21         Q.   So you would agree with me that under Florida

22    law, the Florida Model Jail Standards are what the jails

23    are required to follow -- the minimum of what jails must

24    follow.

25         A.   That would be the minimum, yes, sir.
```

1      Q.    And that's by law in Florida.

2      A.    Yes, sir.

3      Q.    So did the Hillsborough County Sheriff's Office

4  jail conduct its inmate security checks in accordance with

5  what Florida Model Jail Standards recommended?

6      A.    They did for a period of time and then it was

7  expanded 24 hours a day.  I don't know -- when I left -- I

8  don't know what it was when he left.  I had been reassigned

9  to the courthouse in our training division for a number of

10 years prior to leaving -- going into retirement and I'm not

11 sure what it -- what the incremental time frame was that we

12 were utilizing at that point.

13     Q.    So you had been, I guess, out of the jail for a

14 couple of years before you actually retired?

15     A.    That's fair to say.

16     Q.    Okay.

17     A.    Between -- teen -- I had a couple of different

18 assignments at our courthouse and one within our training

19 division near the end of my career.

20     Q.    Okay.

21           So at the end of your career when you were still

22 there -- let me restate that.

23           At the point that you were still at the jail, was

24 the -- the increments of time for -- and the hours that

25 were conducted for security and/or well-being checks the

1  same as what Marion County uses?

2      A.   That I -- as I already said, I don't recall what

3  the incremental time frame was.

4      Q.   All right.

5      A.   We went from the -- the eight hours in the

6  nighttime, we expanded that to 24 hours a day where we

7  were -- where we required our deputies to conduct

8  well-being and wellness checks.

9           What I'm telling you is I don't recall if it was

10 a 30 -- if it was within every 30 minutes or within every

11 60 minutes.

12     Q.   Okay.  And I guess I misunderstood.  I thought

13 you said that that 24 hours was what it was actually when

14 you left employment at the Sheriff's Office.

15     A.   It was as far as I know because I was the one

16 that changed it to that many years before that.

17     Q.   Okay.

18          So what time frame did they switch it to 24 hours

19 as versus eight-hour shifts?

20     A.   That would have been sometime between 2010 and --

21 I retired in 2021, so sometime in that 11-year period, we

22 had changed it because I instituted that change.

23     Q.   Okay.  Well, that's a pretty big gap, I guess.

24          So do you know specifically --

25     A.   I don't.

1    Q.    -- any other time frame?

2    A.    I don't.

3    Q.    And do you know for a fact they're still

4  following that today?

5    A.    Oh, I couldn't tell you.  I'm not involved in

6  their operation.

7    Q.    Do you have a copy of the -- I think I asked you

8  this already, I'll make sure -- but you don't have a copy

9  of the Hillsborough County Sheriff's Office --

10    A.    No, sir.

11    Q.    -- policies and procedures that were in effect in

12  2021?

13    A.    No, sir.

14    Q.    And you haven't done any comparison of those

15  policies to Marion County's policies in 2021?

16    A.    No, sir.

17    Q.    So did the Hillsborough County Sheriff's Office

18  conduct jail staffing analysis at any time in the calendar

19  years of 2017 through 2020?

20    A.    I don't know.

21    Q.    Have you ever seen the Hillsborough County Jail

22  conduct a staffing analysis through an independent agency

23  such as NIC or --

24    A.    I do recall that occurring.  I don't know what

25  year it was but I recall that occurring at least once,

```
1   maybe more than once, throughout my career.

2        Q.   Okay.

3             And is that because they were having staffing

4   problems at the point when they requested the analysis?

5        A.   I'm not sure if it was that or if we were opening

6   new facilities and -- I don't know.

7             In my career, we -- we -- at the beginning of my

8   career we opened a brand-new facility, it was opened the

9   year before I started.  It housed 1700 inmates but then

10  they -- during my career we built a whole 'nother facility

11  that could house 3300 inmates and that opened in different

12  phases and, certainly, a staffing analysis could have been

13  conducted at any one of those times or for other reasons,

14  even, I'm not sure.  I wasn't in a position of authority or

15  leadership at that time.

16       Q.   Okay.

17            So just so I understand the -- I guess the -- the

18  logistics of the Hillsborough jail, they had multiple

19  facilities -- or when I say facilities, multiple jails?

20       A.   We had two.

21       Q.   Two jails, okay.

22            And so they had jail -- they call them Jail 1 and

23  Jail 2?

24       A.   Jail Divisions 1 and 2.

25       Q.   Jail -- 1 and 2.
```

```
 1        A.    Yeah.   1's the Orient Road Jail and then the
 2   other one's the Falkenburg Road Jail.
 3        Q.    Okay.
 4              And so while you were there then, you were a
 5   commander in both of those facilities?
 6        A.    At different times I was, yes, sir.
 7        Q.    Okay.
 8              And all of -- all of the jail system, then, is --
 9   who is in charge of that?  That is the Colonel?
10        A.    That is the Colonel and I fell -- I was
11   immediately below the Colonel.
12        Q.    Okay.
13              And who was the Colonel in the jail at the time
14   that -- over the jail, I should say -- at the time you
15   retired?
16        A.    That would have been Colonel Melissa Moore.
17   She's no longer the Colonel there, as far as I know.
18        Q.    Okay.
19              And who is currently the Colonel?
20        A.    I believe it is Robert Ura, U-r-a.
21        Q.    So just so we're clear, in 2021, how many inmates
22   would have been housed in the, I guess, Jail Division 1?
23        A.    That, I'm unsure of.  The entire facility was not
24   being utilized.  They were utilizing portions of it and
25   they were renovating other portions of it.
```

1    Q.    Okay.

2         So what was the -- what was the average daily

3    inmate population for both of those jails in 2021?

4    A.    I'm -- this is an educated guess but it --

5    probably around 32 or 3300, if I -- if memory serves me

6    correctly.

7    Q.    And so did the average daily inmate population

8    fluctuate from year to year?

9    A.    It typically did but not in great numbers.

10   Q.    And so in -- when you left actually working in

11   the jail, that would have been in 2019?

12   A.    I would have to look at my CV but that sounds

13   like it may be correct.

14   Q.    Okay.

15        And then that's when you transferred to, I think

16   you said, Court Services?

17   A.    I went to Court Services for a very brief period

18   of time and then was moved to be the commander of our

19   training division.  And then, ultimately, before I retired,

20   I was transferred back to the courthouse.

21   Q.    So does the training division handle both the

22   patrol and corrections?

23   A.    Yes, it does, as well as civilians.

24   Q.    So do you have any statistics for the

25   Hillsborough County Jail as far as that you would be able

```
 1   to compare to the Marion County Jail on, for example,

 2   inmate-on-inmate assaults?

 3        A.   I don't have statistics.  I don't have anything

 4   in my possession related to the Hillsborough County

 5   Sheriff's Office and the operation of its jail.

 6        Q.   Okay.

 7             So you wouldn't be able to tell us, for example,

 8   how many inmate-on-inmate battery or assaults occurred in

 9   the Hillsborough County Jail in 2020 --

10        A.   No, sir.

11        Q.   -- or 2021?

12        A.   No, sir.

13        Q.   Would you agree with me it's impossible to

14   prevent an inmate-on-inmate assault?

15             MS. HARTON:  Object to form.

16             THE WITNESS:  Would I agree with you that it's

17        impossible?

18   BY MR. BOGAN:

19        Q.   Yeah, it's impossible for a jail administrator to

20   sit here today and tell me, I can guarantee you that no

21   inmate-on-inmate assault will ever occur in my jail?

22        A.   Oh, I absolutely --

23             MS. HARTON:  Object to form.

24             THE WITNESS:  I'm sorry, Sam.

25             MS. HARTON:  That's okay.
```

```
1                  (Discussion off the record)
2              THE WITNESS:  I couldn't agree -- no jail
3          administrator could guarantee that there's gonna be
4          zero assaults -- inmate-on-inmate assaults.
5    BY MR. BOGAN:
6          Q.    Okay.
7          A.    They can do things to reduce the possibility of
8    that occurring, though.
9          Q.    Exactly.  And that was gonna be my next question.
10   I mean, they do -- they try to do their best to maintain a
11   facility and security to where it couldn't -- or shouldn't
12   happen but the reality of it is, it does and can happen and
13   they can't prevent it.
14             MS. HARTON:  Object to form.
15             THE WITNESS:  They can -- they can minimize it by
16         having staff in the areas more frequently.
17   BY MR. BOGAN:
18         Q.    Exactly.  But they can't prevent it a hundred
19   percent from ever happening.
20         A.    I would agree with that.
21         Q.    And would you agree with me that just because it
22   does occur or it does happen, it doesn't mean that the
23   officers had failed to adequately perform their duties?
24         A.    I can agree with that, too.
25         Q.    Do you know, in terms of -- I know you gave me an
```

1   estimate on the average daily population for the jail in

2   Hillsborough.  Do you know approximately how many inmates

3   are booked in Hillsborough County each year?

4              MS. HARTON:  Object to the form.

5              THE WITNESS:  I don't know how many they book.  I

6        can't even give you an estimate.

7   BY MR. BOGAN:

8        Q.   Okay.  You couldn't even tell me whether it's a

9   hundred thousand or --

10       A.   No, sir.

11       Q.   Okay.

12            And would you agree with me that -- since you've

13  been to both jails, obviously -- that Hillsborough is a

14  bigger jail --

15       A.   Yes, sir.

16       Q.   -- and has bigger capacity?

17       A.   Yes, sir.

18       Q.   And Hillsborough County is a larger population

19  than Marion County.

20       A.   Yes, sir.

21       Q.   And it would be safe to say that, more likely

22  than not, Hillsborough has a higher average booking number

23  than Marion County.

24       A.   I would suspect that.

25       Q.   So other than -- well, strike that before I go

```
 1    on.
 2              So during the period of time when you were at the
 3    jail, do you recall how many open positions the jail had
 4    for corrections deputies that were not filled?
 5         A.   I do not know that answer.
 6         Q.   Did they have openings that they could not fill
 7    in the Corrections Division while you were there at the
 8    jail?
 9         A.   At different points, absolutely, yes, they did.
10         Q.   And is that something that -- based on your
11    experience -- that it is common that jails and even prisons
12    sometimes experience difficulty in filling open positions
13    for corrections deputies?
14              MS. HARTON:  Object to form.
15              THE WITNESS:  Yes, sir.
16    BY MR. BOGAN:
17         Q.   So when will the -- well, strike that.
18              How did Hillsborough County deal with the issue
19    when they had positions that were available they couldn't
20    fill and they obviously still have a jail to run and
21    they've got, you know, deputies and inmates that need to be
22    surprised; how do you deal with that?
23         A.   They did that through voluntary overtime.
24         Q.   So in voluntary versus mandatory overtime; is
25    that why you say voluntary?
```

```
 1        A.    Yes.  We were fortunate.  We had enough people
 2   that volunteered to do overtime where we never had to
 3   mandate it while -- at least while I was there.
 4        Q.    Okay.
 5              And mandating overtime would be, I guess, an
 6   option if, in fact, you didn't get folks to voluntarily
 7   agree to work overtime.
 8        A.    Oh, we discussed it more than once because of --
 9   because we teetered on -- on the doorway of that, of not
10   having enough.
11        Q.    Okay.
12              So is there a particular -- well, strike that.
13              Let me ask you this:  What type of housing units
14   did -- I guess, we'll do the -- was the newest one Division
15   1?
16        A.    No.  I --
17              Are you trying to figure out what type -- what
18   style of jail management we utilized?
19        Q.    Yeah.  In the housing units, what their -- how
20   they were laid out, yes.
21        A.    So they were -- primarily, they were direct
22   supervision jails, both of them, at least 90% of it, the
23   jails -- each of the jails were, with about 10% being
24   remote supervision, where we housed our lockdown inmates,
25   our administrative confinement, disciplinary confinement,
```

```
 1  own protection stuff, people like that.

 2          At the Orient Road Jail, the cells -- each of

 3  the -- each of the pods had 48 cells, some of them were

 4  double-bunked, some were not.

 5          And then, at the Falkenburg Road Jail, they were

 6  open-bay dormitories.

 7      Q.   So the Falkenburg Jail, was that the newer jail

 8  or the older one?

 9      A.   That is the newer one.

10          And in both of those -- both instances, they're

11  operated in -- I think I already said direct supervision,

12  where we had a deputy right in there with the inmates.

13      Q.   Okay.

14          So in the open-dormitory unit in Falkenburg, how

15  many -- approximately how many were in each of the

16  dormitories?

17      A.   Up to 72.  We housed up to 72 in each dormitory.

18      Q.   And when you say direct supervision, are you

19  referring to the fact that the -- one of the housing unit

20  deputies is inside -- stationed inside of the dormitory or

21  he is stationed right outside the dormitory or how does

22  that work?

23      A.   Well, they're right inside freely walking around

24  the pod where they could touch an inmate, an inmate could

25  touch them, there's no barriers.
```

1    Q.   And so, in terms of -- of the setup for the

2  housing unit which is dormitory style, where does the

3  corrections deputy stay during the night?

4    A.   In the pod with the inmates.  They have a

5  workstation that has a computer and other equipment that

6  they might need, but they're in there 24 hours a day, seven

7  days a week, 365 days a year.

8    Q.   Yeah.  And what I'm more interested in is that

9  workstation and how that's set up inside of the unit.

10        So is that in an area where he is elevated, where

11  the deputies are going to be able to observe things from an

12  elevated status?

13    A.   Tricky question because some -- some were not

14  elevated and as I -- as I understand, as I was leaving they

15  were building some that I believe were elevated but they

16  were right out there in the open area of the pod.  They

17  weren't separated by walls or windows or anything, it

18  was -- they all breathed the same air.

19    Q.   And how many deputies were inside of the housing

20  unit which had 72, I guess, inmates?

21    A.   One.

22    Q.   And the up to 72 inmates in that housing unit

23  were all on double bunks -- bunk beds, I guess?

24    A.   No.  In fact, most of them were single bunks.

25  There was only a couple of double bunks in that area.

1      Q.   Okay.

2           So then --

3      A.   It makes for better -- better line of sight and

4  vision when you're looking out throughout the pod to

5  observe the inmates and make sure nothing bad is happening.

6      Q.   So did they use double bunks at all or not?

7      A.   We had -- at the opposite end of the pod, there

8  was one cubical -- so the -- the dormitories at Falkenburg

9  Road Jail were set up in cubicles where four inmates were

10 assigned to each cubical, they all had a single bunk of

11 their own and none of them -- those weren't double-

12 stacked -- but there was one cubical that had a -- there

13 was one or two cubicles that had one bunk bed each in it.

14     Q.   Okay.

15     A.   They were at the far end and against the wall, if

16 my memory serves me correctly.

17     Q.   Okay.

18          So have you been to Gulf Pod in Marion County

19 Jail?

20     A.   I have not.  I've only seen video of it.

21     Q.   Okay.

22          MS. HARTON:  Hey, Bruce, we've been going about

23     an hour 20.

24          MR. BOGAN:  Okay.

25          MS. HARTON:  I don't know how much you have left

```
 1        but if we want to take a break or if we just want to
 2        power through it.
 3            MR. BOGAN:  Yeah, this is fine.  This is a good
 4        time to take a break.
 5            MS. HARTON:  Five, ten minutes?
 6            MR. BOGAN:  Yeah.  Ten?
 7            MS. HARTON:  I said five but it's -- it's up to
 8        you guys.
 9            MR. BOGAN:  Five's good with me.  Whatever.
10            MS. HARTON:  Let's come back at 11:30, seven
11        minutes.
12            MR. BOGAN:  Sounds good.  All right.
13                (Whereupon, a short break was taken)
14            MR. BOGAN:  All right.  Let's go back on the
15        record.
16    BY MR. BOGAN:
17        Q.   In reviewing your report, one of the criticisms
18    that -- that I know you have against the Marion County Jail
19    policies is related to the fact that they were doing the
20    security checks every 60 minutes between the hours of 10:00
21    p.m. and 6:00 a.m.  And in your view, that is inadequate;
22    am I characterizing that accurately?
23        A.   Yes, you are.
24            More frequent officer presence is the more that
25    deters bad behavior such as inmate assaults.
```

1      Q.    Okay.

2      A.    As well as a host of other things.

3      Q.    And so -- and that's what I'm trying to figure

4    out here.

5            In terms of your -- the support for your position

6    that that's inadequate, I know you've cited the U.S.

7    Department of Justice, National Resources for Jail

8    Administrators.

9            Is there any other authoritative text of any kind

10   that you have relied upon to support that opinion?

11     A.    I would have to look at my report to see what's

12   in there.

13     Q.    Okay.  Go ahead.

14     A.    Yeah.  There's a couple of different resources,

15   they're both put out by the National Institute of

16   Corrections.  One is the Sheriff's Guide to Effective Jail

17   Operations and then the other is the Resource Guide for

18   Jail Administrators.

19     Q.    Okay.

20           Any other sources that you're relying upon?

21     A.    No, sir.

22     Q.    Okay.

23           And, I guess, can we agree that the -- the

24   National Resource for Jail Institute -- or, excuse me, Jail

25   Administration, it was not intended, actually, to establish

1    policies or procedures for standard of care for any

2    particular jail, these were put out as guidelines that you

3    can or you can choose not to follow but it's not mandated

4    by any law?

5         MS. HARTON:  Object to the form.

6         THE WITNESS:  So they support my position that

7    more frequent checks are reasonable and prudent and I

8    know that the -- those documents actually say that

9    it's not intended to establish a standard of care.

10   But it also -- it also talks about these are sound

11   correctional principles and practices, and they are.

12   And that's -- if you don't -- if you don't supervise

13   the inmates, they're gonna do what they want to do.

14        More frequent observation of them -- and I'm

15   never gonna say that -- that direct supervision is the

16   only way to manage an inmate population because direct

17   supervision, remote supervision, linear supervision,

18   they're all acceptable models of jail supervision and

19   management.

20        When you operate something other than a

21   direct supervision, you have to make sure your staff

22   members are in there more frequently than every hour

23   only between the hours of 10:00 p.m. and 6:00 a.m.  If

24   they are not, inmates are going to do what they want

25   to do.  The laws of the jungle prevail at that point.

1          The biggest and the strongest is gonna have their way

2          with the weaker.

3    BY MR. BOGAN:

4          Q.   So can we agree, then, that these are not

5    standard of cares that have to be followed -- well, let me

6    restate that.

7               Can we agree that this policy by the National

8    Resource for Jail Administrators is within their discretion

9    to whether or not they can set up that level of a

10   supervision or check or they can choose to do something

11   differently because, obviously, they can choose to follow

12   something less or more, depending upon what their

13   jurisdiction is and what their circumstances are?

14              MS. HARTON:  Objection to form.

15              THE WITNESS:  A reasonable and prudent jail

16         administrator would inact policies that would require

17         checks at least 30 minutes apart 24 hours a day.

18   BY MR. BOGAN:

19         Q.   Okay.

20         A.   That's what a reasonable and prudent

21   administrator would do.

22         Q.   And you would agree with me it's not a deviation

23   of a standard of care for reasonable supervision of inmates

24   not to have a policy that requires 30-minute interval

25   checks versus 60-minute interval checks on an eight-hour

1  basis?

2      A.   Could you repeat that?

3      Q.   Yeah.

4           Can we agree that an administrator's decision not

5  to have 30-minute interval checks 24 hours a day, instead,

6  doing 60-minute checks eight hours a day, plus having

7  the -- obviously, the officers still present in the

8  facility the remainder of the day, is not a deviation of

9  some standard of care?

10     A.   It would be --

11          MS. HARTON:  Object to form.

12          THE WITNESS:  It would be a deviation of the

13      standard of care, in my opinion.

14 BY MR. BOGAN:

15     Q.   In your opinion.

16          So is it your opinion, then, that this -- this

17 standard of care from the National Resource Jail

18 Administrator must be followed by the Hernando -- excuse

19 me, by the Marion County Jail?

20     A.   I didn't say that that was the -- that they

21 created the standard, I said a reasonable and prudent jail

22 administrator would do that.

23          Now, that -- that document -- those books, if you

24 will, they support my opinion.  But that is my opinion that

25 the 30-minute -- 30-minute watches 24 hours a day or 30-

```
 1   minute staggered watches, unpredictible, within the 30-
 2   minute time frame is the prudent and sound way of managing
 3   a jail --
 4        Q.   Would you --
 5        A.   -- thereby producing -- or reducing the
 6   possibility of inmate-on-inmate assaults.
 7        Q.   Would you agree with me that whether or not there
 8   was a deviation of a correctional standard of care is a
 9   decision that the jury has to make as opposed to an expert?
10             MS. HARTON:  Object to form.
11             THE WITNESS:  I wouldn't agree with that.
12   BY MR. BOGAN:
13        Q.   No?  Okay.
14             So you believe that's your role in this case, to
15   say, A, what the standard is and, B, whether there was a
16   deviation of that standard?
17        A.   Absolutely.
18             MS. HARTON:  Object to form.
19   BY MR. BOGAN:
20        Q.   In this particular case, then -- and just so I
21   want to be clear -- you're not suggesting that the law in
22   Florida requires the National Resource Jail Administrator
23   policies or the Sheriff's guide that you referenced must be
24   followed under Florida law.
25        A.   I'm saying --
```

```
 1              MS. HARTON:  Object to form.
 2              THE WITNESS:  I'm saying a reasonable and prudent
 3         jail administrator would have -- would inact policies
 4         that conform with that 30-minute window 24 hours a
 5         day.  Does Florida law require that?  No, Florida law
 6         does not require that.
 7    BY MR. BOGAN:
 8         Q.   Okay.  Thank you.
 9         A.   Florida law requires less than.  And, in my
10    opinion, it's not good enough.
11         Q.   So, do you have a -- a number that you can tell
12    me of the jails within the state of Florida that follow
13    that specific guideline of doing 24 hours a day and 30-
14    minute interval checks on its inmates?
15         A.   I couldn't tell you that number.
16              I would hope that they all do it because
17    inmate-on-inmate fights can occur 24 hours a day and will
18    occur 24 hours a day, if you're not in there.
19         Q.   Okay.
20              So you don't have any numbers that you can give
21    me of what percentages of the jails in Florida follow what
22    you've described as what you think is reasonable.
23         A.   No, I don't.
24         Q.   You're not disputing that Marion County has
25    policies and procedures in place for supervision in
```

```
 1    managing and controlling inmates that are in conformance

 2    with not only the Florida Model Jail Standards, as well as

 3    the Florida Correctional Accreditation Commission.

 4              MS. HARTON:  Object to form.

 5              THE WITNESS:  I'm saying that the policies that

 6         the Marion County Jail has in place are inadequate;

 7         however, they do conform with the Florida Model Jail

 8         Standards but they're still inadequate.

 9    BY MR. BOGAN:

10         Q.   So the -- going back to the second -- to the

11    issue of classification, there are some terms that were

12    thrown out and I just want to get your view of what you're

13    characterizing -- and maybe it's based on what you've

14    reviewed from the Sheriff's Office, I don't know -- but how

15    would you characterize an inmate who has a felony charge

16    that is nonassaultive, what does that mean to you versus an

17    assaultive felony charge?

18         A.   I'm basing that on how they characterize that and

19    how they documented it.

20              But, certainly, if there's violence or the threat

21    of violence involved in someone's crime, it would be a

22    violent crime.

23         Q.   Okay.

24              And what is -- what is violence -- so does an

25    assaultive crime -- well, strike that.
```

```
 1              Does assaultive felony, in your opinion, always
 2   have to be violent?
 3        A.    There's a threat of violence so that -- I mean,
 4   otherwise, where does the assault come from if there's no
 5   threat of violence?
 6        Q.    And I'm not asking for a legal opinion, I'm just
 7   understanding what your view of that -- the term is because
 8   I don't think it's particularly very clear and I'll just be
 9   honest with you.
10              Okay.  So an assault -- a nonassaultive felon is
11   someone who can be charged with a rape?
12              MS. HARTON:  Object to form.
13              THE WITNESS:  Say that question again?
14   BY MR. BOGAN:
15        Q.    Yeah.  Is a nonassaultive felon a person that can
16   be charged with rape?
17              MS. HARTON:  Object to form.
18              THE WITNESS:  There may be circumstances that --
19                  One, I don't know that Florida has a rape
20         charge, even, that they utilize.
21   BY MR. BOGAN:
22        Q.    Sexual battery, yeah.
23        A.    Sexual assault, I believe, is the charge that
24   they use.  And, certainly, there are instances where sexual
25   assaults are charged where they have -- based on ages of --
```

1    of the perpetrator and the victim, if you will, that it's

2    automatically classified as a sexual assault despite the

3    fact that there's no threat of violence occurring, just

4    based merely on the ages of the participants -- of the two

5    people.

6        Q.    So you agree that minors can't consent to having

7    sex in Florida; if you're under the age of --

8        A.    I -- I agree with that.  But your question was,

9    is it violent?  Is it always -- is there violence involved?

10   And there's not always violence involved.

11       Q.    And so you believe, then, that they should -- in

12   classification, they should always split that hair and

13   decide whether the nonconsensual sexual battery charge is

14   violent versus nonviolent.

15            MS. HARTON:  Object to form.

16            THE WITNESS:  They should consider that, yes.

17   BY MR. BOGAN:

18       Q.    Okay.

19            So, in terms of your opinions on, you know, the

20   segregation of inmates, have you relied upon any

21   authoritative text?

22       A.    Upon the segregation of inmates?

23       Q.    Yeah.  Separation, Class 3, yeah.

24       A.    I believe I listed some supporting articles in

25   there.

1    Q.   So -- articles.   Okay.

2         So are these articles --

3    A.   Or publications, I should say.

4    Q.   What publication -- besides an article -- have

5  you relied upon to support your position on the inmate

6  classification or separation?

7    A.    So the National Institutes of Corrections -- of

8  Jail -- Objective Jail Classification System, a Guide for

9  Jail Administrators.

10   Q.   Same authority that was previously cited by you

11 for the inmate checks?

12   A.   No.  It's a different publication.  Same -- same

13 National Institute of Corrections, yes.

14   Q.   Okay.

15        Again, a guideline but not a mandatory guide that

16 has to be followed by a Marion County Jail official.

17   A.   So we can probably make this pretty easy.

18        There's not a written national guideline

19 regarding jail and prison operations, that's where the

20 standard of care comes in, is what would a reasonable and

21 prudent jail administrator or sheriff or warden, whoever

22 you want to put in charge of that facility, what should

23 they -- what would they be doing?

24   Q.   And what did Hernando -- excuse me, Hillsborough

25 County -- I apologize for saying Hernando because I just

1    finished a Hernando County case yesterday -- so what did

2    Hillsborough County Jail's policies and procedures provide

3    as it relates to the housing of sex offenders?

4        A.   It depended on a case-by-case basis where they

5    were housed.  Some were housed in isolation for their own

6    protection and some were housed in the general population.

7        Q.   So you would agree that there is a risk to sex

8    offender inmates being housed in general population and

9    that's one of the reasons why they considered that and

10   considered housing them together?

11       A.   Sure.  I agree with that.

12       Q.   And sex offenders -- and particularly depending

13   on the charge -- but the sex offense involving a minor

14   could even be more dangerous with housing that person in

15   general population.

16       A.   Depending on the -- on the circumstances of, you

17   know, the age of the minor and levels of violence, if there

18   is violence.  A whole number of things would go into

19   consideration when you're determining where to house them.

20            And, certainly -- certainly, the inmate,

21   themselves, if they request protective custody or not.

22       Q.   Do you know -- do you know why Cory Merchant had

23   requested a keep-away on the inmates that were identified

24   in his keep-away request?

25       A.   I don't know.

```
 1              MS. HARTON:  Object to the form.
 2   BY MR. BOGAN:
 3        Q.   Have you ever interviewed Krysti Merchant or
 4   Tommie Merchant, the Plaintiffs in this case?
 5        A.   No, sir.
 6        Q.   Do you have a copy of the criminal investigation?
 7   Is that part of what you reviewed as far as Cory Merchant's
 8   case?
 9        A.   I can't remember.  I would have to look.  I
10   believe there was some investigative materials that I
11   utilized but I'm not a hundred percent sure, I'd have to
12   look at my list of documents.
13        Q.   Okay.
14             I mean -- I mean, if you want to look, I'm not
15   stopping you from looking but I guess it's important to
16   know, obviously, that -- what the nature of this charge was
17   and the circumstances behind it.  I think you're suggesting
18   that the Sheriff should consider that.
19        A.   I'm sorry, I was mistaken.  I thought you were
20   talking about after the incident with Cory Merchant.
21        Q.   Oh.
22        A.   You're talking about arrest documents leading --
23   that brought Latterloah and Merchant into the jail to begin
24   with.
25        Q.   Yes.
```

1      A.    Yes, there was specific violence threatened by

2  Lutterloah and utilized by Lutterloah and I didn't see any

3  of that with Merchant.

4      Q.    And what did you see with Merchant?

5      A.    That he was having -- he had -- had some sort

6  of relationship with an underaged girl where he and her

7  were -- he was sneaking in and out of her house through a

8  window having sex.

9      Q.    So that's what you would characterize it as, as

10  an underaged girl relationship?

11      A.    I didn't see anything to -- to dispute that.

12      Q.    Okay.

13      A.    And maybe I just don't recall.  I don't know.

14      Q.    Okay.

15      A.    I remember him going in and out through a window.

16      Q.    Did you -- were you aware that there was an

17  investigation whether or not Cory Merchant was attempting

18  to contact the victim to try and get her to drop the

19  testimony against him?

20          MS. HARTON:  Object to form.

21          THE WITNESS:  I don't recall.  That doesn't mean

22      it's not there, I just don't recall.

23  BY MR. BOGAN:

24      Q.    Okay.  That, in fact, someone -- and that the

25  investigation centered around it -- wrote a letter to the

1  victim representing that it was the Plaintiff, Krysti

2  Merchant, that was writing this letter asking Cory --

3  asking the victim to drop the case against Cory.  And it

4  turns out the investigation showed that it wasn't Krysti

5  Merchant that wrote that letter.  You did not see that?

6      A.   I don't recall that.

7      Q.   Okay.

8           And the suspicion was that, in fact it was Cory

9  Merchant that was writing that letter to the victim and

10  using his sister's name.  You don't -- didn't have that?

11      A.   I don't recall.

12      Q.   I'm assuming you haven't, then, looked at any of

13  the -- well, strike that.

14           You watched the videos, correct, from that night?

15      A.   Yes, sir.

16      Q.   Have you listened to any audio recordings?

17      A.   I don't remember.  I'd have to look at my list.

18           Yes.  There was -- there was a number of

19  interviews that I listened to.

20      Q.   Okay.

21           So -- and I think I've asked you this but I want

22  to make sure you haven't spoken to any of the people that

23  were in the facility or housed in that dormitory that

24  night.

25      A.   No, sir.

1    Q.   And all of the statements that you've looked at
2  are the ones that are, obviously, contained within your
3  file but they were statements taken by the Sheriff's
4  criminal investigator?

5    A.   Say that again, please?

6    Q.   Yeah.  The statements that you've looked at or
7  read or heard, were those all taken by the Sheriff's
8  criminal investigators?

9    A.    Other than --

10         MS. HARTON:  Object to the form.

11         THE WITNESS:  Other than the two previously
12    mentioned statements from -- that were written by the
13    two inmate -- former inmates.

14  BY MR. BOGAN:

15    Q.   Okay.  So the interviews of Terry Place and
16  Steven Murphy, those were taken by whom?

17    A.   I don't know.  I read a document.  That's what I
18  read.  I don't know anything else about it.

19    Q.   So what's your understanding of what the security
20  activity is, in terms of the officers' presence in the
21  daytime hours at the jail, for example, Gulf Pod?

22    A.   I have no clue.  I didn't -- I don't see where
23  they're mandated to even go in and out of there probably
24  other than to do their other duties such as feeding, maybe
25  changing laundry, bringing the nurse through, things like

1    that.  There's no other mandate that says they have to be

2    in there at all.

3        Q.   So, in terms of the officer's duties during the

4    day, you're not familiar with what he's requred to do as

5    far as those inmates are concerned?

6        A.   I can't recall if there was a -- a post order

7    that outlined that or not.  There may be.  It doesn't -- it

8    doesn't require them to be in there a certain amount of

9    time, though.

10       Q.   Okay.

11            So -- but they are responsible to do a lot of

12   things for those inmates throughout the day; you would

13   agree with that, correct?

14       A.   Sure, I agree.

15       Q.   They're responsible to make sure they are fed

16   three times a day, beginning at 6:00 a.m.  They're

17   responsible to do inmate checks, in other words, counts,

18   checks during the day.

19       A.   Well, counts and checks are different things.

20       Q.   Okay.  Correct.

21            A count is done as well as a check.  Both in the

22   night and during the day there are counts done, correct?

23       A.   I would agree with that.

24       Q.   Okay.

25            And then, again, you mentioned the fact that they

1    are responsible to make sure the food -- inmate food is

2    brought in and that they're served in that dormitory --

3    that same dormitory -- you agree with that -- that -- where

4    they -- the housing of the bunks are, correct?

5        A.    Yes, I agree with that.

6        Q.    And so the officer has to come in when food is

7    being delivered and when the food is being passed out,

8    correct?

9        A.    Based on what I saw on video, the officer stands

10   at the door while that's being passed out.  They don't --

11   they're not going in and walking through the pod conducting

12   any type of safety or security or well-being check, they're

13   simply monitoring the feeding process right there at the

14   door --

15       Q.    Okay.

16             And --

17       A.    -- based on the video I saw.

18       Q.    Based on one video you saw, but do you know for a

19   fact that the officers never go in the cell -- or, excuse

20   me, the dormitory every time food is delivered or served?

21             MS. HARTON:  Object to form.

22             THE WITNESS:  I've only seen one video and they

23       were standing right inside the doorway.

24   BY MR. BOGAN:

25       Q.    Okay.  So other than that video, you have no

1    other information as to what else is done when the feeding

2    is done, which is three times a day, correct?

3        A.   Yes.

4        Q.   And they also -- when the nurse comes to deliver

5    medications, they have to go into or at the cell door.

6    When the nurse calls out the inmate's name, they line up

7    and then their medications are given and the officer has to

8    stand there right with the nurse, fair?

9        A.   Correct.  They stand right there with the nurse,

10   probably right inside the door, I'm assuming.  Just like

11   when they feed the inmates, they're not walking around --

12   based on common practice, they wouldn't be walking around

13   bunk to bunk to pass medication out, they would have the

14   inmates line up, typically, at the door, where the nurse

15   would position herself -- the nurse and the deputy.

16       Q.   So they also are required to have movement of the

17   inmates for various reasons throughout the day; some may

18   have to go to court, some may have to go out for exercise,

19   so there's a lot of different reasons besides just meals

20   and medical for an officer to go in the housing unit during

21   the day, correct?

22       A.   None of those things require the officer or the

23   deputy to walk around and ensure the security and the

24   safety of the inmates that are in there.  All of that,

25   everything that you just mentioned, whether it's feeding,

 1  the nurse, pulling inmates out for recreation, out for

 2  court, all of that can be and is routinely done from a

 3  doorway.

 4      Q.  Well -- and, again, that's what your assumption

 5  is --

 6      A.  Yes.

 7      Q.  -- but you don't know for a fact, do you --

 8      A.  No.

 9      Q.  -- because you only saw one video that saw a guy

10  standing at the door, correct?

11      A.  You are correct.

12      Q.  So in terms of other types of checks, would you

13  agree that periodically -- and I'm not saying it happens

14  every day -- but there are searches, there are things that

15  are done that are not planned with the officers and the

16  inmates, as far as would be a security type, you know, duty

17  on the part of the deputies, fair?

18      A.  I agree with that.

19      Q.  So, you know, I know that you have this criticism

20  about that the security checks are predictible because they

21  start at 10:00 o'clock and so, therefore, the inmates

22  somehow can time when the prediction -- or when the --

23  their presence is going to be done.

24          So I guess my question to you, would you agree

25  with me that the testimony in this case is that the -- in

1  terms of -- we're just talking the Gulf Pod housing units;

2  they are not consistently done in the cell checks in the

3  same manner every night other than whichever housing unit

4  they select to begin with, that's what starts it first,

5  fair?

6          MS. HARTON:  Object to form.

7          THE WITNESS:  I didn't follow that question at

8     all.

9  BY MR. BOGAN:

10     Q.   So let's just say, hypothetically, Gulf Pod, they

11  stuck -- you know that there's more than one housing unit

12  in the Gulf Pod, right?

13     A.   Yes, sir.

14     Q.   Okay.

15          And so, if the housing search -- or not search --

16  security check starts at 10:00 o'clock, they cannot,

17  obviously, go in all four housing units at the same time,

18  correct?

19     A.   That's correct.

20     Q.   They've got to do them one at a time, fair?

21     A.   Correct.

22     Q.   Okay.

23          So there's nothing that indicates that they do

24  the same housing units in the same manner consecutively

25  each night, Do you see anything that says that?

1    A.    No.

2              MS. HARTON:  Object to the form.

3              THE WITNESS:  I do not.

4    BY MR. BOGAN:

5    Q.    And so, again, my question is, A, obviously, the

6    housing units are separate and so you can't search all four

7    units simultaneously, fair?

8    A.    Correct.

9    Q.    And so it's going to take some period of time for

10   each unit to be inspected or checked, I should say; fair?

11   A.    That is true.  And if they were keeping accurate

12   records, they would keep track of what time they were in

13   which of the units between this time and this time --

14   Q.    Okay.

15   A.    -- instead of just using one blanket time to

16   start and finish for four different units.

17   Q.    Okay.

18             So -- so, I guess, again, going back to my

19   question, you would agree that they're not conducting every

20   search of housing units in Gulf Pod at 10:00 p.m.

21             MS. HARTON:  Object to form.

22             THE WITNESS:  They can't do all four at one time,

23      I would agree with that.

24   BY MR. BOGAN:

25   Q.    Okay.  It's virtually impossible to say -- to

 1   say, absolutely, at 10:00 o'clock tonight that this officer

 2   is gonna be coming in our unit because he doesn't know

 3   which unit's gonna be searched first -- or checked first.

 4        A.   I agree.

 5        Q.   Okay.

 6             So -- and at the end of the night, obviously, a

 7   search or check -- I'm sorry -- a check of the unit is

 8   going to take anywhere from 10 to 15 minutes per housing

 9   unit.

10             MS. HARTON:  Object to form.

11             THE WITNESS:  It should take longer than that if

12        they're doing an adequate check of each inmate.

13   BY MR. BOGAN:

14        Q.   Well -- and, again, depending upon, I guess, what

15   you consider to be necessary but they're walking through

16   areas which are all double-bunked, correct?

17        A.   Sure.

18        Q.   So you're -- essentially, you can look at two

19   inmates at once when you're walking through the aisle --

20        A.   I disagree that that's an adequate check.

21             You might -- you might know that they're both

22   there, they haven't escaped, but you haven't done an

23   adequate wellness check because you don't know if the

24   person's alive and breathing.  You're looking at both of

25   them at one time.  Like you're saying, you have to spend an

1    ample amount of time there to make sure you see that.  And,

2    certainly, at night when they're under a blanket and it's

3    dark, it's more difficult to do that.  So, in theory, it

4    should take a little bit longer at night to do these checks

5    than it would during the day where everybody's up walking

6    around.

7        Q.   So would you agree with me that this -- that

8    issue, whether or not Cory Merchant, for example, was in

9    bed unconscious and suffering from some medical condition

10   is not what this case is about?

11       A.   It is not.

12       Q.   This is --

13       A.   But the amount of time that you spent -- that the

14   officers spend in that pod, in that unit, directly reflects

15   upon the level of violence that may or may not exist there.

16            Without the --

17            I think, where you're -- where you and I aren't

18   seeing eye to eye or communicating this the best is, I'm

19   trying -- I'm trying to say that without staff presence, it

20   is more likely -- inmate-on-inmate violence is more likely

21   to occur when staff is not present.  The more often you can

22   have staff going in there and the longer that they're in

23   there, the less likelihood of that inmate-on-inmate

24   violence is to occur.

25       Q.   Sure.  Certainly, if an officer's standing right

```
 1   there, then they're not going to, you know, attempt,

 2   theoretically, to engage in, you know, illegal or

 3   assaultive behavior.  I get that part of your argument.

 4           I guess what I'm asking you to agree is, this is

 5   not a situation where we have a -- an inmate's medical

 6   emergency is happening because he's, you know, in his bunk

 7   and he stopped breathing and you didn't check to make sure

 8   that -- you know, to look at his face to see if he, you

 9   know, was alive or not, that's not what's important in this

10   case; would you agree with that?

11       A.   I would agree.

12       Q.   So during inmates' period of lockdown at Marion

13   County, the -- I guess the policy and procedures are they

14   do have a right to get up and get out of their bunk and go

15   to the restroom.  You're familiar with that, right?

16       A.   I am.

17       Q.   Is that common, you know, in any dormitory-style

18   setting that the inmates are permitted, during both lock-

19   down, to get up and go to use the restroom?

20       A.   Yes, sir.

21       Q.   Is that something that they did in the

22   Hillsborough County Jail?

23       A.   Absolutely.

24       Q.   And so is there a time limit that Hillsborough

25   County has on how long you can be out of your bunk to go to
```

1   the restroom?

2        A.    You would go to the restroom and you'd be

3   expected to get back on your bunk immediately thereafter.

4        Q.    Okay.  But there's no time limit imposed on that.

5        A.    I don't know that you can quantify the amount of

6   time it takes to walk from the restroom back to your bunk

7   but that's the expectation and that's what the -- that's

8   what's enforced.

9        Q.    Okay.

10          And so, other than that, what if they want to get

11  a drink of water?

12       A.    They can do that, as well.

13       Q.    What if they're not feeling well and they feel

14  like they need to talk to the corrections officer, are they

15  allowed to get up and go to the officer?

16       A.    Yes, sir.

17       Q.    Okay.

18          Any other basis for them to get up out of their

19  bunk that wouldn't violate their lockdown privilege?

20       A.    There may be.  If you came up with one, I may or

21  may not agree with it.  Off the top of my head, I can't

22  think of any.

23          Maybe the medication nurse comes through in the

24  middle of the night for a small number of inmates so they'd

25  have to get up for their medicine.

1        You might have a couple of inmates up cleaning in

2   the pod.

3        All this is with -- with proper authorization.

4   Q.   Okay.

5        Some inmates have special privileges that others

6   don't, in terms of if you're a trustee or you're

7   responsible to clean something, something of that nature,

8   so they would have, I guess, ability to move around better

9   or with permission, I should say.

10  A.   Yes.

11  Q.   So going back to the interviews that you read

12  from the two inmates, Terry Place and --

13  A.   Steven Murphy?

14  Q.   -- Steven Murphy --

15       Okay.  Thank you.

16  A.   You're welcome.

17  Q.   -- would you agree with me that they did not

18  identify -- we'll take them one at a time -- Deputy Miller

19  being present during -- or having knowledge about Friday

20  night fights?

21  A.   I would have to review the -- both of the

22  declarations to opine specifically on what they did or

23  didn't say.

24  Q.   Okay.

25       So they say what they say, obviously, but as far

1    as you can remember off the top of your head, did they

2    identify Miller, Kosinski or Dukes of being involved in

3    permitting or advocating, you know, inmate fights?

4        A.    Not to my recollection, no.

5        Q.    So, are you, I guess, going to give an opinion

6    about how long it takes for the deputies to conduct a

7    security check in Gulf Pod, each housing unit?

8        A.    I did give an opinion on that.

9        Q.    Okay.  How much time did -- and I apologize that

10   I don't remember -- what did you say?

11       A.    It's simple.  I initially -- based on the numbers

12   I was provided -- the number of inmates that were in

13   each -- in each pod, then collectively together, I said

14   that it should take at least five to ten seconds to check

15   each person.

16            Then, based on the original number I was

17   provided, before Captain Peterson testified, it was in the

18   neighborhood of 21 minutes it should take, roughly.  And

19   give or take, I'm not -- I wouldn't say if it's under 21

20   minutes, it's not sufficient because there are different

21   factors that play into -- into it.  But that's at a five --

22   that's at a five-second -- stopping and looking at each

23   inmate for five seconds.

24            Now, if you increase -- if I use that same five

25   seconds to the number of inmates that Captain Peterson said

1    that were in the unit, then that increases to about 26

2    minutes to complete it.

3            Now, at 26 minutes, if it was down -- at that

4    number of inmates, if it was down three or four, five

5    minutes, that's probably not a -- not that big of a deal.

6            But what I think was somewhere in the 80 and 90

7    percentile that these checks were done in nine minutes or

8    less, if my memory serves me correctly, Miller said that it

9    only takes him six minutes, typically, to do a check.

10   Q.    Okay.

11           And so -- and, again, I guess that would depend

12   on how many inmates are in the housing unit at that time.

13           Even though you've got 80 bunks, they're not all

14   full, correct?

15   A.    I don't know.  It looked like Alpha Pod was full.

16   Q.    I understand that you're talking about on the

17   night of question, but I'm asking you -- I mean, I think

18   your assessment of all of the --

19   A.    Yeah.

20   Q.    -- housing logs is related to before the date of

21   this incident, if I'm not mistaken.  Isn't that what you

22   were looking at averaging how much time is done?

23   A.    It's the month leading up to it, yes, sir --

24   Q.    Yeah.  And so --

25   A.    -- and the night of.

```
1        Q.   Were you given an average daily population for

2   Alpha or Gulf Pod entirely during that month?

3        A.   I don't recall seeing that.

4        Q.   That would be important to know, though, wouldn't

5   it?

6             So I just want to ask you some questions about

7   your findings and making sure that -- and if you want to

8   flip to Page 21 of your report, I have no problem with

9   that.

10            So you make some conclusory statements.  And I

11  want to, I guess, understand the basis for each of your --

12  what I call conclusory statements.  The first one is that

13  the Sheriff failed to provide a safe environment for the

14  inmates in their care and that this was a violation of the

15  corrections standard of care and caused harm to Cory

16  Merchant.

17            So what is the basis for your concluding that the

18  Sheriff failed to provide a safe environment to the

19  inmates?  Is it the fact that Cory Merchant got into a

20  fight and was injured?

21       A.   No.  They failed to have adequate policies and

22  procedures and permitted certain customs and practices

23  regarding the supervision or lack thereof of the inmate

24  population and failed to -- to -- they failed to adequately

25  supervise and they let them break rules, stay off their
```

1   bunks, all hours of the night, thereby, creating an

2   environment where the inmates are gonna take care of

3   business themselves because the deputies didn't do it.

4        Q.    So let's break this down.

5             What policies and procedures, specifically --

6   you're using that term, obviously, in a broad general

7   sense -- and I want to know specifically what policies and

8   procedures were not -- according to what, in your opinion,

9   should have been required of the deputies?

10       A.    Sure.  That would be the -- the policy and

11  procedure regarding the supervision of inmates, head count

12  of inmates --

13       Q.    And so do you have the policy numbers there?

14       A.    Sure.  Policy 6011.00 --

15       Q.    Okay.

16       A.    -- 6164.00 --

17       Q.    And which policy is that?  That's security --

18       A.    The first one was supervision of inmates, the

19  second one is head count of inmates.

20            This is partially inadequate and partially

21  they're not enforcing their own policy.  You've got a

22  custom and practice of not enforcing your own policy

23  regarding making sure the inmates remain on their bunks

24  other than the instances that they delineate as appropriate

25  reasons.

1           They let Cory Merchant stay off his bunk in an

2    area that wasn't his, thereby creating some sort of tension

3    within the pod, where Lutterloah felt as though he needed

4    to handle the business -- his business and stop him from --

5    Merchant from doing it because the deputy wasn't in there.

6        Q.   Cory Merchant was off his bunk maybe ten seconds

7    before the fight?

8        A.   I don't know.  I would have to look at the video

9    again.

10       Q.   Okay.

11            Well, we -- I think we have already agreed that

12   the whole -- the whole incident, start to finish, when he

13   got off the bunk until he hit Merchant, knocked him down

14   and he went down out of sight, was 20 seconds.

15       A.   Yes.

16            MS. HARTON:  Object to form, Bruce.

17                 You said Lutterloah got off -- you said

18       Merchant got off his bunk ten seconds before --

19            MR. BOGAN:  So I apologize.  Yeah.  So I meant to

20       say Lutterloah.

21            THE WITNESS:  Yeah.  I don't know how long

22       Merchant was off his bunk.

23   BY MR. BOGAN:

24       Q.   Okay.  So --

25       A.   The fact of the matter is, it was -- it was

1    after 1:00 o'clock in the morning and he was in another

2    area of -- of the bunk beds that he shouldn't have been.

3        Q.   And I'm not disputing that Merchant wasn't off of

4    the bunk.  My question is, is there any evidence that you

5    know of that tells us exactly how long Merchant had been

6    off his bunk before the fight happened?

7        A.   No.

8        Q.   And we know, from the video, we see Lutterloah

9    get out of his bunk, walk over, they have the words

10   exchange and then the fight happens and you look at the

11   timer, it's about 20 seconds in total.

12           So other than that period of time -- let's just

13   say it was ten -- ten seconds -- is there any other

14   evidence as to how long Lutterloah was off his bunk before

15   the fight happened?

16       A.   No.

17       Q.   All right.

18           And so, despite that, you're saying that there is

19   this policy of allowing inmates to remain off their bunk.

20           Is there -- well, strike that question.

21           Is there anything else that you're relying upon

22   to say that there's a policy of -- a practice, I should

23   say, of allowing inmates to -- allowed off their bunks

24   after lockdown?

25       A.   I recall reading witness testimony -- deposition

1   testimony to that effect, yes.

2        Q.   And what -- specifically -- practice was there

3   that allows inmates to remain off their bunk?

4        A.   Captain McNeely, I believe it was, said that each

5   one of the deputies enforces the rules -- nothing's in

6   black and white, they enforce the rules how they see fit,

7   something to that effect, and they allowed that to occur.

8        Q.   So McNeely -- or was it Sergeant Dukes, I'm not

9   sure -- but I think that there's a reference that the

10  officers have to have some discretion as to how long a

11  person can remain off their bunk when they're doing

12  something; is that fair?

13       A.   I would agree with that.

14            And discretion does come into play.

15       Q.   Corrections officers have to have some discretion

16  if the guy gets up to walk to get a drink of water and on

17  his way, he stops and there's a guy, you know, reading a

18  book and says hello to him, he has to be able to have the

19  discretion to decide, okay, is he now violating the rule or

20  not violating the rule, correct?

21       A.   I agree.

22       Q.   And he may have the discretion to go, okay, he's

23  just on his way to the bathroom and I'll let it go.

24            So isn't that what, essentially, McNeely and

25  Dukes were referring to when they say the officers have to

```
 1    have discretion?
 2         A.    Maybe.  I don't know what they were referring to.
 3    That's very possible and plausible.
 4         Q.    So what other policy are you referring to that
 5    you believe was -- was not enforced?
 6         A.    That may be the only one that wasn't enforced.
 7         Q.    Okay.
 8         A.    That's not the only one that was inadequate but
 9    that may be the only one that they didn't enforce.
10         Q.    Okay.
11               In terms of inadequacy -- I may have cut you off.
12    I know you got through policy 6011, 6164, and what was
13    the -- is there any other policy you think is inadequate?
14         A.    The post orders.
15         Q.    What policy?
16         A.    For G Pod.  It's not a policy number.
17         Q.    Okay.
18         A.    Post order.
19               I don't -- I don't have the -- I don't believe I
20    have the supervisory policy but based on testimony, the
21    supervisors are not required -- there's not specific
22    enunciation or delineation of their responsibilities in how
23    they supervise or track, monitor their employees'
24    performance.  That would be inadequate.
25         Q.    Okay.  Anything else?
```

1        A.    Their own classification policy, they don't

2   follow that.

3              And I'll lump classification policy and housing

4   plan together because they go hand-in-hand.

5        Q.    So is there a particular number on the

6   classification policy?

7              MS. HARTON:   Object to form.

8   BY MR. BOGAN:

9        Q.    The one that you're referencing.

10       A.    Yeah, I've got to go back through the --

11             Policy 6766.00.

12       Q.    Okay.

13             Any other policies that you think are inadequate?

14       A.    I believe that's all of them.

15       Q.    Okay.

16             So, in terms of, then, your -- you know, your

17   conclusory opinion number one, the policies that you say

18   are inadequate that led to there not being a safe

19   environment in this case, are the supervisory policy 6.011,

20   the head counter policy 6164, the post orders for the G

21   Pod, and then the supervisory policy which has -- I don't

22   think it has a number, you said, and then the

23   classifications policy.

24             So let's go back to what is it about the

25   supervisor policy of 6 point -- supervision policy, excuse

1    me, of 6011 that is inadequate?

2        A.    How often they require their staff to actually go

3    in and supervise the inmates.

4        Q.    Okay.

5        A.    They, therefore, by and large left them

6    unsupervised the vast, vast, vast majority of the day.

7        Q.    Okay.  And, again, I think we've talked about

8    that probably extensively now.  We're referring to the 30

9    minutes versus 60 minutes and 24 hours versus eight hours.

10       A.    That all goes into the supervision of inmates.

11   If you're not there to supervise, how can you provide

12   supervision?

13       Q.    Right.

14       A.    You can't provide supervision from outside the

15   pod.  You might be able to monitor them through a window or

16   through -- through surveillance video but that's not

17   adequate supervision.

18       Q.    And so, again, head count, 6164, how is that

19   inadequate?

20       A.    That's the one that they're not -- that they're

21   not complying with by making inmates stay in their bunks.

22       Q.    Okay.  So that's the head count.

23             That's the lockdown you're referring to, not the

24   fact that the head count -- it's contained within the head

25   count policy --

1      A.    Correct.

2      Q.    -- the lockdown provision, okay.

3      A.    Right.

4      Q.    And then what about the post orders of the G Pod

5  do you think are inadequate?

6      A.    Let me look at it.

7            The fact that the head count or the observation

8  of the inmates only occurs between 2200 and 0600.  And it

9  says accomplished every hour.  And that's actually what

10  they do.  They actually -- they actually comply with that

11  policy and they do it every hour on the hour, making them

12  very predictable.

13            So that's inadequate.  And their custom and

14  practice of doing it in a predictable manner.

15      Q.    So -- and I think we've already talked about this

16  but you agree with me, they're not conducting the security

17  checks exactly at the same time every night, other than it

18  starts at 10:00 o'clock and they're not -- there's no

19  testimony that they conduct the same order of the housing

20  units each night at 10:00 o'clock.

21      A.    There's no testimony to that effect.

22      Q.    Okay.

23            So what's wrong with the supervisor policies?

24      A.    Well, I haven't seen a supervisor policy.  I'm

25  basing that on -- on the testimony of Captain Peterson and

1    Captain McNeely.

2        Q.    Okay.  That there is no policy that describes

3    what a supervising sergeant does?

4        A.    It doesn't delineate what they do, correct, what

5    they're responsible for, the actual supervision of their

6    employees.  They're told they have to walk through -- they

7    have to walk through the units but it -- but it -- once a

8    shift.  But they -- it doesn't tell them how to monitor

9    their employees for performance because, had they been

10   monitoring them, they would have seen that both Kosinski

11   and Miller are -- are doing these checks in a manner that's

12   totally predictable.  One of them, I believe, was 94 or 96%

13   of the time, they start their check at 10:00 o'clock.

14           Albeit you -- you've made your point that they

15   could start in A, B, C or D or it could be B, C, A and D.

16   I don't know what -- where they start, but that goes back

17   to inadequate recordkeeping, as well.  Had they kept

18   adequate records, we would know a time that they were in

19   each of those areas.  But they have one master record for

20   four different sections or pods.

21       Q.    So that opinion, you agree, is based on

22   assumptions that you're making from the housing log record

23   of when the security checks are being made.

24           MS. HARTON:  Objection to form; that misstates

25       his testimony.

1    BY MR. BOGAN:

2        Q.    Agree?

3        A.    Say the question again, please?

4        Q.    Yeah.  You're making assumptions, based on what

5    is written in the housing record logs, because they don't

6    delineate what housing unit gets searched first.

7        A.    You mean where they walk through which one first?

8        Q.    Yes.  Yeah.  It's not recorded they went to A, B

9    or C --

10        A.    They don't keep record of it at all.  That's what

11    I mean, that makes that an inadequate record.

12            The fact that they don't delineate or they don't

13    identify what pod of the section they're going into at what

14    time, that's an inadequate record of it, in and of itself.

15        Q.    They keep a record as to when a security check

16    takes place in the Gulf Pod, correct?  You've seen it.

17        A.    I have seen it.

18        Q.    Okay.

19            And you don't like it because it's not meticulous

20    enough, I guess, for you, in terms of being able to

21    establish which unit at what exact time -- which housing

22    unit at what exact time in Gulf Pod, how long they were in

23    there and did they, you know, record that insufficiently,

24    in your opinion; is that where that is?

25        A.    It would be impossible for me, you, or anybody

1    else to be able to identify what time they were in each of

2    the areas and what time they saw each of the inmates

3    because they don't keep a record of it.

4         Q.   So it should be impossible for you to criticize

5    and say it was done insufficiently -- either, it was

6    sufficiently or insufficiently?

7         A.   I don't agree with that.

8         Q.   Okay.

9              So you're just assuming it's insufficient, then,

10   based on the fact that they didn't record specifically how

11   long they spent in each housing unit.

12        A.   No, I'm telling you --

13             MS. HARTON:  Form.

14             THE WITNESS:  -- the time they spent in each

15        housing unit was insufficient.

16   BY MR. BOGAN:

17        Q.   So, in terms of what was recorded, it was for the

18   entire Gulf -- but I don't want to argue with you -- the

19   fact is, the record says what it says in terms of, you

20   know, when the inspection for the Gulf Pod takes place.

21             And I think those records, obviously, you're

22   being critical of and I think you're making assumptions on

23   those records.  And I guess my question is, you know, to be

24   fair, you shouldn't criticize those records without having

25   complete and full accurate information as to how long they

1    spent in each housing unit.

2        A.    I'm telling you, based on the amount of time that

3    they recorded for the overall pod -- G Pod, that it is --

4    it is impossible for them to be conducting an adequate

5    check in four different sections within that one pod of the

6    number of inmates that they have in there in that amount of

7    time.

8        Q.    So did you make any assumptions as to how many

9    checks were done in G Pod the night of November 7th?

10        A.    I believe I've recorded that somewhere.

11        Q.    Okay.

12        A.    I'd have to look.

13        Q.    Okay.  Go ahead.

14        A.    Okay.

15            I'm not sure if that's in my notes or where it's

16    at.  Let me --

17            I don't have that list.

18        Q.    Do you know when the last security check was done

19    in Gulf Pod Alpha -- or even Gulf Pod before the incident

20    with Cory Merchant occurred?

21        A.    There was two of them listed, if my memory serves

22    me correctly.  One said it started at 1:00 o'clock and

23    ended at 1:04, which was four minutes; one said it started

24    at 1:00 o'clock and ended at 1:09, which was the nine

25    minutes.  I'm not sure, you know, which one is accurate or

1    not because they listed two of them.

2        Q.    And so who -- who recorded those?

3        A.    It was either Kosinski or Miller.  I think it

4    was -- Kosinski was working the post at that point, if I

5    remember right.  I'd have to check my report.

6        Q.    So -- so how long was 1:09 before the incident

7    with Cory Merchant and Lutterloah?

8        A.    I would have to look at what time the report was

9    written regarding the fight.

10            Stand by a minute.

11            It was at 1:10 hours, so a minute after the 1:09

12    or six minutes after the 1:04, whichever one you choose.

13        Q.    So, are you suggesting that those -- that

14    security check was not done in Gulf Pod Alpha at either

15    1:06 or 1:09?

16        A.    I didn't suggest that at all.

17        Q.    So if, in fact, those security checks were done

18    at 1:06 or 1:09 and went through -- you know, went into

19    Gulf Pod Alpha, what else would you have expected Kosinski

20    to have done that night?

21        A.    It goes back to the pattern in practice of when

22    they -- if the inmates know you're coming in at the same

23    time every night -- or at the same time every hour, they're

24    gonna -- as soon as you walk out of there then you're not

25    coming back for an hour, they're going to start doing their

1  misdeeds.

2      Q.   Well, I mean, obviously, the inmates, you know,

3  are able to calculate, I guess, time, correct?  I mean,

4  they have a clock in there?

5      A.   I don't know if they have a clock in there or

6  not.

7      Q.   Okay.

8           So, at the end of the day, if, in fact, there

9  were two security checks done within that time frame, that

10 wouldn't be predictable, would it?

11     A.   I don't know that two security checks were

12 conducted at that time.  They're overlapping.

13     Q.   Well, again, that's what the records show, right?

14     A.   Yes.

15     Q.   Okay.

16     A.   It shows that one check was conducted from 1:00

17 a.m. to 1:04 a.m. and one check was conducted from 1:00

18 a.m. to 1:09 a.m.  One person's not -- can't do both those

19 checks, can they?

20     Q.   So at the end of the day, if, in fact, checks

21 were done at that time frame, that that was what a

22 reasonable correctional facility should be doing to try and

23 make sure that the inmates are secure and in their bunks.

24           MS. HARTON:  Object to form.

25           THE WITNESS:  That is one of the things that they

1        should be doing, yes.

2   BY MR. BOGAN:

3        Q.   Okay.

4        A.   They should be doing security checks and

5   enforcing the rules while they're in there.

6        Q.   And I think we've already established before

7   that, you know, inmate-on-inmate assaults can occur

8   spontaneously without predictability and it can happen at

9   any time of the day or night.

10       A.   They can.  And it is enhanced when they're not

11  supervised.

12       Q.   But they were supervised that night, correct,

13  sir?

14            MS. HARTON:  Object to form.

15            THE WITNESS:  They were supervised inadequately.

16  BY MR. BOGAN:

17       Q.   Well, I understand that's your view.  But whether

18  you think it's inadequately or adequately, they did have

19  supervision that evening.

20       A.   Yeah.  I thought the whole purpose -- I was here

21  to give my opinion and that's why I say inadequately.

22       Q.   I gotcha.

23            So let's move down a little bit to -- because I

24  think some of your opinions overlap here.

25            Well, I want to go to the number 2.  You say,

 1   inmates were -- excuse me.  The Marion County Sheriff's

 2   Office Policies, Procedures, and Post Orders regarding

 3   observations were contradictory and noncomprehensive; i.e.,

 4   failed to require said checks to be conducted 24 hours a

 5   day and inadequate.  This was in violation of correctional

 6   standard of care and caused harm to Cory Merchant.

 7           So is this -- are we referring to the same thing

 8   that we've just talked about in terms of the timing of the

 9   security checks?

10       A.   Yes, sir, in part.

11       Q.   Okay.  What's the other --

12       A.   They also had -- they also had contradictory

13   policies.  One of them stated it starts at 10:00 o'clock,

14   one states it starts at 11:00 o'clock.

15       Q.   Okay.  And I think you wrote to that earlier.

16           So one policy was applicable to this particular

17   Gulf Pod, correct?

18       A.   Yes, sir.

19       Q.   And that the other policy was not applicable to

20   Gulf Pod, correct?

21       A.   No, that's not correct.  It's applicable there,

22   as well.  One was a policy and one was a post order.

23       Q.   Okay.

24           So in the post order that you reviewed said that

25   they should start at 11:00 and one -- the other policy --

1    the written policy says it should start at 10:00.

2        A.    That sounds accurate.

3        Q.    Okay.

4            So regardless of whether or not they followed

5    either one of those policies, they would have had, at 1:00

6    o'clock in the morning, there should have been a search --

7    or a security check, I should say, of Gulf Pod A regardless

8    of which policy they were following.

9        A.    That is correct, they did a -- they did one

10    immediately before.

11        Q.    So did you see anything that supports your

12    conclusion that these contradictory starting times between

13    the post order and the general policy was confusing to the

14    deputies and they didn't know what to do or when to do

15    security checks?

16        A.    No.  The fact that they don't do security checks

17    more frequently and throughout the entire day is where they

18    failed to do them.  They set a stage for something to

19    happen within that pod.

20            First, they put inmates -- violent inmates in

21    there with nonviolent inmates and then they don't supervise

22    them and -- by going in there when they should -- and they

23    don't enforce rules like they're supposed to, so it's no

24    wonder that this happened.

25        Q.    So -- and just so I'm clear, you know, when you

1    say it's violation of correctional standard of care, are we

2    referring to the same correctional standard of care that

3    you've already talked about here, the National Institute of

4    Corrections --

5         A.    You keep implying that that is the standard of

6    care.  That's where that comes from.

7              The standard of care is what would a reasonable

8    or prudent agency or jail administrator do?

9              Does that support -- do those publications

10    support what reasonable and jail administrators do?  It

11    certainly does.  Does that make it a written standard of

12    care?  I don't know that it does.  I don't know that

13    anything can -- can codify or put in writing what the

14    standard of care is.  It's what would a reasonable and

15    prudent person or agency do?

16         Q.    So then the primary basis for -- and maybe all of

17    these opinions is it's your opinion, that's what you

18    believe a reasonable standard of care should be for a

19    correctional facility.

20         A.    Which is supporting --

21              MS. HARTON:  Objection to form.

22              THE WITNESS:  Which is supported by these

23         reputable sources, yes.

24    BY MR. BOGAN:

25         Q.    And that's what I'm trying to figure out here.

1    I'm not trying to be difficult with you.  So you say with

2    reputable sources and I want to know what those reputable

3    sources are besides your opinion.

4        A.   They're the ones listed in my report that we've

5    discussed at length.

6        Q.   Okay.

7             So then, number 3, again, you say the Sheriff's

8    Office had a custom and practice of conducting well-being/

9    wellness/security checks on a predictable schedule.  This

10   was in violation of the correctional standard of care.

11            So, again, is -- are we talking about the same

12   thing again, your opinion plus what you say, relying upon

13   of the National Institute of Correctional Care with the

14   Department of Justice?

15       A.   It's not just my opinion.

16            In fact -- in fact, Captain Peterson, Captain

17   McNeely and I believe Deputy Kosinski all said the same

18   thing in their testimony; that you don't want the inmates

19   to be able to predict when you come in, so you should start

20   them at different times.

21       Q.   Well --

22       A.   But in the same testimony, Deputy Kosinski said,

23   I started on the dot every time at the top of the hour.

24            And I believe Miller said something very similar

25   to that.

1    Q.    Well --

2    A.    They support the notion that, hey, this is a --

3    this is a sound and prudent practice of, we don't want the

4    inmates to be able to figure out when we're coming in

5    because then they do bad things.  That's what the testimony

6    indicates, okay?

7    Q.    So --

8    A.    That's what I'm saying.  We all agreed on it.

9    Q.    Well, that wasn't what I asked you.  I asked you,

10   you know, in terms of authoritative text --

11         I agree that the testimony is what it is and I

12   respectfully disagree with your characterization.  They

13   agreed that it shouldn't be done, you know, to a -- to the

14   extent that the inmates can predict when it's going to be

15   done but no one in this case has said that they did that;

16   that they were predictable in terms of when they were

17   actually conducting the checks every night.  There is no

18   testimony that says that.

19   A.    No, the testimony doesn't say that.

20   Q.    It says he starts at 10:00.  It doesn't mean that

21   he started in Gulf Pod A at 10:00 every night.  He didn't

22   say that.

23         MS. HARTON:  Object to form.

24              Bruce, like, we can't be arguing about what

25         testimony is what, we're just -- ask your question.

1        This is a waste of time.

2              MR. BOGAN:  I think he -- well, I'm doing the

3        same thing he's doing because he's characterizing what

4        he said the testimony is in the case and it's not

5        right.  So --

6              MS. HARTON:  It's argumentative.

7                    Let's move on.

8   BY MR. BOGAN:

9        Q.   So, again, sir, I mean, I don't know, you want to

10  point me to a line and page as specifically of where

11  Kosinski says that he checks Gulf Pod A every night at

12  10:00 o'clock?

13       A.   He doesn't say that.

14       Q.   Okay.

15            So question number 4, the Marion County

16  Sheriff's -- or not question, I'm sorry -- finding number

17  4, Marion County Sheriff's Office had a custom and policy

18  of conducting inadequate well-being/wellness/security

19  checks form -- and form; i.e., length of time actually

20  observing inmates.  This was in violation of the

21  corrections standard of care and causing harm to Cory

22  Merchant.

23            So, again, the basis for that -- obviously, I

24  think we've talked a little bit about -- is your opinion is

25  that they weren't spending enough time and that's your

1    view, that it takes longer than that.

2           What I'm asking is, in terms of your position

3    that it's a violation of correctional standard of care, is

4    there anything else that you're relying upon besides your

5    experience and your opinion?

6       A.    My training, my education, my experience, all of

7    that is taken into consideration when I form my opinion and

8    it is supported by, again, the National Institute of

9    Corrections and the authors of those publications.

10      Q.    So is there a publication or an authoritative

11   text that says you must spend a certain amount of time

12   conducting a security check?

13      A.    I'm just saying --

14           MS. HARTON:  Object to the form.

15           THE WITNESS:  I'm sorry --

16                I thought Miss Harton was speaking.

17           MS. HARTON:  I just objected to the form of the

18       question and I think it's been asked and answered.

19                But go ahead.

20           THE WITNESS:  Can you ask the question again?

21   BY MR. BOGAN:

22      Q.    So, my question was, is there anything besides

23   your opinion, which is based as I understand on your

24   experience, training and education, that you relied upon

25   that described, specifically, the amount of time that needs

1  to be spent conducting a security check on either one

2  inmate or how many inmates, I don't know?

3         A.   That is based upon all that and my actually doing

4  these checks and how long it takes for you, as a person, to

5  be able to ascertain if that person is alive and okay while

6  they're laying in their bed under a blanket --

7         Q.   Okay.

8         A.   -- sometimes with their head covered even.

9              So there is a -- there's 32-plus years of

10 experience going into that opinion.

11        Q.   Okay.

12             So there's no NIC standard or any standard that

13 says how much time you have to spend to make that

14 conclusion.

15        A.   No, not that I'm aware of.

16        Q.   So you go on to say in number 5, concluding that

17 the Marion County Sheriff provided inadequate supervision

18 of its employees and this was in violation of the

19 correctional standard of care and caused harm to Cory

20 Merchant.

21             So, again, how does this --

22             Well, first of all, how did the Marion County --

23 what's the basis for the Sheriff to inadequately supervise

24 its inmates?  What's your basis for your opinion on that?

25        A.   Well, Sergeant Dukes knew that -- Sergeant Dukes,

1    Captain Peterson, I believe there's more than one person

2    that's indicated that they knew that the -- that inmates

3    were allowed to stay up.

4            They, also, had they -- had they been providing

5    adequate supervision, they would know that the deputies

6    aren't doing adequate cell checks or wellness checks on the

7    inmates in these units, both timing and form, as well as

8    predictability-wise.  Had they been providing adequate

9    supervision, they would have identified that.

10           Furthermore -- furthermore, in their own policy,

11   they require the lieutenant to walk through every night, as

12   well, and there's not one notation in the month leading up

13   to this event that the lieutenant actually walked through.

14           But when Sergeant Dukes did walk through, he --

15   he literally walked through.  He did not -- according to --

16   according to what I gathered from the testimony, he did

17   not -- he did not actually stop in these units and actually

18   conduct any type of supervisory oversight, review, dialogue

19   with staff, with inmates or anybody.

20       Q.   So that's your conclusion based on his

21   deposition?

22       A.   Oh, that's -- that was one of the things that I

23   had mentioned.  I mentioned a whole lot of other things

24   right there, as well.

25       Q.   So let me just ask you, are you relying on

1    authoritative text at all, as it relates to that opinion,

2    or is that just, again, what you conclude after reviewing

3    depositions?

4        A.    Well, no, that's --

5             MS. HARTON:  Object to form.

6             THE WITNESS:  I believe -- I believe the -- let's

7        see here.  The Resource Guide for Jail Administrators,

8        as well as the -- there's another publication for

9        Direct Supervision Jails and the Role of the

10        Administrator.  Those would be the couple of

11        authoritative publications that support my opinion.

12    BY MR. BOGAN:

13        Q.    I'm sorry, which -- which authoritative text did

14    you say, the National Institute of --

15        A.    National Institute of Corrections for both of

16    them.  The Resource Guide for Jail Administrators and then

17    the Direct Supervision Jails and Role of the Administrator.

18        Q.    And none of which are required to be followed but

19    are guidelines, correct?

20        A.    Sure.

21        Q.    So let me just -- let me just ask you this

22    question, because you've -- you've made this conclusion at

23    the end of every one of these 14 findings and you said,

24    this was in violation of the correctional standard of care,

25    which obviously I, you know, respect that you can have that

```
 1  opinion, but then you go on to say, after every one of

 2  these opinions, that this caused harm to Cory Merchant.  Do

 3  you see that?

 4       A.   It did.

 5       Q.   And, in fact, aren't you doing exactly what the

 6  court told you you cannot do in that Smith case?

 7            MS. HARTON:  Object to form; you are

 8       mischaracterizing that opinion.

 9  BY MR. BOGAN:

10       Q.   Aren't you, in fact, telling the jury this is

11  what caused the harm to Cory Merchant?

12            That's not your role in this case, correct, sir?

13       A.   It's at least --

14            MS. HARTON:  Hold on.  Hold on.  Hold on.

15            Object to form; that opinion was about his

16       ability to provide medical testimony.

17            You're mischaracterizing his opinions, sir.

18            MR. BOGAN:  It's the same thing.  What's

19       different about it, Sam?  There's nothing different

20       about him concluding this is what caused the harm to

21       Cory Merchant; that's up to the jury to decide in this

22       case.

23  BY MR. BOGAN:

24       Q.   Do you agree with that, sir?

25            MS. HARTON:  Object to form; it's --
```

```
 1              THE WITNESS:  I don't agree with that.
 2    BY MR. BOGAN:
 3         Q.   So you think it's within your province to tell
 4    the jury as to what caused the harm in this case.
 5         A.   I do.
 6         Q.   And you think you should be allowed to give that
 7    opinion.
 8         A.   I do.
 9         Q.   So, opinion number 7, the Marion County Sheriff's
10    Office policy and procedure regarding inmate classification
11    and housing were inadequate.  So what is inadequate about
12    the classification and housing plan?
13         A.   They housed all sex offenders, regardless of
14    whether they were violent or nonviolent, within the same
15    living area without exception.
16              And I -- I take that back, with exception of
17    escape risks or people that were suicidal or needed medical
18    care.  Otherwise, sex offenders were all housed there --
19         Q.   So there can --
20         A.   -- regardless of their classification.
21         Q.   Sex offenders can come in and they're classified
22    as maximum security inmates and you agree that they would
23    not be housed with all other sex offenders, true?
24              MS. HARTON:  Object to the form.
25              THE WITNESS:  I disagree with that.  That's not
```

1      what -- that's not what the testimony was.

2   BY MR. BOGAN:

3      Q.   So you disagree that a person coming in on sex

4   offender charge who is housed -- excuse me, who is

5   classified as a maximum security inmate, they will not be

6   housed in Gulf Pod?  You disagree with that?

7      A.   Oh, they're going to house them in Gulf Pod, in

8   Gulf Alpha.

9      Q.   Even if they're a max security inmate and a

10  security risk?

11     A.   Yes.

12          Well, wait.  You just added security risk.  Your

13  initial question was, if they're -- if they're maximum

14  security.  If you throw in the security risk of being an

15  escape risk, then they would house you in a single cell

16  somewhere else is what they said.

17     Q.   So is there any other -- as far as you've been, I

18  guess, provided documentation in this case, is there any

19  other basis for a max security inmate to be put into a

20  single-cell housing besides the fact that they're a

21  security risk?

22     A.   I'm not --

23          MS. HARTON:  Object to form.

24          THE WITNESS:  I'm not saying that a max security

25     person has to go to the single-cell housing, I'm

1          saying that you should keep the violent offenders away

2          from the nonviolent offenders.

3      BY MR. BOGAN:

4          Q.   Okay.  So I just want to -- I think you tried to

5      clarify your answer and I just want to make sure that I

6      understand how you're clarifying it.  Because there can be

7      a sex offender who is a max security inmate that comes to

8      that facility and he could be housed in single-cell

9      classification and not in Gulf Pod.

10         A.   With certain qualifiers, that's what -- that's

11     what -- that's what they -- the testimony --

12         Q.   Okay.

13              And do you have an understanding of what those

14     qualifiers are or not today?

15         A.   I just said that.  If somebody was an escape

16     risk, if somebody was -- needed medical attention, if

17     somebody was on a suicide watch, there was -- there was

18     certain qualifiers that took them away from Gulf Alpha and

19     put them somewhere else.

20         Q.   Well, so what if this inmate had a sex charge

21     against a minor who -- there was a risk of harm to him

22     placing him in Gulf Pod?

23              MS. HARTON:  Object to form.

24              THE WITNESS:  And you've lost me.

25     BY MR. BOGAN:

1    Q.   Yeah.  So you're not disputing that there are --

2    there's a risk to sex offenders, when they come into the

3    facility, that they can be harmed by other inmates just for

4    that charge alone.

5    A.   Sure, they can.

6    Q.   And a sex offender who is well-known in -- you

7    know, either it's a publicized case, committed a murder of

8    a child and a sex offense on a child, that -- that

9    individual very clearly would not be housed in general Gulf

10   Pod housing, fair?

11   A.   I would hope not.  It would be a wise move.

12        Now, there is one thing:  The housing plan

13   actually had two other -- two other areas that were capable

14   of housing sex offenders according to their own plan.

15   Q.   And -- okay.  Explain.  What do you mean?

16   A.   So -- hold on one second.

17        So Alpha Pod -- no, it's Delta.  Delta Pod

18   Section E and Section F were actually -- it says will house

19   male felony inmates with sexual offenses, for both those

20   areas.

21        It also says, for Alpha Pod Section D will house

22   high mediums and maximum security population male inmates

23   with custody Levels 2 and 3 which Lutterloah falls into

24   that category.

25        However, they -- because they put all sex

1    offenders, regardless, without -- regardless, without the

2    other qualifiers that we previously mentioned, all sex

3    offenders go into Gulf Alpha.

4        Q.    So just so we're clear, what you just read -- and

5    you're conceding that Lutterloah was correctly classified

6    and placed in Gulf Pod Alpha according to that policy.

7            MS. HARTON:  Objection.

8            THE WITNESS:  No, that's not accurate.

9    BY MR. BOGAN:

10        Q.    You just said he was --

11        A.    That's not what I said.

12        Q.    Well, what you just read, that he was a -- a

13    max -- excuse me, a max --

14        A.    So wait a minute.  Wait a minute.

15            You're mistaking Alpha Pod with Gulf Pod.  Alpha

16    pod is its own pod.  But they had Section D within Alpha

17    Pod.

18        Q.    Okay.

19        A.    He was actually housed in Gulf Pod Alpha section.

20    He should have been housed in Alpha Pod Delta section is

21    what I'm -- I said.

22        Q.    Your position is, okay.  I'm --

23        A.    Based on -- based on their own housing policy and

24    classification policy, that's what I'm basing that on.

25        Q.    Okay.  So that's your view.  Obviously, I don't

1  think they agree with you but now I understand what

2  distinction -- you know, between the two pods.  And I had

3  heard you say Gulf Alpha and that's why I had that

4  question.

5      A.   Fair enough.

6          MS. HARTON:  Hey, Bruce, we're approaching the

7      three-hour mark.  If you want to take a break -- get

8      through the final questioning, can we take a break?

9          MR. BOGAN:  Okay.  Yeah.  We can take a break.

10          I'm hoping to wrap up here in, like, about

11      30 minutes.

12          MS. HARTON:  30 minutes?  Okay.

13          Well, I have some questions, too, so maybe

14      we'll take a break and then probably have another

15      hour.

16          MR. BOGAN:  Okay.  All right.  Let's take a

17      five-minute break.

18          (Whereupon, a short break was taken)

19  BY MR. BOGAN:

20      Q.   I want to jump down to number 9, Sergeant Dukes

21  provided inadequate supervision of Kosinski and Dellun

22  Miller.  So what's the basis for that opinion?

23      A.   We discussed that in opinion number 5.  We just

24  finished that.

25      Q.   Okay.

1          He failed -- he -- did he fail to follow a

2    particular policy and procedure that you're aware of in the

3    Marion County Sheriff's Office that applied to sergeants?

4          A.    I don't have that policy.  I don't know.

5          Q.    Okay.

6                But, in your opinion, the inadequate supervision

7    was because he didn't have enough presence in the dorm, as

8    well as with Kosinski and Miller?

9          A.    And he did not -- he did not take any steps to

10   determine whether the quality of their work was adequate

11   regarding wellness checks.

12         Q.    On the issue of wellness checks.

13               Any other aspects?

14               Have you read any of his reviews of their

15   performance?

16         A.    I'm not sure if Dukes actually gave a performance

17   review of either of them.

18         Q.    Okay.

19         A.    I'm not sure if he was the supervisor that gave

20   any performance reviews.

21               But he also -- he also was very well aware of the

22   fact that they conducted their checks at the top of every

23   hour.  He said -- he said as much in his testimony.

24         Q.    Gotcha.  And they started at the same time --

25               Did he say it starts at the same time, every

1    housing unit?

2        A.    You mean each section?

3        Q.    Right.  So each section.

4              Well, I guess, he used the term Gulf.  There's

5    pods and I thought there were housing units which are the

6    same as section units.  I don't know which term we want to,

7    you know, agree to but, I think, in Gulf Pod there were at

8    least four other housing units in Gulf Pod.  Is that what

9    your understanding is?

10       A.    There's four total in Gulf Pod as far as --

11       Q.    Yeah.

12       A.    -- that's my understanding.

13       Q.    Okay.

14       A.    And, no, I did not see anything that he indicated

15   that they began in a particular section or whether they

16   rotated that.

17       Q.    Okay.  Is there anything else for the basis of

18   your opinion that he did not do a good -- or an adequate

19   supervision of Kosinski and Miller?

20       A.    Had he -- had he reviewed video of them, he would

21   see them doing inadequate checks and providing inadequate

22   supervision of the inmates in their pods.

23       Q.    So do you have video that shows them doing

24   inadequate checks?

25       A.    No.  I have the timing that it took for them to

1    do their checks and that's inadequate.

2        Q.    So based on the -- what they wrote on the logs,

3    do you have any other basis to say that they're

4    inadequately performing the checks?

5        A.    No.  That's -- that's a very reliable source for

6    me to make that opinion.

7        Q.    Okay.

8            And you didn't look at any videos of their prior

9    performance on that issue.

10       A.    No, sir.

11       Q.    And not to -- to go over all this again but the

12   correctional standard of care for that opinion is the same

13   as what we're talking about, past -- your experience and

14   training, as well as the NIC standards?

15       A.    What would a reasonable and prudent

16   practitioner -- a correctional practitioner do?  Whether

17   that's the administrator or the officer, what would a

18   reasonable and prudent practitioner do?

19       Q.    Okay.

20       A.    Coupled with my education, training, 32-plus

21   years' experience.

22       Q.    Any particular provision of the NIC that you're

23   pointing to that relates to Sergeant Dukes' inadequate

24   supervision?

25       A.    I think we already discussed that in number 5.

1          It would be the NIC Resource Guide for Jail

2     Administrators and the NIC Direct Supervision Jails and the

3     Role of the Administrator support my opinion.

4          Q.   Then, you have Dukes provided inadequate

5     supervision of the inmates.  What's the basis for that

6     opinion?

7          A.   So just as though he's supposed to -- he should

8     be going through and supervising the -- his officers, he

9     should be doing that with the inmates, too.  And that

10    encompasses actually stopping and talking to inmates if --

11    if they so desire.  But he said he doesn't -- they -- he

12    said he doesn't do that -- or they said he doesn't do that.

13    Testimony shows that he doesn't do that.

14         Q.   So whose testimony?  Because I'm pretty sure I

15    was at Sergeant Dukes' deposition and he testified he walks

16    through the housing units every night.

17         A.   He said he walks through them, but he only stops

18    to talk to inmates in one of them is what he said.

19              The other three pods, he does a drive-by.  He

20    walks through to satisfy that paper requirement that he was

21    there.  But he doesn't actually do anything to -- to say

22    that he's actually supervising; he's walking through.

23         Q.   And so isn't his presence good enough?

24         A.   Not in that instance, no.

25         Q.   And what is it -- what is it that's ineffective

1    about his presence being that the officers and the inmates

2    know that he is coming through and walking through?  What's

3    inefficient about that?

4         A.    So when the supervisor goes through, they should

5    be allowing the inmates to actually approach them and talk

6    to them.  It breaks down barriers.  And if -- if Merchant,

7    if Lutterloah, if any of the other inmates that are in any

8    of these pods had any problems with how the pods were

9    running by the deputies, they would be able to hear that

10   firsthand from the inmates and then they could look into

11   it.  That all goes to part of the supervision of not only

12   the inmates but as well as the staff.  Those are things

13   that we, as -- as floor supervisors and administrators,

14   that's one of the things that we do; we talk to inmates so

15   we know what's going on within the facility.  Because just

16   by walking around and observing, you don't get the full

17   breadth of it.  You have to talk to inmates in order to

18   learn what's happening.

19          And the fact that he's not willing to do that --

20   or doesn't do that, I should say, on a consistent basis, it

21   means he's not supervising, he's not providing adequate

22   supervision.

23        Q.    Well, what if the inmates are asleep?

24        A.    Well, then, they won't -- then they wouldn't, but

25   that's not what he said.

1    Q.   Okay.

2    A.   That's not what he said.

3         In fact, I believe most of the times that the

4    supervisor went through -- if my memory serves me correctly

5    from the logbooks -- was they were going through before

6    lockdown, which is a good practice.

7    Q.   Okay.

8         So is there any other basis for your opinion that

9    he's not properly supervising the inmates?

10   A.   No.  That's it.  That sums it up.

11   Q.   And the same thing with, I guess, questions about

12   Kosinski provided inadequate supervision of the inmates in

13   his care.  What did Kosinski -- what's the basis for your

14   opinion about Kosinski?

15   A.   He's, again, not -- his watches, how often he's

16   going in there, the length of time that it takes him, the

17   fact that he's not -- he's not enforcing rules while he's

18   in there, that all plays into that.

19   Q.   Okay.

20   A.   Same thing with Miller.

21   Q.   And you would agree that at the time of the

22   incident involving Mr. Merchant and Mr. Lutterloah, that

23   Miller was not in the rover station but had left to allow

24   another deputy to go on a lunch break.

25   A.   Yes.  Correct.  He was relieving someone for

1    lunch break.

2         Q.    Right.

3              Which happens in the corrections industry,

4    correct?

5         A.    Of course, yeah.

6         Q.    And then, I guess, 13 and 14 -- and I don't know

7    if these are just rehashing what we've already been talking

8    about -- but conducting inadequate well-being/security

9    checks and timing, form, and on a predictable schedule, is

10   there any other basis for that other than what we've

11   already talked about, that you didn't like the --

12        A.    No, there isn't.

13        Q.    -- the length of time that they walked through

14   there and the way they recorded it?

15        A.    No, there is not.

16        Q.    Okay.

17             So, at this point, as we sit here today, is what

18   we were gonna be marking as Exhibit 2, your Technical

19   Report, is that complete in terms of the opinions that

20   you're prepared to give when this case goes to trial, as

21   you sit here today?

22        A.    As I sit here today.

23             As I said at the onset of the deposition, I

24   suspect that I'll be receiving more information as

25   depositions take place.

1       Q.    Right.

2       A.    And I could be supplementing my report.

3       Q.    Okay.

4             So let me just go over a few things here I need

5  to clean up.

6             Let's see.

7             So I just want to make sure.

8             When you left the Hillsborough County Jail, it

9  was in 2021; did I get that correct?

10      A.    June of 2021, yes, sir.

11      Q.    June of 2021.  And at that time you were in court

12 services, not in the jail?

13      A.    Correct.

14      Q.    And the reason you left -- or decided to retire,

15 did --

16      A.    I was in the DROP program.  I entered that and it

17 was time for me to retire.

18      Q.    Okay.

19            So we've gotten some, I guess, invoices from Miss

20 Harton this morning and I think I totaled those up and it

21 looks like you billed around $26,000 so far in this case;

22 is that accurate?

23      A.    I don't know if it's accurate.  It sounds

24 reasonable, based upon the amount of work I've done on the

25 case.

1      Q.    Okay.

2            And your billing at the -- I know you said you

3      had a $3,000 retainer but then after that retainer, you

4      bill at a rate of $505 an hour?

5      A.    That has increased to $535 an hour at this point.

6      Q.    Okay.

7      A.    But that's what it started out as, yes.

8      Q.    Okay.

9            Are we paying you $535 an hour, then, today for

10     this deposition?

11     A.    Yes, sir.

12     Q.    It's my understanding that you will be billing us

13     for that.

14           And then --

15           Yes, you can take your --

16     A.    I was.  My -- our agreement is with Miss Harton's

17     firm, not you.

18     Q.    Okay.

19     A.    I'll be billing as I normally do and Robson will

20     bill Miss Harton for my time today and how you guys work

21     that out is between you, I guess.

22     Q.    Well, I'm sure she has a lot of money so she

23     probably will pay for it so --

24           So if this case were to go to trial, then, is it

25     the same rate, you bill by the hour to appear at the

133

```
 1    courthouse and travel and everything --
 2        A.   Yes, sir.
 3        Q.   -- it's all at your hourly rate?
 4        A.   Yes, sir.
 5        Q.   Okay.
 6             And, I guess, in terms of cases that you've
 7    worked so far -- I know, obviously, you've given only three
 8    depositions -- have you ever worked or been retained by any
 9    Sheriffs in Florida to get -- consult or give opinions on a
10    case?
11        A.   Can I look at something?
12        Q.   Yeah.  Sure.
13        A.   Let me see if I can tell from this.  I might be
14    able to tell.
15             Not that I can see.
16        Q.   Okay.
17             So -- and just for clarification purposes, what
18    is the methodology that you are using as it relates to your
19    preparation of opinions?
20        A.   Deductive reasoning.
21        Q.   Okay.
22             And in -- your deductive reasoning would include
23    consideration of everything in terms of the testimony that
24    is given or has been taken in the case?
25        A.   Yes.
```

1    Q.   And you would agree with me that it's not your

2    role to be an advocate for the Plaintiff in this case?

3    A.   Correct.

4    Q.   You're supposed to be completely objective as it

5    relates to the overall analysis of this case?

6    A.   Absolutely.  That's why our firm prides itself on

7    taking plaintiff and defense cases.

8    Q.   Okay.

9         And not to -- I think you mentioned at the

10   beginning here today that, I guess, there are some things

11   that you've been subsequently provided that came out after

12   this report came out.  And, just to be fair, I do want to

13   point out, though, that I guess when you made this initial

14   report as well as those conclusions, you had not received

15   the depositions of the Defendants, Kosinski and Miller?

16   A.   Correct.

17   Q.   And I think the only deposition transcript you

18   had actually seen was from Sergeant Dukes; is that fair?

19   A.   Correct.

20        And Kosinski, Miller, McNeely and Peterson all

21   support what I had previously opined on in my report.

22   Q.   And Miss Harton gave me your notes that you have

23   prepared, I guess, when you reviewed the case or -- yeah, I

24   guess it's all of the -- not just depositions but you've

25   made notes.

1          Is there a reason why you have different coloring

2     in your highlighting?

3          A.    To draw my attention to those areas.

4          Q.    Okay.  Is there a significance, though, between

5     blue, yellow, green -- and I don't think you have any other

6     colors here.  You have yellow, blue, green it looks like.

7          A.    Only because the other colors are too dark and I

8     can't use them.

9          Q.    Okay.  So there's no secret code to the coloring

10    system, then.

11         A.    No, sir.

12         Q.    Okay.

13             I just don't know if I got this clarified or not

14    but I just want to make sure.

15             There is no controlling standard that -- whether

16    you want to call it the standard of care -- for a model to

17    follow for the number of corrections officers that need to

18    be assigned to any particular number of inmates -- to

19    supervise any particular number of inmates.  Does that

20    question make sense?

21             In other words, is there some standard or

22    controlling standard or model guideline that you looked to

23    and said, you know, you need five more inmates for, you

24    know, 2,000 -- excuse me, five more correction officers for

25    2,000 inmates or some number guideline along those lines?

1    Do you understand what I'm saying?

2         A.   I do.  I understand that.

3              I didn't look at that in this -- in this

4    situation, but I can't think of anything off the top of my

5    head.  I would have to do more research to determine that.

6         Q.   Okay.

7              So it's not one of your opinions, then, that they

8    failed to meet a standard of care as it relates to the

9    number of inmates that were employed -- well, wait a

10   minute.

11             It's not your opinion that they failed to meet a

12   standard as it relates to the number of correction officers

13   that they employed versus the number of inmates in their

14   care, custody and control.

15        A.   It is not.

16        Q.   Okay.

17             MR. BOGAN:  All right.  I don't think I have any

18        other questions.

19             MS. HARTON:  I just have a few follow-ups.

20                        CROSS-EXAMINATION

21   BY MS. HARTON:

22        Q.   So, Mr. Adee, this was a fairly large record that

23   you reviewed, right?

24        A.   This is one of the larger ones that I've worked

25   on.

1      Q.   Yeah.  And that's part of the reason why

2   you're -- you know, you've billed approximately $30,000 at

3   this point, right; you've had to review all the records in

4   the case, right?

5      A.   Yes, ma'am.

6      Q.   Okay.

7           And you don't have the entire record in front of

8   you right now, right?

9      A.   No, ma'am.

10      Q.   So it's fair to say that, to the extent there are

11   any factual bases for your opinions that you weren't able

12   to articulate in this deposition, they're probably more

13   precisely articulated in your case notes and in your

14   report, right?

15      A.   Yes, ma'am.

16      Q.   Okay.

17           We talked a lot about the Florida Model Jail

18   Standards and the FCAC, which the acronym is escaping me

19   right now.

20           Can you tell me a little bit about how the

21   Florida Model Jail Standards are developed; if you know?

22      A.   Sure.

23           So a number of years ago, all county jails

24   were -- were overseen or monitored, if you will, by the

25   Florida Department of Corrections under Chapter 33-8.

1          At some point -- and I can't remember if it was

2     the late '90s or early 2000s, the Department of Corrections

3     said, hey, we're no longer enforcing 33-8 and the Florida

4     Sheriffs through the Florida Sheriffs Association said,

5     hey, that's not good for us, we need to make sure our jails

6     stay where -- up to par, if you will.

7          And through the Sheriffs Association and the

8     Florida Association of Counties, they developed the Florida

9     Model Jail Standards.

10          At the time, I was a -- probably a lower ranking

11     employee.  I think I was a corporal maybe when that

12     happened.

13          But, in essence, they took 33-8 and put the

14     Florida Model Jail Standards title on it for all intents

15     and purposes and that's what initially became the jail

16     standards.

17     Q.   And those --

18     A.   Throughout the years --

19          I'm sorry.

20     Q.   Go ahead.

21     A.   Throughout the years, they've been modified and

22     tweaked based upon society's demands for change.

23     Q.   And so those Florida Model Jail Standards, as

24     they've been developed and modified since you moved away

25     from the 33-8 section, those standards are developed by the

```
 1   sheriffs and the counties themselves, right?
 2        A.   Yes, they are.  In fact, I've actually been in --
 3   participated in meetings through the Florida Model Jail
 4   Standards committee to weigh in on what I thought we
 5   should -- what we should be doing in certain situations.
 6        Q.   So the Florida -- the Florida Jails -- sorry,
 7   excuse me.  The Florida sheriffs and counties who will be
 8   bound by the Florida Model Jail Standards are the ones who
 9   are developing the standards themselves; that's fair to
10   say, right?
11        A.   That's 100% accurate.
12        Q.   Okay.
13             What about the FCAC Standards; how are those
14   developed?
15        A.   That, I don't know.
16        Q.   Okay.
17             So I want to talk a little bit about your opinion
18   regarding monitoring detainees.  You -- we discussed -- or
19   you discussed with Mr. Bogan a lot about your opinion that
20   they should be monitored more than once an hour on the hour
21   at night, correct?
22        A.   Absolutely.  That is correct.
23        Q.   Okay.
24             And you and Mr. Bogan had a back-and-forth about
25   how the Florida Model Jail Standards -- that is, the
```

1    Florida Model Jail Standards provision that at least jails

2    must do checks every hour on the hour at night, right?

3        A.    That is correct, yes.

4            MR. BOGAN:   Object to the form.

5    BY MS. HARTON:

6        Q.    And can you talk a little bit about what your

7    opinion is as far as why that is not enough monitoring and

8    supervision specifically as it pertains to Gulf Alpha at

9    the Marion County Jail?

10        A.    So Gulf Alpha has got a mixed population in

11    there.  They're all sex offenders but some are violent

12    offenders, some are nonviolent offenders.  Some are

13    classified higher than others.  And the lack of

14    supervision, in general, creates an environment where the

15    inmates are going to do what they want to do.  They're

16    gonna -- they're gonna mete out justice, if you will,

17    internally because staff's not there to enforce the rules.

18    And even if they are there, they're not enforcing the

19    rules, so the inmates take matters into their own hands.

20    And that's what happens when you don't supervise inmates.

21        Q.    And so what you're saying is that the Gulf Alpha

22    is -- because of the mixed population of violent and

23    nonviolent detainees needs to have a particular -- a

24    particularly heightened monitoring or surveillance or

25    supervision than maybe some other general population dorms;

1   is that fair?

2              MR. BOGAN:  Objection.

3              THE WITNESS:  I would say that all the -- all the

4         dorms need to comply with the standard of care.  They

5         should all be doing 30-minute -- checks within 30

6         minutes at irregular intervals 24 hours a day.

7   BY MS. HARTON:

8         Q.   And that's especially important for a pod like

9   Alpha, where you've got violent and nonviolent offenders

10  mixed, right?

11        A.   Absolutely.  It matters even more at that point.

12        Q.   Okay.

13             And why is that?

14        A.   Because of the heightened risk for violence.

15        Q.   Okay.

16             And just -- I think this is my last -- my last

17  line of questioning.

18             We talked a little bit about, during lockdown,

19  the ability for some detainees to get up from their bunks,

20  use the bathroom, talk to a correctional officer if they

21  need something; there are ways in which a detainee would be

22  permitted to go off their bunk during lockdown for a

23  specific purpose, right?

24        A.   Correct.

25        Q.   But to the extent any detainee is milling around,

1    just kind of chatting with other detainees during lockdown,

2    that is not permitted under the written policy of the

3    Marion County Jail, correct?

4              MR. BOGAN:  Object to form.

5                   Go ahead.

6              THE WITNESS:  Sorry.

7                   That is correct.

8    BY MS. HARTON:

9        Q.    And why is it important for that policy to be

10   enforced on a regular basis?

11       A.    Well, specifically, at night, when inmates are

12   trying to sleep, you don't want somebody -- none of us on

13   this Zoom right now would want somebody five or ten feet

14   away from us laughing and joking and talking with other

15   inmates and keeping us awake.  I mean, that's a pretty

16   crucial time of the day or night, it's 1:00 o'clock in the

17   morning, you can hear a pin drop in there.  And if you

18   allow the inmates off of their bunks to go fraternize with

19   other inmates, things like this are gonna happen.

20       Q.    Can you explain a little bit how that relates to

21   the potential for violence within a jail?

22       A.    Sure.

23              Especially when the -- when staff's not coming in

24   there -- when they're only coming in once an hour -- and

25   for the -- for the other, let's say, 50 minutes of the hour

1   were left unsupervised -- I'm gonna take matters into my

2   own hand.  That's what my experience has been with inmates

3   over my career.  If staff aren't gonna -- if staff aren't

4   gonna enforce the rules and take care of the problem

5   inmates, we're going to.

6         It's funny, inmates actually appreciate it when

7   staff enforces rules so they don't have to, because none of

8   them want to get in more trouble.  But if you put them in a

9   position to do it, they will.

10        MS. HARTON:  I think that's everything for me.

11             Oh, one more thing.

12  BY MS. HARTON:

13     Q.   Your supplemental report that you discussed in

14  this deposition, based on the -- the information you've

15  gotten throughout discovery on a rolling basis, you don't

16  expect any of your opinions to change, correct?

17     A.   No, ma'am.

18     Q.   Okay.

19          But if there were some sort of fact that were to

20  change your opinion, you would be sort of responsible for

21  making sure that you were honest about your evaluation of

22  the evidence and would note that change in your opinion,

23  right?

24     A.   Absolutely.

25          MR. BOGAN:  Object to the form.

1          Go ahead.

2              THE WITNESS:  Absolutely, yeah.

3    BY MS. HARTON:

4        Q.   Okay.

5              And, you know, we talked earlier about the

6    factual bases for your opinions and how you don't have the

7    full record in front of you.

8              As far as what you would sort of refer to for the

9    most precise accounting of the factual bases for your

10   opinion, that would include your -- your current technical

11   report, your case notes, and then, also, once it is -- it

12   is produced, whatever is in your supplemental report,

13   right?

14       A.   Yes, ma'am.

15             MS. HARTON:  Okay.  That's all I have.

16             MR. BOGAN:  I don't have any other questions.

17             So what we're gonna do, Mr. Adee, as I

18         mentioned at the beginning of the deposition, I'd like

19         for you to have an electronic -- I don't know if you

20         want to set it up with Dropbox, if you want to, you

21         know, have them send it to me in a thumbdrive,

22         whatever, you can send it to Miss Harton first and

23         then she can send it to me, whatever the best and

24         easiest method is, I'm agreeable to, but I need to

25         have a complete copy of your file materials and so

1    that's what I'm gonna attach.  I've already, I think,

2    identified and labeled what I'm gonna mark it, so

3    that's all I want to say.

4              And, I guess, Miss Harton will, I guess,

5    tell me what her view of that is but --

6         MS. HARTON:  Bruce, I guess I just have a

7    question.

8              So he's going to get, obviously, Dr.

9    Hough -- or Hough's testimony, Cory -- sorry, not

10   Cory -- Krysti and Tommie's testimony that's gonna

11   happen next week.  Do you want whatever he has right

12   now or do you want whatever he has towards the end of

13   discovery?

14        MR. BOGAN:  Yeah.  No.  What I'll take is what he

15   has right now.  I mean, I don't think anything in

16   those depositions are gonna be something that I won't

17   already get from him, so I understand he's gonna look

18   at it so --

19        MS. HARTON:  Okay.  Okay.  That's fine.

20             And then if we want to go off the record, I

21   want to talk to you about something else.

22             (Discussion off the record)

23             (Whereupon, this deposition

24              was concluded at 2:36 p.m.)

25                   - - - - -

1                    CERTIFICATE OF OATH

2   STATE OF FLORIDA:
    COUNTY OF ORANGE:

3

4           I, the undersigned authority, certify that

5       PAUL MICHAEL ADEE personally appeared before me and

6       was duly sworn on April 4, 2025.

7

8           WITNESS my hand and official seal on this 29th

9       day of April 2025.

10

11

12                                    Candy Morgan
                                      Notary Public
13                                    Commission #HH176851
                                      Expires:  9/26/2025

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:
     COUNTY OF ORANGE:

3

4          I, CANDY MORGAN, being a Registered Professional

5    Reporter, a Florida Professional Reporter and Notary

6    Public, State of Florida at large, do hereby certify

7    that I was authorized to and did stenographically

8    report the deposition of PAUL MICHAEL ADEE; that a

9    review of the transcript was not requested; and that

10   the transcript, pages 4 through 145, inclusive,

11   constitutes a true and complete record of my

12   stenographic notes transcribed by me to the best of my

13   ability.

14         I further certify that I am neither counsel for,

15   related to, nor employed by any of the parties to the

16   action in which this deposition was taken, and further

17   that I am not a relative or employee of any attorney

18   or counsel employed by the parties thereto, nor

19   financially or otherwise interested in the outcome of

20   the action.

21

22         DATED this 29th day of April 2025.

23

24         _____

25         CANDY MORGAN, RPR, FPR

26

**$**

**$26,000** 131:21

**$3,000** 10:11 132:3

**$30,000** 137:2

**$505** 132:4

**$535** 132:5,9

**0**

**0600** 99:8

**1**

**1** 8:1,20 19:7 51:22,24, 25 52:22 58:15

**1's** 52:1

**10** 16:4 19:7 84:8

**10%** 58:23

**100%** 139:11

**10:00** 37:25 62:20 64:23 81:21 82:16 83:20 84:1 99:18,20 100:13 107:13 108:1 111:20,21 112:12

**11** 16:7 19:8

**11-year** 49:21

**11:00** 37:25 107:14,25

**11:30** 62:10

**12** 16:13

**13** 130:6

**13th** 19:23 42:7

**14** 116:23 130:6

**14th** 35:25

**15** 84:8

**17** 18:20

**1700** 51:9

**1:00** 94:1 103:22,24 105:16,17 108:5 142:16

**1:04** 103:23 104:12 105:17

**1:06** 104:15,18

**1:09** 103:24 104:6,11,

15,18 105:18

**1:10** 104:11

**1:22-cv-02460** 19:9

**2**

**2** 8:3 51:23,24,25 106:25 121:23 130:18

**2,000** 135:24,25

**20** 19:8 26:23 61:23 93:14 94:11

**20-something** 43:8

**2000s** 138:2

**2010** 49:20

**2017** 50:19

**2019** 27:24 28:11 29:16 53:11

**2020** 33:6 50:19 54:9

**2021** 22:9 28:11 29:6 33:5 49:21 50:12,15 52:21 53:3 54:11 131:9, 10,11

**2022** 35:25

**2024** 42:7

**2025** 6:17,23 8:6 19:23

**21** 20:16 89:18,19 91:8

**22** 36:3

**2200** 99:8

**24** 48:7 49:6,13,18 60:6 65:17 66:5,25 68:4,13, 17,18 98:9 107:4 141:6

**25** 32:16

**26** 14:20,24 90:1,3

**2nd** 6:17 8:5

**3**

**3** 7:11,13 8:11,14,17 9:6 13:13,14,15,16,19,23 30:19,25 71:23 110:7 121:23

**3's** 8:6

**30** 32:17,18 49:10 65:17 98:8 123:11,12 141:5

**30,000-foot** 35:9

**30-** 66:25 67:1 68:13

**30-minute** 65:24 66:5,25 68:4 141:5

**32** 53:5

**32-plus** 114:9 126:20

**33-8** 137:25 138:3,13,25

**3300** 51:11 53:5

**365** 60:7

**38** 14:11

**4**

**4** 14:18 15:13,16,25 16:9 112:15,17

**48** 59:3

**5**

**5** 29:18,22 114:16 123:23 126:25

**50** 142:25

**6**

**6** 97:25

**6.011** 97:19

**60** 49:11 62:20 98:9

**60-minute** 65:25 66:6

**6011** 96:12 98:1

**6011.00** 92:14

**6164** 96:12 97:20 98:18

**6164.00** 92:16

**6766.00** 97:11

**68** 35:25

**6:00** 37:25 62:21 64:23 78:16

**7**

**7** 118:9

**72** 59:17 60:20,22

**7th** 22:9 25:5 103:9

**8**

**8** 15:23

**80** 90:6,13

**9**

**9** 15:25 123:20

**90** 90:6

**90%** 58:22

**90s** 138:2

**94** 100:12

**96%** 100:12

**A**

**A-D-E-E** 5:21

**a.m.** 37:25 62:21 64:23 78:16 105:17,18

**ability** 39:17 41:22 44:5 88:8 117:16 141:19

**absolutely** 20:20 54:22 57:9 67:17 84:1 86:23 134:6 139:22 141:11 143:24 144:2

**ACA** 38:6,11,15

**acceptable** 64:18

**access** 9:17

**accomplish** 44:5

**accomplished** 99:9

**accordance** 48:4

**accounting** 144:9

**Accreditation** 36:11 69:3

**accredited** 36:11

**accurate** 28:13 29:7 83:11 102:25 103:25 108:2 122:8 131:22,23 139:11

**accurately** 62:22

**acronym** 137:18

**acting** 23:10

**activity** 77:20

**actual** 13:2,25 28:19
31:1 100:5

**add** 7:2

**added** 119:12

**additional** 7:3,9,18 11:5,
13

**address** 5:23

**Adee** 5:5,11,13,21
136:22 144:17

**adequate** 84:12,20,23
91:21 98:17 100:18
103:4 115:5,6,8 124:10
125:18 128:21

**adequately** 55:23 91:24
106:18

**Administration** 63:25

**administrative** 58:25

**administrator** 54:19
55:3 65:16,21 66:18,22
67:22 68:3 72:21 109:8
116:10,17 126:17 127:3

**administrator's** 66:4

**administrators** 63:8,18
65:8 72:9 109:10 116:7,
16 127:2 128:13

**advantage** 44:3

**advertising** 20:19,21

**advocate** 134:2

**advocating** 89:3

**affirm** 5:7

**age** 71:7 73:17

**agency** 35:10 50:22
109:8,15

**ages** 70:25 71:4

**agree** 22:7 23:17,20,25
24:5,14 25:1,11,24
26:8,11 31:3,5 32:21
33:25 34:13 43:24 44:1,
8,17,20 45:2 47:21
54:13,16 55:2,20,21,24
56:12 58:7 63:23 65:4,
7,22 66:4 67:7,11 71:6,
8 73:7,11 78:13,14,23
79:3,5 81:13,18,24
83:19,23 84:4 85:7
86:4,10,11 87:21 88:17
95:13,21 99:16 100:21

101:2 102:7 111:11
117:24 118:1,22 123:1
125:7 129:21 134:1

**agreeable** 144:24

**agreed** 93:11 111:8,13

**agreement** 10:3 39:8,10
40:17 41:1 132:16

**ahead** 12:25 31:23
36:17 63:13 103:13
113:19 138:20 142:5
144:1

**air** 60:18

**aisle** 84:19

**Albeit** 100:14

**Alexandria** 19:11

**alive** 84:24 86:9 114:5

**allegations** 43:2

**alleged** 42:23

**allowed** 39:11 87:15
94:23 95:7 115:3 118:6

**allowing** 94:19,23 128:5

**Alpha** 90:15 91:2 103:19
104:14,19 119:8 120:18
121:17,21 122:3,6,15,
16,19,20 123:3 140:8,
10,21 141:9

**altercation** 25:16

**Alvis** 41:11

**amount** 10:7 26:19 78:8
85:1,13 87:5 103:2,6
113:11,25 131:24

**ample** 85:1

**analysis** 35:23 50:18,22
51:4,12 134:5

**analyzing** 30:12 31:1

**and/or** 11:2 48:25

**anticipate** 11:25

**apologize** 6:8 17:15
31:15 72:25 89:9 93:19

**appeared** 21:10

**appearing** 5:23

**appears** 7:8 27:1

**appendix** 7:11,13,24

8:6,7,11,14 13:12,14,
15,16,19,23

**applicable** 16:15
107:16,19,21

**applied** 124:3

**apply** 16:17

**approach** 128:5

**approaching** 123:6

**appropriately** 30:25

**approximately** 26:23
56:2 59:15 137:2

**Architects** 39:2

**area** 60:10,16,25 93:2
94:2 118:15

**areas** 35:7 55:16 84:16
100:19 102:2 121:13,20
135:3

**argue** 102:18

**arguing** 111:24

**argument** 23:9 86:3

**argumentative** 112:6

**arguments** 25:3

**arrest** 74:22

**article** 21:16 72:4

**articles** 16:13 71:24
72:1,2

**articulate** 137:12

**articulated** 137:13

**ascertain** 114:5

**asleep** 128:23

**aspects** 124:13

**assault** 54:14,21 70:4,
10,23 71:2

**assaultive** 69:17,25
70:1 86:3

**assaults** 54:2,8 55:4
62:25 67:6 70:25 106:7

**assessment** 90:18

**assigned** 61:10 135:18

**assignments** 48:18

**Association** 138:4,7,8

**assume** 9:13 16:17 38:8

**assuming** 6:21 15:11
40:6 44:11 76:12 80:10
102:9

**assumption** 16:21 81:4

**assumptions** 100:22
101:4 102:22 103:8

**asterisks** 8:11

**attached** 6:4

**attaching** 7:24

**attempt** 86:1

**attempting** 75:17

**attempts** 42:10

**attended** 33:21

**attention** 120:16 135:3

**audio** 16:1 76:16

**author** 9:2

**authored** 16:14

**authoritative** 17:3 63:9
71:21 111:10 113:10
116:1,11,13

**authority** 51:14 72:10

**authorization** 88:3

**authors** 113:9

**automatically** 71:2

**average** 53:2,7 56:1,22
91:1

**averaging** 90:22

**awake** 142:15

**aware** 21:9 24:6,20
27:8,23,25 28:1 33:3
36:10 41:4 42:9 43:13
75:16 114:15 124:2,21

**ax** 46:18

---

**B**

**back** 10:15 18:6 28:17,
20 46:18 53:20 62:10,
14 69:10 83:18 87:3,6
88:11 97:10,24 100:16
104:21,25 118:16

**back-and-forth** 139:24

**bad** 61:5 62:25 111:5

**barriers** 59:25 128:6

**based** 24:5 29:24 31:5 39:7 40:16,25 42:20 57:10 69:13 70:25 71:4 79:9,17,18 80:12 89:11, 16 96:20 100:21 101:4 102:10 103:2 113:23 114:3 115:20 122:23 126:2 131:24 138:22 143:14

**bases** 137:11 144:6,9

**basing** 69:18 99:25 122:24

**basis** 32:21 66:1 73:4 87:18 91:11,17 109:16 112:23 114:23,24 119:19 123:22 125:17 126:3 127:5 128:20 129:8,13 130:10 142:10 143:15

**bathroom** 95:23 141:20

**battery** 27:9,14 54:8 70:22 71:13

**Beckley** 41:14

**bed** 61:13 85:9 114:6

**beds** 60:23 94:2

**began** 18:11 125:15

**begin** 25:7 74:23 82:4

**beginning** 51:7 78:16 134:10 144:18

**behalf** 19:5

**behavior** 30:15 62:25 86:3

**believability** 43:20

**believable** 43:25 44:25

**big** 49:23 90:5

**bigger** 56:14,16

**biggest** 65:1

**bill** 132:4,20,25

**billed** 131:21 137:2

**billing** 9:12,14,21 10:19 132:2,12,19

**bills** 9:7,9,24 10:17

**bit** 85:4 106:23 112:24 137:20 139:17 140:6 141:18 142:20

**black** 95:6

**Blandin** 22:1

**blanket** 83:15 85:2 114:6

**blue** 135:5,6

**bodies** 47:19

**Bogan** 5:3,16 7:16,22 8:14,16,18 12:24 14:23 15:9,13,15 17:14 19:18 23:13 24:11 25:12 27:6, 20 32:1,8,13 37:15,21 43:23 44:9,18 45:5,21 46:23 47:14 54:18 55:5, 17 56:7 57:16 61:24 62:3,6,9,12,14,16 65:3, 18 66:14 67:12,19 68:7 69:9 70:14,21 71:17 74:2 75:23 77:14 79:24 82:9 83:4,24 84:13 93:19,23 97:8 101:1 102:16 106:2,16 109:24 112:2,8 113:21 116:12 117:9,18,23 118:2 119:2 120:3,25 122:9 123:9,16,19 136:17 139:19,24 140:4 141:2 142:4 143:25 144:16

**book** 56:5 95:18

**booked** 56:3

**booking** 56:22

**books** 66:23

**bound** 139:8

**brand-new** 51:8

**breadth** 128:17

**break** 62:1,4,13 91:25 92:4 123:7,8,9,14,17,18 129:24 130:1

**breaks** 128:6

**breathed** 60:18

**breathing** 84:24 86:7

**bringing** 77:25

**broad** 92:6

**broadcasts** 21:7

**brought** 74:23 79:2

**Brown** 40:9

**Bruce** 5:3 8:10 14:19 31:24 61:22 93:16 111:24 123:6

**building** 60:15

**built** 51:10

**bunk** 25:6 26:20,21 60:23 61:10,13 80:13 86:6,14,25 87:3,6,19 6,9,13,18,22 94:2,4, 6,9,14,19 95:3,11 141:22

**bunks** 60:23,24,25 61:6 79:4 90:13 92:1,23 94:23 98:21 105:23 141:19 142:18

**business** 92:3 93:4

---

**C**

**calculate** 105:3

**calculations** 18:7,8,9, 13,18

**calendar** 50:18

**call** 51:22 91:12 135:16

**called** 6:16 29:16

**calling** 16:9

**calls** 80:6

**Candy** 7:25 15:13

**capable** 41:25 121:13

**capacity** 56:16

**Captain** 89:17,25 95:4 99:25 100:1 110:16 115:1

**care** 47:19 64:1,9 65:23 66:9,13,17 67:8 72:20 91:14,15 92:2 107:6 109:1,2,6,7,12,14,18 110:10,13 112:21 113:3 114:19 116:24 118:18 126:12 129:13 135:16 136:8,14 141:4 143:4

**career** 48:19,21 51:1,7, 8,10 143:3

**cares** 65:5

**Carolina** 40:5

**case** 9:21,25 10:4,9,10, 11,24 11:3 13:5 14:22 15:18 16:15,20 18:9,21, 23 19:9,19,25 20:11 21:12,14 22:11,14,16, 22 23:4,10 24:6 25:2 27:14 28:17 29:8 35:23 36:23 39:2,12,22 40:1, 4,7,19 41:7,9,13 44:13, 19 47:2,7 67:14,20 73:1 74:4,8 76:3 81:25 85:10 86:10 97:19 111:15 112:4 117:6,12,22 118:4 119:18 121:7 130:20 131:21,25 132:24 133:10,24 134:2,5,23 137:4,13 144:11

**case-by-case** 73:4

**cases** 6:19,23 18:20,21 21:25 38:17,24 41:3 133:6 134:7

**category** 29:20 121:24

**caused** 26:13 91:15 107:6 114:19 117:2,11, 20 118:4

**causing** 112:21

**cell** 79:19 80:5 82:2 115:6 119:15

**cells** 59:2,3

**centered** 75:25

**certification** 38:6,15

**certifications** 36:22,23

**certified** 36:18

**challenged** 39:17

**chance** 9:11

**change** 11:18 49:22 138:22 143:16,20,22

**changed** 11:23 49:16,22

**changing** 77:25

**Chantelle** 19:4

**Chantelle's** 19:13

**Chapter** 137:25

**characterization** 111:12

**characterize** 12:5 27:3

69:15,18 75:9

**characterizing** 62:22
69:13 112:3

**charge** 52:9 69:15,17
70:20,23 71:13 72:22
73:13 74:16 119:4
120:20 121:4

**charged** 27:14 70:11,16,
25

**charges** 28:7 30:13,14
31:6

**charts** 16:23

**chatting** 142:1

**check** 65:10 78:21
79:12 82:16 84:7,12,20,
23 86:7 89:7,14 90:9
100:13 101:15 103:5,18
104:5,14 105:16,17
108:7 113:12 114:1

**checked** 83:10 84:3

**checks** 36:25 37:3,11,
17 38:1,10 47:12,16
48:4,25 49:8 62:20 64:7
65:17,25 66:5,6 68:14
72:11 78:17,18,19
81:12,20 82:2 85:4 90:7
99:17 100:11,23 103:9
104:17 105:9,11,19,20
106:4 107:4,9 108:15,
16 110:9 111:17
112:11,19 114:4 115:6
124:11,12,22 125:21,24
126:1,4 130:9 140:2
141:5

**child** 19:5 27:14 121:8

**choose** 64:3 65:10,11
104:12

**circumstances** 65:13
70:18 73:16 74:17

**cite** 17:2,6

**cited** 17:8 63:6 72:10

**City** 5:24

**civilians** 53:23

**clarification** 10:12
133:17

**clarified** 135:13

**clarify** 120:5

**clarifying** 120:6

**class** 33:20 71:23

**classification** 28:3
29:15,23 30:1,4,9,11,18
31:1,6 34:14 69:11
71:12 72:6,8 97:1,3,6
118:10,12,20 120:9
122:24

**classifications** 97:23

**classified** 30:25 71:2
118:21 119:5 122:5
140:13

**clean** 88:7 131:5

**cleaning** 88:1

**clear** 46:25 52:21 67:21
70:8 108:25 122:4

**client** 10:18

**clients** 9:14

**clock** 105:4,5

**close** 20:4 21:20

**closed** 19:22

**closest** 30:23

**clue** 77:22

**co-authored** 16:14

**code** 135:9

**codify** 109:13

**collectively** 89:13

**Colonel** 52:9,10,11,13,
16,17,19

**coloring** 135:1,9

**colors** 135:6,7

**combative** 29:10

**commander** 52:5 53:18

**commercials** 21:7

**Commission** 36:12 69:3

**committed** 121:7

**committee** 139:4

**common** 40:6 57:11
80:12 86:17

**communicating** 85:18

**compare** 54:1

**comparison** 50:14

**complete** 9:12 12:7
14:12 31:16 90:2
102:25 130:19 144:25

**completely** 134:4

**completing** 11:25

**compliance** 32:24 36:6,
8 37:6

**comply** 47:19 99:10
141:4

**complying** 98:21

**comport** 34:6

**comports** 34:10

**composite** 8:4

**comprehensive** 34:8
47:9

**computer** 60:5

**conceding** 122:5

**concern** 22:19,25

**concerned** 47:2 78:5

**conclude** 116:2

**concluding** 91:17
114:16 117:20

**conclusion** 37:3 108:12
114:14 115:20 116:22

**conclusions** 134:14

**conclusory** 91:10,12
97:17

**concrete** 26:3

**condition** 85:9

**conduct** 36:24 48:4 49:7
50:18,22 89:6 99:19
115:18

**conducted** 33:17 38:4,
15 47:13 48:25 51:13
105:12,16,17 107:4
124:22

**conducting** 37:17 79:11
83:19 99:16 103:4
110:8 111:17 112:18
113:12 114:1 130:8

**confidentiality** 39:8,10
40:17 41:1

**confinement** 29:6 58:25

**conform** 34:6 68:4 69:7

**conformance** 69:1

**confronts** 25:6

**confusing** 7:25 108:13

**consecutively** 82:24

**consent** 5:2,3 71:6

**consideration** 44:14,24
73:19 113:7 133:23

**considered** 73:9,10

**consistent** 47:16,18
128:20

**consistently** 82:2

**consult** 133:9

**consulted** 35:21

**consulting** 21:22

**contact** 75:18

**contained** 15:12 16:8
20:9 24:21 77:2 98:24

**continuing** 13:16,17

**contradictory** 107:3,12
108:12

**contrary** 23:11 47:5

**contributed** 16:14

**control** 35:16 136:14

**controlling** 69:1 135:15,
22

**conviction** 27:9

**copies** 18:3

**copy** 6:4,15 13:6,22
14:12,16 15:3 28:14
50:7,8 74:6 144:25

**corporal** 138:11

**correct** 6:22 9:22 10:1
11:14 15:11 16:21
20:18 21:5 22:12 27:15
28:19 32:8,25 38:20
42:22,25 45:7,11,16
46:12 53:13 76:14
78:13,20,22 79:4,8
80:2,9,21 81:10,11
82:18,19,21 83:8 84:16
90:14 95:20 99:1 100:4
101:16 105:3 106:12
107:17,20,21 108:9

116:19 117:12 129:25
130:4 131:9,13 134:3,
16,19 139:21,22 140:3
141:24 142:3,7 143:16

**correction** 135:24
136:12

**correctional** 64:11 67:8
69:3 105:22 107:5
109:1,2,19 110:10,13
113:3 114:19 116:24
126:12,16 141:20

**corrections** 17:17 18:4
27:13,19,24 29:10,12
35:3 36:11 38:21 39:3,6
40:12,15,21,24 41:12
44:23 53:22 57:4,7,13
60:3 63:16 72:7,13
87:14 91:15 95:15
109:4 112:21 113:9
116:15 130:3 135:17
137:25 138:2

**correctly** 37:24 53:6
61:16 90:8 103:22
122:5 129:4

**corroborated** 45:9

**corroborates** 45:4,18

**Cory** 22:8,15 23:5,21
24:2,6,15 29:23 31:7
73:22 74:7,20 75:17
76:2,3,8 85:8 91:15,19
93:1,6 103:20 104:7
107:6 112:21 114:19
117:2,11,21

**counsel** 12:14

**count** 78:21 92:11,19
98:18,22,24,25 99:7

**counter** 97:20

**counties** 138:8 139:1,7

**counts** 78:17,19,22

**county** 16:5 17:25 18:3
21:23 24:16,21 27:13,
19 28:10 30:7 31:18
32:16,19 33:4,15,19
36:5,10 42:19 47:1 48:3
49:1 50:9,17,21 53:25
54:1,4,9 56:3,18,19,23
57:18 61:18 62:18
66:19 68:24 69:6 72:16,
25 73:1,2 86:13,22,25
107:1 112:15,17
114:17,22 118:9 124:3

131:8 137:23 140:9
142:3

**County's** 50:15

**couple** 48:14,17 60:25
63:14 88:1 116:10

**Coupled** 126:20

**court** 19:10,14 40:1,4,5,
6,19 41:14,21 53:16,17
80:18 81:2 117:6
131:11

**courthouse** 48:9,18
53:20 133:1

**courtroom** 38:19,20
42:11

**covered** 114:8

**created** 66:21

**creates** 140:14

**creating** 92:1 93:2

**credence** 30:16

**credible** 43:25

**crime** 69:21,22,25

**criminal** 74:6 77:4,8

**critical** 102:22

**criticism** 81:19

**criticisms** 62:17

**criticize** 102:4,24

**CROSS-EXAMINATION**
136:20

**crucial** 142:16

**cubical** 61:8,10,12

**cubicles** 61:9,13

**current** 6:22 8:21 13:19
30:12,14 31:5 144:10

**custody** 73:21 121:23
136:14

**custom** 92:22 99:13
110:8 112:17

**customs** 42:1 91:22

**cut** 96:11

**CV** 6:19,23 8:21,22
53:12

**D**

**daily** 53:2,7 56:1 91:1

**dangerous** 73:14

**dark** 85:3 135:7

**database** 12:10

**date** 25:16 90:20

**dated** 6:17 8:5 42:7

**Daubert** 41:2

**day** 48:7 49:6 60:6
65:17 66:5,6,8,25 68:5,
13,17,18 78:4,12,16,18,
22 80:2,17,21 81:14
85:5 98:6 105:8,20
106:9 107:5 108:17
141:6 142:16

**days** 60:7

**daytime** 77:21

**deal** 57:18,22 90:5

**death** 26:10 41:22 42:3

**decedent** 22:8 23:21

**decide** 71:13 95:19
117:21

**decided** 131:14

**decision** 66:4 67:9

**declarations** 88:22

**deductive** 133:20,22

**deep** 35:11

**Defamation** 43:3

**Defendants** 22:16 23:9
134:15

**defense** 134:7

**deliberately** 23:11

**delineate** 92:24 100:4
101:6,12

**delineation** 96:22

**deliver** 80:4

**delivered** 79:7,20

**Dellun** 123:21

**Delta** 121:17 122:20

**demands** 138:22

**department** 9:14 17:7,
16 27:13,18,23 63:7
110:14 137:25 138:2

**depend** 90:11

**depended** 73:4

**depending** 65:12 73:12,
16 84:14

**deposition** 6:1,5,24 7:4
8:2,20 12:18 13:24
14:11,18,25 19:19 20:5,
7 39:12 40:11,20 94:25
115:21 127:15 130:23
132:10 134:17 137:12
143:14 144:18

**depositions** 7:10 11:6
12:2 20:6 116:3 130:25
133:8 134:15,24

**deputies** 19:6 49:7 57:4,
13,21 59:20 60:11,19
81:17 89:6 92:3,9 95:5
108:14 115:5 128:9

**deputy** 22:17,23 45:8,
10,24 59:12 60:3 80:15,
23 88:18 93:5 110:17,
22 129:24

**describe** 20:10

**describes** 24:22 100:2

**desire** 127:11

**detained** 30:8

**detainee** 141:21,25

**detainees** 139:18
140:23 141:19 142:1

**determine** 124:10 136:5

**determining** 73:19

**deters** 62:25

**develop** 35:10

**developed** 137:21
138:8,24,25 139:14

**developing** 139:9

**deviation** 65:22 66:8,12
67:8,16

**dialogue** 115:18

**diaries** 9:6

**difference** 28:2

**differently** 65:11

difficult 15:4 85:3 110:1

difficulty 57:12

direct 5:15 20:23 58:21 59:11,18 64:15,16,21 116:9,17 127:2

directly 27:12 85:14

disagree 29:20 84:20 111:12 118:25 119:3,6

disagreement 22:15,20, 24 25:7

disagreements 23:5

disciplinary 29:5 58:25

disclose 15:1 40:25

disclosed 14:22

disclosure 14:24

discovery 143:15

discretion 65:8 95:10, 14,15,19,22 96:1

discuss 39:7

discussed 58:8 110:5 123:23 126:25 139:18, 19 143:13

discusses 20:15

discussion 37:14 55:1

dismissed 42:16

dispute 22:15,24 25:20 26:13,18,24 29:3,13 75:11

disputes 25:3

disputing 68:24 94:3 121:1

disrespectful 29:10

distinction 123:2

District 19:10

division 19:11 41:12 48:9,19 52:22 53:19,21 57:7 58:14

Divisions 51:24

document 17:19 18:15 22:7 66:23 77:17

documentation 24:14 119:18

documented 23:18 24:1

69:19

documents 7:9 8:12 11:1 14:1,2,20 15:3,17 16:8 18:8 20:9 25:2 31:16 32:11 33:7 36:1, 14,19 64:8 74:12,22

domestic 27:9

door 79:10,14 80:5,10, 14 81:10

doorway 58:9 79:23 81:3

dorm 124:7

dormitories 59:6,16 61:8

dormitory 59:17,20,21 60:2 76:23 79:2,3,20

dormitory-style 86:17

dorms 140:25 141:4

dot 110:23

double 60:23,25 61:6

double- 61:11

double-bunked 59:4 84:16

double-check 7:20

drafting 11:4

draw 135:3

drink 87:11 95:16

drive-by 127:19

drop 75:18 76:3 131:16 142:17

Dropbox 14:21 144:20

duces 8:2

Dukes 23:3,5 89:2 95:8, 25 114:25 115:14 123:20 124:16 127:4 134:18

Dukes' 126:23 127:15

duly 5:14

duties 55:23 77:24 78:3

duty 81:16

---

**E**

---

earlier 107:15 144:5

early 138:2

easiest 144:24

easy 72:17

educated 53:4

education 113:6,24 126:20

effect 50:11 95:1,7 99:21

Effective 63:16

eight-hour 49:19 65:25

electronic 12:8,13 13:6, 22,24 14:1,2,18 15:6 144:19

electronically 14:17 15:3,6 17:21,22

elevated 60:10,12,14,15

email 7:19 20:23

emails 10:23

emergency 86:6

employed 21:23 136:9, 13

employee 9:20 10:13 138:11

employees 45:13 100:6, 9 114:18

employees' 96:23

employer 20:17

employer's 39:17

employment 9:19 20:11 49:14

encompass 16:8

encompasses 30:14 127:10

encourage 44:23

end 7:23 30:22 48:19,21 61:7,15 84:6 105:8,20 116:23

ended 27:24 103:23,24

enforce 39:18 95:6 96:9 108:23 140:17 143:4

enforced 87:8 96:5,6 142:10

enforces 95:5 143:7

enforcing 92:21,22 106:5 129:17 138:3 140:18

engage 86:2

enhanced 106:10

ensure 80:23

entered 131:16

entire 13:25 28:10,15 52:23 102:18 108:17 137:7

entitled 15:2

entity 20:16

enunciation 96:22

environment 91:13,18 92:2 97:19 140:14

equipment 60:5

Eric 22:9 23:22 24:2 30:17

escape 118:17 119:15 120:15

escaped 84:22

escaping 137:18

essence 138:13

essential 25:25

essentially 84:18 95:24

establish 63:25 64:9 101:21

established 106:6

Estate 41:10

estimate 56:1,6

evaluating 44:13

evaluation 143:21

evening 25:5 106:19

event 14:13 115:13

everybody's 85:5

evidence 25:3 94:4,14 143:22

exact 101:21,22

EXAMINATION 5:15

examiner 26:4,8

exception 118:15,16

**exchange** 94:10

**excuse** 8:5 63:24 66:18 72:24 79:19 97:25 107:1 119:4 122:13 135:24 139:7

**exercise** 80:18

**exhibit** 6:4 7:24 8:1,4,19 14:18 15:13,16,25 16:9 130:18

**exhibits** 8:17

**exist** 85:15

**exists** 13:8

**expanded** 48:7 49:6

**expect** 32:18 143:16

**expectation** 87:7

**expected** 87:3 104:19

**experience** 57:11,12 113:5,6,24 114:10 126:13,21 143:2

**expert** 9:5 14:11,13 15:2 21:10 38:21 39:3 40:14, 21 67:9

**explain** 121:15 142:20

**extensively** 98:8

**extent** 11:21 111:14 137:10 141:25

**eye** 85:18

———————

**F**

**face** 86:8

**facilities** 51:6,19 52:5

**facility** 24:16 30:3,8 32:20 33:23 34:4,10 51:8,10 52:23 55:11 66:8 72:22 76:23 105:22 109:19 120:8 121:3 128:15

**fact** 24:12 27:12 41:6 46:19 50:3 58:6 59:19 60:24 62:19 71:3 75:24 76:8 78:25 79:19 81:7 91:19 93:25 98:24 99:7 101:12 102:10,19 104:17 105:8,20 108:16 110:16 117:5,10 119:20 124:22 128:19 129:3,17

139:2 143:19

**factors** 89:21

**factual** 137:11 144:6,9

**fail** 124:1

**failed** 55:23 91:13,18, 21,24 107:4 108:18 124:1 136:8,11

**fair** 27:2,5 29:17 30:4 40:2 48:15 80:8 81:17 82:5,20 83:7,10 95:12 102:24 121:10 123:5 134:12,18 137:10 139:9 141:1

**fairly** 136:22

**Falkenburg** 52:2 59:5,7, 14 61:8

**falls** 121:23

**familiar** 33:10 41:6,13 78:4 86:15

**FCAC** 36:18,22 37:4,7,9, 16,23 38:4,7,11 47:6,17 137:18 139:13

**February** 19:23

**fed** 78:15

**federal** 40:1,19 41:14

**feed** 80:11

**feeding** 77:24 79:13 80:1,25

**feel** 87:13

**feeling** 87:13

**feet** 142:13

**fell** 52:10

**felon** 70:10,15

**felony** 69:15,17 70:1 121:19

**felt** 93:3

**field** 9:3 21:10 39:6 40:11,14,23

**fight** 22:8 25:8,21,24,25 26:16,21 27:2 91:20 93:7 94:6,10,15 104:9

**fighting** 29:9

**fights** 44:22,24 45:4,11, 20 68:17 88:20 89:3

**figure** 58:17 63:3 109:25 111:4

**file** 12:8,13 13:6,25 14:18 16:9 77:3 144:25

**files** 13:2 15:20 16:1

**fill** 57:6,20

**filled** 57:4

**filling** 57:12

**final** 123:8

**find** 9:1 36:4 41:19 46:14

**finding** 112:16

**findings** 91:7 116:23

**fine** 62:3

**finish** 83:16 93:12

**finished** 73:1 123:24

**firm** 9:9 22:1,4 39:8,20 132:17 134:6

**firm's** 39:10

**firsthand** 128:10

**fit** 95:6

**Five's** 62:9

**five-minute** 123:17

**five-second** 89:22

**flip** 91:8

**floor** 26:3,6,13 128:13

**Florida** 5:24 31:17 32:1, 3,19,24 33:5,12,16 34:4,7,13 35:22 36:6,11 47:5,17,21,22 48:1,5 67:22,24 68:5,9,12,21 69:2,3,7 70:19 71:7 133:9 137:17,21,25 138:3,4,8,14,23 139:3, 6,7,8,25 140:1

**fluctuate** 53:8

**folks** 58:6

**follow** 47:23,24 64:3 65:11 68:12,21 82:7 97:2 124:1 135:17

**follow-ups** 136:19

**food** 79:1,6,7,20

**force** 34:24

**Forensic** 9:20,25 10:13, 17 12:11,12 20:16,19 21:1,6

**form** 17:13 21:7 23:12 24:9 25:9 27:4,16 37:13,18 43:21 44:7,16 45:1,17 46:21 47:8 54:15,23 55:14 56:4 57:14 64:5 65:14 66:11 67:10,18 68:1 69:4 70:12,17 71:15 74:1 75:20 77:10 79:21 82:6 83:2,21 84:10 93:16 97:7 100:24 102:13 105:24 106:14 109:21 111:23 112:19 113:7, 14,17 115:7 116:5 117:7,15,25 118:24 119:23 120:23 130:9 140:4 142:4 143:25

**formal** 33:17,23

**format** 13:24 15:6 46:9

**formats** 21:11

**forms** 20:21

**fortunate** 58:1

**forward** 44:21

**foster** 44:4

**found** 26:9 47:16

**frame** 48:11 49:3,18 50:1 67:2 105:9,21

**fraternize** 142:18

**freely** 59:23

**French** 39:2,22 40:1

**frequent** 62:24 64:7,14

**frequently** 55:16 64:22 108:17

**Friday** 44:22 45:4,11,20 88:19

**front** 137:7 144:7

**full** 5:18 90:14,15 102:25 128:16 144:7

**full-time** 10:12

**funny** 43:7 143:6

———————

**G**

**Gail** 40:9

**gain** 44:3,5

**gap** 49:23

**gathered** 115:16

**gave** 40:20 55:25 124:16,19 134:22

**general** 35:18 39:5 73:6, 8,15 92:6 108:13 121:9 140:14,25

**generated** 30:2

**generates** 10:18

**girl** 75:6,10

**give** 5:8 14:4 21:11 22:19 41:22 42:2 56:6 68:20 89:5,8,19 106:21 118:6 130:20 133:9

**giving** 5:22 40:20 46:17

**God** 5:10

**good** 5:17,20 62:3,9,12 68:10 125:18 127:23 129:6 138:5

**gotcha** 16:3 106:22 124:24

**great** 53:9

**green** 135:5,6

**grind** 46:18

**ground** 26:3,14,22

**guarantee** 54:20 55:3

**guess** 6:2,18,21 7:8,9 8:20 9:1,9 12:5 13:12, 15 20:16 21:3 26:12 27:8 31:9 32:16 36:3 38:14,18 41:7,11,21 43:18 47:3 48:13 49:12, 23 51:17 52:22 53:4 58:5,14 60:20,23 63:23 74:15 81:24 83:18 84:14 86:4,13 88:8 89:5 90:11 91:11 101:20 102:23 105:3 119:18 125:4 129:11 130:6 131:19 132:21 133:6 134:10,13,23,24

**guide** 63:16,17 67:23 72:8,15 116:7,16 127:1

**guideline** 68:13 72:15, 18 135:22,25

**guidelines** 64:2 116:19

**Gulf** 61:18 77:21 82:1, 10,12 83:20 89:7 91:2 101:16,22 102:18,20 103:19 104:14,19 107:17,20 108:7 111:21 112:11 119:6,7,8 120:9, 18,22 121:9 122:3,6,15, 19 123:3 125:4,7,8,10 140:8,10,21

**guy** 81:9 95:16,17

**guys** 62:8 132:20

---

**H**

**hair** 71:12

**half** 21:19

**hand** 5:6 143:2

**hand-in-hand** 97:4

**handbook** 24:15,22,25

**handle** 53:21 93:4

**handout** 16:18

**hands** 140:19

**happen** 55:12,22 106:8 108:19 142:19

**happened** 94:6,15 108:24 138:12

**happening** 45:16 55:19 61:5 86:6 128:18

**harm** 91:15 107:6 112:21 114:19 117:2, 11,20 118:4 120:21

**harmed** 121:3

**Harton** 5:1 7:14,19 8:7, 10,15 9:8 10:22 12:22 14:19 17:11 23:12 24:9 25:9 27:4,16 31:24 32:5,9 37:13,18 43:21 44:7,16 45:1,17 46:21 47:8 54:15,23,25 55:14 56:4 57:14 61:22,25 62:5,7,10 64:5 65:14 66:11 67:10,18 68:1 69:4 70:12,17 71:15 74:1 75:20 77:10 79:21 82:6 83:2,21 84:10 93:16 97:7 100:24 102:13 105:24 106:14 109:21 111:23 112:6

113:14,16,17 116:5 117:7,14,25 118:24 119:23 120:23 122:7 123:6,12 131:20 132:20 134:22 136:19,21 140:5 141:7 142:8 143:10,12 144:3,15,22

**Harton's** 132:16

**head** 18:24,25 26:3,5,6, 9,13 87:21 89:1 92:11, 19 97:20 98:18,22,24 99:7 114:8 136:5

**hear** 128:9 142:17

**heard** 45:11,12,13,25 77:7 123:3

**heightened** 140:24 141:14

**Hernando** 66:18 72:24, 25 73:1

**hey** 61:22 111:2 123:6 138:3,5

**high** 121:22

**higher** 31:7 56:22 140:13

**highlighting** 135:2

**Hillsborough** 17:25 18:3 21:23 32:15 42:19 48:3 50:9,17,21 51:18 53:25 54:4,9 56:2,3,13, 18,22 57:18 72:24 73:2 86:22,24 131:8

**histories** 30:15

**history** 22:8,15,18

**hit** 26:3,6,13 93:13

**HLM** 19:6

**hold** 117:14 121:16

**home** 5:24

**honest** 14:10 70:9 143:21

**hope** 68:16 121:11

**hoping** 123:10

**hospital** 15:17

**host** 63:2

**hour** 61:23 64:22 99:9, 11 104:23,25 110:23

123:15 124:23 132:4,5, 9,25 139:20 140:2 142:24,25

**hourly** 38:1 133:3

**hours** 48:7,24 49:5,6,13, 18 60:6 62:20 64:23 65:17 66:5,6,25 68:4, 13,17,18 77:21 92:1 98:9 104:11 107:4 141:6

**house** 51:11 73:19 75:7 119:7,15 121:18,21

**housed** 28:12,15 29:2 30:8,16 51:9 52:22 58:24 59:17 73:5,6,8 76:23 118:13,18,23 119:4,6 120:8 121:9 122:19,20

**housing** 27:7 28:3,9,14, 18 34:17,18 58:13,19 59:19 60:2,19,22 73:3, 10,14 79:4 80:20 82:1, 3,11,15,17,24 83:6,20 84:8 89:7 90:12,20 97:3 99:19 100:22 101:5,6, 21 102:11,15 103:1 118:11,12 119:20,25 121:10,12,14 122:23 125:1,5,8 127:16

**hundred** 39:23 55:18 56:9 74:11

**hypothetically** 82:10

---

**I**

**i.e.** 107:3 112:19

**idea** 46:7,17,22

**identified** 6:11 73:23 115:9

**identify** 6:3,12 88:18 89:2 101:13 102:1

**illegal** 86:2

**immediately** 52:11 87:3 108:10

**implying** 109:5

**important** 74:15 86:9 91:4 141:8 142:9

**imposed** 87:4

**impossible** 54:13,17,19
83:25 101:25 102:4
103:4

**inaccurate** 28:25

**inact** 65:16 68:3

**inadequacy** 96:11

**inadequate** 62:21 63:6
69:6,8 92:20 96:8,13,24
97:13,18 98:1,19 99:5,
13 100:17 101:11,14
107:5 112:18 114:17
118:11 123:21 124:6
125:21,24 126:1,23
127:4 129:12 130:8

**inadequately** 106:15,18,
21 114:23 126:4

**incarcerations** 30:13

**incident** 23:6 74:20
90:21 93:12 103:19
104:6 129:22

**incidents** 25:14

**include** 15:25 16:2,4
32:23 34:20,23 35:2
133:22 144:10

**includes** 30:11 34:14,17

**increase** 89:24

**increased** 132:5

**increases** 90:1

**incremental** 48:11 49:3

**increments** 48:24

**independent** 50:22

**individual** 121:9

**individually** 19:5 22:16,
17

**industry** 130:3

**ineffective** 127:25

**inefficient** 128:3

**information** 11:10
24:12,20 80:1 102:25
130:24 143:14

**information's** 24:24

**initial** 119:13 134:13

**initially** 10:3 89:11
138:15

**injured** 91:20

**injury** 26:5,9,13

**inmate** 24:15,21 30:3
42:21,23 43:10,19 48:4
53:3,7 59:24 62:25
64:16 69:15 72:5,11
73:20 77:13 78:17 79:1
84:12 89:3,23 91:23
114:2 118:10 119:5,9,
19 120:7,20

**inmate's** 30:12 43:5
80:6 86:5

**inmate-on-inmate** 54:2,
8,14,21 55:4 67:6 68:17
85:20,23 106:7

**inmates** 24:8 30:8
34:15,18,21,24 43:25
44:2,14,21 45:6,8 46:1
51:9,11 52:21 56:2
57:21 58:24 59:12 60:4,
20,22 61:5,9 64:13,24
65:23 68:14 69:1 71:20,
22 73:8,23 77:13 78:5,
12 80:11,14,17,24 81:1,
16,21 84:19 86:18
87:24 88:1,5,12 89:12,
25 90:4,12 91:14,19
92:2,11,12,18,19,23
94:19,23 95:3 98:3,10,
21 99:8 102:2 103:6
104:22 105:2,23 107:1
108:20,21 110:18
111:4,14 112:20 114:2,
24 115:2,7,19 118:22
121:3,19,22 125:22
127:5,9,10,18 128:1,5,
7,10,12,14,17,23 129:9,
12 135:18,19,23,25
136:9,13 140:15,19,20
142:11,15,18,19 143:2,
5,6

**inmates'** 45:19 86:12

**inside** 59:20,23 60:9,19
79:23 80:10

**inspected** 33:15 83:10

**inspection** 32:2,4,20,23
33:5,12,16,18,23 34:1
102:20

**inspections** 31:18,25
32:7 38:4,15

**inspector** 33:11,25

**instance** 45:3 127:24

**instances** 35:14 59:10
70:24 92:24

**Institute** 17:17 63:15,24
72:13 109:3 110:13
113:8 116:14,15

**instituted** 49:22

**Institutes** 72:7

**insufficient** 102:9,15

**insufficiently** 101:23
102:5,6

**intended** 63:25 64:9

**intents** 138:14

**interested** 60:8

**internally** 140:17

**interval** 65:24,25 66:5
68:14

**intervals** 141:6

**interview** 46:5

**interviewed** 21:13 46:3
74:3

**interviews** 76:19 77:15
88:11

**investigation** 25:19
74:6 75:17,25 76:4

**investigative** 15:20
74:10

**investigator** 77:4

**investigators** 77:8

**invoices** 131:19

**involved** 38:25 50:5
69:21 71:9,10 89:2

**involving** 73:13 129:22

**irregular** 141:6

**isolation** 73:5

**issue** 57:18 69:11 85:8
124:12 126:9

**item** 8:16 16:4

**Ivan** 43:10,13,17

---

**J**

**jail** 27:14,19 28:10 29:15

30:7 31:18,25 32:1,4,
16,19,24 33:12,16,21
34:5,7,11,12,13 35:5,22
36:5,6,8,11 46:19 47:1,
5,17,22 48:4,5,13,23
50:18,21 51:18,22,23,
24,25 52:1,2,8,13,14,22
53:11,25 54:1,5,9,19,21
55:2 56:1,14 57:3,8,20
58:18 59:2,5,7 61:9,19
62:18 63:7,16,18,24
64:2,18 65:8,15 66:17,
19,21 67:3,22 68:3
69:2,6,7 72:8,9,16,19,
21 74:23 77:21 86:22
109:8,10 116:7,16
127:1 131:8,12 137:17,
21 138:9,14,15,23
139:3,8,25 140:1,9
142:3,21

**Jail's** 24:21 33:5 73:2

**jails** 47:22,23 51:19,21
53:3 56:13 57:11 58:22,
23 68:12,21 116:9,17
127:2 137:23 138:5
139:6 140:1

**Jane** 19:6,8

**January** 6:17,23 8:5,23

**John** 19:6,8

**joking** 142:14

**Joshua** 40:9

**judgment** 42:17

**jump** 123:20

**June** 131:10,11

**jungle** 64:25

**jurisdiction** 65:13

**jury** 67:9 117:10,21
118:4

**justice** 17:7,16 63:7
110:14 140:16

**Justin** 45:8

---

**K**

**keep-away** 23:18,21
24:2,7,23 73:23,24

**keeping** 83:11 142:15

**kind** 25:20 63:9 142:1

knew 114:25 115:2

knocked 93:13

knowledge 20:1 88:19

Kosinski 22:23 45:8,10, 24 89:2 100:10 104:3,4, 19 110:17,22 112:11 123:21 124:8 125:19 129:12,13,14 134:15,20

Krysti 74:3 76:1,4

---

**L**

---

labeled 8:14

lack 91:23 140:13

laid 35:18 58:20

large 98:5 136:22

larger 56:18 136:24

late 138:2

lateness 6:8

Latterloah 74:23

laughing 142:14

laundry 77:25

law 22:1 32:20 47:22 48:1 64:4 67:21,24 68:5,9

laws 64:25

laying 114:6

leadership 51:15

leading 74:22 90:23 115:12

learn 128:18

leave 35:9

leaving 48:10 60:14

lecture 16:19

led 97:18

left 48:7,8 49:14 53:10 61:25 98:5 129:23 131:8,14 143:1

legal 22:3 43:3 70:6

lend 30:15

length 110:5 112:19 129:16 130:13

letter 75:25 76:2,5,9

level 29:15,23 30:18 31:6 39:20 65:9 85:15

levels 73:17 121:23

lieutenant 115:11,13

likelihood 85:23

limit 42:10 86:24 87:4

limitation 41:21

limited 41:8 47:10

linear 64:17

lines 135:25

link 14:22

list 6:12,19,23 7:21 8:3 10:15 13:1,16,17 14:1, 20 18:6,20 31:16,21 32:11 36:13 40:3 74:12 76:17 103:17

listed 13:18 18:13 32:11 35:25 71:24 103:21 104:1 110:4

listened 76:16,19

literally 115:15

living 118:15

lock- 86:18

lockdown 58:24 86:12 87:19 94:24 98:23 99:2 129:6 141:18,22 142:1

log 28:15 100:22

logbooks 129:5

logistics 51:18

logs 90:20 101:5 126:2

long 18:12 21:18 86:25 89:6 93:21 94:5,14 95:10 101:22 102:11,25 104:6 114:4

longer 52:17 84:11 85:4, 22 113:1 138:3

looked 6:19 17:20 25:2 31:17 76:12 77:1,6 90:15 135:22

lost 120:24

lot 44:3 78:11 80:19 115:23 132:22 137:17 139:19

Louisiana 19:11

lower 138:10

lump 97:3

lunch 129:24 130:1

Lutterloah 22:9 23:22 24:2 25:4,5,15,21 26:19 30:17,24 75:2 93:3,17, 20 94:8,14 104:7 121:23 122:5 128:7 129:22

---

**M**

---

M-A-R-L-E-R 19:15

made 10:23 100:14,23 116:22 134:13,25

maintain 12:7 55:10

maintained 12:10

majority 98:6

make 14:14 28:2 38:19 43:18 44:5 47:4 50:8 61:5 64:21 67:9 72:17 76:22 78:15 79:1 85:1 86:7 91:10 103:8 105:23 109:11 114:13 120:5 126:6 131:7 135:14,20 138:5

makes 61:3 101:11

making 34:6 91:7 92:23 98:21 99:11 100:22 101:4 102:22 143:21

male 121:19,22

manage 64:16

management 58:18 64:19

managing 67:2 69:1

mandate 58:3 78:1

mandated 64:3 77:23

mandating 58:5

mandatory 57:24 72:15

manner 15:21 23:10 47:10 82:3,24 99:14 100:11

Maria 19:4

Marion 16:5 24:16,21

27:13,19 28:10 30:7 31:18 32:19 33:4,15,19 36:5,10 47:1 49:1 50:15 54:1 56:19,23 61:18 62:18 66:19 68:24 69:6 72:16 86:12 107:1 112:15,17 114:17,22 118:9 124:3 140:9 142:3

mark 6:10 8:1,16 14:17 15:12 19:6 123:7

Marker 40:18

marketing 20:23

marking 130:18

Marler 19:5 40:18

master 100:19

materials 11:5,13,18,19, 22 12:6,8,13,19 13:1,6 14:12,16 16:10 20:10 23:23,25 43:3 46:11,14 74:10 144:25

matter 40:15,23 93:25

matters 140:19 141:11 143:1

max 119:9,19,24 120:7 122:13

maximum 30:23 118:22 119:5,13 121:22

Mcneely 95:4,8,24 100:1 110:17 134:20

meals 80:19

means 128:21

meant 93:19

media 20:21,23 21:7,11, 12

medical 15:16 19:7,8 26:4,8 28:23 29:1,2 80:20 85:9 86:5 117:16 118:17 120:16

medication 80:13 87:23

medications 80:5,7

medicine 87:25

medium 29:16,18,22 30:19,22,25

mediums 121:22

meet 136:8,11

meeting 33:20

meetings 139:3

Melissa 52:16

members 19:8 64:22

memo 41:20

memory 37:24 53:5
61:16 90:8 103:21
129:4

mentioned 77:12 78:25
80:25 115:23 122:2
134:9 144:18

Merchant 22:8,16,19,23
23:5,11,21 24:3,6,15
25:4,6,15,20 26:2,20
27:8 29:23 30:2 73:22
74:3,4,20,23 75:3,4,17
76:2,5,9 85:8 91:16,19
93:1,5,6,13,18,22 94:3,
5 103:20 104:7 107:6
112:22 114:20 117:2,
11,21 128:6 129:22

Merchant's 28:9 29:15
31:7 74:7

mete 140:16

method 144:24

methodology 133:18

meticulous 101:19

Michael 5:11,13,21

middle 87:24

Miller 22:17,19 88:18
89:2 90:8 100:11 104:3
110:24 123:22 124:8
125:19 129:20,23
134:15,20

milling 141:25

minimize 55:15

minimum 35:12,15
47:23,25

minor 19:5 73:13,17
120:21

minors 71:6

minute 7:3 67:1,2 68:14
104:10,11 122:14
136:10

minutes 49:10,11 62:5,
11,20 65:17 84:8 89:18,
20 90:2,3,5,7,9 98:9
103:23,25 104:12
123:11,12 141:6 142:25

Miranda 41:10

mischaracterizing
117:8,17

misdeeds 105:1

mispronouncing 21:3

misquoted 17:15

misstates 12:22 100:24

mistaken 17:7 35:13
74:19 90:21

mistaking 122:15

misunderstood 49:12

mixed 140:10,22 141:10

model 31:18,24 32:1,3,
24 33:5,12,16 34:5,7,13
35:22 36:6 47:5,17,22
48:5 69:2,7 135:16,22
137:17,21 138:9,14,23
139:3,8,25 140:1

models 64:18

modified 138:21,24

money 132:22

monitor 96:23 98:15
100:8

monitored 137:24
139:20

monitoring 79:13
100:10 139:18 140:7,24

Monteverde 43:6

month 90:23 91:2
115:12

Moore 52:16

morning 5:17,20 6:6 9:9
38:1 94:1 108:6 131:20
142:17

Mosley 39:2

motion 41:3,19

motivation 44:2 46:16

move 88:8 106:23 112:7
121:11

moved 53:18 138:24

movement 28:18 80:16

multiple 10:23 51:18,19

murder 121:7

Murphy 77:16 88:13,14

mute 17:11

---

## N

named 43:10

national 17:17 63:7,15,
24 65:7 66:17 67:22
72:7,13,18 109:3
110:13 113:8 116:14,15

nature 21:8 39:5 43:1
45:4 74:16 88:7

necessarily 28:4 31:3
35:17 45:15

needed 93:3 118:17
120:16

neighborhood 89:18

newer 59:7,9

newest 58:14

news 21:11 42:4

NIC 50:23 114:12
126:14,22 127:1,2

night 25:21 44:22 45:4,
11,20 60:3 76:14,24
78:22 82:3,25 84:6
85:2,4 87:24 88:20
90:17,25 92:1 99:17,20
103:9 104:20,23 106:9,
12 111:17,21 112:11
115:11 127:16 139:21
140:2 142:11,16

nighttime 49:6

nonassaultive 69:16
70:10,15

noncomprehensive
107:3

nonconsensual 71:13

nonviolent 71:14
108:21 118:14 120:2
140:12,23 141:9

notation 115:12

note 143:22

notes 7:17 10:22,23
11:2 28:17,21 29:8
103:15 134:22,25
137:13 144:11

nother 51:10

nothing's 95:5

notice 6:5 8:2,19 47:4

notion 45:19 111:2

November 22:9 25:5
28:11 35:24 103:9

number 8:20 9:6,9
15:23,25 16:4,7,13
18:20 20:16 35:25
46:15 48:9 56:22 68:11,
15 73:18 76:18 87:24
89:12,16,25 90:4 96:16
97:5,17,22 103:6
106:25 110:7 112:15,16
114:16 118:9 123:20,23
126:25 135:17,18,19,25
136:9,12,13 137:23

numbers 31:14 53:9
68:20 89:11 92:13

nurse 77:25 80:4,6,8,9,
14,15 81:1 87:23

---

## O

oath 5:6

object 14:19 17:12,13
23:12 25:9 27:4,16
37:13,18 43:21 44:7,16
45:1,17 46:21 47:8
54:15,23 55:14 56:4
57:14 64:5 66:11 67:10,
18 68:1 69:4 70:12,17
71:15 74:1 75:20 77:10
79:21 82:6 83:2,21
84:10 93:16 97:7
105:24 106:14 111:23
113:14 116:5 117:7,15,
25 118:24 119:23
120:23 140:4 142:4
143:25

objected 113:17

Objection 12:22 24:9
65:14 100:24 109:21
122:7 141:2

objective 72:8 134:4

**observation** 64:14 99:7

**observations** 107:3

**observe** 60:11 61:5

**observing** 112:20
128:16

**occasions** 29:6

**occur** 54:21 55:22
68:17,18 85:21,24 95:7
106:7

**occurred** 45:20 54:8
103:20

**occurring** 45:23 50:24,
25 55:8 71:3

**occurs** 25:8 26:21 99:8

**offender** 73:8 119:4
120:7 121:6

**offenders** 73:3,12
118:13,18,21,23 120:1,
2 121:2,14 122:1,3
140:11,12 141:9

**offense** 73:13 121:8

**offenses** 121:19

**offered** 40:14

**offhand** 24:17

**Office** 17:25 18:4 42:20
48:3 49:14 50:9,17 54:5
69:14 107:2 110:8
112:17 118:10 124:3

**officer** 62:24 79:6,9
80:7,20,22 84:1 87:14,
15 126:17 141:20

**officer's** 78:3 85:25

**officers** 29:10 35:3
44:23 45:13 55:23 66:7
79:19 81:15 85:14
95:10,15,25 127:8
128:1 135:17,24 136:12

**officers'** 77:20

**official** 72:16

**older** 59:8

**one's** 52:2

**ongoing** 25:20 39:22

**onset** 130:23

**open** 57:3,12 60:16

**open-bay** 59:6

**open-dormitory** 59:14

**opened** 51:8,11

**opening** 51:5

**openings** 57:6

**operate** 64:20

**operated** 59:11

**operation** 50:6 54:5

**operations** 63:17 72:19

**opine** 37:5 88:22

**opined** 134:21

**opinion** 11:18 17:9
21:11 29:23 36:4 41:22
42:2 63:10 66:13,15,16,
24 68:10 70:1,6 89:5,8
92:8 97:17 100:21
101:24 106:21 109:17
110:3,12,15 112:24
113:5,7,23 114:10,24
116:1,11 117:1,8,15
118:7,9 123:22,23
124:6 125:18 126:6,12
127:3,6 129:8,14
136:11 139:17,19 140:7
143:20,22 144:10

**opinions** 6:18 11:16,17,
23 12:20 17:5 40:20
42:1 71:19 106:24
109:17 117:2,17 130:19
133:9,19 136:7 137:11
143:16 144:6

**opposed** 32:4 67:9

**opposite** 61:7

**option** 58:6

**order** 41:20 42:7 78:6
96:18 99:19 107:22,24
108:13 128:17

**orders** 96:14 97:20 99:4
107:2

**Orient** 52:1 59:2

**original** 13:14,16,17
89:16

**outlined** 78:7

**overlap** 106:24

**overlapping** 105:12

**overseen** 137:24

**oversight** 115:18

**overtime** 57:23,24 58:2,
5,7

———

**P**

———

**p.m.** 37:25 62:21 64:23
83:20

**paper** 127:20

**paperwork** 30:2

**par** 138:6

**paragraph** 20:14

**paroduced** 8:22

**part** 7:10 20:22 37:5
46:11 74:7 81:17 86:3
107:10 128:11 137:1

**partially** 92:20

**participants** 71:4

**participated** 33:22
139:3

**pass** 80:13

**passages** 17:18

**passed** 33:4 79:7,10

**past** 22:20,25 23:6 24:8
30:12,13,14,15 34:1
126:13

**patrol** 53:22

**pattern** 104:21

**Paul** 5:11,13,21

**pay** 132:23

**paying** 132:9

**people** 58:1 59:1 71:5
76:22 118:17

**percent** 39:23 55:19
74:11

**percentages** 18:10
68:21

**percentile** 90:7

**perform** 55:23

**performance** 96:24
100:9 124:15,16,20
126:9

**performed** 18:9 38:11

**performing** 126:4

**period** 48:6 49:21 53:17
57:2 83:9 86:12 94:12

**periodically** 9:15 81:13

**permission** 88:9

**permitted** 38:18 39:7
42:2 86:18 91:22
141:22 142:2

**permitting** 89:3

**perpetrator** 71:1

**person** 70:15 73:14
89:15 95:11 109:15
114:4,5 115:1 119:3,25

**person's** 84:24 105:18

**pertains** 140:8

**Peterson** 89:17,25
99:25 110:16 115:1
134:20

**ph** 43:6

**phases** 51:12

**physical** 14:1 25:15

**picture** 26:23

**pin** 142:17

**place** 46:3 68:25 69:6
77:15 88:12 101:16
102:20 130:25

**Place's** 46:16

**placing** 120:22

**plaintiff** 5:1 76:1 134:2,7

**Plaintiff's** 12:14

**Plaintiffs** 74:4

**plan** 97:4 118:12
121:12,14

**planned** 81:15

**Plant** 5:24

**plausible** 96:3

**play** 89:21 95:14

**plays** 129:18

**Pleas** 40:6

**PLLC** 22:4

**pod** 28:12 59:24 60:4,16 61:4,7,18 77:21 79:11 82:1,10,12 83:20 85:14 88:2 89:7,13 90:15 91:2 93:3 96:16 97:21 98:15 99:4 101:13,16,22 102:20 103:3,5,9,19 104:14,19 107:17,20 108:7,19 111:21 112:11 119:6,7 120:9,22 121:10,17,21 122:6,15, 16,17,19,20 125:7,8,10 141:8

**pods** 28:24 59:3 100:20 123:2 125:5,22 127:19 128:8

**point** 11:21 21:14 25:4, 18 26:19 28:25 29:2 43:18 48:12,23 51:4 64:25 97:25 100:14 104:4 112:10 130:17 132:5 134:13 137:3 138:1 141:11

**pointing** 126:23

**points** 31:3 57:9

**policies** 16:4 17:24 18:4 30:6 34:2,3 35:2,4,8 36:5 47:1 50:11,15 62:19 64:1 65:16 67:23 68:3,25 69:5 73:2 91:21 92:5,7 97:13,17 99:23 107:2,13 108:5

**policy** 35:6,10,15,17,19 65:7,24 86:13 92:10,13, 14,17,21,22 94:19,22 96:4,12,13,15,16,20 97:1,3,6,11,19,20,21, 23,25 98:25 99:11,24 100:2 107:16,19,22,25 108:1,8,13 112:17 115:10 118:10 122:6, 23,24 124:2,4 142:2,9

**population** 53:3,7 56:1, 18 64:16 73:6,8,15 91:1,24 121:22 140:10, 22,25

**portions** 52:24,25

**position** 51:14 63:5 64:6 72:5 80:15 113:2 122:22 143:9

**positions** 57:3,12,19

**possession** 54:4

**possibility** 55:7 67:6

**post** 21:14 78:6 96:14, 18 97:20 99:4 104:4 107:2,22,24 108:13

**post-incident** 25:19

**potential** 142:21

**potentially** 45:13

**power** 62:2

**practice** 80:12 92:22 94:22 95:2 99:14 104:21 110:8 111:3 129:6

**practices** 38:22 42:1 64:11 91:22

**practitioner** 126:16,18

**pre-sentence** 29:16

**precise** 144:9

**precisely** 137:13

**predict** 110:19 111:14

**predictability** 106:8

**predictability-wise** 115:8

**predictable** 99:12,14 100:12 105:10 110:9 111:16 130:9

**predictible** 81:20

**prediction** 81:22

**preparation** 11:22 18:1 133:19

**prepared** 10:22 11:2 18:16 130:20 134:23

**prescribed** 34:11

**presence** 62:24 77:20 81:23 85:19 124:7 127:23 128:1

**present** 66:7 85:21 88:19

**presentation** 16:19

**presented** 46:8

**pretty** 7:19 21:20 38:8 49:23 72:17 127:14 142:15

**prevail** 64:25

**prevent** 42:10 54:14 55:13,18

**preventable** 41:23,24 42:3

**previous** 33:6

**previously** 6:11,16,20 8:23 21:25 72:10 77:11 122:2 134:21

**prides** 134:6

**primarily** 58:21

**primary** 109:16

**principles** 64:11

**prior** 6:1 7:14 20:10 25:16 27:8 48:10 126:8

**prison** 72:19

**prisons** 57:11

**privilege** 44:3 87:19

**privileges** 88:5

**problem** 91:8 143:4

**problems** 23:6 51:4 128:8

**procedure** 35:7,16,17 92:11 118:10 124:2

**procedures** 16:5 17:24 18:4 30:7 34:3 35:2,5,8 36:5 38:22 42:2 47:1,7 50:11 64:1 68:25 73:2 86:13 91:22 92:5,8 107:2

**process** 11:4 24:22 30:9,11 34:4 79:13

**produce** 12:12,19 14:21

**produced** 6:16,23 13:7, 23 15:1 144:12

**producing** 67:5

**professional** 8:21

**program** 131:16

**progress** 11:7

**proof** 24:18

**proper** 88:3

**properly** 129:9

**protection** 59:1 73:6

**protective** 73:21

**provide** 73:2 91:13,18 98:11,14 117:16

**provided** 6:4 7:14 8:8 12:6,9,14 18:10 24:15 28:14 89:12,17 114:17 119:18 123:21 127:4 129:12 134:11

**Provider** 19:7

**providing** 11:17 40:10 115:4,8 125:21 128:21

**province** 118:3

**provision** 99:2 126:22 140:1

**prudent** 64:7 65:15,20 66:21 67:2 68:2 72:21 109:8,15 111:3 126:15, 18

**publication** 16:18 72:4, 12 113:10 116:8

**publications** 9:2 72:3 109:9 113:9 116:11

**publicized** 121:7

**pulling** 81:1

**punch** 26:2

**purpose** 106:20 141:23

**purposes** 6:3 13:24 14:17 35:22 44:12 133:17 138:15

**put** 5:6 15:6 43:20 63:15 64:2 72:22 108:20 109:13 119:19 120:19 121:25 138:13 143:8

---

**Q**

**qualifiers** 120:10,14,18 122:2

**quality** 124:10

**quantify** 87:5

**question** 6:21 12:16 17:12 23:3,19 38:14 40:10 43:22 55:9 60:13 70:13 71:8 81:24 82:7 83:5,19 90:17 94:4,20 101:3 102:23 111:25 112:15,16 113:18,20,22 116:22 119:13 123:4

135:20

**questioning** 123:8
141:17

**questions** 91:6 123:13
129:11 136:18 144:16

**quick** 26:1 27:2

**quickly** 19:22

**quoted** 17:18

---

**R**

**raise** 5:5

**ranking** 138:10

**rape** 70:11,16,19

**rate** 132:4,25 133:3

**read** 77:7,17,18 88:11
122:4,12 124:14

**reading** 94:25 95:17

**ready** 19:4

**reality** 55:12

**reask** 23:19

**reason** 22:24 23:8
26:12,24 28:24 29:3,13
41:16 46:18 131:14
135:1 137:1

**reasonable** 64:7 65:15,
20,23 66:21 68:2,22
72:20 105:22 109:7,10,
14,18 126:15,18 131:24

**reasoning** 133:20,22

**reasons** 51:13 73:9
80:17,19 92:25

**reassigned** 48:8

**recall** 24:17,24 25:14,22
27:10,17,21,22 31:20
32:10 33:7 43:1 49:2,9
50:24,25 57:3 75:13,21,
22 76:6,11 78:6 91:3
94:25

**received** 6:6 9:10 24:18
36:19 134:14

**receiving** 130:24

**recollection** 37:22 89:4

**recommended** 48:5

**record** 5:18 6:3 37:14
55:1 62:15 100:19,22
101:5,10,11,14,15,23
102:3,10,19 136:22
137:7 144:7

**recorded** 101:8 102:17
103:3,10 104:2 130:14

**recordings** 76:16

**recordkeeping** 100:17

**records** 9:6 10:19 15:17
83:12 100:18 102:21,
23,24 105:13 137:3

**recreation** 81:1

**reduce** 55:7

**reducing** 67:5

**refer** 144:8

**reference** 95:9

**referenced** 67:23

**referencing** 97:9

**referred** 16:23

**referring** 32:5,6 59:19
95:25 96:2,4 98:8,23
107:7 109:2

**reflect** 11:12

**reflects** 24:14 85:14

**regular** 32:20 142:10

**Rehabilitation** 41:12

**rehashing** 130:7

**relate** 34:23

**related** 17:4 32:7,23
33:20 35:2 36:24 47:11
54:4 62:19 90:20

**relates** 16:19 37:3 38:9
47:6 73:3 116:1 126:23
133:18 134:5 136:8,12
142:20

**relationship** 23:1 75:6,
10

**reliable** 126:5

**relied** 17:20,22 63:10
71:20 72:5 113:24

**relieving** 129:25

**rely** 17:24

**relying** 63:20 94:21
110:12 113:4 115:25

**remain** 92:23 94:19
95:3,11

**remainder** 66:8

**remember** 18:22 25:10
29:1,11 31:17 33:19
43:3,5,10 74:9 75:15
76:17 89:1,10 104:5
138:1

**remote** 58:24 64:17

**rendered** 11:2

**rendering** 42:1

**renovating** 52:25

**repeat** 66:2

**report** 6:16 8:4 10:21,25
11:5,11,12,23 12:1
16:24,25 17:2 18:1,13
20:12,14 24:1 25:18
28:15,18 29:11 37:6
39:12 62:17 63:11 91:8
104:5,8 110:4 130:19
131:2 134:12,14,21
137:14 143:13 144:11,
12

**reported** 21:12 23:17,20

**reporter** 19:14

**reports** 11:2 28:21

**represent** 9:12 36:16,18

**representing** 76:1

**represents** 6:18

**reputable** 109:23 110:2

**request** 11:2 13:22
14:10 23:18,20 24:2,7,
23 41:7 73:21,24

**requested** 51:4 73:23

**require** 14:21 65:16
68:5,6 78:8 80:22 98:2
107:4 115:11

**required** 10:8 32:19
38:1 47:17,23 49:7
80:16 92:9 96:21
116:18

**requirement** 127:20

**requirements** 36:23
37:4,16 38:6

**requires** 14:20 65:24
67:22 68:9

**requred** 78:4

**research** 136:5

**Resource** 63:17,24 65:8
66:17 67:22 116:7,16
127:1

**resources** 17:8 63:7,14

**respect** 116:25

**respectfully** 111:12

**responsibilities** 96:22

**responsible** 78:11,15,
17 79:1 88:7 100:5
143:20

**responsive** 11:1

**restate** 48:22 65:6

**restroom** 86:15,19 87:1,
2,6

**result** 26:5

**resume'** 8:21

**retained** 39:3 133:8

**retainer** 10:3,4,7,10,11
132:3

**retire** 131:14,17

**retired** 48:14 49:21
52:15 53:19

**retirement** 48:10

**review** 22:11,14,22 23:4
24:5 25:2 36:3,13,22
47:2 88:21 115:18
124:17 137:3

**reviewed** 7:10 11:13,22
12:6,20 13:2,3 14:13
15:18 16:1 23:23 24:1
29:24 30:1 31:19 32:12
35:24 36:1 47:7 69:14
74:7 107:24 125:20
134:23 136:23

**reviewing** 10:24 31:15
44:12 62:17 116:2

**reviews** 124:14,20

**rights** 23:11

**risk** 73:7 119:10,12,14,
15,21 120:16,21 121:2
141:14

risks 118:17

road 8:1 52:1,2 59:2,5
61:9

Robert 52:20

Robson 9:19,25 10:13,
17 12:11,12 13:7 20:16,
19 21:1,4,6,20 132:19

Rodriguez 43:11,13,17

role 67:14 116:9,17
117:12 127:3 134:2

rolling 143:15

Romanucci 22:1

rotated 125:16

roughly 89:18

routinely 81:2

rover 129:23

RPSO 19:6

rule 14:19,24 95:19,20

rules 91:25 95:5,6 106:5
108:23 129:17 140:17,
19 143:4,7

run 57:20

running 128:9

—————————

S

safe 56:21 91:13,18
97:18

safety 36:25 37:3 79:12
80:24

Sam 5:1 7:16 54:24
117:19

satisfy 127:20

schedule 110:9 130:9

scientific 9:2

scope 20:10 47:11

search 82:15 83:6,20
84:7 108:6

searched 84:3 101:6

searches 81:14

seconds 25:7 26:23
89:14,23,25 93:6,14,18
94:11,13

secret 135:9

section 101:13 121:18,
21 122:16,19,20 125:2,
3,6,15 138:25

sections 100:20 103:5

secure 105:23

security 30:23 31:6
34:20 37:11,17 38:10
48:4,25 55:11 62:20
77:19 79:12 80:23
81:16,20 82:16 89:7
92:17 99:16 100:23
101:15 103:18 104:14,
17 105:9,11 106:4
107:9 108:7,15,16
113:12 114:1 118:22
119:5,9,10,12,14,19,21,
24 120:7 121:22

seeking 24:2

segregation 71:20,22

select 82:4

send 15:7 144:21,22,23

sends 9:14

sense 92:7 135:20

sentence 27:24

separate 7:24 14:25
18:15 83:6

separated 60:17

separation 71:23 72:6

September 42:7

sergeant 23:3,5 95:8
100:3 114:25 115:14
123:20 126:23 127:15
134:18

sergeants 124:3

served 8:4 33:11 79:2,
20

serves 37:24 53:5 61:16
90:8 103:21 129:4

Service 19:7

services 53:16,17
131:12

serving 27:23

set 34:12 37:9,16,19
60:9 61:9 65:9 108:18

144:20

setting 86:18

setup 60:1

sex 71:7 73:3,7,12,13
75:8 118:13,18,21,23
119:3 120:7,20 121:2,6,
8,14,25 122:2 140:11

sexual 27:14 70:22,23,
24 71:2,13 121:19

sheriff 16:5 19:6 21:23
24:16 72:21 74:18
91:13,18 114:17,23

Sheriff's 17:25 18:4
42:20 48:3 49:14 50:9,
17 54:5 63:16 67:23
69:14 77:3,7 107:1
110:7 112:16,17 118:9
124:3

sheriffs 133:9 138:4,7
139:1,7

shift 100:8

shifts 49:19

short 62:13 123:18

show 105:13

showed 76:4

showing 18:8

shows 28:15 105:16
125:23 127:13

Shrewsbury 41:11,23

sight 61:3 93:14

sign 10:4

signed 39:8 41:1

significance 135:4

similar 38:7,8,14 110:24

simple 89:11

simply 79:13

simultaneously 83:7

single 60:24 61:10
119:15

single-cell 119:20,25
120:8

sir 5:12,17 7:6,12 8:24
9:4 10:5,20 11:24 12:10
15:14,19,22 16:6,16

18:2,5,17,19 19:20
21:24 22:2,5,21 23:2,7,
15 24:4,10 30:5,10
32:22 33:1 39:14 40:8,
13,22 42:12 46:13
47:25 48:2 50:10,13,16
52:6 54:10,12 56:10,15,
17,20 57:15 63:21 74:5
76:15,25 82:13 86:20
87:16 90:23 106:13
107:10,18 112:9
117:12,17,24 126:10
131:10 132:11 133:2,4
135:11

sister's 76:10

sit 33:4 54:20 130:17,
21,22

situation 86:5 136:4

situations 139:5

Slater 22:3

sleep 142:12

small 20:14 87:24

Smith 41:7,10 117:6

sneaking 75:7

social 20:23

society's 138:22

solemnly 5:7

someone's 69:21

sort 22:20,24 75:5 93:2
143:19,20 144:8

sound 64:10 67:2 111:3

sounds 53:12 62:12
108:2 131:23

source 17:18 126:5

sources 63:20 109:23
110:2,3

South 40:5

speak 46:1

speaking 113:16

special 88:5

specific 37:16,19 45:3
68:13 75:1 96:21
141:23

specifically 37:9 47:11
49:24 88:22 92:5,7 95:2

102:10 112:10 113:25 140:8 142:11

**spectrum** 30:22

**spell** 19:13

**spend** 84:25 85:14 113:11 114:13

**spending** 112:25

**spent** 85:13 102:11,14 103:1 114:1

**split** 71:12

**spoken** 76:22

**spontaneous** 27:2

**spontaneously** 106:8

**stacked** 61:12

**staff** 19:8 29:12 55:16 64:21 85:19,21,22 98:2 115:19 128:12 143:3,7

**staff's** 140:17 142:23

**staffing** 50:18,22 51:3, 12

**stage** 108:18

**staggered** 67:1

**stand** 41:16 80:8,9 104:10

**standard** 32:2 35:6,15 37:7 47:19 64:1,9 65:5, 23 66:9,13,17,21 67:8, 15,16 72:20 91:15 107:6 109:1,2,5,7,11, 14,18 110:10 112:21 113:3 114:12,19 116:24 126:12 135:15,16,21,22 136:8,12 141:4

**standards** 31:25 32:4,6, 7,25 33:12,16,21 34:5, 7,11,12,13 35:12,22 36:7,8 37:9 38:9 47:6, 17,22 48:5 69:2,8 126:14 137:18,21 138:9,14,16,23,25 139:4,8,9,13,25 140:1

**standing** 79:23 81:10 85:25

**standpoint** 47:9

**stands** 79:9

**start** 81:21 83:16 93:12

100:13,15,16 104:25 107:25 108:1 110:19

**started** 51:9 103:22,23 110:23 111:21 124:24 132:7

**starting** 21:20 108:12

**starts** 82:4,16 99:18 107:13,14 111:20 124:25

**state** 5:18 40:4,6 68:12

**stated** 107:13

**statement** 35:18 46:6,8

**statements** 77:1,3,6,12 91:10,12

**states** 19:9 107:14

**station** 129:23

**stationed** 59:20,21

**statistics** 53:24 54:3

**status** 29:16 30:12 60:12

**stay** 60:3 91:25 93:1 98:21 115:3 138:6

**STENOGRAPHER** 5:4, 12 15:14 19:16

**steps** 124:9

**Steven** 77:16 88:13,14

**sticks** 43:7

**stop** 93:4 115:17

**stopped** 86:7

**stopping** 74:15 89:22 127:10

**stops** 95:17 127:17

**stored** 15:5

**strike** 23:19 33:10 38:3 56:25 57:17 58:12 69:25 76:13 94:20

**strongest** 65:1

**stuck** 82:11

**stuff** 16:25 59:1

**style** 58:18 60:2

**subject** 34:8,9 40:15,23 41:2

**submitted** 9:24

**subsequently** 134:11

**sued** 42:13,21 43:14

**suffering** 85:9

**sufficient** 89:20

**sufficiently** 102:6

**suggest** 22:23 104:16

**suggested** 23:4

**suggesting** 67:21 74:17 104:13

**suicidal** 118:17

**suicide** 120:17

**summary** 42:17

**sums** 129:10

**supervise** 64:12 91:25 96:23 98:3,11 108:21 114:23 135:19 140:20

**supervised** 106:11,12, 15

**supervising** 100:3 127:8,22 128:21 129:9

**supervision** 34:18 35:3 58:22,24 59:11,18 64:15,17,18,21 65:10, 23 68:25 91:23 92:11, 18 97:25 98:10,12,14, 17 100:5 106:19 114:17 115:5,9 116:9,17 123:21 124:6 125:19,22 126:24 127:2,5 128:11, 22 129:12 140:8,14,25

**supervisor** 97:25 99:23, 24 124:19 128:4 129:4

**supervisors** 96:21 128:13

**supervisory** 96:20 97:19,21 115:18

**supplement** 11:9,11,12

**supplemental** 8:7 11:4, 23 12:1 143:13 144:12

**supplementing** 11:16 131:2

**support** 12:20 23:9 63:5,10 64:6 66:24 72:5 109:9,10 111:2 116:11

127:3 134:21

**supported** 109:22 113:8

**supporting** 17:9 71:24 109:20

**supports** 108:11

**suppose** 13:8

**supposed** 25:10 35:20 47:12 108:23 127:7 134:4

**surprised** 57:22

**surveillance** 98:16 140:24

**suspect** 56:24 130:24

**suspicion** 76:8

**sustained** 26:4

**swear** 5:7

**switch** 49:18

**sworn** 5:14

**syllabus** 16:18

**system** 31:2 44:4,5 52:8 72:8 135:10

---

**T**

**tables** 16:23

**takes** 87:6 89:6 90:9 101:16 102:20 113:1 114:4 129:16

**taking** 6:5 8:2,20 134:7

**talk** 7:2 9:18 39:11 87:14 127:18 128:5,14, 17 139:17 140:6 141:20

**talked** 47:15 98:7 99:15 107:8 109:3 112:24 130:11 137:17 141:18 144:5

**talking** 39:6 74:20,22 82:1 90:16 110:11 126:13 127:10 130:7 142:14

**talks** 64:10

**targeting** 47:3

**technical** 6:16 8:3 9:2 130:18 144:10

**tecum** 8:3

**teen** 48:17

**teetered** 58:9

**television** 21:6,7

**telling** 49:9 102:12
103:2 117:10

**tells** 94:5

**ten** 62:5,6 89:14 93:6,18
94:13 142:13

**tension** 93:2

**term** 45:11,12,14,15,25
70:7 92:6 125:4,6

**terms** 25:1,24 27:7 28:2,
9 30:17 37:10 38:17
39:17 46:16 55:25 60:1
63:5 69:11 71:19 77:20
78:3 81:12 82:1 88:6
96:11 97:16 101:20
102:17,19 107:8
111:10,16 113:2 130:19
133:6,23

**Terry** 46:3,16 77:15
88:12

**testified** 5:14 38:21,25
89:17 127:15

**testify** 38:19

**testimony** 5:8 6:20 7:5
12:23 40:11 41:8 42:10
45:3,9 46:17 75:19
81:25 94:25 95:1 96:20
99:19,21,25 100:25
110:18,22 111:5,11,18,
19,25 112:4 115:16
117:16 119:1 120:11
124:23 127:13,14
133:23

**text** 17:3 63:9 71:21
111:10 113:11 116:1,13

**theoretically** 86:2

**theory** 85:3

**thereof** 91:23

**thing** 15:10 45:24 107:7
110:12,18 112:3 117:18
121:12 129:11,20
143:11

**things** 6:10,12,18 21:8
31:2 34:2 44:3,12,23
55:7 60:11 63:2 73:18

77:25 78:12,19 80:22
81:14 105:25 111:5
115:22,23 128:12,14
131:4 134:10 142:19

**thought** 49:12 74:19
106:20 113:16 125:5
139:4

**thousand** 56:9

**threat** 69:20 70:3,5 71:3

**threatened** 75:1

**three-hour** 123:7

**three-punch** 25:8,25

**throw** 119:14

**thrown** 69:12

**thumbdrive** 144:21

**time** 7:5 9:6 15:1 26:16,
19 28:10,16 39:1 48:6,
11,24 49:3,18 50:1,18
51:15 52:13,14 53:18
57:2 62:4 67:2 78:9
79:20 81:22 82:17,20
83:9,12,13,15,22 84:25
85:1,13 86:24 87:4,6
88:18 89:9 90:12,22
94:12 99:17 100:13,18
101:14,21,22 102:1,2,
14 103:2,7 104:8,23
105:3,9,12,21 106:9
110:23 112:1,19,25
113:11,25 114:13
124:24,25 129:16,21
130:13 131:11,17
132:20 138:10 142:16

**timer** 94:11

**times** 18:11,12 28:23
42:15 44:2 51:13 52:6
78:16 80:2 108:12
110:20 129:3

**timing** 37:10,17,20,22
107:8 115:7 125:25
130:9

**title** 138:14

**today** 5:23 6:1 7:14 8:17
33:4 50:4 54:20 120:14
130:17,21,22 132:9,20
134:10

**told** 26:18 100:6 117:6

**Tommie** 74:4

**tonight** 84:1

**tool** 35:16

**top** 18:24,25 87:21 89:1
110:23 124:22 136:4

**topic** 47:3

**topics** 34:14,17,20,23

**total** 26:18 94:11 125:10

**totaled** 131:20

**totally** 100:12

**touch** 59:24,25

**track** 83:12 96:23

**training** 48:9,18 53:19,
21 113:6,24 126:14,20

**transcript** 134:17

**transcripts** 20:5,7

**transferred** 53:15,20

**travel** 133:1

**trial** 7:5 130:20 132:24

**Tricky** 60:13

**trouble** 143:8

**true** 42:24 83:11 118:23

**trustee** 88:6

**truth** 5:8,9

**truthful** 44:15 45:16

**turns** 76:4

**tweaked** 138:22

**type** 30:3 41:19 58:13,
17 79:12 81:16 115:18

**types** 81:12

**typically** 35:5,9 53:9
80:14 90:9

———————————

**U**

**U-R-A** 52:20

**U.S.** 17:7,16 63:6

**ultimately** 53:19

**unconscious** 85:9

**underaged** 75:6,10

**undergo** 32:19

**understand** 39:16 51:17
60:14 90:16 91:11
106:17 113:23 120:6
123:1 136:1,2

**understanding** 30:18
31:12 37:10 39:14 70:7
77:19 120:13 125:9,12
132:12

**unhappy** 46:19

**unit** 59:14,19 60:2,9,20,
22 80:20 82:3,11 83:10
84:2,7,9 85:14 89:7
90:1,12 101:6,21,22
102:11,15 103:1 125:1

**unit's** 84:3

**United** 19:9

**units** 34:18 58:13,19
82:1,17,24 83:6,7,13,
16,20 99:20 100:7
115:7,17 125:5,6,8
127:16

**Unknown** 19:7

**unpredictible** 67:1

**unsupervised** 98:6
143:1

**unsure** 52:23

**untruthful** 44:4

**unusual** 14:9 15:4

**up-to-date** 9:12,13

**updated** 7:13,21,24

**upper** 30:22

**Ura** 52:20

**utilize** 70:20

**utilized** 15:21 17:8
52:24 58:18 74:11 75:2

**utilizing** 48:12 52:24

———————————

**V**

**vague** 34:9

**vaguely** 29:1

**varies** 10:9

**vast** 98:6

**verbal** 25:15

**version** 35:25 36:4

**versus** 19:6 39:2 40:9 49:19 57:24 65:25 69:16 71:14 98:9 136:13

**victim** 71:1 75:18 76:1, 3,9

**video** 61:20 79:9,17,18, 22,25 81:9 93:8 94:8 98:16 125:20,23

**videos** 76:14 126:8

**view** 35:9 62:21 69:12 70:7 106:17 113:1 122:25

**violate** 87:19

**violating** 95:19,20

**violation** 91:14 107:5 109:1 110:10 112:20 113:3 114:18 116:24

**violence** 69:20,21,24 70:3,5 71:3,9,10 73:17, 18 75:1 85:15,20,24 141:14 142:21

**violent** 69:22 70:2 71:9, 14 108:20 118:14 120:1 140:11,22 141:9

**Virginia** 41:11,15

**virtually** 83:25

**vision** 61:4

**voluntarily** 58:6

**voluntary** 57:23,24,25

**volunteered** 58:2

W

**wait** 119:12 122:14 136:9

**waiting** 11:5

**walk** 80:23 87:6 94:9 95:16 100:6,7 101:7 104:24 115:11,14

**walked** 115:13,15 130:13

**walking** 59:23 79:11 80:11,12 84:15,19 85:5 127:22 128:2,16

**walks** 26:20 127:15,17, 20

**wall** 61:15

**walls** 60:17

**warden** 72:21

**Washington** 21:14

**waste** 112:1

**watch** 120:17

**watched** 76:14

**watches** 18:11 66:25 67:1 129:15

**water** 87:11 95:16

**Watts** 40:9

**ways** 141:21

**weaker** 65:2

**webinar** 20:25

**website** 21:1

**weeds** 35:11

**week** 60:7

**weigh** 139:4

**well-being** 36:25 37:3, 11,17 38:10 48:25 49:8 79:12 110:8

**well-being/security** 130:8

**well-being/wellness/ security** 112:18

**well-known** 121:6

**wellness** 36:25 49:8 84:23 115:6 124:11,12

**wellness/security** 110:9

**West** 19:10 41:11,14

**Western** 19:10

**whatsoever** 23:8

**whichever** 82:3 104:12

**white** 95:6

**window** 68:4 75:8,15 98:15

**windows** 60:17

**wise** 121:11

**Wood** 19:6

**word** 28:19

**words** 10:3 24:22 25:7 26:21 28:18 78:17 94:9 135:21

**work** 9:20 10:2,4 11:6 21:22 42:20 58:7 59:22 124:10 131:24 132:20

**worked** 21:25 32:15 133:7,8 136:24

**working** 53:10 104:4

**workstation** 60:5,9

**worse** 14:14

**wrap** 123:10

**writing** 76:2,9 109:13

**written** 21:15,16 29:11 34:3 46:9,25 47:6 72:18 77:12 101:5 104:9 108:1 109:11 142:2

**wrong** 99:23

**wrote** 75:25 76:5 107:15 126:2

Y

**year** 21:19 33:5,6 50:25 51:9 53:8 56:3 60:7

**years** 14:11 21:19 32:16,17,18 43:8 48:10, 14 49:16 50:19 114:9 137:23 138:18,21

**years'** 126:21

**yellow** 135:5,6

**yesterday** 73:1

Z

**Zoom** 142:13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO.: 5:23-cv-00661

KRYSTI MERCHANT, as Personal
Representative for the Estate of
Cory Merchant, Deceased,

  Plaintiff,

v.

BILLY WOODS, Sheriff of Marion County,
Florida, in his official capacity;
Deputy Justin Kosinski;
Deputy Dellun Miller,
Sergeant Jerome Dukes,

  Defendants.

_____/

## NOTICE OF DEPOSITION
(Via Videoconference-Zoom)

PLEASE TAKE NOTICE that Defendants, BILLY WOODS, Sheriff of

Marion County, et al. will take the deposition of **Paul M. Adee**, by remote

audio –video conference on **Friday, April 4, 2025** at **11:00 a.m. (EST)**.  This

deposition is taken for the purposes of discovery, or use as evidence in this

action, or for such purposes as authorized under applicable statutes or rules

of Court.  The deposition will continue from day to day until completed.

1

**EXHIBIT**

Ex. 1 - P. Adee - 4/4/25

**Please Take Further Notice that:**

1.      The deposition will be conducted remotely, using audio-visual conference technology before Landmark Reporting, a Notary Public, or before some other officer authorized by law to administer oaths;

2.      The court reporter will report the deposition from a location separate from the witness;

3.      Counsel for the parties and their clients will be participating from various, separate locations;

4.      The court reporter will administer the oath to the witness remotely;

5.      The witness will be required to provide identification satisfactory to the court reporter, and this identification must be legible on camera;

6.      Each participating attorney may be visible to all other participants, and their statements  will be audible to all participants;

7.       The court reporter will record the testimony;

8.      The deposition may be recorded electronically; and

9.      Counsel for all parties will be required to stipulate on the record:

        a. Their consent to this manner of deposition; and

        b. Their waiver of any objection to this manner of deposition, including any objection to the admissibility at trial of this testimony based on this manner of deposition.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 2nd day of April, 2025, I electronically served the following notice to counsel for Plaintiff, **Sam Harton, Esquire**, Romanucci and Blandin, 321 North Clark Street, Chicago, Illinois 60654 and **James M. Slater, Esquire**, Slater Legal, PLLC, 113 South Monroe Street, Tallahassee, Florida 32301.

/s/ Bruce R. Bogan
Bruce R. Bogan, Esquire
Fla. Bar No. 599565
Gary M. Glassman, Esquire
Fla. Bar No. 0825786
Hilyard, Bogan & Palmer, P.A.
Post Office Box 4973
Orlando, FL 32802-4973
Telephone: 407-425-4251
Facsimile: 407-841-8431
Email: bbogan@hilyardlawfirm.com
gary@hilyardlawfirm.com
Attorneys for Defendants

Topic: MERCHANT V. BILLU

Time: Apr 4, 2025 11:00 AM Eastern Time (US and Canada)

Join Zoom Meeting

https://us06web.zoom.us/j/88178677955

Meeting ID: 881 7867 7955

Passcode: 407026

cc: Landmark Reporting

## EXHIBIT "A"

1. A professional resume or curriculum vitae summarizing said witness' professional qualifications.

2. Copies of all scientific and technical publications authored by said witness.

3. All time records, diaries, and bills prepared and rendered in connection with said witness' investigation and evaluation of the issues involved in the lawsuit.

4. Any and all reports and notes rendered or prepared in this case.

5. All depositions, summaries of testimony, reports, x-rays, test results, photographs, or any other items reviewed in forming or preparing said witness' opinions or the basis of his opinions herein.

6. Any written notes, correspondence, tests, texts, pamphlets, or articles reviewed, consulted or otherwise relied upon by said witness in reviewing, evaluating and/or formulating opinions in this matter.

7. Any and all medical records, hospital records or other documentation utilized by said witness in reviewing this matter.

8. Any and all investigation files utilized by said witness in reviewing this matter.

9. Any and all in audio files utilized by said witness in reviewing this matter.

10. Any and all policies and procedures utilized by said witness in reviewing this matter.

11. Said witness' complete file in connection with his investigation and evaluation of the issues involved in the lawsuit, including but not limited to:

   a.   All documents furnished to him by anyone;
   b.   All documents obtained or created by him;
   c.   All documents he reviewed, referred to, or relied upon in arriving at any of his opinions or conclusions concerning the issues involved in the lawsuit, including but not limited to all scientific and technical articles, publications, codes, standards, and other literature;
   d.   All models, illustrations, photographs, or other exhibits or documents of any kind, which said witness intends or contemplates using to explain, illustrate, or support his testimony at trial.

12. Any and all articles authored, coauthored, or contributed to concerning any of the conditions, analysis or procedures applicable to this case.

4

13. Copies of all publications, syllabuses and other handouts or visual aids used during any lectures or presentations pertaining to any issues about which said witness intends to testify in this matter.

14. Any tables or charts referred to or utilized in rendering said witness' opinions in this matter.

15. Any calculations performed.

16. Any correspondence, notes, records, or any other computer-assisted generated by said witness, listing any opinions or conclusions formulated or proposed or preliminary opinions in this case.

17. A listing of all cases within the last three (3) years in which said witness has given testimony as an expert, including identification of: the case style; plaintiff's attorney; defendant's attorney; court in which case was pending; and whether the testimony was by deposition, trial or both.

18. A list of all previous depositions given and/or trials in which testimony was given along with copies of transcripts of depositions in all cases within the three (3) years in which said witness has testified as an expert.

19. An approximation of said witness' involvement as an expert witness based on the number of hours, percent of hours, or income derived from expert services, including percentage of work performed for plaintiffs vs. defendants.

20. Documents describing the scope of his employment in the pending case.

21. Copies of any advertisements concerning his availability as an expert or consultant or a listing of any expert locator/referral services in which he has participated or agreed to make referrals to him.

22. Financial documentation showing the total amount of fees the Defendant(s) **Romanucci & Blandin or Slater Legal, PLLC,** has paid for your services in the last three (3) years.

23. Financial documentation showing the total amount of fees the Defendant(s) counsel, **Romanucci & Blandin or Slater Legal, PLLC,** has paid for your services in the last three (3) years.

24. Copies of all articles, treatises, or other publications in the witness's possession or control reviewed, referred to, or relied upon in arriving at any of his opinions or conclusions concerning the issues involved in the lawsuit.

**TECHNICAL REPORT**

of the

**CORY MERCHANT INCIDENT**

Krysti Merchant, as Personal Representative for the Estate of Cory Merchant, Deceased

v.

Billy Woods, Sheriff of Marion County, Florida, in his official capacity; Deputy Justin Kosinski; Deputy Joseph Miller, Sergeant Jerome Dukes, et al.

RFI File: 24LL0261

Prepared by:

**Paul M. Adee, C.C.M., C.C.H.P.**

January 2, 2025



EXHIBIT

Ex. 2 - P. Adee - 4/4/25



THE EXPERTS
**Robson Forensic**

**CORY MERCHANT INCIDENT**

<u>**EXPERT'S REPORT**</u>                                                            <u>**JANUARY 2, 2025**</u>

**A.      INTRODUCTION**

Mr. Cory Merchant (Merchant) was an inmate at the Marion County Jail (MCJ) in Ocala, Florida on 11/7/21. He was initially arrested on 11/8/19 for Lewd or Lascivious Behavior (Victim Aged 12-16); and subsequently had 2 additional charges filed on 1/27/20 for Sexual Assault by 24 years of age (YOA) Older Sexual Battery Victim 16 or 17 YOA and Lewd Lascivious Behavior Offender 18 YOA or Older Victim 12 YOA less 16 YOA.

Mr. Eric Lutterloah (Lutterloah) was also an inmate at the Marion County Jail in Ocala, Florida on 11/7/21. He was arrested on 6/4/20 for Armed Kidnapping and Sexual Battery Physical Force Not Likely to Cause Injury.

At the time of this incident Merchant and Lutterloah were being housed in G-Pod Section-A, together. During the early morning hours on 11/7/21, Lutterloah attacked Merchant by striking him and causing him to fall to the floor. Subsequently, Merchant was transported to the hospital where he died on 11/13/21 as a result of the injuries sustained during the attack by Lutterloah.

The scope of my investigation was to determine if the Marion County Sheriff's Office (MCSO), Sheriff Billy Woods, and the other named defendants complied with the Marion County Sheriff's Office Policies, Procedures, and Post Orders and the correctional standard of care regarding the care and treatment of Cory Merchant while in their custody.

My investigation into this matter and the preparation of this report was performed at the request of Sam Harton, Esq. of Romanucci and Blandin Law, LLC.

**B.      QUALIFICATIONS**

I, Paul M. Adee, served 32 years as a correctional officer. I began my career as a correctional officer with the Winnebago County Sheriff's Office in Rockford, Illinois and ended my career as a major (division commander) with the Hillsborough County Sheriff's Office in Tampa, Florida. During that time, I served as a correctional officer/detention deputy; field training officer; detention supervisor as corporal, sergeant, and lieutenant; detention/corrections administrator as a captain and major. My assignments included correctional officer/pod deputy, assistant squad supervisor (corporal), squad supervisor (sergeant), detention training sergeant, shift commander(lieutenant), transportation bureau commander (lieutenant), judicial protection bureau commander (lieutenant), deputy division commander (captain), and division commander (major).



As a correctional officer and detention deputy, I was trained in the proper protocol regarding the care, custody, and control of inmates. I was also trained to conduct well-being or wellness checks as required by policy, procedure, and established standards. As a correctional officer and detention deputy, I was responsible for conducting routine well-being checks and inspections of inmates and their living areas to ensure their health and welfare. As a field training officer and supervisor, I provided initial and ongoing training to subordinates regarding these same matters.

As a detention supervisor and commander assigned to the detention facilities, I provided oversight and supervision of deputies and supervisors in the proper care, custody, and control of inmates. I ensured subordinate personnel conducted adequate well-being checks of inmates in their charge and that they were managing the inmate living areas in accordance with established policy and standards. As a division commander, I also provided oversight of the classification unit which was responsible for initial and ongoing inmate classification processes. I have conducted and/or reviewed numerous investigations of alleged officer and/or inmate misconduct and recommended discipline when appropriate.

I hold a Bachelor of Arts degree in Criminal Justice from Saint Leo University and have successfully completed over 1,500 hours of basic, annual, and advanced training. I am a graduate of the University of Louisville Southern Police Institute Command Officer's Development Course. I am a Certified Correctional Health Professional (CCHP) through the National Commission on Correctional Health Care (NCCHC) and a Certified Correctional Manager (CCM) through the American Correctional Association (ACA).

My CV outlining my complete education, experience, and training is attached as Appendix 1.

The approach taken for the analysis of this investigation is based on reliable scientific reasoning and methodology which is accepted by the scientific community. My opinions are offered to within a reasonable degree of professional certainty relying on correctional principles and practices. My opinions are subject to change if additional information becomes available.

<u>Terms of Compensation</u>

The professional service fees Robson Forensic, Inc. charges for all tasks that I have undertaken in this case is currently $505 per hour, subject to change.  To date Robson Forensic has billed approximately $15,150 for my work in this matter.

<u>Testimony as an Expert</u>

A document listing each of the occasions on which I have given expert testimony in the past 4 years is attached as Appendix 2.



Exhibits

I may use the following materials as exhibits to illustrate testimony: all references and documents cited in this report or listed as Materials Available for Review.

**C.      MATERIALS AVAILABLE FOR REVIEW**

Attached as Appendix 3.

**D.      EMPLOYEE BACKGROUND & MARION COUNTY SHERIFF'S OFFICE POLICIES, PROCEDURES, AND POST ORDERS**

Employee Background

Billy Woods was employed as the Sheriff of Marion County during the time that Cory Merchant was confined at the Marion County Jail at the time of this incident.

Jerome Dukes was employed as a Sergeant at the Marion County Jail by the Marion County Sheriff's Office during the time that Cory Merchant was confined therein at the time of this incident.

Justin Kosinski was employed as a Detention Deputy at the Marion County Jail by the Marion County Sheriff's Office during the time that Cory Merchant was confined therein at the time of this incident.

Dellun Miller was employed as a Detention Deputy at the Marion County Jail by the Marion County Sheriff's Office during the time that Cory Merchant was confined therein at the time of this incident.

Marion County Sheriff's Office Policies, Procedures, and Post Orders

Marion County Sheriff's Office **Policy 6011.00 Supervision of Inmates** – Jail, dated 4/13/23:[1]

- **Duty posts are located adjacent to inmate living areas to permit detention deputies to hear and respond promptly to emergency situations** and are staffed to provide full coverage of designated security posts, surveillance of inmates and performance of all ancillary functions. Each housing area has at least one certified detention deputy present at all times.
- **All high and medium security inmates are observed by a detention deputy as frequently as possible. More frequent observation is required for those inmates who are violent,** mentally disordered, suicidal, or who demonstrate unusual or bizarre behavior. Suicidal inmates housed alone are under continual observation.
- **All inmates will be visually checked every hour between 10:00 PM and 6:00 AM**, with the results recorded and maintained in the Daily Log of the Jail Management Computer System.

---

[1] Marion County Sheriff's Office Policy 6011.00 Supervision of Inmates – Jail, dated 4/13/23



- A permanent log, recording routine, emergency and unusual situations shall be maintained in the jail's computer system.
- Procedures
  - The Jail Watch Commanders shall: **Conduct daily walk-through tours and inspections of housing units to gauge the temperament of the inmate population and ensure that both staff and inmates are adhering to Agency rules and regulations. An unannounced supervisor check will be documented in the daily pod log.**
  - **The Sergeants shall: Ensure that each pod detention deputy maintains a daily activity log by recording routine and emergency situations in the Daily Log in the jail's computer system.** Each shift shall prepare a daily shift activity report (Detention Supervisor Control Sheet) regarding all unusual occurrences for submittal to the Bureau Major through the chain of command. An unannounced supervisor check will be documented in the daily pod log when the sergeant makes his rounds.
- Inspections
  - **It is the responsibility of the supervisory staff to continuously assess inmate morale and the quality of care and supervision inmates receive.** Line supervisory staff will conduct a patrol of all areas of the facility on a shift basis, including weekends and holidays.
- General Supervision
  - **Detention deputies should vary their routines so that inmates cannot determine when their cell block or cells will be checked or inspected.**
  - All staff members shall monitor inmate movement to ensure the security and orderly running of the facility.

Marion County Sheriff's Office **Policy 6164.00 Headcount of Inmates**, dated 3/7/24:[2]

- Headcount of Inmates
  - **Night shift will conduct one (1) lock-down headcount.** The full "Lock-Down" count will be accomplished when all inmates are required to be immobilized and visually inspected.
- Definitions
  - **Lock-Down Headcount** - A headcount where all inmates stand for the count by their respective cell door or bunk. **After identification of the inmate, the inmates are secured in their cells or restricted to their bunks**.
- 6164.35 Security Checks
  - **When conducting a security check, all flashlights will be used sparingly, but with enough light thrown on the inmate to leave no doubt as to whether a human is actually in the bunk. The detention deputy must be certain of seeing flesh in all cases rather than counting an inmate on the basis of seeing any part of his/her clothing, hair or shoes**.
  - **All inmates will be visually checked every hour between the hours of 2300 and 0600**, unless they are involved in an outside program that precludes a personal check. Checks will be entered in the Daily Activity Log.

---

[2] Marion County Sheriff's Office Policy 6164.00 Headcount of Inmates, dated 3/7/24



Marion County Sheriff's Office **Post Order Post: Gulf Pod**, dated 1/8/19:[3]

- Purpose: The purpose of this Post Order is to outline the duties and responsibilities of those detention deputies assigned to the Gulf Pod post. This Post Order supersedes all previous Gulf Pod Post Orders and will not be changed without the approval of the Detention Bureau Chief or his/her designee.
- General Responsibilities
  - 1. Maintain the security of the facility at all times.
  - 2. Maintain vigilance of all inmates assigned to the unit.
  - 3. Be thoroughly familiar with the Jail's emergency procedures.
  - 4. Maintain a clean and orderly operation of the post during tour of duty.
- Specific Duties and Responsibilities
  - 5. Conduct headcounts as follows:
    - b. An additional lockdown headcount will be conducted **as the inmates are locked-down each evening at 2200 hours**.
  - 25. **Security checks will be accomplished every hour between the hours of 2200 to 0600**. These checks will be logged and maintained by the pod officer in the computers Daily Activity Log.

Marion County Sheriff's Office **Policy 6766.00 Classification of Inmates**, dated 3/14/24:[4]

- The policy of the Marion County Sheriff's Office is to segregate inmates housed in the Marion County Jail to ensure the safety and security of the individual inmates, as well as the smooth operation of the facility. The classification system evaluates the following:
  - **History of assaultive behavior by reviewing current charges, past criminal conviction and institutional behavior.**
- Classifications personnel shall use the following data and techniques to determine special needs of the inmates:
  - Criminal history
- SCREENING OF INMATES
  - **Screening of inmates who are potentially vulnerable, and/or dangerous, or present a security risk shall include**:
    - **A review of the frequency, recentness and severity of both community and facility violent behavior by the inmate**.
    - **Inmates who are potentially vulnerable and/or aggressive will be housed according to their classification, and may need to be separated from other inmates**.
    - Sex Offenders, witnesses and LGBTQ inmates may need protection, and may need to be separated from other inmates.

---

[3] Marion County Sheriff's Office Post Order Post: Gulf Pod, dated 1/8/19
[4] Marion County Sheriff's Office Policy 6766.00 Classification of Inmates, dated 3/14/24



- Medium Security Levels- Includes inmates designated as Custody Levels 3 Medium High, 4 or 5. Inmates assigned to the medium security level will include sentenced misdemeanors and felons who do not qualify for minimum security and do not require a maximum level of security. In addition, inmates awaiting trial or sentencing and likely prison bound who do not require a maximum level of security will be placed in medium security. Medium High 3 inmates do not qualify for inmate worker status and may be limited to programs in their assigned housing area. Custody Levels 4 and 5 may qualify for inmate worker status and programs outside of their assigned housing area.
- Maximum Security Levels- Includes inmates designated as Custody Levels 1-High and 2-Close. **Inmates who are assigned to maximum security will be those who have been charged with serious assaultive felony crimes or have a history of assaultive felony violent convictions.** They also have other holds or detainers concerning such types of crimes or may be individuals who have displayed a significant disciplinary problem within the facility or display a need for a maximum amount of supervision and may have limited out of cell time. They will have limited access to programs that will be reviewed on a case by case basis. Maximum Security Inmates who are High Risk Security/Escape Risk will be placed in a solid red uniform and housed in confinement.

## E.    DESCRIPTION OF THE INCIDENT

Merchant / Lutterloah Charges, Classification, Housing Assignments

Cory Merchant was arrested on 11/8/19 for Lewd or Lascivious Behavior (Victim Aged 12 -16); and subsequently had 2 additional charges filed on 1/27/20 for Sexual Assault by 24 YOA Older Sexual Battery Victim 16 or 17 YOA and Lewd Lascivious Behavior Offender 18 YOA or Older Victim 12Y less 16Y and booked into the Marion County Jail. According to MCJ documents, **Merchant's charge was considered a non-assaultive felony and he was classified as medium (5) (pre) security, which was on the low end of the medium security spectrum**.[5] Prior to 11/7/21, the date of Lutterloah's attack, Merchant had been assigned to G-Pod Section-A.[6]

Eric Lutterloah was arrested on 6/4/20 for Armed Kidnapping and Sexual Battery Physical Force Not Likely to Cause Injury.[7] According to MCJ documents, **Lutterloah's charges were considered assaultive felonies, and he had a previous history of sexual assault/battery in a prison or jail**.[8, 9] **He was classified as high medium (3)** security, which was on the high end of the medium security spectrum.[10] Despite this, Lutterloah was also assigned to G-Pod Section-A, along with Cory Merchant.[11]

---

[5] Marion County Sheriff's Office Inmate File re: Cory Merchant ID #A0092328 Booking #1900010514
[6] Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21
[7] Marion County Sheriff's Office Probable Cause Affidavit Case #MCSO20OFF009528/2005110789 by Detective B. Burleson #5542, dated 5/12/20
[8] Marion County Sheriff's Office Inmate Classification Report re: Eric Lutterloah ID #A0070076 Booking #2000004904
[9] Marion County Sheriff's Office PREA Sexual Violence Screening Form re: Eric Lutterloah, dated 6/4/20
[10] Marion County Sheriff's Office Inmate File re: Eric Lutterloah ID#A0070076 Booking #2000004904
[11] Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21



<u>Lutterloah Attack on Merchant</u>

According to his incident report, Deputy Kosinski was alerted to an incident (i.e., man down) in G-Pod A-Section at approximately 0110 hours. Deputy Kosinski described the event as follows:

> "Upon review of the section cameras, it appears Inmate Cory Merchant and Inmate Eric Lutterloah where in a physical altercation. Inmate Lutterloah gets out of his assigned bed (G/Ax12) and confronts Inmate Merchant in between Bunks G/A X14 and 16. Inmate Lutterloah appears to strike Inmate Merchant several times, causing him to fall to the ground between bunks G/A128 and 129. When Inmate Merchant fell, he was no longer in view of the camera. Inmate Lutterloah appears to walk to his assigned bunk area, then walk back to Inmate Merchant a couple of times before sitting on his assigned bunk. Inmate Merchant is assigned to bunk G/A123B and was out of his assigned area when the disturbance started."[12]

Merchant was transported, via EMS, to Ocala Regional Medical Center for treatment.[13] Cory Merchant subsequently died as a result of the injuries he sustained in this attack. According to his Death Certificate, Cory Merchant died on 11/13/21 as a result of complications of blunt head trauma and assault with the manner of death listed as homicide.[14]

<u>G-Pod Description</u>

G-Pod was comprised of 4 sections (i.e., A, B, C, and D) that can house a total population of 256 inmates. It was operated as a podular remote supervision housing unit, that is, staff were not assigned or located directly inside of the inmate living areas (i.e., sections). Instead, they were located in a control room adjacent to the sections. The control room had a window and video surveillance monitors to aid staff in providing supervision of the inmate population.[15]

<u>G-Pod Security Checks</u>

According to Marion County Sheriff's Office policy, procedure and post orders, staff were only required to conduct security checks between the hours of 2200-0600 or 2300-0600 hours, depending upon which policy, procedure or post order you were following, as they contradicted each other.[16, 17, 18]

According to the Marion County Sheriff's Office Daily Log for G-Pod on 11/7/21, Deputy Kosinski completed two separate security checks immediately prior to Lutterloah's attack on Merchant as follows:

---

[12] Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21
[13] Marion County Sheriff's Office Supplemental Incident Report #210005382 by Sergeant Jerome Dukes, dated 11/7/21
[14] State of Florida Bureau of Vital Statistics Certification of Death re: Cory Merchant, dated 11/23/21
[15] Marion County Jail Staff Analysis by CRS Incorporated, dated 4/24/19
[16] Marion County Sheriff's Office Policy 6011.00 Supervision of Inmates – Jail, dated 4/13/23
[17] Marion County Sheriff's Office Policy 6164.00 Headcount of Inmates, dated 3/7/24
[18] Marion County Sheriff's Office Post Order Post: Gulf Pod, dated 1/8/19



0100-0104 check logged on 11/7/21 at 0104 hours and 0100-0109 check logged on 11/7/21 at 0119 hours.[19]

**F.     ANALYSIS**

Security/Well-being/Wellness Check Policies/Procedures/Post Orders

Policies and procedures are the formal mechanisms which administrators use to communicate with staff. Policies and procedures are often utilized during internal and external investigations when determining if policies and procedures, along with statutory requirements, are being followed by the agency and/or whether they are followed by staff during specific instances. In either case, policies and procedures must be specific and non-contradictory, as vagueness and/or contradictions confuse staff members and oftentimes cause less than desirable outcomes. As identified by the U.S. Department of Justice, National Institute of Corrections:[20]

> Failure to direct - This is a failure in the obligation or affirmative duty to provide employees written directives in the form of policies and procedures or other such **directives that clearly limit and outline the duties and responsibilities of staff** at each level of administration.

One of the core functions of a jail or correctional facility is to ensure the safety and well-being of the people who are committed therein. This is accomplished by staff conducting wellness/well-being/security checks, within designated time frames and on an irregular schedule, of the inmate population. These checks are utilized for multiple purposes. They are used to ensure inmates are not engaging in self-harm, causing harm to others, where they are supposed to be, and not violating facility rules, etc. An adequate check of each offender should take between 5-10 seconds, as the officer should be observing the person's body to ensure that they are breathing by looking for their chest to rise and fall. Officers should also observe the inmate to ascertain if they are moving their limbs, head, or another body part that would indicate they are alive. If the inmate is standing and/or moving around inside of the cell or living area, the check may take slightly less time. As identified by the U.S. Department of Justice, National Institute of Corrections in the Sheriff's Guide to Effective Jail Operations:[21]

> Jail staff must be able to account for and assure the well-being of inmates at all times. This is accomplished through a system of inmate well-being checks and counts. **The presence of staff in inmate-occupied areas is the most effective means of assuring the well-being of inmates. Good practice dictates that all inmates in the general population be viewed by staff in person at least every 30 minutes on an irregular schedule.** Persons who are violent, mentally ill, intoxicated, or have other special problems warranting closer supervision require more frequent checks.

---

[19] Marion County Sheriff's Office Daily Logs Location: G, dated 10/7/21 – 11/7/21

[20] U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, Mark D. Martin & Thomas A. Rosazza, 2004

[21] U.S. Department of Justice, National Institute of Corrections, Sheriff's Guide to Effective Jail Operations, Mark D. Martin & Paul Katsampes, D.P.A., 2007



As identified by the U.S. Department of Justice, National Institute of Corrections in the Resource Guide for Jail Administrators:[22]

> **Good practice dictates that all inmates in general population housing be viewed by staff in person at least every 30 minutes on an irregular schedule.** People who are violent, mentally ill, intoxicated, or have other special problems warranting closer supervision require more frequent checks or, in some cases, constant supervision. The jail should have an established method for documenting the time and results of well-being checks.

In this instance, the Marion County Sheriff's Office's policies, procedures, and post orders were inadequate as they **ONLY** required security (i.e., well-being or wellness) checks between the hours of 2200 – 0600 or 2300 – 0600, depending upon which policy or post order you were following as indicated below.

As identified in the Daily Log for G-Pod from 10/7/21 – 11/7/21, there were 203 "security checks" documented. 194 of the 203 security checks (i.e., 96%) began at the top of each hour between 2300 hours each night with the final check beginning at 0500 hours the following morning. For clarity, I have again provided the Marion County Sheriff's Office policies, procedures, and post orders that discuss security (i.e., well-being or wellness) checks on inmates are highlighted below.

**Policy 6011.00 Supervision of Inmates**:[23]

- All high and medium security inmates are observed by a detention deputy as frequently as possible. More frequent observation is required for those inmates who are violent.
- All inmates will be visually checked every hour between **10:00 PM and 6:00 AM.**
- **All high and medium security inmates are observed by a detention deputy as frequently as possible.** More frequent observation is required for those inmates who are violent, mentally disordered, suicidal, or who demonstrate unusual or bizarre behavior. Suicidal inmates housed alone are under continual observation.

**Policy 6164.00 Headcount of Inmates**:[24]

- 6164.35 Security Checks
  - When conducting a security check, all flashlights will be used sparingly, but with enough light thrown on the inmate to leave no doubt as to whether a human is actually in the bunk. **The detention deputy must be certain of seeing flesh in all cases rather than counting an inmate on the basis of seeing any part of his/her clothing, hair or shoes**.
  - **All inmates will be visually checked every hour between the hours of 2300 and 0600**.

---

[22] U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, Mark D. Martin & Thomas A. Rosazza, 2004
[23] Marion County Sheriff's Office Policy 6011.00 Supervision of Inmates – Jail, dated 4/13/23
[24] Marion County Sheriff's Office Policy 6164.00 Headcount of Inmates, dated 3/7/24



**Post Order Post: Gulf Pod:**[25]

- Specific Duties and Responsibilities
    - **Security checks will be accomplished every hour between the hours of 2200 to 0600**. These checks will be logged and maintained by the pod officer in the computers Daily Activity Log.

The contradiction between policies and post orders, the fact that security/well-being/wellness checks were **not** required throughout the entire 24-hour cycle of each day, and the Marion County Sheriff's Office custom and practice of beginning security checks at the top of each hour, thereby making them extremely predictable, created a dangerous condition for Cory Merchant.

<u>Lockdown / Headcount</u>

Based on my experience, education and training, maintaining control of the inmate population is achieved through adequate supervision of the inmates and consistent enforcement of policies, procedures, and the inmate rules and regulations. Failure to adequately control the inmate population through consistent enforcement of these rules creates an environment wherein the inmates feel that they are free to behave in any manner they desire as staff do not care. As identified by the U.S. Department of Justice, National Institute of Corrections:[26]

> The fifth element of inmate behavior management (IBM) is **supervising inmates to hold them individually accountable for their behavior**. Staff presence in inmate-occupied areas and positive staff interaction with inmates will result in desired inmate behavior. Skills such as decision making, problem solving, communication, and motivation contribute to the effectiveness of this element.

In this instance, the Marion County Sheriff's Office Headcount Policy stated:[27]

- Headcount of Inmates
    - **Night shift will conduct one (1) lock-down headcount**. The full "Lock-Down" count will be accomplished when all inmates are required to be immobilized and visually inspected.
- Definitions
    - **Lock-Down Headcount - A headcount where all inmates stand for the count by their respective cell door or bunk. <u>After identification of the inmate, the inmates are secured in their cells or restricted to their bunks</u>**.

Furthermore, the Marion County Sheriff's Office Inmate Rules and Regulations Handbook stated:[28]

---

[25] Marion County Sheriff's Office Post Order Post: Gulf Pod, dated 1/8/19
[26] U.S. Department of Justice, National Institute of Corrections, Inmate Behavior Management: Guide to Meeting Basic Needs, 2014
[27] Marion County Sheriff's Office Policy 6164.00 Headcount of Inmates, dated 3/7/24
[28] Marion County Sheriff's Office Inmate Rules and Regulations Handbook, dated 12/2017



> Lockdown - Each night at approximately 9:45 P.M., "Lockdown" will be announced by a Detention Deputy. By 10:00 P/M. you are ordered to stand by your assigned cell/bunk. The Detention Deputy's will conduct a headcount at this time and secure you in your cell. All cell lights must be off by 10:00 P.M. **Inmates in open bay housing are to be on their bunk by 10:00 P.M. No inmates are to get off their bunk during lockdown except to use the bathroom.** All lights will be turned off and excessive noise will not be tolerated. Lights are turned on at approximately 5:30 A.M. At this time, you are to get ready for breakfast with starts at approximately 6:00 A.M.

In this instance, Sergeant Dukes knew that deputies allowed inmates to remain off of their assigned bunks after lockdown in violation of policy, procedure and the inmate rules and regulations. According to Sergeant Dukes' testimony regarding what an officer was supposed to do when they observed an inmate off their bunk and chatting with another inmate at their bunk after lockdown, **"It is a judgement call by the deputy as to when to address an inmate who is at another inmate's bunk, talking after lockdown. When it becomes <u>excessive</u>, you address it and tell the inmate to get back to their bunk."**[29] Neither Sergeant Dukes, nor Deputies Kosinski or Miller, adequately enforced the "lockdown" rule by ensuring inmates were restricted to their bunks during lockdown hours. This created a dangerous condition for Cory Merchant.

<u>Classification of Inmates</u>

Based on my experience, education and training, adequate and proper classification of the inmate population is essential to the safety, security, and orderly running of a jail. There are several groups of people that should not be housed together (i.e., males and females, adults and juveniles, violent and non-violent, etc.). As identified by the U.S. Department of Justice, National Institute of Corrections:[30]

> Regardless of a jail's size and complexity, its primary responsibility is to safely and securely detain all persons placed in its custody. Classification is an essential management tool for performing this function. By definition, classification is the process of placing things or people into groups according to some rational idea or plan. A good system of classifying inmates will reduce escapes and escape attempts, suicides and suicide attempts, inmate-on-inmate assaults, and the unnecessary incarceration of non-threatening persons. These outcomes conserve valuable resources by reducing expenditures for legal fees and court costs, overtime pay, and medical care.

> Due to the diversity of the population, inmates are generally separated into broad categories. Most jurisdictions, for example, distinguish between pre-trial and sentenced inmates, adults and juveniles, and males and females. Many also categorize inmates by the amount of their bond if it is set by statute. **Numerous jails attempt to separate the violent from the non-violent** or those

---

[29] Deposition Transcript of Jerome Dukes, dated 9/12/24, pages 91-92
[30] U.S. Department of Justice National Institute of Corrections, Objective Jail Classification Systems: A Guide for Jail Administrators, James Austin Ph.D., 1998



charged with felonies from those charged with misdemeanors. In addition, some jurisdictions try to identify special management inmates (protective custody, suicide risk, etc.).

<u>A Housing Plan Consistent with the Classification System</u>

Each jail must ensure that it has a written housing plan for each housing unit. The function of a housing plan is to establish sufficient space at each custody level to accommodate housing the number of inmates assigned to each level. For example, minimum-custody inmates should be housed in a minimum-security unit (typically dorm type units). Medium-custody inmates should be housed in double cells or secure dorm units, and maximum-custody inmates should be housed in single-cell units.

In this instance, the Marion County Sheriff's Office placed all sex offenders, regardless of whether or not they were considered violent or non-violent, in the same living area (i.e., G-Pod A-Section). Eric Lutterloah's charges were considered assaultive felonies, and he had a previous history of sexual assault/battery in a prison or jail.[31, 32] He should have been separated and housed in a different area than non-violent offenders such as Cory Merchant, as his charge was considered a non-assaultive felony[33] and he did not have a history of violence. This violated their own Classification Policy which stated:[34]

- The policy of the Marion County Sheriff's Office is to segregate inmates housed in the Marion County Jail to ensure the safety and security of the individual inmates, as well as the smooth operation of the facility. The classification system evaluates the following:
    - **History of assaultive behavior by reviewing current charges, past criminal conviction and institutional behavior.**
- SCREENING OF INMATES
    - **Screening of inmates who are potentially vulnerable, and/or dangerous, or present a security risk shall include**:
        - **A review of the frequency, recentness and severity of both community and facility violent behavior by the inmate.**
        - **Inmates who are potentially vulnerable and/or aggressive will be housed according to their classification and may need to be separated from other inmates.**

This created a dangerous condition for Cory Merchant.

---

[31] Marion County Sheriff's Office Inmate Classification Report re: Eric Lutterloah ID #A0070076 Booking #2000004904
[32] Marion County Sheriff's Office PREA Sexual Violence Screening Form re: Eric Lutterloah, dated 6/4/20
[33] Marion County Sheriff's Office Inmate File re: Cory Merchant ID #A0092328 Booking #1900010514
[34] Marion County Sheriff's Office Policy 6766.00 Classification of Inmates, dated 3/14/24



<u>Prior Attacks on Cory Merchant</u>

Cory Merchant was the victim of two violent attacks within G-Pod A-Section prior to being attacked by Inmate Eric Lutterloah on 11/7/21. He was attacked by Inmate John McDowell on 3/24/20[35] and again on 6/29/20 by Inmate Walter Summers.[36] After each attack, Merchant was left in G-Pod A-Section where he would be looked at as someone who was weak and vulnerable. The Marion County Sheriff's Office had a duty and obligation to protect him from future attacks and they failed to do such. They could have, and should have, transferred Merchant to another pod for his own protection, but failed to do such. As identified by the U.S. Department of Justice, National Institute of Corrections:[37]

> **Safety needs: Protection from harm, including personal injuries resulting from assault** or unsafe environmental conditions. In the context of the jail, **this means ensuring that inmates do not victimize one another**, eliminating hazardous environmental conditions, and developing plans to ensure inmates' well-being during emergencies.

As identified in American Jails Magazine by author Hal Brotheim:[38]

> The government's obligation upon incarcerating a citizen, derived from the 8th and 14th Amendments of the U.S. Constitution, is to provide reasonable protection for that person. **Jails have a duty to take reasonable measures to guarantee inmates' safety from assault,** suicide, fires and other facility dangers, and preventable illness. **We are charged with preventing assault** and the excessive use of force as well as suicide and self-harm. We must respond to serious medical and mental health needs; and we must avoid unconstitutional conditions of confinement.

As identified by the American Bar Association in ABA Standards for Criminal Justice 3rd Edition Treatment of Prisoners:[39]

> **Correctional officials should implement procedures for identifying those prisoners who are particularly vulnerable to physical** or sexual **abuse**, manipulation, or psychologically harmful verbal abuse by other prisoners or by staff, **and for protecting these and other prisoners who request and need protection.**

This created a dangerous condition for Cory Merchant.

<u>G-Pod Level of Violence & Lack of Staff Supervision of the Inmates</u>

Based on my education, training, and experience working in and managing jail operations, it is my opinion that providing ongoing supervision and management of the inmate population is what minimizes the

---

[35] Marion County Sheriff's Office Incident Report #200001461 by Deputy Courtney Washington, dated 3/24/20
[36] Marion County Sheriff's Office Incident Report #200003047 by Deputy John Frye, dated 6/29/20
[37] U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, Mark D. Martin & Thomas A. Rosazza, 2004
[38] American Jails Magazine, Transgender Inmates The Dilemma, Hal Brotheim, 2013
[39] American Bar Association Standards for Criminal Justice 3rd Edition: Treatment of Prisoners, 2011



number and frequency of inmate-on-inmate assaults, inmate-on-staff assaults, thefts, and other violations of facility rules. If staff are not in direct continuous contact with the inmates such as in this instance, and they are not conducting well-being, wellness, or security checks within 30-minute intervals, the inmates will manage themselves. Typically this will cause the number and frequency of inmate-on-inmate assaults, inmate-on-staff assaults, thefts, and various other violations of facility rules to increase. As identified by the U.S. Department of Justice, National Institute of Corrections:[40]

**Given the importance of inmate behavior management in achieving safety and security, it may be viewed as the jail's core function and the jail administrator's primary concern.** You should consider all decisions regarding jail operations with respect to their impact on inmate behavior management.

**Staff interaction with inmates has a clear purpose: to obtain positive inmate behavior, namely, compliance with jail rules to achieve the goals of the behavior management plan**. In this interaction, jail staff are in the role of supervisor.

Several barriers can impede staff interaction with inmates and, therefore, supervision of inmates. These barriers include the following factors:

- The physical plant.
- Staffing levels.
- Staff placement.
- Staff behavior.
- **The level of administrative commitment to staff interaction with inmates**.

**Because supervision is dependent on staff interaction with inmates, the jail must develop strategies to decrease barriers between staff and inmates**. Doing so will assist staff in establishing control over all areas of the jail. For example, <u>if the physical plant is a barrier to supervision and cannot be changed, the jail can increase supervision by changing expectations for the level and type of staff interaction with inmates</u>.

<u>Inmate Behavior Management: The Key to a Safe and Secure Jail</u>

In the absence of staff management of inmate behavior, however, the emphasis on physically containing inmates failed to keep jails secure. **With inmates left to their own devices inside cellblocks, problems such as violence, vandalism, and lack of sanitation became so common that they seemed inherent to jails, which, along with communities, have paid dearly for these problems through costly litigation, staff and inmate deaths, jail riots and fires, and escapes.**

---

[40] U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, Mark D. Martin & Thomas A. Rosazza, 2004



Friday Night Fight Nights

Terry Place, who was an inmate at the Marion County Jail and assigned to G-Pod, stated the following as it related to the level of violence within G-Pod at the Marion County Jail: [41]

- Gulf-Alpha was extremely violent, and I constantly feared for my safety at the hands of other inmates and correctional staff.
- There is a pervasive culture of violence in the Marion County Jail.
- Lutterloah had an extremely violent reputation amongst the inmates and guards.
- On multiple occasions, I witnessed guards encourage Lutterloah to be violent towards other inmates, saying things to him like "take care of business, Lutterloah."
- Inmates in Gulf Pod were able to engage in physical violence against each other constantly without intervention from guards.
- On Friday nights in Gulf Pod, inmates would participate in "Friday Night Fight Night," in which at least two inmates, but often up to six inmates, would engage in physical and violent altercations.
- Guards usually not make any effort to stop Friday Night Fight Nights.
- Friday Night Fight Nights occurred most Fridays in Gulf Pod.
- The few times that I did witness guards address inmates engaging in Friday Night Fight Nights, they would only come into the pod, tell the inmates to stop, then leave.
- After the guards left the pod, inmates would continue fighting and would not receive any discipline.
- I only witnessed inmates getting punished for fighting in the jail after the fight had already escalated to the point that someone had to receive medical care.
- As a result of the pervasive violence throughout the jail, I witnessed several inmates receive broken noses and deep lacerations from other inmates prior to Cory Merchant's death.
- Violent altercations in Gulf-Alpha occurred approximately 4-5 times a week.
- At 10 p.m., the inmates are supposed to go on lockdown after the last headcount.
- During lockdown, the inmates are supposed to be in their bunks and not roaming around the dorm.
- Almost no officers at the Marion County Jail enforced lockdown.
- At approximately 10 p.m. on the night of Cory Merchant's death, Officers Miller and Ski did the final headcount of the night and put Gulf-Alpha on lockdown but did not enforce headcount throughout the night.

Steven Murphy, who was an inmate at the Marion County Jail and assigned to G-Pod, stated the following as it related to the level of violence within G-Pod at the Marion County Jail:[42]
- The Marion County Jail was extremely violent, with fights occurring on a daily basis.
- I knew Eric Lutterloah while I was in the Marion County Jail, and he was a visibly and obviously aggressive person.
- Eric Lutterloah tended to pick on others in his dorm who were smaller and weaker than him.

---

[41] Declaration of Terry Place, dated 10/26/23
[42] Declaration of Steven Murphy, dated 10/25/23



- Eric Lutterloah would often pick fights by escalating a verbal altercation into a full on brawl.
- As a trustee, I was able to access the rover's area in which guards were stationed to surveil Gulf Pod.
- While in the rover's area of different pods, I witnessed guards exhibiting unprofessional behavior such as watching YouTube videos when they were supposed to be surveilling the dorms, and making fart noises over the intercom.
- Officers in the Marion County Jail often encourage fighting.
- On several occasions, I witnessed an inmate complain to a Marion County Jail guard about getting physically attacked by another inmate, then witnessed the guards respond by laughing.
- Gulf Pod had a reputation throughout the jail of being the most violent pod.
- Foxtrot also had a reputation of being extremely violent.

In this instance, based on the facts contained in 115 separate incident reports that originated from G-Pod and were dated between 2018 – 2021, the number of inmate-on-inmate fights, inmate-on-inmate assaults/batteries, inmate-on-inmate aggravated batteries, and deaths increased each year as follows:[43]

| 2017 | 2018 | 2019 | 2020 | 2021(*Thru 11/14/21) |
|---|---|---|---|---|
| 4 | 11 | 22 | 45 | 41* (on pace for 47 by end of 2021) |

*(2020: 45 incidents in 12 months = 3.75 per month; 2021: 41 incidents in 10 ½ months = 3.90 per month = 47 per year)*

The Marion County Sheriff's Office **did not** require well-being, wellness, or security checks within 30-minute intervals at all. They merely required hourly checks, and then, only during the nighttime lockdown hours (2200 or 2300 – 0600). **Face-to-face supervision of the inmate population was virtually non-existent, which allowed for the level of physical violence to exponentially increase year-after-year as previously outlined.**

Based on the G-Pod Daily Log for the time frame 10/7/21 – 11/7/21, when Deputies Kosinski and Miller entered G-Pod to conduct their hourly security checks of the 4 inmate living sections containing 256 inmates, 89% (i.e., 51 of 57) and 96% (i.e., 49 of 51) of the security checks, respectively, were conducted within 9 minutes or less. Furthermore, Deputies Kosinski and Miller conducted their hourly security checks in 7 minutes or less 75% (i.e., 43 of 57) and 94% (i.e., 48 of 51) of the time, respectively. These are woefully inadequate timeframes to check 256 inmates in 4 separate living areas. On average, when viewing each inmate for 5 seconds, it should take approximately 21 minutes to complete well-being, wellness, or security check of 256 inmates. This does not include the deputy's routine observations, inspection of the physical plant, and interactions with inmates while walking through each area.

Jail administrators should be continuously analyzing facility operations, to include the level of violence therein. This is not a complicated process, as administrators have access to all reports generated by staff.

---

[43] Marion County Sheriff's Office Incident Reports (115), dated 2018 - 2021



As identified by the U.S. Department of Justice, National Institute of Corrections in the Resource Guide for Jail Administrators:[44]

> The jail's operations and programs should be monitored regularly through a process of internal inspections and reviews. **An internal monitoring system provides timely observation and assessment of critical jail functions and helps the jail administrator stay informed about programs, activities, and problems in the jail. It can reveal how well the facility is complying with policies and procedures, standards, and other legal requirements. It also provides a means to determine if the jail is meeting its goals and helps to identify areas needing change**.

As identified by the U.S. Department of Justice, National Institute of Corrections in the Sheriff's Guide to Effective jail Operations:[45]

> The sheriff has a responsibility to provide a safe jail setting for staff, inmates, and others who visit or use the facility. **The primary goal of safety in the jail is to protect inmates, staff, and the public from harm. <u>This goal is achieved through the identification and management of risks to the safety and well-being of jail occupants and the community</u>. These risks include not only those unique to the jail environment, such as inmate assaults or violence**, but also risks inherent in any residential and work setting (e.g., accidents, disease, natural disaster).

In this instance, during the review of said reports, the administrator should have taken notice of the increasing number of inmate-on-inmate assaults, batteries, and fights year after year. They could have and should have enacted a solution to counter the increased level of violence by mandating that staff conduct additional "security" checks throughout the entire 24 hours of each day within 30 minute intervals at varied times. Not only would this have reduced the level of violence, but it would also have conformed with the standard of care.

The lack of inmate supervision by the Marion County Sheriff's Office, and Deputies Kosinski and Dellun Miller, created a dangerous condition for Cory Merchant.

<u>Supervisory Oversight</u>

Effective supervision is critically important to the efficient and effective operation of a jail. Supervisors are responsible for the direct supervision and oversight of subordinate personnel and the areas assigned to them.  Supervision is an ongoing process whereby the supervisor has regular, frequent interaction with their subordinates. They observe, ask questions, elicit feedback, and take an active approach in the employees' growth and development.  They must also ensure that subordinate personnel complete all tasks as required and monitor the quality of their work.

---

[44] U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, Mark D. Martin & Thomas A. Rosazza, 2004
[45] U.S. Department of Justice, National Institute of Corrections, Sheriff's Guide to Effective Jail Operations, Mark D. Martin & Paul Katsampes, D.P.A., 2007



Supervisors also have an obligation to take an active role in the supervision of the inmates that their subordinates are responsible for. They must have that same regular frequent interaction with the inmates. This provides the inmates with an opportunity to be heard, whether they are lodging a complaint, asking a question, or merely looking to have a conversation with the supervisor. This type of supervisory engagement, with employees and inmates, sets the stage for open communication by breaking down any perceived barriers. As identified by the U.S. Department of Justice, National Institute of Corrections:[46]

> Jail functions that should be monitored:
>
> - **General Security: Shift supervisors observe security practices during daily patrol.**
> - **Jail Log: Shift supervisors review and sign off on jail log daily.**
> - **Well-being Checks & Counts: Administrator, or designee, observe and review logs weekly.**
>
> Failure to supervise - This is a failure in the obligation or affirmative duty to provide ongoing supervision and direction to staff. In addition to training and directing staff (through written policy and procedures) at all levels, you must guide, coach, correct, and monitor them on a continuing basis to meet the duty to supervise. Jail administrators too often direct and train employees but then leave them unsupervised.

As identified by the U.S. Department of Justice, National Institute of Corrections:[47]

> A core part of the shift supervisor's duties is to visit various posts throughout the shift. These visits are essential to the supervisor's knowledge of what is taking place throughout the jail, managing the shift, assessing staff performance, and providing coaching and support to individual staff.

In this instance, Sergeant Dukes and the Marion County Sheriff's Office failed to provide adequate supervision of their employees and the inmates in their charge. Sergeant Dukes testified that he would walk through all the sections within the course of his hours, but he would only address the inmates (i.e., interact, take questions from, etc.) in one section of the pod.[48] Thereby, ignoring the remaining inmates located in the other three sections of the pod. It is unknown how much time Sergeant Dukes or any other supervisor spent in G-Pod as the Daily Log only captured the time each supervisor entered the pod, and not the time they departed.

Sergeant Dukes knew that the deputies he was responsible for supervising conducted security checks at the top of each hour, as he testified, he believed Deputy Kosinski was conducting a security check in another section when Merchant was attacked by Lutterloah. Sergeant Dukes testified, "According to the time, he's doing – they're doing a security check. Because how close it is to the – the 1:00 as far as the

---

[46] U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, Mark D. Martin & Thomas A. Rosazza, 2004
[47] U.S. Department of Justice, National Institute of Corrections, Direct Supervision Jails the Role of the Administrator, David Bogard, Virginia A. Hutchinson, Vicci Persons, 2010
[48] Deposition Transcript of Jerome Dukes, dated 9/12/24, page 125



one – the – the – the hourly check."[49] Sergeant Dukes should have corrected Deputies Kosinski and Miller by advising them that good practice and the standard of care dictates that security checks be staggered or conducted at irregular intervals.

Additionally, had Sergeant Dukes, or any other supervisor or administrator from the Marion County Sheriff's Office actually reviewed the surveillance video of the security checks or analyzed the amount of time that it took their staff to conduct a security check of 4 different sections that held 256 inmates, they would have identified that the security checks were inadequate in timing and form. As previously indicated, Sergeant Dukes also knew that deputies were not following policy and procedures by allowing inmates to remain off of their bunks after lockdown.

The failure of Sergeant Dukes and the Marion County Sheriff's Office to provide adequate supervision of their employees and inmates created a dangerous condition for Cory Merchant.

*(The remainder of this page was left blank intentionally.)*

---

[49] Deposition Transcript of Jerome Dukes, dated 9/12/24, pages 136-138



**G.    FINDINGS**

Within the bounds of reasonable professional certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. The Marion County Sheriff's Office failed to provide a safe environment for the inmates in their care. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

2. The Marion County Sheriff's Office Policies, Procedures, and Post Orders regarding the observation (i.e., well-being/wellness/security checks) of inmates were contradictory, non-comprehensive (i.e., failed to require said checks to be conducted 24 hours per day), and inadequate. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

3. The Marion County Sheriff's Office had a custom and practice of conducting well-being/wellness/security checks on a predictable schedule. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

4. The Marion County Sheriff's Office had a custom and practice of conducting inadequate well-being/wellness/security checks in timing and form (i.e., length of time actually observing inmates). This was in violation of the correctional standard of care and caused harm to Cory Merchant.

5. The Marion County Sheriff's Office provided inadequate supervision of its employees. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

6. The Marion County Sheriff's Office provided inadequate supervision of the inmates in their care. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

7. The Marion County Sheriff's Office Policies and Procedures regarding inmate classification and housing plan were inadequate. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

8. The Marion County Sheriff's Office failed to adequately protect Cory Merchant, a non-violent inmate, from Eric Lutterloah, a violent inmate. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

9. Sergeant Jerome Dukes provided inadequate supervision of Deputies Justin Kosinski and Dellun Miller. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

10. Sergeant Jerome Dukes provided inadequate supervision of the inmates in his care. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

11. Deputy Justin Kosinski provided inadequate supervision of the inmates in his care. This was in violation of the correctional standard of care and caused harm to Cory Merchant.



12. Deputy Dellun Miller provided inadequate supervision of the inmates in his care. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

13. Deputy Justin Kosinski conducted inadequate well-being/wellness/security checks in timing, form, and on a predictable schedule. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

14. Deputy Dellun Miller conducted inadequate well-being/wellness/security checks in timing, form, and on a predictable schedule. This was in violation of the correctional standard of care and caused harm to Cory Merchant.

Paul M. Adee, C.C.M., C.C.H.P.

Appendix 1
CV of Paul M. Adee, C.C.M., C.C.H.P.

THE EXPERTS
Robson Forensic

# THE EXPERTS
# Robson Forensic

PAUL M. ADEE, CCM, CCHP
Police Practices, Security, and Corrections Expert

**PROFESSIONAL EXPERIENCE**

2022 to
Present

**Robson Forensic, Inc**.
*Associate*
Provide technical investigations, analysis, reports, and testimony toward the resolution of personal injury litigation and failure analysis related to police practices and corrections and jail related incidents. Police, corrections, and jail procedures expertise includes duties and responsibilities of correctional officers/detention deputies, supervisors, correctional facilities, and jails including:

- Use of force
- In-custody Death: suicide, restraint asphyxia, withdrawal, overdose, trauma
- Inmate medical assessments: physical, mental health, detoxification
- Prisoner transportation - state and federal prisoners
- Emergency vehicle operation
- Jail security
- Observation of inmates
- Search protocols: inmate, cell or building, vehicle
- Inmate classification
    - General population
    - Restrictive housing: disciplinary, administrative
    - Gender classification
    - Adult and juvenile
    - Inmate worker (Trusty)
- Restraint procedures
- Internal investigations
- Policies and procedures
- Law enforcement and Detention training
- Field training protocols
- Jail inspections and consulting
- Firearms
- Less lethal weapons: Taser, O.C.
- Premises security: courthouse and office buildings, operational plans, access control, surveillance
- Food service
- Hiring practices

# THE EXPERTS
# Robson Forensic

## PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

| 1991 to 2021 | **Hillsborough County Sheriff's Office** |
|---|---|

*Major/Division Commander – Court Operations Division*                    *2019 & 2020-2021*

Provided leadership, management, and supervision for as many as 200 employees (sworn and civilian) and contractors.

- Responsible for overall security at five courthouse facilities and the County Administration building
- Managed and conducted security and threat protocol training for staff
- Reviewed all critical incidents to identify and remediate deficiencies in policies, procedures, and actions
- Managed civil process to ensure all was served in accordance with state statute
- Implemented active shooter training for all county employees and personnel within the administrative offices of the court
- Implemented concurrent security and health screening protocols for access to courthouse, county center, state attorneys, and public defender's facilities during Covid-19 pandemic
- Managed complex personnel, criminal, and use of force investigations
- Reviewed all operational plans regarding high profile or high-risk trials and hearings
- Conducted employee pre-disciplinary hearings
- Reviewed all employee performance evaluations
- Reviewed all allegations of inmate or staff misconduct
- Developed and implemented security plans and crowd control protocols during mass demonstrations at the courthouse and county center

*Major/Division Commander–Training Division*                    *2019-2020*

Provided leadership, management, and supervision for 40+ employees (sworn and civilian) of the division and all incoming law enforcement and detention recruits.

- Managed all aspects of the recruit training program for law enforcement and detention deputies
- Managed all aspects, to include approving and implementing lesson plans, of annual in-service training for law enforcement and detention deputies
- Managed the preparation and administration of promotional testing and assessment center operations and evaluations
- Managed the selection and implementation of body worn cameras
- Developed and implemented annual training for civilian personnel
- Ensured appropriate policies and protocols were in place to track, inventory, and manage lethal and less than lethal weapons
- Ensured appropriate policies and procedures were in place to track and manage the status of sworn staff member's certifications

**THE EXPERTS**
# Robson Forensic

### PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

*Major / Division Commander – Jail Division 2*                    *2018-2019*
Provided leadership, management, and supervision for 300+ employees (sworn and civilian).

- Developed and implemented policies to ensure the safe, secure, efficient, and effective day-to-day operations of the Falkenburg Road Jail which housed up to 3,300 inmates
- Reviewed use of force investigations to ensure compliance with agency policies
- Conducted after action debriefings for line level and supervisory staff related to use of force and other significant events
- Reviewed allegations of inmate or staff misconduct
- Assumed deputy job responsibilities including conducting facility operations while maintaining contact with inmate population

*Major/Division Commander – Jail Division 1*                    *2017-2018*
Provided leadership, management, and supervision for 225+ employees (sworn and civilian).

- Developed and implemented policies to ensure the safe, secure, efficient, and effective day-to-day operations of the Orient Road Jail which housed up to 1,700 inmates
- Reviewed use of force investigations to ensure compliance with agency policies
- Conducted employee pre-disciplinary hearings
- Conducted after action debriefings for line level and supervisory staff related to use of force and other significant events
- Assumed deputy job responsibilities including conducting facility operations while maintaining contact with inmate population

*Major / Division Commander – Jail Division 3 (Support Services)*          *2013-2017*
Provided leadership, management, and supervision for 200+ employees and contractors.

- Identified quality of care issues with a primary medical care provider
- Drafted Request for Proposal (RFP) for comprehensive inmate healthcare
- Evaluated, selected, negotiated with, and managed $24 million dollar budget and agreement for medical vendor that provided comprehensive inmate healthcare
- Reviewed electronic medical records and databases to ensure vendor compliance with agreement, policies, and provider's orders
- Investigated inmate deaths and other instances of potential litigation involving inmate medical care and correctional operations
- Ensured National Commission on Correctional Health Care (NCCHC) standards were met by medical vendor
- Implemented protocols for detoxing new inmates to minimize potential health risks
- Identified and implemented enhanced staffing of the mental health team and medical staff
- Managed $3+ million food service agreement and vendor which was responsible for producing over 3.25 million meals annually
- Managed in-house laundry facility that laundered more than 2 million pounds of laundry annually
- Managed inmate commissary agreement
- Managed inmate telecommunications and visitation agreement from an operational standpoint

**THE EXPERTS**
# Robson Forensic

## PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

- Managed the transportation of our inmates throughout the state of Florida, to include court hearings, medical appointments, and transfers to other jurisdictions (90k inmates and 500k miles travelled annually)
- Reviewed use of force investigations to ensure compliance with agency policies
- Reviewed and approved security clearances for contract staff

*Captain/Deputy Division Commander – Jail Division 2*                    *2010-2013*
- Provided leadership, management, and direct supervision to 13 direct reports and indirect supervision to a total staff of 450 employees.
- Responsible for the day-to-day operations of the Falkenburg Road Jail which housed up to 3,300 inmates
- Developed and implemented processes to ensure staff adherence to policies and procedures
- Analyzed systems to evaluate and improve operational efficiency
- Developed and implemented new processes to provide direct support to staff members following critical incidents
- Assumed deputy job responsibilities including conducting facility operations while maintaining contact with inmate population
- Reviewed use of force investigations to ensure compliance with agency policies
- Reviewed all incident reports
- Reviewed allegations of inmate or staff misconduct

*Lieutenant/Bureau Commander–Judicial Protection Bureau*                    *2009-2010*
Provided leadership, management, and supervision for 125 employees.
- Ensured each courtroom had the appropriate staffing levels
- Conducted and reviewed use of force investigations to ensure compliance with agency policies
- Conducted and reviewed allegations of inmate or staff misconduct
- Conducted security assessments
- Developed security protocols for courtroom and staff
- Recommended building modifications to enhance security
- Developed and conducted courtroom security training
- Managed all aspects of inmate and prisoner movement
- Supervised personnel during critical incidents
- Developed proposal for Sheriff's Office to take over courthouse and county center security
- Led transition of courthouse and county center security to Sheriff's Office

*Lieutenant/Section Commander – Transportation Section*                    *2008-2009*
Provided leadership, management, and supervision for 60 employees.
- Conducted and reviewed use of force investigations to ensure compliance with agency policies
- Managed a fleet of more than 50 vehicles
- Developed operational plans for transportation of high-risk inmates
- Provided vision and direction to ensure safe, efficient, and secure transport of inmates
- Reviewed and updated policies and procedures regarding transportation of inmates

# Robson Forensic
**THE EXPERTS**

## PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

- Developed and implemented strategic plan with County Code Enforcement Director to provide manpower for Sheriff's Jail Work Crew Program for county clean-up projects
- Reviewed traffic crash investigations
- Prepared and reviewed employee performance evaluations for direct report and indirect report employees

*Lieutenant/Shift Commander – Jail Division 2*                     *2007-2008*
Provided leadership, management, and supervision for 115 employees at the Falkenburg Road Jail.

- Conducted and reviewed use of force investigations to ensure compliance with agency policies
- Conducted and reviewed allegations of inmate or staff misconduct
- Supervised staff for adherence to agency policies and procedures
- Supervised inmates for adherence to established rules and regulations
- Served as facility Field Training Coordinator overseeing the field training program
- Reviewed all field training reports
- Developed remedial training plans for trainees and tenured employees
- Reviewed inmate disciplinary sanctions
- Reviewed incident reports
- Provided training, guidance, and direction to staff
- Supervised personnel during critical incidents
- Conducted debriefings and training for personnel after critical incidents
- Conducted inspections of jail facilities, personnel, and inmates
- Ensured facility was properly staffed

*Sergeant/Detention Training Coordinator – Training Division*                     *2005-2007*
Provided leadership, management, and supervision for 6 employees.

- Developed, reviewed, and approved instructor lesson plans for sworn and civilian employees
- Provided instruction to students
- Instructor certifications – general topics, firearms, Taser
- Developed training schedules for 1,700 sworn and civilian employees
- Conducted supervisory oversight of instructors for quality assurance purposes
- Conducted investigations of alleged staff misconduct
- Prepared employee performance evaluations
- Conducted supervisory oversight (1:1) for an employee enrolled in the Performance Improvement Program
- Provided guidance to civilian support personnel regarding adequacy and importance of maintaining accurate training records

**THE EXPERTS**
# Robson Forensic

### PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

*Sergeant/Squad Supervisor – Jail Division 1*                                    *2001-2005*
Provided leadership, management, and supervision for 15 employees.
- Conducted and reviewed use of force investigations to ensure compliance with agency policies
- Provided direct supervision and support to subordinate personnel
- Conducted investigations of alleged inmate or staff misconduct
- Conducted facility and personnel inspections
- Conducted inmate disciplinary hearings
- Responded to inmate complaints and grievances
- Implemented and monitored employee staffing levels
- Supervised personnel during critical incidents
- Provided coaching and counseling to employees and inmates
- Supervised inmate headcounts
- Provided input regarding inmate classification
- Conducted daily rounds of all inmates living areas under my command
- Conducted jail inspections throughout the state of Florida
- Served as a Field Training Supervisor
- Reviewed field training reports
- Developed remedial training plans

*Corporal/Assistant Squad Supervisor – Jail Division 1*                          *1996-2001*
Provided leadership, management, and supervision for 8 employees; and assisted the squad supervisor.
- Conducted use of force investigations to ensure compliance with agency policies
- Provided direct supervision and support to subordinate personnel
- Conducted investigations of alleged inmate or staff misconduct
- Conducted facility and personnel inspections
- Conducted inmate disciplinary hearings
- Responded to inmate complaints and grievances
- Supervised personnel during critical incidents
- Provided coaching and counseling to employees and inmates
- Supervised inmate headcounts
- Conducted daily rounds of all inmates living areas under my command
- Served as a Field Training Supervisor
- Developed remedial training plans
- Provided input regarding inmate classification
- Conducted jail inspections throughout the state of Florida

THE EXPERTS
# Robson Forensic

PAUL M. ADEE, CCM, CCHP
Police Practices, Security, and Corrections Expert

*Deputy - Jail Division 1*                                                                            *1991-1996*
Provided direct supervision for 72 inmates within the inmate living area (pod).
- Provided security within pod
- Conducted cell, bunk, and pod inspections
- Conducted inmate feeding and laundry exchange
- Distributed inmate canteen
- Distributed inmate mail (personal and legal)
- Supervised medication distribution
- Provided answers to questions and complaints
- Provided hygiene items and cleaning supplies
- Investigated inmate misconduct
- Provided input regarding inmate classification

1995 to    **United States Marshalls Service**
1999       *Part-time Guard*
Provided armed/unarmed security for Deputy United States Marshall's while transporting prisoners and providing supervision of same while attending court proceedings.

1990       **American Red Cross Homeless Shelter**
           *Security Guard*
Ensured the safety and security of staff members and 75 residents.
- Proactively addressed potential security issues
- Enforced shelter rules
- Resolved conflict
- Deterred criminal activity
- Conducted searches

1989 to    **Kmart/Sears**
1990       *Loss Prevention Specialist*
Responsible for enforcing loss prevention policies and procedures to safeguard company assets, minimize theft and reduce shortages and fraud. Monitored inventory and conducted audits and investigations.

1988 to    **Winnebago County Sheriff's Office**
1990       *Correctional Officer*
Responsible for the day-to-day care, custody, and control of up to 350 inmates.
- Maintained strict adherence to all rules and regulations
- Provided inmate meals, clothing, bedding, toiletries
- Inspected inmate living areas
- Investigated inmate misconduct
- Completed incident reports
- Restrained inmates when necessary and appropriate

# THE EXPERTS
# Robson Forensic

PAUL M. ADEE, CCM, CCHP
Police Practices, Security, and Corrections Expert

| | |
|---|---|
| 1984 to 1988 | **United States Navy – USS Puget Sound** |

*Watch Section Supervisor (E4)*
Managed the radio communications on the USS Puget Sound for my squad/shift. Held Top Secret Security clearance. Supervised and cultivated a team of up to six sailors ranking from E1 to E4. Honorably discharged.
- Recognized with a Meritorious Unit Commendation and two Sea Service Ribbons, and Good Conduct Award

**PROFESSIONAL CREDENTIALS**

Certified Correctional Officer, Florida
Certified Correctional Health Professional, National Commission on Correctional Health Care
Certified Corrections Manager, American Correctional Association

**EDUCATION**

B.A., Criminal Justice, Saint Leo University, Saint Leo, Florida, 2011

**CONTINUING EDUCATION**

National Commission on Correctional Health Care National Conference, October 2023
- An In-Depth Review of NCCHC's Standards for Health Services in Jails and Prisons
- Suicide Screening and Assessment: 10 Key Issues and Controversies
- Constitutional Requirements for Correctional Behavioral Health
- Deposition Basics: Expect Challenges, Avoid Pitfalls
- Words Matter: Defend Litigation with Good Records
- Mock Deposition Preparation for Your Health Care Provider
- Litigation Lessons: Defensive Patience for Difficult Patients
- The Anatomy of a Correctional Health Care Lawsuit and Beyond

American Correctional Association 2023 Winter Conference, January 2023
- Current Drug Trends: National Threat Assessment
- Ohio's Quality Assurance of Transportation Practices: Basics Approach in Evaluating
- Transportation Protocols and Best Practices
- The Crossroads of Criminal Justice, Academia and Medicine: How Three Professions Intersect to Reduce Recidivism of Incarceration
- Continuum of Care in the Virginia Department of Corrections to Reduce Placement of Vulnerable Population in RHU
- Beyond Good and Evil: Inside the Mind of the Psychopath
- Tracking Sentinel Events Online and Reporting Daily Call Using Online Sentinel Event Log

# THE EXPERTS
# Robson Forensic

## PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

Virtual Winter Conference on Correctional Health Care, December 2022
- Prostate Cancer Update for Corrections
- A Winning Record: Exploring the Role of Medical Records in Litigation
- Improve Patient Engagement and Utilization through Cultural Responsiveness
- Safety and Security in the Dental Clinic
- Building Resiliency to Cope with Occupational Stress
- The Care and Management of Transgender, Gender-Dysphoric, and Intersex People
- Culture Shift: Establishing a Near Miss Reporting System in a Major Correctional Facility
- The Connection Between Human Trafficking and Corrections: Effective Interventions
- Suicide Prevention

Leadership Challenges During the 2020 Civil Unrest in Portland, FLETC, 2021

Recognizing Head Injuries in Infants & Children, Florida Department of Law Enforcement, 2021

Rescue Task Force, Hillsborough County Sheriff's Office, 2020

Helping Employees Through Crisis, Hillsborough County Sheriff's Office, 2020

Duty to Act, Hillsborough County Sheriff's Office, 2020

Personal Protective Equipment, Hillsborough County Sheriff's Office, 2020

Suicide Awareness, Hillsborough County Sheriff's Office, 2020

Human Trafficking, Florida Department of Law Enforcement, 2020

Narcan Roll Call for Law Enforcement, Hillsborough County Sheriff's Office, 2019

Saving Lives by Understanding the Threat, Hillsborough County Sheriff's Office, 2019

Suicide by Cop, Police Executive Research Forum, 2019

Tourniquet Application Review, Hillsborough County Sheriff's Office, 2019

Autism and Law Enforcement, Hillsborough County Sheriff's Office, 2019

Autism, Hillsborough County Sheriff's Office, 2017

Diabetic Emergency and Officer Response, Hillsborough County Sheriff's Office, 2016

Physiological Response Dynamics Training, Hillsborough County Sheriff's Office, 2016

One Breath: The importance of Recognizing Agonal & Other Breathing Problems, Institute for the Prevention of In-custody Deaths Inc., 2016

Ethics, Hillsborough County Sheriff's Office, 2013

Discriminatory Profiling & Traffic Stops, Hillsborough County Sheriff's Office, 2013

Mentally Ill & Ethics Video, Hillsborough County Sheriff's Office, 2011

Field Force Command and Planning for Executives, FEMA, 2011

First Responder, Hillsborough County Sheriff's Office, 2010

Court Security, Public Agency Training Council, 20 hours, 2010

Physical Security, Hillsborough County Sheriff's Office, 2009

Command Officer's Development Course, University of Louisville, Southern Police Institute, 400 hours, 2008

Taser M26 Advanced and X26 Instructor, Hillsborough Community College, 2007

Human Trafficking, Florida Coalition Against Human Trafficking, 2007

The Bulletproof Mind, St. Petersburg College, 2006

Instructor Workshop, Hillsborough Community College, 2006

**THE EXPERTS**
# Robson Forensic

## PAUL M. ADEE, CCM, CCHP
### Police Practices, Security, and Corrections Expert

Terrorism: The Israeli Experience, Hillsborough County Sheriff's Office, 2006
The Middle Eastern Mindset, Hillsborough County Sheriff's Office, 2006
Use of Force, Hillsborough County Sheriff's Office, 2005
Agency Instructor Certification, St. Petersburg College, 2006
Taser X26, Hillsborough County Sheriff's Office, 2006
CMS Instructor Techniques, Hillsborough Community College, 80 hours, 2005
Criminal Justice Instructor's Conference, Florida Department of Law Enforcement,
    2005
ICS 100 Incident Command System Introduction, FEMA, 2005
ICS 700 National Incident Management System (NIMS) Introduction, FEMA, 2005
Building and Maintaining a Sound Behavioral Climate, Hillsborough Community College, 2005
Special FTO Liabilities, University of North Florida, 2004
AED, Hillsborough County Sheriff's Office, 2004
Leadership Training, Hillsborough County Sheriff's Office, 2003
Florida Jail Services Inspector, Florida Association of Counties, 2003
Positive Leadership, Hillsborough County Sheriff's Office, 2002
Terrorism Operational Response, St. Petersburg College, 2002
Hepatitis, Law Enforcement Training Network, 2002
Mental Preparedness, Law Enforcement Training Network, 2002
Sexual Misconduct, Law Enforcement Training Network, 2002
Sexual Abuse, Hillsborough County Sheriff's Office, 2002
Professionalism, Law Enforcement Training Network, 2001
Basic First Aid Parts 1 & 2, Law Enforcement Training Network, 2000
Cultural Diversity Parts 1,2,3 & 5, Law Enforcement Training Network, 2000
Sexual Harassment 1, Law Enforcement Training Network, 2000, 2001
Florida Jail Inspector, Florida Association of Counties, 40 hours, 1998
Career Development Middle Management, Hillsborough County Sheriff's Office, 1998
Bloodborne Pathogens, Hillsborough County Sheriff's Office, 1997, 1999, 2000, 2001, 2013
First Aid, Hillsborough County Sheriff's Office, 1997, 2000
Domestic Violence, Hillsborough County Sheriff's Office, 1996, 2004
Jail Field Training Officer, Hillsborough County Sheriff's Office, 1995
Oleoresin Capsicum (OC) Certification, Hillsborough County Sheriff's Office, 1995, 2005
Fire, Safety and Sanitation Officer, Hillsborough County Sheriff's Office, 1995
Defensive Tactics, Hillsborough County Sheriff's Office, 1994, 1995, 1997, 1999, 2000, 2001, 2002,
    2004, 2005
CPR, Hillsborough County Sheriff's Office, 1994, 1997, 1999, 2001, 2003, 2004
Human Diversity, Hillsborough County Sheriff's Office, 1993, 1994, 1998, 2000, 2004, 2007
Line Supervision, Hillsborough County Sheriff's Office, 1992
Jail Suicide Prevention, Northwest Illinois Criminal Justice Commission, 1990
FBI State Certified Firearms Instructor, Northwest Illinois Criminal Justice Commission, 1989
Report Writing, Northwest Illinois Criminal Justice Commission, 1989
Self Defense Refresher, Northwest Illinois Criminal Justice Commission, 1988
AIDS Info Seminar, Northwest Illinois Criminal Justice Commission, 1988

**THE EXPERTS**
# Robson Forensic

PAUL M. ADEE, CCM, CCHP
Police Practices, Security, and Corrections Expert

**PROFESSIONAL MEMBERSHIPS**

American Correctional Association, member
ASIS International, member
International Association of Police Chiefs, member
American Jail Association, member
Optimist Club of Tampa, member

Appendix 2
Testimony History of Paul M. Adee, C.C.M., C.C.H.P.

**Robson Forensic**
**THE EXPERTS**

Paul Adee
History of Expert Testimony by Deposition or Trial

<u>Date</u>        <u>Case Name and Description</u>

9/11/23      Estate of Nicolette Tanya Eugenua French, et al. v. Moseley Architects, P.C. and
             Moseley Architects of South Carolina, P.C., et al.
             Case No.:  2021-CP-26-06200
             Court of Common Pleas of Horry County, South Carolina; *Deposition*

8/13/24      Joshua Brown v. Gail Watts, Emanual Okome, Ashley Ehirim, Correctional Officer Idowu,
             Correctional Officer King, Correctional Officer Langford, Correctional Officer Rice,
             Correctional Officer Oakley
             Case No.: 21-CV-02248-DLB
             United States District Court for the District of Maryland; *Deposition*



Appendix 3
Materials Available for Review

**Robson Forensic**
THE EXPERTS

24LL0261 Harton-Merchant

Case Materials Available for Review

Appendix 3

**<u>Documents</u>**

1.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661-JSM-PRL First Amended Complaint, dated 12/8/23

2.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Billy Woods' Answers to Interrogatories

3.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Dellun Miller's Answers to Interrogatories

4.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Justin Kosinski's Answers to Interrogatories

5.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Jerome Dukes Answers to Interrogatories

6.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Sheriff, Billy Woods' Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23

7.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Deputy, Jerome Dukes' Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23

8.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Dellun Miller's, Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23

9.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Justin Kosinski's, Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23

10.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Sheriff Billy Woods' Objections to Plaintiff's First Request for Production, dated 4/1/24

11.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Billy Woods Responses to Plaintiff's Request for Production, dated 4/1/24

12.  United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Billy Woods Responses to Plaintiff's Third Request for Production,

13.  Fed. R. Civ. P. 30(B)(6) Rider Marion County, undated

14.  Marion County Jail Staff Analysis by CRS Incorporated, dated 4/24/19

15.  Marion County Jail Personnel Distribution, 2016 - 2021

16.  Marion County Sheriff's Office Operations Directive 6050.00 Post Orders, dated 2/23/17

17.  Marion County Sheriff's Office Operations Directive 6136.00 Detention Training, dated 2/23/17

18.  Marion County Sheriff's Office Operations Directive 6633.00 Inmate Grievance and Request Procedures, dated 12/13/21

19.  Marion County Sheriff's Office Operations Directive 6006.00 Staff Communications – Jail, dated 2/23/17
20.  Marion County Sheriff's Office Operations Directive 4700.00 Unusual Occurrences, dated 2/10/17
21.  Marion County Sheriff's Office Operations Directive 6013.00 Incident Reports, dated 2/23/17
22.  Marion County Sheriff's Office Operations Directive 6540.00 Jail Medical Facility, dated 2/13/17
23.  Marion County Sheriff's Office Operations Directive 6315.00 Critical Incident Debriefing – Jail, dated 2/23/17
24.  Marion County Sheriff's Office Policy 3041.00 Duty Assignment – Hours of Work, dated 2/23/17
25.  Marion County Sheriff's Office Policy 3350.00 Discipline Policy, dated 7/21/21
26.  Marion County Sheriff's Office Policy 6091.00 Employee Regulations – Jail, dated 10/30/18
27.  Marion County Sheriff's Office Policy 6630.00 Special Management Inmates, dated 2/14/17
28.  Marion County Sheriff's Office Policy 6631.00 Juvenile Detention, dated 10/30/18
29.  Marion County Sheriff's Office Policy 6633.00 Inmate Grievance and Request Procedures, dated 12/13/21
30.  Marion County Sheriff's Office Policy 3036.00 Personnel Injury and Disability, dated 1/2/19
31.  Marion County Sheriff's Office Policy 6314.00 Mass Arrest, Jail Procedures, dated 2/23/17
32.  Marion County Sheriff's Office Policy 6011.00 Supervision of Inmates – Jail, dated 4/13/23
33.  Marion County Sheriff's Office Policy 6766.00 Classification of Inmates, dated 3/14/24
34.  Marion County Sheriff's Office Policy 6012.00 Facility Reports, dated 3/27/18
35.  Marion County Sheriff's Office Policy 6164.00 Headcount of Inmates, dated 3/7/24
36.  Marion County Sheriff's Office Policy 6723.00 Orientation of Inmates, dated 12/14/22
37.  Marion County Sheriff's Office Policy 6322.00 Jail Housekeeping Plan, dated 2/23/17
38.  Marion County Sheriff's Office Policy 3030.00 Personnel Management, dated 10/25/21
39.  Marion County Sheriff's Office Policy 6729.00 Inmate Gain Time, dated 2/17/17
40.  Marion County Sheriff's Office Policy 6570.00 Notification in the Event of Injury, Serious Illness or Death, dated 2/14/20
41.  Marion County Sheriff's Office Policy 6330.00 Security and Control, General, dated 2/6/24
42.  Marion County Sheriff's Office Policy6721.00 Intake and Booking Procedures, dated 2/6/24
43.  Marion County Sheriff's Office Post Order Post: Alpha Control, dated 6/26/19
44.  Marion County Sheriff's Office Post Order Post: Alpha Pod, dated 9/11/18
45.  Marion County Sheriff's Office Post Order Post: Alpha/Echo, dated 8/31/23
46.  Marion County Sheriff's Office Post Order Post: Bravo Control, dated 12/19/14
47.  Marion County Sheriff's Office Post Order Post: Bravo Alpha (Step-Down Unit), dated 7/2/19
48.  Marion County Sheriff's Office Post Order Post: Charlie Control, dated 3/31/06
49.  Marion County Sheriff's Office Post Order Post: Charlie Pod, dated 1/8/19
50.  Marion County Sheriff's Office Post Order Post: Delta Control, dated 6/29/19
51.  Marion County Sheriff's Office Post Order Post: Delta Pod, dated 6/19/19
52.  Marion County Sheriff's Office Post Order Post: Echo Pod, dated 5/12/12
53.  Marion County Sheriff's Office Post Order Post: Echo/Foxtrot Control, dated 1/3/05
54.  Marion County Sheriff's Office Post Order Post: Foxtrot Pod, dated 6/21/19
55.  Marion County Sheriff's Office Post Order Post: Gulf Pod, dated 1/8/19

56.   Marion County Sheriff's Office Post Order Post: Hotel Pod, dated 1/8/19

57.   Marion County Sheriff's Office Post Order Post: Intake Control, dated 8/24/10

58.   Marion County Sheriff's Office Post Order Post: Master Control, dated 6/25/19

59.   Marion County Sheriff's Office Booking & Release Internal Manual, dated 2/28/24

60.   Official Minutes of Marion County Board of County Commissioners (Pl Merchant 0001-1473)

61.   Report on Suicide Prevention Practices Within the Marion County Jail by Lindsay M. Hayes, dated 11/10/18 (Pl Merchant 1474-1517)

62.   PREA Facility Audit Report: Final, dated 1/2/22 (Pl Merchant 1518-1633)

63.   Marion County Sheriff's Office Detention Bureau Annual Report 2022 (Pl Merchant 2544-2563)

64.   Marion County Crime Statistics (Pl Merchant 1634-1635)

65.   Marion County Sheriff's Office Analysis of Security and Operational Functions Report by Nancy A. DeFerrari, CJM and Lieutenant Chris Vorisek, dated 10/15/18 (Pl Merchant 1636-1672)

66.   Marion County Sheriff's Office Inmate Rules and Regulations Handbook, dated 12/2017 (Pl Merchant 1673-1701)

67.   Marion County Sheriff's Office Inmate Rules and Regulations Handbook, dated 6/2024

68.   Florida Model Jail Standards, dated 11/14/22 (Pl Merchant 1702-1793)

69.   Official Minutes of Marion County Board of County Commissioners (Pl Merchant 1794-1797)

70.   Letter from Cathy Wyckoff to Marion County Commissioners, dated 3/22/19 (Pl Merchant 1798-1801)

71.   Emailed Public Record Requests (Pl Merchant 1802-1813)

72.   Handwritten Note, dated 11/16/18 (Pl Merchant 1814)

73.   Official Minutes of Marion County Board of County Commissioners (Pl Merchant 1815-1818)

74.   Letter from Timothy McCourt to Cathy Wyckoff, dated 3/6/19 (Pl Merchant 1819)

75.   Report on Suicide Prevention Practices Within the Marion County Jail by Lindsay M. Hayes, dated 11/10/18 (Pl Merchant 1820-1863)

76.   Email from Cathy Wyckoff to Tim McCourt, Williams Woods and others re: Inmate Violence in the Marion County Jail Investigation, dated 9/25/23 (Pl Merchant 1864-1866)

77.   Marion County Sheriff's Office Job Descriptions, dated 2/22/23 (Pl Merchant 1867-1874)

78.   Cathy Wyckoff Communications with Marion County Sheriff's Office (Pl Merchant 1875-1897)

79.   EMS Call Logs dated 1/1/17-9/25/23 (Pl Merchant 1898-1916)

80.   FDLE Internal Investigation Report re: Jerome Dukes, dated 10/13/16 (Pl Merchant 1917-1922)

81.   Marion County Sheriff's Office Citizen Comment/Complaint Report re: Corporal Jerome Dukes, dated 9/25/16 (Pl Merchant 1928-1933)

82.   FOIA Request and Response (Pl Merchant 1934-1947)

83.   Marion County Sheriff's Office Incident Report #16000961 by Deputy Gregory Spicher, dated 2/25/16

84.   Marion County Sheriff's Office Incident Report #16002104 by Deputy Ronald Palmer, dated 5/21/16

85.   Marion County Sheriff's Office Incident Report #16002520 by Deputy Robert Regan, dated 6/20/16

86.   Marion County Sheriff's Office Incident Report #16004360 by Deputy Jordan Leon-Sanchez, dated 10/15/16

87.   Marion County Sheriff's Office Incident Report #17000773 by Deputy Alan Drake, dated 2/16/17 (Pl Merchant 1962-1977)

88. Marion County Sheriff's Office Incident Report #17004822(01) by Detective Rhonda Stroup, dated 2/16/17 (Pl Merchant 1978-1982)

89. Marion County Sheriff's Office Incident Report #17005302 by Deputy Justin Kosinski, dated 11/25/17 (Pl Merchant 1983-1985)

90. Marion County Sheriff's Office Incident Report #17032302(01) by Detective Rhonda Stroup, dated 11/25/17 (Pl Merchant 1986-1990)

91. Marion County Sheriff's Office Incident Report #18006531(01) by Detective Rhonda Stroup, dated 3/3/18 (Pl Merchant 1991-1994)

92. Marion County Sheriff's Office Incident Report #18015700(01) by Detective Rhonda Stroup, dated 6/12/18 (Pl Merchant 1995-1999)

93. Marion County Sheriff's Office Incident Report #18018460(03) by Detective Nathan McLain, dated 7/24/18 (Pl Merchant 2000-2006)

94. Marion County Sheriff's Office Incident Report #18022684(01) by Detective Nathan McLain, dated 8/24/18 (Pl Merchant 2007-2010)

95. Marion County Sheriff's Office Incident Report #19013548(04) by Detective Nathan McLain, dated 5/15/19 (1952-1960)

96. Marion County Sheriff's Office Incident Report #190002112 by Deputy Howard Cromwell, dated 5/17/19

97. Marion County Sheriff's Office Incident Report #190002339 by Deputy Andrew Yacuzzo, dated 6/1/19

98. Marion County Sheriff's Office Incident Report #190002533 by Deputy Jason Lester, dated 6/15/19

99. Marion County Sheriff's Office Incident Report #19018702(01) by Detective Nathan McLain, dated 7/10/19 (Pl Merchant 2011-2014)

100. Marion County Sheriff's Office Incident Report #190004880 by Deputy Andrew Yacuzzo, dated 11/12/19

101. Marion County Sheriff's Office Incident Report #200001425 by Deputy Tyler Adams, dated 3/21/20 (Pl Merchant 2015-2017)

102. Marion County Sheriff's Office Incident Report #200001461 by Deputy Courtney Washington, dated 3/24/20

103. Marion County Sheriff's Office Incident Report #200003047 by Deputy John Frye, dated 6/29/20

104. Marion County Sheriff's Office Incident Report #200003926 by Deputy Sandra Denardis, dated 8/29/20

105. Marion County Sheriff's Office Incident Report #210002232 by Deputy Jarrod Henson, dated 5/7/21

106. Marion County Sheriff's Office Incident Report #210002252 by Deputy Kristofer Valdez, dated 5/8/21

107. Marion County Sheriff's Office Incident Report #210002303 by Deputy Didier Canelle, dated 5/11/21

108. Marion County Sheriff's Office Incident Report #210003128 by Deputy Andrew Yacuzzo, dated 6/27/21

109. Marion County Sheriff's Office Incident Report #210003457 by Deputy Shawn Prince, dated 7/16/21

110. Marion County Sheriff's Office Incident Report #210004010 by Deputy Justin Enchautequi, date 8/19/21

111. Marion County Sheriff's Office Incident Report #210005261 by Deputy Samaryon Wyman, dated 11/1/21

112. Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21

113. Marion County Sheriff's Office Incident Report #18000682 by Deputy Christopher Turner, dated 2/12/18 (Pl Merchant 2018-2022)

114. Marion County Sheriff's Office Incident Report #18001025 by Deputy Christopher Turner, dated 3/3/18 (Pl Merchant 2023-2024)

115. Marion County Sheriff's Office Incident Report #180002178 by Deputy Devon McCarthy, dated 5/9/18 (Pl Merchant 2025-2027)

116. Marion County Sheriff's Office Incident Report #180002853 by Deputy Andrew Yacuzzo, dated 6/12/18 (Pl Merchant 2028)

117. Marion County Sheriff's Office Incident Report #180004140 by Deputy Zachary Welch, dated 8/22/18 (Pl Merchant 2029-2030)

118. Marion County Sheriff's Office Incident Report #180005050 by Deputy Zachary Welch, dated 10/8/18 (Pl Merchant 2031)

119. Marion County Sheriff's Office Incident Report #180006476 by Deputy Kristofer Valdez, dated 12/26/18 (Pl Merchant 2032-2033)

120. Marion County Sheriff's Office Incident Report #190001098 by Deputy Brandon Dowels, dated 3/12/19 (Pl Merchant 2034-2038)

121. Marion County Sheriff's Office Incident Report #190002664 by Deputy Shaquille Thomas, dated 6/23/19 (Pl Merchant 2039-2041)

122. Marion County Sheriff's Office Incident Report #190003159 by Deputy Cory Schweitzer, dated 7/25/19 (Pl Merchant 2042-2043)

123. Marion County Sheriff's Office Incident Report #190003469 by Deputy Cody Liss, dated 8/15/19 (Pl Merchant 2044-2045)

124. Marion County Sheriff's Office Incident Report #190003958 by Richard Zimmerman, dated 9/16/19 (Pl Merchant 2046-2048)

125. Marion County Sheriff's Office Incident Report #190004802 by Deputy Robert Regan, dated 11/8/19 (Pl Merchant 2049)

126. Marion County Sheriff's Office Incident Report #190004893 by Deputy Jacqueline Johnson-Cabrera, dated 11/9/19 (Pl Merchant 2050)

127. Marion County Sheriff's Office Incident Report #190004955 by Deputy Robert Regan, dated 11/17/19 (Pl Merchant 2051)

128. Marion County Sheriff's Office Incident Report #190004991 by Deputy Xavier McMiller, dated 11/19/19 (Pl Merchant 2052-2054)

129. Marion County Sheriff's Office Incident Report #190004999 by Deputy Gregory Spicher Jr., dated 11/19/19 (Pl Merchant 2055)

130. Marion County Sheriff's Office Incident Report #190005006 by Deputy Errol James, dated 11/19/19 (Pl Merchant 2056-2057)

131. Marion County Sheriff's Office Incident Report #190005038 by Deputy Samaryon Wyman, dated 11/20/19 (Pl Merchant 2058)

132. Marion County Sheriff's Office Incident Report #190005068 by Deputy Cory Schweitzer, dated 11/22/19 (Pl Merchant 2059)

133. Marion County Sheriff's Office Incident Report #190005203 by Deputy Samaryon Wyman, dated 11/30/19 (Pl Merchant 2060)

134. Marion County Sheriff's Office Incident Report #190005235 by Deputy Xavier McMiller, dated 12/2/19 (Pl Merchant 2061-2062)

135. Marion County Sheriff's Office Incident Report #190005589 by Deputy William Arias, dated 12/19/19 (Pl Merchant 2063)

136. Marion County Sheriff's Office Incident Report #190005710 by Deputy Samaryon Wyman, dated 12/28/19 (Pl Merchant 2064)

137. Marion County Sheriff's Office Incident Report #190005742 by Deputy Robert Regan, dated 12/29/19 (Pl Merchant 2065-2066)

138. Marion County Sheriff's Office Incident Report #200000116 by Deputy Samaryon Wyman, dated 1/7/20 (Pl Merchant 2067)

139. Marion County Sheriff's Office Incident Report #200000204 by Deputy Tammy Counts, dated 1/12/20 (Pl Merchant 2068-2069)

140. Marion County Sheriff's Office Incident Report #200000206 by Deputy Justin Kosinski, dated 1/13/20 (Pl Merchant 2070)

141. Marion County Sheriff's Office Incident Report #200000217 by Deputy Justin Kosinski, dated 1/13/20 (Pl Merchant 2071)

142. Marion County Sheriff's Office Incident Report #200000312 by Deputy Xavier McMiller, dated 1/18/20 (Pl Merchant 2072-2074)

143. Marion County Sheriff's Office Incident Report #200000381 by Deputy Darryl Keaton, dated 1/21/20 (Pl Merchant 2075-2077)

144. Marion County Sheriff's Office Incident Report #200000482 by Deputy Samaryon Wyman, dated 1/26/20 (Pl Merchant 2078)

145. Marion County Sheriff's Office Incident Report #200000531 by Deputy Isai Palau, dated 1/29/20 (Pl Merchant 2079)

146. Marion County Sheriff's Office Incident Report #200001092 by Deputy Justin Kosinski, dated 3/1/20 (Pl Merchant 2080-2081)

147. Marion County Sheriff's Office Incident Report #200001102 by Deputy Xavier McMiller, dated 3/2/20 (Pl Merchant 2082-2083)

148. Marion County Sheriff's Office Incident Report #200001122 by Deputy Tyler Adams, dated 3/3/20 (Pl Merchant 2084-2085)

149. Marion County Sheriff's Office Incident Report #200001383 by Deputy Cory Schweitzer, dated 3/19/20 (Pl Merchant 2086-2087)

150. Marion County Sheriff's Office Incident Report #200001514 by Deputy Justin Kosinski, dated 3/27/20 (Pl Merchant 2088-2089)

151. Marion County Sheriff's Office Incident Report #200001520 by Deputy Jarred Bryant, dated 3/28/20 (Pl Merchant 2090-2092)

152. Marion County Sheriff's Office Incident Report #200001761 by Deputy Xavier McMiller, dated 4/10/20 (Pl Merchant 2093-2094)

153. Marion County Sheriff's Office Incident Report #200001983 by Deputy Zachary Linder, dated 4/24/20 (Pl Merchant 2095-2096)

154. Marion County Sheriff's Office Incident Report #200002227 by Deputy Dylan Roberts, dated 5/9/20 (Pl Merchant 2097-2099)

155. Marion County Sheriff's Office Incident Report #200002383 by Deputy Cory Schweitzer, dated 5/19/20 (Pl Merchant 2100-2102)

156. Marion County Sheriff's Office Incident Report #200002773 by Deputy Justin Kosinski, dated 6/11/20 (Pl Merchant 2103-2105)

157. Marion County Sheriff's Office Incident Report #200002806 by Deputy John Frye, dated 6/12/20 (Pl Merchant 2106-2108)

158. Marion County Sheriff's Office Incident Report #200002867 by Deputy Samaryon, dated 6/17/20 (Pl Merchant 2109-2110)

159. Marion County Sheriff's Office Incident Report #200002944 by Deputy Edwin Rushing, dated 6/21/20 (Pl Merchant 2111)

160. Marion County Sheriff's Office Incident Report #200003138 by Deputy Jared Davis, dated 7/6/20 (Pl Merchant 2112-2115)

161. Marion County Sheriff's Office Incident Report #200003191 by Deputy John Frye, dated 7/10/20 (Pl Merchant 2116-2117)

162. Marion County Sheriff's Office Incident Report #200003208 by Deputy John Frye, dated 7/11/20 (Pl Merchant 2118)

163. Marion County Sheriff's Office Incident Report #200003212 by Deputy Samaryon Wyman, dated 7/20/20 (Pl Merchant 2119-2121)

164. Marion County Sheriff's Office Incident Report #200003301 by Deputy Errol James, dated 7/17/20 (Pl Merchant 2122)

165. Marion County Sheriff's Office Incident Report #200003411 by Deputy Jared Davis, dated 7/25/20 (Pl Merchant 2123-2124)

166. Marion County Sheriff's Office Incident Report #200003561 by Deputy Dylan Roberts, dated 8/3/20 (Pl Merchant 2125-2127)

167. Marion County Sheriff's Office Incident Report #200003572 by Deputy Samaryon Wyman, dated 8/3/20 (Pl Merchant 2128-2131)

168. Marion County Sheriff's Office Incident Report #200003610 by Deputy Errol James, dated 8/6/20 (Pl Merchant 2132)

169. Marion County Sheriff's Office Incident Report #200003726 by Deputy Laura Vogt, dated 8/15/20 (Pl Merchant 2133-2134)

170. Marion County Sheriff's Office Incident Report #200004079 by Deputy Tammy Counts, dated 9/10/20 (Pl Merchant 2135-2136)

171. Marion County Sheriff's Office Incident Report #200004097 by Deputy Justin Kosinski, dated 9/12/20 (Pl Merchant 2137-2139)

172. Marion County Sheriff's Office Incident Report #200004218 by Deputy Samaryon Wyman, dated 9/19/20 (Pl Merchant 2140-2141)

173. Marion County Sheriff's Office Incident Report #200004254 by Deputy Xavier McMiller, dated 9/21/20 (Pl Merchant 2142)

174. Marion County Sheriff's Office Incident Report #200004421 by Deputy Samaryon Wyman, dated 10/2/20 (Pl Merchant 2143-2144)

175. Marion County Sheriff's Office Incident Report #200005052 by Deputy Errol James, dated 11/12/20 (Pl Merchant 2145)

176. Marion County Sheriff's Office Incident Report #200005190 by Deputy Xavier McMiller, dated 11/21/20 (Pl Merchant 2146-2148)

177. Marion County Sheriff's Office Incident Report #200005240 by Deputy Cory Schweitzer, dated 11/25/20 (Pl Merchant 2149-2150)

178. Marion County Sheriff's Office Incident Report #200005255 by Deputy Justin Kosinski, dated 11/25/20 (Pl Merchant 2151-2153)

179. Marion County Sheriff's Office Incident Report #200005448 by Xavier McMiller, dated 12/9/20 (Pl Merchant 2154-2158)

180. Marion County Sheriff's Office Incident Report #200005468 by Deputy James Errol, dated 12/10/20 (Pl Merchant 2159)

181. Marion County Sheriff's Office Incident Report #210000047 by Deputy Xavier McMiller, dated 1/3/21 (Pl Merchant 2160-2161)

182. Marion County Sheriff's Office Incident Report #210000051 by Deputy Xavier McMiller, dated 1/4/21 (Pl Merchant 2162)

183. Marion County Sheriff's Office Incident Report #210000181 by Deputy Errol James, dated 1/11/21 (Pl Merchant 2163)

184. Marion County Sheriff's Office Incident Report #210000322 by Deputy John Frye, dated 1/18/21 (Pl Merchant 2164-2166)

185. Marion County Sheriff's Office Incident Report #210000346 by Deputy Darryl Keaton, dated 1/19/21 (Pl Merchant 2167-2168)

186. Marion County Sheriff's Office Incident Report #210000568 by Deputy Xavier McMiller, dated 2/1/21 (Pl Merchant 2169-2172)

187. Marion County Sheriff's Office Incident Report #210000741 by Deputy Samaryon Wyman, dated 2/10/21 (Pl Merchant 2173)

188. Marion County Sheriff's Office Incident Report #210000789 by Deputy Errol James, dated 2/13/21 (Pl Merchant 2174)

189. Marion County Sheriff's Office Incident Report #210000860 by Deputy Tyler Adams, dated 2/16/21 (Pl Merchant 2175-2176)

190. Marion County Sheriff's Office Incident Report #210000992 by Deputy Joe Phillips, dated 2/25/21 (Pl Merchant 2177)

191. Marion County Sheriff's Office Incident Report #210001008 by Deputy Xavier McMiller, dated 2/27/21 (Pl Merchant 2178-2182)

192. Marion County Sheriff's Office Incident Report #210001075 by Deputy Tyler Adams, dated 3/2/21 (Pl Merchant 2183-2185)

193. Marion County Sheriff's Office Incident Report #210001120 by Deputy Xavier McMiller, dated 3/5/21 (Pl Merchant 2186-2188)

194. Marion County Sheriff's Office Incident Report #210001623 by Deputy Dellun Miller, dated 3/31/21 (Pl Merchant 2189-2197)

195. Marion County Sheriff's Office Incident Report #210001675 by Deputy Tyler Adams, dated 4/3/21 (Pl Merchant 2198-2199)

196. Marion County Sheriff's Office Incident Report #210001947 by Deputy Xavier McMiller, dated 4/20/21 (Pl Merchant 2200-2203)

197. Marion County Sheriff's Office Incident Report #210002246 by Deputy Dylan Roberts, dated 5/8/21 (Pl Merchant 2204-2205)

198. Marion County Sheriff's Office Incident Report #210002287 by Deputy John Frye, dated 5/11/21 (Pl Merchant 2206)

199. Marion County Sheriff's Office Incident Report #210002523 by Deputy Cory Schweitzer, dated 5/23/21 (Pl Merchant 2207-2208)

200. Marion County Sheriff's Office Incident Report #210002751 by Deputy Dylan Roberts, dated 6/5/21 (Pl Merchant 2209-2210)

201. Marion County Sheriff's Office Incident Report #210003100 by Deputy Darryl Keaton, dated 6/26/21 (Pl Merchant 2211-2217)

202. Marion County Sheriff's Office Incident Report #210003168 by Deputy Cherrelle Jennings, dated 6/30/21 (Pl Merchant 2218)

203. Marion County Sheriff's Office Incident Report #210003344 by Deputy Darryl Keaton, dated 7/10/21 (Pl Merchant 2219-2220)

204. Marion County Sheriff's Office Incident Report #210003730 by Deputy Dellun Miller, dated 8/1/21 (Pl Merchant 2221-2224)

205. Marion County Sheriff's Office Incident Report #210003835 by Deputy John Frye, dated 8/8/21 (Pl Merchant 2225-2226)

206. Marion County Sheriff's Office Incident Report #210003841 by Deputy John Frye, dated 8/8/21 (Pl Merchant 2227-2230)

207. Marion County Sheriff's Office Incident Report #210003939 by Deputy Errol James, dated 8/15/21 (Pl Merchant 2231)

208. Marion County Sheriff's Office Incident Report #210004366 by Deputy Joe Phillips, dated 9/8/21 (Pl Merchant 2232-2233)

209. Marion County Sheriff's Office Incident Report #210004389 by Deputy John Frye, dated 9/10/21 (Pl Merchant 2234-2235)

210. Marion County Sheriff's Office Incident Report #210004395 by Deputy John Frye, dated 9/10/21 (Pl Merchant 2236-2237)

211. Marion County Sheriff's Office Incident Report #210004401 by Deputy John Frye, dated 9/10/21 (Pl Merchant 2238)

212. Marion County Sheriff's Office Incident Report #210004426 by Deputy Shaquille Thomas, dated 9/12/21

213. Marion County Sheriff's Office Incident Report #210004678 by Deputy Cory Schweitzer, dated 9/25/21 (Pl Merchant 2239-2240)

214. Marion County Sheriff's Office Incident Report #210004804 by Deputy Dylan Roberts, dated 10/4/21 (Pl Merchant 2241-2242)

215. Marion County Sheriff's Office Incident Report #210004881 by Deputy Dylan Roberts, dated 10/8/21 (Pl Merchant 2243-2244)

216. Marion County Sheriff's Office Incident Report #210004896 by Deputy Justin Kosinski, dated 10/9/21 (Pl Merchant 2245-2246)

217. Marion County Sheriff's Office Incident Report #210005039 by Deputy Cory Schweitzer, dated 10/18/21 (Pl Merchant 2247-2248)

218. Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21 (Pl Merchant 2251-2253)

219. Marion County Sheriff's Office Incident Report #210005399 by Deputy Joe Phillips, dated 11/8/21 (Pl Merchant 2254-2255)

220. Marion County Sheriff's Office Incident Report #210005516 by Deputy Robert Regan, dated 11/14/21 (Pl Merchant 2256-2258)

221. Marion County Sheriff's Office Incident Report #210005517 by Deputy Robert Regan, dated 11/14/21 (Pl Merchant 2259-2261)

222. Marion County Sheriff's Office Incident Report #19OFF020557(13) by Detective Nathan McLain, dated 8/1/19 (Pl Merchant 2262-2330)

223. Marion County Sheriff's Office Incident Report #19OFF030278(02) by Detective Nathan McLain, dated 11/26/19 (Pl Merchant 2231-2238)

224. Marion County Sheriff's Office Incident Report #20OFF006894(01) by Detective Nathan McLain, dated 3/31/20 (Pl Merchant 2339-2343)

225. Marion County Sheriff's Office Incident Report #20OFF006894(01) by Detective Nathan McLain, dated 3/31/20 (Pl Merchant 2344-2349)

226. Marion County Sheriff's Office Incident Report #20OFF003779(03) by Detective I. Palau, dated 2/19/21 (Pl Merchant 2350-2356)

227. Marion County Sheriff's Office Incident Report #21OFF014588(02) by Detective I. Palau, dated 6/30/21 (Pl Merchant 2357-2364)

228. Marion County Sheriff's Office Incident Report #21OFF020749(01) by Detective Nathan McClain, dated 10/1/21 (Pl Merchant 2365-2370)

229. Marion County Sheriff's Office Incident Report #21OFF023413(10) by Detective Nathan McClain (Pl Merchant 2371-2397)

230. Marion County Sheriff's Office Administrative Review Report #AR-21-231 re: Lieutenant Kristin Johnson #5163, dated 11/15/21 (Pl Merchant 2399-2416)

231. Marion County Sheriff's Office Administrative Review Report #DA-05-127 re: Officer William Konopinski #5673, dated 6/28/16 (Pl Merchant 2417-2421)

232. Marion County Sheriff's Office Administrative Review Report #9017 re: Officer Justin Kosinski #5573, dated 12/20/12 (Pl Merchant 2422-2428)

233. Marion County Sheriff's Office Observation Report #6560 re: Officer Justin Kosinski #5573, dated 2/8/11 (Pl Merchant 2429-2434)

234. Marion County Sheriff's Office Use of Force Report #UOF 19-148 re: Corey Merchant, dated 5/18/19 (Pl Merchant 2435-2449)

235. Marion County Sheriff's Office Observation Report #OR17-063 re: Deputy Kristofer Valdez #6168, dated 11/16/17 (Pl Merchant 2532-2537)

236. Marion County Sheriff's Office Observation Report #OR18-010 re: Deputy Craig Savage #6172, dated 2/16/18 (Pl Merchant 2538-2542)

237. Marion County Sheriff's Office In-Custody Report, dated 10/1/21 – 11/30/21

238. Various Newspaper Articles (Pl Merchant 2452-2505)

239. Newspaper Article (Pl Merchant 2526-2531)

240. Medical Examiner Districts 5 & 24 Report #2021-2744 re: Cory Merchant, dated 1/11/22 (Pl Merchant 2507-2522)

241. State of Florida Bureau of Vital Statistics Certification of Death re: Cory Merchant, dated 11/23/21 (Pl Merchant 4784)

242. December 2022 Positions (Pl Merchant 2523)

243. January 2022 Positions (Pl Merchant 2524)

244. June 2021 Positions (Pl Merchant 2525)

245. Declaration of Terry Place, dated 10/26/23 (Pl Merchant 3564-3566)

246. Declaration of Steven Murphy, dated 10/25/23 (Pl Merchant 3567-3568)

247. Ocala Health System Medical Records re: Cory Merchant #G000789582 (Pl Merchant 3569-4693)

248. FDLE Criminal History Information on the Internet re: Cory Merchant, dated 4/17/24 (Pl Merchant 4694-4727)

249. Sprint Telephone Records/Billing re: Cory Merchant (Pl Merchant 4728-4783)

250. Marion County Jail Video Visitation Report re: Cory Merchant, dated 7/7/20 – 6/23/21

251. Circuit Court of Marion County Order Appointing Personal Representative 23CP000581AX (Pl Merchant 4785-4786)

252. Marion County Sheriff's Office 67 Case Photos re: MCSO21OFF023413

253. Booking Property Photos (3)

254. Marion County Sheriff's Office Incident Report #99022042 by Deputy Alfred Greenway, dated 7/8/1999

255. Marion County Sheriff's Office Incident Report #01009187 by Deputy Beckie Sirolli, dated 3/15/01

256. Marion County Sheriff's Office Incident Report #01011340 by Deputy Timothy Ohara, dated 4/1/01

257. Marion County Sheriff's Office Incident Report #04034398 by Deputy Niels Tonnesen, dated 6/20/04

258. Marion County Sheriff's Office Incident Report #

259. Marion County Sheriff's Office Incident Report #05029238 by Deputy Christophe Erickson, dated 5/28/05

260. Marion County Sheriff's Office Incident Report #05030150, unknown author, dated 6/2/05

261. Marion County Sheriff's Office Incident Report #05046038 by Deputy Robert Youmans, dated 8/26/05

262. Marion County Sheriff's Office Incident Report #07049249 by Deputy Elliott Chauncey, dated 9/25/07

263. Marion County Sheriff's Office Incident Report #08063462 by Deputy Richard Peters, dated 12/9/08

264. Marion County Sheriff's Office Incident Report #14016693 by Deputy Regina Graham, dated 6/19/14

265. Marion County Sheriff's Office Incident Report #15028953 by Deputy Roy Johnson, dated 9/2/15

266. Marion County Sheriff's Office Incident Report #16001728 by Deputy Kasey Newton, dated 1/13/16

267. Marion County Sheriff's Office Incident Report #16003345 by Deputy David Christmas, dated 1/25/16

268. Marion County Sheriff's Office Incident Report #16013038 by Deputy Dawn Heath, dated 5/10/16

269. Marion County Sheriff's Office Incident Report #16016110 by Deputy Robert Rath, dated 5/6/16

270. Marion County Sheriff's Office Incident Report #16016111 by Deputy Robert Rath, dated 5/6/16

271. Marion County Sheriff's Office Incident Report #18011135 by Deputy Kevin Johnson, dated 4/26/18

272. Marion County Sheriff's Office Incident Report #18027202 by Detective Stephen Juliano, dated 10/8/18

273. Marion County Sheriff's Office Incident Report #19016128, dated 6/11/19

274. Marion County Sheriff's Office Incident Report #19OFF020168 by Detective Daniel Pinder, dated 7/26/19

275. Marion County Sheriff's Office Incident Report #21OFF023413 by Detective Nathan McLain, dated 11/17/21

276. Marion County Sheriff's Office Detention Personnel Post Assignments, dated 11/6/21

277. Incident Detail Report #2111070079, dated 11/7/21

278. Marion County Sheriff's Office Disciplinary Report History re: Cory Merchant, various booking numbers

279. Marion County Sheriff's Office Housing Movements Report re: Cory Merchant ID #A0092328 Booking #1900010514

280. Marion County Sheriff's Office Inmate File re: Cory Merchant ID #A0092328 Booking #1900010514

281. Marion County Sheriff's Office Inmate Mail History re: Cory Merchant ID #A0092328 Booking #1900010514

282. Marion County Sheriff's Office Inmate Medical Records re: Cory Merchant ID #A0092328

283. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 11/24/19

284. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 4/11/20

285. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 9/23/20

286. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 12/15/20

287. Marion County Sheriff's Office Inspection of Confinement Log re: Cory Merchant

288. Marion County Sheriff's Office Telephone Call Detail Report re: Cory Merchant, dated 11/8/19 – 12/22/21

289. Marion County Sheriff's Office Inmate File re: Eric Lutterloah ID#A0070076 Booking #2000004904

290. Marion County Sheriff's Office Probable Cause Affidavit Case #MCSO20OFF009528/2005110789 by Detective B. Burleson #5542, dated 5/12/20

291. Marion County Sheriff's Office Lutterloah Inmate File 1 of 2

292. Marion County Sheriff's Office Lutterloah Inmate File 2 of 2

293. Marion County Sheriff's Office Alerts History Report re: Eric Lutterloah

294. Marion County Sheriff's Office Housing Movements Report re: Eric Lutterloah ID #A0070076 Booking #2000004904

295. Marion County Sheriff's Office Inmate Classification Report re: Eric Lutterloah ID #A0070076 Booking #2000004904

296. Marion County Sheriff's Office Inmate Classification Record re: Eric Lutterloah, dated 6/4/20

297. Marion County Sheriff's Office Inmate Mail History re: Eric Lutterloah ID #A00700776 Booking #2000004904
298. Marion County Sheriff's Office Keep Aways Report re: Eric Lutterloah
299. Marion County Sheriff's Office Inmate Visitors Report re: Eric Lutterloah
300. Marion County Sheriff's Office PREA Sexual Violence Screening Form re: Eric Lutterloah, dated 6/4/20
301. Marion County Sheriff's Office Courthouse Division Bailiff Unit Internal Manual, dated 10/2023
302. Marion County Sheriff's Office Daily Logs Location: G, dated 10/7/21 – 11/7/21
303. Marion County Sheriff's Office Daily Logs Location: G, dated 11/6/21 – 11/8/21
304. Training Records re: Jerome Dukes
305. Training Records re: Justin Kosinski
306. Training Records re: Dellun Miller
307. Personnel File re: Dellun Miller
308. Marion County Sheriff's Office Letter of Counseling re: Deputy Dellun Miller #4614, dated 4/14/21
309. Marion County Sheriff's Office Memorandum re: Sergeant Dellun Miller #4614, dated 12/29/20
310. Marion County Sheriff's Office Letter of Reprimand re: Deputy Dellun Miller #4614, dated 7/7/14
311. Deposition Transcript of Jerome Dukes, dated 9/12/24

**Audio Recordings**

1. Interview: Inmate Posey (Pl Merchant 1923)
2. Interview: Nurse Ramos (Pl Merchant 1924)
3. Interview: Officer Dukes (Pl Merchant 1925)
4. Interview: Officer Moore (Pl Merchant 1926)
5. Interview: Merchant (Pl Merchant 1948)
6. Interview: Merchant (Pl Merchant 1949)
7. Interview: Lightle Baker (Pl Merchant 1950)
8. Interview: KJ Case, Lightle (Pl Merchant 2398)
9. 911 Call: Swift Pace (Pl Merchant 2506)
10. McPhadden Call (Pl Merchant 2543)
11. Interview 210917 0907
12. Interview 210917 0909
13. Interview 210917 0903
14. Interview 210917 0857
15. Victim Interview 2021-09-29 12064
16. Interview (Extraction 1.1) Deputy Kosinski
17. Interview (Extraction 1.1) Tommie Merchant px
18. Interview 211107 0732
19. Interview 211107 0741

20. Interview 211107 0749
21. Interview 211107 0757
22. Interview Angel Acost-Cruz Audio 2021-11-07 06
23. Interview Deputy Kosinski Audio 2021-11-07 054
24. Interview Eric Lutterloah Audio 2021-11-07 0751
25. Interview Frank Calabria Audio 2021-11
26. Interview Ryan Glover Audio 2021-11-07
27. Interview Jason Santore Audio 2021-11-07 065311 5
28. Interview 211105 2021
29. Interview 211126 0000
30. Interview Nurses John Little and Natasha Sa
31. Interview Robert Furr Audio 2-21-11-07 070418 5212
32. Interview 211104 2205
33. Interview 211108 2253
34. 10.26.101.27-350e240a0a24651b3a001137b9
35. 10.36.148.13-000be3770a24940d76e93442a


**<u>Video Surveillance</u>**

1. Posey Complaint Video, dated 9/24/16 (Pl Merchant 1927)
2. Baker Kimberly's Center, dated 1/21/16 (Pl Merchant 1951)
3. Exhibit 16 Surveillance Video, dated 10/9/21
4. Exhibit 17 Surveillance Video, dated 9/10/21
5. Surveillance Video G-Pod, dated 9/10/21
6. Surveillance Video 1 Book-Cam-29-Rel-Ent-2020-09-12, dated 9/12/21
7. Surveillance Video 2 Book-Cam-29-Rel-Ent-2020-09-12, dated 9/12/21

24LL0261 Harton-Merchant

Case Materials Available for Review

Appendix 3

## Documents

1. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661-JSM-PRL First Amended Complaint, dated 12/8/23
2. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Billy Woods' Answers to Interrogatories
3. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Dellun Miller's Answers to Interrogatories
4. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Justin Kosinski's Answers to Interrogatories
5. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Jerome Dukes Answers to Interrogatories
6. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Sheriff, Billy Woods' Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23
7. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Deputy, Jerome Dukes' Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23
8. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Dellun Miller's, Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23
9. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Justin Kosinski's, Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated 12/22/23
10. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant Sheriff Billy Woods' Objections to Plaintiff's First Request for Production, dated 4/1/24
11. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Billy Woods Responses to Plaintiff's Request for Production, dated 4/1/24
12. United States District Court Middle District of Florida Ocala Division Case No. 5:23-cv-00661 Defendant, Billy Woods Responses to Plaintiff's Third Request for Production, dated
13. Fed. R. Civ. P. 30(B)(6) Rider Marion County, undated
14. Marion County Jail Staff Analysis by CRS Incorporated, dated 4/24/19
15. Marion County Jail Personnel Distribution, 2016 - 2021
16. Marion County Sheriff's Office Operations Directive 6050.00 Post Orders, dated 2/23/17
17. Marion County Sheriff's Office Operations Directive 6136.00 Detention Training, dated 2/23/17
18. Marion County Sheriff's Office Operations Directive 6633.00 Inmate Grievance and Request Procedures, dated 12/13/21

**EXHIBIT**

Ex. 3 - P. Adee - 4/4/25

19. Marion County Sheriff's Office Operations Directive 6006.00 Staff Communications – Jail, dated 2/23/17
20. Marion County Sheriff's Office Operations Directive 4700.00 Unusual Occurrences, dated 2/10/17
21. Marion County Sheriff's Office Operations Directive 6013.00 Incident Reports, dated 2/23/17
22. Marion County Sheriff's Office Operations Directive 6540.00 Jail Medical Facility, dated 2/13/17
23. Marion County Sheriff's Office Operations Directive 6315.00 Critical Incident Debriefing – Jail, dated 2/23/17
24. Marion County Sheriff's Office Policy 3041.00 Duty Assignment – Hours of Work, dated 2/23/17
25. Marion County Sheriff's Office Policy 3350.00 Discipline Policy, dated 7/21/21
26. Marion County Sheriff's Office Policy 6091.00 Employee Regulations – Jail, dated 10/30/18
27. Marion County Sheriff's Office Policy 6630.00 Special Management Inmates, dated 2/14/17
28. Marion County Sheriff's Office Policy 6631.00 Juvenile Detention, dated 10/30/18
29. Marion County Sheriff's Office Policy 6633.00 Inmate Grievance and Request Procedures, dated 12/13/21
30. Marion County Sheriff's Office Policy 3036.00 Personnel Injury and Disability, dated 1/2/19
31. Marion County Sheriff's Office Policy 6314.00 Mass Arrest, Jail Procedures, dated 2/23/17
32. Marion County Sheriff's Office Policy 6011.00 Supervision of Inmates – Jail, dated 4/13/23
33. Marion County Sheriff's Office Policy 6766.00 Classification of Inmates, dated 3/14/24
34. Marion County Sheriff's Office Policy 6012.00 Facility Reports, dated 3/27/18
35. Marion County Sheriff's Office Policy 6164.00 Headcount of Inmates, dated 3/7/24
36. Marion County Sheriff's Office Policy 6723.00 Orientation of Inmates, dated 12/14/22
37. Marion County Sheriff's Office Policy 6322.00 Jail Housekeeping Plan, dated 2/23/17
38. Marion County Sheriff's Office Policy 3030.00 Personnel Management, dated 10/25/21
39. Marion County Sheriff's Office Policy 6729.00 Inmate Gain Time, dated 2/17/17
40. Marion County Sheriff's Office Policy 6570.00 Notification in the Event of Injury, Serious Illness or Death, dated 2/14/20
41. Marion County Sheriff's Office Policy 6330.00 Security and Control, General, dated 2/6/24
42. Marion County Sheriff's Office Policy6721.00 Intake and Booking Procedures, dated 2/6/24
43. Marion County Sheriff's Office Post Order Post: Alpha Control, dated 6/26/19
44. Marion County Sheriff's Office Post Order Post: Alpha Pod, dated 9/11/18
45. Marion County Sheriff's Office Post Order Post: Alpha/Echo, dated 8/31/23
46. Marion County Sheriff's Office Post Order Post: Bravo Control, dated 12/19/14
47. Marion County Sheriff's Office Post Order Post: Bravo Alpha (Step-Down Unit), dated 7/2/19
48. Marion County Sheriff's Office Post Order Post: Charlie Control, dated 3/31/06
49. Marion County Sheriff's Office Post Order Post: Charlie Pod, dated 1/8/19
50. Marion County Sheriff's Office Post Order Post: Delta Control, dated 6/29/19
51. Marion County Sheriff's Office Post Order Post: Delta Pod, dated 6/19/19
52. Marion County Sheriff's Office Post Order Post: Echo Pod, dated 5/12/12
53. Marion County Sheriff's Office Post Order Post: Echo/Foxtrot Control, dated 1/3/05
54. Marion County Sheriff's Office Post Order Post: Foxtrot Pod, dated 6/21/19
55. Marion County Sheriff's Office Post Order Post: Gulf Pod, dated 1/8/19

56.    Marion County Sheriff's Office Post Order Post: Hotel Pod, dated 1/8/19

57.    Marion County Sheriff's Office Post Order Post: Intake Control, dated 8/24/10

58.    Marion County Sheriff's Office Post Order Post: Master Control, dated 6/25/19

59.    Marion County Sheriff's Office Booking & Release Internal Manual, dated 2/28/24

60.    Official Minutes of Marion County Board of County Commissioners (Pl Merchant 0001-1473)

61.    Report on Suicide Prevention Practices Within the Marion County Jail by Lindsay M. Hayes, dated 11/10/18 (Pl Merchant 1474-1517)

62.    PREA Facility Audit Report: Final, dated 1/2/22 (Pl Merchant 1518-1633)

63.    Marion County Sheriff's Office Detention Bureau Annual Report 2022 (Pl Merchant 2544-2563)

64.    Marion County Crime Statistics (Pl Merchant 1634-1635)

65.    Marion County Sheriff's Office Analysis of Security and Operational Functions Report by Nancy A. DeFerrari, CJM and Lieutenant Chris Vorisek, dated 10/15/18 (Pl Merchant 1636-1672)

66.    Marion County Sheriff's Office Inmate Rules and Regulations Handbook, dated 12/2017 (Pl Merchant 1673-1701)

67.    Marion County Sheriff's Office Inmate Rules and Regulations Handbook, dated 6/2024

68.    Florida Model Jail Standards, dated 11/14/22 (Pl Merchant 1702-1793)

69.    Official Minutes of Marion County Board of County Commissioners (Pl Merchant 1794-1797)

70.    Letter from Cathy Wyckoff to Marion County Commissioners, dated 3/22/19 (Pl Merchant 1798-1801)

71.    Emailed Public Record Requests (Pl Merchant 1802-1813)

72.    Handwritten Note, dated 11/16/18 (Pl Merchant 1814)

73.    Official Minutes of Marion County Board of County Commissioners (Pl Merchant 1815-1818)

74.    Letter from Timothy McCourt to Cathy Wyckoff, dated 3/6/19 (Pl Merchant 1819)

75.    Report on Suicide Prevention Practices Within the Marion County Jail by Lindsay M. Hayes, dated 11/10/18 (Pl Merchant 1820-1863)

76.    Email from Cathy Wyckoff to Tim McCourt, Williams Woods and others re: Inmate Violence in the Marion County Jail Investigation, dated 9/25/23 (Pl Merchant 1864-1866)

77.    Marion County Sheriff's Office Job Descriptions, dated 2/22/23 (Pl Merchant 1867-1874)

78.    Cathy Wyckoff Communications with Marion County Sheriff's Office (Pl Merchant 1875-1897)

79.    EMS Call Logs dated 1/1/17-9/25/23 (Pl Merchant 1898-1916)

80.    FDLE Internal Investigation Report re: Jerome Dukes, dated 10/13/16 (Pl Merchant 1917-1922)

81.    Marion County Sheriff's Office Citizen Comment/Complaint Report re: Corporal Jerome Dukes, dated 9/25/16 (Pl Merchant 1928-1933)

82.    FOIA Request and Response (Pl Merchant 1934-1947)

83.    Marion County Sheriff's Office Incident Report #16000961 by Deputy Gregory Spicher, dated 2/25/16

84.    Marion County Sheriff's Office Incident Report #16002104 by Deputy Ronald Palmer, dated 5/21/16

85.    Marion County Sheriff's Office Incident Report #16002520 by Deputy Robert Regan, dated 6/20/16

86.    Marion County Sheriff's Office Incident Report #16004360 by Deputy Jordan Leon-Sanchez, dated 10/15/16

87.    Marion County Sheriff's Office Incident Report #17000773 by Deputy Alan Drake, dated 2/16/17 (Pl Merchant 1962-1977)

88. Marion County Sheriff's Office Incident Report #17004822(01) by Detective Rhonda Stroup, dated 2/16/17 (Pl Merchant 1978-1982)

89. Marion County Sheriff's Office Incident Report #17005302 by Deputy Justin Kosinski, dated 11/25/17 (Pl Merchant 1983-1985)

90. Marion County Sheriff's Office Incident Report #17032302(01) by Detective Rhonda Stroup, dated 11/25/17 (Pl Merchant 1986-1990)

91. Marion County Sheriff's Office Incident Report #18006531(01) by Detective Rhonda Stroup, dated 3/3/18 (Pl Merchant 1991-1994)

92. Marion County Sheriff's Office Incident Report #18015700(01) by Detective Rhonda Stroup, dated 6/12/18 (Pl Merchant 1995-1999)

93. Marion County Sheriff's Office Incident Report #18018460(03) by Detective Nathan McLain, dated 7/24/18 (Pl Merchant 2000-2006)

94. Marion County Sheriff's Office Incident Report #18022684(01) by Detective Nathan McLain, dated 8/24/18 (Pl Merchant 2007-2010)

95. Marion County Sheriff's Office Incident Report #19013548(04) by Detective Nathan McLain, dated 5/15/19 (1952-1960)

96. Marion County Sheriff's Office Incident Report #190002112 by Deputy Howard Cromwell, dated 5/17/19

97. Marion County Sheriff's Office Incident Report #190002339 by Deputy Andrew Yacuzzo, dated 6/1/19

98. Marion County Sheriff's Office Incident Report #190002533 by Deputy Jason Lester, dated 6/15/19

99. Marion County Sheriff's Office Incident Report #19018702(01) by Detective Nathan McLain, dated 7/10/19 (Pl Merchant 2011-2014)

100. Marion County Sheriff's Office Incident Report #190004880 by Deputy Andrew Yacuzzo, dated 11/12/19

101. Marion County Sheriff's Office Incident Report #200001425 by Deputy Tyler Adams, dated 3/21/20 (Pl Merchant 2015-2017)

102. Marion County Sheriff's Office Incident Report #200001461 by Deputy Courtney Washington, dated 3/24/20

103. Marion County Sheriff's Office Incident Report #200003047 by Deputy John Frye, dated 6/29/20

104. Marion County Sheriff's Office Incident Report #200003926 by Deputy Sandra Denardis, dated 8/29/20

105. Marion County Sheriff's Office Incident Report #210002232 by Deputy Jarrod Henson, dated 5/7/21

106. Marion County Sheriff's Office Incident Report #210002252 by Deputy Kristofer Valdez, dated 5/8/21

107. Marion County Sheriff's Office Incident Report #210002303 by Deputy Didier Canelle, dated 5/11/21

108. Marion County Sheriff's Office Incident Report #210003128 by Deputy Andrew Yacuzzo, dated 6/27/21

109. Marion County Sheriff's Office Incident Report #210003457 by Deputy Shawn Prince, dated 7/16/21

110. Marion County Sheriff's Office Incident Report #210004010 by Deputy Justin Enchautequi, date 8/19/21

111. Marion County Sheriff's Office Incident Report #210005261 by Deputy Samaryon Wyman, dated 11/1/21

112. Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21

113. Marion County Sheriff's Office Incident Report #18000682 by Deputy Christopher Turner, dated 2/12/18 (Pl Merchant 2018-2022)

114. Marion County Sheriff's Office Incident Report #18001025 by Deputy Christopher Turner, dated 3/3/18 (Pl Merchant 2023-2024)

115. Marion County Sheriff's Office Incident Report #180002178 by Deputy Devon McCarthy, dated 5/9/18 (Pl Merchant 2025-2027)

116. Marion County Sheriff's Office Incident Report #180002853 by Deputy Andrew Yacuzzo, dated 6/12/18 (Pl Merchant 2028)

117. Marion County Sheriff's Office Incident Report #180004140 by Deputy Zachary Welch, dated 8/22/18 (Pl Merchant 2029-2030)

118. Marion County Sheriff's Office Incident Report #180005050 by Deputy Zachary Welch, dated 10/8/18 (Pl Merchant 2031)

119. Marion County Sheriff's Office Incident Report #180006476 by Deputy Kristofer Valdez, dated 12/26/18 (Pl Merchant 2032-2033)

120. Marion County Sheriff's Office Incident Report #190001098 by Deputy Brandon Dowels, dated 3/12/19 (Pl Merchant 2034-2038)

121. Marion County Sheriff's Office Incident Report #190002664 by Deputy Shaquille Thomas, dated 6/23/19 (Pl Merchant 2039-2041)

122. Marion County Sheriff's Office Incident Report #190003159 by Deputy Cory Schweitzer, dated 7/25/19 (Pl Merchant 2042-2043)

123. Marion County Sheriff's Office Incident Report #190003469 by Deputy Cody Liss, dated 8/15/19 (Pl Merchant 2044-2045)

124. Marion County Sheriff's Office Incident Report #190003958 by Richard Zimmerman, dated 9/16/19 (Pl Merchant 2046-2048)

125. Marion County Sheriff's Office Incident Report #190004802 by Deputy Robert Regan, dated 11/8/19 (Pl Merchant 2049)

126. Marion County Sheriff's Office Incident Report #190004893 by Deputy Jacqueline Johnson-Cabrera, dated 11/9/19 (Pl Merchant 2050)

127. Marion County Sheriff's Office Incident Report #190004955 by Deputy Robert Regan, dated 11/17/19 (Pl Merchant 2051)

128. Marion County Sheriff's Office Incident Report #190004991 by Deputy Xavier McMiller, dated 11/19/19 (Pl Merchant 2052-2054)

129. Marion County Sheriff's Office Incident Report #190004999 by Deputy Gregory Spicher Jr., dated 11/19/19 (Pl Merchant 2055)

130. Marion County Sheriff's Office Incident Report #190005006 by Deputy Errol James, dated 11/19/19 (Pl Merchant 2056-2057)

131. Marion County Sheriff's Office Incident Report #190005038 by Deputy Samaryon Wyman, dated 11/20/19 (Pl Merchant 2058)

132. Marion County Sheriff's Office Incident Report #190005068 by Deputy Cory Schweitzer, dated 11/22/19 (Pl Merchant 2059)

133. Marion County Sheriff's Office Incident Report #190005203 by Deputy Samaryon Wyman, dated 11/30/19 (Pl Merchant 2060)

134. Marion County Sheriff's Office Incident Report #190005235 by Deputy Xavier McMiller, dated 12/2/19 (Pl Merchant 2061-2062)

135. Marion County Sheriff's Office Incident Report #190005589 by Deputy William Arias, dated 12/19/19 (Pl Merchant 2063)

136. Marion County Sheriff's Office Incident Report #190005710 by Deputy Samaryon Wyman, dated 12/28/19 (Pl Merchant 2064)

137. Marion County Sheriff's Office Incident Report #190005742 by Deputy Robert Regan, dated 12/29/19 (Pl Merchant 2065-2066)

138. Marion County Sheriff's Office Incident Report #200000116 by Deputy Samaryon Wyman, dated 1/7/20 (Pl Merchant 2067)

139. Marion County Sheriff's Office Incident Report #200000204 by Deputy Tammy Counts, dated 1/12/20 (Pl Merchant 2068-2069)

140. Marion County Sheriff's Office Incident Report #200000206 by Deputy Justin Kosinski, dated 1/13/20 (Pl Merchant 2070)

141. Marion County Sheriff's Office Incident Report #200000217 by Deputy Justin Kosinski, dated 1/13/20 (Pl Merchant 2071)

142. Marion County Sheriff's Office Incident Report #200000312 by Deputy Xavier McMiller, dated 1/18/20 (Pl Merchant 2072-2074)

143. Marion County Sheriff's Office Incident Report #200000381 by Deputy Darryl Keaton, dated 1/21/20 (Pl Merchant 2075-2077)

144. Marion County Sheriff's Office Incident Report #200000482 by Deputy Samaryon Wyman, dated 1/26/20 (Pl Merchant 2078)

145. Marion County Sheriff's Office Incident Report #200000531 by Deputy Isai Palau, dated 1/29/20 (Pl Merchant 2079)

146. Marion County Sheriff's Office Incident Report #200001092 by Deputy Justin Kosinski, dated 3/1/20 (Pl Merchant 2080-2081)

147. Marion County Sheriff's Office Incident Report #200001102 by Deputy Xavier McMiller, dated 3/2/20 (Pl Merchant 2082-2083)

148. Marion County Sheriff's Office Incident Report #200001122 by Deputy Tyler Adams, dated 3/3/20 (Pl Merchant 2084-2085)

149. Marion County Sheriff's Office Incident Report #200001383 by Deputy Cory Schweitzer, dated 3/19/20 (Pl Merchant 2086-2087)

150. Marion County Sheriff's Office Incident Report #200001514 by Deputy Justin Kosinski, dated 3/27/20 (Pl Merchant 2088-2089)

151. Marion County Sheriff's Office Incident Report #200001520 by Deputy Jarred Bryant, dated 3/28/20 (Pl Merchant 2090-2092)

152. Marion County Sheriff's Office Incident Report #200001761 by Deputy Xavier McMiller, dated 4/10/20 (Pl Merchant 2093-2094)

153. Marion County Sheriff's Office Incident Report #200001983 by Deputy Zachary Linder, dated 4/24/20 (Pl Merchant 2095-2096)

154. Marion County Sheriff's Office Incident Report #200002227 by Deputy Dylan Roberts, dated 5/9/20 (Pl Merchant 2097-2099)

155. Marion County Sheriff's Office Incident Report #200002383 by Deputy Cory Schweitzer, dated 5/19/20 (Pl Merchant 2100-2102)

156. Marion County Sheriff's Office Incident Report #200002773 by Deputy Justin Kosinski, dated 6/11/20 (Pl Merchant 2103-2105)

157. Marion County Sheriff's Office Incident Report #200002806 by Deputy John Frye, dated 6/12/20 (Pl Merchant 2106-2108)

158. Marion County Sheriff's Office Incident Report #200002867 by Deputy Samaryon, dated 6/17/20 (Pl Merchant 2109-2110)

159. Marion County Sheriff's Office Incident Report #200002944 by Deputy Edwin Rushing, dated 6/21/20 (Pl Merchant 2111)

160. Marion County Sheriff's Office Incident Report #200003138 by Deputy Jared Davis, dated 7/6/20 (Pl Merchant 2112-2115)

161. Marion County Sheriff's Office Incident Report #200003191 by Deputy John Frye, dated 7/10/20 (Pl Merchant 2116-2117)

162. Marion County Sheriff's Office Incident Report #200003208 by Deputy John Frye, dated 7/11/20 (Pl Merchant 2118)

163. Marion County Sheriff's Office Incident Report #200003212 by Deputy Samaryon Wyman, dated 7/12/20 (Pl Merchant 2119-2121)

164. Marion County Sheriff's Office Incident Report #200003301 by Deputy Errol James, dated 7/17/20 (Pl Merchant 2122)

165. Marion County Sheriff's Office Incident Report #200003411 by Deputy Jared Davis, dated 7/25/20 (Pl Merchant 2123-2124)

166. Marion County Sheriff's Office Incident Report #200003561 by Deputy Dylan Roberts, dated 8/3/20 (Pl Merchant 2125-2127)

167. Marion County Sheriff's Office Incident Report #200003572 by Deputy Samaryon Wyman, dated 8/3/20 (Pl Merchant 2128-2131)

168. Marion County Sheriff's Office Incident Report #200003610 by Deputy Errol James, dated 8/6/20 (Pl Merchant 2132)

169. Marion County Sheriff's Office Incident Report #200003726 by Deputy Laura Vogt, dated 8/15/20 (Pl Merchant 2133-2134)

170. Marion County Sheriff's Office Incident Report #200004079 by Deputy Tammy Counts, dated 9/10/20 (Pl Merchant 2135-2136)

171. Marion County Sheriff's Office Incident Report #200004097 by Deputy Justin Kosinski, dated 9/12/20 (Pl Merchant 2137-2139)

172. Marion County Sheriff's Office Incident Report #200004218 by Deputy Samaryon Wyman, dated 9/19/20 (Pl Merchant 2140-2141)

173. Marion County Sheriff's Office Incident Report #200004254 by Deputy Xavier McMiller, dated 9/21/20 (Pl Merchant 2142)

174. Marion County Sheriff's Office Incident Report #200004421 by Deputy Samaryon Wyman, dated 10/2/20 (Pl Merchant 2143-2144)

175. Marion County Sheriff's Office Incident Report #200005052 by Deputy Errol James, dated 11/12/20 (Pl Merchant 2145)

176. Marion County Sheriff's Office Incident Report #200005190 by Deputy Xavier McMiller, dated 11/21/20 (Pl Merchant 2146-2148)

177. Marion County Sheriff's Office Incident Report #200005240 by Deputy Cory Schweitzer, dated 11/25/20 (Pl Merchant 2149-2150)

178. Marion County Sheriff's Office Incident Report #200005255 by Deputy Justin Kosinski, dated 11/25/20 (Pl Merchant 2151-2153)

179. Marion County Sheriff's Office Incident Report #200005448 by Xavier McMiller, dated 12/9/20 (Pl Merchant 2154-2158)

180. Marion County Sheriff's Office Incident Report #200005468 by Deputy James Errol, dated 12/10/20 (Pl Merchant 2159)

181. Marion County Sheriff's Office Incident Report #210000047 by Deputy Xavier McMiller, dated 1/3/21 (Pl Merchant 2160-2161)

182. Marion County Sheriff's Office Incident Report #210000051 by Deputy Xavier McMiller, dated 1/4/21 (Pl Merchant 2162)

183. Marion County Sheriff's Office Incident Report #210000181 by Deputy Errol James, dated 1/11/21 (Pl Merchant 2163)

184. Marion County Sheriff's Office Incident Report #210000322 by Deputy John Frye, dated 1/18/21 (Pl Merchant 2164-2166)

185. Marion County Sheriff's Office Incident Report #210000346 by Deputy Darryl Keaton, dated 1/19/21 (Pl Merchant 2167-2168)

186. Marion County Sheriff's Office Incident Report #210000568 by Deputy Xavier McMiller, dated 2/1/21 (Pl Merchant 2169-2172)

187. Marion County Sheriff's Office Incident Report #210000741 by Deputy Samaryon Wyman, dated 2/10/21 (Pl Merchant 2173)

188. Marion County Sheriff's Office Incident Report #210000789 by Deputy Errol James, dated 2/13/21 (Pl Merchant 2174)

189. Marion County Sheriff's Office Incident Report #210000860 by Deputy Tyler Adams, dated 2/16/21 (Pl Merchant 2175-2176)

190. Marion County Sheriff's Office Incident Report #210000992 by Deputy Joe Phillips, dated 2/25/21 (Pl Merchant 2177)

191. Marion County Sheriff's Office Incident Report #210001008 by Deputy Xavier McMiller, dated 2/27/21 (Pl Merchant 2178-2182)

192. Marion County Sheriff's Office Incident Report #210001075 by Deputy Tyler Adams, dated 3/2/21 (Pl Merchant 2183-2185)

193. Marion County Sheriff's Office Incident Report #210001120 by Deputy Xavier McMiller, dated 3/5/21 (Pl Merchant 2186-2188)

194. Marion County Sheriff's Office Incident Report #210001623 by Deputy Dellun Miller, dated 3/31/21 (Pl Merchant 2189-2197)

195. Marion County Sheriff's Office Incident Report #210001675 by Deputy Tyler Adams, dated 4/3/21 (Pl Merchant 2198-2199)

196. Marion County Sheriff's Office Incident Report #210001947 by Deputy Xavier McMiller, dated 4/20/21 (Pl Merchant 2200-2203)

197. Marion County Sheriff's Office Incident Report #210002246 by Deputy Dylan Roberts, dated 5/8/21 (Pl Merchant 2204-2205)

198. Marion County Sheriff's Office Incident Report #210002287 by Deputy John Frye, dated 5/11/21 (Pl Merchant 2206)

199. Marion County Sheriff's Office Incident Report #210002523 by Deputy Cory Schweitzer, dated 5/23/21 (Pl Merchant 2207-2208)

200. Marion County Sheriff's Office Incident Report #210002751 by Deputy Dylan Roberts, dated 6/5/21 (Pl Merchant 2209-2210)

201. Marion County Sheriff's Office Incident Report #210003100 by Deputy Darryl Keaton, dated 6/26/21 (Pl Merchant 2211-2217)

202. Marion County Sheriff's Office Incident Report #210003168 by Deputy Cherrelle Jennings, dated 6/30/21 (Pl Merchant 2218)

203. Marion County Sheriff's Office Incident Report #210003344 by Deputy Darryl Keaton, dated 7/10/21 (Pl Merchant 2219-2220)

204. Marion County Sheriff's Office Incident Report #210003730 by Deputy Dellun Miller, dated 8/1/21 (Pl Merchant 2221-2224)

205. Marion County Sheriff's Office Incident Report #210003835 by Deputy John Frye, dated 8/8/21 (Pl Merchant 2225-2226)

206. Marion County Sheriff's Office Incident Report #210003841 by Deputy John Frye, dated 8/8/21 (Pl Merchant 2227-2230)

207. Marion County Sheriff's Office Incident Report #210003939 by Deputy Errol James, dated 8/15/21 (Pl Merchant 2231)

208. Marion County Sheriff's Office Incident Report #210004366 by Deputy Joe Phillips, dated 9/8/21 (Pl Merchant 2232-2233)

209. Marion County Sheriff's Office Incident Report #210004389 by Deputy John Frye, dated 9/10/21 (Pl Merchant 2234-2235)

210. Marion County Sheriff's Office Incident Report #210004395 by Deputy John Frye, dated 9/10/21 (Pl Merchant 2236-2237)

211. Marion County Sheriff's Office Incident Report #210004401 by Deputy John Frye, dated 9/10/21 (Pl Merchant 2238)

212. Marion County Sheriff's Office Incident Report #210004426 by Deputy Shaquille Thomas, dated 9/12/21

213. Marion County Sheriff's Office Incident Report #210004678 by Deputy Cory Schweitzer, dated 9/25/21 (Pl Merchant 2239-2240)

214. Marion County Sheriff's Office Incident Report #210004804 by Deputy Dylan Roberts, dated 10/4/21 (Pl Merchant 2241-2242)

215. Marion County Sheriff's Office Incident Report #210004881 by Deputy Dylan Roberts, dated 10/8/21 (Pl Merchant 2243-2244)

216. Marion County Sheriff's Office Incident Report #210004896 by Deputy Justin Kosinski, dated 10/9/21 (Pl Merchant 2245-2246)

217. Marion County Sheriff's Office Incident Report #210005039 by Deputy Cory Schweitzer, dated 10/18/21 (Pl Merchant 2247-2248)

218. Marion County Sheriff's Office Incident Report #210005382 by Deputy Justin Kosinski, dated 11/7/21 (Pl Merchant 2251-2253)

219. Marion County Sheriff's Office Incident Report #210005399 by Deputy Joe Phillips, dated 11/8/21 (Pl Merchant 2254-2255)

220. Marion County Sheriff's Office Incident Report #210005516 by Deputy Robert Regan, dated 11/14/21 (Pl Merchant 2256-2258)

221. Marion County Sheriff's Office Incident Report #210005517 by Deputy Robert Regan, dated 11/14/21 (Pl Merchant 2259-2261)

222. Marion County Sheriff's Office Incident Report #19OFF020557(13) by Detective Nathan McLain, dated 8/1/19 (Pl Merchant 2262-2330)

223. Marion County Sheriff's Office Incident Report #19OFF030278(02) by Detective Nathan McLain, dated 11/26/19 (Pl Merchant 2231-2238)

224. Marion County Sheriff's Office Incident Report #20OFF006894(01) by Detective Nathan McLain, dated 3/31/20 (Pl Merchant 2339-2343)

225. Marion County Sheriff's Office Incident Report #20OFF006894(01) by Detective Nathan McLain, dated 3/31/20 (Pl Merchant 2344-2349)

226. Marion County Sheriff's Office Incident Report #20OFF003779(03) by Detective I. Palau, dated 2/19/21 (Pl Merchant 2350-2356)

227. Marion County Sheriff's Office Incident Report #21OFF014588(02) by Detective I. Palau, dated 6/30/21 (Pl Merchant 2357-2364)

228. Marion County Sheriff's Office Incident Report #21OFF020749(01) by Detective Nathan McClain, dated 10/1/21 (Pl Merchant 2365-2370)

229. Marion County Sheriff's Office Incident Report #21OFF023413(10) by Detective Nathan McClain (Pl Merchant 2371-2397)

230. Marion County Sheriff's Office Administrative Review Report #AR-21-231 re: Lieutenant Kristin Johnson #5163, dated 11/15/21 (Pl Merchant 2399-2416)

231. Marion County Sheriff's Office Administrative Review Report #DA-05-127 re: Officer William Konopinski #5673, dated 6/28/16 (Pl Merchant 2417-2421)

232. Marion County Sheriff's Office Administrative Review Report #9017 re: Officer Justin Kosinski #5573, dated 12/20/12 (Pl Merchant 2422-2428)

233. Marion County Sheriff's Office Observation Report #6560 re: Officer Justin Kosinski #5573, dated 2/8/11 (Pl Merchant 2429-2434)

234. Marion County Sheriff's Office Use of Force Report #UOF 19-148 re: Corey Merchant, dated 5/18/19 (Pl Merchant 2435-2449)

235. Marion County Sheriff's Office Observation Report #OR17-063 re: Deputy Kristofer Valdez #6168, dated 11/16/17 (Pl Merchant 2532-2537)

236. Marion County Sheriff's Office Observation Report #OR18-010 re: Deputy Craig Savage #6172, dated 2/16/18 (Pl Merchant 2538-2542)

237. Marion County Sheriff's Office In-Custody Report, dated 10/1/21 – 11/30/21

238. Various Newspaper Articles (Pl Merchant 2452-2505)

239. Newspaper Article (Pl Merchant 2526-2531)

240. Medical Examiner Districts 5 & 24 Report #2021-2744 re: Cory Merchant, dated 1/11/22 (Pl Merchant 2507-2522)

241. State of Florida Bureau of Vital Statistics Certification of Death re: Cory Merchant, dated 11/23/21 (Pl Merchant 4784)

242. December 2022 Positions (Pl Merchant 2523)

243. January 2022 Positions (Pl Merchant 2524)

244. June 2021 Positions (Pl Merchant 2525)

245. Declaration of Terry Place, dated 10/26/23 (Pl Merchant 3564-3566)

246. Declaration of Steven Murphy, dated 10/25/23 (Pl Merchant 3567-3568)

247. Ocala Health System Medical Records re: Cory Merchant #G000789582 (Pl Merchant 3569-4693)

248. FDLE Criminal History Information on the Internet re: Cory Merchant, dated 4/17/24 (Pl Merchant 4694-4727)

249. Sprint Telephone Records/Billing re: Cory Merchant (Pl Merchant 4728-4783)

250. Marion County Jail Video Visitation Report re: Cory Merchant, dated 7/7/20 – 6/23/21

251. Circuit Court of Marion County Order Appointing Personal Representative 23CP000581AX (Pl Merchant 4785-4786)

252. Marion County Sheriff's Office 67 Case Photos re: MCSO21OFF023413

253. Booking Property Photos (3)

254. Marion County Sheriff's Office Incident Report #99022042 by Deputy Alfred Greenway, dated 7/8/1999

255. Marion County Sheriff's Office Incident Report #01009187 by Deputy Beckie Sirolli, dated 3/15/01

256. Marion County Sheriff's Office Incident Report #01011340 by Deputy Timothy Ohara, dated 4/1/01

257. Marion County Sheriff's Office Incident Report #04034398 by Deputy Niels Tonnesen, dated 6/20/04

258. Marion County Sheriff's Office Incident Report #

259. Marion County Sheriff's Office Incident Report #05029238 by Deputy Christophe Erickson, dated 5/28/05

260. Marion County Sheriff's Office Incident Report #05030150, unknown author, dated 6/2/05

261. Marion County Sheriff's Office Incident Report #05046038 by Deputy Robert Youmans, dated 8/26/05

262. Marion County Sheriff's Office Incident Report #07049249 by Deputy Elliott Chauncey, dated 9/25/07

263. Marion County Sheriff's Office Incident Report #08063462 by Deputy Richard Peters, dated 12/9/08

264. Marion County Sheriff's Office Incident Report #14016693 by Deputy Regina Graham, dated 6/19/14

265. Marion County Sheriff's Office Incident Report #15028953 by Deputy Roy Johnson, dated 9/2/15

266. Marion County Sheriff's Office Incident Report #16001728 by Deputy Kasey Newton, dated 1/13/16

267. Marion County Sheriff's Office Incident Report #16003345 by Deputy David Christmas, dated 1/25/16

268. Marion County Sheriff's Office Incident Report #16013038 by Deputy Dawn Heath, dated 5/10/16

269. Marion County Sheriff's Office Incident Report #16016110 by Deputy Robert Rath, dated 5/6/16

270. Marion County Sheriff's Office Incident Report #16016111 by Deputy Robert Rath, dated 5/6/16

271. Marion County Sheriff's Office Incident Report #18011135 by Deputy Kevin Johnson, dated 4/26/18

272. Marion County Sheriff's Office Incident Report #18027202 by Detective Stephen Juliano, dated 10/8/18

273. Marion County Sheriff's Office Incident Report #19016128, dated 6/11/19

274. Marion County Sheriff's Office Incident Report #19OFF020168 by Detective Daniel Pinder, dated 7/26/19

275. Marion County Sheriff's Office Incident Report #21OFF023413 by Detective Nathan McLain, dated 11/17/21

276. Marion County Sheriff's Office Detention Personnel Post Assignments, dated 11/6/21

277. Incident Detail Report #2111070079, dated 11/7/21

278. Marion County Sheriff's Office Disciplinary Report History re: Cory Merchant, various booking numbers

279. Marion County Sheriff's Office Housing Movements Report re: Cory Merchant ID #A0092328 Booking #1900010514

280. Marion County Sheriff's Office Inmate File re: Cory Merchant ID #A0092328 Booking #1900010514

281. Marion County Sheriff's Office Inmate Mail History re: Cory Merchant ID #A0092328 Booking #1900010514

282. Marion County Sheriff's Office Inmate Medical Records re: Cory Merchant ID #A0092328

283. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 11/24/19

284. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 4/11/20

285. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 9/23/20

286. Marion County Sheriff's Office Inmate Request Form re: Cory Merchant ID #A0092328, dated 12/15/20

287. Marion County Sheriff's Office Inspection of Confinement Log re: Cory Merchant

288. Marion County Sheriff's Office Telephone Call Detail Report re: Cory Merchant, dated 11/8/19 – 12/22/21

289. Marion County Sheriff's Office Inmate File re: Eric Lutterloah ID#A0070076 Booking #2000004904

290. Marion County Sheriff's Office Probable Cause Affidavit Case #MCSO20OFF009528/2005110789 by Detective B. Burleson #5542, dated 5/12/20

291. Marion County Sheriff's Office Lutterloah Inmate File 1 of 2

292. Marion County Sheriff's Office Lutterloah Inmate File 2 of 2

293. Marion County Sheriff's Office Alerts History Report re: Eric Lutterloah

294. Marion County Sheriff's Office Housing Movements Report re: Eric Lutterloah ID #A0070076 Booking #2000004904

295. Marion County Sheriff's Office Inmate Classification Report re: Eric Lutterloah ID #A0070076 Booking #2000004904

296. Marion County Sheriff's Office Inmate Classification Record re: Eric Lutterloah, dated 6/4/20

297. Marion County Sheriff's Office Inmate Mail History re: Eric Lutterloah ID #A00700776 Booking #2000004904
298. Marion County Sheriff's Office Keep Aways Report re: Eric Lutterloah
299. Marion County Sheriff's Office Inmate Visitors Report re: Eric Lutterloah
300. Marion County Sheriff's Office PREA Sexual Violence Screening Form re: Eric Lutterloah, dated 6/4/20
301. Marion County Sheriff's Office Courthouse Division Bailiff Unit Internal Manual, dated 10/2023
302. Marion County Sheriff's Office Daily Logs Location: G, dated 10/7/21 – 11/7/21
303. Marion County Sheriff's Office Daily Logs Location: G, dated 11/6/21 – 11/8/21
304. Training Records re: Jerome Dukes
305. Training Records re: Justin Kosinski
306. Training Records re: Dellun Miller
307. Personnel File re: Dellun Miller
308. Marion County Sheriff's Office Letter of Counseling re: Deputy Dellun Miller #4614, dated 4/14/21
309. Marion County Sheriff's Office Memorandum re: Sergeant Dellun Miller #4614, dated 12/29/20
310. Marion County Sheriff's Office Letter of Reprimand re: Deputy Dellun Miller #4614, dated 7/7/14
311. Deposition Transcript of Jerome Dukes, dated 9/12/24

**Audio Recordings**

1. Interview: Inmate Posey (Pl Merchant 1923)
2. Interview: Nurse Ramos (Pl Merchant 1924)
3. Interview: Officer Dukes (Pl Merchant 1925)
4. Interview: Officer Moore (Pl Merchant 1926)
5. Interview: Merchant (Pl Merchant 1948)
6. Interview: Merchant (Pl Merchant 1949)
7. Interview: Lightle Baker (Pl Merchant 1950)
8. Interview: KJ Case, Lightle (Pl Merchant 2398)
9. 911 Call: Swift Pace (Pl Merchant 2506)
10. McPhadden Call (Pl Merchant 2543)
11. Interview 210917 0907
12. Interview 210917 0909
13. Interview 210917 0903
14. Interview 210917 0857
15. Victim Interview 2021-09-29 12064
16. Interview (Extraction 1.1) Deputy Kosinski
17. Interview (Extraction 1.1) Tommie Merchant px
18. Interview 211107 0732
19. Interview 211107 0741

20. Interview 211107 0749
21. Interview 211107 0757
22. Interview Angel Acost-Cruz Audio 2021-11-07 06
23. Interview Deputy Kosinski Audio 2021-11-07 054
24. Interview Eric Lutterloah Audio 2021-11-07 0751
25. Interview Frank Calabria Audio 2021-11
26. Interview Ryan Glover Audio 2021-11-07
27. Interview Jason Santore Audio 2021-11-07 065311 5
28. Interview 211105 2021
29. Interview 211126 0000
30. Interview Nurses John Little and Natasha Sa
31. Interview Robert Furr Audio 2-21-11-07 070418 5212
32. Interview 211104 2205
33. Interview 211108 2253
34. 10.26.101.27-350e240a0a24651b3a001137b9
35. 10.36.148.13-000be3770a24940d76e93442a


**Video Surveillance**

1. Posey Complaint Video, dated 9/24/16 (Pl Merchant 1927)
2. Baker Kimberly's Center, dated 1/21/16 (Pl Merchant 1951)
3. Exhibit 16 Surveillance Video, dated 10/9/21
4. Exhibit 17 Surveillance Video, dated 9/10/21
5. Surveillance Video G-Pod, dated 9/10/21
6. Surveillance Video 1 Book-Cam-29-Rel-Ent-2020-09-12, dated 9/12/21
7. Surveillance Video 2 Book-Cam-29-Rel-Ent-2020-09-12, dated 9/12/21