## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

Krysti Merchant, as Personal
Representative for the Estate of
Cory Merchant,

      Plaintiff,

v.                          Case No. 5:23-cv-661-JSM-PRL

Billy Woods, et al.,

      Defendants.

_____

### Plaintiff's Motion to Exclude or Limit Opinion Testimony of Defendants' Expert Dr. Richard Hough

Plaintiff Krysti Merchant, as the Personal Representative of the Estate of Cory Merchant, by and through her attorneys, respectfully requests that the Court exclude or limit the opinion testimony of Defendant's Expert Dr. Richard Hough.

## I.    Introduction

Plaintiff has brought this action against Defendants Sheriff Billy Woods, Jerome Dukes, Justin Kosinski, and Dellun Miller for the death of her brother, who was killed while in custody of the Marion County Sheriff's Office (MCSO) at the Marion County Jail (MCJ). She alleges violations of the Fourteenth Amendment's Due Process Clause and the Florida Wrongful Death Act.

Central to Plaintiff's allegations is her *Monell* claim, in which she alleges that Sheriff Billy Woods, in his official capacity implemented official policies, sustained widespread practices, and imposed conditions of confinement which posed a substantial risk of harm to Plaintiff's decedent, Cory Merchant, at MCJ. At trial, Plaintiff will set out to prove these policies, practices, and conditions, including an official policy of classifying pre-trial detainees together regardless of their known risk of violence and a widespread practice of failing to monitor those pre-trial detainees.

In their defense of Plaintiff's claims at trial, Defendant has disclosed correctional practices expert Dr. Richard Hough. See Exhibit 1, Hough Report. Dr. Hough centers his opinions on the Florida Model Jail Standards (FJMS), which are standards that bind Florida sheriffs and counties by law. Ex. 1 at 10 n. 22; ECF 52-2, Adee Deposition at 137:17-139:11. Importantly, the sheriffs and counties who are bound by them are also the ones who develop them. ECF 52-2, Adee Deposition at 137:17-139:11. The FJMS are a facet of Florida law, *not* a constitutional minimum. Throughout his report, though, Dr. Hough repeatedly instructs what law to apply (the FJMS) and what result to reach (that there is no constitutional violation), while making other baseless assertions that are both unhelpful and unreliable. These opinions should be excluded.

2

## II.    <u>Legal Standard</u>

The Supreme Court has held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v.Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). Further, the Court clarified that the Daubert gatekeeping function applies to all forms of expert testimony, not just scientific. *Kumho Tire Company v. Carmichael* 526 U.S. 137, 141 (1999). The district court fulfills its role as gatekeeper by screening the proposed evidence and evaluating it in light of the specific circumstances of the case to ensure that it is reliable and sufficiently relevant to assist the jury in resolving the factual disputes. *Daubert*, 509 U.S. at 592–93. In determining the admissibility of expert testimony, "a trial court engages in a three-part inquiry: (1) whether the expert is qualified[1] to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue." *Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1269 (S.D. Fla. 2022) (citing *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005)). The burden of

---

[1] Plaintiff does not dispute Dr. Hough's qualifications.

laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence. *Carson v. Heli-Tech, Inc.*, No. 2:01-CV-643 FTMSPC, 2003 WL 25735745, at *1 (M.D. Fla. Sept. 25, 2003) (citing *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir.2002)).

### III.  <u>Discussion</u>

#### A. Dr. Hough improperly seeks to instruct the jury on applicable law and what result to reach.

Dr. Hough's testimony is not helpful to the jury because it repeatedly instructs the jury on applicable law *and* tells the jury how they should find based on that law. An expert may not tell the jury what result to reach or what the legal implications of conduct are, as the court must be the jury's only source of law. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, at *1541 (11th Cir. 1990). "[C]ourts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018). Statements that "offer expert opinion in the form of legal conclusions" pose a risk of "confusing, prejudicing, or misdirecting the jury." *Id.*

4

   1. <u>*Dr. Hough[2] improperly instructs that Florida law is the
   controlling standard then uses that inadmissible legal
   conclusion as the primary basis of his opinions.*</u>

Dr. Hough's report and testimony are rife with various semantic

iterations of a singular, prejudicial legal conclusion: Defendants cannot be

liable because they complied with Florida law and administrative code. Dr.

Hough explicitly instructs the jury on the standard by which the jury should

judge MCSO's conduct:

> Many of the issues talked about in [the guidelines and
> standards referenced by Plaintiff's expert] are
> important, and provide new administrators who are
> unfamiliar with corrections, insights and ideas. **For
> the instant matter, the law and administrative
> code as enacted by the Florida Legislature is the**

---

[2] Dr. Hough has a history of providing testimony that amounts to legal
conclusions that are ultimately excluded. In *Kates v. Nocco*, Dr. Hough was
precluded from testifying that police acted "in accordance with Constitutional
guidance, state law, [and] case law," that a Sheriff's Office did not "breach
constitutional criteria," and "use of various sources of data and information
were conducted within law." No. 8:22-CV-342-VMC-TGW, 2023 WL 3452678,
at *6 (M.D. Fla. May 15, 2023). In *Shew v. Horvath*, the Court found "any
legal conclusions propounded by Dr. Hough, including that the arrest of
[theplaintiff] was lawful because [the defendant officer] had probable cause,
would not assist the trier of fact "because it is the role of the judge, and not
an expert witness, to instruct the jury on the applicable principles of law."
No. 8:16-CV-766-T-33JSS, 2017 WL 632515, at *7 (M.D. Fla. Feb. 16, 2017).
In *Jarvis v. City of Daytona Beach*, the Court excluded seven of Dr. Hough's
opinions because they were unhelpful. No. 6:23-CV-508-JSS-RMN, 2024 WL
3717233, at *2-3 (M.D. Fla. Aug. 8, 2024). This included "opinions concerning
whether [the defendants'] 'tactics ... were reasonable' and in accord with
'constitutional guidance,' and whether a 'pattern or practice of intentional
behavior or official misconduct' or 'a violation of established law' exists. *Id.*

5

> **actual standard that agencies in Florida must meet.**

Ex. 1, Hough Report at 10 (emphasis added). This sentence then identifies

the referenced standards via footnote:

> "**The Florida Model Jail Standards (FMJS) are minimum standards which jails across Florida must meet to ensure the constitutional rights of those incarcerated are upheld**. Prior to 1996, the Florida Department of Corrections was responsible for the standards and inspection process for local county jails. Legislation was passed in 1996 that gave the authority of inspections to the local level. This change required the Florida Sheriffs Association and Florida Association of Counties to appoint individuals to serve on a Commission that would govern standards that local jails must comply with."

Id. at n. 22. Dr. Hough clarified in his deposition that, in referring to "the

instant matter" in the quote discussed *supra,* he was referring to this civil

case, and that the FMJS govern this case:

> Q: And so what's the basis for your opinion that the law and administrative code as enacted by the Florida Legislature is the standard by which to assess this case.
>
> A: The Florida Model Jail Standards are the standards that jails within the State of Florida have to abide by I'm not sure how else to to put that. And Marion does.

Exhibit 2, Hough Deposition at 30:9-31:23. This opinion, in and of itself, is

extraordinarily misleading, unhelpful, confusing, and prejudicial. Allowing

Dr. Hough to testify that Florida law and administrative code as enacted by

the Florida Legislature is *the applicable standard* would imply that any

6

legislative or administrative authority to which the State of Florida delegates authority can establish the constitutional floor simply by enacting law or regulation. Neither Dr. Hough nor the Florida Legislature gets to define the parameters of constitutional rights. As discussed, *infra*, the degree to which this testimony would prejudice the Plaintiff and confuse the jury cannot be overstated.

**First**, Dr. Hough has plainly advised what "law and administrative code" is the standard by which Marion County should be judged. Ex. 1 at 10; Ex. 2 at 30-31. This invades the court's exclusive purview of advising the jury of applicable law. *Commodores Ent. Corp.*, 879 F.3d at 1129. Dr. Hough's statement that the FMJS or any other "law and administrative code as enacted by the Florida Legislature" provides the standard by which to judge Defendants is simply not true and could irrevocably prejudice the Plaintiff by confusing the jury about her burden of proof, which will be laid out in the jury instructions according to *constitutional* law.

**Second,** Dr. Hough goes so far to opine that Defendants *did* comply with the FJMS. See Ex. 1 at 8, 15, 17. As an example, **Opinion 23** states, "MCSO procedures, as instituted by Sheriff Woods, are consistent with the State Model Jail Stan[d]ards, which are the only mandatory standards for jails within the State of Florida." This is a bare legal conclusion that not only instructs the jury on applicable law, but also absolves Defendants of liability

7

by assuring that they complied with Florida law. These opinions are inadmissible. *See Kearney v. Auto-Owners Ins. Co.*, No. 8:06–cv–595–T–24TGW, 2009 WL 3712343, at *3–4 (M.D. Fla. Nov. 5, 2009) (finding the opinion that a party did not violate a Florida statute was one of an expert's multiple "inadmissible legal conclusions that are not the proper subject of expert testimony"), *aff'd*, 422 F. App'x 812 (11th Cir. 2011).

**Third,** Dr. Hough does not merely provide an isolated opinion about the use of the Florida Model Jail Standards in evaluating Defendant's conduct. Rather, these legal conclusions are peppered throughout his report, underlying each of his opinions that absolve Defendants of wrongdoing. For example, his primary critique of Plaintiff's expert, Paul Adee, is that he relies on standards that are not mandated by state law. In **Opinion 19,** he says,

> Plaintiff's practices expert Mr. Adee recites several non-guiding documents that discuss sundry jail issues. It is unclear why he does this, as they have no relevance to required Florida jail procedures. There are no statutory "standards." **It is misleading and meaningless to refer vaguely to "standards," when the Marion County Jail is required only to adhere to standards established by the Florida legislature through promulgation of rules and law.**

Ex. 1 at 24 (emphasis added). In essence, Dr. Hough faults Dr. Adee for looking to multiple sources articulating standards as opposed to relying on the plenary authority of Florida law. Whereas Plaintiff's expert, Mr. Adee,

8

pulls from multiple sources and his own experience to help the jury understand prevailing practices that intend to keep people safe in jail, Dr. Hough tells the jury to use Florida law as their guiding star in evaluating the MCSO's conduct. From there, he will encourage the jury to disregard Mr. Adee's testimony because Dr. Adee does *not* hinge his opinions on Florida law. His legal conclusions are unhelpful and prejudicial on their own, but they become even more prejudicial to the Plaintiff when used as the primary basis to undermine her expert. Dr. Hough should not be permitted to use such legal conclusions to support his criticism of Mr. Adee.

> 2. <u>*Dr. Hough instructs the jury that Defendants did not violate the Constitution.*</u>

Dr. Hough's entire report portends highly prejudicial and inadmissible testimony that Sheriff Woods did not violate the Constitution and Plaintiff cannot prevail on her *Monell* claim. That is not Dr. Hough's role. His role is to testify "regarding prevailing standards in the field of law enforcement," "present factors that might inform an officer's decision regarding standards," and help the jury "in conducting its own analysis of a [constitutional] claim." *Day v. Edenfield*, No. 5:19CV505-MCR/MJF, 2022 WL 972430, at *4 (N.D. Fla. Mar. 31, 2022). Dr. Hough's opinions, though, go far beyond helping the jury understand the way things work inside of a municipal jail, instead improperly instructing the jury on the legal issues in this case.

9

To prove her theory that MCSO had a policy or widespread practice that violated Mr. Merchant's constitutional rights, Plaintiff will have to show a "practice or course of conduct that is so widespread that it has acquired the force of law." Eleventh Circuit Pattern Jury Instructions (Civil) § 5.10 (2024 ed.). Tracking the language of this burden of proof, Dr. Hough's report is rife with instructions to the jury that Plaintiff has not proven her claim. For example, in **Opinion 17,** Dr. Hough attacks Mr. Adee's reliance on the declarations of two witnesses, stating,

> Mr. Adee asserting a "Friday Night Fight Night" within the Jail, based on the "declaration" of two inmates, provides no further documentation. This includes no records that I have been furnished identifying the source of these two declarations. **Complaint to a 'widespread custom and practice' of 'failing to supervise inmates and prevent violent attacks,' is without substantive evidence in the record.** Merely listing various prior matters purported to establish a practice and custom is empirically unsupported. Rather, a separate and specific analysis of each of the events, and a timeseries comparison to like events would be minimally necessary to try to establish any deviation from a possible norm**.** Further, there is no analysis offered as to how such alleged practices were in any way connected to the instant matter.

Ex. 1 at 23 (emphasis added).

There are two problems with **Opinion 17**. First, Dr. Hough is implying that the testimony of the witnesses in this declaration should not be believed, which is not permissible testimony from an expert. *Day v. Edenfield*, No.

10

5:19CV505-MCR/MJF, 2022 WL 972430, at *8 (N.D. Fla. Mar. 31, 2022) ("expert testimony 'concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility'") (citing *United States v. Beasley,* 72 F.3d 1518, 1528 (11th Cir. 1996)). Second, Dr. Hough is telling the jury what result to reach. Whether or not there is a widespread custom and practice of failing to supervise inmates and prevent violent attacks is precisely what Plaintiff sets out to prove, and Defendant cannot instruct the jury on how to decide that question.

Dr. Hough's opinions have been excluded for a remarkably similar approach to his report. In *Shew v. Horvath,* Dr. Hough opined, regarding a false arrest claim, that the arrest of the plaintiff was lawful because the defendant officer had probable cause. No. 8:16-CV-766-T-33JSS, 2017 WL 632515, at *7 (M.D. Fla. Feb. 16, 2017). This Court excluded that testimony because it was a legal conclusion. Just as Dr. Hough was not permitted to tell the *Shew* jury that the defendant officer had probable cause—tantamount to telling them the plaintiff could not prove a false arrest claim—Dr. Hough should not be permitted, here, to tell the jury that there was no widespread custom or practice—tantamount to telling the jury Plaintiff cannot prove her *Monell* claim.

More specific to the *Monell* language is *LaRock v. Albany Cnty. Nursing Home* No. 1:19-CV-0604 (AMN/DJS), 2024 WL 4566362, at *5 (N.D.N.Y. Oct.

11

24, 2024). There, the defendant's expert offered the testimony that he had "seen no evidence to demonstrate there was a persistent and widespread pattern and practice of violating Mr. Sanford or any other residents' rights." *Id*. The Court excluded this opinion because it "track[ed] the exact language of the legal issues at issue in this case, and thus, they couch his opinions in terms that derive their definitions from judicial interpretations." *Id*. The legal issue there, as here, was the 'widespread custom and practice' theory of a *Monell* claim.

Dr. Hough, himself, has previously been precluded, in this Court, from parroting *Monell* language to support an improper opinion that a plaintiff could not prove their case. In *Jarvis v. City of Daytona Beach*, this Court ruled he could not testify to the legal conclusions of whether a "'pattern or practice of intentional behavior or official misconduct' or 'a violation of established law' exists." No. 6:23-CV-508-JSS-RMN, 2024 WL 3717233, at *2-3 (M.D. Fla. Aug. 8, 2024). Through these opinions, this Court found "Dr. Hough merely tells the jury what result to reach." *Id*. (cleaned up). Dr. Hough attempts to do the same regarding Cory Merchant.

Here, Dr. Hough go so far to opine, multiple times, that there is no evidence that Defendant acted unconstitutionally: "nothing in the record indicat[es] Sheriff Woods allowed or created unconstitutional policies or practices" (**Opinion 1**); "[w]here no precedent or standards at Marion County

12

Jail are violated, neither drops below established constitutional minimums,
nor is compelling to impose or substitute judgment of local jail
administrators" (**Opinion 18**); "[t]he standards of professional groups (or
practice experts), while instructive, do not substitute or supersede applicable
constitutional standards" (**Opinion 18**). Of course, whether or not any
Defendant's conduct was unconstitutional is the precise legal issue upon
which liability will hinge, and expert opinions answering such questions are
inadmissible. See *Adkins v. Roberts*, No. 5:18CV271-MCR/MJF, 2022 WL
1272403, at *6 (N.D. Fla. Mar. 31, 2022) ("legal conclusions on the existence
of constitutional violations […] are likewise excluded because they are
neither helpful nor proper expert opinion."). This Court should exclude each
and every statement by Dr. Hough which invades the province of the jury by
instructing them on the applicable law and/or advising them what conclusion
to reach on the legal issues in this case.

## B. Dr. Hough did not articulate a reliable basis for many of his opinions.

In addition to his legal conclusions, Dr. Hough also makes many bare
assertions that lack ascertainable methodology. "The trial court's gatekeeping
function requires more than simply 'taking the expert's word for it.'" Rule 702
Advisory Committee Notes (2000 Amendment). "An expert's unexplained
assurance that his opinion rests upon accepted scientific methodology is

13

insufficient to establish reliability." *Battle v. Gold Kist, Inc.*, No. 3:06-CV-782-K-32TEM, 2008 WL 4097717, at *8 (M.D. Fla. Sept. 2, 2008).

Dr. Hough routinely makes unexplained assurances for which he does not provide a basis or explanation. For example, in **Opinion 5**, he states,

> Persons who arrive at a short-term jail facility have motivations and lives that are complex and largely unknown to staff, even after assessments, admission, and ongoing contact. **Troubled individuals are not inclined to share details of their lives even when asked direct questions.** Life stressors are common in the general population and in correctional populations but are not equated with acting out or violence.

Ex. 1 at 18 (emphasis added). The bolded sentence is a generalized speculation about the motivation of people in custody, and the full opinion does not provide any context as to its basis. When Plaintiff's counsel asked Dr. Hough to explain the basis for this opinion, it resulted in the following exchange:

> Q: I want to know what's your basis for troubled --you say troubled individuals are not inclined to share details of their lives even when asked direct questions. How do you know that? What do you have some sort of research? · Some sort of study?
>
> [Form objection]
>
> A: I object to that form, too, just as a person objecting that you just narrated into the record rather than -- that was all testimony --
>
> Q: You are not a lawyer. You have -- you're –

14

A: You're right, I'm not. And you want to let me respond. I'll respond. I'm not a fact witness, counselor. So, I'll provide my response. **You're being ridiculous asking me about this sentence and coming up saying, what's my basis for making that that comment? Well, I don't know, my education, my training, my experience to say, and I think it might resonate with the jury, that troubled individuals are not inclined to share details of their lives even when asked direct questions within that paragraph about life stressors. And you don't know all there is to know about people who come in to a jail facility.** That's that's the paragraph. That's the point.

[...]

Q: Dr. Hough, are you saying that I'm being ridiculous because I'm asking you the basis that you have for this sentence in your report?

A: Well, I both apologized and pointed out that I'm getting frustrated. I think it is ridiculous to keep asking me about this particular sentence. So, if I can understand better what you hope to glean from this, as opposed to a strategy or a technique that you utilize with people who you depose. I'm going to -- I answered the best I can several times now.

Q: I don't think you have. You've not provided me the basis for the -- for your opinion in this particular sentence.

[Form objection]

A: Yeah, the sentence doesn't stand alone. It's within that opinion. I've explained the opinion. You've asked and I've answered several times.

Q: You have not provided me the basis for this opinion. [Objection] Let's go with let's go with the whole paragraph. Then what's the basis for this whole paragraph? Number five on page 18.

15

A: Again, I've answered that repeatedly that you don't know all about people who you have in your facility.

Q: That's the basis for this opinion?

[Form objection]

A: The whole report and evaluation and the work is the basis for the opinion. My, as I said, education, experience, training, how analysis such as this is conducted about a spontaneous assault with no ability to predict that it was going to occur, that's all the point here about not knowing that someone's going to be violent. Everyone has the capacity for violence.

Q: Again, do you have any research, publication, any authority to back up anything that you just said?

[Form objection]

A: No. My career and teaching college for, I don't know, 35 years, and teaching correctional officers for 40 years, and people in the topics of corrections, and human behavior within a criminal justice context and environment.

Ex. 2 at 45-48 (emphasis added). It is not "ridiculous" to request the bases for opinions that, on their face, appear speculative because credentials are not a sufficient basis even for nonscientific opinions. "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261. "[I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.

16

*VFS Leasing Co. v. G.F. Kelly, Inc.*, No. CIVA 3:06CV638-SRW, 2007 WL 2069842, at *4 (M.D. Ala. July 13, 2007). It is Dr. Hough's burden to show that his opinion is reliable, but even when given the opportunity to explain a simple opinion in his report, he responded with exasperation, ultimately providing nothing more than his credentials.

As another example of Dr. Hough's baseless opinions, in **Opinion No. 22**, he states:

> While the MCSO experienced staff shortages as noted in the 2019 staffing study, **at no point was inmate safety and security compromised and the jail always provided sufficient staffing to cover the shifts**. Prison and jail staffing shortages are common. There is not an automatic indication of safety or security compromise due to such shortages.

Ex. 1 at 25. This opinion is the *only time throughout the entire report* that Dr. Hough references staffing shortage with one exception:

> The Marion County Jail undertook an "Analysis of Security and Operation "Functions Affecting the Introduction and Distribution of Contraband into the Marion County Jail." The report was dated October 15, 2018. The First Amended Complaint erroneously states: "The 2018 Analysis of Security and Operational Functions fount the staffing levels at the MCJ to be 'woefully low.'"55 In fact, on page 30 of 32 pages, the Report attributes that finding to a staffing analysis done by the jail in 2014. The Report suggested contracting with an outside entity to conduct a new staffing analysis."

17

Ex. 1 at 19. Accordingly, the only reference that Dr. Hough makes to staffing

shortages outside of Opinion 22 not only includes a reference to a study

finding their staffing levels to be woefully low, but also fails to provide the

basis for the assertion that the staffing levels did not impact safety and

security at MCJ. He provides no analysis or reference to support his

contention that the staffing shortages had no impact on the safety and

security at MCJ. He just says it. That is not enough to satisfy *Daubert*'s

reliability prong.

In **Opinion 14, Opinion 15, and Opinion 16,** Dr. Hough opines that

Marion County complies with contemporary jail standards. But he never

explains what standards he is referring to. Notably, he attacks Adee for citing

standards that aren't "mandatory," and the only "standard" Dr. Hough

articulates as acceptable to rely upon is *Florida law*. Ex. 1 at 9-10. He does

not lay a foundation for which "contemporary jail standards" he is referring

to and, given his dismissal of Adee's 'non-mandatory' standards, Plaintiff is

left to assume that he is either referring to the FMJS or his own experience.

If the former, it is a thinly veiled legal conclusion about MCSO's compliance

with the FMJS. If the latter, he fails to explain what standards he is relying

on and *how* they allowed him to conclude something like, "the information in

the record that I have reviewed shows no deviation from customary training

and practices within corrections." Ex. 1 at 23. There is no sound methodology

18

to support **Opinion 14, Opinion 15, and Opinion 16**, and they renew the

concerns, discussed *supra*, about Dr. Hough testifying to legal conclusions.

Finally, in **Opinion 12,** Dr. Hough opines that "[t]here is nothing in

the record […] supporting or indicating […] Sheriff Billy Woods implemented

the following unofficial customs and practices" and then goes on to list

nineteen substantive allegations of unconstitutional policies in Plaintiff's

complaint, including "MCSO deputies are not required to supervise MCJ

inmates during their shift" and "MCSO deputies are not required to keep a

watchful eye on the dorms to which they are assigned and the inmates within

them." Ex. 1 at 20-22. Not only does **Opinion 12** carry the same problem

discussed, *supra*, regarding legal conclusions, in which Dr. Hough tracks

language of the legal issues, it reflects no reliable methodology. What

evidence, standards, or other bases did he rely on to conclude that there is no

merit to *nineteen* of Plaintiff's allegations? Dr. Hough has not made that

reasonably clear, and it is his burden to do so.

### IV.    <u>Conclusion</u>

Wherefore, Plaintiff respectfully requests this Honorable Court exclude

Dr. Hough's **Opinions 1, 5, 12, 14, 15, 16, 17, 18, 19, 22, and 23,** and any

other opinions which this Court finds unreliable, unhelpful, or otherwise

inadmissible.

Respectfully submitted,

/s/ Sam Harton
Sam Harton (*pro hac vice*)
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
sharton@rblaw.net

/s/ James M. Slater
James M. Slater (FBN 111779)
SLATER LEGAL PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
james@slater.legal
Tel. (305) 523-9023

Attorney for Plaintiffs

## Certificate of Conferral

I, Sam Harton, certify that the parties conferred in good faith via telephone

on their respective *Daubert* motions. This motion remains opposed.

/s/ Sam Harton
Sam Harton (*pro hac vice*)
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
sharton@rblaw.net