

February 5, 2025

Bruce R. Bogan, Esq.
Hilyard, Bogan & Palmer, P.A.
105 E. Robinson Street, Suite 201
Orlando, FL 32801-1622

RE:    E.O. Cory Merchant v. Sheriff Billy Woods, Marion County, Florida, et al. Case No.: 5:23-cv-00661-JSM-PRL

Dear Attorney Bogan:

Following is my report regarding the materials sent to me in the above styled case. My opinions in this case are based in part upon a careful review of the documents furnished to me by your office listed in **Appendix A**. I have attached my fees policy as **Appendix B** and my current CV as **Appendix C**. During the past four years I have testified at several depositions, hearings, and trials at the state and federal court level. These are noted in **Appendix D**.

The analysis is based upon those documents and the current practices and professional standards of jails. The review of said materials, my assessment, and my report are based upon my knowledge of jail operations and corrections combined with my education, training, experience, and my ongoing research and teaching of jail, detention and corrections issues, policies, and practices to practitioners, academy recruits, and university students over several decades.

**Qualifications**

I began my career as a law enforcement officer in 1979 in the State of Florida. I have been continuously training corrections and law enforcement officers in various topics since 1980. I have specifically taught corrections procedures in Florida Basic Recruit Training Programs (academy) for more than thirty years. I have specifically taught dynamics of and responses to inmate interactions for more than thirty years to correction academy recruits, in-service corrections and juvenile detention officers, and college students. I have specifically conducted inmate medical and mental health training as an agency and academy instructor. As corrections bureau administrator for two Florida Sheriff's Offices, and superintendent for two regional juvenile detention centers, I have been responsible for the medical staff performance to the extent of my training and education, and the medical department management and contractual arrangements where those applied. I am accredited by the National Commission on Correctional Health Care (NCCHC) as a Certified Correctional Health Professional (CCHP). I have taught correctional procedures courses at the college and university level since 1989.

I have constructed and collaborated on policies for the operation of jail and detention facilities by criminal justice personnel, and I have reviewed hundreds of such policies. I have been retained as an expert in cases involving the training of corrections staff, and specifically in jail medical screening, classification procedures, suicide by inmates, and emergency medical events, and the agency policies and procedures addressing such matters. I have specifically managed correctional facilities with medical departments and staff.

I have specifically conducted numerous death investigations as a homicide detective. In my role as a professor, I created and teach the course *Homicide*. I have similarly taught the courses *Medicolegal Investigation of Death*, and *Criminal Investigations*. I am a member of the International Homicide Investigators Association (IHIA), International Association for Correctional and Forensic Psychology (IACFP), among others.

Page 2 of 60

I have specifically conducted internal/professional standards investigations, I have supervised employees in the conduct of such investigations, and I have reviewed such investigations as a command-level officer. I am certified as an internal affairs investigator, and I am a member of the National Internal Affairs Investigators Association. In my various supervisory and command roles during my career I have specifically administered and approved counseling, training, and discipline up to and including termination for employees.

I have specifically written criminal justice agency policies and procedures, consulted with others on writing and revisions, and reviewed policies and procedures over the course of my career. During American Correctional Association (ACA) accreditation at one agency, I was the chief administrator and accreditation lead, as well as served on the general orders review committee for all agency policies and procedures. For another agency I instituted revisions of all corrections and law enforcement policies and procedures. At two sheriff's offices, I created and commanded the Detention Training Officer (DTO) programs responsible for training all officers in their job duties. I created the model for state-wide training of certified detention officers in the Florida Department of Juvenile Justice. I specifically teach university courses in public policy and criminal justice policy. I specifically teach university courses in criminal justice management and corrections procedures.

**Methodology**

In case analysis, as a consultant, I utilize national standards, model policies, handbooks, and guides put forth by various professional organizations and bodies of standards and guidelines such as the American Correctional Association (ACA), the American Jail Association (AJA), the National Sheriffs Association (NSA), the National Commission on Correctional Health Care (NCCHC) the Commission on the Accreditation of Law Enforcement Agencies (CALEA), National Institute of Corrections (NIC), and others. I am a member of a number of these organizations, and I have served as a Jail Committee member of the National Law Enforcement and Corrections Technology Advisory Council (NLECTAC).

As an academician and forensic criminologist with more than thirty-five years of teaching corrections and police policies and procedures, my analyses are further informed by the national and international bodies of literature from peer-reviewed academic journals, as well as government sources such as the Bureau of Justice Statistics, National Institute of Corrections, National Criminal Justice Reference Service, the Government Accountability Office, the Congressional Research Service Reports, and others. My own authorship of peer-reviewed academic journal articles, and textbooks, on criminal justice topics are components of my subject matter expertise. I am one of only two American scholars named as International Ambassador of the British Society of Criminology (BSC). In the Fall of 2019, I lectured throughout the U.K. on American police major case investigative methods.

My experience as a former officer, investigator, supervisor, command-level administrator, director of law enforcement and corrections academies, director of corrections, chief of training, and jail and detention center superintendent, together with my experience training officers over the past forty years, combine to provide substantive experience to support my qualifications to conduct such reviews and analyses. Each of these qualifications, and all these together, provide me with a broad knowledge of generally accepted practices and procedures, which I apply to analyze whether the facts in a case fall above or below those standards, articulate such standards, and explain to a jury how they apply to the facts in a specific case.

As expected of any expert accepted by the Court, my methodology follows the Supreme Court standards established in *Daubert v. Merrill Pharmaceuticals, Inc.,* (1993)[1] and *Kumho Tire Company v. Carmichael,* (1999).[2] My method in reviews is to list all case materials, an initial fact scenario- not fact finding nor credibility judgement- and to provide opinions comparing specific case facts to accepted practices, never legal conclusions nor personal opinions. As a professor teaching criminal justice and public policy, I am aware of the importance of social science research to the outcome of many such public

---

[1] 509 U.S. 579
[2] 119 S. Ct. 1167

and criminal justice policies. The empirical research methods- quantitative, qualitative, or mixed- provide useful information that can be explained to jurors. This research is open inquiry, rigorously tested (peer-review), and reported publicly for further scrutiny. I have served (and continue to) as editorial (peer) reviewer for numerous academic journals, and I sit on the editorial board of the journals *Psychology and Behavioral Sciences,* and *Homicide Studies*. I was guest editor of a special edition of this journal focused on the investigation of homicide. Review of science, like the testimony of an expert, must be the product of reliable principles and methods applied to the facts of the case.[3]

To the extent that corrections as a vocation has been examined by social science researchers and criminologists routinely since only the 1970s, the research and observations are scholarly and employ all the rigor of peer-review. The past fifty years have demonstrated the general acceptance within the social science community of the methods and theories developed. The body of scientific knowledge that I draw upon and focus through my qualifications to apply and explain, is well established. The information and analysis that I can provide to the trier-of-fact is conceptually and contextually useful and not common knowledge nor common sense. Such reference, in part, on peer-reviewed social science and other scientific literature, helps ensure the reliability required by the courts in assessing the acceptability of expert testimony.[4]

**Additional Materials**

I may amend my opinions and supplement my report as necessary based upon additional information furnished to me as well as my own research and further analysis of case factors. Some facts in this case may be disputed and I attempt to identify these while incorporating them and undisputed facts in my own case analysis. I have conducted case analysis and been proffered as an expert witness in criminal justice practices in state and federal courts since 1991. My qualifications to conduct case analysis, draw

---

[3] Federal Rules of Evidence, Rule 702
[4] Ibid.

conclusions and render expert opinions such as the ones in this report are based on my personal and

professional knowledge, education, specialized training, and ongoing research and teaching in these

areas.[5]


## Incident Summary

In the analysis of an event, there is typically inconsistency in some statements among individuals

involved. This may result from perception, intoxication, emotion, the passage of time, or other factors. An

expert witness provides analysis and observations without assigning credibility to one person or another,

as that is a responsibility for jurors. The following initial information from the various reports and

materials in the record is utilized for purposes of analysis in this matter.[6]

As noted in the First Amended Complaint:

> On November 7, 2021, at approximately 1:10 a.m., an inmate at the Marion
> County Jail, Eric Lutterloah, struck Cory Merchant several times, causing
> him to fall to the ground.[7]


From the report of Corrections Officer Justin Kosinski:

### Narrative

On 11/7/21 at approximately 0110 hours while working Gulf pod Rover, I was alerted to
an incident in Alpha section. Inmate Frank Calabria stated "man down" through the section door.
Inmate Cory Merchant was observed laying on the ground between two bunks bleeding from his
left ear. I called for medical to respond with a stretcher. Sergeant Dukes, Sergeant Konopinski,
Deputy Savage, Deputy Valdez, and Nurse J. Little responded at 0113 hours, with a stretcher and
back board. Inmate Merchant was placed on the back board. Deputy savage, Nurse Little and
myself lifted Inmate Merchant on the back board and placed him on the stretcher. Nurse Little
advised for 911 to be contacted and respond to the Jail. Inmate Merchant was transported to
Booking by Sergeant Konopinski, Sergeant Dukes, Deputy Valdez, Deputy Savage, and Nurse
J.Little.
Upon Review of the section cameras, it appears Inmate Cory Merchant and Inmate Eric
Lutterloah where in a physical altercation. Inmate Lutterloah gets out of his assigned bed
(G/Ax12) and confronts Inmate Merchant in between Bunks G/AX14 and 16. Inmate Lutterloah
appears to strike Inmate Merchant several times, causing him to fall to the ground between bunks

---

[5] Federal Rules of Evidence, Rule 702
[6] Appendix A
[7] First Amended Complaint, ¶ 1

G/A128 and 129. When Inmate Merchant fell he was no longer in view of the camera. Inmate
Lutterloah appears to walk to his assigned bunk area, then walk back to Inmate Merchant a couple
of times before sitting on his assigned Bunk. Inmate Merchant is assigned to bunk G/A123B, and
was out of his assigned area when the disturbance started.

Inmate Lutterloah was removed from the section and rehoused in Alpha Pod on
Administrative Confinement pending a disciplinary report. Sergeant Konopinski transported
Inmate Lutterloah to the Infirmary and was evaluated by Nurse Sanders before being housed in
confinement.[8]

Noted in the Autopsy Report from the Office of the Medical Examiner[9]:

# MEDICAL EXAMINER DISTRICTS 5 & 24
**Citrus, Hernando, Lake, Marion, Seminole & Sumter Counties**
**809 Pine Street**
**Leesburg, Florida 34748**
**Phone: (352) 326-5961**
**Fax: (352) 365-6438**

## AUTOPSY REPORT

**NAME: MERCHANT, Cory**          **CASE NUMBER: 2021-2744**

**DATE OF DEATH: November 13, 2021**          **AGE: 35   SEX: Male   RACE: White**

**COUNTY: Marion**

**DATE AND TIME OF AUTOPSY: November 13, 2021 @ 0900 hours**

**AUTOPSY FINDINGS:**

1. **Blunt head trauma, with subscalpular hemorrhage, skull fractures, epidural, subdural, and subarachnoid hemorrhages, and cerebral contusions**
   a. **Cerebral edema, 1460 grams**
2. **Acute bronchopneumonia, with diffuse alveolar damage (right lung – 1010 grams; left lung – 820 grams)**
3. **Mild coronary atherosclerosis**
4. **Mild pulmonary anthracosis**

**CAUSE OF DEATH: Complications of blunt head trauma due to assault**

**MANNER OF DEATH: Homicide**

*Wendy A. Lavezzi, M.D.*
**Wendy A. Lavezzi, M.D.**
**Deputy Chief Medical Examiner**
**Date: January 11, 2022**

---

[8] Marion County Sheriff's Office Incident Report #210005382, Officer Justin Kosinski
[9] Medical Examiner Report 2021-2744, November 13, 2021

The findings of the Deputy Chief Medical Examiner, Dr. Wendy A. Lavezzi included blunt head trauma as well as acute bronchopneumonia.[10] Dr. Lavezzi noted that Mr. Merchant's Cause of Death was "Complications of blunt head trauma due to assault." Merchant's Manner of Death was ruled as "Homicide."[11] While a Medical Examiner or Coroner (ME/C) Manner of Death is not a legal one, in cases such as the instant matter, it aligns with the criminal legal investigation and charge of Inmate Lutterloah's actions causing the death of Inmate Merchant. Inmate Lutterloah, similar to Inmate Merchant, had previously been held in the Marion County Jail. Lutterloah knew that "Battery or attempted battery, with or without a weapon," was a Class "A" violation of facility rules.[12]

## Discussion

The Marion County, Florida Jail General Orders are in alignment with the state-guidelines of the Florida Model Jail Standards.[13] This includes the inmate classification plan as required by the Florida Commission on the Accreditation of Corrections (FCAC). The Jail is accredited by FCAC. The facility is subject to annual inspection, as well as ongoing unannounced inspections to verify adherence to standards of the State of Florida.

Given several prior stays in jail by both Eric Lutterloah and Cory Merchant, the detention was not a novel experience for either man.[14] The placement of Cory Merchant through classification procedures to his assigned housing in G Pod by corrections staff is not unexpected, nor inappropriate. According to the National Institute of Corrections (NIC):

> In practice, reclassification of jail inmates tends to be a function of four factors:
> - Change in inmate status from pre-trial to sentenced,
> - The inmate's conduct while incarcerated,

---

[10] Ibid.
[11] Ibid.; PL MERCHANT 002507
[12] Marion County Jail Inmate Rules and Regulations Handbook, Prohibited Acts and Sanctions, page 16 of 29, PL Merchant 001688
[13] Florida Model Jail Standards, Chapter 6
[14] FDLE criminal history information

- Length of confinement,
- Filing of additional charges.[15]

The factors initially described in the NIC publication on Objective Classification goes on:

> Each jail should determine the factors to be used to establish an inmate's most appropriate custody level, or classification. The most common factors used are:
> - Severity of current charges/convictions;
> - Serious offense history;
> - Escape history;
> - Institutional disciplinary history;
> - Prior felony convictions;
> - Alcohol/drug abuse;
> - Stability factors (e.g., age, employment, length of residence).[16]

Plaintiff expert Mr. Paul Adee, within his report, cites several times to the U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators.[17] This document was developed twenty years ago to assist (mainly) new jail administrators in understanding many of the aspects of jail operations facing officers, supervisors, managers, and particularly, administrators.[18] Plaintiff's expert would have the Court and other readers see the excerpts as guiding for local jail administrators. They are not. A more faithful reference to this "Resource Guide" would include from the section "Using These Materials," that:

> The **materials presented in this guide are not intended to establish policy, procedure, or a standard of care for particular jails [emphasis added]**. Each jurisdiction has its own laws, standards, and guidelines regarding the topics covered herein. You, as a jail administrator, must abide by the requirements applicable to your own jurisdiction and should consult with your legal advisor before making changes in policies and procedures.[19]

---

[15] National Institute of Corrections, Objective Jail Classification Systems: A Guide for Jal Administrators, 1998
[16] National Institute of Corrections, Objective Jail Classification Systems: A Guide for Jal Administrators, 1998
[17] Report of Mr. Paul Adee, at, for example, pages 9, 10, 14, 15, 18, 19
[18] "We hope this guide will serve as a basic reference for sound correctional practice in operating a local jail, both for administrators new to the position and veteran administrators who want to improve their effectiveness." U.S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, P. iii
[19] .S. Department of Justice, National Institute of Corrections, Resource Guide for Jail Administrators, P. 5

Mr. Adee also refers to the Sheriff's Guide to Effective Jail Operations, also from the National Institute of Corrections (NIC), and drawn, in part, from the previous document.[20] This document was also written for the benefit of: "...new sheriffs who are learning about their responsibilities for the jail for the first time as well as veteran sheriffs seeking to improve the effectiveness of their operations."[21] The "Sheriff's Guide" was written as a companion to the "Resource Guide." Like the Resource Guide, the Sheriff's Guide is not a standard, does not set policy for any of the more than 3,000 local jails in the United States, and does not have the effect of law. Many of the issues talked about in these guides are important, and provide new administrators who are unfamiliar with corrections, insights and ideas. For the instant matter, the law and administrative code as enacted by the Florida Legislature is the actual standard that agencies in Florida must meet.[22]

### The Spontaneous Assault

Mr. Adee also cites a trade magazine article written by a California corrections lieutenant in 2013. The passage from the article that Mr. Adee quotes is:

> The government's obligation upon incarcerating a citizen, derived from the 8th and 14th Amendments of the U.S. Constitution, is to provide reasonable protection for that person. Jails have a duty to take reasonable measures to guarantee inmates' safety from assault, suicide, fires and other facility dangers, and preventable illness. We are charged with preventing assault and the excessive use of force as well as suicide and self -harm. We must respond to serious medical and mental health needs; and we must avoid unconstitutional conditions of confinement.[23]

Mr. Adee not only added emphasis that was not in the original, but he omitted the final sentence of the paragraph, which, when added is:

---

[20] Report of Paul Adee, at, for example, p. 9
[21] Sheriff's Guide to Effective Jail Operations, Foreward
[22] "The Florida Model Jail Standards (FMJS) are minimum standards which jails across Florida must meet to ensure the constitutional rights of those incarcerated are upheld. Prior to 1996, the Florida Department of Corrections was responsible for the standards and inspection process for local county jails. Legislation was passed in 1996 that gave the authority of inspections to the local level. This change required the Florida Sheriffs Association and Florida Association of Counties to appoint individuals to serve on a Commission that would govern standards that local jails must comply with."
https://flsheriffs.org/how-we-serve/jail-services/florida-model-jail-standards/
[23] Report of Paul Adee, at p. 14

Page 10 of 60

The government's obligation upon incarcerating a citizen, derived from the 8th and 14th Amendments of the U.S. Constitution, is to provide reasonable protection for that person. Jails have a duty to take reasonable measures to guarantee inmates' safety from assault, suicide, fires and other facility dangers, and preventable illness. We are charged with preventing assault and the excessive use of force as well as suicide and self -harm. We must respond to serious medical and mental health needs; and we must avoid unconstitutional conditions of confinement. The fundamental question is, "How do we uphold our obligations when managing transgender offenders?"[24]

The author was specifically writing to address the challenge of transgender inmates, not spontaneous assault between two male inmates, neither of which was known or alleged to be transgendered.

If someone is brought into the detention facility and they are fighting, they are secluded. Solitary confinement for its own sake or as a preventive measure against violence is not called for by law, regulation, or the Florida Model Jail Standards. The presence of staff in close proximity to housing areas with visibility is more than adequate as inmates are held within a jail or detention facility. The Marion County Housing meets the Department of Detention Directive that addresses Staffing and Training, as well as the Florida Commission on Accreditation of Correction standard (FCAC 6.16). The Marion County, Florida Jail General Orders are aligned with the state-guidelines of the Florida Model Jail Standards.[25] This includes the inmate classification plan as required by the Florida Commission on the Accreditation of Corrections (FCAC).

The excerpt below explains some of the concept of a "sucker punch" or spontaneous assault:

Now some would have us believe that all such assaults are predictable and preventable. This is of course preposterous when dealing with the human animal. Moreover, no one is any one thing or behaves in one way at all times. The argument for police officers, correctional officers, probation officers, to be trained psychologists or psychiatrists, and for booking facilities to be prediction and treatment centers is beyond challenging, it is simply not possible.
**What's to stop me?**
The premise is that even with authority figures present, or what we imagine to be the socially restraining effect of others, one person may act violently toward another. Certainly all people are capable of physically violent acts. Just as clearly, certain individuals have been involved in a

---

[24] Brotheim, H. (2013). Transgender Inmates: THE DILEMMA. *American Jails, 27*(2), 40-42,45-47.
[25] Florida Model Jail Standards, Chapter 6

physically violent event. Though for many interjected into a fight, their role may have been a legitimate one such as an officer, teacher, or referee who intervened or restrained an aggressive other. Will a person who has been violent repeat the same behavior? We do not know and even if we have assessed that someone has the potential to be violent, we have no way to reliably predict when, where, or against whom.[26]

The spontaneous assault, or for that matter past fights or violence, are neither predictive of future violence by an individual, nor support for alternate classification, as though citizens in jails are either "violent" or "nonviolent." The calculus for classification of inmates is ongoing throughout a person's stay. No one is all one thing all of the time. This, for example, is also why suicide cannot be predicted.[27] Action always beats reaction, and the "elbow test" of assault even with the presence of authority figures, informs us that one person may attack others without warning or apparent reason.

There is no indication that staff, nor other inmates, were aware there might be an attack on Inmate Merchant.[28] Nor was there any information that would have suggested to correctional staff that they should consider anything in dormitory to be amiss once inmates were at lights out. Death in a county jail in the U.S. is infrequent, death from illness being the leading category.[29] In 2019, 553 jail inmates died from illness[30]; there were 734,500 people in jail that year in the U.S.,[31] meaning that at base rate, the incidence is small. Death of an inmate by *homicide* is significantly lower at just *0.03 deaths per 1,000* incarcerated people between 2008-2019.[32] "Accidents and homicides each accounted for about 2% of deaths in local jails in 2019."[33] Such death by homicide rarely occurs at the beginning of a jail stay: "The median time served for victims of homicide in jails was 30 days during 2000–19, compared to 9 days for

---

[26] Hough, R.M. "Sucker Punched," *Calibre Press* Training Network. November 13, 2018.

[27] Berman, A. L., & Canning, R. D. (2022). Proximal Risk for Suicide in Correctional Settings: A Call for Priority Research. *Psychological Services*, *19*(3), 407–412.

[28] PCSO reports and interviews

[29] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[30] Ibid.

[31] Bureau of Justice Statistics, Annual Probation Survey, Annual Parole Survey, National Prisoner Statistics program, 2009–2019; Annual Survey of Jails, 2009–2018; and Census of Jails, 2019.

[32] Adler JL, Chen W. Jail Conditions and Mortality: Death Rates Associated With Turnover, Jail Size, And Population Characteristics. Health Aff (Millwood). 2023 Jun;42(6):849-857.

[33] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

those who died by suicide."[34] "Local jails reported 10.3 million admissions in 2019."[35] With more than 10,000,000 admissions to jails in 2019, only **25** inmates died by homicide.[36] As depicted in inset Figure 1, "The adjusted homicide rate for U.S. residents in 2019 was 4 per 100,000, compared to 3 per 100,000 for local jail inmates."[37]



Figure 1

Confrontations are an issue in the general public and incarcerated populations.  The Marion County Jail put in place components of a policy reasonably designed to guide staff in addressing fights or violence by inmates. According to research over more than 75 years, the issue of inmate violence may be explained in several ways. The restrictive environment of a jail or prison may cause an inmate to adapt to the absence of certain needs in what is known as "deprivation theory."[38] The "importation" perspective suggests that a person brings their characteristics with them to some extent.[39] The "situational" perspective recognizes the context and factors uniquely present in different events.[40] Of course, none of

---

[34] Ibid.

[35] Bureau of Justice Statistics: "Jail Inmates in 2019." (2021).

[36] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics., Table 1 Number of deaths of local jail inmates, by cause of death, 2000–2019 (Includes homicides committed by other inmates, incidental to the use of force by staff, and resulting from assaults sustained prior to incarceration.)

[37] *Mortality in local jails*. (2000-2019). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics., Figure 3

[38] Sykes, G. M. (1958). *The society of captives: A study of a maximum security prison*. Princeton, NJ: Princeton University Press.

[39] Irwin J. K., & Cressey, D. R. (1962). Thieves, convicts and the inmate culture. *Social Problems, 10*, 142-155.

[40] Wener, R. (2000). Design and the likelihood of prison assaults. In L. Fairweather &

these are mutually exclusive, nor meant to fully explain the spontaneous decision by one human to strike another.

The central role of local jail officials in Marion County, Florida and elsewhere is to maintain the temporary care, custody, and control of incarcerated individuals. The majority of the individuals placed in jail are there for brief stays of a few hours to a few weeks for facilities of any size.[41] Yet jail staff are called upon every shift of every day to try and care for and manage a challenged and challenging population. The majority of jail inmates, for example, may manifest some of the behaviors across the range of factors that behavior, though I have not reviewed empirical documentation of such behaviors accumulated in a way that triggered a placement on any type of elevated housing watch for either inmate involved in the instant matter. For example, younger inmates have been found to engage in more misconduct,[42] unlike Eric Lutterloah, who was 52 at the time he decided to hit Cory Merchant. If isolated behaviors occur by any or all the inmates in a jail, this does not create a circumstance to place everyone into one large room and sit with them. These behaviors are spread throughout society, and arise from families, life stressors, and the individual thought processes of the person in any setting, including, infrequently, one who dies from an assault. The importation of a person's entire reality occurs when they cross the threshold of a detention or correctional facility. Corrections officers will rarely know about the myriad factors affecting a person, let alone being in a position or have an expectation of addressing these issues.

Corrections employees receive training regarding jail policies. The use of adequate policies and training can be of help to officers, but it cannot eliminate the risk of injury or death at the hands of a person determined to injure another person, as with Inmate Lutterloah. While a retroactive view of staff

---

S. McConville (Eds.), *Prison architecture: Policy, design, and experience*
(pp. 49-54). Boston, MA: Architectural Press.
[41] Bureau of Justice Statistics, Jail Inmates
[42] cf. Berk, R. A., Kriegler, B., & Baek, J. (2006). Forecasting dangerous inmate misconduct: An application of ensemble statistical procedures. *Journal of Quantitative Criminology, 22*, 131-145.; Morris, R. G., Longmire, D. R., Buffington-Vollum, J., & Vollum, S. (2010). Institutional misconduct and differential parole eligibility among capital inmates. *Criminal Justice and Behavior, 37*, 413-438.; Sorensen, J., & Cunningham, M. D. (2009). Conviction offense and prison violence: A comparative study of murderers and other offenders. *Crime & Delinquency, 56*, 103-125.

decision-making is often officer-centered, this would fail to appropriately incorporate an unknown and

dynamic thought process by the *subject*. As noted by Plaintiff expert in his report:

> According to the Marion County Sheriff's Daily Log for G-Pod on 11/7/21, Deputy
> Kosinski completed two separate security check *immediately prior to Lutterloah's attack*
> *on Merchant* [*emphasis added*] as follows: 0100-0104 check logged on 11/7/21 at 0104
> hours and 0100-0109 check logged on 11/7/21 at 0119 hours.[43]

There was no obvious violation of the rules of lockdown when one or two inmates had gotten up from

their bunk for some reason.[44] Discretion also comes into play when inmates may get up to use the toilet,

or that an officer may not be looking into a given unit when someone is up. There was no glaring or

obvious extended policy violation.


### Classification

Jails in the State of Florida utilize various classification practices as determined through the

discretionary decision-making of local jail officials. The Florida Model Jail Standards[45] as well as the

standards of the Florida Corrections Accreditation Commission, Inc.,[46] address the topic of Classification.

The Marion County Sheriff's Office complies with and references these standards within their Detention

Directives. Based on the information I reviewed; the Marion County Sheriff's Office has in place

acceptable correctional management policies. Corrections practices and procedures are constrained by

applicable law, policy, training, supervision by higher authority, report review, and the proper conduct of

the officers who wield the authority to care for incarcerated others. I have reviewed no empirical

information that a change in housing classification would have been required during the time Cory

Merchant or Eric Lutterloah was in the Marion County Jail.

The two relevant subsections from the Florida Model Jail Standards that address Classification

are:

---

[43] Report of Mr. Paul Adee, attributed to official MCSO logs Location G, dated 10/7/21 – 11/7/21 [sic]
[44] Dormitory video
[45] FMJS Chapter 4 Admission, Classification, and Release, 2021 edition
[46] FCAC Chapter 14 Admission, Classification, and Release

6.1     As soon as practical following admission to a detention facility, each inmate shall be classified. The classification process shall include all information available or obtainable from the social, legal, and self-reported medical history of the inmate.

6.2     The primary objective of classification is to place inmates in the type of quarters that best meet their needs and to provide reasonable protection for all inmates. Each facility shall have designated classification personnel.[47]

As to the voluntary Florida Corrections Accreditation Commission (FCAC), the relevant standard is: **14.02M**

A *written directive* provides a *classification* process which includes:
**I. Bullets**

      A. Initial classification within a specified timeframe;
      B. Housing;
      C. Access to programs; and
      D. A reclassification process.[48]

Within the chapter on inmate housing:

**15.02M**

A *written directive* requires dangerous felons to be housed separately from misdemeanants.[49]

**15.03M**

A *written directive* requires correctional officers conduct documented physical observations, at intervals not to exceed 30 minutes, of *inmates* whose behavior presents a serious threat to the safety and security of the facility or *staff*.[50]

The actual procedural determinations addressed in these two standards are those established by the relevant jail, not an outside entity nor a post-hoc attempt to construe the standards above as more than what is stated. Neither the Florida Model Jail Standards (FMJS), nor the Florica Corrections Accreditation Commission (FCAC), specify, nor can they, what the classification procedures shall be in each jail within the State of Florida.

---

[47] FMJS Chapter 4 Admission, Classification, and Release
[48] FCAC Standards, Edition 4.18, 2022
[49] FCAC Standards, Edition 4.18, 2022, no bullets
[50] Ibid., no bullets

Mr. Adee provides comments of two former inmate of the Marion County Jail.

Importantly, bureaucratic controls over the use of arrest have also been addressed by the U.S. Supreme Court as it relates to the adequate training of officers (*City of Canton v. Harris*, 1989), and agencies policy that clearly direct officers to respect Fourteenth Amendment issues arising from trained policy (*Monell v. New York City Department of Social Services*, 1978).[51] The policies, training, and supervision in place at the Marion County Sheriff's Office anticipate and guide officer response to the many circumstances in corrections work.

**Opinions**

Through my experience as a corrections officer, trainer, and administrator, corrections and law enforcement academy director, field training officer/supervisor/commander, more than forty years of teaching corrections and law enforcement procedures to academy recruits, in-service officers, and college and university students, my personal experience of conducting and supervising the conduct of corrections business including health and medical services, my ongoing research and analysis of such policies and practices, my academic and professional presentations, my authorship of various documents, my standing as a board Certified Correctional Health Professional (CCHP) of the National Commission on Correctional Healthcare (NCCHC), and based upon a reasonable degree of professional certainty, I find that:

1.    The conditions of detention of pre-adjudicated and convicted adults at the Marion County Jail are reasonable and proper under the prevailing practices of corrections including the Florida Model Jail Standards. I have reviewed nothing in the record indicating Sheriff Woods allowed or created unconstitutional policies or practices.

---

[51] 436 US 658 (1978)

2.    There was no noted deficiency in the policies and practices of Marion County Jail that would make it apparent that staff would not know how to respond in the event of a medical emergency or inmate fight. It is normal in jails of the size of Marion County to take inmates off-site for advanced medical care. Sheriff Woods utilized medical and mental health staff in the operation of the jail.

3.    Sheriff Woods has promulgated or caused to be produced policies and procedures that direct correctional operations.

4.    Sheriff Woods has caused to be maintained through procedures, logs and other documents to record incidents such as a fight between inmates or an assault on one by others.

5.    Persons who arrive at a short-term jail facility have motivations and lives that are complex and largely unknown to staff, even after assessments, admission, and ongoing contact. Troubled individuals are not inclined to share details of their lives even when asked direct questions. Life stressors are common in the general population and in correctional populations but are not equated with acting out or violence.

6.    The First Amended Complaint states: "On November 10, 2018, an independent monitor found that the Marion County Jail had a suicide rate of 63.8 deaths per 100,000 inmates—a rate that is higher than that of county jails of varying size throughout the United States."[52] In fact, the Marion County Jail contracted with Lindsay Hayes to provide technical assistance; a proactive step that is **not** the actions of an "independent monitor."[53] Misleading as that is, the First Amended Complaint utilizes the language of "rates" to present an impression having anything to do with "63.8 deaths."[54] In fact, Ms. Hayes' Report notes no suicides between 2014 and 2017, and goes on to note four suicide in 2018.

---

[52] Ibid., at ¶ 86
[53] Lindsay Hayes: "It should be noted that the determination for the need of this writer's assessment was not prompted by litigation or critical investigation of any of the four recent inmate suicides. Rather, these actions were taken through the pro-active initiative of Sheriff Woods and Major Bowen who were committed to determining what steps, if any, were necessary to improve suicide prevention practices within the Marion County Jail."; Hayes report Introduction.
[54] First Amended Complaint, ¶ 86

Using the language of rates and statistics, Ms. Hayes completes a calculation as if the jail had 100,000 inmates in it and then notes the *number* of suicide – four – would equate to the nonexistent number at a *rate* of 63.8 per the fictional number of 100,000. Note in the image below that more than 47,000 <u>actual</u> inmates had been booked into the Marion County Jail with just 4 suicides.

**SUICIDE RATE**
**WITHIN THE MARION COUNTY JAIL**
**2014 THRU 2018**

| Year | ADP* | Yearly Admissions* | Suicides | Suicide Rate** |
|------|------|--------------------|----------|----------------|
| 2014 | 1,375 | n/a | 0 | 0 |
| 2015 | 1,254 | 12,285 | 0 | 0 |
| 2016 | 1,123 | 10,649 | 0 | 0 |
| 2017 | 1,170 | 11,029 | 0 | 0 |
| 2018 (Nov) | 1,319 | 13,502 | 4 | 303.3 |
| 2014-2018 (Nov) | 6,271 | 47,465 | 4 | 63.8 |

*Source: Marion County Sheriff's Office
**Consistent with calculations by the U.S. Justice Department, the rate is based upon the ADP

7.    The investigations/reviews of the incident were conducted in a manner consistent with contemporary law enforcement methods. Florida Jail Standards were met.

8.    The Marion County Jail undertook an "Analysis of Security and Operation Functions Affecting the Introduction and Distribution of Contraband into the Marion County Jail." The report was dated October 15, 2018. The First Amended Complaint erroneously states: "The 2018 Analysis of Security and Operational Functions fount the staffing levels at the MCJ to be 'woefully low.'"[55] In fact, on page 30 of 32 pages, the Report attributes that finding to a staffing analysis done by the jail in 2014. The Report suggested contracting with an outside entity to conduct a new staffing analysis.[56]

9.    There was no indication that facility classification was utilized improperly or incorrectly. Both Cory Merchant and Eric Lutterloah were appropriately classified as to security and needs of the facility. Cory Merchant had previously been arrested and convicted for Domestic Violence Battery.[57] Neither fight that Merchant may have been involved in were

---

[55] First Amended Complaint, at ¶ 85
[56] 2018 Contraband Report at page 30
[57] FDLE Criminal History of Cory Merchant; PL Merchant 004722

with Eric Lutterloah. The information regarding the two fights included one that Merchant initiated. In the other, an officer only observed after the fact that Merchant had a black eye – Cory Merchant denied there had been a fight. None of this indicates that Merchant would be classified as a vulnerable inmate.

10. The Marion County Jail undergoes annual inspection for compliance with the Florida Model Jail Standards requirements. The independent review certifies that a jail facility meets prescribed standards in the State of Florida. Key in the process of inspection is the presence of policies and procedures that guide agency members, operations, documentation of efforts, and review by external independent authority. The policy and the procedures to be followed are based on state rules and guidelines. Such reliance on state mandatory standards and guidelines as foundational to facility police and procedure is standard within contemporary corrections.

11. Corrections staff properly rely on medical and mental health staff for medical and mental health issues. This is normal for facilities of this size. No information in the case suggests that medical staff are unavailable to corrections staff. EMS was appropriately summoned following Inmate Lutterloah striking Inmate Merchant.

12. Sheriff Woods promulgated or caused general orders and procedures to be produced for members of the Detention Bureau of the Marion County Jail. This is customary, expected, and standards compliant. There is nothing in the record that I have examined supporting or indicating "…Sheriff Billy Woods implemented the following unofficial customs and practices throughout MCJ:

> i. MCSO deputies are not required to supervise MCJ inmates during
> their shift.
>
> ii. MCSO deputies are not required to keep a watchful eye on the
> dorms to which they are assigned and the inmates within them.

iii. MCSO deputies are not responsible for preventing inmate-on inmate violence.

MCSO deputies are not responsible for reducing inmate-on-inmate violence.

v. MCSO deputies are not required to maintain safety and security amongst the inmates in their custody.

vi. MCSO deputies may ignore incidents of violence in the MCJ.

vii. MCSO deputies may ignore substantial risks of violence between inmates during their shifts.

viii. MCSO deputies are not required to protect inmates from substantial risks of violence between inmates during their shifts.

ix. An MCSO deputy who witnesses an incident of physical violence is not required to intervene.

x. An MCSO deputy who witnesses an incident of physical violence and fails to intervene is not subject to discipline.

xi. If an MCJ inmate causes physical violence to occur, they may receive a disciplinary report, but will not actually be subject to discipline.

xii. If an MCJ inmate causes physical violence to occur, they will be returned to an open-dorm section with other inmates.

xiii. MCSO deputies are permitted to watch YouTube videos on their computer and engage in other recreational activities while on shift in lieu of supervising individuals in their custody.

xiv. MCSO deputies are not responsible for the custody and control of inmates.

xv. MCSO deputies are not required to maintain order and discipline

within the facility, enforce all inmate rules and regulations, and

report all violations promptly, in writing, to a Corrections Custody

Supervisor.

xvi. MCSO does not require its deputies to be constantly alert and

security conscious in order to prevent escapes, introduction of

contraband or other violations.

xvii. MCSO does not require its deputies to stand guard, observe inmates

and take required action in emergencies.

xviii. MCSO does not require its deputies to respond to emergencies in the

jail such as fights or other emergencies.

xix. MCSO does not require its deputies to be alert for conditions or

situations, which inhibit efficient operation of the Agency or the

Corrections Bureau, and make recommendations for solutions."[58]

13.   The Complaint states, and is subsequently parroted by Mr. Adee,[59] a number of

unremarkable aspects of housing at the Marion County Jail that are the same as jails and

prisons across the United States: dormitory housing is utilized, there are far more inmates

than officers, dorms are lined with bunks, inmates are often idle. The spontaneous assault

of an inmate on another inmate was not a reasonably foreseeable outcome of entering the

Marion County Jail. In addition, corrections staff were reasonably relying on their training,

experience, and supervision. I have reviewed no empirical information of a failure to act as

expected by Detention Bureau members.

14.   The officers' actions were within law, agency policy, and contemporary training.

Importantly, bureaucratic controls over search and the use of force have also been

---

[58] First Amended Complaint, ¶ 352
[59] Report of Paul Adee, at Section G.

addressed by the U.S. Supreme Court (*City of Canton v. Harris*, 1989; *Monell v. New York City Department of Social Services*, 1978). The information in the record that I have reviewed shows no deviation from customary training and practices within corrections.

15.     Based on preparations, policies, training, and proper supervisory action, the Marion County Jail responds to supervision of inmates in a manner consistent with contemporary jail corrections practices. The deputies followed their procedures in supervising the inmates on the evening in question. Such provision of care is overseen by Marion County Sheriff Billy Woods.

16.     Marion County Jail uses acceptable correctional management methods. Corrections practices and procedures are constrained by applicable law, policy, training, supervision by higher authority, report review, and the proper conduct of the officers who wield the authority to care for incarcerated others. Staff assigned to jail duties have received training in appropriate inmate supervision. This includes the inmate welfare checks required by policy and adhered to by security staff. Two different policies of MCSO call for beginning night checks at different hours. This is not relevant since the incident occurred at 1:10 AM; two hourly checks had already been conducted.

17.     Mr. Adee asserting a "Friday Night Fight Night" within the Jail, based on the "declaration" of two inmates, provides no further documentation. This includes no records that I have been furnished identifying the source of these two declarations. Reference in the Complaint to a "widespread custom and practice" of "failing to supervise  inmates and prevent violent attacks,"[60] is without substantive evidence in the record. Merely listing various prior matters purported to establish a practice and custom is empirically unsupported. Rather, a separate and specific analysis of each of the events, and a time-series comparison to like events would be minimally necessary to try to establish any

---

[60] Complaint at p. 15 at ¶ 76

deviation from a possible norm. Further, there is no analysis offered as to how such alleged

practices were in any way connected to the instant matter.

18.     Mr. Adee states in his report fourteen "Findings."[61] Each Finding ends with "This was in

violation of the correctional standard of care and caused harm to Cory Merchant." Mr.

Adee does not articulate specifics of his analysis leading to his use of the phrase

"correctional standard of care." Where no precedent or standards at Marion County Jail are

violated, neither drops below established constitutional minimums, nor is compelling to

impose or substitute the judgement of local jail administrators. Indefinite and generalized

reference to no guiding or meaningful standard or measure cannot offer a method of

measurement. The standards of professional groups (or practices experts), while

instructive, do not substitute or supersede applicable constitutional standards.

19.     Plaintiff's practices expert Mr. Adee recites several non-guiding documents that discuss

sundry jail issues. It is unclear why he does this, as they have no relevance to required

Florida jail procedures. There are no statutory "standards." It is misleading and

meaningless to refer vaguely to "standards," when the Marion County Jail is required only

to adhere to standards established by the Florida legislature through promulgation of rules

and laws.

20.     Mr. Adee asserts inadequate supervision of staff and of inmates. There is no controlling

standard or procedure supporting a finding of "inadequate," and Mr. Adee cites to none.

21.     Sheriff Woods has instituted policies and training that address the housing and supervision of

inmates by staff. This is expected, customary, and Florida Model Jail Standards and Florida

Corrections Accreditation Commission compliant. The Marion County Jail undergoes annual

inspection for compliance with the Florida Model Jail Standards requirements, and multi-

year inspections for FCAC. The independent reviews certify that a jail facility meets

---

[61] Report by Mr. Adee, at G

prescribed standards in the State of Florida. Key in the process of inspection is the presence of policies and procedures that guide agency members, operations, documentation of efforts, and review by external independent authority. The policy and the procedures to be followed are based on state rules and guidelines. Such reliance on state mandatory standards and guidelines as foundational to facility police and procedure is standard within contemporary corrections.

22.    While the MCSO experienced staff shortages as noted in the 2019 staffing study, at no point was inmate safety and security compromised and the jail always provided sufficient staffing to cover the shifts. Prison and jail staffing shortages are common. There is not an automatic indication of safety or security compromise due to such shortages.

23.    Mr. Adee asserts deficiencies of select policies and procedures of the Jail. He fails to note that the MCSO procedures, as instituted by Sheriff Woods, are consistent with the State Model Jail Standards, which are the only mandatory standards for jails within the State of Florida. The policies instituted under Sheriff Woods also conform to the voluntary Florida Corrections Accreditation standards. Again, there are no mandatory "national standards." Mr. Adee asserts a false failure to adhere to standards that do not exist.

24.    Plaintiff's expert Mr. Adee refers to the National Institute of Corrections (NIC) guidance as if mandatory. It is not. Plaintiff's correctional expert offers no specific facts in the record to prop up a straw man of:

> As identified by the U.S. Department of Justice, National Institute of Corrections:
>
> > A core part of the shift supervisor's duties is to visit various posts throughout the shift. These visits are essential to the supervisor's knowledge of what is taking place throughout the jail, managing the shift, assessing staff performance, and providing coaching and support to individual staff.[62]

---

[62] Report of Paul Adee at page 19 of 22

25.    None of the opinions that I have offered in this matter are given as legal conclusions. Rather, much of the language of the law, as well as statutory and case law, are utilized in the training of law enforcement and other public safety personnel. References to terms utilized in legal opinions and training matters are offered only as to common knowledge, training, and policies of criminal justice entities.

26.    The Marion County Sheriff's Office is an accredited agency by the Florida Corrections Accreditation Commission, Inc. The independent review certifies that a corrections organization meets prescribed standards in the field. Key in the lengthy process to pursue accreditation is the development and maintenance of the policies and procedures that guide agency members. The Marion County Sheriff's Office has been reaccredited multiple times for Sheriff Woods's ongoing commitment to excellence demonstrated through the agency operations, documentation of efforts, and review by external independent authority.

Respectfully submitted,

*Richard M. Hough, Sr.*

Dr. Richard M. Hough, Sr., CPP, CCHP, SHRM-SCP