**Page 1**

```
 1            UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                 OCALA DIVISION
 3  KRYSTI MERCHANT, as      .  Case No. 5:23-cv-00661
    Personal Representative, .
 4  for the                  .
          Estate of          .
 5  Cory Merchant, Deceased  .
 6  Plaintiff,               .  May 28, 2025
                             .  1:00 PM EST - 5:07 PM EST
 7       v.                  .
                             .
 8  BILLY WOODS, Sheriff of  .
    Marion County, Florida   .
 9  in his official capacity;.
    Deputy Justin Kosinski,  .
10  Deputy Joseph Miller,    .
    Sergeant Jerome Dukes,   .
11                           .
         Defendants.         .
12  . . . . . . . . . . . . . .
13
             VIDEOCONFERENCE-ZOOM DEPOSITION
14          OF RICHARD HOUGH, SR., CPP, CCHP
15  APPEARANCES:
16  For the Plaintiffs:    Romanucci & Blandin, LLC
17                         By: Sam Harton, Esquire
18                         321 North Clark Street
                           Suite 900
19                         Chicago, Illinois 60654
                           (312) 458-1000
20
    For the Defendants:    Hilyard, Bogan & Palmer, P.A.
21                         By: Bruce R. Bogan, Esquire
                           105 East Robinson Street
22                         Suite 201
                           Orlando, Florida 32802
23                         (407) 425-4251
24
25
```

**Page 2**

```
 1                      INDEX
 2                                           Page
 3
 4
 5  WITNESSES FOR THE          Direct   Cross
 6  PLAINTIFFS:
 7
 8  RICHARD HOUGH, SR., CPP, CCHP    4      100
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
    EXHIBITS                       Marked Received
 2   66                               11
 3   19                               67
 4   64                               69
 5   65                               77
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                P R O C E E D I N G S
 2      (Thereupon, the following proceedings were held at
 3  12:00 PM)
 4   Thereupon,
 5           RICHARD HOUGH, SR., CPP, CCHP,
 6    was called as witness and after having been first
 7  duly sworn, was examined, and testified as follows:
 8                DIRECT EXAMINATION
 9  BY MS. HARTON:
10      Q    Dr. Hough, I'm assuming you've given
11  depositions before.
12      A    I have.
13      Q    Okay.  Let's just go over some of the ground
14  rules.  Obviously very important to give verbal answers.
15  Yes's and no's, explanations, but not uh-uh, ah-uh's,
16  shaking the head, nodding the head, understood?
17      A    Yes.
18      Q    Okay.  There may be times where the attorneys
19  object.  Unless they instruct you not to answer for some
20  sort of privilege, you understand that you have to
21  answer the question, correct?
22      A    Yes.
23      Q    Okay.  And you know, obviously this is not
24  like a normal conversation where we sort of anticipate
25  what other people are going to say.  You need to let me
```

1  finish my question before you start giving your answer.
2  And I need to let you give your full answer before I
3  start giving my next question, I'm going to do my best
4  if you promise me to do your best.  Is that fair?
5      A   Absolutely.
6      Q   Okay.  A few things that are specific to this
7  case, in these corrections cases, the words inmates and
8  detainees and prisoners kind of get used
9  interchangeably; although, they all have, you know, kind
10 of more specific meanings in the field of corrections.
11     But I hope that throughout the day I might use the
12 word detainee.  That's probably the proper word for most
13 of the people that we're going to be speaking about
14 today.
15     But I'm probably also going to use the word inmates
16 because that's how a lot of policies refer to the people
17 in the Marion County Jail.
18     So can we just get on the same page that if I say
19 detainee or inmate, I'm talking about people who are in
20 the custody of Marion County Jail or some other
21 corrections facility.  Is that fair?
22     A   Yes.
23     Q   Okay.  And if there's some sort of material
24 distinction that needs to be made as far as detainees or
25 inmates.  As far as the question that I'm asking, you

5

1  can feel free to make that distinction, okay?
2      A   Sure.
3      Q   Okay.  And then have you -- what have you
4  reviewed in anticipation for your deposition today?
5      A   I don't remember which parts.  I've gone back
6  through my report sometime in the last few days.
7      I know there was a lot of documents in this case.
8  So prior to my report all of the materials I was
9  furnished.
10     But like I said, as far as leading up to here, I
11 think I looked back through maybe a couple of the
12 policies and glanced at, I think a couple of the
13 deposition transcripts.
14     But I've been on the road for the last two weeks,
15 so I'm not -- I'm not -- I'm not sure which ones I did
16 look at.
17     Q   Okay.  And did you meet with the attorneys for
18 Marion County?
19     A   Spoke with Mr. Bogan briefly.
20     Q   Okay.  For about how long?
21     A   Oh, let's say about 30 minutes.
22     Q   Okay.  And where are you today?
23     A   In Johnson City, Tennessee.
24     Q   Okay.  Are you at your your home office?  Your
25 your actual office?

6

1      A   Correct.  My home office.
2      Q   Okay.  Is anyone else in the room with you?
3      A   No.
4      Q   Okay.  Do you have any documents in front of
5  you?
6      A   A copy of my report.
7      Q   Okay, great.  Is that the full report with all
8  the appendices and everything?
9      A   Yes.
10     Q   Great.  And a few questions that I have to ask
11 that are a little bit rude, but do you have any felonies
12 in your background?
13     A   I do not.
14     Q   Okay.  When I was researching you there's a
15 Supreme Court of Ohio case that deals with a Richard M.
16 Hough, who was convicted of, I believe it was a
17 vehicular manslaughter.  I assume that it's not you
18 today.
19     A   That is not me.
20     Q   Different Richard M. Hough.  Understood.
21     So, another kind of rude question.  Is there any
22 sort of reason why you would not be able to testify
23 fully and truthfully today?
24     You took some sort of medication.  You didn't get
25 enough sleep last night.  You're suffering from some

7

1  sort of illness.
2      A   No.
3      Q   Okay.  You were retained by Mr. Bogan and his
4  firm, Hilyard, Bogan and Palmer, correct?
5      A   Yes.
6      Q   And how many times have they retained you?
7      A   I would probably estimate over the last 10
8  years, maybe 10 or so times.  That came up recently in
9  another case with another firm.  So that's what sticks
10 out in my mind.
11     Q   Okay.  Do you have any other clients that you
12 do expert work for that you've been retained that many
13 times?
14     A   I'm sure.  Yeah.
15     Q   Okay.  What kind of cases were you retained by
16 Hilyard, Bogan and Palmer?
17     A   I think that each would be either a police
18 practices or a corrections practices case.  Probably on
19 behalf of the Florida Sheriff's Risk Management Fund, I
20 think is the as the client.  I can't -- I can't recall
21 any that that would not be the case.
22     Q   As you're thinking back to those cases that
23 Hilyard, Bogan and Palmer has retained you on, are you
24 just considering those that they've retained you to
25 disclose a report and/or testify, or are you also

8

1  considering those that they've retained you to consult
2  on?
3      A   I don't believe they have utilized me as a
4  consulting expert in any of those cases.  I think all of
5  those would have been as a retained, disclosed
6  testifying expert.
7      Q   And Hilyard, Bogan and Palmer is not the only
8  law firm that has retained you in their representation
9  of the client, the Florida Risk Management Fund.
10 Correct.
11     A   Oh, right.
12     Q   Right.  So, sorry, is it the Florida Sheriffs
13 Risk Management Fund?  Is that the correct --
14     A   I, I believe I'm saying their title correctly.
15 I believe that's right.
16     Q   And your understanding is why -- don't you
17 just tell me what your understanding of the Florida
18 Sheriff Risk Management Fund is.
19     A   Kind of there in the name, just the collective
20 insurance entity that the various of the 60 or so
21 sheriff's offices within the State of Florida can or do
22 participate in for their liability coverage and
23 representation.
24     Q   They provide insurance to the the various
25 sheriff's departments throughout Florida, right?

9

1      A   I can't, you know, speak to, you know, all of
2  their functions.  But that's where typically a check
3  comes from after I submit an invoice.  So yes, to my
4  knowledge, that covers it.
5      Q   And how many times have you been retained to
6  provide a report, consult, provide testimony in any case
7  for the Florida Sheriff's Risk Management fund?
8      A   I don't know.  Of course, the Rule 26 part of
9  my report will cover the last three or four years,
10 whatever is required in terms of testimony, but I don't
11 know how many times I've been retained by the Fund.
12     Q   Is it more than 15?
13     A   We're all based on kind of what we just said
14 about how many over the past decade, perhaps for this
15 firm, I'd say yes, but I won't do much more of a
16 guessing game than that.
17     Q   Okay.  How much of your income comes from
18 expert witness work, what percentage?
19     A   I would say over the last, probably averaging
20 over the last three years, 65 percent.  Maybe 70
21 percent.
22          MS. HARTON:  Okay.  You have provided a report
23     in this case.  Let's just get this out of the way
24     and enter it into the record.  I've labeled it
25     Exhibit 66 and you've got a copy of it in front of

10

1      you.
2          (Thereupon, Plaintiff's Exhibit 66 was marked for
3  identification.)
4  BY MS. HARTON:
5      Q   Let's see.  So this is the this is the first
6  page of your report.
7          That looks correct, right?
8      A   Yes, that looks correct.
9      Q   All right.  And then if I go all the way down
10 to the bottom, it's a total of 60 pages with the last
11 page being blank.  It's a total of 60 pages including
12 the appendices, right?
13     A   That sounds right.
14     Q   All right.  Is there anything that I have
15 throughout this depo, as I'm showing you the the report,
16 that's different from the report you have in front of
17 you, you're going to let me know, right?
18     A   Yes.
19     Q   Okay.  I'm going to go down to Exhibit 66,
20 Appendix A.  These are the documents that you reviewed,
21 right?
22     A   That would be correct.
23     Q   Okay.  Have you reviewed any other materials
24 in addition to the ones listed in this disclosure?
25     A   I don't recall what.  Perhaps I've been

11

1  forwarded since the date of the report, February 5th.
2  So it's entirely possible, but I don't.  I'm not sure.
3          Looking at that, I know the electronic folder
4  strikes me it had a lot, but I know some of that may
5  have been in sub folders.
6      Q   You've been forwarded other depositions that
7  have been taken throughout discovery that you didn't
8  have when you disclosed this report?
9      A   I think that would be correct.  I see McNeely,
10 Miller.
11     I'm not sure, but prior to issuing the report, this
12 would be the list.
13     Q   Did anything that you may have reviewed, after
14 you disclosed this report, none of that changed your
15 opinions, right?
16     A   Correct.
17     Q   So you list all the materials that you've
18 reviewed here.  You've reviewed every single one of
19 these documents listed in these five pages, right?
20     A   At some point in the in the process, yes.  As
21 you flip through those -- I nothing comes up that I
22 would not have, for some reason, reviewed in this.
23     Q   Tell me about your your review process.  Are
24 there, you know, some documents that you kind of paid
25 more attention to than others, some that you kind of

12

1  recognized as not being relevant and skimmed through?
2  Tell me about your process.
3      A   As I think, somewhere within the report I talk
4  about the methodology of looking at, on any of these
5  cases, if you call me up tomorrow and say, hey, you
6  know, I've got a case, maybe you could look at it.
7      I'm going to start with everything that you do
8  furnish to me and then once, kind of digesting that and
9  that's all the documents to kind of look at that balance
10 against what are existing documents either within the
11 field in this case corrections or law enforcement
12 depending on the matter.  Any, perhaps, guidance or
13 recommended or advised models or policies that are out
14 there.
15     I usually, I'm sure in the report refer to the
16 American Correctional Association, American Jail
17 Association.  In this case, of course, looking at the
18 Florida Model Jail Standards and the Florida
19 Accreditation Commission for Corrections.
20     Those would be the two guiding ones in this case,
21 and look to determine within the scope of whatever I've
22 been asked to review, whether there is some departure
23 from standards, and if I'm able to render an opinion
24 regarding whether that bears on any aspects of the case
25 or not.

13

1      Q   We said earlier that there were a lot of
2  documents in this case, right?
3      A   Yes.
4      Q   Did you read every single word of every single
5  document or were there some that you skimmed through?
6      A   I don't know.  You've used that term skim
7  twice.  I think if we were to pull up each and every one
8  of the documents to remember back to whenever I received
9  any of those, I would have to literally look at each of
10 those to determine, you know, how many pages in each.
11     And is it potentially that in any one of the
12 documents some aspect of it didn't get as full of
13 reading as somewhere else.  I certainly wouldn't sign on
14 for the benefit of your presentation to the jury that I
15 skimmed the materials.  No.
16     Q   Okay.  In this case, there were some written
17 interrogatories that were answered by Marin County and
18 some of the other defendants in this case.  I'm not
19 seeing those on your appendix.  Do you recall reviewing
20 any written interrogatories?
21     A   Independently sitting here?  No, I don't
22 recall.
23     Q   Okay.  So your fee schedule is the next
24 appendix.  You have a -- just kind of going through the
25 highlights here.  You've got an initial retainer of

14

1  $3,000, another retainer prior to disclosure for 2.5
2  thousand, sorry, $2,500.  And then you charge 375 per
3  hour and then you've got some other fees pertaining to
4  travel.  And then of course a fee for this deposition of
5  $1,800.
6      Is that all accurate kind of how I summarized that?
7      A   Yes, that seems right.
8      Q   How how much?  Have you invoiced for today, as
9  we sit here today?
10     A   I don't believe it's any more than that
11 initial $5,500.  I don't recall any other invoice at
12 this point.
13     Q   Okay.  How many hours have you spent on the
14 case?
15     A   Post retainer, I think it is approximately
16 somewhere between seven and nine.  But until I
17 determined that an issue an invoice, I'm not positive.
18     Q   Seven to nine total hours on this case you've
19 spent?
20     A   Post retainer, meaning it would have been a
21 minimum or up to 15 hours is covered by the initial
22 retainers and so that anything after that.  So then
23 probably, therefore, you know, in the area of 25 or so
24 hours.
25     Q   Okay.  Let's go through your CV, which is

15

1  appendix C.  First I want to start -- you've got two
2  masters in public administration.  Can you tell me why
3  you have two?
4      A   Sure.  The second one, as you see from the
5  University of South Florida, is all but thesis.  I had
6  completed all but three courses before being accepted to
7  Harvard.
8      Went off, did the master's degree at Harvard, came
9  back, didn't like the idea of leaving three courses
10 hanging.  None of these courses are repeats.  In other
11 words, it's a completely different curriculum, still
12 arriving at public administration, public management.
13     Q   So you took.  Sorry, I might be confused here.
14 You took all of your -- almost all of your master's
15 courses until you had three left at University of South
16 Florida.  And then did you take those additional three
17 courses at Harvard, those last three?
18     A   No, I took those at USF, once I returned from
19 Harvard.
20     Q   Okay.  So then how many courses did you take
21 at Harvard?
22     A   I think it was 10.
23     Q   Okay.  And did you do a thesis while you were
24 there?
25     A   I'm trying to remember there was a major

16



1  paper.  I don't recall if they termed it as thesis.
2  It's been a while.
3      Q   Le me go through some of your positions.  I'll
4  start start sort of at the bottom here.
5      You started a started your career in law
6  enforcement as a patrol officer for the Bradenton Beach
7  Police Department, right?
8      A   That is correct.
9      Q   Okay.  Then you -- you went to -- why'd you
10 switch from Bradenton Beach to Longboat Key?
11     A   Larger agency.
12     Q   Okay.  And you became a department training
13 officer and then a senior patrol officer, right?
14     A   That's correct.
15     Q   Okay.  Did you do it -- when you were at those
16 two police departments did you do any corrections work
17 or were you just sort of on patrol?
18     A   No, those were as patrol officers.
19     Q   Right.  So then when's your first position
20 that you start getting into corrections?
21     A   That would be.  That would be 1991 where you
22 see the entry there under the Manatee County Sheriff's
23 Office.
24     Actually, that's not true because -- let's take a
25 look here.  As administrative division commander at the

17

1  Manatee Sheriff's Office, which was 1989.  Part of that
2  division included all training for the agency.  But
3  then, yeah, I see the next one above that 1991 when I
4  returned then started a corrections and a law
5  enforcement academy for the Sheriff's office.
6      That's one of the statewide training academies.  So
7  in the 1989, probably, time frame, but then 1991 is when
8  I took over the corrections bureau at that agency.
9      Q   Well, what had you done in corrections besides
10 -- what is -- tell me what this law Enforcement and
11 Corrections Academy coordinator position was.
12     A   That's overall in charge of all training for
13 all entry level corrections deputies as well as law
14 enforcement deputies.
15     Q   And you became the coordinator of that.  But
16 it looks to me like prior to that position you had no
17 corrections experience whatsoever, it was all patrol.
18     A   In terms of working as a corrections officer,
19 that's correct.  During the period of time as policy
20 advisor that would also have included some aspects of
21 written policy.
22     I was part of the agency's General Orders Review
23 Committee.  We were going through, at the time, national
24 accreditation, which was for law enforcement.
25     It had some some implications with corrections, but

18

1  largely not.  So, yeah, I'd say 89, 90, 91 is where
2  really any substantial involvement began.
3      Q   You weren't a corrections officer or doing any
4  corrections administration, right?
5      A   Not until then.
6      Q   Not until 1991?
7      A   Correct.  Well, it depends on, let's see, when
8  the academy started.  Yeah, that sounds right.  1991
9  sounds right.
10     Q   Okay.  The deputy chief corrections bureau
11 CERT commander; what's a CERT commander?
12     A   Correctional emergency response team.
13     Q   Okay.  This was at the Manatee County
14 Sheriff's Office.  I assume that that Manatee County
15 Sheriff's Office had some sort of regime by which it
16 classified inmates and housed inmates according to their
17 classifications, right?
18     A   Sure.  Yes.
19     Q   Okay.  What was your role in terms of
20 participating in the classification of inmates or
21 participating in developing policies related to
22 classifications of inmates at Manatee County?
23     A   I was director of corrections, and so within
24 the overall bureau, which I think was three divisions at
25 the time, the development of all policies were under and

19

1  modeled the same thing we did at the department in
2  creating a corrections general orders review committee,
3  because we also undertook national accreditation for
4  corrections, specifically at that time.  So leading the
5  the team that researched and wrote all policies for the
6  corrections component was all part of me.
7      I taught that at some point in the Academy as well,
8  along with, I'd have to look at the curriculum, but most
9  topics within corrections in the State of Florida at
10 some point or another.  Put myself through the academy
11 while we were running our first corrections academy to
12 become cross certified as a correctional officer at that
13 at that time also.
14     Q   I don't think I heard you say anything about
15 classifications.  And I'm sorry if I just missed it, but
16 what specifically did you do in this position from 1991
17 to 1995 at Manatee County that had to do with
18 classification of inmates?
19     A   Yeah.  On two points there, one as being in
20 charge of the entire corrections bureau.  That was a
21 section that reported up through the chain to me.
22     And having taught the section on classifications in
23 the correctional academy.
24     Q   And just to be clear, you said you were --
25 this is your deputy chief corrections bureau, and I

20



1  think you said that at that point you were in charge of
2  that jail, right?  Is that a fair characterization?
3      A   Yeah, there were four correctional facilities,
4  but that is correct that I was in charge of all four of
5  them.
6      Q   You were in charge of all four jails, even
7  though you had never worked as a correctional officer or
8  a correctional sergeant?
9      A   Correct.  Or lieutenant or captain or a major
10  or corporal.  That's correct.
11      Q   And how did you -- explain to me how you made
12  that jump from, you know, you had all this this
13  experience in policing, jumping over to corrections.
14  And not only jumping over to corrections, being in
15  charge of four correctional facilities.
16      A   Nothing particularly unusual.  That was the
17  Sheriff's assignment to build the first juvenile boot
18  camp in the state, to build a new correctional facility,
19  to create the correctional academy and to revise/revamp
20  the recruitment and hiring of corrections, and as noted,
21  there, leadership of those divisions within the agency.
22      Q   In your education section, there aren't dates
23  next to when you got your degrees.  When did you get
24  your master of public administration at USF?
25      A   Well, the Harvard one was '91, so I'll have to

21

1  figure the split.  When I got back I probably completed
2  the coursework there.  I would say either 1993 or '94.
3  That's that's a guess.  It's a quarter of a century ago.
4  But I think that's about right.
5      Q   What about Saint Leo University?
6      A   Late 80s.
7      Q   So, did you get this position, as being in
8  charge of these four jails, in Manatee County after you
9  graduated from Harvard?
10      A   That is correct, yes.
11      Q   So, next you become -- you go to the Santa
12  Rosa County, Florida Sheriff's Office.
13      Sorry.  I'll go back down for you.
14      So, it says 1995 to 1998 you were at Santa Rosa
15  County, Florida Sheriff's Office and you started there
16  as a corrections bureau administrator, right?
17      A   That is correct.  Yeah.  I see there, there we
18  go.  '95.  Correct.
19      Q   And now what do you do at -- as a corrections
20  bureau administrator how is that job different from your
21  your past job at Manatee County?
22      A   It wasn't really much different at all.
23      Q   You were still in charge of a jail?
24      A   Correct.  The corrections operation also
25  included work release center, but, yeah, essentially.

22

1  And building another jail.
2      Q   And what -- did Santa Rosa County have a
3  regime by which it classified inmates and house those
4  inmates according to their classifications?
5      A   Yes.
6      Q   Okay.  What was your role in helping develop
7  those classification policies at Santa Rosa?
8      A   Those had already been developed in Santa
9  Rosa.  So, once again I was in charge of corrections
10  that would have reported up through the chain of command
11  to me.
12      Q   Okay, so so both at Manatee County and Santa
13  Rosa, they already had these sort of classification
14  regimes in place when you got there, right?
15      A   Each had a classification unit in existence;
16  that is correct.
17      Q   And did you participate in any policy changes,
18  procedural changes as it related to the classification
19  of inmates?
20      A   Well, I've already testified at Santa Rosa or
21  excuse me, at Manatee, yes, that's correct.
22      At Santa Rosa I can't recall specifically whether
23  that was part of the overall set of correctional
24  policies and procedures that I directed the rewrite of.
25  We were working on going towards state accreditation

23

1  when I left and went to the Department of Juvenile
2  Justice.
3  Q   So I want to go back to Manatee County.  Sorry.
4      You participated in policy changes related to
5  classifications.
6      A   Correct.  All the policies of the entire
7  bureau.
8      Q   And do you remember what you changed about the
9  classification policies in Manatee County?
10      A   Oh, golly.  No.  25 years ago.  I don't.  I
11  don't remember that.
12      Q   Okay.  What about --
13      A   Actually, that would have been like 30 years
14  ago.
15      Q   Right.  And same answer for Santa Rosa County.
16  You know that you changed some policies, but you're not
17  sure to what extent you changed the policy about
18  classifications, right?
19      A   I would say that's accurate.  Yes.
20      Q   Okay.  And that's the last time -- and when
21  you leave Santa Rosa County in 1998, that's the last
22  time you work in adult corrections, right?
23      A   Correct.  For adult corrections.  That was it.
24      Q   Okay.  So the the only time that you've worked
25  from adult adult corrections was from 1991 at Manatee

24

1  County to 1998, in Santa Rosa County, right?
2      A   That sounds right.  Other than 30 years of
3  consulting in it.  But I believe that would be correct.
4      Q   Okay.  And then you go work for five years in
5  the Florida Department of Juvenile Justice, right?
6      A   Correct.  In the detention services.
7      Q   Those are all minors, people under 18, right?
8      A   Yes, they are.
9      Q   Why'd you laugh?
10     A   Because they have a higher assault rate on
11 officers than all state agencies in the State of Florida
12 combined.  It's much more challenging population for
13 anybody who knows anything about corrections.
14     Q   And in the Juvenile Justice Department did you
15 participate in developing policies/procedures for any of
16 the facilities or the department at large?
17     A   As noted on the -- my CV there, I created the
18 Statewide Juvenile Detention Officer Training Program to
19 train correctional officers within the facilities across
20 the State of Florida at the regional level for the two
21 detention centers, that at different times I was in
22 charge of.
23     Also led the effort to develop the new policies for
24 one that was the Okaloosa Regional Juvenile Detention
25 Center and some rewrites for the other detention center.

                                                    25

1      Q   And so those are -- so you helped develop a
2  training program.  Did you do anything else in terms of
3  developing policies and procedures for the Department of
4  Juvenile Justice?
5      A   In the final, I think it was about six months
6  or so of the time I was there I worked on, as part of a
7  small working group as a subject matter expert on use of
8  force, use of force policy, tactical procedures, all of
9  which resulted in rewritten or newly created policy for
10 that state agency, yes.
11     Q   Did any of those policies, procedures or
12 training that you helped develop have to do with
13 classifications?
14     A   Not in that final period, no.
15     Q   What about the training that you developed
16 before that final period?  Did any of those trainings
17 have to do with classifying juveniles?
18     A   The state already had in place the statewide
19 system for that.  So I don't remember, other than hiring
20 70 new people who'd never been correctional officers
21 before and overseeing their training, I don't think I
22 wrote anything on classification that would have been
23 new for the State of Florida at that point.
24     Q   I want to ask the same questions as it
25 pertains to supervision of monitoring of inmates.  At

                                                    26

1  any of those three departments where you were in charge
2  of their corrections facilities did you participate in
3  the development of policies, procedures or training
4  relating to the monitoring and supervision of inmates?
5      A   All three agencies, yes.
6      Q   And can you -- we can go, you know, one-by-
7  one.  But can you recall the specifics of any of those
8  policies, procedures, or trainings that you developed
9  related to supervision and monitoring of inmates?
10     A   I would not be able to recall for any of those
11 three agencies specific examples of what within those
12 topic areas that I may have changed or modified.
13     Q   And same question for inmate-on-inmate
14 violence.  Do you remember the specifics of any
15 policies, procedures, trainings that you developed at
16 any of those three agencies.
17     A   That would be contained within the supervision
18 and management that we just discussed?
19     Q   Okay.  And you don't recall any particular
20 change that you made, said, hey, I think this would be a
21 good idea to implement anything like that?
22     A   Not -- not as such, no.
23     Q   Okay.  Now, we've said the term
24 classifications a few times, and I kind of explained
25 what I meant, but I just want to make sure we're on the

                                                    27

1  same page.  When I'm talking about classifications in
2  terms of corrections what do you understand that to
3  mean?
4      A   Well, probably more important to understand
5  what you mean so that the questions get an appropriate
6  response from me.
7      Generally, within the correctional field, including
8  whether it's detention centers, jails or prisons, for
9  that matter, you are with the staff to the extent you
10 have the staff to accomplish this.
11     Trying to determine an appropriate housing
12 location, to the extent you have varied housing.  And
13 where to place individuals that may be most appropriate
14 for their particular needs and for the security of the
15 facility.
16     Q   And why is it important to have a
17 classifications regime and process at any jail?
18     A   Well, as I just said, when you consider
19 housing as well as what programs you either have
20 available to offer to the inmate population, those are
21 some of your, you know, guiding things.
22     So the good order of the facility is kind of an
23 umbrella term to think about, you know, how well a place
24 can be run when you have a group of incarcerated humans.
25     Q   And one of the reasons for classifications is

                                                    28



1  that some people pose a higher risk of -- higher
2  security risk to the officers and to other inmates. And
3  so it's important that the jail classifies them
4  according to that known risk, right?
5      A    Risk, to the extent that risk can be
6  determined is one aspect of classification. It's in the
7  mix. Yes.
8      Q    Let's talk about your report now. I'm going
9  to go up to page 10.
10     Okay. And I want to point your attention to this
11  first paragraph, and take a minute to read it if you
12  need to, and let me know when you're ready for me to ask
13  you a question.
14     And if you --
15     A    The one under spontaneous assault?
16     Q    No, just the first, the top, the first
17  paragraph.
18     A    Okay.
19     Q    And if you want to read on the the version
20  that you have printed out, that's totally fine too.
21     A    Yeah, it's –
22     Q    Whatever you prefer.
23     Okay, I can actually just take this down then and
24  then we can just --
25     A    That's fine.

29

1      Q    Well, maybe I can.
2      A    I do see the paragraph. Yes.
3      Q    Okay, so that last sentence you say, "For the
4  instant matter the law and administrative code as
5  enacted by Florida Legislature is the actual standard
6  that agencies in Florida must meet."
7      Do you see that?
8      A    I do.
9      Q    Okay. So by the "instant matter" you're
10  talking about this case that we're here about, which is
11  Merchant versus Wood's case involving the death of Cory
12  Merchant in the Marion County Jail, right?
13     A    Correct.
14     Q    Okay. So what is the basis for your opinion
15  that the law and administrative code as enacted by the
16  Florida Legislature is the actual standard by which to
17  assess the incident matter in this case involving Cory
18  Merchant?
19     A    And again, putting the entire paragraph in
20  context, Mr. Adee refers to something that is not in
21  any.
22     THE COURT REPORTER: I'm sorry, who?
23     THE WITNESS: A-D-E-E. Expert for the
24  Plaintiff.
25     He references a document that is not guiding

30

1  for the State of Florida. What is guiding for the
2  State of Florida is the Florida Model Jail
3  Standards as well as, to a certain extent, the
4  Florida Commission for the Accreditation of
5  Corrections since Marion County has gone through
6  that voluntary process to achieve state level
7  accreditation.
8  BY MS. HARTON:
9      Q    Yeah. And so what's the basis for your
10  opinion that the law and administrative code as enacted
11  by the Florida Legislature is the standard by which to
12  assess this case.
13     A    The Florida Model Jail Standards are the
14  standards that jails within the State of Florida have to
15  abide by. I'm not sure how else to to put that. And
16  Marion does.
17     Q    Okay. And those standards -- those are the
18  standards that that –
19     Sorry. You said, "and Marion does."?
20     A    "Does." The Marion County Sheriff's Office
21  Jail Facility adheres to the Florida Model Jail
22  Standards as well as the Florida Commission for the
23  Accreditation of Corrections.
24     Q    Okay. And so, those standards, the Florida
25  Model Jail Standards and the Florida Committee for

31

1  Accreditation –
2      Sorry, remind me what that FCAC stands for again.
3      A    Florida Commission for the Accreditation of
4  Corrections.
5      Q    Right. So I'm going to refer to them as FMJS
6  or Florida Model Jail Standards. And the FCAC.
7      THE COURT REPORTER: I'm sorry, just a little
8  bit slower.
9  BY MS. HARTON:
10     Q    Yes. The Florida Model Jail Standards and the
11  Florida Committee for Accreditation of Corrections.
12     Those two standards provide the foundation for all
13  of your opinions, right?
14     A    Well, no.
15     Q    Okay. Can you explain?
16     A    Well, you just took me back to 30 years ago on
17  the CV. I have a 45 year career including, obviously,
18  many things we didn't discuss that form the basis of my
19  opinions as well as what are -- what is the academic
20  literature showing us, what other things, to include
21  some of the items referred to by Mr. Adee.
22     The universe of those items form the basis of how I
23  would evaluate any case or analyze it.
24     Q    So these -- so in this paragraph, you sort of
25  fault Mr. Adee for relying too heavily on these National

32

1  Institute of Corrections and Sheriffs Guide Resources.
2  But those those are sources by which you can draw some
3  sort of guidance as to how to run corrections, right?
4      A    That's that's that's too broad of a statement.
5  Mr. Adee is applying it specifically in this case.  And
6  and I, yes, I say this in a variety of places in the
7  report, is to presenting that as though this is guiding
8  in a legal sense that anybody, any state or territory
9  within the US would have to follow that document, which
10  they do not.
11      So that's the point to be made here is that the
12  Florida Model Jail Standards, the FMJS and the FCAC
13  Standards are those that a Florida jail, if they're
14  accredited, but the Florida Model Jail Standards,
15  regardless.
16      Those are the ones that you have to abide by,
17  others may provide guidance, commentary.  I make the
18  point in the report that the document Mr. Adee refers to
19  is an informational one for new sheriffs, new
20  corrections director sometimes.
21      It was created 20 some years ago.  So it is not
22  something that's a requirement for any of the 3100 jails
23  in the U.S. that has to follow.
24      Q    What's your basis for what you later included
25  in opinion that Mr. Adee is using these -- the Sheriff's

33

1  Resource Guide and this National Institute of
2  Corrections Guide; what's your basis for the opinion
3  that he's saying that those are mandatory or carry any
4  sort of force of law?
5      A    Which opinion of mine are you referring to
6  specifically?
7      Q    I mean, we can get into it.  We can get into
8  it later.  But you say --
9      A    Well, you're asking me a specific question.
10  So my basis for an opinion on his opinion is not what
11  I'm here for.
12      My opinions rest on the analysis that I did, but
13  it's certainly also within my purview to point out when
14  I think something is inaccurately stated.
15      Q    Okay.  But so if you go to opinion 19, page
16  24, opinion 19 of your report.  I'll let you get there.
17  Let me know when you're ready.
18      A    I'm there.
19      Q    You say plaintiffs practices expert Mr. Adee
20  recites several non guiding documents that discuss
21  sundry jail issues.  What non guiding documents are you
22  referring to?
23      A    Well, we just referred to the one.
24      Q    The Sheriff's Guide?
25      A    Correct.

34

1      Q    And the National Institute of Corrections?
2      A    Correct.
3      Q    Why are they not guiding?  Don't -- go ahead.
4      A    They they bear no weight of law nor regulatory
5  guidance or authority.  They are commentary by the
6  National Institute of Corrections on certain aspects of
7  certain operations of correctional facilities that may
8  be helpful to understand the environment and how things
9  might be run, but they do not direct how a sheriff in
10  the State of Florida must do things.
11      Q    Okay.  And so what are the things that direct
12  what -- how a sheriff must do things?
13      A    Well, I've already testified to that twice.
14  Here's a third time.  Florida Model Jail Standards and
15  the Florida Commission for the Accreditation of
16  Corrections.
17      There are, of course, statutes that come into play.
18  But the Florida Model Jail Standards were developed
19  considering all of the statutes that touch on county
20  level correctional facilities and operations.
21      Q    And it's -- and the Florida Model Jail
22  Standards and the -- the Florida Florida Model Jail
23  Standards and the Florida Commission for Accreditation
24  of Corrections, those provide standards that carry the
25  authority of law?

35

1      MR. BOGAN:  Object to form.
2      THE WITNESS:  As I said, the Florida Model
3  Jail Standards are mandatory for jails in the State
4  of Florida to follow.
5      What I said about FCAC is that because Marion
6  County undertook the voluntary accreditation, that
7  if they do not adhere to the standards at the
8  prescribed level that that they must they are at
9  risk of not being reaccredited.
10  BY MS. HARTON:
11      Q    So in addition to the Florida Model Jail
12  Standards and any standards required by the FCAC, jails
13  in Florida are also required to meet the standards set
14  forth by the United States Constitution, right?
15      A    That is correct.
16      Q    Okay.  Is it your opinion that those standards
17  that we just discussed, the Florida Model Jail Standards
18  and any standards set forth by the FCAC that those are
19  reflective of the constitutional minimum standards?
20      MR. BOGAN:  Object to form.
21      THE WITNESS:  Well, of course, as I note in my
22  report, I don't -- I'm not in a position to offer
23  legal conclusions.  I can speak at length in
24  regards to the training of correctional
25  professionals and how much of that training

36



1    incorporates case law, constitutional law,
2    statutory law in regards to how officers are
3    trained.
4        So to -- I have no reason in the record of
5    this case, nor in anything since Florida's
6    Accreditation Commission has existed, that would
7    indicate that that body did not reflect or take
8    into account constitutional law as directed by the
9    Florida Legislature and in creating those
10   standards. So, no legal opinion on my part. But
11   yes, it appears that the statewide accreditation
12   reflects law.
13   BY MS. HARTON:
14       Q    Florida state law or constitutional law or
15   both?
16       A    As I said, my view would be that both are
17   contained within the Florida Model Jail Standards when
18   they created those.
19       Q    Okay.
20       A    Again, that's not a legal conclusion. You're
21   -- you're inquiring paths to a state level accreditation
22   and what was set up since that's directed by the Florida
23   legislature.
24       Q    But you understand that this case is being
25   brought against the Sheriff for constitutional

37

1    violations. You understand that, right?
2        A    I do.
3        Q    Okay. And you say that for the instance
4    matter, the law and administrative code as enacted by
5    the Florida Legislature is the actual standard that
6    agencies in Florida must meet.
7        So, my question is, is it your opinion that these
8    Florida standards that you've cited multiple times, the
9    Florida Model Jail Standards and those set forth by the
10   FCAC, are the only standard by which we can understand
11   whether there was a constitutional violation in this
12   case?
13       A    Well, again, you're you're calling for a legal
14   conclusion that isn't within the purview of an expert.
15       I'll take you back to what I testified to seven or
16   eight minutes ago, which was the context of that
17   paragraph juxtaposing Mr. Adee's offering of a 20 year
18   old document meant to familiarize new sheriffs about
19   responsibilities in a jail as opposed to actual
20   standards in the State of Florida that direct what
21   sheriff and a jail must do.
22       Not some exclusive statement that keeps out the
23   U.S. Constitution or perhaps federal case law decision
24   made somewhere. So not -- by all means ask more. I'm
25   not entirely sure --

38

1        Q    Let me let me ask you this question.
2        A    Go ahead.
3        Q    Well, what is the basis for your understanding
4    that these -- the law and administrative code as enacted
5    by the Florida Legislature is any more useful in helping
6    us understand what the constitutional minimal standards
7    are than the National Institute of Corrections or the
8    Sheriff's Guide?
9        A    Yeah. One's required. One's not. I'm
10   failing to understand why --
11       Q    Required by the State of Florida, right?
12       A    Correct. There's no -- let me finish,
13   counselor. Remember the golden rule.
14       There's no jail within the State of Florida that
15   has to do anything that the National Institute of
16   Correction says. They all have to do what the Florida
17   Model Jail Standards say. What is not clear about that?
18       Q    What about the -- what is your basis for the
19   use of the Florida Model Jail Standards as a way to
20   understand what is required by the Constitution?
21       A    Okay, you just pulled that one out of air or
22   left field or something. I never said in this report
23   that the Florida Model Jail Standards or FCAC is the
24   pathway into the U.S. Constitution.
25       Your question was going off the fact that your

39

1    expert offered up a 20 year old NIC document as
2    something that directs what sheriffs in Florida do, and
3    it doesn't. That's the point in that paragraph. We can
4    keep doing the gymnastics, but that's was what I
5    said in the paragraph.
6        And when you're ready, we'll we'll take a break so
7    I could get some coffee.
8        Q    Can I -- just want to finish this line of
9    questioning.
10       A    One more question then I need to get up and
11   take a break. But that's fine.
12       Q    Is it is it your opinion that if a jail
13   complies with Florida law, they have met Constitutional
14   minimal standards?
15       MR. BOGAN: Object to form.
16       THE WITNESS: I appreciate, I guess, what you
17   think, I guess, you're going for, I guess, which is
18   to keep getting me to say something that's not
19   within my purview, which is a legal conclusion.
20       So I don't offer an opinion besides the
21   protracted monologue I just gave a couple of
22   minutes ago in regards to the legislature of the
23   State of Florida, set up the Florida model Jail
24   Standards, Commission and Committee that put
25   together the Florida Model Jail Standards, which

40



1  are required by Florida law to be followed by
2  sheriffs and jails.
3      And you might wish to depose somebody from
4  that commission to speak as to whether, or to what
5  degree they believe, it comports with the United
6  States Constitution, or if there's a case to be
7  made that I haven't seen for the court to take up
8  that the Florida Model Jail Standards, as long as
9  they've been in effect, somehow now deviate from
10 the US Constitution in some way.  I guess that's
11 not for me to say.  I'll try to explain that better
12 to the jury when you ask me.
13 BY MS. HARTON:
14     Q  Well, can you explain it as best to the jury
15 today, since this is my deposition, where I'm going to
16 find out what you're going to tell the jury?
17     A  Well, I, well, I just did.  We're going to go
18 with asked and answered about four times on that.
19     Q  Well, no, you just said that maybe you can
20 answer it better in front of the jury and then you're
21 not going to explain to me what you're going to say to
22 the jury?
23     A  Well, upon reflection, I mean, maybe -- maybe
24 something will occur to me, but I think by then at trial
25 there will have been enough objections and maybe a

41

1  sidebar that the court's going to tell you to move on,
2  counselor.  So that's -- I'm not holding something back.
3      I'm trying to figure out dog on bone, that's what
4  you're doing here with the paragraph and and again,
5  trying to get me after this many years to say something
6  that would what Daubert me by saying I some legal
7  conclusion that I can't draw.  None of that's going to
8  make it before the jury.
9          MS. HARTON:  Let's take a break.
10         THE WITNESS:  Great idea.
11     (Brief recess taken.)
12 BY MS. HARTON:
13     Q  I want to go to the end of your report where
14 you list all of your opinions.
15     I want to go to number five.  It's on page 18
16 of your report.
17     A  Okay.
18     Q  Let me know when you're there.
19     A  I'm at number five.
20     Q  Okay.  So, in the middle of that paragraph,
21 you -- I'll just read the whole thing.
22     "Persons who arrive at a short term jail facility
23     have motivations and lives that are complex and
24     largely unknown to staff, even after assessments,
25     admission and ongoing contact."

42

1      And then you say,
2          "Troubled individuals are not inclined to
3          share details of their lives even when asked direct
4          questions."
5      What's your basis for that second sentence?
6      A  Oh, my.  A sentence out of the entire report.
7  The basis for that sentence.  Well, it stands on its
8  own.
9      First of all, is that troubled individuals don't
10 share everything.  People who are in a correctional
11 facility, typically, kind of by definition, have had
12 something go wrong in their personal existence.
13     Otherwise they they wouldn't be there.  So when
14 you're asking information or assessing individuals, much
15 the same way, I don't know, the the medical drama House
16 was based upon the fact that everyone are shading
17 sometimes, even if they don't know it, the information
18 they're providing to you.
19     So that the whole paragraph, since it isn't a
20 faithful reading to pluck out one sentence out of there,
21 the paragraph gets at the point that you don't know
22 about what's inside the mind of any individual member of
23 your inmate population, but that regardless of these
24 various troubles, complications, stressors that each and
25 every one of us deals with that doesn't mean that

43

1  someone's going to act out at any particular moment or
2  be violent.
3      Q  Dr. Hough, you wrote this report, right?
4      A  Yes, I did.  Why would you ask?
5      Q  Of course you wrote it, right?  And so --
6      A  Of course I did.  Why would you ask?
7      Q  And you wrote and you wrote every sentence in
8  this report, right?
9      A  I sure did.
10     Q  And there's a reason why you included each and
11 every sentence of this report, right?
12     A  Oh, that's a broad question when you're -- I
13 don't know if you're filing a motion or you're
14 particular writing process.  Me, I've written many books
15 and many reports.
16     So as I'm working through something, why a
17 particular sentence at a moment applies to something?
18 Gosh, I'm not sure.
19     Again, that's something I'll try to relate to the,
20 you know, the jury when repeating that about this one
21 sentence.  But follow up with what your point is and
22 I'll try to answer it.
23     Q  I want to, I mean, you included every single
24 sentence in this as a support for your opinions about
25 this federal litigation that you have been retained to

44



1  testify in.
2      And so, I want to know for each -- for these
3  sentences where you are, you are making claims about
4  what troubled individuals do or do not do.
5      I want to know what's your basis for troubled --
6  you say troubled individuals are not inclined to share
7  details of their lives even when asked direct questions.
8  How do you know that? What do you have some sort of
9  research? Some sort of study?
10     MR. BOGAN: Ojection form.
11     THE WITNESS: I object to that form, too, just
12     as a person objecting that you just narrated into
13     the record rather than -- that was all testimony --
14  BY MS. HARTON:
15     Q  You are not a lawyer. You have -- you're --
16     A  You're right, I'm not. And you want to let me
17  respond. I'll respond. I'm not a fact witness,
18  counselor.
19     So, I'll provide my response. You're being
20  ridiculous asking me about this sentence and coming up
21  saying, what's my basis for making that that comment?
22     Well, I don't know, my education, my training, my
23  experience to say, and I think it might resonate with
24  the jury, that troubled individuals are not inclined to
25  share details of their lives even when asked direct

45

1  questions within that paragraph about life stressors.
2      And you don't know all there is to know about
3  people who come in to a jail facility. That's that's
4  the paragraph. That's the point.
5      Q  Sorry. Go ahead.
6      A  No, no, I apologize. I'm getting a little
7  frustrated because I'm not sure if you're just trying to
8  use up the four hours or you really are trying to get to
9  a point that I want to try to help you reach. So I'll
10  try to answer it more. Go ahead.
11     Q  For the record, I get seven hours.
12     A  Not today you don't.
13     Q  And are you saying -- Yes, I do. I absolutely
14  do.
15     A  No. This was for a four hour block of time
16  from one to five, and I've got an appointment at 5:30.
17  So, no, this isn't going seven hours if that's what
18  you're trying to say. But if that's not your point,
19  maybe bring it back to what your question is.
20     Q  Dr. Hough, are you saying that I'm being
21  ridiculous because I'm asking you the basis that you
22  have for this sentence in your report?
23     A  Well, I both apologized and pointed out that
24  I'm getting frustrated. I think it is ridiculous to
25  keep asking me about this particular sentence. So, if I

46

1  can understand better what you hope to glean from this,
2  as opposed to a strategy or a technique that you utilize
3  with people who you depose. I'm going to -- I answered
4  the best I can several times now.
5      Q  I don't think you have. You've not provided
6  me the basis for the -- for your opinion in this
7  particular sentence.
8      MR. BOGAN: Object to form.
9      THE WITNESS: Yeah, the sentence doesn't stand
10     alone. It's within that opinion. I've explained
11     the opinion. You've asked and I've answered
12     several times.
13     MS. HARTON: You have not provided me the
14     basis for this opinion.
15     MR. BOGAN: Object to form.
16  BY MS. HARTON:
17     Q  Let's go with let's go with the whole
18  paragraph. Then what's the basis for this whole
19  paragraph? Number five on page 18.
20     A  Again, I've answered that repeatedly that you
21  don't know all about people who you have in your
22  facility.
23     Q  That's the basis for this opinion?
24     MR. BOGAN: Object to form.
25     THE WITNESS: The whole report and evaluation

47

1  and the work is the basis for the opinion. My, as
2  I said, education, experience, training, how
3  analysis such as this is conducted about a
4  spontaneous assault with no ability to predict that
5  it was going to occur, that's all the point here
6  about not knowing that someone's going to be
7  violent. Everyone has the capacity for violence.
8  BY MS. HARTON:
9      Q  Again, do you have any research, publication,
10  any authority to back up anything that you just said?
11     MR. BOGAN: Object to form.
12     THE WITNESS: No. My career and teaching
13     college for, I don't know, 35 years, and teaching
14     correctional officers for 40 years, and people in
15     the topics of corrections, and human behavior
16     within a criminal justice context and environment.
17  BY MS. HARTON:
18     Q  Throughout this report there's a few times
19  where you reference statistics on, for example, the
20  rates of homicides and jails versus the community. On
21  page 18, opinion six you talk about suicide rates and
22  just providing that context.
23     But my question is, you are you are not a
24  statistician, correct?
25     A  My job title and employment, I'm not employed

48

1  somewhere as a statistician. I'm a professor of
2  criminal justice who works with statistics every day.
3  I'm not, again, I -- your distinction eludes me.
4      Q   Okay. Understood.
5      Okay. I want to go to opinion nine. That is on
6  page 19.
7      You say,
8          "There was no indication that facility
9      classification was utilized improperly or
10     incorrectly. Both Cory Merchant and Eric Lutterloh
11     were appropriately classified as to security and
12     the needs of the facility.
13         Cory Merchant had previously been arrested and
14     convicted for domestic violence, battery. Neither
15     fight that Merchant may have been involved in were
16     with Eric Lutterloh.
17         The information regarding the two fights
18     included one that Merchant initiated and the other
19     an officer, only observed after the fact that
20     Merchant had a black eye.
21         Cory Merchant denied there had been a fight.
22     None of this indicates that Merchant would be
23     classified as a vulnerable inmate."
24     Did I read all that right.
25     A   I believe you did, yes.
                                                        49

1      Q   Okay. You talk about how Cory was
2  appropriately, Cory and Eric were appropriately
3  classified as to the security and needs of the
4  facility. What's the basis for that opinion?
5      A   The classification general order that exists
6  for Marion County Sheriff's Office. The testimony of
7  the two 30(b) witnesses, the general practices within
8  corrections, specifically within jails across the United
9  States, the actual classification decision tree, the
10 north point levels schema that is used by the Marion
11 County Sheriff's Office to classify levels for the
12 inmates.
13     So, yeah, the fact that as charged sex offenders,
14 both were housed in the same location is typical and
15 customary of county correctional facilities.
16     Q   You said, "appropriately classified."
17 Appropriately classified according to what?
18     A   I just listed those.
19     Q   So, appropriately classified according to the
20 jail's own policies?
21     A   I listed that as one part of it.
22     We're missing something here. You seem to just
23 keep repeating some of the things I've already answered
24 at length about the policies, about the 30(b) witnesses,
25 both the captains, about what's common routine in county
                                                        50

1  facilities across the U.S. The fact that it's very
2  normal that you place sex offenders in the same housing
3  area.
4      In fact, that's one of those things contained
5  within the Florida Model Jail Standards is that a
6  prohibition would be a violent felon with a misdemeanor.
7  But there's nothing that says don't put sex offenders in
8  the same housing unit or classify them differently.
9      So, all of all of those things would certainly be
10 part of, I hope, responsive to your question.
11     Q   Right. You said, "very normal that you place
12 sex offenders in the same" place. Very normal according
13 to what, the Florida Model Jail Standards?
14     MR. BOGAN: Object to form.
15     THE WITNESS: Well, and I appreciate that this
16 is your method, I read it in some of your other
17 depositions of, I don't know, picking out these
18 sentences. To what end? I'm not sure. But there
19 is nothing that says don't put sex offenders
20 together.
21     What you will find, as I have found in many
22 years of looking at correctional cases, is that
23 this is the norm. It is absolutely typical to put
24 sex offenders in the same housing unit.
25     One, I don't recall if it was Captain Peterson
                                                        51

1  or McNealy talking about, you know, one of the
2  reasons for that is protection of the inmate
3  sometimes from other inmates who may not regard
4  those who have committed sex offenses well.
5      Because, again, a group of humans within any
6  particular facility all have their own individual
7  thoughts and ways of looking at things, you know,
8  which goes back to opinion five that we just talked
9  about a few minutes ago.
10 BY MS. HARTON:
11     Q   Okay. You said you said, "the norm." This is
12 the norm. This is very normal. You keep you keep
13 saying these things.
14     But I need to understand where you're getting that
15 from. Is it from the Florida Model Jail Standards? Is
16 it from the National Institute of Corrections? Where
17 are you getting that from?
18     MR. BOGAN: Object to form.
19     THE WITNESS: Well, yeah, as I just explained
20 a couple minutes ago, the Florida Model Jail
21 Standards. I already testified to this. I'm sorry
22 if you forgot it or somehow missed it.
23     They don't specifically state that. The
24 prohibition would be violent felons with
25 misdemeanors, women separated from men, juveniles
                                                        52



1  separated from both.
2      No, not the National Institute of Corrections,
3  unless I went back through, you know, many, many
4  decades of whether they comment that, yeah, it's
5  normal that you're going to put those two sex
6  offenders -- that you're going to put sex offenders
7  in the same place. It's up to each individual
8  sheriff.
9      So, my experience over 45 years within
10 criminal justice and dealing with various of these
11 issues, along with what's out there in literature
12 and practices, which is why an hour ago I said to
13 the extent a facility has either the housing to
14 separate people out, which many don't, that you
15 come up with, this is the basis of where
16 classification came from, is that you have to have,
17 or it's beneficial a lot of times, to have some way
18 to break it up.
19     Because you can't, in the case of, like,
20 Marion that may have, I don't know today if they
21 have 1800/2000 inmates. I'm not sure where they're
22 at, but no county in the U.S. could afford to build
23 a jail facility with 3000 or 2000, you know,
24 separate jail cells to kind of match what their
25 inmate population is.

53

1      So, the idea that it's normal to have sex
2      offenders gather together, that is from my
3      expertise as a corrections consultant.
4  BY MS. HARTON:
5      Q    Okay. You said it's up to each individual
6  sheriff. And you said a lot there. So I'm just hoping
7  that you can help me understand exactly what you meant
8  by, "It's up to each individual sheriff."
9      A    If that's a question, yeah, let's try to pull
10 that out of what you asked me to follow up on that I
11 tried to help you with. And that is, that it is up to
12 each individual sheriff how classification will be
13 accomplished in their Florida jail. That is correct.
14     Q    Let's go to opinion 13. Let me know when
15 you're ready.
16     A    I'm there.
17     MR. BOGAN: Okay.
18 BY MS. HARTON:
19     Q    I want to you. I'm just going to read the
20 kind of first half of the paragraph and then and then we
21 can talk about it. The complaint states, and is
22 subsequently parroted by Mr. Adee,
23     "A number of unremarkable aspects of housing
24     at Marion County Jail that are the same as jails
25     and prisons across the United States. Dormitory

54

1      housing is utilized. There are far more inmates
2      than officers. Dorms are lined with bunks.
3      Inmates are often idle."
4      Then you say,
5      "The spontaneous assault of an inmate on
6      another inmate was not a reasonably foreseeable
7      outcome of entering the Marion County Jail."
8      Do you see that?
9      A    I do.
10     Q    Okay. That second sentence, what is your
11 basis for the opinion that this assault was not
12 reasonably foreseeable?
13     A    Well, I appreciate the wordplay there about
14 where's the absence of evidence or evidence of absence.
15     The a spontaneous assault is by its nature
16 spontaneous. And so being in a jail, any jail, whether
17 it's Cook County, Illinois or Marion County, Florida
18 doesn't create some foreseeability that someone's going
19 to just spontaneously punch somebody else.
20     So the sentence, again, within within the
21 paragraph, the sentence stands by itself is that there
22 is no literature, there is no social science
23 documentation that being in a particular jail causes
24 someone to assault somebody else just spontaneously like
25 this.

55

1      Q    So, is it your opinion that all spontaneous
2  assaults within a jail are unforeseeable?
3      MR. BOGAN: Object to the form.
4      THE WITNESS: The use of the term "spontaneous
5  assault" is that, yes, you cannot foresee that
6  there's going to be on, you know, a particular day
7  at a particular time somebody is going to punch
8  another person.
9      Yeah, that is by its nature and what we, you
10 know, think of when we talk about the elbow test.
11 The fact that, you know, you could even have a
12 correctional officer there, the same as on the
13 street, if you have a law enforcement officer
14 present and if someone wants to punch another
15 person, many of those people are going to do
16 exactly that. It is absolutely not foreseeable.
17 BY MS. HARTON:
18     Q    But you're not saying that it is -- it is
19 never foreseeable that one inmate might attack another
20 inmate, right?
21     MR. BOGAN: Object to form.
22     THE WITNESS: The question was about
23 spontaneous assault.
24     MS. HARTON: I know. I'm asking. I'm asking
25 a --

56



1    THE WITNESS:  Let me finish.  Let me finish.
2    Eric Lutterloh spontaneously assaulted Cory
3  Merchant.  If, and the basis sometimes of an
4  assault charge, if you see somebody and they have
5  certain physical posturing and they say, "I going
6  to come and I'm going to hit you and then they
7  proceed to attempt to do that.  Okay.
8    And they're moving towards the individual.
9  There, there, there, now we have something where we
10  can go, okay, if something doesn't change the
11  dynamic of what's going on right now that we're all
12  seeing because it's being, you know, announced and
13  there's action.  That would be something we could
14  call foreseeable but not a spontaneous assault.
15    Cory Merchant told one of the officers, "If I
16  see you on the street, I'm going to beat your ass
17  with a baseball bat."  Well, okay.
18    I mean, so we got a  foreseeability that if
19  Mr. Merchant were near a baseball bat and he saw
20  that officer outside of the facility, we could have
21  a problem there.  But in this case, no.
22  BY MS. HARTON:
23    Q    Yeah.  So.  Okay.  So.
24    I see what you're trying -- what you're saying, and
25  I'm just trying to kind of unpack this sentence a little

57

1  bit because it's an important sentence.  And, what about
2  this assault, what evidence have you reviewed?
3    Or strike that.  Let me take a step back.
4    A    Sure.
5    Q    What sort of -- so I think we can both agree
6  then, that there are some assaults that happen in a jail
7  that are absolutely foreseeable and some that are
8  spontaneous and not foreseeable, right?  We're on the
9  same page there?
10    A    No, I don't think we're on the same page
11  there.  If you want to split that out to where you're
12  putting words in my mouth on some particular assault
13  that is foreseeable.
14    I think if you want to go with my example, sure,
15  like one inmates on one side, and one's on the other,
16  it's like I'm coming and I'm going to hit you and they
17  start moving towards them.  Yes, I would go with you on
18  that.  But again, the sentence is about a spontaneous
19  assault and it's not reasonably foreseeable.
20    Q    Right.
21    A    It stands alone.
22    Q    Let's take a step away from the sentence.
23  Let's just talk about jails in general.
24    A    Sure.
25    Q    Some inmate-on-inmate assaults are

58

1  foreseeable.  Some are not, right?
2    A    The the kind of simplistic hypothetical I
3  gave, which I'm not too familiar with actually
4  occurring, would be one that I offer up as a
5  hypothetical that illustrates for the jury how you can
6  have that sucker punching, which is a spontaneous
7  assault, is what generally occurs in a jail.
8    Now, I'll violate one of those rules.  I'll keep
9  talking.  I'll try to help her.
10    Two inmates are playing basketball on the rec yard,
11  and one of them feels the other one cheated, or they're
12  all worked up and they bump chests and somebody shoves.
13  We've got a narrow window of foreseeability here.  That
14  one might might strike the other.  So I think I've.
15    I think we got around to, yes, I think there are
16  some limited interactions that are specific that could
17  be somewhat in -- within a very narrow frame of probably
18  seconds foreseeable.
19    Q    And, you would agree with me that if an
20  inmate-on-inmate assault does become foreseeable,
21  reasonably foreseeable, to a corrections officer or any
22  other correctional employee, they have a responsibility
23  to take all reasonable measures to prevent that assault
24  from happening, right?
25    MR. BOGAN:  Object to form.

59

1    THE WITNESS:  All right.  Let me unpack that.
2    So, I've already made the point that
3  reasonable foreseeability of mutual combat, or an
4  assault, whether in any location, we'll stick with
5  corrections.  If there is someone aware, a
6  correctional officer, or staff member.
7    If someone's aware of it and in that, as I
8  stated with my two examples, mere seconds.  If
9  within those seconds something could be done within
10  safety for the staff and policy that some action
11  should be put in motion and we can color in, add in
12  brushstrokes there, that you want to ask me about.
13  But that would be my answer.
14  BY MS. HARTON:
15    Q    Yeah, we've talked a lot about these kind of
16  foreseeable assaults.  Kind of reacting in the moment.
17  Right?
18    There are things that corrections officers can do
19  to react in the moment when they kind of feel a fight is
20  about to happen, right?
21    A    Well, I made reference to the well-known elbow
22  test, and you and I are correctional officers, and Mr.
23  Byers is standing there as an inmate, and he's about to
24  punch somebody else.
25    And he doesn't care that we're standing there, and

60



1  he goes to do it.  If somehow we have Hollywood movie
2  esque reaction ability that could catch his arm in
3  midswing, sure.
4       Or we see an argument occurring and it hasn't
5  gotten physical yet and we can call some officers to go
6  into the dormitory.
7       There are things that you're going to want, as I
8  said, to put in motion as opposed to the instant matter
9  where you have somebody go over and punch somebody else
10 a couple times.  That's not one of those circumstances.
11      So, I think we're agreeing, you know, in principle
12 that, you know, in some limited circumstances, if you
13 have an ability, there are things you might be able to
14 do.  Maybe that's the answer.  I'm not sure.
15      Q    Okay.  Yeah.  I mean, the thing that I'm just
16 trying to get at is that there are things that officers
17 can do in some scenarios to prevent inmate-on-inmate
18 violence before it's about to happen or as it's
19 happening, right?
20      A    Yeah.  What's your - look, I appreciate this,
21 but you've asked that three different ways.  At some
22 point in this deposition you'll recognize that it's not
23 my first deposition.
24      I've answered it two or three times, four maybe
25 now,  and that it's an incredibly narrow set of

61

1  circumstances with an even narrower time frame that in a
2  spontaneous assault that by its nature is spontaneous,
3  ergo a sucker punch where, you know, if it's in the chow
4  hall, it's in the rec yard, it's, you know, in the dorm
5  like this, and somebody takes their opportunity to punch
6  somebody else without announcing it or in this case, no
7  previous friction that was known between these two
8  inmates, eccetera, it's not reasonably foreseeable.  The
9  examples I gave might get into reasonably foreseeable.
10      Q    Right.  And so, are there any things, actions
11 that correctional administrators could or should take in
12 order to mitigate the risk that these spontaneous
13 assaults happen, anything that correctional
14 administrators can do?
15      MR. BOGAN:  Object to form.
16      THE WITNESS:  As, at the Marion County Jail,
17 and the Marion County Sheriff's Office, things
18 they've specifically done to set expectations as
19 opposed to perhaps mitigate risk of a spontaneous
20 assault.
21      So to the extent that in those human inmates
22 who have been given a copy of the inmate rules and
23 regulations and been asked to sign for it.
24      Especially in this case, we have two
25 individuals, Lutterloh and Merchant, who it's not a

62

1  novel experience being in a correctional facility,
2  who know, first of all, you can't hit people.
3  That's illegal.
4       You can't hit people because it's against the
5  rules.  There's disciplinary consequences which
6  were in evidence in the record in this particular
7  case.  There's criminal consequences.  There could
8  be housing segregation, immediate kind of
9  consequences.
10      So there's, yeah, there are those things that
11 are in place that were in place at the time of the
12 assault on Cory Merchant by the Marion County Jail
13 leadership and the sheriff that did indicate don't
14 hurt somebody else, don't steal commissary like
15 Cory Merchant did.  Don't do other things.
16      Don't call the correctional officer a "fat
17 ass" and "fuck you" like Cory Merchant did.  All of
18 those things, there's rules that say don't do that.
19 And yet, spontaniously, Cory Merchant did all those
20 things.  And in this case, Eric Lutterloh
21 spontaneously punched Cory Merchant.
22      Why?
23      We don't we don't know why that is.
24      So yeah, I mean, all across the world, not
25 just all across Florida or Illinois, you know,

63

1  where you are, there's good-hearted, hard-working
2  correctional folks who set these expectations and
3  attempt to keep these things from occurring.  But
4  that doesn't respect the agency of the human animal
5  who just takes it upon themselves to punch
6  somebody.
7  BY MS. HARTON:
8       Q    You said that, there are things that they can
9  do to attempt these spontaneous assaults from occurring.
10 Could -- is one of those --
11      A    You're going to turn that into a compound
12 sentence?  No, I didn't.
13      I listed the things that they have done and that
14 they are doing every day: policies, disciplinary
15 responses, criminal investigation, movement of housing.
16      Yes, those are things they've done to set
17 expectations for all behavior.  Which would include
18 under all behavior not to spontaneously assault
19 somebody.  Yes.
20      Q    What did you - sorry.  You said, "movement of
21 housing."  What did you mean by that?
22      A    Getting put into single cell or administrative
23 segregation for violating facility rules, like things
24 that would cause disorder, such as attacking another
25 inmate.

64



1    Q    Would you agree that making sure that people
2  who are classified as a high security risk are not
3  housed with people who are classified as a low security
4  risk is one way to mitigate the risk of inmate-on-inmate
5  violence?
6    A    No.
7    Q    Okay.  Why not?
8    A    Well, you're throwing around some terms there
9  as if they meant the same thing in those 3100 different
10  jails.  They don't.
11       Again, certainly, I'll defer to the 30(b) witnesses
12  and the fact witnesses.  High risk, again, one of the
13  captains, I think, explained this to you in his
14  deposition, could mean that there's a mental health
15  issue, could mean that there's a medical issue, could
16  mean there's security risk, but would never assault or
17  attack anybody or we wouldn't foresee that they would
18  assault or attack somebody.
19       So having someone thus classified high risk in a
20  housing area with someone not classified high risk is
21  not some kind of automatic bird whistle, you know, for
22  the jury to sit up and go high risk, medium, low risk,
23  can't be together.  No that's that's that's not
24  accurate.
25    Q    I think I said high security risk.

65

1    A    You did.
2    Q    And so I'm not referring to to any sort of
3  medical issues.  I'm specifically referring to people
4  who have been classified as a high risk to the security
5  of the facility.
6       Would you agree with me that classifying people --
7  that someone who is classified.
8       Sorry.  Let me just go back.
9       Would you agree with me that one way to mitigate
10  the risk of spontaneous assaults is to not put people
11  who are classified as a high security risk with people
12  who are classified as a low security risk?
13    A    Well, I mentioned, you know, for instance --
14    Q    It's a yes or no question.  It's really a very
15  simple question.
16    A    Don't cut me off, counselor.  I don't do yes
17  or no questions.  I'm not a fact witness.  So I
18  appreciate again what you want.  I'm not here to give
19  you what you want.
20       I'm a social scientist.  I'm a criminologist.  I'm
21  trying to give you -- excuse me.  I'm trying to give the
22  court and the jury the benefit of why we have expert
23  witnesses.
24       So, what I was about to say was, an escape risk
25  would be a high security risk person trying to

66

1  semantically then connect this to someone who you
2  somehow might know is going to assault somebody on
3  Wednesday at 4:00, which doesn't exist, is a different
4  thing.
5       Florida Model Jail Standards said, I said this to
6  you, separate female felons, female misdemeanors, if you
7  can, non-sentence, sentence, adult felons, adult
8  misdemeanants, if you can.  A third of the jails in the
9  U.S. house fewer than 50 people.  So there is not some
10  one size fits all as far as that goes.
11       So, no high security risk, as you said, is not
12  something where you would just automatically, first of
13  all, be able to just house in an individual cell or with
14  someone else deemed high security risk because that may
15  cover different things.
16       And that, again, that's up to the sheriff.  That's
17  up to each, you know, in the 67 counties in Florida,
18  that's up to each agency.
19       (Brief recess.)
20       MS. HARTON:  I'm going to show you some
21       interrogatories.
22       (Thereupon, Plaintiff's Exhibit 19 was marked for
23  identification.)
24  BY MS. HARTON:
25    Q    This is Exhibit 19.

67

1       Can you see this document?
2    A    I see something labeled.  Well, now I see page
3  one.  I don't know if I have seen this, but I do see it,
4  yes.
5    Q    It is labeled, "Defendant Billy Woods Answers
6  to Interrogatories."  You see that?
7    A    I do.
8    Q    Okay.  Billy Woods is the Sheriff of Marion
9  County, fight?
10    A    I don't know if he currently is or not.
11    Q    Okay.  He was at the time of Cory Merchant's
12  death, right?
13    A    That's my understanding.
14    Q    Okay.  And this first question asks, you know,
15  it's asking who the person answering this interrogatory
16  is.  And the answer here is, "Marissa Duquette, General
17  Counsel of the Marin County Sheriff's Office."  Do you
18  see that?
19    A    I do.
20    Q    Okay.  And at the very end of this document,
21  Marissa Duquette, General Counsel, Marin County
22  Sheriff's Office, signs off on these interrogatories.
23  Do you see that?
24    A    I do see her name again.
25    Q    I'm going to go up to interrogatory number 14.

68



1  The question here is,
2      "Identify and explain any and all training the
3  Marin County Sheriff's Office provides to its agents
4  including documentation of what training, if any, was
5  received by defendant correctional officers, including
6  frequency of training, length of training, whether
7  training was optional or mandatory, and whether and when
8  retraining --
9      I'm sorry, I'm looking at the wrong thing.
10     Can we take a break for a minute?
11         MR. BOGAN:  Sure.
12     (Brief recess.)
13  BY MS. HARTON:
14     Q   I think it might be helpful for us to lay some
15  foundation first.  You're familiar with the numerical
16  system that Marion County uses to classify its inmates,
17  right?
18     A   I don't know with so many in my head from so
19  many places, I certainly don't have that memorized.  We
20  can pull up one of their policies on classification.
21  And look, I wouldn't want to do a memory test on it.
22  That wouldn't be good.
23         MS. HARTON:  Let's pull up Exhibit 64.
24     (Thereupon, Plaintiff's Exhibit 64 was marked for
25  identification.)
                                                    69

1  BY MS. HARTON:
2      Q   Do you see this document?
3      A   I do.
4      Q   Is this a document that you reviewed before
5  writing your report?
6      A   Oh, I don't remember if it was before or
7  after.
8      Again, with the number of documents in this case,
9  I'm not sure.  Is it the general order?  We'd have to
10  just go back and look.
11     Q   Does this look like a general order?
12     Sorry.  I just want to make -- I'm not -- I want to
13  make sure that you see the document that I have up.
14     A   My question was, was it in the general order?
15  So, to ask me a memory question, no.  You're going to
16  have to show me what the -- what it's from.  And look,
17  I'm not going to play a game with you.
18     Q   I genuinely -- okay.
19     At the top it says classification here, right?  You
20  see that?
21     A   Yeah.
22     Q   Okay.  We're on Zoom, so I genuinely want to
23  make sure that you're seeing the thing that I'm showing
24  you.
25     A   I see that, but then you said, "Did I see it
                                                    70

1  before I wrote the report?"  And we need to know what it
2  came from.  Is it part of the classification general
3  order?  To which you replied, "Does it look like a
4  general order?"  I don't know.  Is it?
5      I'm asking you a question.  I look a lot of cases.
6  Let's just try to be fair and get through the deposition
7  without too much strife here.  I'm not trying to be
8  difficult.
9      Q   Are you done?
10     A   Okay, fine.  That's great.  All right.  You be
11  that way.
12     Q   Okay.
13     A   Tell me where it came from, counselor.
14  Where's this document from?
15     Q   Doctor, I am trying to talk about the
16  document.  Give me one second.  Okay.
17     Do you see it at the top here it says, "Eric Thanal
18  Lutterloh."
19     A   I do see that.
20     Q   Okay.  So, this is Mr. Lutterloh's
21  classification page that shows how he was classified
22  when he was booked into the into the jail.  It says,
23  "Booking Date 6/4/2020."  And then it's got this matrix
24  down here.  Do you see that?
25     A   I do.
                                                    71

1      Q   Okay.  And now looking at this, do you
2  recognize this matrix that they have at the bottom?
3      A   I recognize having seen this and it must have
4  obviously been in Mr. Lutterloh's file, his jail file.
5      Q   Okay.  You referenced that you -- I think
6  before we got to the document, you referenced that there
7  are, you know, other jails, other cases that you've seen
8  different numerical classification regimes; is that
9  fair?
10     A   Yes.
11     Q   Okay.  Does this look like one that you've
12  seen in other jails, or is this one that is kind of
13  unique to what Marion County came up with?
14     A   Across the 3100 jails and 3000, you know, plus
15  when we add in the prisons and everything, I couldn't
16  characterize and then give you a citation to whether
17  this is -- I certainly don't find it to be unique as a
18  decision tree as to whether -- I can't recall anybody
19  right now that I would say, oh, that's like such and
20  such county uses.  I couldn't tell you.
21     Q   It's pretty typical.  According to industry
22  standards for jails to use decision trees like this to
23  classify inmates according to a number of risk factors,
24  right?
25     A   I think that's fair.  Whether they use the
                                                    72

1  graphic or they just kind of use their listing of the
2  factors that they'll either do with a weighting, as in
3  weights, to assign the classification, yes.
4      Q   Okay.  And here with Mr. Lutterloh, he is
5  classified as a high/medium; do you see that?
6      A   I see that on that date it says high/medium.
7      Q   Okay.  And there's nine different
8  classifications here; high to to very low, right?
9      A   Okay.  Okay.
10      Q   Do you understand that, based on the record
11  that you reviewed to reflect the numerical
12  classification regime at Marion County Jail, where highs
13  are number one and very lows are number nine and
14  everything else in between is is graded that way?
15      A   I didn't memorize or commit any of that since
16  I know both sides would have access to a 30(b) witness
17  to explain, at any given point in time, what their
18  specific security classification codes were.  But I'm
19  recognizing what you're showing me.
20      Q   You didn't think that was important, for this
21  deposition, to know the specific classification --
22  numerical classification regime they have at Marion
23  County?
24      A   Well, I clearly didn't say that, did I?
25      Q   So, it is important to this deposition to know

73

1  what the classification regime is, right?
2          MR. BOGAN:  Object to form.
3          THE WITNESS:  Well, of course it's important
4      to know, as it was important for the Florida Model
5      Jail Standards that the agency have one, have a
6      classification scheme.
7          Again, 67 counties in Florida, each and every
8      one gets to do it the way they want.  So whether in
9      jail cases in any other states that I'm working at
10      the moment or other counties within the State of
11      Florida, jail cases that I'm working on at the
12      moment, whether I remember on a given day, say when
13      you ask me a question, no, it would be really
14      important to say, are they basing it on the kind of
15      normal things you do?
16          They are.
17          And do they have classifications that do split
18      it apart?
19          They do.
20          And did both of the inmates involved here go
21      through a classification process?
22          They did.
23          So that would be important for me.
24  BY MS. HARTON:
25      Q   Okay.  So, if I represented to you that these

74

1  -- that high classification was a one in their
2  classification regime in the highest security risk and
3  very low is a nine; the very lowest security risk.
4  You'd have no reason to disagree with me, right?
5          MR. BOGAN:  Object to form.
6          THE WITNESS:  No.  If that's what you're
7      presenting is accurate, I would have no reason to
8      think you were setting up a trick question.
9  BY MS. HARTON:
10      Q   And here it looks like Mr. Lutterloh was
11  classified as a three, a high/medium right?
12      A   On that date, and that's what it looks like,
13  high/medium.
14      Q   Okay.  Are you aware of his classification
15  changing at any point during his incarceration?
16      A   I'm not aware of one, no.
17      Q   Okay.  And this document is kind of weird to
18  deal with.  So we're going to try to get through it.
19          But the second page, maybe I can do this.  I know
20  this is kind of small, but it might be easier to
21  navigate.
22          Okay, so, the second page at the top, it says,
23  "Eric Lutterloh" and it has a bunch of questions, right?
24      A   I see the four questions, yes.
25      Q   Okay.  The first question is, "Is the current

75

1  offense an assault of felony?"
2          And it says, "Yes," right?
3      A   I see that.
4      Q   Okay.  And we go back to this tree.  There's a
5  "yes" on that first block, right?
6      A   Yes.
7      Q   Okay.  Then the next three questions asked
8  about Eric Lutterloh are "nos" right?
9      A   Yeah.  "Prior assault or felony convictions?"
10  "No."
11  "Escape."
12  "No."
13  "Known institutional behavior problems?"
14  "No."
15      Q   Okay.  And so the next three blocks on his
16  little diagram are "nos".  And then it has some kind of
17  spitting out to this high/medium three.  You see that?
18      A   I do.
19      Q   Okay.  So we can kind of see how these
20  questions are correlating with the map on the first
21  page, right?
22      A   It appears that way.
23      Q   Okay.
24      A   I'd certinly defer to the 30(b) witness on
25  explaining it.

76

1          MS. HARTON:  Okay.  And then the next page,
2     I'm going to show you this, is Exhibit 65.
3          (Thereupon, Plaintiff's Exhibit 65 was marked for
4     identification.)
5     BY MS. HARTON:
6          Q    Sorry.  The next exhibit I'm going to show you
7     is Exhibit 65.  And this is a similar document.  It
8     says, "classification" at the top.  And then it says,
9     "Cory Merchant."  You see that?
10         A    I do.
11         Q    Okay, so this is the same type of record, but
12    this is Cory Merchant's classification document as
13    opposed to Eric Lutterloh's right?
14         A    Okay.
15         Q    Okay.  And then you see, kind of, he's got the
16    same diagram here, except he is classified as a
17    "medium/pre" a "number five."  Do you see that?
18         A    Yes.
19         Q    Okay.  Let me go to the next page.
20         He's got a different set of questions.  And it
21    says, "Is the current offense and assault or felony?"
22    Do you see that?
23         A    I do.
24         Q    And that says, "no."  Right?
25         A    Yes.
                                                          77

1          Q    And so, from there he's he's asked a number of
2     other questions that Eric Lutterloh was not asked,
3     right?
4          A    Correct.
5          Q    And the only question that he answers yes to
6     is whether he's likely prison bound.  Do you see that?
7          A    That is what the classification person
8     indicated.  Yes.
9          Q    I'm sorry that it keeps blinking blue.  I
10    don't know why it's doing that.
11         So, in your expertise what does someone likely
12    being prison bound have to do with their classification?
13         A    Security risk.  If someone has a pretty good
14    indication they're going to go off to prison they might
15    be more motivated to either try to get out in some way.
16         They perhaps could be, perhaps, have thoughts of
17    self-harm.  But it is definitely a security
18    consideration because that's balanced against someone,
19    say, in a minimum security who is perhaps going to do 30
20    days in the county jail on a misdemeanor conviction.
21         Q    Yeah.  And then same question for this top
22    question that both Cory and Eric Lutterloh answered,
23    which is or were designated to have answered.
24         It says, "Is the current offense an assaultive
25    felony?"  Why is that question relevant to classifying
                                                          78

1     an inmate in your expertise?
2          A    Well, it would come down to why is it that the
3     Marion County Sheriff's Office included that as a
4     question there and that would be for someone from their
5     staff to answer.
6          Q    You can't tell me as an expert in corrections
7     why it would be important to ask an inmate whether or
8     not their current offense is an assaultive felony?
9          A    Well, I appreciate this –
10         MR. BOGAN:  Object to form.
11         THE WITNESS:  Yeah.  The second opportunity to
12    answer on behalf of the Marion County Sheriff's
13    Office.  But of course, I'm not here to answer for
14    the sheriff's office.
15         In terms of, again, the fact that they have a
16    classification policy and these questions and the
17    matrix that they go through, that's from my
18    standpoint, the important aspect of why they have
19    it.
20         As to what I seem to recall, and I will defer
21    to the two captains and others who you've already
22    spoken with, who can give you factual information,
23    is the fact that there are a variety of things they
24    take into account, as evidenced here in this list,
25    as well as on the graphic that you've shown me,
                                                          79

1     that they take into account and come up with a
2     final where are they going to be placed.
3          And, by the way, that the inmate has the
4     ability to appeal that for whatever reason.
5          So, why on the assaultive felony, it's one
6     more aspect of it.  But assaultive felony would
7     certainly not mean therefore, 24 hours a day, or 16
8     hours a day, when they're awake, they're going to
9     assault somebody every other minute.  So, yeah,
10    it's one data point.  That's why it's in there.
11    BY MS. HARTON:
12         Q    Yeah.  It's a data point that helps you as a
13    correctional administrator understand what about that
14    person?
15         A    Just overall level of where should they be
16    housed?  Did they commit armed robberies?  Did they
17    commit a spree shooting?
18         Things that may or may not have relevance inside of
19    the facility, but that are logical questions to find out
20    just more information.
21         I appreciate that, you know, maybe it would be
22    interesting on your part to know, does that immediately
23    trigger or indicate that somebody is going to be all one
24    thing all the time?
25         So, I would have to tell you no, that's not what
                                                          80



1  assaultive felony means.  It's a data point within a
2  pretty, looks like, comprehensive classification
3  process.
4      Q    It's one data point to consider in determining
5  where to house someone so that they can be housed
6  safely, right?
7      A    Where to house someone.  I can't sign on to
8  house safely.
9      Q    Why not?
10     A    Well, there's no requirement or statutory
11 language that states you're guaranteeing, ensuring,
12 insuring, making absolutely positive that no one,
13 including officers and staff, are going to get injured
14 while they're inside of a correctional facility.
15      So, to have you kind of tail on there with the part
16 how safely, all of this is certainly, you know, attempts
17 to have good order in a facility and do the best that is
18 possible to keep an early facility and to have people,
19 you know, be there until they move on to whatever's
20 next.
21      Q    That question about the -- Sorry.  Let me.
22 You've worked in a few different jails, all with
23 classification systems, and you've consulted with dozens
24 of jails, all with different classification systems,
25 right?
                                                        81

1      A    Yes.
2      Q    Okay.  Do they all ask questions, like the one
3  that we just discussed, about whether the current
4  offense that they -- that individuals facing is some
5  sort of assaultive felony or violent crime or something
6  of that effect?
7      A    As far as I can recall, most of the ones that
8  I've seen, and certainly in agencies where I've
9  personally work, and, again, in cases that I've worked
10 on, have a question in regards to current charges.
11      And then, as with Marion, once you pass that
12 initial pre-booking and move on to primary
13 classification within that, I think it's a 72 hour
14 period, that will likely involve more.
15      What do we know about an individual's prior
16 history?  Because by then someone will have been able to
17 hopefully run an actual criminal history by database
18 check.
19      Q    Okay.  And all those data points, that
20 information, is helpful to correctional administrators
21 in determining a number of things about those inmates,
22 their security risk, their suicide risk, all sorts of
23 important things that go into how they're housed, right?
24      A    They can all be helpful for some of those
25 things.  I make a point in the report that suicide, much
                                                        82

1  like spontaneous assault, is in this case, can't be
2  predicted with specificity.
3      Q    Right.  But there's a reason why you ask
4  questions that get you those data points, right?
5      A    Yes.  Because of reasonably doing the things
6  that can be done to run a correctional facility as well
7  as it can be when dealing with a group of humans.
8      Q    I want to go to page 13 of your report.
9  Are you at page 13?
10     A    Yes.
11     Q    Okay.  Under that graph you've got there, you
12 say, "Confrontations are an issue in the general public
13 and incarcerated populations.  The Marion County Jail
14 put in place components of a policy reasonably designed
15 to guide staff in addressing fights or violence by
16 inmates."
17      I want to stop there.  Can you explain to me what
18 you meant by, "the Marion County Jail put in place
19 components of a policy reasonably designed," etcetra.
20 Can you just kind of explain that sentence a little more
21 to me?
22     A    Sure.  You have the inmate handbook, which
23 goes over the rules and violations and disciplinary
24 policy for the inmates.  You have the policy on
25 supervision of inmates.  That's for the officers.  Both
                                                        83

1  of those go together to address issues about behavior to
2  include fights or violence by inmates.
3      Q    Okay.  Is there a reason why you said
4  "components of a policy?"
5      A    Well, I just named two.  One is the handbook
6  for the inmates.  The other is policies for the
7  officers.  There's the disciplinary component for the
8  inmates.  So components in the sense of it's not just
9  one item.
10     Q    And just so that I'm clear, components, you've
11 got one component for the inmate.  Sort of imposing
12 rules on the inmates so that they know how they're
13 supposed to behave.
14      And is the other component rules and structures for
15 the officers so that they know how to react and
16 anticipate any issues that may arise on their shift?
17     A    Well, that's a whole bunch more that you added
18 in there.  Yes, I did say that one other component was
19 the policy on supervision of inmates.
20     Q    Okay.  Would you include the classification
21 policy as a component that's part of guiding staff and
22 addressing fights or violence by inmates?
23     A    That would be very broad.  And you would
24 immediately say, well, show me where in the
25 classification policy it uses the word fights or
                                                        84



1   violence.
2        So, again, they have an adequate classification
3   policy.  They have an adequate supervision of inmates
4   policy.
5        Q    It's not really where I was trying to go with
6   it.  I guess I'm just -- in your in your expertise as a
7   law enforcement expert and a corrections expert you
8   would agree that having a classifications policy in
9   place is an important component in running a jail in a
10  way that guides staff to address fights and violence by
11  inmates, right?
12       A    Well, what we said about two hours and 15
13  minutes ago was that classifications policy, part of the
14  point and why having a policy is required by the State
15  of Florida, is it's for the good order and security of a
16  facility.
17       I appreciate the fact that you want to attach some
18  way of foreseeing or attaching it to the word, fights or
19  violence.  It's broader than that, that it is about the
20  overall order of the facility, not specific to just
21  trying to address inmate violence.
22       Q    But one of the things that a classifications
23  policy does is help the jail prevent inmate-on-inmate
24  violence, among other things.  But one of the things is
25  preventing inmate-on-inmate violence, right?

                                                        85

1        A    I'm not sure if I, since this is now memory
2   test, if I can recall a specific section within the
3   classification policy at Marion County that says, and in
4   addition to whatever is at the beginning of the policy,
5   this will address violence in the facility.
6        So, since we both understand your role and the fact
7   that I'm trying to faithfully answer what I know of from
8   the materials in the record.
9        You've shown that I need to be really careful in
10  how I how I phrase things.  So I've testified to what
11  the classifications policy, in my view, is for both the
12  Marion County Sheriff's Office and at the other 3100,
13  you know, county jails in the U.S.
14       Q    Yeah.  And I'm not asking you to do a memory
15  test on the Marion County policy.  I'm not asking about
16  the Marion County policy right now.
17       I am asking about your expertise on
18  classifications, policies generally as a corrections
19  expert.  So I'll ask my question again and -- I'm sorry
20  if I put it in the wrong context last time.
21       In your expertise as a law enforcement corrections
22  expert, is it important to have a classification policy
23  because it, among other things, helps the jail prepare
24  for and anticipate and prevent mitigate the risk of
25  inmate-on-inmate violence?

                                                        86

1        I can rephrase this if that was a long --
2        A    Well, we get to the end part here.
3        So, for instance, the Marion County policy on
4   classification doesn't use the word violence anywhere in
5   the policy because it's not a violence policy.  It's a
6   classification policy.
7        And so, again, your dogged attempt to keep asking
8   this in a way that attaches the classification policy
9   coming out of my mouth to say that somehow addresses
10  violence or fighting.  I don't know.
11       I guess this is how you were trained, that you just
12  keep asking in different kind of ways.  It's not like I
13  haven't seen that in 45 years over, and over, and over
14  again.  But that's not what their policy was for.
15  That's not what specifically classifications for.
16       It's do you have people who need to be housed in
17  certain ways to get the medical care, to make them more
18  accessible to programs for mental health, to put the
19  felons away from the misdemeanants unless you have non-
20  violent felons?  It's not.  It's not.
21       And this is how I'm going to have to, you know,
22  express it to try to be a benefit to the jury and
23  understanding the context.  It's -- and this is all
24  going to go back to what the, probably what the fact
25  witnesses say.

                                                        87

1        But I, from my standpoint, yeah, as an expert in
2   corrections and in this area, it's about how do you
3   appropriately house them.  Not, you know, policy doesn't
4   cover all things.  No one policy covers all things.
5   Maybe that helps, I don't know.
6        Q    Yeah.  And and in your experience and your
7   expertise, how you house people is important in your
8   efforts as a correctional administrator to mitigate the
9   risk of inmate-on-inmate violence?
10       A    You got -- you got to mitigate inmate-on-
11  inmate violence.  In this case it's about spontaneous
12  assault, which is not impacted by whether one or the
13  other inmate, you know, understands the classification
14  policy.
15       It's about in the moment somebody made the decision
16  to punch somebody else.  This policy is not implicated
17  in that, but for the fact that both inmates, Lutterloh
18  and Merchant were appropriately classified as sexual
19  crime individuals and housed in a place, you know, with
20  similar charged individuals.
21       So, I, you know, I think I've answered this as
22  many, both two hours ago and now, the best I can, or
23  certainly as repeatedly as I can.
24       Q    So, it's your opinion that the way that these
25  inmates were classified in this case has nothing to do

                                                        88

**89**

1  with the inmate-on-inmate violence that occurred?
2      MR. BOGAN:  Object to form.
3      THE WITNESS:  I didn't issue that opinion,
4  obviously.
5      You just narrated something and asked if
6  that's my -- that's one of those ones I get so
7  tired of, having an attorney narrate something and
8  then say that's your opinion.
9      This was, Eric Lutterloh, spontaneously sucker
10  punched Cory Merchant.  That's not only my opinion,
11  that's what the record clearly reflects.
12      The fact that both were classified into the
13  same housing area was appropriate, that it met
14  Florida Model Jail Standards.  It met the Florida
15  Corrections Accreditation Commission.  And that it
16  is normal as we discussed, that this occurs.
17      So, I'm not sure how how I can say more about
18  that.
19  BY MS. HARTON:
20      Q    I want to go back to that interrogatory.
21      Okay.  So this is the interrogatory I showed you
22  earlier.  This is Exhibit 19.  I'm going to point you
23  actually to interrogatory number 15.  The question was,
24      "Q    Describe in detail the housing layout at
25      the Marion County Jail, including how many housing

**90**

1      units there are, the names for each housing unit,
2      any special designations assigned to any unit such
3      as medical units, segregation units, booking units,
4      the inmate capacity and the number of bunks per
5      unit.  Whether each housing unit contains cells or
6      is dorms style."
7      Okay.  And then the answer was,
8      "A    The Marion County Jail housing is as
9      shown below."
10      And then there's a few pages where it explains how
11  people are classified, or sorry, how people are housed.
12  And you see that it says, for example, "Bravo Pod
13  Section B.  It will house male, medium security inmates,
14  with the custody level four and five."
15      You see that?
16      A    I do see that.
17      Q    Okay.  And then it houses in section C and D
18  of Bravo.  It houses high/medium security inmates of the
19  custody level three.  Right?
20      A    I see that.
21      Q    And then the next section, "E, it will house
22  male, medium security inmates, in the custody level four
23  or 5."
24      A    I see that.
25      Q    Okay.  And then it's the same thing down in

**91**

1  Delta Pod where it says that, "Medium security inmates
2  with a custody level four and five will be housed
3  together in these section A through D of Delta Pod."
4      Do you see that?
5      A    Yes.
6      Q    Okay.  And then section E and F "will house
7  male felony inmates with sexual offenses.  Right?
8      A    Yes.
9      Q    And in those sexual offense pods, there's no
10  distinction as to what their custody level is, right?
11      A    Right.  I don't see it on here.  That's
12  correct.
13      Q    Okay.  And then the next pod, Echo Pod,
14  they've got some more sections with custody level four
15  and five.  You see that?
16      A    I do.
17      Q    Another section with custody level six through
18  nine.  You see that?
19      A    Yes.
20      Q    Okay.  And then, section B and C of Gulf Pod
21  custody level four and five.  You see that?
22      A    Yes.
23      Q    And then, again, another section where they're
24  housing all the male inmates with sexual offenses in
25  Gulf Alpha.  Right?

**92**

1      A    Yes.
2      Q    Okay.  And so, it kind of based on this looks
3  like generally these male inmates are are being housed
4  with the -- the threes are housed together, the fours
5  and fives are housed together and then the sixes through
6  nines are housed together.  Do you agree with that?
7      A    Again, for whatever period of time that the
8  defendant replied and provided this information
9  responsive to your request for interrogatory, it
10  generally appears that.
11      I have no reason to doubt what you're showing me.
12  I can't speak to what the captain's did.  And I can tell
13  you that if one of those dorms collapsed today they
14  would have to further mix inmates and there would be
15  nothing unlawful or inappropriate as long as they
16  covered it in the classification policy.
17      So I take this as what it is and go ahead.
18      Q    But if they were to mix threes, twos and
19  threes with fours, fives, sixes, you would have no issue
20  with that?
21      MR. BOGAN:  Object to form.
22      THE WITNESS:  Again, I didn't say that.  The
23  reality is that if they covered in their
24  classification policy what the logic was of who
25  could be housed where and that it doesn't violate

93

1  the Florida Model Jail Standards that I mentioned
2  earlier that has some specific things, don't mix
3  men and women, don't mix juveniles with adults,
4  etcetera, then that would be a decision for the
5  Marion County Sheriff's Office to make.
6      MS. HARTON: Okay. I'm about done. I have a
7  few more questions, but I think we'll be a lot
8  quicker if we take five minutes for me to go
9  through my outline X some things out, come back.
10 I'll just be more efficient that way. Does that
11 sound good to everyone?
12     THE WITNESS: Yep.
13 (Brief recess.)
14 BY MS. HARTON:
15     Q   Okay. Thanks. Have you ever done a security
16 check in a job before?
17     A   Yes.
18     Q   Okay. When did you do security checks?
19     A   I think the last time for security check, the
20 end of 2023 I did about eight of the juvenile detention
21 centers across the State of Florida for an adult
22 facility, which, well, for an adult facility.
23     I don't know the last time that I would have done
24 an actual security check, probably at least 10 years ago
25 would be my estimate.

94

1      Q   And when you conducted those security checks
2  in those juvenile facilities, what did you do? Did you
3  sort of go into the areas where the juveniles were and
4  do a round to account for their wellness and safety?
5      We -- I think we might be talking about different
6  things.
7      A   We are. Although it did include being in the
8  housing units, interacting with the juvenile inmates and
9  talking, you know, to them. But, yeah, I think --
10     Q   Yeah. Why don't you go ahead and tell me what
11 you what saying, what you thought you meant as a
12 security check.
13     A   Yeah.
14     Q   This is why it's important to lay a foundation
15 for things, I apologize.
16     A   No. No. No. No. I saw where we both went
17 there. So kind of writ large, a security check of an
18 entire facility, you know, is kind of that where you're
19 looking at the locking systems, you're looking at any
20 equipment and devices you're looking at, you know,
21 whether they're, you know, generator actually runs.
22     But it's also being inside, talking to the
23 corrections officers, talking to the inmates. So, yeah,
24 it was that at, like, eight facilities across the state.
25     Q   Okay. But just going back to my original

95

1  question, you know, when I say security checks, I'm
2  referencing sort of the rounds that a correctional
3  officer does on a shift as they do in Marion County
4  during lockdown every hour, where they're going into the
5  into the dorm and they're kind of accounting for the
6  well-being of each inmate. Right. You understand what
7  I mean now by security check?
8      A   Sure. Yeah. And, again, like I said, that's
9  other than that component within what I was doing as the
10 statewide corrections expert for the Florida Department
11 of Juvenile Justice two years ago, for a three year
12 period, it would probably be about 10 years before that
13 for a strictly adult facility.
14     Q   You've never had to diffuse a violent
15 situation between two inmates before, right?
16     A   Oh, yes. Yes, I absolutely have. As a
17 director of corrections at two different counties in
18 Florida, I was a very hands on individual. Spent lots
19 of time on all three shifts with my folks, including my
20 folks being the citizens who were incarcerated.
21     And yeah, it came up a number of times where
22 because of the great length of experience in defusing
23 fraught and charged situations, that I was right there
24 doing that. Yeah.
25     Q   So, I'm assuming in some instances back when

96

1  you were working in corrections facilities, you had to
2  use force on inmates before, right?
3      A   Certainly as a law enforcement officer.
4  Trying to think in corrections, I'm going to say there
5  may have been a couple of instances. Nothing comes to
6  mind. Definitely can recall separating inmates who were
7  fighting. But that doesn't rise to the level of what's
8  considered use of force.
9      Q   Okay.
10     A   But, I mean, I've taught defensive tactics for
11 37 years in Florida corrections and law enforcement
12 academies, so.
13     Q   Okay. Are you aware of, I mean, you
14 referenced it earlier. You're aware of what a Daubert
15 challenge is, right?
16     A   I am.
17     Q   Okay. Are you aware of any cases that have
18 excluded you, excluded any of your opinions, through a
19 Daubert challenge or any other evidentiary challenge?
20     A   I can think of, I believe, two that would
21 count. There was there was one, this was a law
22 enforcement case.
23     First of all, none in corrections but the law
24 enforcement case I'm thinking of, it was an investigator
25 had done an investigation and charged somebody with real



**Page 97**

1    estate fraud.
2         And in my report I talked about how officers, law
3    enforcement officers, are trained in developing probable
4    cause.
5         And I don't think, you know, this -- it never
6    reached trial, but the judge said if we get there, you
7    can't speak ultimately about probable cause, which I was
8    well aware of.  But so that got entered as, because the
9    court read one of my opinions out of 20 some, to go to
10   that.
11        And the other one was a case, also law enforcement.
12   It was a lethal use of force.  An officer involved
13   shooting.  And I want to say it was about three years
14   ago.  And every opinion of the plaintiff's expert was
15   struck.  And in my case, again, two.
16        One was an opinion where I spoke about the
17   scientific research regarding touch DNA and about the
18   CSI effect.  And the court said you can't talk about
19   those two things.
20        And then that same day granted summary judgment to
21   the defendant.  So the law firm didn't go back and offer
22   that I'd written, or had more information in those two
23   areas.
24        Those are the only two instances that that I'm
25   aware of.

**Page 98**

1         Q    That one that you were just referring to, the
2    DNA issue, was that the Vannucci case, if you remember
3    correctly?
4         A    Maybe.
5         Q    That's okay.
6         A    I'm not positive.  So I don't want to mislead
7    you.  It was South Florida.
8         Q    Okay.  I want to go down to the cases that
9    you've testified on.
10        Okay.  Actually, since you have it in front of you,
11   why don't you just go to the witness list and go through
12   it.
13        A    I'm trying to get it there.  And yes, I'm
14   there.
15        Q    Okay.  Could you just take a minute to go
16   through those and just let me know of any of those which
17   ones you believe you had any sort of successful Daubert
18   challenge against you?
19             MR. BOGAN:  Object to form.
20             THE WITNESS:  I mean, the two I just told you
21        about were the only two I have any knowledge that
22        anybody's --
23             MS. HARTON:  Yeah.
24             THE WITNESS:  -- been successful.  So the
25        answer would be none.

**Page 99**

1    BY MS. HARTON:
2         Q    Yeah, I guess I was just trying to see if any
3    -- if looking through your case list would help jog your
4    memory as to the names of those cases.
5         A    Oh, well, like I said, the first one that had
6    to do with just the admonition, don't speak about
7    ultimate probable cause, never went to trial.  And it
8    would have been more than three years ago, or four years
9    ago.  So it wouldn't be on here anyway.
10        The shooting one, yeah.  Let me -- I'll try, but I
11   don't know.  I don't even know if I was deposed, so it
12   wouldn't be here.  But let me see if we can see it.
13        See, so I see Vannucci listed there on page 57.
14   But, again, I don't know that that was it.  I see there
15   was a deposition in that case, so.
16        Q    Okay.
17        A    It had already fallen off, I think.
18        Well, no, I guess it was a one month in by the time
19   I think I issued this report, but I don't remember.
20   Yeah.
21        Q    You're not aware of a decision in the case
22   Kates versus Nocco in the Middle District of Florida,
23   Tampa division.  You were retained as an expert in that
24   case.  Do you recall that case?
25        A    I don't.

**Page 100**

1         Q    Okay.  And you weren't aware that in 2023, a
2    judge struck a number of your opinions because he deemed
3    them legal conclusions?
4             MR. BOGAN:  Object to form.
5             THE WITNESS:  No, I'm not aware of that.  Do
6        you have what case that was?
7    BY MS. HARTON:
8         Q    Yeah.  Kates versus Nocco.
9         A    Oh, that was it.  Oh, okay.
10        Q    Yeah.  I can give you the case number.  It's a
11   case –
12        A    How do you spell Kates?
13        Q    K-A-T-E-S.
14        A    K-A-T-E-S.  Okay.
15        I know that Chris Nocco is a Sheriff in Florida,
16   so.  Okay.  No, I'm not aware of that.
17             MS. HARTON:  All right.  Okay.  That's all
18        I've got.
19                    CROSS-EXAMINATION
20   BY MR. BOGAN:
21        Q    I just have a couple quick questions for you,
22   Dr. Hough.
23        I want to go back.  This goes back a couple hours
24   ago.  The questions involving the Florida Model Jail
25   Standards.  And I just I just want to be clear, it's not

1  your opinion that you're not going to testify that the
2  Florida Model Jail Standards is going to determine
3  whether a constitutional violation occurred in this
4  case?
5      A  No, I am not.
6      Q  Okay.  Of course I don't know.  I mean, I
7  think you testified to this, but you have no reason to
8  believe that the Florida Model Jail Standards are
9  unconstitutional or have been held to be
10 unconstitutional?
11          MS. HARTON:  Object to form.
12          THE WITNESS:  No, I have no such information.
13 BY MR. BOGAN:
14     Q  Okay.  And I think, you know, I think the
15 reason -- you may have testified to this.  And I
16 apologize.  I just want to make it clear for the record.
17 I think the reason that you cited to the Florida Model
18 Jail Standards, as well as the FCAC, is because these
19 standards help inform the policies of, in this specific
20 case, involving the Marion County Sheriff's Office?
21          MS. HARTON:  Object to form.
22          THE WITNES:  And that is correct.  Yes.
23 BY MR. BOGAN:
24     Q  And, I think, you also testified this as well
25 and it's within your report.  But what you've observed

101

1  in these policies is that they are consistent with the
2  Florida Model Jail Standards, the FCAC, as well as other
3  correctional facilities in Florida and the United
4  States?
5          MS. HARTON:  Object to form.
6          THE WITNESS:  That is correct.
7          MR. BOGAN:  You know, that's all the questions
8  I have.  Thank you, doctor.
9          MS. HARTON:  All right.  You should have
10 plenty of time to get to your appointment, doctor.
11         THE COURT REPORTER:  Ms. Harton, can I have
12 the exhibit?
13         MS. HARTON:  Yes.  I will.  I think I used a
14 few.  I'll just email them all to you.  What's your
15 email?
16         THE COURT REPORTER:  Yeah, let me put it in
17 the chat.
18         MR. BOGAN:  Just while we're here, I have 66,
19 19, 64 and 65.
20         MS. HARTON:  Yep.  I like to pre-label them
21 all for the case.
22         THE COURT REPORTER:  And does anyone need the
23 transcript?
24         MR. BOGAN:  I do not need it at this time,
25 but we may be ordering it.

102

1          MS. HARTON:  Yeah, I'll go ahead and order it.
2          MR. BOGAN:  And I'll when I -- when Bruce gets
3  back, I'll speak with him and we may very well order
4  it as well.  But at this point we'll hold off.
5          All right.  Well thanks, guys.
6
7  (Thereupon, the deposition was concluded at 5:07 PM
8  with reading and signing having not been waived.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

103

1                    CERTIFICATE OF OATH
2
3  THE STATE OF FLORIDA
4  COUNTY OF MIAMI-DADE:
5
6      I, the undersigned authority, hereby certify that
7  DR. RICHARD HOUGH appeared before me via Zoom on May 28,
8  2025, and was duly sworn.
9      WITNESS my hand and official seal on this, June 12,
10 2025.
11
12         _____
13         MICHELE ANZIVINO,
14         Notary Public-State of Florida
15         My commission # HH37658
16         Expires 03/19/2027
17
18
19
20
21
22
23
24
25

104

```
1                    REPORTER'S CERTIFICATE
2
3    THE STATE OF FLORIDA
4    COUNTY OF MIAMI-DADE:
5
6         I, MICHELE ANZIVINO, Court Reporter and Notary
7    Public, certify that I was authorized to and did report
8    the deposition of DR. RICHARD HOUGH; the transcript is a
9    true and complete record of my notes.
10        I further certify that I am not a relative,
11   employee, attorney, or counsel of any of the parties,
12   nor am I a relative or employee of any of the parties'
13   attorney or counsel with the action, nor am I
14   financially interested in the action.
15        DATED on this 12th day of June 2025.
16
17                   _____
18                   MICHELE ANZIVINO,
19                   Notary Public-State of Florida
20                   My commission # HH37658
21                   Expires 03/19/2027
22
23
24
25
                                              105
```



Richard Hough, Sr., CPP, CCHP 05/28/2025

**$**

**$1,800**
15:5
**$2,500**
15:2
**$3,000**
15:1
**$5,500**
15:11

**1**

**10**
8:7,8 16:22 29:9
93:24 95:12
**12:00**
4:3
**13**
54:14 83:8,9
**14**
68:25
**15**
10:12 15:21 85:12
89:23
**16**
80:7
**18**
25:7 42:15 47:19
48:21
**1800/2000**
53:21
**19**
34:15,16 49:6 67:22,
25 89:22 102:19
**1989**
18:1,7
**1991**
17:21 18:3,7 19:6,8
20:16 24:25
**1993**
22:2
**1995**
20:17 22:14
**1998**
22:14 24:21 25:1

**2**

**2.5**
15:1
**20**
33:21 38:17 40:1
97:9
**2000**
53:23
**2023**
93:20 100:1
**24**
34:16 80:7
**25**
15:23 24:10
**26**
10:8

**3**

**30**
6:21 24:13 25:2
32:16 78:19
**30(b)**
50:7,24 65:11 73:16
76:24
**3000**
53:23 72:14
**3100**
33:22 65:9 72:14
86:12

**35**
48:13
**37**
96:11
**375**
15:2

**4**

**40**
48:14
**45**
32:17 53:9 87:13
**4:00**
67:3

**5**

**5**
90:23
**50**
67:9
**57**
99:13
**5:30**
46:16
**5th**
12:1

**6**

**6/4/2020**
71:23
**60**
9:20 11:10,11
**64**
69:23,24 102:19
**65**
10:20 77:2,3,7
102:19
**66**
10:25 11:2,19
102:18
**67**
67:17 74:7

**7**

**70**
10:20 26:20
**72**
82:13

**8**

**80s**
22:6
**89**
19:1

**9**

**90**
19:1
**91**
19:1 21:25
**94**
22:2
**95**
22:18

**A**

**A-D-E-E**
30:23
**abide**
31:15 33:16
**ability**
48:4 61:2,13 80:4

**absence**
55:14
**absolutely**
5:5 46:13 51:23
56:16 58:7 81:12
95:16
**academic**
32:19
**academies**
18:6 96:12
**academy**
18:5,11 19:8 20:7,
10,11,23 21:19
**accepted**
16:6
**access**
73:16
**accessible**
87:18
**accomplish**
28:10
**accomplished**
54:13
**account**
37:8 79:24 80:1 94:4
**accounting**
95:5
**accreditation**
13:19 18:24 20:3
23:25 31:4,7,23
32:1,3,11 35:15,23
36:6 37:6,11,21
89:15
**accredited**
33:14
**accurate**
15:6 24:19 65:24
75:7
**achieve**
31:6
**act**
44:1
**action**
57:13 60:10
**actions**
62:10
**actual**
6:25 30:5,16 38:5,19
50:9 82:17 93:24
**add**
60:11 72:15
**added**
84:17
**addition**
11:24 36:11 86:4
**additional**
16:16
**address**
84:1 85:10,21 86:5
**addresses**
87:9
**addressing**
83:15 84:22
**Adee**
30:20 32:21,25 33:5,
18,25 34:19 54:22
**Adee's**
38:17
**adequate**
85:2,3
**adhere**
36:7
**adheres**
31:21
**administration**
16:2,12 19:4 21:24
**administrative**
17:25 30:4,15 31:10
38:4 39:4 64:22

**administrator**
22:16,20 80:13 88:8
**administrators**
62:11,14 82:20
**admission**
42:25
**admonition**
99:6
**adult**
24:22,23,25 67:7
93:21,22 95:13
**adults**
93:3
**advised**
13:13
**advisor**
18:20
**afford**
53:22
**agencies**
25:11 27:5,11,16
30:6 38:6 82:8
**agency**
17:11 18:2,8 21:21
26:10 64:4 67:18
74:5
**agency's**
18:22
**agents**
69:3
**agree**
58:5 59:19 65:1
66:6,9 85:8 92:6
**agreeing**
61:11
**ah-uh's**
4:15
**ahead**
35:3 39:2 46:5,10
92:17 94:10
**air**
39:21
**Alpha**
91:25
**American**
13:16
**analysis**
34:12 48:3
**analyze**
32:23
**and/or**
8:25
**animal**
64:4
**announced**
57:12
**announcing**
62:6
**answering**
68:15
**answers**
4:14 68:5 78:5
**anticipate**
4:24 84:16 86:24
**anticipation**
6:4
**anybody's**
98:22
**apologize**
46:6 94:15 101:16
**apologized**
46:23
**appeal**
80:4
**appears**
37:11 76:22 92:10
**appendices**
7:8 11:12
**appendix**
11:20 14:19,24 16:1

**administrator**
applies
44:17
**applying**
33:5
**appointment**
46:16 102:10
**appropriately**
49:11 50:2,16,17,19
88:3,18
**approximately**
15:15
**area**
15:23 51:3 65:20
88:2 89:13
**areas**
27:12 94:3 97:23
**argument**
61:4
**arise**
84:16
**arm**
61:2
**armed**
80:16
**arrested**
49:13
**arrive**
42:22
**arriving**
16:12
**asks**
68:14
**aspect**
14:12 29:6 79:18
80:6
**aspects**
13:24 18:20 35:6
54:23
**ass**
57:16 63:17
**assault**
25:10 29:15 48:4
55:5,11,15,24 56:5,
23 57:4,14 58:2,12,
19 59:7,20,23 60:4
62:2,20 63:12 64:18
65:16,18 67:2 76:1,9
77:21 80:9 83:1
88:12
**assaulted**
57:2
**assaultive**
78:24 79:8 80:5,6
81:1 82:5
**assaults**
56:2 58:6,25 60:16
62:13 64:9 66:10
**assess**
30:17 31:12
**assessing**
43:14
**assessments**
42:24
**assign**
73:3
**assigned**
90:2
**assignment**
21:17
**Association**
13:16,17
**assume**
7:17 19:14
**assuming**
4:10 95:25
**attach**
85:17
**attaches**
87:8

**attaching**
85:18
**attack**
56:19 65:17,18
**attacking**
64:24
**attempt**
57:7 64:3,9 87:7
**attempts**
81:16
**attention**
12:25 29:10
**attorney**
89:7
**attorneys**
4:18 6:17
**authority**
35:5,25 48:10
**automatic**
65:21
**automatically**
67:12
**averaging**
10:19
**awake**
80:8
**aware**
60:5,7 75:14,16
96:13,14,17 97:8,25
99:21 100:1,5,16

**B**

**back**
6:5,11 8:22 14:8
16:9 22:1,13 24:3
32:16 38:15 42:2
46:19 48:10 52:8
53:3 58:3 66:8 70:10
76:4 87:24 89:20
93:9 94:25 95:25
97:21 100:23
**background**
7:12
**balance**
13:9
**balanced**
78:18
**baseball**
57:17,19
**based**
10:13 43:16 73:10
92:2
**basing**
74:14
**basis**
30:14 31:9 32:18,22
33:24 34:2,10 39:3,
18 43:5,7 45:5,21
46:21 47:6,14,18,23
48:1 50:4 53:15
55:11 57:3
**basketball**
59:10
**bat**
57:17,19
**battery**
49:14
**Beach**
17:6,10
**bear**
35:4
**bears**
13:24
**beat**
57:16
**began**
19:2
**beginning**
86:4



behalf
8:19 79:12
behave
84:13
behavior
48:15 64:17,18
76:13 84:1
beneficial
53:17
benefit
14:14 66:22 87:22
Billy
68:5,8
bird
65:21
bit
7:11 32:8 58:1
black
49:20
blank
11:11
blinking
78:9
block
46:15 76:5
blocks
76:15
blue
78:9
body
37:7
Bogan
6:19 8:3,4,16,23 9:7
36:1,20 40:15 45:10
47:8,15,24 48:11
51:14 52:18 54:17
56:3,21 59:25 62:15
69:11 74:2 75:5
79:10 89:2 92:21
98:19 100:4,20
101:13,23 102:7,18,
24
bone
42:3
booked
71:22
booking
71:23 90:3
books
44:14
boot
21:17
bottom
11:10 17:4 72:2
bound
78:6,12
Bradenton
17:6,10
Bravo
90:12,18
break
40:6,11 42:9 53:18
69:10
briefly
6:19
bring
46:19
broad
33:4 44:12 84:23
broader
85:19
brought
37:25
brushstrokes
60:12
build
21:17,18 53:22
building
23:1

bump
59:12
bunch
75:23 84:17
bunks
55:2 90:4
bureau
18:8 19:10,24 20:20,
25 22:16,20 24:7
Byers
60:23

## C

call
13:5 57:14 61:5
63:16
called
4:6
calling
38:13
camp
21:18
capacity
48:7 90:4
captain
21:9 51:25
captain's
92:12
captains
50:25 65:13 79:21
care
60:25 87:17
career
17:5 32:17 48:12
careful
86:9
carry
34:3 35:24
case
5:7 6:7 7:15 8:9,18,
21 10:6,23 13:6,11,
17,20,24 14:2,16,18
15:14,18 30:10,11,
17 31:12 32:23 33:5
37:1,5,24 38:12,23
41:6 53:19 57:21
62:6,24 63:7,20 70:8
83:1 88:11,25 96:22,
24 97:11,15 98:2
99:3,15,21,24 100:6,
10,11 101:4,20
102:21
cases
5:7 8:15,22 9:4 13:5
51:22 71:5 72:7
74:9,11 82:9 96:17
98:8 99:4
catch
61:2
CCHP
4:5
cell
64:22 67:13
cells
53:24 90:5
center
22:25 25:25
centers
25:21 28:8 93:21
century
22:3
CERT
19:11
certified
20:12
certinly
76:24
chain
20:21 23:10

challenge
96:15,19 98:18
challenging
25:12
change
27:20 57:10
changed
12:14 24:8,16,17
27:12
changing
75:15
characterization
21:2
characterize
72:16
charge
15:2 18:12 20:20
21:1,4,6,15 22:8,23
23:9 25:22 27:1 57:4
charged
50:13 88:20 95:23
96:25
charges
82:10
chat
102:17
cheated
59:11
check
10:2 82:18 93:16,19,
24 94:12,17 95:7
checks
93:18 94:1 95:1
chests
59:12
chief
19:10 20:25
chow
62:3
Chris
100:15
circumstances
61:10,12 62:1
citation
72:16
cited
38:8 101:17
citizens
95:20
City
6:23
claims
45:3
classification
19:20 20:18 23:7,13,
15,18 24:9 26:22
29:6 49:9 50:5,9
53:16 54:12 69:20
70:19 71:2,21 72:8
73:3,12,18,21,22
74:1,6,21 75:1,2,14
77:8,12 78:7,12
79:16 81:23,24
82:13 84:20,25 85:2
86:3,22 87:4,6,8
88:13 92:16,24
classifications
19:17,22 20:15,22
23:4 24:5,18 26:13
27:24 28:1,17,25
73:8 74:17 85:8,13,
22 86:11,18 87:15
classified
19:16 23:3 49:11,23
50:3,16,17,19 65:2,
3,19,20 66:4,7,11,12
71:21 73:5 75:11
77:16 88:18,25
89:12 90:11
classifies
29:3

classify
50:11 51:8 69:16
72:23
classifying
26:17 66:6 78:25
clear
20:24 39:17 84:10
100:25 101:16
client
8:20 9:9
clients
8:11
code
30:4,15 31:10 38:4
39:4
codes
73:18
coffee
40:7
collapsed
92:13
collective
9:19
college
48:13
color
60:11
combat
60:3
combined
25:12
command
23:10
commander
17:25 19:11
comment
45:21 53:4
commentary
33:17 35:5
commissary
63:14
commission
13:9 31:4,22 32:3
35:15,23 37:6 40:24
41:4 89:15
commit
73:15 80:16,17
committed
52:4
committee
18:23 20:2 31:25
32:11 40:24
common
50:25
community
48:20
complaint
54:21
completed
16:6 22:1
completely
16:11
complex
42:23
complications
43:24
complies
40:13
component
20:6 84:7,11,14,18,
21 85:9 95:9
components
83:14,19 84:4,8,10
comports
41:5
compound
64:11
comprehensive
81:2

conclusion
37:20 38:14 40:19
42:7
conclusions
36:23 100:3
conducted
48:3 94:1
Confrontations
83:12
confused
16:13
connect
67:1
consequences
63:5,7,9
consideration
78:18
considered
96:8
consistent
102:1
Constitution
36:14 38:23 39:20,
24 41:6,10
constitutional
36:19 37:1,8,14,25
38:11 39:6 40:13
101:3
consult
9:1 10:6
consultant
54:3
consulted
81:23
consulting
9:4 25:3
contact
42:25
contained
27:17 37:17 51:4
context
30:20 38:16 48:16,
22 86:20 87:23
conversation
4:24
convicted
7:16 49:14
conviction
78:20
convictions
76:9
Cook
55:17
coordinator
18:11,15
copy
7:6 10:25 62:22
corporal
21:10
correct
4:21 7:1 8:4 9:10,13
11:7,8,22 12:9,16
17:8,14 18:19 19:7
21:4,9,10 22:10,17,
18,24 23:16,21 24:6,
23 25:3,6 30:13
34:25 35:2 36:15
39:12 48:24 54:13
78:4 91:12 101:22
102:6
Correction
39:16
correctional
13:16 19:12 20:12,
23 21:3,7,8,15,18,19
23:23 25:19 26:20
28:7 35:7,20 36:24
43:10 48:14 50:15
51:22 56:12 59:22
60:6,22 62:11,13
63:1,16 64:2 69:5

conclusion
80:13 81:14 82:20
83:6 88:8 95:2 102:3
corrections
5:7,10,21 8:18
13:11,19 17:16,20
18:4,8,9,11,13,17,
18,25 19:3,4,10,23
20:2,4,6,9,11,20,25
21:13,14,20 22:16,
19,24 23:9 24:22,23,
25 25:13 27:2 28:2
31:5,23 32:4,11
33:1,3,20 34:22 35:1,
6,16,24 39:7 48:15
50:8 52:16 53:2 54:3
59:21 60:5,18 79:6
85:7 86:18,21 88:2
89:15 94:23 95:10,
17 96:1,4,11,23
correctly
9:14 98:3
correlating
76:20
Cory
30:11,17 49:10,13,
21 50:1,2 57:2,15
63:12,15,17,19,21
68:11 77:9,12 78:22
89:10
Counsel
68:17,21
counselor
39:13 42:2 45:18
66:16 71:13
count
96:21
counties
67:17 74:7,10 95:17
county
5:17,20 6:18 14:17
17:22 19:13,14,22
20:17 22:8,12,15,21
23:2,12 24:3,9,19,21
25:1 30:12 31:5,20
35:19 36:6 50:6,11,
15,25 53:22 54:24
55:7,17 62:16,17
63:12 68:9,17,21
69:3,16 72:13,20
73:12,23 78:20 79:3,
12 83:13,18 86:3,12,
13,15,16 87:3 89:25
90:8 93:5 95:3
101:20
couple
6:11,12 40:21 52:20
61:10 96:5 100:21,
23
courses
16:6,9,10,15,17,20
coursework
22:2
court
7:15 30:22 32:7 41:7
66:22 97:9,18
102:11,16,22
court's
42:1
cover
10:9 67:15 88:4
coverage
9:22
covered
15:21 92:16,23
covers
10:4 88:4
CPP
4:5
create
21:19 55:18



Richard Hough, Sr., CPP, CCHP 05/28/2025

created
25:17 26:9 33:21
37:18
creating
20:2 37:9
crime
82:5 88:19
criminal
48:16 49:2 53:10
63:7 64:15 82:17
criminologist
66:20
cross
20:12
CROSS-
EXAMINATION
100:19
CSI
97:18
current
75:25 77:21 78:24
79:8 82:3,10
curriculum
16:11 20:8
custody
5:20 90:14,19,22
91:2,10,14,17,21
customary
50:15
cut
66:16
CV
15:25 25:17 32:17

**D**

data
80:10,12 81:1,4
82:19 83:4
database
82:17
date
12:1 71:23 73:6
75:12
dates
21:22
Daubert
42:6 96:14,19 98:17
day
5:11 49:2 56:6 64:14
74:12 80:7,8 97:20
days
6:6 78:20
deal
75:18
dealing
53:10 83:7
deals
7:15 43:25
death
30:11 68:12
decade
10:14
decades
53:4
decision
38:23 50:9 72:18,22
88:15 93:4 99:21
deemed
67:14 100:2
defendant
68:5 69:5 92:8 97:21
defendants
14:18
defensive
96:10
defer
65:11 76:24 79:20
definition
43:11

defusing
95:22
degree
16:8 41:5
degrees
21:23
Delta
91:1,3
denied
49:21
department
17:7,12 20:1 24:1
25:5,14,16 26:3
95:10
departments
9:25 17:16 27:1
departure
13:22
depending
13:12
depends
19:7
depo
11:15
depose
41:3 47:3
deposed
99:11
deposition
6:4,13 15:4 41:15
61:22,23 65:14 71:6
73:21,25 99:15
depositions
4:11 12:6 51:17
deputies
18:13,14
deputy
19:10 20:25
Describe
89:24
designated
78:23
designations
90:2
designed
83:14,19
detail
89:24
details
43:3 45:7,25
detainee
5:12,19
detainees
5:8,24
detention
25:6,18,21,24,25
28:8 93:20
determine
13:21 14:10 28:11
101:2
determined
15:17 29:6
determining
81:4 82:21
develop
23:6 25:23 26:1,12
developed
23:8 26:15 27:8,15
35:18
developing
19:21 25:15 26:3
97:3
development
19:25 27:3
deviate
41:9
devices
94:20
diagram
76:16 77:16

differently
51:8
difficult
71:8
diffuse
95:14
digesting
13:8
direct
4:8 35:9,11 38:20
43:3 45:7,25
directed
23:24 37:8,22
director
19:23 33:20 95:17
directs
40:2
disagree
75:4
disciplinary
63:5 64:14 83:23
84:7
disclose
8:25
disclosed
9:5 12:8,14
disclosure
11:24 15:1
discovery
12:7
discuss
32:18 34:20
discussed
27:18 36:17 82:3
89:16
disorder
64:24
distinction
5:24 6:1 49:3 91:10
District
99:22
division
17:25 18:2 99:23
divisions
19:24 21:21
DNA
97:17 98:2
doctor
71:15 102:8,10
document
14:5 30:25 33:9,18
38:18 40:1 68:1,20
70:2,4,13 71:14,16
72:6 75:17 77:7,12
documentation
55:23 69:4
documents
6:7 7:4 11:20 12:19,
24 13:9,10 14:2,8,12
34:20,21 70:8
dog
42:3
dogged
87:7
domestic
49:14
don't
46:12 66:16 68:10
dorm
62:4 95:5
dormitory
54:25 61:6
dorms
55:2 90:6 92:13
doubt
92:11
dozens
81:23
drama
43:15

draw
33:2 42:7
duly
4:7
Duquette
68:16,21
dynamic
57:11

**E**

earlier
14:1 89:22 93:2
96:14
early
81:18
easier
75:20
eccetera
62:8
Echo
91:13
education
21:22 45:22 48:2
effect
41:9 82:6 97:18
efficient
93:10
effort
25:23
efforts
88:8
elbow
56:10 60:21
electronic
12:3
eludes
49:3
email
102:14,15
emergency
19:12
employed
48:25
employee
59:22
employment
48:25
enacted
30:5,15 31:10 38:4
39:4
end
42:13 51:18 68:20
87:2 93:20
enforcement
13:11 17:6 18:5,10,
14,24 56:13 85:7
86:21 96:3,11,22,24
97:3,11
ensuring
81:11
enter
10:24
entered
97:8
entering
55:7
entire
20:20 24:6 30:19
43:6 94:18
entity
9:20
entry
17:22 18:13
environment
35:8 48:16
equipment
94:20
ergo
62:3

Eric
49:10,16 50:2 57:2
63:20 71:17 75:23
76:8 77:13 78:2,22
89:9
escape
66:24 76:11
esque
61:2
essentially
22:25
estate
97:1
estimate
8:7 93:25
etcetera
93:4
etcetra
83:19
evaluate
32:23
evaluation
47:25
evidence
55:14 58:2 63:6
evidenced
79:24
evidentiary
96:19
EXAMINATION
4:8
examined
4:7
examples
27:11 60:8 62:9
excluded
96:18
exclusive
38:22
excuse
23:21 66:21
exhibit
10:25 11:2,19 67:22,
25 69:23,24 77:2,3,
6,7 89:22 102:12
exist
67:3
existed
37:6
existence
23:15 43:12
existing
13:10
exists
62:18
expectations
62:18 64:2,17
experience
18:17 21:13 45:23
48:2 53:9 63:1 88:6
95:22
expert
8:12 9:4,6 10:18
26:7 30:23 34:19
38:14 40:1 66:22
79:6 85:7 86:19,22
88:1 95:10 97:14
99:23
expertise
54:3 78:11 79:1 85:6
86:17,21 88:7
explain
21:11 32:15 41:11,
14,21 69:2 73:17
83:17,20
explained
27:24 47:10 52:19
65:13
explaining
76:25

explains
90:10
explanations
4:15
express
87:22
extent
24:17 28:9,12 29:5
31:3 53:13 62:21
eye
49:20

**F**

facilities
21:3,15 25:16,19
27:2 35:7,20 50:15
51:1 94:2,24 96:1
102:3
facility
5:21 21:18 28:15,22
31:21 42:22 43:11
46:3 47:22 49:8,12
50:4 52:6 53:13,23
57:20 63:1 64:23
66:5 80:19 81:14,17,
18 83:6 85:16,20
86:5 93:22 94:18
95:13
facing
82:4
fact
39:25 43:16 45:17
49:19 50:13 51:1,4
56:11 65:12 66:17
79:15,23 85:17 86:6
87:24 88:17 89:12
factors
72:23 73:2
factual
79:22
failing
39:10
fair
5:4,21 21:2 71:6
72:9,25
faithful
43:20
faithfully
86:7
fallen
99:17
familiar
59:3 69:15
familiarize
38:18
fat
63:16
fault
32:25
FCAC
32:2,6 33:12 36:5,
12,18 38:10 39:23
101:18 102:2
February
12:1
federal
38:23 44:25
fee
14:23 15:4
feel
6:1 60:19
feels
59:11
fees
15:3
felon
51:6
felonies
7:11



Richard Hough, Sr., CPP, CCHP 05/28/2025

**felons**
52:24 67:6,7 87:19,
20

**felony**
76:1,9 77:21 78:25
79:8 80:5,6 81:1
82:5 91:7

**female**
67:6

**fewer**
67:9

**field**
5:10 13:11 28:7
39:22

**fight**
49:15,21 60:19 68:9

**fighting**
87:10 96:7

**fights**
49:17 83:15 84:2,22,
25 85:10,18

**figure**
22:1 42:3

**file**
72:4

**filing**
44:13

**final**
26:5,14,16 80:2

**find**
41:16 51:21 72:17
80:19

**fine**
29:20,25 40:11
71:10

**finish**
5:1 39:12 40:8 57:1

**firm**
8:4,9 9:8 10:15
97:21

**fits**
67:10

**fives**
92:5,19

**flip**
12:21

**Florida**
8:19 9:9,12,17,21,25
10:7 13:18 16:5,16
20:9 22:12,15 25:5,
11,20 26:23 30:5,6,
16 31:1,2,4,11,13,
14,21,22,24,25 32:3,
6,10,11 33:12,13,14
35:10,14,15,18,21,
22,23 36:2,4,11,13,
17 37:9,14,17,22
38:5,6,8,9,20 39:5,
11,14,16,19,23 40:2,
13,23,25 41:1,8
51:5,13 52:15,20
54:13 55:17 63:25
67:5,17 74:4,7,11
85:15 89:14 93:1,21
95:10,18 96:11 98:7
99:22 100:15,24
101:2,8,17 102:2,3

**Florida's**
37:5

**FMJS**
32:5 33:12

**folder**
12:3

**folders**
12:5

**folks**
64:2 95:19,20

**follow**
33:9,23 36:4 44:21
54:10

---

**force**
26:8 34:4 96:2,8
97:12

**foresee**
56:5 65:17

**foreseeability**
55:18 57:18 59:13
60:3

**foreseeable**
55:6,12 56:16,19
57:14 58:7,8,13,19
59:1,18,20,21 60:16
62:8,9

**foreseeing**
85:18

**forgot**
52:22

**form**
32:18,22 36:1,20
40:15 45:10,11 47:8,
15,24 48:11 51:14
52:18 56:3,21 59:25
62:15 74:2 75:5
79:10 89:2 92:21
98:19 100:4 101:11,
21 102:5

**forwarded**
12:1,6

**found**
51:21

**foundation**
32:12 69:15 94:14

**fours**
92:4,19

**frame**
18:7 59:17 62:1

**fraud**
97:1

**fraught**
95:23

**free**
6:1

**frequency**
69:6

**friction**
62:7

**front**
7:4 10:25 11:16
41:20 98:10

**frustrated**
46:7,24

**fuck**
63:17

**full**
5:2 7:7 14:12

**fully**
7:23

**functions**
10:2

**fund**
8:19 9:9,13,18 10:7,
11

**furnish**
13:8

**furnished**
6:9

---

**G**

**game**
10:16 70:17

**gather**
54:2

**gave**
40:21 59:3 62:9

**general**
18:22 20:2 50:5,7
58:23 68:16,21 70:9,
11,14 71:2,4 83:12

---

**generally**
28:7 59:7 86:18
92:3,10

**generator**
94:21

**genuinely**
70:18,22

**give**
4:14 5:2 66:18,21
71:16 72:16 79:22
100:10

**giving**
5:1,3

**glanced**
6:12

**glean**
47:1

**golden**
39:13

**golly**
24:10

**good**
27:21 28:22 69:22
78:13 81:17 85:15
93:11

**good-hearted**
64:1

**Gosh**
44:18

**graded**
73:14

**graduated**
22:9

**granted**
97:20

**graph**
83:11

**graphic**
73:1 79:25

**great**
7:7,10 42:10 71:10
95:22

**ground**
4:13

**group**
26:7 28:24 52:5 83:7

**guaranteeing**
81:11

**guess**
22:3 40:16,17 41:10
85:6 87:11 99:2,18

**guessing**
10:16

**guidance**
13:12 33:3,17 35:5

**guide**
33:1 34:1,2,24 39:8
83:15

**guides**
85:10

**guiding**
13:20 28:21 30:25
31:1 33:7 34:20,21
35:3 84:21

**Gulf**
91:20,25

**gymnastics**
40:4

---

**H**

**half**
54:20

**hall**
62:4

**handbook**
83:22 84:5

**hands**
95:18

---

**hanging**
16:10

**happen**
58:6 60:20 61:18
62:13

**happening**
59:24 61:19

**hard-working**
64:1

**Harton**
4:9 10:22 11:4 31:8
32:9 36:10 37:13
41:13 42:9,12 45:14
47:13,16 48:8,17
52:10 54:4,18 56:17,
24 57:22 60:14 64:7
67:20,24 69:13,23
70:1 74:24 75:9
77:1,5 80:11 89:19
93:6,14 98:23 99:1
100:7,17 101:11,21
102:5,9,11,13,20

**Harvard**
16:7,8,17,19,21
21:25 22:9

**head**
4:16 69:18

**health**
65:14 87:18

**heard**
20:14

**heavily**
32:25

**held**
4:2 101:9

**helped**
26:1,12

**helpful**
35:8 69:14 82:20,24

**helping**
23:6 39:5

**helps**
80:12 86:23 88:5

**hey**
13:5 27:20

**high**
65:2,12,19,20,22,25
66:4,11,25 67:11,14
73:8 75:1

**high/medium**
73:5,6 75:11,13
76:17 90:18

**higher**
25:10 29:1

**highest**
75:2

**highlights**
14:25

**highs**
73:12

**Hilyard**
8:4,16,23 9:7

**hiring**
21:20 26:19

**history**
82:16,17

**hit**
57:6 58:16 63:2,4

**holding**
42:2

**Hollywood**
61:1

**home**
6:24 7:1

**homicides**
48:20

**hope**
5:11 47:1 51:10

**hoping**
54:6

---

**Hough**
4:5,10 7:16,20 44:3
46:20 100:22

**hour**
15:3 46:15 53:12
82:13 95:4

**hours**
15:13,18,21,24 46:8,
11,17 80:7,8 85:12
88:22 100:23

**house**
23:3 43:15 67:9,13
81:5,7,8 88:3,7
90:13,21 91:6

**housed**
19:16 50:14 65:3
80:16 81:5 82:23
87:16 88:19 90:11
92:9,3,4,5,6,25

**houses**
90:17,18

**housing**
28:11,12,19 51:2,8,
24 53:13 54:23 55:1
63:8 64:15,21 65:20
89:13,24,25 90:1,5,8
91:24 94:8

**human**
48:15 62:21 64:4

**humans**
28:24 52:5 83:7

**hurt**
63:14

**hypothetical**
59:2,5

---

**I**

**idea**
16:9 27:21 42:10
54:1

**identification**
11:3 67:23 69:25
77:4

**identify**
69:2

**idle**
55:3

**illegal**
63:3

**Illinois**
55:17 63:25

**illness**
8:1

**illustrates**
59:5

**immediately**
80:22 84:24

**impacted**
88:12

**implement**
27:21

**implicated**
88:16

**implications**
18:25

**important**
4:14 28:4,16 29:3
58:1 73:20,25 74:3,
4,14,23 79:7,18
82:23 85:9 86:22
88:7 94:14

**imposing**
84:11

**improperly**
49:9

**inaccurately**
34:14

**inappropriate**
92:15

---

**incarcerated**
28:24 83:13 95:20

**incarceration**
75:15

**incident**
30:17

**inclined**
43:2 45:6,24

**include**
32:20 64:17 84:2,20
94:7

**included**
18:2,20 22:25 33:24
44:10,23 49:18 79:3

**including**
11:11 28:7 32:17
69:4,5 81:13 89:25
95:19

**income**
10:17

**incorporates**
37:1

**incorrectly**
49:10

**incredibly**
61:25

**independently**
14:21

**indication**
49:8 78:14

**individual**
43:22 52:6 53:7
54:5,8,12 57:8 67:13
95:18

**individual's**
82:15

**individuals**
28:13 43:2,9,14
45:4,6,24 62:25 82:4
88:19,20

**industry**
72:21

**inform**
101:19

**information**
43:14,17 49:17
79:22 80:20 82:20
92:8 97:22 101:12

**informational**
33:19

**initial**
14:25 15:11,21
82:12

**initiated**
49:18

**injured**
81:13

**inmate**
5:19 28:20 43:23
49:23 52:2 53:25
55:5,6 56:19,20
60:23 62:22 64:25
79:1,7 80:3 83:22
84:11 85:21 88:11,
13 90:4 95:6

**inmate-on-**
88:10

**inmate-on-inmate**
27:13 58:25 59:20
61:17 65:4 85:23,25
86:25 88:9 89:1

**inmates**
5:7,15,25 19:16,20,
22 20:18 23:3,4,19
26:25 27:4,9 29:2
50:12 52:3 53:21
55:1,3 58:15 59:10
62:8,21 69:16 72:23
74:20 82:21 83:16,
24,25 84:2,6,8,12,
19,22 85:3,11 88:17,



Richard Hough, Sr., CPP, CCHP 05/28/2025

25 90:13,18,22 91:1,
7,24 92:3,14 94:8,23
95:15 96:2,6
inquiring
37:21
inside
43:22 80:18 81:14
94:22
instance
38:3 66:13 87:3
instances
95:25 96:5 97:24
instant
30:4,9 61:8
Institute
33:1 34:1 35:1,6
39:7,15 52:16 53:2
institutional
76:13
instruct
4:19
insurance
9:20,24
insuring
81:12
interacting
94:8
interactions
59:16
interchangeably
5:9
interesting
80:22
interrogatories
14:17,20 67:21 68:6,
22
interrogatory
68:15,25 89:20,21,
23 92:9
investigation
64:15 96:25
investigator
96:24
invoice
10:3 15:11,17
invoiced
15:8
involve
82:14
involved
49:15 74:20 97:12
involvement
19:2
involving
30:11,17 100:24
101:20
issue
15:17 65:15 83:12
89:3 92:19 98:2
issued
99:19
issues
34:21 53:11 66:3
84:1,16
issuing
12:11
item
84:9
items
32:21,22
it's
16:11 22:3 29:21
34:13 66:14 88:11
I'd
76:24
I'll
17:3 34:16
I'm
30:22 45:16 67:20

## J

jail
5:17,20 13:16,18
21:2 22:23 23:1
28:17 29:3 30:12
31:2,13,21,25 32:6,
10 33:12,13,14
34:21 35:14,18,21,
22 36:3,11,17 37:17
38:9,19,21 39:14,17,
19,23 40:12,23,25
41:8 42:22 46:3
51:5,13 52:15,20
53:23,24 54:13,24
55:7,16,23 56:2 58:6
59:7 62:16 63:12
67:5 71:22 72:4
73:12 74:5,9,11
78:20 83:13,18 85:9,
23 86:23 89:14,21
90:8 93:1 100:24
101:2,8,18 102:2
jail's
50:20
jails
21:6 22:8 28:8 31:14
33:22 36:3,12 41:2
48:20 50:8 54:24
58:25 65:10 67:8
72:7,12,14,22 81:22,
24 86:13
job
22:20,21 48:25
93:16
jog
99:3
Johnson
6:23
judge
97:6 100:2
judgment
97:20
jump
21:12
jumping
21:13,14
jury
14:14 41:12,14,16,
20,22 42:8 44:20
45:24 59:5 65:22
66:22 87:22
justice
24:2 25:5,14 26:4
48:16 49:2 53:10
95:11
juvenile
21:17 24:1 25:5,14,
18,24 26:4 93:20
94:2,8 95:11
juveniles
26:17 52:25 93:3
94:3
juxtaposing
38:17

## K

K-A-T-E-S
100:13,14
Kates
99:22 100:8,12
Key
17:10
kind
5:8,9 7:21 8:15 9:19
10:13 12:24,25 13:8,
9 14:24 15:6 27:24
28:22 43:11 53:24
54:20 57:25 59:2

60:15,16,19 63:8
65:21 72:12 73:1
74:14 75:17,20
76:16,19 77:15
81:15 83:20 87:12
92:2 94:17,18 95:5
knowing
48:6
knowledge
10:4 98:21

## L

labeled
10:24 68:2,5
language
81:11
large
25:16 94:17
largely
19:1 42:24
Larger
17:11
Late
22:6
laugh
25:9
law
9:8 13:11 17:5 18:4,
10,13,24 30:4,15
31:10 34:4 35:4,25
37:1,2,8,12,14 38:4,
23 39:4 40:13 41:1
56:13 85:7 86:21
96:3,11,21,23 97:2,
11,21
lawyer
45:15
lay
69:14 94:14
layout
89:24
Le
17:3
leadership
21:21 63:13
leading
6:10 20:4
leave
24:21
leaving
16:9
led
25:23
left
16:15 24:1 39:22
legal
33:8 36:23 37:10,20
38:13 40:19 42:6
100:3
legislature
30:5,16 31:11 37:9,
23 38:5 39:5 40:22
length
36:23 50:24 69:6
95:22
Leo
22:5
lethal
97:12
Let's
11:5 15:25 29:8
level
18:13 25:20 31:6
35:20 36:8 37:21
80:15 90:14,19,22
91:2,10,14,17,21
96:7
levels
50:10,11

liability
9:22
lieutenant
21:9
life
46:1
limited
59:16 61:12
lined
55:2
list
12:12,17 42:14
79:24 98:11 99:3
listed
11:24 12:19 50:18,
21 64:13 99:13
listing
73:1
literally
14:9
literature
32:20 53:11 55:22
litigation
44:25
lives
42:23 43:3 45:7,25
location
28:12 50:14 60:4
lockdown
95:4
locking
94:19
logic
92:24
logical
80:19
long
6:20 41:8 87:1 92:15
Longboat
17:10
looked
6:11
lot
5:16 6:7 12:4 14:1
53:17 54:6 60:15
71:5 93:7
lots
95:18
low
65:3,22 66:12 73:8
75:3
lowest
75:3
lows
73:13
Lutterloh
49:10,16 57:2 62:25
63:20 71:18 73:4
75:10,23 76:8 78:2,
22 88:17 89:9
Lutterloh's
71:20
Lutterloh's
72:4 77:13

## M

made
5:24 21:11 27:20
33:11 38:24 41:7
60:2,21 88:15
major
16:25 21:9
make
6:1 27:25 33:17 42:8
70:12,13,23 82:25
87:17 93:5 101:16
making
45:3,21 65:1 81:12

male
90:13,22 91:7,24
92:3
management
8:19 9:9,13,18 10:7
16:12 27:18
Manatee
17:22 18:1 19:13,14,
22 20:17 22:8,21
23:12,21 24:3,9,25
mandatory
34:3 36:3 69:7
manslaughter
7:17
map
76:20
Marin
14:17 68:17,21 69:3
Marion
5:17,20 6:18 30:12
31:5,16,19,20 36:5
50:6,10 53:20 54:24
55:7,17 62:16,17
63:12 68:8 69:16
72:13 73:12,22 79:3,
12 82:11 83:13,18
86:3,12,15,16 87:3
89:25 90:8 93:5 95:3
101:20
Marissa
68:16,21
marked
11:2 67:22 69:24
77:3
master
21:24
master's
16:8,14
masters
16:2
match
53:24
material
5:23
materials
6:8 11:23 12:17
14:15 86:8
matrix
71:23 72:2 79:17
matter
13:12 26:7 28:9
30:4,9,17 38:4 61:8
Mcnealy
52:1
Mcneely
12:9
meaning
15:20
meanings
5:10
means
38:24 81:1
meant
27:25 38:18 54:7
65:9 83:18 94:11
measures
59:23
medical
43:15 65:15 66:3
87:17 90:3
medication
7:24
medium
65:22 90:13,22 91:1
medium/pre
77:17
meet
6:17 30:6 36:13 38:6
member
43:22 60:6

male
memorize
73:15
memorized
69:19
memory
69:21 70:15 86:1,14
99:4
men
52:25 93:3
mental
65:14 87:18
mention
66:13 93:1
Merchant
30:11,12,18 49:10,
13,15,18,20,21,22
57:3,15,19 62:25
63:12,15,17,19,21
77:9 88:18 89:10
Merchant's
77:12
Merchant's
68:11
mere
60:8
met
40:13 89:13,14
method
51:16
methodology
13:4
middle
42:20 99:22
midswing
61:3
Miller
12:10
mind
8:10 43:22 96:6
mine
34:5
minimal
39:6 40:14
minimum
15:21 36:19 78:19
minors
25:7
minute
29:11 69:10 80:9
98:15
minutes
6:21 38:16 40:22
52:9,20 85:13 93:8
misdemeanants
67:8 87:19
misdemeanor
51:6 78:20
misdemeanors
52:25 67:6
mislead
98:6
missed
20:15 52:22
missing
50:22
mitigate
62:12,19 65:4 66:9
86:24 88:8,10
mix
29:7 92:14,18 93:2,3
model
13:18 31:2,13,21,25
32:6,10 33:12,14
35:14,18,21,22 36:2,
11,17 37:17 38:9
39:17,19,23 40:23,
25 41:8 51:5,13
52:15,20 67:5 74:4
89:14 93:1 100:24
101:2,8,17 102:2



modeled
20:1
models
13:13
modified
27:12
moment
44:1,17 60:16,19
74:10,12 88:15
monitoring
26:25 27:4,9
monologue
40:21
month
99:18
months
26:5
motion
44:13 60:11 61:8
motivated
78:15
motivations
42:23
mouth
58:12 87:9
move
42:1 81:19 82:12
movement
64:15,20
movie
61:1
moving
57:8 58:17
multiple
38:8
mutual
60:3

**N**

named
84:5
names
90:1 99:4
narrate
89:7
narrated
45:12 89:5
narrow
59:13,17 61:25
narrower
62:1
national
18:23 20:3 32:25
34:1 35:1,6 39:7,15
52:16 53:2
nature
55:15 56:9 62:2
navigate
75:21
newly
26:9
NIC
40:1
night
7:25
nines
92:6
no's
4:15
Nocco
99:22 100:8,15
nodding
4:16
non-
87:19
non-sentence
67:7
norm
51:23 52:11,12

normal
4:24 51:2,11,12
52:12 53:5 54:1
74:15 89:16
north
50:10
nos
76:8,16
note
36:21
noted
21:20 25:17
number
42:15,19 47:19
54:23 68:25 70:8
72:23 73:13 77:17
78:1 82:21 89:23
90:4 95:21 100:2,10
numerical
69:15 72:8 73:11,22

**O**

object
4:19 36:1,20 40:15
45:11 47:8,15,24
48:11 51:14 52:18
56:3,21 59:25 62:15
74:2 75:5 79:10 89:2
92:21 98:19 100:4
101:11,21 102:5
objecting
45:12
objections
41:25
observed
49:19 101:25
occur
41:24 48:5
occurred
89:1 101:3
occurring
59:4 61:4 64:3,9
occurs
59:7 89:16
offenders
50:13 51:2,7,12,19,
24 53:6 54:2
offense
76:1 77:21 78:24
79:8 82:4 91:9
offenses
52:4 91:7,24
offer
28:20 36:22 40:20
59:4 97:21
offered
40:1
offering
38:17
office
6:24,25 7:1 17:23
18:1,5 19:14,15
22:12,15 31:20 50:6,
11 62:17 68:17,22
69:3 79:3,13,14
86:12 93:5 101:20
officer
17:6,13 18:18 19:3
20:12 21:7 25:18
49:19 56:12,13
57:20 59:21 60:6
63:16 95:3 96:3
97:12
officers
17:18 25:11,19
26:20 29:2 37:2
48:14 55:2 57:15
60:18,22 61:5,16
69:5 81:13 83:25
84:7,15 94:23 97:2,3

offices
9:21
Ohio
7:15
Ojection
45:10
Okaloosa
25:24
one's
39:9 58:15
one-by-
27:6
ongoing
42:25
operation
22:24
operations
35:7,20
opinion
13:23 30:14 31:10
33:25 34:2,5,10,15,
16 36:16 37:10 38:7
40:12,20 47:6,10,11,
14,23 48:1,21 49:5
52:9 53:8 54:14
55:11 56:1 88:24
89:3,8,10 97:14,16
101:1
opinions
12:15 32:13,19
34:12 42:14 44:24
96:18 97:9 100:2
opportunity
62:5 79:11
opposed
38:19 47:2 61:8
62:19 77:13
optional
69:7
order
28:22 50:5 62:12
70:9,11,14 71:3,4
81:17 85:15,20
ordering
102:25
orders
18:22 20:2
original
94:25
outcome
55:7
outline
93:9
overseeing
26:21

**P**

pages
11:10,11 12:19
14:10 90:10
paid
12:24
Palmer
8:4,16,23 9:7
paper
17:1
paragraph
29:11,17 30:2,19
32:24 38:17 40:3,5
42:4,20 43:19,21
46:1,4 47:18,19
54:20 55:21
parroted
54:22
part
10:8 18:1,22 20:6
23:23 26:6 37:10
50:21 51:10 71:2
80:22 81:15 84:21
85:13 87:2

participate
9:22 23:17 25:15
27:2
participated
24:4
participating
19:20,21
parts
6:5
pass
82:11
past
10:14 22:21
paths
37:21
pathway
39:24
patrol
17:6,13,17,18 18:17
people
4:25 5:13,16,19 25:7
26:20 29:1 43:10
46:3 47:3,21 48:14
53:14 56:15 63:2,4
65:1,3 66:3,6,10,11
67:9 81:18 87:16
88:7 90:11
percent
10:20,21
percentage
10:18
period
18:19 26:14,16
82:14 92:7 95:12
person
45:12 56:8,15 66:25
68:15 78:7 80:14
personal
82:9
personally
82:9
Persons
42:22
pertaining
15:3
pertains
26:25
Peterson
51:25
phrase
86:10
physical
57:5 61:5
picking
51:17
place
23:14 26:18 28:13,
23 51:2,11,12 53:7
63:11 83:14,18 85:9
88:19
places
33:6 69:19
Plaintiff
30:24
plaintiff's
97:14
plaintiffs
34:19
Plaintiff's
11:2 67:22 69:24
77:3
play
35:17 70:17
playing
59:10
plenty
102:10
pluck
43:20

PM
4:3
pod
90:12 91:1,3,13,20
pods
91:9
point
12:20 15:12 20:7,10
21:1 26:23 29:10
33:11,18 34:13 40:3
43:21 44:21 46:4,9,
18 48:5 50:10 60:2
61:22 73:17 75:15
80:10,12 81:1,4
82:25 85:14 89:22
pointed
46:23
points
20:19 82:19 83:4
police
8:17 17:7,16
policies
5:16 6:12 13:13
19:21,25 20:5 23:7,
24 24:6,9,16 25:23
26:3,11 27:3,8,15
50:20,24 64:14
69:20 84:6 86:18
101:19 102:1
policies/
procedures
25:15
policing
21:13
policy
18:19,21 23:17 24:4,
17 26:8,9 60:10
79:16 83:14,19,24
84:4,19,21,25 85:3,
4,8,13,14,23 86:3,4,
11,15,16,22 87:3,5,
6,8,14 88:3,4,14,16
92:16,24
population
25:12 28:20 43:23
53:25
populations
83:13
pose
29:1
position
17:19 18:11,16
20:16 22:7 36:22
positions
17:3
positive
15:17 81:12 98:6
Post
15:15,20
posturing
57:5
potentially
14:11
practices
8:18 34:19 50:7
53:12
pre-booking
82:12
pre-label
102:20
predict
48:4
predicted
83:2
prefer
29:22
prepare
86:23
prescribed
36:8

present
56:14
presentation
14:14
presenting
33:7 75:7
pretty
72:21 78:13 81:2
prevent
59:23 61:17 85:23
86:24
preventing
85:25
previous
62:7
previously
49:13
primary
82:12
principle
61:11
printed
29:20
prior
6:8 12:11 15:1 18:16
76:9 82:15
prison
78:6,12,14
prisoners
5:8
prisons
28:8 54:25 72:15
privilege
4:20
probable
97:3,7 99:7
problem
57:21
problems
76:13
procedural
23:18
procedures
23:24 26:3,8,11
27:3,8,15
proceed
57:7
proceedings
4:2
process
12:20,23 13:2 28:17
31:6 44:14 74:21
81:3
professionals
36:25
professor
49:1
program
25:18 26:2
programs
28:19 87:18
prohibition
51:6 52:24
promise
5:4
proper
5:12
protection
52:2
protracted
40:21
provide
9:24 10:6 32:12
33:17 35:24 45:19
provided
10:22 47:5,13 92:8
providing
43:18 48:22
public
16:2,12 21:24 83:12



publication
48:9
pull
14:7 54:9 69:20,23
pulled
39:21
punch
55:19 56:7,14 60:24
61:9 62:3,5 64:5
88:16
punched
63:21 89:10
punching
59:6
purview
34:13 38:14 40:19
put
20:10 31:15 40:24
51:7,19,23 53:5,6
60:11 61:8 64:22
66:10 83:14,18
86:20 87:18 102:16
putting
30:19 58:12

**Q**

quarter
22:3
question
4:21 5:1,3,25 7:21
27:13 29:13 34:9
38:7 39:1,25 40:10
44:12 46:19 48:23
51:10 54:9 56:22
66:14,15 68:14 69:1
70:14,15 71:5 74:13
75:8,25 78:5,21,22,
25 79:4 81:21 82:10
86:19 89:23 95:1
questioning
40:9
questions
7:10 26:24 28:5 43:4
45:7 46:1 66:17
75:24 76:7,20 77:20
78:2 79:16 80:19
82:2 83:4 93:7
100:21,24 102:7
questions,right
75:23
quick
100:21
quicker
93:8

**R**

rate
25:10
rates
48:20,21
reaccredited
36:9
reach
46:9
reached
97:6
react
60:19 84:15
reacting
60:16
reaction
61:2
read
14:4 29:11,19 42:21
49:24 51:16 54:19
97:9
reading
14:13 43:20

ready
29:12 34:17 40:6
54:15
real
96:25
reality
92:23
reason
7:22 12:22 37:4
44:10 75:4,7 80:4
83:3 84:3 92:11
101:7,15,17
reasonable
59:23 60:3
reasons
28:25 52:2
rec
59:10 62:4
recall
8:20 11:25 14:19,22
15:11 17:1 23:22
27:7,10,19 51:25
72:18 79:20 82:7
86:2 96:6 99:24
received
14:8 69:5
recently
8:8
recess
42:11 67:19 69:12
93:13
recites
34:20
recognize
61:22 72:2,3
recognized
13:1
recognizing
73:19
recommended
13:13
record
10:24 37:4 45:13
46:11 63:6 73:10
77:11 86:8 89:11
101:16
recruitment
21:20
refer
5:16 13:15 32:5
reference
48:19 60:21
referenced
72:5,6 96:14
references
30:25
referencing
95:2
referred
32:21 34:23
referring
34:5,22 66:2,3 98:1
refers
30:20 33:18
reflect
37:7 73:11
reflection
41:23
reflective
36:19
reflects
37:12 89:11
regard
52:3
regime
19:15 23:3 28:17
73:12,22 74:1 75:2
regimes
23:14 72:8

regional
25:20,24
regulations
62:23
regulatory
35:4
relate
44:19
related
19:21 23:18 24:4
27:9
relating
27:4
release
22:25
relevance
80:18
relevant
13:1 78:25
relying
32:25
remember
6:5 14:8 16:25 24:8,
11 26:19 27:14
39:13 70:6 74:12
98:2 99:19
remind
32:2
render
13:23
repeatedly
47:20 88:23
repeating
44:20 50:23
repeats
16:10
rephrase
87:1
replied
71:3 92:8
report
6:8 7:6,7 8:25
10:6,9,22 11:6,15,16
12:1,8,11,14 13:3,15
29:8 33:7,18 34:16
36:22 39:22 42:13,
16 43:6 44:3,8,11
46:22 47:25 48:18
70:5 71:1 82:25 83:8
97:2 99:19 101:25
reported
20:21 23:10
REPORTER
30:22 32:7 102:11,
16,22
reports
44:15
representation
9:8,23
represented
74:25
request
92:9
required
10:10 36:12,13 39:9,
11,20 41:1 85:14
requirement
33:22 81:10
research
45:9 48:9 97:17
researched
20:5
researching
7:14
resonate
45:23
Resource
34:1
Resources
33:1

respect
64:4
respond
45:17
response
19:12 28:6 45:19
responses
64:15
responsibilities
38:19
responsibility
59:22
responsive
51:10 92:9
rest
34:12
resulted
26:9
retained
8:3,6,12,15,23,24
9:1,5,8 10:5,11
44:25 99:23
retainer
14:25 15:1,15,20
retainers
15:22
retraining
69:8
returned
16:18 18:4
review
12:23 13:22 18:22
20:2
reviewed
6:4 11:20,23 12:13,
18,22 58:2 70:4
73:11
reviewing
14:19
revise/revamp
21:19
rewrite
23:24
rewrites
25:25
rewritten
26:9
Richard
4:5 7:15,20
ridiculous
45:20 46:21,24
rise
96:7
risk
8:19 9:9,13,18 10:7
29:1,2,4,5 36:9
62:12,19 65:2,4,12,
16,19,20,22,25 66:4,
10,11,12,24,25
67:11,14 72:23 75:2,
3 78:13 82:22 86:24
88:9
road
6:14
robberies
80:16
role
19:19 23:6 86:6
room
7:2
Rosa
22:12,14 23:2,7,9,
13,20,22 24:15,21
25:1
round
94:4
rounds
95:2
routine
50:25

rude
7:11,21
rule
10:8 39:13
rules
4:14 59:8 62:22
63:5,18 64:23 83:23
84:12,14
run
28:24 33:3 35:9
82:17 83:6
running
20:11 85:9
runs
94:21

**S**

safely
81:6,8,16
safety
60:10 94:4
Saint
22:5
Santa
22:11,14 23:2,7,8,
12,20,22 24:15,21
25:1
scenarios
61:17
schedule
14:23
schema
50:10
scheme
74:6
science
55:22
scientific
97:17
scientist
66:20
scope
13:21
seconds
59:18 60:8,9
section
20:21,22 21:22 86:2
90:13,17,21 91:3,6,
17,20,23
sections
91:14
security
28:14 29:2 49:11
50:3 65:2,3,16,25
66:4,11,12,25 67:11,
14 73:18 75:2,3
78:13,17,19 82:22
85:15 90:13,18,22
91:1 93:15,18,19,24
94:1,12,17 95:1,7
segregation
63:8 64:23 90:3
self-harm
78:17
semantically
67:1
senior
17:13
sense
33:8 84:8
sentence
30:3 43:5,6,7,20
44:7,11,17,21,24
45:20 46:22,25 47:7,
9 55:10,20,21 57:25
58:1,18,22 64:12
67:7 83:20
sentences
45:3 51:18

separate
53:14,24 67:6
separated
52:25 53:1
separating
96:6
sergeant
21:8
services
25:6
set
23:23 36:13,18
37:22 38:9 40:23
61:25 62:18 64:2,16
77:20
setting
75:8
sex
50:13 51:2,7,12,19,
24 52:4 53:5,6 54:1
sexual
88:18 91:7,9,24
shading
43:16
shaking
4:16
share
43:3,10 45:6,25
sheriff
9:18 35:9,12 37:25
38:21 53:8 54:6,8,12
63:13 67:16 68:8
100:15
sheriff's
8:19 9:21,25 10:7
17:22 18:1,5 19:14,
15 21:17 22:12,15
31:20 34:24 39:8
50:6,11 62:17 68:17,
22 69:3 79:3,12,14
86:12 93:5 101:20
sheriffs
9:12 33:1,19 38:18
40:2 41:2
Sheriff's
33:25
shift
84:16 95:3
shifts
95:19
shooting
80:17 97:13 99:10
short
42:22
shoves
59:12
show
67:20 70:16 77:2,6
84:24
showed
89:21
showing
11:15 32:20 70:23
73:19 92:11
shown
79:25 86:9 90:9
shows
71:21
side
58:15
sidebar
42:1
sides
73:16
sign
14:13 62:23 81:7
signs
68:22
similar
77:7 88:20



**simple**
66:15

**simplistic**
59:2

**single**
12:18 14:4 44:23
64:22

**sit**
15:9 65:22

**sitting**
14:21

**situation**
95:15

**situations**
95:23

**sixes**
92:5,19

**size**
67:10

**skim**
14:6

**skimmed**
13:1 14:5,15

**sleep**
7:25

**slower**
32:8

**small**
26:7 75:20

**social**
55:22 66:20

**someone's**
44:1 48:6 55:18 60:7

**sort**
4:20,24 5:23 7:22,24
8:1 17:4,17 19:15
23:13 32:24 33:3
34:4 45:8,9 58:5
66:2 82:5 84:11 94:3
95:2 98:17

**sorts**
82:22

**sound**
93:11

**sounds**
11:13 19:8,9 25:2

**sources**
33:2

**South**
16:5,15 98:7

**speak**
10:1 36:23 41:4
92:12 97:7 99:6

**speaking**
5:13

**special**
90:2

**specific**
5:6,10 27:11 34:9
59:16 73:18,21
85:20 86:2 93:2
101:19

**specifically**
20:4,16 23:22 33:5
34:6 50:8 52:23
62:18 66:3 87:15

**specificity**
83:2

**specifics**
27:7,14

**spell**
100:12

**spent**
15:13,19 95:18

**spitting**
76:17

**split**
22:1 58:11 74:17

**spoke**
6:19 97:16

**spoken**
79:22

**spontaneous**
29:15 48:4 55:5,15,
16 56:1,4,23 57:14
58:8,18 59:6 62:2,
12,19 64:9 66:10
83:1 88:11

**spontaneously**
55:19,24 57:2 63:21
64:18 89:9

**spontaniously**
63:19

**spree**
80:17

**SR**
4:5

**staff**
28:9,10 42:24 60:6,
10 79:5 81:13 83:15
84:21 85:10

**stand**
47:9

**standard**
30:5,16 31:11 38:5,
10

**standards**
13:18,23 31:3,13,14,
17,18,22,24,25 32:6,
10,12 33:12,13,14
35:14,18,22,23,24
36:3,7,12,13,16,17,
18,19 37:10,17 38:8,
9,20 39:6,17,19,23
40:14,24,25 41:8
51:5,13 52:15,21
67:5 72:22 74:5
89:14 93:1 100:25
101:2,8,18,19 102:2

**standing**
60:23,25

**standpoint**
79:18 88:1

**stands**
32:2 43:7 55:21
58:21

**start**
5:1,3 13:7 16:1 17:4,
20 58:17

**started**
17:5 18:4 19:8 22:15

**state**
9:21 20:9 21:18
23:25 25:11,20
26:10,18,23 31:1,2,
6,14 33:8 35:10 36:3
37:14,21 38:20
39:11,14 40:23
52:23 74:10 85:14
93:21 94:24

**stated**
34:14 60:8

**statement**
33:4 38:22

**states**
36:14 41:6 50:9
54:21,25 74:9 81:11
102:4

**statewide**
18:6 25:18 26:18
37:11 95:10

**statistician**
48:24 49:1

**statistics**
48:19 49:2

**statutes**
35:17,19

**statutory**
37:2 81:10

**steal**
63:14

**step**
58:3,22

**stick**
60:4

**sticks**
8:9

**stop**
83:17

**strategy**
47:2

**street**
56:13 57:16

**stressors**
43:24 46:1

**strictly**
95:13

**strife**
71:7

**strike**
58:3 59:14

**strikes**
12:4

**struck**
97:15 100:2

**structures**
84:14

**study**
45:9

**style**
90:6

**subject**
26:7

**submit**
10:3

**subsequently**
54:22

**substantial**
19:2

**successful**
98:17,24

**sucker**
59:6 62:3 89:9

**suffering**
7:25

**suicide**
48:21 82:22,25

**summarized**
15:6

**summary**
97:20

**sundry**
34:21

**supervision**
26:25 27:4,9,17
83:25 84:19 85:3

**support**
44:24

**supposed**
84:13

**Supreme**
7:15

**switch**
17:10

**sworn**
4:7

**system**
26:19 69:16

**systems**
81:23,24 94:19

---

**T**

**tactical**
26:8

**tactics**
96:10

**tail**
81:15

**takes**
62:5 64:5

**talk**
13:3 29:8 48:21 50:1
54:21 56:10 58:23
71:15 97:18

**talked**
52:8 60:15 97:2

**talking**
5:19 28:1 30:10 52:1
59:9 94:5,9,22,23

**Tampa**
9:22 99:23

**taught**
20:7 22:96:10

**teaching**
48:12,13

**team**
19:12 20:5

**technique**
47:2

**Tennessee**
6:23

**term**
14:6 27:23 28:23
42:22 56:4

**termed**
17:1

**terms**
10:10 18:18 19:19
26:2 28:2 65:8 79:15

**territory**
33:8

**test**
56:10 60:22 69:21
86:2,15

**testified**
4:7 23:20 35:13
38:15 52:21 86:10
98:9 101:7,15,24

**testify**
7:22 8:25 45:1 101:1

**testifying**
9:6

**testimony**
10:6,10 45:13 50:6

**Thanal**
71:17

**thesis**
16:5,23 17:1

**they're**
91:23

**thing**
20:1 42:21 61:15
65:9 67:4 69:9 70:23
80:24 90:25

**things**
5:6 28:21 32:18,20
35:8,10,11,12 50:23
51:4,9 52:7,13 60:18
61:7,13,16 62:10,17
63:10,15,18,20 64:3,
8,13,16,23 67:15
74:15 79:23 80:18
82:21,23,25 83:5
85:22,24 86:10,23
88:4 93:2,9 94:6,15
97:19

**thinking**
8:22 96:24

**thought**
94:11

**thoughts**
52:7 78:16

**thousand**
15:2

**threes**
92:4,18,19

**throwing**
65:8

**time**
18:7,19,23 19:25
20:4,13 24:20,22,24

**26:6 35:14 46:15
56:7 62:1 63:11
68:11 73:17 80:24
86:20 92:7 93:19,23
95:19 99:18 102:10,
24

**times**
4:18 8:6,8,13 10:5,
11 25:21 27:24 38:8
41:18 47:4,12 48:18
53:17 61:10,24
95:21

**tired**
89:7

**title**
9:14 48:25

**today**
5:14 6:4,22 7:18,23
15:8,9 41:15 46:12
53:20 92:13

**told**
57:15 98:20

**tomorrow**
13:5

**top**
29:16 70:19 71:17
75:22 77:8 78:21

**topic**
27:12

**topics**
20:9 48:15

**total**
11:10,11 15:18

**totally**
29:20

**touch**
35:19 97:17

**train**
25:19

**trained**
37:3 87:11 97:3

**training**
17:12 18:2,6,12
25:18 26:2,12,15,21
27:3 36:24,25 45:22
48:2 69:2,4,6,7

**trainings**
26:16 27:8,15

**transcript**
102:23

**transcripts**
6:13

**travel**
15:4

**tree**
50:9 72:18 76:4

**trees**
72:22

**trial**
41:24 97:6 99:7

**trick**
75:8

**trigger**
80:23

**troubled**
43:2,9 45:4,5,6,24

**troubles**
43:24

**true**
17:24

**truthfully**
7:23

**turn**
64:11

**twos**
92:18

**type**
77:11

**typical**
50:14 51:23 72:21

**typically**
10:2 43:11

---

**U**

**U.S.**
33:23 38:23 39:24
51:1 53:22 67:9
86:13

**uh-uh**
4:15

**ultimate**
99:7

**ultimately**
97:7

**umbrella**
28:23

**unconstitutional**
101:9,10

**understand**
4:20 28:2,4 35:8
37:24 38:1,10 39:6,
10,20 47:1 52:14
54:7 73:10 80:13
86:6 95:6

**understanding**
9:16,17 39:3 68:13
87:23

**understands**
88:13

**understood**
4:16 7:20 49:4

**undertook**
20:3 36:6

**unforeseeable**
56:2

**unique**
72:13,17

**unit**
23:15 51:8,24 90:1,
2,5

**United**
36:14 41:5 50:8
54:25 102:3

**units**
90:1,3 94:8

**universe**
32:22

**University**
16:5,15 22:5

**unknown**
42:24

**unlawful**
92:15

**unpack**
57:25 60:1

**unremarkable**
54:23

**unusual**
21:16

**USF**
16:18 21:24

**utilize**
47:2

**utilized**
9:3 49:9 55:1

---

**V**

**Vannucci**
98:2 99:13

**varied**
28:12

**variety**
33:6 79:23

**vehicular**
7:17

**verbal**
4:14



**version**
29:19
**versus**
30:11 48:20 99:22
100:8
**view**
37:16 86:11
**violate**
59:8 92:25
**violating**
64:23
**violation**
38:11 101:3
**violations**
38:1 83:23
**violence**
27:14 48:7 49:14
61:18 65:5 83:15
84:2,22 85:1,10,19,
21,24,25 86:5,25
87:4,5,10 88:9,11
89:1
**violent**
44:2 48:7 51:6 52:24
82:5 87:20 95:14
**voluntary**
31:6 36:6
**vulnerable**
49:23

———————
**W**
———————

**ways**
52:7 61:21 87:12,17
**Wednesday**
67:3
**weeks**
6:14
**weight**
35:4
**weighting**
73:2
**weights**
73:3
**weird**
75:17
**well-being**
95:6
**well-known**
60:21
**wellness**
94:4
**weren't**
19:3
**whatever's**
81:19
**whatsoever**
18:17
**when's**
17:19
**whistle**
65:21
**who'd**
26:20
**why'd**
17:9 25:9
**window**
59:13
**WINTESS**
30:23
**WITNES**
101:22
**witnesses**
50:7,24 65:11,12
66:23 87:25
**women**
52:25 93:3
**Wood's**
30:11

**Woods**
68:5,8
**word**
5:12,15 14:4 84:25
85:18 87:4
**wordplay**
55:13
**words**
5:7 16:11 58:12
**work**
8:12 10:18 17:16
22:25 24:22 25:4
48:1 82:9
**worked**
21:7 24:24 26:6
59:12 81:22 82:9
**working**
18:18 23:25 26:7
44:16 74:9,11 96:1
**works**
49:2
**world**
63:24
**writ**
94:17
**writing**
44:14 70:5
**written**
14:16,20 18:21
44:14 97:22
**wrong**
43:12 69:9 86:20
**wrote**
20:5 26:22 44:3,5,7
71:1

———————
**Y**
———————

**yard**
59:10 62:4
**year**
32:17 38:17 40:1
95:11
**years**
8:8 10:9,20 24:10,13
25:2,4 32:16 33:21
42:5 48:13,14 51:22
53:9 87:13 93:24
95:11,12 96:11
97:13 99:8
**Yes's**
4:15
**you'll**
61:22
**You're**
45:16 69:15
**you've**
15:18

———————
**Z**
———————

**Zoom**
70:22

