# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

Krysti Merchant,

               Plaintiff,

     v.

Billy Woods, *et al.*,

               Defendants.

Case No. 5:23-cv-00661

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## I.    Plaintiff's Exhibit List

| Ex. No | Name of Exhibit |
|--------|-----------------|
| 1 | Lutterloah Classification |
| 2 | Merchant Classification |
| 3 | Merchant Warrant |
| 4 | Lutterloah Warrant |
| 5 | Wanted by Woods Video |
| 6 | Lutterloah Sex Offender Registration |
| 7 | Marion County Facebook Post |
| 8 | Gulf Pod Diagram |
| 9 | Lutterloah June 25 Report |
| 10 | Adee Report |
| 11 | 2019 Staffing Analysis |
| 12 | Place Affidavit |
| 13 | Murphy Affidavit |

## II.　**Introduction**

The Marion County Jail ("MCJ"), which is operated by the Marion County Sheriff's Office, of which Billy Woods was the Sheriff,[1] observes multiple policies that it follows to protect detainees who are more vulnerable from detainees who are more dangerous and violent. Critical among these is a trifecta: ***first***, the MCJ classifies all incoming detainees on a 1 to 9 numbered scale from most dangerous (#1) to most vulnerable (#9). ***Second***, using this classification system, the MCJ segregates detainees classified as more dangerous away from those classified as more vulnerable, preventing them from being housed together. ***Third***, the MCJ assigns more correctional officers to units that house detainees classified as more dangerous, using their increased presence to deter attacks and other violent or dangerous interactions between detainees. This increased staffing augments the jail's danger-classification segregation. The increased staffing of units to those units housing detainees who have been classified as more dangerous is designed to and does mitigate the dangers posed assaults and other dangerous conduct by those detainees classified as dangerous. The MCJ does have additional safety policies as well, such as a "keep-away" system permitting a detainee that they be kept away from particular individuals with whom they have a conflict. But

---

[1] Billy Woods is sued in his official capacity as Marion County Sheriff.

1

multiple MCJ witnesses testified, and Plaintiff's expert agrees, that the MCJ's system of classification, segregation, and increased staffing for units with high-danger detainees are the critical means for ensuring safety and reducing the risk of violence within the MCJ.

The MCJ, however, excludes one group of detainees from the classification-segregation-staffing safety trifecta: detainees who are accused of sex crimes. The MCJ does perform safety classifications of detainees who have been charged with sex offenses and thus does identify those detainees who are more dangerous and those detainees who are more likely to be victims. But instead of segregating these detainees to ensure that dangerous detainees are not housed with vulnerable ones, the MCJ places all detainees charged with sex offenses—regardless of their safety classification—in the same, common, dorm-style housing unit, called Gulf Pod-Alpha Section (Gulf-Alpha). In doing so, for that class of detainees, MCJ eliminates the segregation stage of the safety trifecta, the basic security measure that MCJ administrators and staff alike recognize as necessary to mitigate the risk of assault by dangerous detainees against vulnerable ones.

Detainees charged with sex offenses do not all have similar security classifications. To the contrary, while sex crimes are serious offenses, the assaultive—i.e., physically violent—conduct that comprises them can range from gravely serious to nonexistent. All the same, under the MCJ's policies,

2

Gulf Pod houses together detainees with even the most dangerous classification for physical violence alongside detainees who are classified as being among the vulnerable to attack by others. The result is that as a matter of MCJ policy, detainees in Gulf-Alpha are housed in violation of the MCJ's own policies—operating everywhere else in the jail—that are designed to prevent dangerous and vulnerable detainees from being housed together.

That policy placed Mr. Merchant and his killer, Eric Lutterloah, in the same unit. Mr. Merchant was given relatively low danger classification of "5." Mr. Lutterloah was given a classification of "3," meaning he was assessed as more dangerous. Under the MCJ's policies for operating elsewhere in the jail, detainees with classifications of "3" are housed in higher security units and segregated from detainees with classifications of "5." The Sheriff allowed Mr. Lutterloah, however, to be housed in the same unit as Mr. Merchant, consistent with MCJ's policy that all detainees accused of sex offenses be housed together, regardless of classification level and security risk.

MCJ compounded the danger created by this housing policy with policies and practices that encouraged attacks on vulnerable detainees like Mr. Merchant. *First*, it understaffed the Gulf Pod. Even though the unit housing detainees accused of sex crimes included detainees with high-danger classifications like Mr. Lutterloah, it was not staffed with the number of guards that the MCJ otherwise assigned to units with increased security risks.

3

Under MCJ policy, units housing detainees with a danger classification of "3" and above are assigned to Pods with extra staff to increase surveillance of the detainees. In Alpha Pod, for example, there are five staff members assigned to monitor a maximum of 176 detainees, ensuring more coverage of the unit. The increased staffing permits a more comprehensive monitoring of the unit, which deters misconduct like the assault that killed Mr. Merchant. Gulf Pod, which has a maximum capacity of 265 detainees and is frequently at or near capacity, is staffed by only two guards, one of which is often busy with other tasks and not in the unit, making more frequent rounds difficult.

*Second*, the staff presence and supervision that *was* implemented was insufficient. MCJ deputies only completed well-being checks every sixty minutes, only at night, at predictable intervals, and often in a cursory manner. Plaintiff's expert explains in his report that this is deficient, as it resulted in virtually nonexistent face-to-face supervision of the inmate population. MCJ should have mandated security checks for the entire 24-hour day at 30-minute intervals on an irregular schedule to establish consistent staff presence, in which detainees knew that their bad behavior would likely be observed by correctional staff. Indeed, the security checks that *were* 'completed' were often done in a cursory manner which mechanically checked the formal security check requirement, but did not actually make staff presence known to the detainees and consequently deter bad conduct. Quite the contrary, officers

4

routinely exercised discretion that allowed detainees to break rules that were designed to maintain control of the Pod and keep detainees safe, such as the requirement that detainees remain on their bunk during nighttime lockdown.

**Third,** these deficient policies and practices were the foundation of an exceptionally violent jail. At trial, Plaintiff will call witnesses who will attest to the atmosphere of chaos and violence that defined MCJ—especially Gulf Pod. These witnesses, who have testified in deposition or averred to their experience through affidavit, will paint a picture of a jail in which staff encourage inmate-on-inmate assaults and allow violence to perpetuate. For example, the term "Friday Night Fight Nights" is known throughout the jail to be a sort of 'fight club' that occurs on Friday evening amongst inmates that is allowed to continue despite officer knowledge.

The foregoing evidence, and the evidence reviewed herein, is sufficient for a reasonable jury to infer (1) that there was a substantial risk that vulnerable-classified detainees like Mr. Merchant could be harmed by dangerous-classified detainees like Mr. Lutterloah; (2) that the MCJ actually knew of that risk; (3) that the MCJ disregarded that risk or failed to take reasonable measures to protect vulnerable detainees like Mr. Merchant; and (4) that the MCJ's failure to protect vulnerable detainees like Mr. Merchant caused his injuries. *Cf.* Eleventh Circuit Pattern Jury Instruction 5.9 (Apr. 15, 2024). Plaintiff has offered sufficient evidence to satisfy each of these elements.

5

Plaintiff should be afforded the opportunity to present this evidence to a jury. Summary judgment as to Sheriff Woods must be denied.

### III.    Factual Background

The Marion County Jail ("MCJ") is operated by Marion County Sheriff's Office ("Sheriff's Office"), of which Defendant Billy Woods is the Sheriff. It is comprised of eleven housing units, commonly referred to as Pods. [2] ECF 49 at 4. One of the core functions of the MCJ's staff is to ensure the safety of the people in their custody. ECF 50-14, Nix. Dep. at 53: 21-25; ECF 50-18, McNeely Dep. at 30:7-11.

**A. The Marion County Jail's classification-and-segregation system.**

One of the basic tools that MCJ uses to protect the people detained in its care is a classification-and-segregation system. While MCJ uses this protection for detainees in the general population, it withdraws the protection for detainees housed Gulf Pod-Alpha Section (Gulf-Alpha), who were accused of sex offenses.

1. <u>MCJ classifies and segregates detainees in its general population.</u>

One of the basic tools that the Sheriff's Office uses to protect detainees in the MCJ is to identify which detainees are likely to perpetrate violence and which detainees are likely to be victims of violence—then keep those two

---

[2] In MCJ, the terms "pod" and "dorm" are interchangeable. ECF 50-14, Nix Dep. at 33:7-34:1

groups separated. ECF 50-18, McNeely Dep. at 17:16-20. The Sheriff's Office does this because it recognizes that housing violent detainees with vulnerable ones generates a risk of harm, and that housing violent detainees with non-violent ones makes it hard for deputies responsible for monitoring them to prevent violence. ECF 50-18, McNeely Dep. at 24:5-25:9. Consequently, the Sheriff's Office employs a classifications system that is designed to ensure that detainees are housed with other detainees who carry similar levels of security risk. ECF 50-14, Nix Dep. at 40:2-41:21, ECF 50-18, McNeely Dep. at 17:16-20. During the classifications process, detainees are asked about their criminal history, and a classifications employee runs a criminal background check. ECF 50-13, Peterson Dep. at 41:3-43:12; ECF 50-18, McNeely Dep. at 17:2-4. These steps are part of a broader assessment to consider whether the individual is likely to be a victim of violence or a perpetrator of violence. ECF 50-13, Peterson Dep. at 54:24-55:10.

The MCJ's classifications process ultimately results in each detainee being assigned a number 1 through 9 to denote where they fall on the safety spectrum, with the lowest numbers indicating a higher security risk. ECF 50-14, Nix Dep. at 28:21-29:10. The classifications policy identifies detainees designated as Levels 1 and 2 as maximum-security inmates who "have been charged with serious assaultive felony crimes or have a history of assaultive felony violent convictions." ECF 50-15 at 5.

7

Levels 3, 4, and 5 are classified as "medium-security," but Level 3 detainees are categorically different than Level 4 & 5 detainees. ECF 50-15 at 5. Level 3 detainees are housed with Level 1 & 2 maximum-security detainees, *not* the Level 4 & 5 "medium-security" detainees. ECF 50-12, Woods Interrogatory Responses at 9; ECF 50-14, Nix Deposition at 40:2-41:21. Other safety measures are imposed on Level 3 detainees as well. Whereas Level 4 and 5 detainees can qualify as "trustee" workers, Level 3 detainees cannot. ECF 50-15 at 5. Level 3 detainees are housed in the higher-security Alpha Pod, whereas Level 4 & 5 detainees are not housed in Alpha pod. ECF 50-12, Woods Interrogatory Responses at 9, ECF 50-14, Nix Dep. at 40:2-41:21. Level 3 detainees are either housed with Level 3 or Level 2 detainees. Id. Level 4 and 5 detainees are housed together, and Level 6, 7, 8, and 9 detainees are grouped together. Id. Detainees designated 1, 2, or 3 are *not* to be placed in Gulf Pod. ECF 50-14, Nix Deposition at 40:2-41:21, 47:15-48:23.

Marion County's classification process has two stages, one that occurs during booking and one that occurs in the subsequent 24 hours or so. ECF 50-14, Nix Dep. at 47:15-17; ECF 50-13, Peterson Dep. at 47:16-48:6. After new detainees come into the jail and go through booking, they are typically put in a pre-classification section, unless they are flagged as a high security—like a violent underlying charge—in which case they are automatically designated a 1, 2, or 3 and placed in Alpha Pod, which is the highest security pod. ECF 50-

8

14, Nix Dep. at 40:2-41:21. For example, an individual who was charged with an aggravated battery with a deadly weapon is automatically placed in Alpha Pod, with classification as a 1, 2, or 3 in a subsequent step. ECF 50-14, Nix Dep. at 40:2-41:21, 47:15-48:23. In other words, the MCJ does not permit detainees with violent classifications that would classify them in Levels 1, 2, or 3 from being housed with more vulnerable detainees even for the short period of time that detainees are in the jail's intake unit—except in sex offense units like Gulf Pod. *Id.*

The following image, from the Sheriff's interrogatory responses, summarizes the segregation policy followed at the MCJ. As the interrogatory response demonstrates, Level 3 detainees are sometimes housed with Level 2 detainees (Alpha Pod Section D) and sometimes alone (Bravo Pod Sections C & D) but *never* with Level 4 or 5 detainees, who are housed separately (Bravo Pod Sections B & E).

9

**Alpha Pod - Max cap 176**

**1. Section A-** will house male inmates who are placed in Administrative and Disciplinary Confinement.
**2. Section B-** will house male inmates who have been placed in Disciplinary Confinement.
**3. Section C-** will house male inmates who are placed in Administrative and Disciplinary Confinement.
**4. Section D-** will house High Medium and Maximum-Security population male inmates with Custody Levels 2 and 3.
**5. Section E-** will house male inmates who have been placed in Maximum Security Administrative Confinement.
**6. Section F-** will house male inmates who are place in Administrative Confinement.

**Bravo Pod - Maxcap192**

**1. Section A-** will house Pre-Classification female inmates pending Primary Classification and will house overflow minimum security female inmates.
**2. Section B-** will house Medium Security Inmates with a Custody Level 4 and 5.
**3. Section C -** will house male High Medium Security inmates with a Custody Level3-High Medium.
**4. Section D -**will house male High Medium Security inmates with a Custody Level3-High Medium.
**5. Section E-** will house male Medium Security Inmates with a Custody Level 4 and 5.
**6. Section F-** will house female inmates placed on Suicide Step Down, and Special Needs

ECF 50-12, Woods Interrogatory Responses at 9-10.[3]

Detainees designated a '2' or '3' are housed together on Alpha Pod because they are "inmates who are charged with crimes such as murder, aggravated battery with a deadly weapon. The more serious crimes[.]" ECF 50-14, Nix Dep. at 28-21-29:10. The only section designated to house level '2' and '3' male detainees together is Alpha Pod-Section Delta (Alpha-Delta). ECF 50-

---

[3] Plaintiff notes that, in addition to the housing plan described in this interrogatory, 30(b)(6) witness Brian Peterson also identified a housing plan dated October 28, 2021. ECF 50-13, Peterson Dep. at 29:3-31:22. While that housing plan was not produced, Peterson testified that there were no differences between the two housing plans in terms of the descriptions of each section, except that Foxtrot Pod-Alpha Section also housed sex offenders in the October 28, 2021, housing plan.

10

12, Woods Interrogatory Answers at 9; ECF 50-14, Nix Dep. at 29:3-10. The MCJ groups and segregates the jail's detainees in this way because if detainees are not so segregated there is a much higher risk of attack. See ECF 50-18, McNeely Dep. at 110:20-25; ECF 50-14, Nix Deposition at 40:2-41:21, 47:15-48:23; ECF 50-13, Peterson Dep. at 82:12-83:14.

Due to the heightened security needs, Alpha Pod is monitored by a total of five MCJ staff members monitoring its maximum capacity of 176 detainees. ECF 50-14, Nix Dep. at 32:4-33:6; ECF 50-39. Alpha Pod-Charlie Section also houses maximum security inmates as well as "high-medium" detainees with custody levels 2 and 3. ECF 50-14, Nix Dep. at 28:21. High-risk detainees who are not considered maximum security are housed together in general population on Alpha Pod with "more attention." ECF 50-13, Peterson Dep. at 82:12-22. Because they are considered "violent inmates," "they require more observation just to help maintain security." Id. With high-risk detainees, "[t]he detention assistants are kind of watching over that section a little more, just because of their past violent tendencies." ECF 50-13, Peterson Dep. at 82:12-83:14.[4]

---

[4] The segregation and security measures discussed above are supplemented with individual tailoring as individual circumstances arise. Beyond their initial classification, a detainee can be moved between Pods if jail staff learns of a reason why they should be placed in a different housing unit. For example, if a detainee hurts another detainee, those two detainees will be separated from each other. ECF 50-13, Peterson Dep. at 63:14-64:5. Additionally, a detainee can request "keep-aways" from other particular detainees, ECF 50-

11

## 2. <u>MCJ abandons its classification-and-segregation policy for detainees accused of sex offenses.</u>

The MCJ's classification-and-segregation safety system described above applies to all of the MCJ's detainees *except for one group*: those who are detained on charges of committing sex offenses. Detainees accused of sex offenses go through the MCJ's classification process, like all of the jail's other detainees. See Ex. 1, Lutterloah Classification; Ex. 2, Merchant Classification. However, regardless of the classification, all detainees accused of sex offenses are housed together—irrespective of propensity for violence that the classification process reveals, and which would otherwise result in segregation from detainees of certain classification levels. ECF 50-18, McNeely Dep. at 112:8-14; ECF 50-13, Peterson Dep. at 51:5-52:19, 72:11-24. Instead of being segregated based on the MCJ's 1-to-9 safety classification, all detainees accused of sex offenses are housed in a single dormitory pod together, such as Gulf-Alpha. Id. Every individual held in Gulf-Alpha is either accused of a sex crime and awaiting trial or has already been convicted of a sex crime. ECF 50-13, Peterson Dep. at 26:19- 27:1. The Sheriff's interrogatory response sets out this classification as follows:

---

13, Peterson Dep. at 65:2-23, which can result in the jail moving a detainee to separate them from someone they've identified in a keep-away. ECF 50-26 (Keep-Away Policy).

12

**Gulf Pod Max cap 265**

**1. Section A- will house male felony inmates with Sexual Offenses.**
**2. Section B- will house male Medium Security Inmates, Custody Level4 and 5.**
**3. Section C- will house male Medium Security Inmates, Custody Level 4 and 5.**
**4. Section D- will house Pre-Classification male inmates pending Primary Classification.**

ECF 50-12, Woods Interrogatory Responses at 9-10.[5]

As a matter of policy, all accused and convicted sex offenders are housed together, regardless of the level of danger that their security classification indicates:

> Q: So as a matter of policy, the -- Marion County is considering an individual's past convictions, prior to deciding where to place them in the jail, fair?
>
> A. No.
>
> Q. No. Okay. Go – explain?
>
> A. Again. The initial placing an inmate, if they're charged with a sex offense, they're going to go into the sex offender unit. That's not taken into account. They're -- they're -- that necessarily doesn't take into account their criminal history.
>
> [...]
>
> Q. So all the sex offenders that are put into, for example, Gulf Pod Section A, they are classified there

---

[5] Gulf Pod is not alone; there are other sections in the jail that house people accused and convicted of sexual offenses. ECF 50-12, Woods Interrogatory Answers at 9-10 (Delta-Echo and Delta-Foxtrot hold accused and convicted sex offenders); ECF 50-13, Peterson Dep. at 27:25-31:22 (Foxtrot-Alpha held accused and convicted sex offenders in November 2021). **Detainees accused of sex crimes are all housed together irrespective of security classification.** ECF 50-13, Peterson Dep. at 51:5-52:19, 72:11-24.

13

without necessarily considering their prior criminal convictions? [Form objection]

A: Correct.

[…]

Q: When you classify an inmate into Gulf Pod Section A[lpha] as a sexual offender, you're not necessarily considering, was this an aggravated sexual offense, versus, you know, lewd battery or anything like that, or you're not comparing the severity of each offense when determining how to classify them; is that fair?

[Form objection]

A: Yes. That's correct.

ECF 50-13, Peterson Dep. at 51:5-52:19.

> **Q. If someone was in the jail because they are accused of a sexually-based crime and kidnapping and assault, would you consider, in classifications and booking, that that person has -- is a risk for violence in the jail?**
>
> **[Form objection]**
>
> **A: They would be housed as a sex offender with the sex offender inmates.**
>
> **Q. Okay. Even if -- even if there are other associated charges with their sex offense that show a heightened level of violence?**
>
> **[Form objection].**
>
> **A: Yes.**

ECF 50-13, Peterson Dep. at 72:11-24 (emphasis added).

Critically, the MCJ makes no distinction among sex offenses, based on the seriousness of the underlying crime. ECF 50-14, Nix Dep. at 38:10-39:9. All

14

detainees accused of a sexual offense are placed in dorm-style sections with other convicted and accused sex offenders—irrespective of the danger level at which they have been classified. ECF 50-13, Peterson Dep. at 76:4-77:23. Indeed, one of Marion County's 30(b)(6) witnesses did not even know that sex offenders were assigned a numerical classification and operated on the assumption that Levels 1, 2, and 3 detainees were not placed in Gulf Pod:

> [I]n G[u]lf Pod, they would not have been supervising 1s, 2s or 3s, and they would not have been supervising 6, 7, 8, 9s. They would have only been supervising [4]s and 5s and sex offenders […] That's the only wild card in that, so that you have Delta section who are pre-class. So they haven't been given -- a given a number yet, right? So I guess to answer your question, they could be -- with the exception of 1s, 2s, and 3s, because they are -- you know, those -- they are -- they are classified at booking based upon their charges. So is somebody comes in with a murder charge, they're not going to G[u]lf Delta. They're going to go to Alpha Pod, Delta section, right? We're not going to put them with somebody who came in with a driver's license suspended charge, right? So I would say [Gulf-Alpha deputies] were supervising inmates from a Level 4 and with the potential up to a Level 9.

ECF 50-14, Nix Deposition at 40:2-41:21. The claim that Gulf deputies were only supervising detainees Level 4 and above, of course, was not accurate, as the blanket 'sex offender' designation led to Level 3 detainees like Lutterloah being housed in Gulf Pod and other MCJ witnesses testified to the contrary. ECF 50-18, McNeely Dep. at 110:20-25; ECF 50-14, Nix Deposition at 40:2-41:21, 47:15-48:23; ECF 50-13, Peterson Dep. at 82:12-83:14.

15

MCJ, as a matter of policy, houses all alleged sex offenders together regardless of classification and security risk, even though the Sheriff's Office recognizes that there are different levels of severity and attendant danger among sex offenses. ECF 50-13, Peterson Dep. at 52:21-53:1; 74:9-25. Yet, it is the Sheriff's policy, for example, that an individual who raped someone *that they had just kidnapped and used a weapon against* as part of their underlying crime would be placed in a general population sexual offense section, such as Gulf-Alpha, containing detainees who may have been accused of sex crimes, but not of violence. ECF 50-13, Peterson Dep. at 75:1-76:23.

3. <u>Merchant and Lutterloah would never have been housed together but for the MCJ abandoning its classification-segregation policy for detainees accused of sex offenses.</u>

The Sheriff's failure to apply its own classification-and-segregation system for sex offense detainees led to Cory Merchant being housed with Eric Lutterloah, the man who would eventually kill him. Cory Merchant was charged with lewd and lascivious battery—i.e., having sexual contact with someone under the age of consent. Ex. 3, Merchant Warrant. Eric Lutterloah, on the other hand, had previously been convicted of sexual battery, was on the sex offender registry, and was charged with kidnapping an adult for ransom and sexual battery, after he sexually assaulted someone at knifepoint. Ex. 4, Lutterloah Warrant; Ex. 5, Wanted by Woods Video; Ex. 6, Lutterloah Sex Offender Registration; Ex. 7, Marion County Facebook Post.

16

Like all detainees entering the MCJ, Mr. Merchant and Mr. Lutterloah both underwent the jail's safety classifications process. Mr. Merchant was designated Level 5 (Medium Pre) because he was not accused of an assaultive felony, had no prior assaultive felony convictions, no history of escape, less than three prior felony convictions, no detainer warrants or pending charges, no past/present institutional behavior, and was not on sentenced status, but, given the nature of his offense, was "likely prison bound." Ex. 2, Merchant Classification. Mr. Lutterloah, on the other hand, was being held in the MCJ for a violent, assaultive felony, was already a registered sex offender, and had a conviction for sexual battery from 2007. Ex. 1, Lutterloah Classification; Ex. 4, Lutterloah Warrant; Ex. 5, Wanted by Woods Video; Ex. 6, Lutterloah Sex Offender Registration, Ex. 7, Marion County Facebook Post. The MCJ classified Lutterloah as Level 3 due to the nature of his offense being an assaultive felony. Ex. 1, Lutterloah Classification.

Mr. Lutterloah, indeed, was notorious, with a crime so serious and threatening that Sheriff's Office posted the following on its Facebook page:

> Hello Marion County citizens, Sheriff Billy Woods here and yes, today is Wanted by Woods Wednesday! We are looking for 50-year-old Eric Lutterloah who is wanted for Sexual Battery and Kidnapping.
>
> Citizens, Eric recently held a woman by knifepoint while he sexually battered her. In 2003 he was arrested for Sexual Battery on a Child Under 16-years-old and was found guilty in 2007. Eric has a

17

history of this type of behavior and we need him off the streets.

Ex. 7, Marion County Facebook Post. Sheriff Billy Woods *himself* made a public statement in a video, describing to the public exactly how dangerous he believed Eric Lutterloah to be. In that video, Sheriff Woods stated:

> Hello Marion County Citizens. Sheriff Bill Woods here and yes, its Wanted by Woods Wednesday. Today, I've got a true dirtbag for you. We are looking for 50-year-old Eric Lutterloah who is wanted for sexual battery and kidnapping. Now ladies, I need you to memorize this face. Memorize the name, don't forget it.

> Because citizens, here's what Eric did. Eric recently held a woman by knifepoint while he sexually battered her. In 2003, he was arrested for sexual battery, on a child under 16 years of age and was found guilty in 2007. Eric has a history of this type of behavior.

> We need him off of the streets, now. So everybody watching, look at this face. Don't forget it. True dirtbag, right here.

Ex. 5, Wanted by Woods Video.[6] Despite the acknowledgement by Sheriff Woods himself, the elected head of the Sheriff's Office, that Eric Lutterloah had engaged in an extraordinary act of violence, it was the policy of the Sheriff's Office that such detainees be housed with persons who had not been accused of violence at all, and in fact were classified as vulnerable to attack.

---

[6] Marion County's Facebook Post and the Wanted by Woods Video can also be found here: https://www.facebook.com/watch/?v=303076387355493.

ECF 50-18, McNeely Dep. at 110:20-25; ECF 50-14, Nix Deposition at 40:2-41:21, 47:15-48:23; ECF 50-13, Peterson Dep. at 82:12-83:14.

Mr. Merchant was one of those people. He was classified as Level 5. Mr. Lutterloah, on the other hand, was classified as Level 3. Had the Sheriff's Office applied its classification-and-segregation safety system to detainees accused of sex offenses, Mr. Merchant would never have been placed in the same unit as Mr. Lutterloah—precisely because the classification system would have identified that Mr. Merchant was at risk of being assaulted by a higher risk detainee like Mr. Lutterloah. Because the Sheriff's policy toward alleged sex offenders overrode its safety classification system, however, the MCJ placed Mr. Merchant and Mr. Lutterloah in the same unit, exposing Mr. Merchant to the danger of attack against which the Sheriff's Office would have protected all other, non-sex-offense detainees. But for the policy that all alleged sex offenders are housed together, Mr. Lutterloah's classification should have triggered his placement in Alpha Pod. ECF 50-14, Nix Dep. at 40:2-41:21. On November 7, 2021, Mr. Lutterloah struck Mr. Merchant repeatedly, causing his death. ECF 50-2, Report; 50-4, Medical Report.

Notably, even after Mr. Lutterloah's killing of Mr. Merchant, Lutterloah was able to seriously harm another inmate in a sex-offense dorm. After the incident, Lutterloah was moved to Alpha-Charlie. ECF 50-30, Lutterloah Classification Log at 1. On December 1, 2021, nearly a month after the

19

incident, Mr. Lutterloah was reclassified as a 2-Close, the second highest security risk classification, due to a "new assaultive felony charge," i.e., his attack against Mr. Merchant. ECF 50-30 at 6. Lutterloah lived in Alpha Pod until April 26, 2022, less than six months after *killing* another detainee, when he was moved to Foxtrot-Alpha. Id. Foxtrot-Alpha was a sex-offense pod like Gulf-Alpha that did not abide by the MCJ's classification scheme. ECF 50-13, Peterson Dep. at 27:25-31:22. On June 25, 2022, in Foxtrot, Lutterloah struck another inmate, who was classified as a 4-Medium, and broke his jaw. Ex. 9, Lutterloah June 25 Report.

Plaintiff's corrections expert, Paul Adee, offers the opinion that classification of the inmate population is essential to the safety, security, and orderly running of a jail, that it is industry practice to separate violent from non-violent detainees, and that such separation is essential to the safety of vulnerable detainees. Ex. 10, Adee Rpt. at 12-14. The failure to employ classification and subsequent segregation of detainees based on security risk for persons charged with sex offenses, Mr. Adee opines, endangered Mr. Merchant. Ex. 10, Adee Rpt. at 13. Mr. Adee further opines that the MCJ's abandonment of a classification-segregation system in Gulf Pod-Alpha caused Mr. Merchant to be harmed. *Id.* at 21.

20

**B. Other MCJ policies and practices compounded its failure to segregate dangerous and vulnerable detainees in Gulf Pod.**

As set forth above, the MCJ's abandonment of classification and segregation for detainees charged with sex offenses endangered Mr. Merchant by placing him with violent detainees, among them Mr. Lutterloah. The Sheriff's Office compounded this danger with multiple official policies, and common practices within the MCJ, that magnified the danger that created by mingling violent and nonviolent detainees. Those failures took a few basic forms: understaffing, deficient monitoring practices, and an excessive culture of violence within the jail.

1. <u>The MCJ policymakers knowingly understaffed the jail and Gulf Pod in particular.</u>

Effective prevention of violence requires adequate supervision of detainees by jail staff. Ex. 10, Adee Report at 9. The Sheriff's Office recognized as much, testifying that preventing violence requires detainees to be adequately supervised and monitored, ECF 50-18, McNeely Dep. at 18:10-20:24, which requires "[c]onsistent observation" and "[a]lways being in the housing unit" ECF 50-18, McNeely Dep. at 30:13-31:17. The MCJ, however, did not hire sufficient staff to accomplish this goal.

Starting in approximately 2016 and going through 2021, the population of the Marion County Jail began to increase markedly. ECF 50-13, Peterson Dep. at 24:22-26:3; ECF 50-14, Nix. Dep. at 51:2-52:9. The Sheriff's Office

21

acknowledges that this increase in population carried an increased risk of violence that the MCJ was required to address. ECF 50-18, McNeely Dep. at 124:11-125:20. A critical means of addressing the increase in detainees was an increase in jail staff. In 2019, the MCJ contracted with CRS, Inc. to conduct an independent review of its staffing practices. Ex. 11, 2019 Staffing Analysis. The MCJ had already received a 2013 in-house staffing analysis which found that there were "serious deficiencies in jail staffing" at the jail, as well as reviews of security practices that "underscored the need for changes in staffing." Ex. 11, 2019 Staffing Analysis. The 2019 independent staffing analysis found that staffing at the jail was inadequate. Id.

The Sheriff's Office acknowledged as much and connected low staffing directly with increased danger to detainees. The Sheriff's Office was aware that MCJ's detainees can perceive its staffing shortages and will take opportunities to "do whatever it is that they wanted[,]" including fighting with other inmates. ECF 50-14, Nix. Dep. at 81:21-82:21. The Sheriff's Office was concerned in 2021 that detainees knew the MCJ were short-staffed. ECF 50-14, Nix. Dep. at 81:21-82:24. Yet in that year, the MCJ had more than 100 authorized staff below what the 2019 staffing analysis said the jail needed. ECF 50-14, Nix. Dep. at 70:22-25.

The staffing shortage was acute for Gulf Pod. The 2019 CRS staffing analysis advised that Gulf Pod should have a third detention deputy. Ex. 11,

22

2019 Staffing Analysis at 32. That recommendation, however, was not implemented in 2021, the year Cory Merchant died. ECF 50-14, Nix. Dep. at 89:11-90:3. Because the Sheriff's Office failed to follow the CRS staffing recommendation for Gulf Pod, at the time of Mr. Merchant's death in 2021 the pod was staffed with only two detention deputies responsible for monitoring the pod's detainees, one of which is often elsewhere. ECF 50-14, Nix Dep. at 35:1-8; ECF 50-19, Dukes Dep at 39:9-41:25. To make matters worse, in addition to monitoring the detainees on Gulf pod, these two deputies had numerous other responsibilities. ECF 50-14, Nix Dep. at 35:1-8. That included supervising inmate workers, passing out supplies, and escorting medical personnel. ECF 50-13, Peterson Dep at 101:10-102:10; ECF 50-19, Dukes Dep at 122:20-123:12.

The two Gulf Pod deputies were positioned in a rover station outside the living sections. ECF 50-19, Dukes Dep at 40:11, 44:9; See also Ex. 8, Gulf Pod Diagram. In that station they could watch CCTV cameras, *id.*, but the cameras had limited coverage and were not a substitute for maintaining a physical presence on the pods. ECF 50-18, McNeely Dep. at 103:12-25 (surveillance limits); *See also* ECF 50-18, McNeely Dep. at 30:13-31:22 (general need for physical presence on pods). Additionally, there was poor visibility into Gulf-Alpha from the rover into certain areas, and the view of each detainee was

23

obstructed by the bunks placed throughout the section. ECF 50-13, Peterson

Dep. at 94:4-96:12; ECF 50-19, Dukes Dep at 44:3, 45:18.



*Diagram of Gulf Pod. Ex. 8.*

The staffing of Gulf Pod with only two deputies created an additional problem: Gulf pod contains four sections (Alpha, Bravo, Charlie, Delta) with a control room/rover station where deputies are stationed. See Ex. 8, Diagram of Gulf Pod. With only two deputies in the pod who had to attend to multiple duties, a deputy conducting a security check on one of the pods sometimes left the other three pods completely unmonitored. ECF 50-21, Kosinski Dep. at 41:12-42:22. Similarly, when one deputy went on break, and a single deputy inside one of the living sections, the rover stations (and thus the other three living sections) would be left completely unattended. ECF 50-19, Dukes Dep at 40:11-41:25, 97:22-24.

At the time Lutterloah assaulted Merchant, there was one detention deputy, Justin Kosinski, monitoring all of Gulf Pod alone. ECF 50-37, Dukes Affidavit at 2. Defendant Miller was relieving master control for lunch and not in the pod. ECF 50-23, Miller Dep. at 17:3-18:3. Justin Kosinski was solely responsible for monitoring Gulf Pod, which held 200-300 inmates, at the time of the incident. ECF 50-23, Miller Dep. at 42:9-43:21; ECF 50-21, Kosinski Dep. at 21:17-22:25. It is likely that Kosinski was conducting a check in another section in Gulf Pod at the time of the incident. ECF 50-19, Dukes Dep at 137:12-138:21.

It is notable that staffing of Gulf Pod contrasted with units facing similar circumstances that did *not* house sex offenders. Alpha Pod, which housed

25

detainees with high-danger security classifications, *see supra*, is monitored by
three detention deputies, one of which is solely responsible for Alpha-Echo, and
two 'control' employees who added an "added level of security" to Alpha Pod by
observing the Alpha pod from glass windows and being "the eyes and ears of
the detention deputies." ECF 50-14, Nix Dep. at 32:4-33:6. Accordingly, there
are a total of five people monitoring Alpha Pod, which has a maximum capacity
of 176 detainees. ECF 50-14, Nix Dep. at 34:2-13. Gulf-Alpha, where detainees
charged with sex abuses are confined, also houses detainees classified as high-
security risks—who are mixed in with detainees classified as vulnerable.
*Supra*. Indeed, sections housing people accused of sex offenses are the *only*
places in the jail where high-security and low-security detainees can be housed
together—which, if anything, heightens the risks of violence in those sections,
*supra*. Yet Gulf-Alpha receives no extra staffing to mitigate the heightened
danger. ECF 50-13, Peterson Dep. at 92:13-20.

    2.  <u>The monitoring measures that were in place in Gulf Pod were
insufficient.</u>

The monitoring measures that *were* in place in the MCJ, and in Gulf Pod
in particular, were deficient. Security checks, which are designed to establish
officer presence, ensure the safety of detainees, and deter misconduct, were too
infrequent, were not staggered to make them unpredictable, as they should
have been, and were done in a cursory manner that meant the officer's

presence was not felt in the unit. Additionally, Gulf Pod deputies frequently allowed inmates to break rules that were designed to maintain control and security within the dorm.

**Deficient security checks:** The Sheriff's Office recognizes that consistent supervision of inmates and frequent physical presence of correctional staff minimize the frequency of inmate-on-inmate assaults. ECF 50-18, McNeely Dep. at 23:24-24:16. The Sheriff's Office recognizes that insufficient physical presence of correctional staff in inmate-occupied areas increases the risk of violence between inmates. Id. Deputies understand that physical presence by deputies serve as a potential deterrent for inmate-on-inmate violence. ECF 50-21, Kosinski Dep. at 68:14-69:10. Plaintiff's corrections expert, Mr. Adee, agrees. He explains that national standards for jails provide that "The presence of staff in inmate-occupied areas is the most effective means of assuring the well-being of inmates. Good practice dictates that all inmates in the general population be viewed by staff in person at least every 30 minutes on an irregular schedule." Ex. 10, Adee Rpt. at 9 (quoting U.S. Dept. of Justice, National Institute of Corrections, *Sheriff's Guide to Effective Jail Operations*.)

Despite this recognition, several MCJ policies and practices combined to reduce the presence of correctional officers on Gulf Pod during the time that Mr. Lutterloah attacked Mr. Merchant. In fact, by policy and practice, each of

27

the features outlined by Mr. Adee for adequate security checks—(1) security
checks at least every 30 minutes; (2) on an irregular schedule; (3) in which staff
actually view the detainee—were violated in Gulf Pod at the MCJ. That, Mr.
Adee opines, would have created a dangerous situation on a pod that already
faced heightened danger from the failure to segregate dangerous and
vulnerable detainees. Ex. 10, Adee Rpt. at 9

During lockdown, which ran from 11 p.m. to 6 a.m., detention deputies
were to perform security checks—in which they were supposed to walk through
the section to check on the well-being of each detainee—every hour. ECF 50-
13, Peterson Dep. at 84:3-86:5; ECF 50-18, McNeely Dep. at 69:11-18. This was
pursuant to the Sheriff's written policy, which only required checks every hour.
Adee Rpt. at 4 (citing Marion County Sheriff's Office Policy 6011.00). Mr. Adee
explains that this was far too infrequent; such security checks should occur at
least every 30 minutes. Ex. 10, Adee Rpt. at 9.

In addition to requiring only hourly security checks, the Sheriff's Office
does not require its deputies to perform checks at irregular times. Instead, the
Sheriff's written policy requires only that "Security checks will be
accomplished every hour" during lockdown, *see* Ex. 10, Adee Rpt. at 6 (quoting
Marion County Sheriff Post Order Post). The Sheriff's Office failed to require
staggered checks even though it recognized that staggering security checks
reduces "predictability and complacency." ECF 50-18, McNeely Dep. at 90:6-

28

92:15. Indeed the Sheriff's Office did not require irregular safety checks, even though it recognized that unpredictability of security checks increases jail safety:

> Q: What -- how does maintaining unpredictability in the intervals of the security checks promote the goals of the jail?
>
> A: If you -- if -- if a detention deputy shows up in unpredicted intervals, then the inmate population is less likely to pattern those detention deputies and the detention deputies are more likely to be able to circumvent any type of potentially criminal behavior or rule violations.
>
> Q: By maintaining an unpredictable schedule of security checks, you are ensuring that inmates can't time when they are being surveilled and when they are not, correct?
>
> A: We're not ensuring that they can't, we are we're -- we're making it more difficult to do so.
>
> Q: Yeah, you're making it more difficult for potential perpetrators to identify the times where they can safely carry out some sort of rule violation or a criminal act in the jail, right?
>
> A: Correct.

ECF 50-18, McNeely Dep. at 91:6-92:15.

Data on security checks by deputies reflected that, indeed, security checks were not irregular. Deputies in Gulf Pod, rather, performed virtually all of their security checks right at the top of the hour with very little variation. ECF 50-21, Kosinski Dep. at 35:13-22. Plaintiff's corrections expert, Mr. Adee,

29

analyzed a one-month period of check logs and found that 194 of 203 (96%) of
security checks done that month were done at the top of the hour. Ex. 10, Adee
Rpt. at 10. Mr. Adee offers the opinion that conducting security checks in this
manner made them extremely predictable, which increased the risk that more
dangerous detainees would know when they could prey on more vulnerable
ones. Ex. 10, Adee Rpt. at 10-11.

To effectively protect detainees, security checks require more than a brief
glance into a pod. Instead, the deputy must confirm the wellbeing of each
individual inmate within the pod and can only be completed if a deputy goes
through each section of the pod and looks into each bunk to make sure that
each individual in their bunks are safe and well. ECF 50-18, McNeely Dep. at
71:3-72:6. The MCJ's *written* policies recognize this. They require that the
"detention deputy must be certain of seeing flesh in all cases rather than
counting an inmate on the basis of seeing any part of his clothing, hair, or
shoes." ECF 50-22, Headcount of Inmates Policy, at 4. Because of the need to
confirm the well-being of each detainee, it should take a deputy at least 15-20
minutes to conduct an adequate security check of the entire Gulf Pod. ECF 50-
18, McNeely Dep. at 73:5-77:23 ("Q: It's your testimony that a deputy can
conduct an adequate security check of the entire Gulf Pod, when there are 256
inmates in Gulf Pod, in ten to 15 minutes? A: I would say, 15. · Yeah, 15 to 20
[…] 15 to 20 is probably more accurate."). An adequate security check of Gulf

30

Pod thus cannot be completed in under ten minutes. Merely walking through the common area where the picnic tables are placed would not be considered a security check. ECF 50-21, Kosinski Dep. at 29:17-30:9.

    MCJ policy, however, is full of deficiencies that render these security checks ineffective. The policy, in practice, allows detention deputies to perform security checks by opening the door and sticking their head in the section, as opposed to walking through the pod, if the partner in their pod is away. ECF 50-13, Peterson Dep. at 86:7-14. Deputy Miller admits he completes security checks of Gulf Pod in *six* minutes. ECF 50-23, Miller Dep. at 25:6-10. And the security log for Gulf Pod reveals that this was far from an aberration. Plaintiff's expert, Mr. Adee, reviewed a one-month period in the log, which revealed that Deputies Kosinski and Miller, who were stationed in Gulf Pod, conducted between 89% and 96% of their security checks in 9 minutes or less, with and 75% to 94% of their checks within 7 minutes or less. Ex. 10, Adee Rpt. at 17. Given the number of detainees on the pod, Mr. Adee agrees with the Defendants' own testimony that such short time periods would ensure cursory checks that would not amount to sufficient deputy presence on the pods. Id. at 17.

    Mr. Adee also notes that the security checks were performed only during the jail's lockdown periods, overnight when detainees were supposed to be asleep. Id. at 17. During the day there were no security checks, meaning that

31

in the MCJ generally and in Gulf Pod in particular, "[f]ace-to-face supervision of the inmate population was virtually non-existent," which, Mr. Adee opines, would allow for high levels of violence within the pods. Ex. 10, Adee Rpt. at 17.

***Failure to enforce lockdown policies:*** During the night, at either 10 p.m. or 11 p.m. a Gulf Pod deputy is supposed to conduct a headcount of the detainees that signifies the beginning of evening lockdown. ECF 50-20, Post Order at 3; ECF 50-16, Inmate Rules at 13. The lights are then turned down, which enables sleep but decreases visibility. ECF 50-18, McNeely Dep. at 97:11-98:23. To ensure safety, written policy requires each detainee to stay in their bunk unless they need to go to the bathroom or have some other distinct need they need to fulfill. ECF 50-18, McNeely Dep. at 21:5-22:15. Inmates are not permitted to socialize or perambulate during lockdown. ECF 50-18, McNeely Dep. at 21:13-17, 97:11-98:23. It is the responsibility of the deputies to ensure that inmates are not fraternizing with each other during lockdown, and the sergeant's responsibility to ensure that deputies are enforcing that rule. ECF 50-18, McNeely Dep. at 97:11-98:23. Ensuring that inmates remain on their bunks during lockdown is one preventive measure to try to minimize the opportunity for inmate-on-inmate violence. ECF 50-18, McNeely Dep. at 99:8-20 The sergeant has the responsibility to address the issue if a deputy is failing to enforce a lockdown rule. ECF 50-18, McNeely Dep. at 99:22-100:22.

32

MCJ recognizes that lockdown rules that require inmates to remain on their bunks at night are "[f]or the security of the housing unit," and that making sure that inmates remain in their bunks and are not fraternizing with each other during lockdown is to "better prevent altercations." ECF 50-18, McNeely Dep. at 98:17-99:22. If inmates are allowed to be out of their bunk at night during lockdown, there is a higher risk that there will be a physical altercation. ECF 50-18, McNeely Dep. at 103:5-10.

Despite the importance of these lockdown rules, deputies exercised discretion, which is not contemplated by the lockdown policy, to allow detainees in Gulf Pod to socialize with other inmates at night. ECF 50-21, Kosinski Dep. at 50:17-54:14, 65:21-66:17. It was common to see inmates standing around by their bunks because certain inmates were "night owls." ECF 50-21, Kosinski Dep. at 50:17-51:18. This was true even though deputies were required to order an inmate back in their bunk if they were out of it and not using the restroom. ECF 50-21, Kosinski Dep. at 54:4-14. In the experience of a detainee who had been held in Gulf Pod, almost no corrections officers enforced the MCJ's lockdown rules there. Place Aff ¶ 31-33. Ultimately, "[i]t is a judgement call by the deputy as to when to address an inmate who is at another inmate's bunk, talking after lockdown. When it becomes excessive, you address it and tell the inmate to get back to their bunk." ECF 50-19, Dukes Dep. at 91:10-92:22. When Mr. Lutterloah attacked Mr. Merchant, multiple

detainees were standing off of their bunks during the lockdown period. ECF
50-1.

### 3. MCJ in general and Gulf Pod in particular saw considerable violence and danger for detainees.

At the time of Cory Merchant's death and assault, the MCJ had been
conducting audits of inmate-on-inmate assaults within the jail and were aware
of the rate at which inmates were assaulting other inmates. The Defendants
produced to Plaintiff in this case 115 incident reports between 2018 and 2021,
which were analyzed by Plaintiff's expert. *See* Ex. 10, Adee Report at 17. These
reports reflect a substantial increase in inmate-on-inmate assaults in that time
period: 11 inmate-on-inmate assaults in 2018, 22 in 2019, 45 in 2020, and 41
through November 7, 2021 (on pace for 47 by the end of the year). Id.

Violence and inmate fights in the Marion County Jail were
commonplace. Plaintiff has produced affidavits of two former MCJ detainees
whom she expects to call at trial, and who were housed on Gulf Pod. One of the
detainees, Terry Place, has attested that there is a pervasive culture of violence
within Gulf Pod pursuant to which detainees could freely engage in violence
without being disciplined. Exhibit 12, Place Affidavit. Among other things, Mr.
Place, as well as Plaintiff's brother, Tommie Merchant, who is a former MCJ
detainee, averred that detainees on Gulf Pod engaged in "Friday Night Fight
Nights." Ex. 12, Place Affidavit ¶¶ 15-17; ECF 50-35, Tommie Merchant Dep. at

34

68:5-69:1. Corroborating Mr. Place's affidavit and Mr. Merchant's testimony, Deputy Kosinski testified that he had heard the term "Friday Night Fight Nights" before, and testified that he would not be surprised if there was a night where inmates were getting together and facilitating physical altercations. ECF-21, Kosinski Dep. at 42:24-45:17. Kosinski also testified that he would not be surprised if a physical altercation occurred without anyone informing him as the officer on duty. ECF-21, Kosinski Dep. at 48:16-49:13. Overall Mr. Place estimates that violent altercations occurred on Gulf Pod 4 to 5 times a week. Ex. 12, Place Aff. ¶ 22. Mr. Place avers that there was a culture of violence in Gulf Pod, and that he constantly feared for his safety while he was detained there. Id. at ¶¶ 4-5.

A second Gulf Pod detainee, Steven Murphy, estimates that fights occurred on Gulf Pod almost on a daily basis, Ex. 13, Murphy Aff. ¶ 3, to which guards had an alarmingly indifferent attitude, Id. at ¶¶ 15-17. Mr. Murphy avers that Lutterloah in particular had a reputation for being violent and picking on weaker detainees (Mr. Place, meanwhile, avers that guards were indifferent to Lutterloah's violence, Ex. 12, Place Aff. ¶ 13), but that guards in Gulf Pod spent much of their time in the control room on social media instead of going out to surveil the dorms. Ex. 13, Murphy Aff ¶ 4-6 (Mr. Murphy was a trustee and was allowed into the guard area as a result).

35

## IV.    <u>Legal Standard</u>

To prevail on a summary judgment motion, the moving party must show

"that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing

such a contention, the district court must "view the evidence and all factual

inferences therefrom in the light most favorable to the non-moving party, and

resolve all reasonable doubts about the facts in favor of the non-movant."

*Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quotation omitted).

"An issue of fact is 'material' if, under the applicable substantive law, it might

affect the outcome of the case. An issue of fact is 'genuine' if the record taken

as a whole could lead a rational trier of fact to find for the nonmoving party."

*Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

## V.    <u>Discussion</u>

The Court's assessment of the sufficiency of the evidence at the summary

judgment stage turns on two separate doctrines. First there is the substantive

law under which Plaintiff's federal claims are asserted: "[T]he Fourteenth

Amendment (by way of Eighth Amendment standards) requires that inmates

be furnished with the basic human needs, one of which is reasonable safety."

*Ogletree v. Colbert Cnty., Alabama*, No. 3:18-CV-01218-HNJ, 2021 WL

4477630, at *26 (N.D. Ala. Sept. 30, 2021) (quoting *Helling v. McKinney*, 509

U.S. 25, 33 (1993)). Under this regime a failure-to-protect claim, like the one

36

at bar, has three elements: (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

These elements, in turn, are examined through the lens of the *Monell* doctrine, which controls Section 1983 claims against municipalities like Marion County, sued here as Sheriff Woods in his official capacity. *That* liability is established by "prov[ing] that the deprivation resulted from '(1) an action taken or policy made by an official responsible for making final policy in that area of the County's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker.'" *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir.1994); brackets omitted). Plaintiff examines each substantive *Hale* element in turn according to the policies and widespread practices implemented by Marion County at MCJ.[7]

---

[7] Plaintiff respectfully submits that the Eleventh Circuit's decision in Hale v. Tallapoosa County, 50 F.3d 1579 (11th Cir. 1995) is a particularly useful guide for the Court's analysis of this case. In Hale, the Court of Appeals endorsed a failure-to-protect Monell claim in circumstances strikingly similar to those at issue in this case: a man detained on a non-violent offense was housed with and attacked by a man charged with serious violent crimes in a jail that lacked a classification system and had inappropriately allowed them to be housed together. Hale held that under these and related circumstances, the jailer could be held liable on a failure-to-protect claim.

## A. Substantial risk of serious harm.

A plaintiff asserting a failure to protect claim must offer evidence showing that they were "incarcerated under conditions posing a substantial risk of serious harm[.]" *Hale*, 50 F.3d at 1582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This condition exists when a prisoner is exposed to an "unreasonable exposure to violence," *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993), which can occur, among other things, " '[w]hen prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners and the level of violence has become . . . high . . . .' " *id.* (quoting *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. 1981). In assessing the evidence going to this element, "context is king," *Guy v. Dunn*, No. 4:21-CV-00264-ACA, 2023 WL 6378967, at *9 (N.D. Ala. Sept. 29, 2023) (collecting authorities, including *Hale*), and generally includes proof of "incidents of violence" alongside "staffing and/or security issues." *Id.*

In this case, Plaintiff has come forward with evidence of both. As Plaintiff's expert, Mr. Adee, reports, the MCJ had a steady, high, and increasing incidence of assault in the years leading up to Mr. Merchant's killing. Ex. 10, Adee Report at 16-18. Two former Gulf Pod detainees, moreover, have averred that that pod in particular was the site of near-constant violence, with altercations between detainees occurring on a regular and even daily basis. Ex. 12, Place Affidavit; Ex. 13, Murphy Affidavit. Both

38

the statistics reviewed by Mr. Adee and the former detainee averments point to a serious problem of detainee-on-detainee violence within Gulf Pod.

Then there are the "staffing and/or security issues." As Plaintiff has explained at length, *supra*, as a matter of policy the MCJ combined on Gulf Pod detainees it considered *too dangerous to combine anywhere else in the jail. Supra,* pp. 6-20. The point is obvious but bears repeating: the MCJ's own classification policies identified detainees who should not be housed together because of an unacceptable risk of violence—yet housed together detainees with exactly those classification levels in its Gulf Pod. Indeed, Defendant Woods concedes in his own brief that some inmates are more dangerous than others, ECF 49 at 13, yet his policy allowed for inmates of all classification levels to be mixed if they were accused of a sex offense. *Supra,* pp. 12-16. The MCJ's own classification-and-segregation policy, and its abandonment of that policy for detainees confined in Gulf Pod, establish that detainees on Gulf Pod who were classified as vulnerable faced an unreasonable risk of harm.

Finally, there is the compounding nature of the MCJ's other policies and practices: its understaffing of correctional officers on Gulf Pod *despite a recommendation that more staffing there was advisable* (*supra,* pp. 21-26); its one-hour inspection policy (*supra,* pp. 27-28); the widespread practice by Gulf Pod security officers conducting security inspections on a fixed schedule that made them predictable (*supra,* pp. 28-30); and doing so in a cursory manner

39

indicating that the inspections were too cursory to promote safety (*supra,* pp. 30-32)—all combined to compound the risk created by the lack of security segregation of people charged with sex crimes. Mr. Adee has offered the opinion that these various problems combined to make Gulf Pod unreasonably dangerous, and a reasonable jury, examining the evidence of violence on the pod, could agree with him. The first element is satisfied.

### B. The defendants' deliberate indifference to that risk.

In proving deliberate indifference to a serious risk of harm, a plaintiff must make two showings—first, that the Sheriff's Office "knew of the substantial risk of serious harm," and second, that the Sheriff's Office "knowingly or recklessly 'disregard[ed] that risk by failing to take reasonable measures to abate it[.]'" *Hale*, 50 F.3d at 1583 (quoting *Farmer*, 511 U.S. at 847 (brackets original).

***Knowledge of risk.*** As to the knowledge requirement, the Supreme Court in *Farmer* explained that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," such that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." 511 U.S. at 842 (quoted in *Hale*, 50 F.3d at 583). *Farmer* elaborated that in assessing the knowledge of a risk, "it does not matter . . . whether a prisoner faces an excessive risk of attack for

40

reasons personal to him or because all prisoners in his situation face such a risk" *Id.* By way of example, *Farmer* noted that "a prisoner can establish exposure to a sufficiently serious risk of harm by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Id.* at 843 (quotation omitted).

There is ample evidence permitting an inference that the Sheriff's Office knew that detainees classified as more vulnerable, like Mr. Merchant, were exposed to a substantial risk of harm on Gulf Pod. The MCJ's classification-and-segregation policy was an acknowledgement that a substantial risk of violence existed that required segregating violent from vulnerable detainees in the jail—and yet, as a matter of policy, Sheriff's Office abandoned that protective measure for Gulf Pod. *Supra,* pp. 6-16. As a matter of policy, the MCJ also disregarded a written report by a consultant that more guards should be assigned to Gulf Pod, instead keeping the number at two and acknowledging that one of those guards was often not even in the pod. *Supra,* pp. 21-26. And the MCJ's requirement that guards only conduct security checks on the pod every hour was a matter of written policy. *Supra,* pp. 26-28. As an institution, the Sheriff can be said to know of its own official policies under *Monell*.

The risk-generating evidence that is not a matter of official policy, meanwhile, was sufficiently widespread that it may be "deemed authorized by the policymaking officials because they must have known about it but failed to

41

stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). As Mr. Adee showed in his report, the logs for multiple guards over the course of a month showed both that they conducted virtually all of their rounds at the top of the hour, making them predictable and therefore dramatically degrading their efficacy, and that virtually all the logs over the course of the month showed security sweeps so short as to be of little value for securing safety. All this was evidence, notably, that was gathered from the Sheriff's own electronic records, meaning that it was in no way hidden. Meanwhile, incident reports reviewed by Mr. Adee showed increasing reported violence in the MCJ in the years leading up to the attack on Mr. Merchant, and Mr. Place and Mr. Murphy, the two former Gulf Pod detainees who swore out affidavits about their experiences on Gulf Pod, averred to a pod so dangerous it featured daily or near-daily physical altercations among detainees, and that weaker detainees on the pod were particularly victims of the widespread violence on the pod. *Supra,* pp. 34-36. Given the widespread nature of this danger and violence, a reasonable factfinder could infer from these facts that "it was plainly foreseeable to a reasonable law enforcement official that a violent attack was likely to occur." *Hale*, 50 F.3d at 1583. The Sheriff's Office had the requisite knowledge of the risk faced by vulnerable detainees on Gulf Pod, like Mr. Merchant.

42

Defendant Woods implies he cannot be liable because he didn't know
*Lutterloah* was a particular risk of harm, that Mr. Merchant was particularly
vulnerable, or that the two of them specifically would be involved in an
altercation. ECF 49 at 14-16. First, this is not entirely true. Sheriff Woods
himself identified Lutterloah as a particular risk to the Marion County
community in a public service announcement. *Supra,* pp. 16-20. Second, the
County *did* know Mr. Merchant was a vulnerable inmate because he was
classified as a Level 5, which the jail itself identifies as vulnerable enough to
not be classified with heightened security inmates designated Levels 1, 2, or 3.
*Supra,* pp. 6-20. Third, knowledge of risk is not limited to knowledge of a
specific risk attendant to one or two detainees. *Farmer v. Brennan*, 511 U.S.
825, 843, 114 S. Ct. 1970, 1982, 128 L. Ed. 2d 811 (1994) ("Nor may a prison
official escape liability for deliberate indifference by showing that, while he
was aware of an obvious, substantial risk to inmate safety, he did not know
that the complainant was especially likely to be assaulted by the specific
prisoner who eventually committed the assault."). Plaintiff has put forth
sufficient evidence to show that Marion County was aware of the risks
associated with mixing detainees of such varying classification levels and
failing to implement monitoring and surveillance measures to account for the
increased risks in Gulf-Alpha, and that a 5-Medium Pre like Mr. Merchant
would be vulnerable to a higher security, 3-High-Medium like Mr. Lutterloah,

43

especially when the Sheriff himself had taken the time to identify him as a particular danger to the community because of his underlying crime.

**Failure to take reasonable measures to abate the risk.** A municipality fails to take reasonable measures to abate a known risk if it "knew of ways to reduce the harm but knowingly . . . or . . . recklessly declined to act." *Hale*, 50 F.3d at 1583. In this case, the Sheriff's Office demonstrably knew of ways to reduce attacks by violent on vulnerable detainees— everywhere else in the jail, it segregated such detainees from each other. *Supra,* pp. 6-11; *Cf. Hale*, 50 F.3d at 1583 (holding that the jail's failure to segregate dangerous and vulnerable detainees was evidence that the jail failed to take reasonable measures to protect vulnerable detainees from violence). Sheriff's Office also ignored recommendations by a consultant that it increase the number of guards on Gulf Pod. *Supra,* pp. 21-26. It could have, but did not, require the guards on Gulf Pod to conduct more frequent, irregular, and more thorough security checks of Gulf Pod, and it could have enforced lockdowns. *Supra,* pp. 26-34. Mr. Murphy and Mr. Place, notably, remark on the lack of guard presence on the pod as contributing to the culture of lawlessness there (Ex. 12, Place Affidavit, Ex. 13, Murphy Affidavit)—a point with which Mr. Adee, Plaintiff's expert, wholeheartedly agrees, opining that the lack of "face-to-face supervision of supervision of the inmate population . . . allowed for the level of physical violence" to increase at the jail. Ex. 10, Adee Rpt. at 17. A

44

reasonable fact finder could conclude from this evidence that the Sheriff's Office knowingly or recklessly declined to take reasonable steps to address the risk of violence faced by vulnerable detainees like Mr. Merchant. The Sheriff's Office, in other words, was deliberately indifferent to a substantial risk of serious harm in violation of the Fourteenth Amendment.

## C. Causation.

Under *Hale*, a Plaintiff asserting a failure to protect claim against a municipal defendant like the Sheriff's Office is "required to show two causal links: first, a link between [the municipality's] allegedly deliberately indifferent acts and omissions and the excessive risk of violence; and second, a link between the excessive risk of violence and his injury." *Hale*, 50 F.3d at 1584. In making this showing, "[i]f a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is precluded from contending that the unconstitutional condition was not at least a proximate cause of injuries that arose from that condition." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (quotation omitted). That is to say that a "finding that a [jail] condition offends the [Fourteenth] Amendment presupposes the distinct likelihood that the harm threatened will result." *Id.* (addressing Eighth Amendment in prison context). Thus, where the plaintiff presents evidence proving the defendant's "deliberate indifference to a constitutionally infirm condition," that "wrong must, in turn, have been the

45

proximate cause" of the plaintiff's injuries brought about by the assault in question. *LaMarca*, 995 F.2d at 1538–39.

Here, causation is simple: if Marion County would have applied their *own classification scheme*—which is designed to keep detainees safe—in the sex-offense sections, Cory Merchant, a 5-Pre-Medium, never would have been housed with a 3-High-Medium like Eric Lutterloah. *Supra*, pp. 6-20. Mr. Lutterloah would have been placed with other Level 3s or Level 2s in Alpha Pod, where he would have been subject to heightened monitoring and surveillance. *Supra*, pp. 16-20. Instead, Marion County created a powder keg of a jail dorm, in which detainees were placed into Gulf-Alpha without regard for their classification and were not provided any increased monitoring or surveillance to account for the heightened risk associated with placing inmates of all classification levels together. *Supra*, pp. 12-34. Had Marion County implemented its own classification-and-segregation scheme in Gulf-Alpha, as it did for all non-sex-offense pods, Mr. Merchant would have been housed with other inmates of similar classifications instead of detainees like Mr. Lutterloah who had already been identified as a heightened security risk. *Supra*, pp. 16-20.

Defendants argue that "Lutterloah's assault was spontaneous and unexpected," and that assaults such as these are "inevitable" in the correctional environment. ECF 49 at 14. Plaintiff agrees that there is a

46

particularly heightened risk of violence attendant to correctional settings, but
that is precisely *why* local governments have a duty to implement reasonable
security and classification measures that eliminate *unreasonable* risk.
Otherwise, any person accused of any crime could be thrown into jail with no
more caution than throwing them to wolves. Indeed, Marion County and its
correctional staff agree that it is their responsibility to take reasonable steps
to mitigate the risk of inmate-on-inmate violence. *Supra*, pp. 6-7, 21-22.

### D. Individual Defendants

Defendants claim that liability of Defendant Woods is dependent on a
constitutional violation committed by one of the Individual Defendants. ECF
49 at 12. This misunderstands the governing law. "*Monell* [ ] and its progeny
do not require that a jury must first find an individual defendant liable before
imposing liability on local government." *Anderson v. City of Atlanta*, 778 F.2d
678, 686 (11th Cir. 1985). "[M]unicipal liability can exist if a jury finds that a
constitutional injury is due to a municipal policy, custom, or practice, but also
finds that no officer is individually liable for the violation." *Barnett v.
MacArthur*, 956 F.3d 1291, 1301 (11th Cir. 2020). Defendant's contention that
Plaintiff must prove an underlying constitutional violation to succeed on a
*Monell* claim is contrary to Eleventh Circuit law as well as the consensus of its
sister circuits. See *Id*. at 1301-1302 (collecting cases). Rather, when there is no
individual liability for an individual defendant, "the question is whether that

47

verdict 'can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. [...]" *Id.* at 1302 (quoting *Speer v. City of Wynne*, 276 F.3d 980, 985–86 (8th Cir. 2002).

Here, Plaintiff's claim hinges on *systemic deficiencies* at MCJ, specifically the policy that the jail abandon any classification regime for accused sex offenders (*supra*, pp. 6-20) and the policies and practices related to insufficient staff presence, monitoring, and surveillance (*supra*, pp. 21-36), all of which occurred in the foreground of a particularly violent jail. These systemic deficiencies were not necessarily the fault of one officer acting unreasonably; rather, the officers here appear to have often acted in accordance with the jail's policies, procedures, and practices. Liability hinges on those policies, procedures, and practices creating known and unreasonable risks of harm, particularly to the class of detainees accused of sex offenses, such as Mr. Merchant. This case is about institutional issues at MCJ, as opposed to flagrant misconduct by one individual, so it is easy to harmonize *Monell* liability upon Sheriff Woods, in his official capacity, even if responsibility is not pinned on one particular deputy or sergeant.

## E. Florida Law

Plaintiff does not dispute that Krysti and Tommie Merchant are not 'survivors' under the Florida Wrongful Death Act (FWDA) because they were not depended upon by Mr. Merchant for support or services as defined in the

48

statute. ECF 49 at 23. He has no other surviving relatives, as his parents are deceased, he never had children, and he was never married. Id. This leaves no survivor who can recover under Florida Law on behalf of Mr. Merchant.

Defendants have only addressed Plaintiff's right to recover under the FWDA. Defendants do not make any argument that Plaintiff is not entitled to recovery under §§ 1983 and/or 1988. Plaintiff does not wish to waste additional judicial resources in briefing an issue that was not squarely addressed in Defendant's Motion, especially when there is already substantial dispositive briefing in this case for the Court to consider. Plaintiff respectfully requests that, if the Court is inclined to address which damages Plaintiff is entitled to for her civil rights claim at the dispositive motion stage, she be provided an opportunity to more comprehensively address the issue. At this time, though, Plaintiff merely provides a brief overview of the applicable law and Plaintiff's position regarding entitlement to damages under §§ 1983 and 1988:

"[A] court must follow the state law unless it is inconsistent with the policies underlying § 1983. Those policies are (1) to compensate the victim for the deprivation of his federal rights and (2) to deter such future violations." *Est. of Breedlove v. Orange Cnty. Sheriff's Off.*, No. 6:11-CV-2027-ORL-31, 2012 WL 2389765, at *2 (M.D. Fla. June 25, 2012). This Court has previously held that the FWDA is inconsistent with policies underlying § 1983:

49

The FWDA is a creature of state law, and pursuant to the Act, a decedent's estate receives no compensation for the hedonic damages sustained by the decedent. In other words, the FWDA prevents or limits compensation for actual injuries caused by a particular constitutional deprivation, as mandated by § 1983, when those injuries include pain and suffering sustained as a result of a constitutional violation which happens to culminate in death. Thus, the FWDA creates an inconsistency between state law and federal statutory law. Courts have found state survival statutes to be inconsistent with the purpose of the Civil Rights Act of 1871, and have declined to apply those state statutes, where application of the state survival statute precludes recovery.

Because the purpose of § 1983 is to provide compensation for actual damages—not a subset of those damages—the FWDA is inconsistent with the compensatory purposes of that federal law. Moreover, although the principles of compensation may be difficult to apply to a particular case, as the Supreme Court has recognized, courts 'are capable of making these types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of [constitutional] rights. Finally, as a practical matter, application of the federal common law over a patch-work of conflicting state survival statutes promotes consistency and advances the federal rights protected by § 1983.

*Howard v. Wilkinson*, 379 F. Supp. 3d 1251, 1255 (M.D. Fla. 2019) (cleaned

up).[8]

---

[8] Plaintiff recognizes there is a split within this District Court regarding whether the FWDA is inconsistent with federal law. See *Race v. Bradford Cnty., Fla.*, No. 3:18-CV-153-J-39PDB, 2019 WL 7482235 at *21 (M.D. Fla. Aug. 20, 2019), *report and recommendation adopted as modified,* No. 3:18-CV-153-J-39PDB, 2019 WL 7482213 (M.D. Fla. Sept. 26, 2019). This is one of the primary reasons Plaintiff requests the opportunity to fully brief the issue at the appropriate time but, again, does not

Here, the FWDA is inconsistent with §§ 1983 and 1988 for two reasons. First, as noted in *Howard*, the FWDA only provides a remedy for a subset of damages by precluding recovery of hedonic damages associated with death. These are primarily economic damages, which have not been suffered by any of Mr. Merchant's remaining blood relatives, thus offering no avenue of recovery. Second, regardless of the subset of damages the FWDA *can* provide, *no* remedy is available for Mr. Merchant's death, specifically, merely because most of his blood relatives are deceased. The FWDA provides that Mr. Merchant has no 'survivors' under Florida law because his closest surviving relatives are his sister and brother, as opposed to his parents, spouse, or child. Has his parents not premature passed away, the FWDA would not bar recovery for Mr. Merchant's death, and so Mr. Merchant's access to a remedy hinges on little more than luck. Under Florida law, Marion County would have less risk of liability if their policies and practices resulted in Mr. Lutterloah merely scratching Mr. Merchant as opposed to killing him. That is simply not consistent with the goals of §§ 1983 and 1988 to compensate the victim for the deprivation of his federal rights and to deter such future violations.

---

do so here as the issue of the damages which Plaintiff is entitled to under federal law has not been raised by Defendant.

51

Accordingly, the FWDA is inconsistent with the dual purposes of applicable federal law, and Plaintiff should be entitled to meaningful compensation.

## VI.    Conclusion

The MCJ, operated by Billy Woods as Sheriff of Marion County, employs a trifecta of security measures to address the recognized danger posed by the reality that some of the detainees it houses may pose a danger to others: first, using criminal history and other criteria, it classifies detainees based on their dangerousness. Second, it segregates those detainees classified as more dangerous from those classified as less dangerous and thus more likely to be victims. And third, it provides increased staffing in those areas with detainees classified as more dangerous are housed. All of these important security measures, however, were not applied to Cory Merchant, though, due to a policy that all alleged sex offenders be housed together, regardless of security risk and classification. Worse, MCJ did not impose any heightened security measures in the sex offense dorms, such as Gulf-Alpha, despite knowledge that it was placing detainees of varying security risks together. Consequently, Mr. Merchant was housed with a dangerous inmate who was identified as a much higher security risk and who he never would have been housed with if he was accused of a non-sexually related offense. Given these policies and procedures in Gulf-Alpha, an attack like the one Mr. Lutterloah committed on November 7, 2021 was bound to occur, and Cory Merchant was the unfortunate victim.

Plaintiff has sufficiently identified policies and practices at MCJ that posed a substantial risk of harm to detainees like Mr. Merchant, the Sheriff and his Office's deliberate indifference to that risk, and facts supporting the notion that such policies and practices caused Mr. Merchant to be housed with and attacked by Mr. Lutterloah. Defendant Woods' Motion for Summary Judgment should be denied.

Respectfully submitted,
/s/ Sam Harton
Attorney for Plaintiffs

Sam Harton (IL No. 6342112)
(pro hac vice)
ROMANUCCI & BLANDIN LLC
321 North Clark Street
Suite 900
Chicago, IL 60654
+ 1 (312) 253-8590, Main
+1 (312) 458-1004, Facsimile
Email: sharton@rblaw.net
      sweil@rblaw.net

James Murray Slater
Slater Legal PLLC
2296 Henderson Mill Rd NE
Suite 116
Atlanta, GA 30345
305-523-9023
Email: james@slater.legal

53