*FINAL REPORT*

# JAIL STAFFING ANALYSIS

## Marion County Jail

**Ocala, Florida**

*Prepared for:*
Sheriff Billy Woods

**PLAINTIFF'S EXHIBIT**
**11**

CRS Incorporated
Gettysburg PA
A non-profit organization
www.correction.org
rod@correction.org

*Final Report*    Marion County Jail Staffing Analysis

Ocala, Florida

April 24, 2019

CONTENTS

|     | Executive Summary | i |
|-----|-------------------|---|
| I.  | Introduction | 1 |
| II. | Summary of Findings and Recommendations | 2 |
|     | A. Step One: Analyzing the Context | 2 |
|     | B. Step Two: Analyzing Intermittent Activities | 9 |
|     | C. Steps Three and Four: Drafting and Reviewing the Coverage Plan | 12 |
|     | D. Step Five: Scheduling | 13 |
|     | E. Step Six: Net Annual Work Hours | 13 |
|     | F. Step Seven: Budgeting and Personnel | 17 |
| III. | Implementation | 19 |
| IV. | Assembled Recommendations | 19 |
|     | APPENDIX A: Notes from First Meetings | A-1 |
|     | APPENDIX B: Proposed Coverage Plan | B-1 |

CRS Incorporated
Gettysburg PA   www.correction.org
Rod Miller  rod@correction.org

EXECUTIVE SUMMARY

This report presents the first independent review of Marion County Jail staffing practices conducted in over a decade. A comprehensive in-house staffing analysis completed in 2013 identified serious deficiencies in jail staffing. That analysis used the methodology developed by the National Institute of Corrections (NIC); this project used a newer version of the NIC process (p.1). Appendix A presents notes from some of the work sessions conducted during this project, and explains the process in more detail.

Prior to authorizing this project, Sheriff Woods commissioned independent reviews of jail suicide prevention protocols and practices (Lindsay Hayes, National Center for Institutions and Alternatives), and security practices (Nancy DeFerrari). Their findings underscored the need for changes in staffing.

In recent years, the Sheriff and his staff have worked hard to adjust practices, find efficiencies, and generate the most value from the staffing resources that have been available. They have been creative in their use of the facility and technology, and have refined operating practices to reduce risk. Their efforts have mitigated some of the challenges posed by the facility and its inmate population.

Today, the design and deteriorating condition of the jail complex pose more risks to inmates, staff, contractors and volunteers.  More inmates have serious mental health, substance abuse, and medical needs, requiring more services, movement inside the facility, transport to outside providers, and hospitalization. These conditions combine to underscore the need for sufficient effective staffing (p.2).

Daily operations are more complex as a result of these conditions. Working with the consultant, jail staff identified new opportunities to "work even smarter" by aggressively managing intermittent activities and using technology to reduce movement inside the complex (p.9).

A comprehensive "coverage plan" was developed (p.12). The plan was built from scratch, using half-hour increments. Staff hours were added to the coverage plan when *needed*, no less and no more. This process discovered new approaches that effectively and efficiently address needs. The proposed plan is presented in Appendix B, along with a comparison of staffing needs to current budgeted staffing levels.

The plan requires nearly 60% more staff hours to operate the entire complex (all housing pods open). At this time three housing pods are closed (B, D, and F); the proposed coverage plan is 38.5% more than the current budgeted plan when staffing for the three pods is subtracted.

The coverage plan calls for relieved posts and positions (over 90% of all hours in the plan), non-relieved positions, and a pool of overtime hours to address the growing number of sporadic events that demand immediate staffing for short periods of time (a.k.a. "It Happens" hours.) These events have increased markedly in recent years and were not addressed in previous plans and budgets.

Refinements in scheduling practices are proposed (p. 15). Budgeting policies are suggested (p. 17) including the need to phase out the use of comp time, and increase and manage the use of overtime.

Recommendations are assembled on page 19. A three-year implementation process is suggested.

*Final Report*    Marion County Jail Staffing Analysis

Ocala, Florida

April 24, 2019

CRS Incorporated
Gettysburg PA   www.correction.org
Rod Miller  rod@correction.org

I. INTRODUCTION

In early 2019, Sheriff Woods contracted with CRS, a non-profit organization based in Gettysburg, Pennsylvania, to conduct a jail staffing analysis. Rod Miller, who founded CRS in 1972, worked with jail officials and staff to implement the analysis. Rod made three trips to Marion County, spending 10 days on site collecting information, observing operations, and meeting with a team that was created for this project. His time on site included visits late Saturday night, Sunday during the day, and on several other days of the week.

The staffing analysis methodology developed by the National Institute of Corrections (NIC) guided the process. The latest staffing book, tools, and sample reports may be downloaded at www.correction.org.

The NIC methodology demands a great deal of participation from local officials and staff. This was accomplished by four days of meeting with a small "working group" of eight employees:

- Vicki Christman, Master Sgt.
- Kristin Johnson, Internal Affairs
- Matt McNeely, Lt./Watch Commander
- Bryan Nix, Lt. Facilities
- Brian Peterson, Sgt. Classifications
- Galen Priest, Lt./Watch Commander
- Annette Pritchett, Lt./Kitchen
- Awilda Santos, Cpl, DR Hearing Officer

Appendix A presents notes from the first two meetings, along with the power point slides that were used during the two days. The slides explain the NIC methodology in more detail.

The notes were distributed to all jail staff along with a request for comments, concerns, and suggestions. Many staff responded, providing valuable insights that were reviewed by the Working Group and incorporated into the following findings and recommendations.

## II. SUMMARY OF FINDINGS AND RECOMMENDATIONS

The following narrative summarizes findings under the steps of the staffing analysis process.

> A. <u>Step One:</u> <u>Analyzing the "Context"</u>

This step set the stage for the overall process. It required assembling information and insights about the current jail facility, operations, and inmates. Prior to the first site visit, Capt. Ron Burnett provided a wealth of information, data, and background. Capt. Burnett managed this project, ensuring that the needs of the consultant were met.

The information was used throughout the staffing analysis process. It also provides descriptions of the jail facility, technology, and operations for persons who have not visited the jail.

At the first meeting. Working Group participants identified their *concerns* about the jail. at the start of the first meeting. Their concerns included:

- Officer safety
- "Relief Factor" -- lack of accuracy
- Critical incidents- frequency and type
- Declining thoroughness in daily operations, caused by staffing shortfalls.
- Employee stress
- Employee Retention
- Declining level of staff experience "on the floor" each shift
- Eroded function of the sergeant, making them less available to serve as first-line supervisors and to respond to, and manage, incidents
- Amount of paperwork that must be completed
- Expectations vs. reality- not possible to do everything, and do it right, due to staffing shortfalls
- "Distractions" that divert the attention of pod staff-- meals, delivery of medications, picking up and delivering laundry, commissary, and other events
- Inmates know "we're short"
- The need to say "no" if an activity can't be done safely, and permission to set limits
- Lack of consistency in daily operations
- Staff are taking shortcuts in order to get everything done
- Training is only provided on employees' days off
- Declining capability to respond to incidents and situations
- Insufficient preparation of new staff
- Escorting inmates outside of pods- pod staff end up doing it causing further staff shortages in the pods
- Concerns about the quality of contractors who implement external transport
- Detention assistants (DA's) are not provided with pay incentives for longevity
- Less cross training of staff now, reducing flexibility of post assignments
- Field training officers (FTO) face more challenges, harder to implement now

Participants were asked to identify *changes* in the "context" of the jail since 2007, when the jail was expanded. Their responses included:

FACILITY
- Facility—doubled in size
- New housing is dormitories rather than the celled units in old facility
- Corridors- long distance to escort inmate movement
- Declining condition of the facility and its systems, especially old facility
- Older celled units are more secure than dorms

TECHNOLOGY
- Sliding doors in Alpha pod are deteriorating
- Cameras have been upgraded
- Drones- may help with exterior security

INMATES
- Present more medical needs
- Present mental health needs
- Intake/booking takes longer due to needs
- More inmates have drug/substance abuse issues
- Gangs increasing demands to separate inmates in housing
- More violent
- Younger inmates act more "entitled"- present more challenges
- PREA – inmates are manipulating, overall demands higher level of vigilance

Figure A-1 illustrates the scale of the facility, including:

- Main corridor is 1,200 feet long (4 football fields, ¼ mile)
- New housing units are 250 long by 150 wide (37,500 sq ft, over ¾ acre)
- Footprint of facility is 1,450 by 650 ft (21.6 acres)
- Each of the new pods (G, H) house 256 inmates in four dormitories
- More than 12,000 bookings and nearly 12,000 releases annually (66 per day)

Figure A-1: Jail Buildings and Site, Annotated



Figure A.2 illustrates the density of the inmate population housed in the new dormitory pods, and the number of Detention Deputies who are usually stationed in the pod (2). At times there is only one Detention Deputy in a pod.

Figure A-2: New Housing Pod- Number of Inmates and Staff



Deputies assigned to supervise inmates in one of the new pods are usually responsible for the safety and security of 256 inmates; recently more than 280 inmates were housed in one of the new pods. The design was based on the premise that pod deputies have clear, unobstructed views of all inmates in the housing units from their station.  In practice, views are often obstructed or degraded by:

- Reflections from lighting in the common area of the pod
- Inmates standing near the windows watching staff activity
- Distance from entry door to the back of the housing unit
- Bunks and beds
- Blind spots caused by the design and construction of the facility

More important, effective inmate supervision requires staff to see each inmate face-to-face, without any barriers. In this way they can ascertain the condition of each inmate.

Figure A-3 presents a surveillance camera view of one of the dormitories in G Pod, in the new part of the complex.

Figure A-3: Surveillance Camera View of Dormitory in G Pod



Some of the housing units in the older part of the complex are also dormitories, usually two levels high. These pose even more challenges for staff viewing of the housing unit.

Dormitories pose special challenges:

- No physical separation of inmates as in celled units
- Can't tell an inmate to "go to your cell"
- Never sleeps- conditions do not ease after lights out
- Staff see what inmates want them to see

Figure A-4: Surveillance camera view of two-level dormitory (A Pod)



Pods in the older sections of the facility have "towers" staffed by Detention Assistants (DA). These towers were designed to allow staff in the tower to look down into the housing units and the core of the pod. When DD's need to go into one of the high security housing units, they may not enter until a DA in the tower is watching.

Figure A-5: Tower in Older Pod



The towers are staff intensive requiring two or more employees 24/7. Figure A- 6 shows a surveillance camera view of the "core" area of C Pod, which houses female inmates.

*Final Report*        Marion County Jail Staffing Analysis        April 2019        7

Figure A-6: Pod C (Female) Core



The "tower" is visible in the center of the photo. In this photo, the nurse is taking the blood pressure of an inmate (right), and an officer is speaking with several inmates. A few minutes later the nurse delivered medications to inmates in the pod, standing at the door into each housing unit with a deputy, watching inmates take their medicine and recording the delivery.

Sheriff's employees have been creative in their efforts to improve safety, security, and efficiency. Figure A-7 shows a high security housing unit in A Pod in which additional security measures have been added, including a small area that was fabricated to allow inmates to use a kiosk and participate in personal and attorney visits while other activities continue in the unit.

Figure A-7: Retrofitted Security Improvements in an A Pod Housing Unit



*Step One Summary*: Very few changes in recent years make it easier to operate the jail, and many increase the risks presented to staff and inmates.

RECOMMENDATIONS:

A1.    Safely reduce jail occupancy by working with criminal justice officials to develop alternatives to jail and to implement new policies and practices.

A2.    Decrease time it takes for medications, meals, laundry, and similar activities.

A3.    Restore decentralized operations wherever possible (bring materials, services, and programs to inmates in their housing units.)

A4.    Expand the use of digital and other forms of technology:

    a.    Increase use of video for attorney visits.

    b.    Use video for religious services, AA, and similar group activities—allow two-way interaction, conduct programs and services one time in multiple pods rather than repeating in each unit.

    c.    Refine "Beacon" to reduce paperwork and redundant entry of information.

    d.    Consider using inmate bar code to increase documentation and reduce staff time.

    e.    Use motion detection, sound, and other capabilities of current "smart" cameras to increase return on investment and improve security.

    f.    Increase the use of video cameras for "detection" using computer-based active monitoring software.

    g.    Consider implementing "active" video monitoring.

    h.    Increase review of digital video recordings (DVR) during times of low activity.

    i.    Examine ways to use video to reduce staffing of some of the towers.

A5.    Improve the quality of inmate supervision in housing units. Personally view every inmate at least hourly, or more frequently as policies require. These health and welfare checks should involve interaction with inmates during waking hours, and should ensure that officers seek out all inmates to ascertain their condition. Supervision is face-to-face.

A6.    Revise policies and procedures to authorize supervisors to reduce demand to match actual supply on a shift. Specify the actions that may be implemented in order of priority.

A7.    Explore the use of inmate behavior management strategies to promote positive inmate behavior through the use of incentives.

A8.    Reduce the practice of housing inmates in dayrooms (old facility) whenever possible.

A9.    Improve the frequency and quality of security practices such as searches and shakedowns.

*Final Report*　　　Marion County Jail Staffing Analysis　　　April 2019　　　9

B. <u>Step Two</u>: <u>Analyzing Intermittent Activities</u>

This step identifies and analyzes short-term many that occur at least once each week at the same times. These create additional staffing demands when they occur. Analyzing intermittent activities identifies opportunities to "work smarter" by managing these activities.

The Working Group assembled a long list of activities as a starting point. These were distilled into a list of "baseline" activities such as shift change, meals, and medications (Figure B-1). Inmate programs were assembled in another list by time and day (Figure B-2); religious programs and activities comprised the third list (Figure B-3).

Figure B-1: Baseline Activities in Order of Start Time

| Activity | Start | End | Weight | Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|---|---|---|---|
| Medical - Lab Draws | 0100 | 0300 | 1 | x | x | x | x | x | x | x |
| Meal Breakfast | 0500 | 0600 | 3 | x | x | x | x | x | x | x |
| Medical - Blood Sugar | 0500 | 0600 | 2 | x | x | x | x | x | x | x |
| Medical - Infirmary Court Meds | 0500 | 0600 | 2 | x | x | x | x | x | | |
| Medical - Infirm Blood Sugar/Insulin | 0500 | 0600 | 1 | x | x | x | x | x | x | x |
| SHIFT CHANGE- Count | 0530 | 0700 | 3 | x | x | x | x | x | x | x |
| Medical - Sick Call | 0600 | 1800 | 2 | x | x | x | x | x | x | x |
| Medical - History and Physical | 0600 | 1800 | 2 | x | x | x | x | x | x | x |
| Canteen F, A | 0630 | 1130 | 1 | | x | | | | | |
| Canteen C Med Inf | 0630 | 1000 | 1 | | | x | | | | |
| Meds - Morning | 0700 | 0800 | 2 | x | x | x | x | x | x | x |
| Medical - INFIRMARY | 0700 | 2200 | 2 | x | x | x | x | x | x | x |
| Mental Health - Evaluations | 0700 | 1900 | 2 | x | x | x | x | x | x | x |
| Canteen Juvenile | 0730 | 0800 | 1 | | | | | x | | |
| Canteen G | 0800 | 1000 | 1 | x | | | | | | |
| Friday H | 0800 | 1000 | 1 | | | | | x | | |
| Medical - Clinic | 0800 | 1700 | 2 | x | x | x | x | x | | |
| Medical - Infirm Nursing Assess | 0800 | 1000 | 1 | x | x | x | x | x | x | x |
| Medical - Physician Rounds | 0900 | 1200 | 2 | x | x | x | x | x | x | x |
| Meal Lunch | 1100 | 1200 | 3 | x | x | x | x | x | x | x |
| Meds- Afternoon | 1600 | 1700 | 2 | x | x | x | x | x | x | x |
| Medical - Infirm Blood Sugar/Insulin | 1600 | 1700 | 1 | x | x | x | x | x | x | x |
| Meal Supper | 1700 | 1800 | 3 | x | x | x | x | x | x | x |
| Medical - Blood Sugar | 1700 | 1800 | 2 | x | x | x | x | x | x | x |
| SHIFT CHANGE- Count | 1730 | 1900 | 3 | x | x | x | x | x | x | x |
| Meds - Evening  E Pod | 1900 | 2000 | 2 | x | x | x | x | x | x | x |
| Mail | 1900 | 2000 | 1 | x | x | x | x | x | x | x |
| Medical - Infirm Nursing Assess | 1900 | 1000 | 1 | x | x | x | x | x | x | x |
| LOCKDOWN | 2130 | 2230 | 3 | x | x | x | x | x | x | x |

Figure B-2: Intermittent Activities – Programs

*Final Report*          Marion County Jail Staffing Analysis          April 2019          10



Figure B-3: Intermittent Activities- Religion



At first glance, programs and services do not seem to pose significant challenges because they are dispersed throughout the week. But the problem with intermittent activities is that they occur "on top of" the basic 24-hour activities such as supervising inmates and operating central control.

When these extra demands occur, staffing in the facility does not increase. When demand exceeds the supply of staff, something doesn't get done, or get done well. These lapses create serious safety and security threats to staff, inmates, and others who come into the jail.

Figure B-4 shows the programs and religious activities on top of the baseline activities (blue). The graph illustrates that programs and religious activities usually occur that at the worst possible times—when other intermittent activity levels are high.

Figure B-4: Baseline, Program, and Religious Intermittent Activities, Monday through Sunday



The group examined the current activity patterns in detail. They considered moving meal times so that breakfast would not occur at the end of the night shift. Eventually they discarded this idea, noting that the "coverage plan" that will be developed in the next round of work should take care of those needs by proposing a new overlapping shift.

The group concluded that activities should be proactively managed to create a two-hour "time out" between 1100 and 1300 (approximately). During this time, virtually all activities should stop, providing a chance for inmates to have a time out in the housing units, and more important, for staff to get their lunch breaks. The specific timing of this time out will be developed later in the process.

The discussion identified the need to reduce inmate transports within the facility because there are no staff assigned to this function. As a result, staff are pulled from housing units, intake, and other areas to move inmates on demand. This is disruptive and inefficient. In the next round of work the group will look at options to manage inmate transport more efficiently.

They also suggested that all attorney visits should be conducted via video; this would increase safety and reduce transport a great deal. They considered extending this practice to all inmate programs, noting that by networking some programs, inmates from several housing units could participate in a program at the same time without posing classification and separation concerns.

RECOMMENDATIONS:

B1. Aggressively manage activities to reduce log jams and increase efficiency:

B2. Create 2-hour blackout from 1100 to 1300 to allow for breaks

B3. Coordinate timing of all volunteers and outside professionals, ensure they work when it is best for overall operations

B4. Decrease the time it takes to deliver medications, meals, laundry, to inmates in housing.

B5. Use technology to reduce inmate movement and the presence of providers and volunteers inside the jail.

    C.  <u>Steps Three and Four: Drafting and Reviewing the Coverage Plan</u>

The latest edition of the NIC jail staffing analysis identifies three types of hours needed to operate a jail:

***Relieved***.  A relieved post or position is one that is always filled, regardless of which specific employee is used to fill it. A master control post is usually a relieved post. When the employees who are scheduled to work this post do not report for duty, other employees are provided to fill the post (using overtime, part-time employees, or other methods).

***Non-Relieved***.  A non-relieved post or position is one that is not filled when the individual employee assigned to the post/position does not report for duty. A jail administrator would be an example of a non-relieved position; when the administrator does not report for duty, no other employee is assigned to those duties.

***"It Happens."*** Hours required to respond to sporadic events and situations that cannot be predicted. In Marion County the primary examples of staffing hospital posts, transporting inmates for medical treatment in the community, "medical observation" suicide watches, and escorting persons making unscheduled repairs to the facility. When these events happen, they must be staffed, usually taking employees from their other duties.

The third type of hours are new to the staffing analysis process. In some facilities these sporadic events consume as much as 8% of all staffing hours.[1]

This project primarily focussed on relieved posts and positions, the largest category of coverage hours:

- The coverage plan was built in 30-minute increments to ensure accuracy.
- The process of drafting the coverage plan started with a clean slate.
- Hours were added when there was a need, not a "want."
- Coverage began when the need started and ended when the demand receded.
- The mindset was to identify *what is needed- no less, and no more.*

---

[1] A 2013 staffing analysis was implemented by Clint Bowen, who was a Captain at the time, using the 2nd Edition of the NIC staffing texts. "It Happens" had not been added to the process at that time.

Most relieved hours are delivered by certified Detention Deputies (DD), Sergeants (Sgt), and non-certified Detention Assistants (DA). This process identified some functions that are currently non-relieved that should become relieved posts and positions.

The process developed the coverage plan in a series of "layers." The primary layers were analyzed in order:

1. Effectively supervising inmates when they are in their housing units.
2. Supervising inmates when they were in other areas of the facility.
3. Supervising inmates when they a moving within the facility.
4. Providing employee breaks.
5. Supervising employees (first line supervision).

The relieved coverage plan is presented in Appendix B. It is illustrated in Figure C-1, showing the number and types of staff needed in 30-minute increments, Monday through Sunday. The Intermittent Activity graph is shown below coverage to facilitate comparison.

Figure C-1: Relieved Coverage Plan, Monday – Sunday



*Final Report*          Marion County Jail Staffing Analysis          April 2019                    14

The coverage plan addresses employee breaks directly, ensuring that all staff are provided with breaks during their shifts.

Finally, the sporadic events that must be staffed (It Happens) are addressed by adding two relieved DD's to the outside transportation unit, and by recommending that 10% of all coverage hours be provided by approved overtime.

RECOMMENDATIONS:

C1.  Consider using part-time staff where possible.

C2.  Refine coverage plan to reduce "down" time caused by the 12-hour schedule configuration.

C3.  Restore effective continuous first-line supervision of staff.

C4.  Use data ("evidence") to identify precise needs for higher staffing levels in booking, release, master control, internal transport, and similar functions. Start with the minimum level and build up.

C5.  Provide coverage when needed—no less and no more. Coverage should end when the demand ends, rather than being determined by shift configuration.

C6.  Address staff breaks as part of the coverage plan rather than poaching staff and supervisors from their primary duties.

C7.  Reconfigure posts based on coverage plan. Perimeter security should not be assigned to Booking and Release, for example.

C8.  Restore staffing for Booking Corridor and holding cells. Once this area is staffed, movement to and from Golf and C Pod should decrease markedly as short-term detainees are no longer moved into regular housing units.

C9.  Create movement staffing team for main corridor, keep staff in units rather than requiring them to do internal transports.

C10. Assign deputies to accompany civilians to units for the following processes:
     a.  Medications
     b.  Meals
     c.  Laundry pick-up and delivery
     d.  Commissary delivery

C11. Convert some non-relieved positions into relieved positions, for both uniformed and civilian posts.

C12. Add a 24/7 "security" post in the Booking and Release area to continuously supervise all inmates in the area.

C13. Add "administrative" sergeants and possibly other administrative staff to allow sergeants and shift commanders to provide proactive supervision to employees at their posts.

C14. Create a protocol for analyzing the 'It Happens' hours used each year; ensure these hours are requested as overtime in the annual budget.

D. <u>Scheduling, Step 5</u>

The coverage plan is delivered by scheduling individual staff to work specific times and days. Marion County has been creative in its scheduling practices, using alternative schedules to efficiently meet coverage needs. The "front gate" post is a recent example: the post is staffing from 0900 to 2100 daily, corresponding to peak demand.

Most relieved staff are on a 12-hour rotating schedule. Staff are divided into four teams and each pair of teams works on the days off of the other team. Teams rotate from days to nights periodically. As a result, all employees have the same days off.

RECOMMENDATIONS

D1 <u>Primary Schedule</u>. Retain current 12 hour rotating shift configuration unless staff express an interest in alternatives in the future. Considering surveying staff every year to identify their satisfaction with their schedule.

D2 <u>Scheduling Leave</u>. As staffing levels increase and teams are filled, allow staff to schedule more time off on weekends. This will allow employees to use the time off that they have earned, and it will also reduce the number of employees work on weekends, corresponding to the lower coverage levels.

D3 As staffing levels increase, add employees to the four teams up to the number of staff needed to meet night shift coverage levels. Day Shift staffing levels are higher. Deployment should be increased during the hours inmates are awake by strategically adding shifts to correspond to demand. A variety of shift configurations should be used to provide alternatives to the 12-hour shift for employees who would prefer shorter work hours.

D4 Creative scheduling practices should be employed to efficiently increase staffing during peak periods of demand, and reduce supply as demand declines.

E. <u>Net Annual Work Hours (NAWH) Step 6</u>

While employees are scheduled for 2,194 hours annually (12-hour shifts), they will only work scheduled shifts for 1,605 hours. It is important to analyze these "net" hours every year as part of the budget process. This relieved coverage hours on the ground into FTE's (Full Time Equivalent) employees who must be hired and scheduled to implement the coverage plan.

For example, a post that is covered 24/7 requires 8,760 coverage hours (net hours). If NAWH is 1,625[2] hours per employee, the budget should provide for 5.46 FTE's (8,760 divided by 1,625). The coverage hours would be delivered by a combination of full-time employees and overtime hours.

---

[2] The 2013 Staffing Analysis report estimated NAWH for Detention Officers was 1,625.

NAWH changes every year for many reasons. If NAWH is 1,560, the budget must provide 5.62 FTE's for the same post. Figure E-1 summarizes the coverage hours needed to implement the proposed coverage plan. The table:

- Identifies the total annual relieved coverage hours needed for each classification of employee (Column 1)
- Presents the NAWH for each classification of employee (Columns 2)
- Converts annual coverage hours into Full-Time-Equivalent employees (FTE) by dividing coverage hours (1) by NAWH (2)
- Identifies non-relieved positions (Column 4), and
- Provides the total FTE's (Column 3 plus Column 4)

Figure E-1: Total Annual Coverage Courts Converted to FTE's, and Non-Relieved Positions

| Employee Classification | 1. Annual Coverage Hours | 2. NAWH | 3. FTE Relieved | 4. FTE Non-Relieved | 5. Total FTE |
|---|---|---|---|---|---|
| Capt | | | | 4.00 | 4.00 |
| Chap | | | | 1.00 | 1.00 |
| Civilian | | | | 6.00 | 6.00 |
| CS1 | 17,520 | 1,700 | 10.31 | 7.00 | 17.31 |
| CS2 | 8,760 | 1,700 | 5.15 | 0.00 | 5.15 |
| DA | 153,448 | 1,700 | 90.26 | 5.00 | 95.26 |
| Dir | | | | 1.00 | 1.00 |
| DD | 478,228 | 1,625 | 294.29 | 9.00 | 303.29 |
| Invest. | | | | 1.00 | 1.00 |
| Lt | 8,760 | 1,600 | 5.47 | 3.00 | 8.47 |
| Major | | | | 1.00 | 1.00 |
| Sec/Exec Sec | | | | 2.00 | 2.00 |
| Sgt | 63,402 | 1,600 | 39.63 | 5.00 | 44.64 |
| | | | | | |
| | | | | Total | 490.12 |
| | | | | Relieved | 445.12 | 90.8% |
| | | | | Non Rel | 45.00 | 9.2% |

Note that relieved coverage hours comprise 91% of all FTE's required in the proposed coverage plan. This is typical for jails because they operate on a 24/7 basis.

RECOMMENDATIONS

E1  NAWH should be calculated for employees who are assigned to relieved posts, to inform the annual budgeting process.

E2  NAWH should be calculated by employee classification (e.g. DD, DA, Sergeant, etc.)

E3   The number of categories used to calculate NAWH should increase to improve the accuracy of calculations.[3]

E4   Three years of NAWH findings should be used to estimate NAWH for the upcoming budget year.

F.  Budgeting and Personnel (Step 7)

The link between to preceding analysis and annual budgets must be strengthened to ensure that the budget requests all funds necessary to implement the coverage plan. Figure F-1 compares the proposed coverage plan to 2018-2019 budgeted positions.

Figure F-1: Proposed Coverage Plan Compared to Current Budgeted Positions

| Employee Classification | FY 2018-19 Budgeted FTE (3 Pods Closed) | Proposed FTE- (All Pods Open) |
|---|---|---|
| Major | 1 | 1.00 |
| Secretary/Exec Sec | 2 | 2.00 |
| Chaplain | 1 | 1.00 |
| Program Service Dir. | 1 | 1.00 |
| Captains | 4 | 4.00 |
| Lieutenants | 7 | 8.47 |
| Sergeants | 21 | 44.64 |
| Civilian | 9 | 6.00 |
| Investigator | 0 | 1.00 |
| Detention Deputies | 160 | 303.29 |
| Detention Assistants | 65 | 95.26 |
| Classifications Specialists | 16 | 22.46 |
|  |  |  |
| **A. Authorized Pos.** | **287** | **440.52** |
| B. Overtime Equivalent FTE | 19 | 49.6 |
| C. TOTAL FTEs (A + B)) | 306 | **490.12** |

---

[3] More information and sample NAWH lists may be found at www.correction.org.

*Final Report*          Marion County Jail Staffing Analysis          April 2019          18

The proposed coverage plan requires 182.12 more FTE's than the current budgeted level (59.5% more).

Note that Figure F1- identifies FTE's that should be provided as overtime rather than hiring more employees.

The proposed coverage plan provides for all housing pods to be operated (occupied). Currently three pods are closed (B, D, F). Figure F-2 describes the number of FTE employees needed to operate each pod.[4]

Figure F-2: FTE's Needed to Operate Each Pod

| INMATE HOUSING | DD FTE | DA FTE | TOTAL FTE |
|---|---|---|---|
| Pod A | 32.34 | 10.31 | **42.65** |
| Pod B | 14.37 | 10.31 | **24.68** |
| Pod C | 18.87 | 10.31 | **29.17** |
| Pod D | 14.37 | 10.31 | **24.68** |
| Pod E | 14.37 | 2.58 | **16.95** |
| Pod F | 14.37 | 2.58 | **16.95** |
| Pod G | 14.37 | 0.00 | **14.37** |
| Pod H | 14.37 | 0.00 | **14.37** |
| Juvenile | 10.78 | 0.00 | **10.78** |
| Medical Pod | 26.95 | 0.00 | **26.95** |
| Infirmary | 10.78 | 0.00 | **10.78** |

When staffing for the three closed units is subtracted, the proposed coverage plan requires 423.82 FTEs compared to the current budgeted 306 FTEs (a 38.5% increase.)

RECOMMENDATIONS

F1  Sheriff's personnel should work with the County's budget officials to explain the staffing analysis process and findings, connecting the hours needed on the ground to the funds requested in the budget.

F2  The use of compensatory time should be phased out within three years.

---

[4] Only the staff needed to operate a pod are included. Closing a pod would also reduce overall staffing needs (movement, delivery of programs and services, etc.).

F3  Overtime should be funded to the level requested by the Sheriff. This may comprise as much as 10% of all employee hours. In moderation, overtime is an efficient way to address staffing shortfalls on a day-to-day basis.

F4   Expand and diversify recruiting efforts, including prospective employees who are not planning to use jail employment as a step toward law enforcement certification.

F5  Reduce attrition by improving working conditions, providing competitive salaries, and offering alternative schedules.

F6  Create step increases for DA's, similar to those provided to uniformed staff. Encourage all staff to stay with the agency.

F7  Expand "specialty" designations and pay premiums for DA's, as needed, to attract and retain qualified staff.

## III. IMPLEMENTATION

The recommendations and coverage plan described in this report should be used as a "Master Plan" to guide efforts over the next three years.

A work plan should be developed to organize and direct all of the activities needed to implement the plan. The plan should be reviewed annually, and revised as needed.

## IV. ASSEMBLED RECOMMENDATIONS

A1. Safely reduce jail occupancy by working with criminal justice officials to develop alternatives to jail and to implement new policies and practices.

A2.  Decrease time it takes for medications, meals, laundry, and similar activities.

A3.   Restore decentralized operations wherever possible (bring materials, services, and programs to inmates in their housing units.)

A4.   Expand the use of digital and other forms of technology:

    a.  Increase use of video for attorney visits.
    b.  Use video for religious services, AA, and similar group activities—allow two-way interaction, conduct programs and services one time in multiple pods rather than repeating in each unit.
    c.  Refine "Beacon" to reduce paperwork and redundant entry of information.
    d.  Consider using inmate bar code to increase documentation and reduce staff time.
    e.  Use motion detection, sound, and other capabilities of current "smart" cameras to increase return on investment and improve security.

    f.   Increase the use of video cameras for "detection" using computer-based active monitoring software.

    g.   Consider implementing "active" video monitoring.

    h.   Increase review of digital video recordings (DVR) during times of low activity.

    i.   Examine ways to use video to reduce staffing of some of the towers.

A5.   Improve the quality of inmate supervision in housing units. Personally view every inmate at least hourly, or more frequently as policies require. These health and welfare checks should involve interaction with inmates during waking hours, and should ensure that officers seek out all inmates to ascertain their condition. Supervision is face-to-face.

A6.   Revise policies and procedures to authorize supervisors to reduce demand to match actual supply on a shift. Specify the actions that may be implemented in order of priority.

A7.   Explore the use of inmate behavior management strategies to promote positive inmate behavior through the use of incentives.

A8.   Reduce the practice of housing inmates in dayrooms (old facility) whenever possible.

A9.   Improve the frequency and quality of security practices such as searches and shakedowns.

B1.   Aggressively manage activities to reduce log jams and increase efficiency:

B2.   Create 2-hour blackout from 1100 to 1300 to allow for breaks

B3.   Coordinate timing of all volunteers and outside professionals, ensure they work when it is best for overall operations

B4.   Decrease the time it takes to deliver medications, meals, laundry, to inmates in housing.

B5.   Use technology to reduce inmate movement and the presence of providers and volunteers inside the jail.

C1.   Consider using part-time staff where possible.

C2.   Refine coverage plan to reduce "down" time caused by the 12-hour schedule configuration.

C3.   Restore effective continuous first-line supervision of staff.

C4.   Use data ("evidence") to identify precise needs for higher staffing levels in booking, release, master control, internal transport, and similar functions. Start with the minimum level and build up.

C5.   Provide coverage when needed—no less and no more. Coverage should end when the demand ends, rather than being determined by shift configuration.

C6.   Address staff breaks as part of the coverage plan rather than poaching staff and supervisors from their primary duties.

C7.   Reconfigure posts based on coverage plan. Perimeter security should not be assigned to Booking and Release, for example.

C8.  Restore staffing for Booking Corridor and holding cells. Once this area is staffed, movement to and from Golf and C Pod should decrease markedly as short-term detainees are no longer moved into regular housing units.

C9.  Create movement staffing team for main corridor, keep staff in units rather than requiring them to do internal transports.

C10. Assign deputies to accompany civilians to units for the following processes:
   a.  Medications
   b.  Meals
   c.  Laundry pick-up and delivery
   d.  Commissary delivery

C11. Convert some non-relieved positions into relieved positions, for both uniformed and civilian posts.

C12. Add a 24/7 "security" post in the Booking and Release area to continuously supervise all inmates in the area.

C13. Add "administrative" sergeants and possibly other administrative staff to allow sergeants and shift commanders to provide proactive supervision to employees at their posts.

C14. Create a protocol for analyzing the 'It Happens' hours used each year; ensure these hours are requested as overtime in the annual budget.


D1  <u>Primary Schedule</u>. Retain current 12 hour rotating shift configuration unless staff express an interest in alternatives in the future. Considering surveying staff every year to identify their satisfaction with their schedule.

D2  <u>Scheduling Leave</u>. As staffing levels increase and teams are filled, allow staff to schedule more time off on weekends. This will allow employees to use the time off that they have earned, and it will also reduce the number of employees work on weekends, corresponding to the lower coverage levels.

D3  As staffing levels increase, add employees to the four teams up to the number of staff needed to meet night shift coverage levels. Day Shift staffing levels are higher. Deployment should be increased during the hours inmates are awake by strategically adding shifts to correspond to demand. A variety of shift configurations should be used to provide alternatives to the 12-hour shift for employees who would prefer shorter work hours.

D4  Creative scheduling practices should be employed to efficiently increase staffing during peak periods of demand, and reduce supply as demand declines.


E1  NAWH should be calculated for employees who are assigned to relieved posts, to inform the annual budgeting process.

E2  NAWH should be calculated by employee classification (e.g.  DD, DA, Sergeant, etc.)

E3   The number of categories used to calculate NAWH should increase to improve the accuracy of calculations.[5]

E4   Three years of NAWH findings should be used to estimate NAWH for the upcoming budget year.

F1   Sheriff's personnel should work with the County's budget officials to explain the staffing analysis process and findings, connecting the hours needed on the ground to the funds requested in the budget.

F2   The use of compensatory time should be phased out within three years.

F3   Overtime should be funded to the level requested by the Sheriff. This may comprise as much as 10% of all employee hours. In moderation, overtime is an efficient way to address staffing shortfalls on a day-to-day basis.

F4   Expand and diversify recruiting efforts, including prospective employees who are not planning to use jail employment as a step toward law enforcement certification.

F5   Reduce attrition by improving working conditions, providing competitive salaries, and offering alternative schedules.

F6   Create step increases for DA's, similar to those provided to uniformed staff. Encourage all staff to stay with the agency.

F7   Expand "specialty" designations and pay premiums for DA's, as needed, to attract and retain qualified staff.

=======================================================================

Appendix A: Notes from First Meetings

Appendix B: Proposed Coverage Plan

---

[5] More information and sample NAWH lists may be found at www.correction.org.

APPENDIX A: Notes from First Meetings

*Marion County Jail Staffing Analysis*

Ocala, Florida

February 12-13, 2019

Sheriff Woods has contracted with CRS, a non-profit organization based in Gettysburg, Pennsylvania, to conduct a jail staffing analysis. Rod Miller, who founded CRS in 1972, is working with jail officials and staff to implement the analysis. The staffing analysis methodology developed by the National Institute of Corrections (NIC) is guiding the process. The latest staffing book, tools, and sample reports may be downloaded at www.correction.org.

This is the first of two reports that are being provided to all jail staff. It is a draft summary of the first two days of meetings (February 12, 13). Staff are asked to review this document and to share their thoughts with the consultant via email, prior to the next round of meetings.

Process

The NIC methodology demands a great deal of participation from local officials and staff. This is being accomplished by full-day sessions with a small "working group" of eight employees:

- Vicki Christman, Master Sgt.
- Kristin Johnson, Internal Affairs
- Matt McNeely, Lt./Watch Commander
- Bryan Nix, Lt. Facilities
- Brian Peterson, Sgt. Classifications
- Galen Priest, Lt./Watch Commander
- Annette Pritchett, Lt./Kitchen
- Awilda Santos, Cpl, DR Hearing Officer

Attachment 1 presents the power point slides that were used during the two days. The slides explain the NIC methodology in more detail.

The project will focus on the first four steps of the NIC process, as well as Step 6, which improves the math that converts hours on the ground into budget requests. The first two steps were the focus of the recent meetings.

Step One: <u>Analyzing the "Context"</u>

This step sets the stage for the overall process. It requires assembling information and insights about the current jail facility, operations, and inmates. This information guides the analysis, and also provides persons who are not familiar with the jail to gain a better understanding of the challenges that staff face every day. The county commissioners will use this information to help them understand the jail's staffing needs.

Working group participants were asked to identify their *concerns* at the start of the first meeting. Their responses were recorded on flipcharts by the consultant (who has poor penmanship). Photos of these pages are provided in Attachment 2.

<u>Concerns</u> included:

- Officer safety
- "Relief Factor" lack of accuracy
- Critical incidents
- Thoroughness- doing things *right*
- Stress
- Retention
- Cumulative experience on the floor
- Function of the sergeant- 1st line supervisor, response management
- Paperwork
- Expectation vs. reality
- "Distractions" in pods—meals, meds, laundry, etc.
- Inmates know we're short
- Say "no" if we can't do it safely
- Lack of consistency
- Taking shortcuts
- Training only on days off
- Response capabilities
- Preparing staff to do the job
- Transport (escort in jail) – never really staffed at all
- Contracted transport (external) – quality
- Need higher "level" of D.A.'s in some places
- "Trickle down" cumulates
- Less cross training now
- FTO's – harder to implement now

Participants were asked to identify *changes* in the "context" of the jail since 2007, when the jail was expanded. Their responses are provided in Attachment 2.

<u>Changes</u> included:

FACILITY
- Facility—doubled in size
- Housing in dorms [not celled units]
- Corridors- distance
- Length of entrance corridor to pods
- Condition [of facility and its systems]
- Older issues less (the celled facility has less issues)
- Older more secure (cells facility more secure)
- Layout of complex- long distances
- No "gates" on main corridors between each end of the facility [Rod's issue]
- "Protection in depth" [facility lacks multiple features that combine to ensure security]

TECHNOLOGY
- Alpha sliders ↓ [deteriorating]
- Cameras ↑ [improved]
- Drones- may help with exterior security
- PREA – manipulating level of vigilance

INMATES
- Medical [more needs]
- Mental health [more needs]
- Intake/booking [takes longer]
- Drugs/substance abuse [more issues]  NARCAN [Naloxone]
- Gangs (separate) [more demands to keep separate]
- Violent
- "Entitled"

Step One Summary

Participants identified many characteristics of current operations. Very few items in the preceding list makes operating the jail easier; most pose additional challenges to staff.

Prior to the first site visit, jail officials send a great deal of information and data to the consultant. This will also be used to paint a meaningful picture of jail operations for the county commissioners and others who are not familiar with day-to-day operations.
<u>Step Two</u>: <u>Analyzing Intermittent Activities</u>

This step looks at the many events that occur each week, in an effort to find ways to "work smarter" by taking control of these activities. The starting point is to identify the major activities and their timing. Attachment 3 presents a list of "baseline" activities such as shift change, meals, and medications. Inmate

programs were assembled in another list by time and day; religious programs and activities comprised the third list.

Figure 1 presents a graph of activity levels, by half hour increments, from Monday through Sunday. It illustrates the peaks and valleys of demand in current daily operations.

Figure 1: Intermittent Activities, Monday through Sunday



The problem with intermittent activities as that they occur "on top of" the basic 24-hour activities such as supervising inmates and operating central control. When these extra demands occur, staffing in the facility does not increase. The result--- something doesn't get done, or get done well.

The group examined the current activity patterns in detail. They considered moving meal times so that breakfast would not occur at the end of the night shift. Eventually they discarded this idea, noting that the "coverage plan" that will be developed in the next round of work should take care of those needs by proposed a new overlapping shift.

The group concluded that activities should be proactively managed to create a two-hour "time out" between 1100 and 1300 (approximately). During this time, virtually all activities should stop, providing a chance to inmates to have a time out in the housing units, and more important, for staff to get their lunch breaks. The specific timing of this time out will be developed later in the process.

The discussion identified the need to reduce inmate transports within the facility because there are no staff assigned to this function. As a result, staff are pulled from housing units, intake, and other areas to move inmates on demand. This is disruptive and inefficient. In the next round of work the group will look at options to manage inmate transport more efficiently.

They also suggested that all attorney visits should be conducted via video; this would increase safety and reduce transport a great deal. They considered extending this practice to all inmate programs, noting that by networking some programs, inmates from several housing units could participate in a program at the same time without posing classification and separation concerns.

More changes in daily operations will be considered in the next round of work. The group hopes to receive a lot of ideas from staff when these notes are circulated.

<u>Next Steps</u>

These notes will be distributed to all staff along with a request for comments and suggestions. The response will be assembled prior to the next round of work, and will be part of the Working Group's agenda.

The next meetings will be held on March 5 and 6. Notes and recommendations from those meetings will be distributed to all staff.

APPENDIX B: COVERAGE PLAN, TOTAL HOURS, FTE's

**Detailed Proposed Coverage Plan**

| Post/Position | Employee Classif. | Start Hr | End Hr | Hrs/Day | Days/Wk | Relieved Y/N |
|---|---|---|---|---|---|---|
| **INMATE HOUSING** | | | | | | |
| Pod A Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod A Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod A Rover 3 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod A Rover 4 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod A Rover 5 | DD | 0000 | 2400 | 24 | 7 | Y |
| Hsg Pod A/E Rover | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod A Control Rm 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod A Control Rm 2 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod B Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod B Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod B Rover 3 | DD | 0600 | 2200 | 16 | 7 | Y |
| Pod B Control Rm 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod B Control Rm 2 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod C Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod C Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod C Rover 3 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod C Rover 4 | DD | 0900 | 2100 | 12 | 7 | Y |
| Pod C Control Rm 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod C Control Rm 2 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod D Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod D Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod D Rover 3 | DD | 0600 | 2200 | 16 | 7 | Y |
| Pod D Control Rm 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod D Control Rm 2 | DA | 0000 | 2400 | 24 | 7 | Y |
| Pod E Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod E Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod E Rover 3 | DD | 0600 | 2200 | 16 | 7 | Y |
| Pod F Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod F Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod F Rover 3 | DD | 0600 | 2200 | 16 | 7 | Y |
| E/F/ Control Rm 1 | DA | 0000 | 2400 | 24 | 7 | Y |

Appendix B: Coverage Plan      Marion County Jail Staffing Analysis      April 2019      B-2

| Post/Position | Employee Classif. | Start Hr | End Hr | Hrs/Day | Days/Wk | Relieved Y/N |
|---|---|---|---|---|---|---|
| Pod G Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod G Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod G Rover 3 | DD | 0600 | 2200 | 16 | 7 | Y |
| Pod H Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod H Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Pod H Rover 3 | DD | 0600 | 2200 | 16 | 7 | Y |
| Juvenile Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Juvenile Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| MEDICAL | | | | | | |
| Medical Pod Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Medical Pod Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Medical Pod Rover 3 | DD | 0000 | 2400 | 24 | 7 | Y |
| S/P Female Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| S/P Male Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Infirmary Rover 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Infirmary Rover 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Medical Clinic Rover 1 | DD | 0800 | 1700 | 8 | 5 | N |
| Medical Contract Monitor | Civ | 0800 | 1700 | 8 | 5 | N |
| INTAKE/ BOOKING/ RELEASE | | | | | | |
| Intake Control 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Booking Asst 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Booking Asst 2 | DA | 0000 | 2400 | 24 | 7 | Y |
| Property Ofc 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| Property Ofc 2 | DA | 2000 | 600 | 10 | 6 | Y |
| Property Specialist | Civ | 0800 | 1700 | 8 | 5 | N |
| Intake/Booking Off 1 | DD | 0000 | 2400 | 24 | 7 | Y |
| Intake/Booking Off 2 | DD | 0000 | 2400 | 24 | 7 | Y |
| Intake/Booking Off 3 | DD | 0000 | 2400 | 24 | 7 | Y |
| Intake/Booking Off 4 | DD | 0000 | 2400 | 24 | 7 | Y |
| Intake/Booking Off 5 | DD | 1200 | 2400 | 12 | 7 | Y |
| Intake Housing Off 1 (Booking Corridor | DD | 0000 | 2400 | 24 | 7 | Y |
| Intake Housing Off 2 (Booking Corridor | DD | 0000 | 2400 | 24 | 7 | Y |

| Post/Position | Employee Classif. | Start Hr | End Hr | Hrs/Day | Days/Wk | Relieved Y/N |
|---|---|---|---|---|---|---|
| CLASSIFICATION | | | | | | |
| Classification Supv 1 | Lt | 0800 | 1700 | 8 | 5 | N |
| Classification Supv 2 | Sgt | 0800 | 1700 | 8 | 5 | N |
| Clasiffication Supv 3 | Sgt | 1100 | 2000 | 8 | 5 | N |
| Classif. Spec 1 - 1 | CS1 | 0000 | 2400 | 24 | 7 | Y |
| Classif. Spec 1 - 2 | CS1 | 0000 | 2400 | 24 | 7 | Y |
| Classif. Spec 2 - 1 | CS2 | 0000 | 2400 | 24 | 7 | Y |
| Admin Classification 1 | CS | 0800 | 1700 | 8 | 5 | N |
| Admin Classification 2 | CS | 0800 | 1700 | 8 | 5 | N |
| Admin Classification 3 | CS | 0800 | 1700 | 8 | 5 | N |
| Admin Classification 4 | CS | 0800 | 1700 | 8 | 5 | N |
| Admin Classification 5 | CS | 0800 | 1700 | 8 | 5 | N |
| Admin Classification 6 | CS | 0800 | 1700 | 8 | 5 | N |
| Admin Classification 7 | CS | 0800 | 1700 | 8 | 5 | N |
| INMATE PROGRAMS AND SERVICES | | | | | | |
| Inmate Prog Supv | Dir | 0700 | 1800 | 10 | 4 | N |
| Inmate Service Sup | Lt | 0700 | 1800 | 10 | 4 | N |
| Inmate Visitation Offc 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| *Inmate Visitation Offc 2 (Days)* | DA | 0900 | 2100 | 12 | 5 | Y |
| Uniform Sewing Ofc 1 | DA | 0700 | 1600 | 8 | 5 | N |
| Laundry Ofc 1 | DD | 0700 | 1600 | 8 | 5 | Y |
| Laundry Ofc 2 | DD | 0700 | 1600 | 8 | 5 | Y |
| Kitchen Supv 1 | Lt | 0800 | 1700 | 8 | 5 | N |
| Kitchen Supv 2 | Sgt | 0800 | 1700 | 8 | 5 | N |
| Kitchen Off 1 | DD | 0130 | 1330 | 12 | 7 | Y |
| Kitchen Off 2 | DD | 0600 | 1800 | 12 | 7 | Y |
| Kitchen Off 3 | DD | 0900 | 2100 | 12 | 7 | Y |
| Bakery Ofc | DA | 0700 | 1600 | 8 | 5 | Y |
| Staff Dining Nights Only | DD | 0800 | 2000 | 12 | 7 | Y |
| Kitchen Warehouse | DA | 0800 | 1700 | 8 | 5 | N |
| Culinary Arts Instructor | Civ | 0800 | 1700 | 8 | 5 | N |
| Inmate Mail Off 1 | DA | 0700 | 1800 | 10 | 4 | N |
| Inmate Law Library Off | DA | 0700 | 1800 | 8 | 5 | N |
| Chaplain 1 | Chap | 0800 | 1700 | 8 | 5 | N |

Appendix B: Coverage Plan    Marion County Jail Staffing Analysis    April 2019    B-4

| Post/Position | Employee Classif. | Start Hr | End Hr | Hrs/Day | Days/Wk | Relieved Y/N |
|---|---|---|---|---|---|---|
| PREA Coordinator | Civ | 0800 | 1700 | 8 | 5 | N |
| ESCORT MEDS, MEALS, and PROVIDE BREAKS | | | | | | |
| *Meds/Meals/Breaks 1* | DD | 0400 | 2000 | 16 | 7 | Y |
| *Meds/Meals/Breaks 2* | DD | 0600 | 2200 | 16 | 7 | Y |
| *Meds/Meals/Breaks 3* | DD | 0600 | 2200 | 16 | 7 | Y |
| *Meds/Meals/Breaks 4* | DD | 0700 | 2300 | 16 | 7 | Y |
| **INMATE WORK** | | | | | | |
| Inmate Wrkr Off | DA | 0800 | 1700 | 8 | 5 | N |
| Work Crew Ofc 1 | DD | 0700 | 1500 | 8 | 5 | Y |
| Work Crew Ofc 2 | DD | 0700 | 1500 | 8 | 5 | Y |
| Work Crew Ofc 3 | DA | 0700 | 1500 | 8 | 5 | Y |
| Work Crew Ofc 4 | DA | 0700 | 1500 | 8 | 5 | Y |
| Work Crew Ofc 5 | DA | 0700 | 1500 | 8 | 5 | Y |
| Work Crew Ofc 6 | DA | 0700 | 1500 | 8 | 5 | Y |
| Litter Control Ofc 1 | DA | 0700 | 1500 | 8 | 5 | Y |
| **FARM** | | | | | | |
| Inmate Farm Supv | Sgt | 0700 | 1600 | 8 | 5 | Y |
| Inmate Farm Off 1 | DD | 0700 | 1700 | 10 | 4 | Y |
| Inmate Farm Off 2 | DD | 0700 | 1700 | 10 | 4 | Y |
| Inmate Farm Off 3 | DD | 0700 | 1600 | 8 | 5 | Y |
| Inmate Farm Off 4 | DD | 0700 | 1600 | 8 | 5 | Y |
| Agricultural Technician | Civ | 0800 | 1700 | 8 | 5 | N |
| SECURITY | | | | | | |
| Front Gate | DD | 0900 | 2100 | 12 | 7 | Y |
| Master Control 1 | DA | 0000 | 2400 | 24 | 7 | Y |
| *Master Control 2* | DA | 1300 | 2200 | 9 | 7 | Y |
| *Perimeter Security, Random Searches* | DD | 0000 | 2400 | 24 | 7 | Y |
| *Maintenance Escort/Security 1* | DD | 0730 | 1630 | 8 | 5 | Y |
| *Maintenance Escort/Security 2* | DD | 0730 | 1630 | 8 | 5 | Y |
| *Maintenance Escort/Security 3* | DD | 0730 | 1630 | 8 | 5 | Y |
| *Maintenance Escort/Security 4* | DD | 0730 | 1630 | 8 | 5 | Y |

Appendix B: Coverage Plan     Marion County Jail Staffing Analysis     April 2019     B-5

| Post/Position | Employee Classif. | Start Hr | End Hr | Hrs/Day | Days/Wk | Relieved Y/N |
|---|---|---|---|---|---|---|
| Admin Sec Ofc | DD | 0800 | 1700 | 8 | 5 | Y |
| Fire/Safety/Sanitation | DD | 0700 | 1500 | 8 | 5 | N |
| Jail Investigator | Inv | 0800 | 1700 | 8 | 5 | N |
| **INMATE MOVEMENT** | | | | | | |
| *Inmate Movement (Inside) 1* | DD | 0000 | 2400 | 24 | 7 | Y |
| *Inmate Movement (Inside) 2* | DD | 0000 | 2400 | 24 | 7 | Y |
| *Inmate Movement (Inside) 3* | DD | 0000 | 2400 | 24 | 7 | Y |
| *Inmate Movement (Inside) 4* | DD | 0400 | 2000 | 16 | 7 | Y |
| *Inmate Movement (Inside) 5* | DD | 0800 | 2400 | 16 | 7 | Y |
| **STAFF FIRST-LINE SUPERVISION** | | | | | | |
| Housing Supervisor 1 | Sgt | 0000 | 2400 | 24 | 7 | Y |
| Housing Supervisor 2 | Sgt | 0000 | 2400 | 24 | 7 | Y |
| Housing Supervisor 3 | Sgt | 0000 | 2400 | 24 | 7 | Y |
| Housing Supervisor 3 | Sgt | 0000 | 2400 | 24 | 7 | Y |
| Intake/Booking Supv | Sgt | 0000 | 2400 | 24 | 7 | Y |
| Admin Sgt 1 | Sgt | 0000 | 2400 | 24 | 7 | Y |
| Admin Sgt 2 | Sgt | 0000 | 2400 | 24 | 7 | Y |
| **COMMAND** | | | | | | |
| Jail Administrator | Major | 0800 | 1700 | 8 | 5 | N |
| Division Commander 1 | Capt | 0800 | 1700 | 8 | 5 | N |
| Division Commander 2 | Capt | 0800 | 1700 | 8 | 5 | N |
| A Platoon Commander | Capt | 0800 | 1700 | 8 | 5 | N |
| B  Platoon Commander | Capt | 0800 | 1700 | 8 | 5 | N |
| Watch Commander 1 | Lt | 0600 | 1800 | 12 | 3.5 | Y |
| Watch Commander 2 | Lt | 0600 | 1800 | 12 | 3.5 | Y |
| Watch Commander 3 | Lt | 1800 | 0600 | 12 | 3.5 | Y |
| Watch Commander 4 | Lt | 1800 | 0600 | 12 | 3.5 | Y |
| **INMATE TRANSPORT (Outside)** | | | | | | |
| Transport 1 | DD | 0600 | 1500 | 8 | 5 | N |
| Transport 2 | DD | 0600 | 1500 | 8 | 5 | N |

| Post/Position | Employee Classif. | Start Hr | End Hr | Hrs/Day | Days/Wk | Relieved Y/N |
|---|---|---|---|---|---|---|
| Transport 3 | DD | 0700 | 1600 | 8 | 5 | N |
| Transport 4 | DD | 0700 | 1600 | 8 | 5 | N |
| Transport 5 | DD | 0700 | 1600 | 8 | 5 | N |
| Transport 6 | DD | 0800 | 1700 | 8 | 5 | N |
| Transport 7 | DD | 0800 | 1700 | 8 | 5 | N |
| Supervisor | Sgt | 0800 | 1700 | 8 | 5 | N |
| OTHER | | | | | | |
| Training Supv | Sgt | 0800 | 1700 | 8 | 5 | N |
| Facilities Maint. Tech | Civ | 0800 | 1700 | 8 | 5 | N |
| Admin Sec | Sec | 0800 | 1700 | 8 | 5 | N |

**Proposed Coverage Plan Totals and Conversion to FTEs**

| Employee Classification | 1. Annual Coverage Hours | 2. NAWH | 3. FTE Relieved | 4. FTE Non-Relieved | 5. Total FTE | |
|---|---|---|---|---|---|---|
| Capt | | | | 4.00 | 4.00 | |
| Chap | | | | 1.00 | 1.00 | |
| Civilian | | | | 6.00 | 6.00 | |
| CS1 | 17,520 | 1,700 | 10.31 | 7.00 | 17.31 | |
| CS2 | 8,760 | 1,700 | 5.15 | 0.00 | 5.15 | |
| DA | 153,448 | 1,700 | 90.26 | 5.00 | 95.26 | |
| Dir | | | | 1.00 | 1.00 | |
| DD | 478,228 | 1,625 | 294.29 | 9.00 | 305.29 | |
| Invest. | | | | 1.00 | 1.00 | |
| Lt | 8,760 | 1,600 | 5.47 | 3.00 | 8.47 | |
| Major | | | | 1.00 | 1.00 | |
| Sec/Exec Sec | | | | 2.00 | 2.00 | |
| Sgt | 63,402 | 1,600 | 39.63 | 5.00 | 44.63 | |
| | | | | | | |
| | | | | Total | 490.12 | |
| | | | | Relieved | 445.12 | 90.8% |
| | | | | Non Rel | 45.00 | 9.2% |

## FTE Employees to Staff Each Housing Pod (Relieved)

| INMATE HOUSING | DD FTE | DA FTE | TOTAL FTE |
|---|---|---|---|
| Pod A | 32.34 | 10.31 | **42.65** |
| Pod B | 14.37 | 10.31 | **24.68** |
| Pod C | 18.87 | 10.31 | **29.17** |
| Pod D | 14.37 | 10.31 | **24.68** |
| Pod E | 14.37 | 2.58 | **16.95** |
| Pod F | 14.37 | 2.58 | **16.95** |
| Pod G | 14.37 | 0.00 | **14.37** |
| Pod H | 14.37 | 0.00 | **14.37** |
| Juvenile | 10.78 | 0.00 | **10.78** |
| Medical Pod | 26.95 | 0.00 | **26.95** |
| Infirmary | 10.78 | 0.00 | **10.78** |