## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

KRYSTI MERCHANT, as Personal
Representative for the Estate of
Cory Merchant, Deceased,

     Plaintiff,

v.
                           Case No. 5:23-cv-00661
                           **DISPOSITIVE MOTION**

BILLY WOODS, Sheriff of Marion
County, Florida, in his official
Capacity; Deputy JUSTIN KOSINSKI;
Deputy DELLUN MILLER; Sergeant
JEROME DUKES;

     Defendants.

_____/

### DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Defendants, BILLY WOODS, Sheriff of Marion County, Florida, in his official Capacity ("**Sheriff Woods**"), Deputy JUSTIN KOSINSKI ("**Kosinski**"), Deputy DELLUN MILLER ("**Miller**"), and Sergeant JEROME DUKES ("**Dukes**") (collectively **"Defendants"**), by and through their undersigned attorneys, pursuant to Rule 56, Fed. R. Civ. P., hereby file their Reply to Plaintiff's Response to Defendants' Motions for Summary Judgment, and state:

### INTRODUCTION

Plaintiff, KRYSTI MERCHANT, as Personal Representative for the Estate of

1

Cory Merchant, Deceased ("**Plaintiff**"), filed her First Amended Complaint (Doc. 20) against Defendants seeking damages under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment to the United States Constitution, and under Florida law for wrongful death negligence. (Doc. 20). Plaintiff claimed that Defendants, individually (Kosinki, Miller, Dukes), and in his official capacity (Sheriff Woods), violated Cory Merchant's ("**Merchant**") constitutional rights and committed negligence under Florida law during Merchant's confinement inside the Marion County Jail after Eric Lutterloah ("**Lutterloah**"), another pretrial detainee, punched Merchant, which caused him to fall to the ground, strike his head, lose consciousness, and eventually pass away at a local hospital in Ocala, Florida. Each of the Defendants moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P. (Doc. 47 [Dukes], Doc. 48 [Kosinski and Miller], Doc. 49 [Sheriff Woods]).

The individual Defendants asserted that based on the record evidence their alleged acts or omissions did not violate any of Merchant's constitutional rights or clearly established law, and assuming *arguendo* that their acts or omissions did, the individual Defendants did not act with "deliberate indifference" or cause Lutterloah to assault Merchant. Thus, each was entitled to qualified immunity. *See, e.g. Goodman v. Kimbrough*, 718 F.3d 1325 (11th Cir. 2014) ("[t]o survive summary judgment in a case alleging deliberate indifference, a plaintiff must

produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.") (citation omitted).   The individual Defendants further asserted that they exercised reasonable care under Florida law and even assuming *arguendo* that their acts or omissions were negligent, the record evidence did not support the claim that each "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  *See* § 768.28(9)(a), Fla. Stat.  Thus, the individual Defendants were entitled to summary judgment as a matter of law.

Sheriff Woods argued that notwithstanding the individual Defendants' entitlement to qualified immunity, no custom or policy of Sheriff Woods was the "moving force" behind any alleged constitutional violation.  *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.").  Sheriff Woods further asserted that under Florida law, the individual Defendants exercised reasonable care to protect the inmates, including Merchant, inside the Marion County Jail, and, even assuming a breach of this duty, Lutterloah's unexpected assault on Merchant was not a reasonably foreseeable

consequence of any Defendants' alleged negligent acts or omissions.  *See Spann v. State, Department of Corrections*, 421 So. 2d 1090, 1092 (Fla. 4th DCA 1982).

In response to these arguments, at summary judgment, Plaintiff has abandoned her all of her claims against the individual Defendants and her Florida negligence claim against Sheriff Woods.[1]  Doc. 62, p. 48 ("Here, Plaintiff's claim hinges on *systemic deficiencies* at MCJ, specifically the policy that the jail abandon [sic] any classification regime for accused sex offenders and the policies and practices related to insufficient staff presence, monitoring, and surveillance, all of which occurred in the foreground of a particularly violent jail.").  Although Sheriff Woods argued in his summary judgment motion that the alleged conditions inside the jail that Plaintiff contended constituted "deliberate indifference" to a "substantial risk of serious harm" were not sufficient to hold him liable under § 1983, Plaintiff devoted substantially more amount of space to the subject given

---

[1] The Eleventh Circuit instructs that "[w]hen a party moves for final, not partial, summary judgment, . . . 'it [becomes] incumbent upon the [nonmovant] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in [the moving party's] favor.'"  *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (third, fourth and fifth alteration in original) (*quoting Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001)).  "Failure to do so may result in waiver or abandonment of the issue."  *Id.* Thus, a plaintiff cannot rely on facts contained in the complaint, but must counter the defendant's factual showing by raising genuine issues of material fact.  *Id.* (*citing Hutton v. Strickland*, 919 F.2d 1531, 1536-37 (11th Cir. 1990)); *see also Schwarz v. Vills. Charter Sch., Inc.*, Case No. 5:12-cv-177-Oc-34PRL, 2016 U.S. Dist. LEXIS 24432 (M.D. Fla. Feb. 29, 2016) (finding that the plaintiff abandoned certain claims by failing to argue them in their response to the defendant's summary judgment motion).  Here, based on Plaintiff's Omnibus Response, Plaintiff has affirmatively and unequivocally abandoned her claims by failing to address any of the individual Defendants' Motions for Summary Judgment or Sheriff Woods' argument for summary judgment on the Florida law negligence claim.

Sheriff's Woods' page limitation and his focus on the other claims alleged in the Plaintiff's lengthy First Amended Complaint.   Despite Plaintiff's extended Response, and its resulting circumcision to the case, Plaintiff's claim that Sheriff Woods abandoned his "classification-and-segregation policy" in "Gulf-Alpha"[2] lacks factual support in the record and mischaracterizes key testimony.   Further, even assuming that Sheriff Woods' policy confined Lutterloah and Merchant in the same, dormitory-style housing section with other inmates charged with felony sex offenses, neither this, nor in combination with Plaintiff's other "systemic deficiencies," created a "substantial risk of serious harm" to Merchant, or any other inmate inside Gulf-Alpha. Nor did Sheriff Woods act with "deliberate indifference" to any substantial risk of harm by confining Lutterloah and Merchant together, or with other persons charged with felony sex offenses.   Thus, as argued herein and in their original Motions for Summary Judgment, Defendants are entitled to final summary judgment as a matter of law on Counts I, II, III, and IV of Plaintiff's First Amended Complaint.

## **REPLY MEMORANDUM OF LAW**

1.     <u>Plaintiff's reliance on the Northpointe numerical values does not support Plaintiff's contention that Sheriff Woods abandoned his classification policy for inmates charged with felony sex offenses.</u>

---

[2] The parties and the record evidence have referred to Gulf Pod, Section Alpha as "Gulf Pod," "Gulf Alpha," "Gulf Alpha Section," "G-Pod," "sex offense pod," and other permutations depending on the context.   For ease, Sheriff Woods adopts Plaintiff's, "Gulf-Alpha," when referring to the housing section in which Lutterloah assaulted Merchant on November 7, 2021.

Plaintiff argues that the Sheriff's Office classification policy, *see* Doc. 50-15, and inmate booking process results in the assignment of numerical values representing the "security risk" for each inmate.  Then, Plaintiff claims, based on that numerical value, the jail assigns each inmate to a particular housing section within the jail, except for one particular group - those charged with felony sex offenses.  While the record and testimony does not support the assertion that a numerical value alone assigned to each inmate selects the appropriate housing section for the inmate to reside in the jail, *see* Doc. 50-13, Peterson Deposition, 45/9-61/11 (discussing the classification process during booking), the Northpointe numerical value system, as a tool, helps contribute to where a particular inmate may be housed inside the jail.[3]  *See id.* 50/8-50/15 (noting that the decision tree helps determine location of inmate housing).

However, the record does not support Plaintiff's conclusory assertion, when parroting her correctional practices expert, Paul Adee, that, "as a matter of policy, all accused and convicted sex offenders are housed together, regardless of the level

---

[3] Plaintiff referred to this numerical value as "fall[ing] on the safety spectrum."  Doc. 62-7.  This nomenclature is found nowhere in the record, but appears designed to support Plaintiff's later assertion that Merchant was a "vulnerable inmate" simply by his placement into Gulf-Alpha.  *See* Doc. 62-43 ("Mr. Merchant was a vulnerable inmate because he was classified as a Level 5, which the jail itself identifies as vulnerable enough to not be classified with heightened security inmates designated Levels 1, 2, or 3.").  But there is no evidence in the record to support that a lower numbered inmate necessarily places him at risk for assault by an inmate with a higher numerical value, or otherwise makes him "vulnerable."

of danger that their security classification indicates."[4]  *See* Doc. 62, p. 13.  Plaintiff

and Mr. Adee apparently make this deduction by parsing Captain Peterson's

testimony,[5] relying on the testimony of the corporate representative designated to

testify on staffing, Doc. 50-14, Nix Deposition, 42/21-43/2, and placing heavy

interpretative weight on Sheriff Wood's Answer to Interrogatory #15, *see* Doc. 50-

12, and the Northpointe classification decision trees for Lutterloah and Merchant.

*see* Doc. 63-1, Doc. 63-2, to suggest that Lutterloah, because of his "3-High

Medium" value, "assaultive felony" criminal offense, and Sheriff Woods' public

service announcement about wanted criminals in the community, should never

have been in Gulf-Alpha with "likely prison bound" Merchant, who with a mere

"5-Medium" value was too vulnerable and at risk for assault to be housed with

other persons charged with felony sex offenses, or at least someone allegedly as

dangerous as Lutterloah.  *See* Doc. 62, P. 12-19.

Of course, Plaintiff cannot argue that the classification policy failed to

recognize the unique vulnerability inmates charged with felony sex offenses face

---

[4] Although not noted by Plaintiff, in Charlie Pod, Sections B, C, D, and E, a "2" could be placed with a "3" and "4," and a "3," like Lutterloah, could be placed with a "4" and "5," like Merchant. *See* Doc. 50-12, p. 9.  Thus, for Plaintiff to argue that the Marion County Jail only places a "3" with a "5" in Gulf Alpha is not accurate.  *See* Doc. 62, p. 13 ("The MCJ's classification-and-segregation safety system described above applies to all of the MCJ's detainees *except for one group*: those who are detained on charges of committing sex offenses.") (emphasis in original).

[5] In that same exchange with Plaintiff's counsel that Plaintiff does not include, Captain Peterson expands on the ways a person charged with a felony sex offense may be placed in a different housing section from other inmates similarly charged.  *See* Doc. 50-13, 53/4-55/10.

from other inmates dissimilarly charged, Doc. 52-1, Adee Deposition, 73/7-73/21, or that the classification and booking procedure failed to recognize the unique vulnerability of certain inmates, such as those with mental health issues, physical limitations, or those needing protective custody for some other reason, or even that correctional officers failed to go through all the steps outlined in the classification policy with Merchant and Lutterloah.  Plaintiff cannot argue this because the record evidence shows Defendant's classification policy encompasses all of these important concepts, and neither Lutterloah nor Merchant expressed any unique characteristic or vulnerability that would necessitate segregation from other inmates charged with felony sex offenses, or segregation from each other. Nor does Plaintiff's case present the situation where a jail administrator failed to consider *any* reasonable measures to reduce the risk of violence, *see, e.g., Hale v. Tallapoosa County*, 50 F.3d 1579, 1584 (11th Cir. 1995) ("[t]he evidence showed, for example, that the jail had no policy for classifying and segregating the inmates and that Hale, who was detained for a failure to appear, was held with Bobo Greer, who was detained for murder and attempted murder . . ."), or exhibited deliberate indifference to a vulnerable group of inmates' pleas for assistance, *see, e.g., Goebert v. Lee County*, 510 F.3d 1312 (11th Cir. 2007) (deliberate indifference when correctional supervisor ignored pregnant woman's complaints of leaking amniotic fluid, which resulted in the fetus' death), that could be fairly said to have caused

the constitutional violation.  Instead, this case can be properly evaluated by looking towards the unrebutted evidence that despite the criminal charges that caused Lutterloah's initial confinement in the Marion County Jail, he was a model inmate for 515 days until his assault on Merchant, that Merchant exhibited no vulnerability to any risk of assault, that correctional officers had no knowledge of strife between Lutterloah and Merchant or any expectation of a fight, and the less than 30 seconds it took Lutterloah to leave his bunk, walk over to the next bunk, talk to Merchant, and then render Merchant unconscious with three punches, as the reason Plaintiff made the legal decision to abandon her claims against the individual Defendants.  This evidence and the remaining evidence cited in Defendants' summary judgment motions, support the conclusion that no evidence exists to "support a reasonable jury's finding that [Defendants] harbored a subjective awareness that [Merchant] was in serious danger," or that Sheriff Woods' policy of generally confining inmates charged with felony sex offenses together caused Lutterloah's assault on Merchant.  *See Goodman*, 718 F.3d at 1332; *see also Farmer*, 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment."); *see also* Doc. 50-9, Hough Deposition, 48/5-53/13 (discussing at length that it is typical and customary for jails across the country to place together inmates charged with felony sex offenses).

9

2.    <u>Plaintiff's "systemic deficiencies" do not rise to a constitutional violation either separately or in combination with each other</u>.

After asserting that Sheriff Woods' segregation of inmates charged with felony sex offenses from other inmates violated the Constitution, Plaintiff then argues that the individual Defendants' actions, while not rising to a constitutional violation collectively or individually, evidenced "systemic deficiencies" inside the jail that proves Sheriff Wood's policies violated Merchant's constitutional rights. None of these "systemic deficiencies" support Plaintiff's *Monell* claim that Sheriff Woods' policies caused any alleged constitutional violation.

A.    <u>Neither the Marion County Jail nor Gulf Alpha, in particular, exposed inmates to a "substantial risk of serious harm."</u>

First, Plaintiff asserts that her expert, Mr. Adee, noted a steady, high, and increasing incidence of assault in the years leading up to Lutterloah's assault on Merchant. *See* Doc. 62, p. 38. However, these numbers mean little without context, such comparison to the average daily inmate population numbers, *see* Doc. 50-14, Nix Deposition, 51/2-53/5, or analysis of the factual circumstances of the assaults, and neither Mr. Adee nor Plaintiff provided this context and analysis to give value to the raw number of assaults that occurred in Gulf Pod, which contained four separate housing sections, in any given year. *See Purcell ex. rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1322-23, n. 21 (11th Cir. 2005) (noting that outside of the decedent's brother's testimony that a few serious fights occurred in the lead

up to the assault on the decedent, "the record [wa]s insufficient to show that serious inmate-on-inmate violence was the norm or something close to it," or that the fights occurred as a result of money and gambling, which the jail permitted and ultimately was the reason for the fight).

Plaintiff then relies on the affidavits of two former inmates, one of which was not even present in Gulf Alpha at the time of Lutterloah's assault, and Merchant's brother, who had not been inside Marion County Jail since 2012 except for a brief sojourn from his incarceration in the Florida Department of Corrections in 2015, to assert that fights occurred on a daily basis, but correctional officers did nothing to stop it. Doc. 62-12, Place Affidavit, Doc. 62-13, Murphy Affidavit, Doc. 50-35, Merchant Deposition, 36/2-36/4, 73/11-76/23. Even if the Court credited this testimony, the fight between Lutterloah and Merchant contained none of the salacious and unsubstantiated circumstances that allegedly occurred on a regular basis inside the jail. There is no evidence in the record that this incident between Lutterloah and Merchant occurred during an alleged "Friday Night Fight" event, that correctional officers encouraged Lutterloah to fight Merchant, or that correctional officers let Merchant bleed out for 30 minutes before rendering aid.[6] Even Deputy Kosinski's acknowledgment that he heard the term "Friday Night

---

[6] Plaintiff tries to make issues of disputed fact with her expert witness and these affidavits, but the video depicts Lutterloah's assault and the speed with which it occurred. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Fights" or some variation thereof inside the jail is hardly remarkable. *See* Doc. 62, p. 36. Nor was his response as to why he never witnessed the event occur - inmates have a lot of time on their hands and it would be surprising to learn that this occurred with such frequency that no one in jail had said anything about it or tried to stop it. Doc. 50-21, Kosinski Deposition, 42/24-45/24. Thus, Plaintiff's assertion that incidents of violence inside the Marion County Jail, or Gulf Alpha specifically, rose to a constitutional violation is not supported by the record. *See also Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (violence among inmates must have resulted in so many incidents or injuries that such incidents or injuries were "the norm or something close to it.") (*quoting Purcell*, 400 F.3d at 1322).

> **B.    Plaintiff's use of the 2019 Staffing Analysis does not support the claim that the Marion County Jail or Gulf Pod lacked the necessary correctional officers to adequately supervise the inmates.**

Plaintiff used the 2019 Staff Analysis to argue that (1) since the analysis identified staffing challenges inside the Marion County Jail, then the inmates had a "substantial risk of serious harm," and (2) since Sheriff Woods ignored recommendations from the analysis, Sheriff Woods exhibited "deliberate indifference." Doc. 62, p. 22. 23. 41, 44. As for the first point, staffing shortages at jail facilities are not uncommon. *See* Doc. 52-1, Adee Deposition, 57/6-58/10 (describing his experience with staff shortages at the Hillsborough County Jail and how the jail used overtime to accommodate the shortages). And staffing depends

on budgeting allocated from the Marion County Board of County Commissioners, which was the reason Sheriff Woods retained consultants to draft the 2019 Staffing Analysis.  *See* Doc. 50-14, Nix Deposition, 69/5-69/11.  In fact, the record evidence shows that the County Commissioners have steadily increased funding to allow Sheriff Woods to hire additional staff and reduce his reliance on overtime due to Sheriff Woods' consistent advocacy for additional positions inside the Marion County Jail.  *See* Doc. 50-14, Nix Deposition, 59/5-66/13, 67/9-70/20; Doc. 62-11, Staffing Analysis, p. 17-19.  This hardly supports an inference of a failure to take reasonable measures to secure the facility and safety of the inmates, or that Sheriff Woods exhibited "deliberate indifference" to Merchant, or the inmates inside the Marion County Jail by failing to employ sufficient numbers of correctional officers.

Finally, the Staffing Analysis identified that the main challenges with staffing occurred during the day when the activity demand of inmates, e.g., programs, court, and religious activities, exceeded the supply of staff.  Doc. 62-11, Staffing Analysis, p. 9-12.  None of the issues and recommendations in the Staff Analysis identified security deficiencies related to inadequate nightly and hourly security checks or the prevalence of staged fighting between inmates, and only recommended changes to the staff scheduling plan to allow additional night shift employees across all housing sections in the jail as the staffing levels increased.

*See* Doc. 62-11, Staffing Analysis, p. 15.[7]  But regardless of the purpose of the analysis or what it identified as potential challenges inside the jail, the record evidence does not support the assertion that two correctional deputies were inadequate to supervise Gulf Pod at night.  And Plaintiff makes no argument that it was inadequate, other than to compare Gulf Pod's staffing levels to the housing sections with "maximum security levels," which Gulf Pod was not.  *See* Doc. 62, p. 25-26; *see also* Doc. 50-15, Classification Policy, Sec. 6766.25 (defining classification categories); Doc. 50-13, Peterson Deposition, 80/17-81/15.  Thus, while Plaintiff uses the 2019 Staffing Analysis to argue that Merchant faced a "substantial risk of serious harm," Doc. 62, p. 38, and that Sheriff Woods exhibited "deliberate indifference," the record evidence, and the Staffing Analysis, does not support such an assertion.  *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) ("'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").

      C.    <u>Plaintiff's "systemic deficiencies" related to the individual Defendants' actions do not rise to a constitutional violation.</u>

      Plaintiff relies heavily on her expert for both her assertion that Sheriff

---

[7] Plaintiff further misunderstood the staffing recommendation the analysis made for Gulf Pod. Doc. 62-11, Staffing Analysis, p. 22, 44.  The Staffing Analysis only recommended another part-time, day shift detention deputy ("DD") but kept the same two correctional officers to supervise Gulf Pod at night.  *See* Doc. 62, p. 44.  The record also supports that Gulf Pod did, in fact, implement this recommendation to some extent around the time of the incident.  *See* Doc. 50-19, Dukes Deposition, 97/9-97/21.

Woods' abandoned his classification policy for inmates charged with felony sex offenses, and her assertion that the individual Defendants' security checks or supervision was generally inadequate in Gulf-Alpha.  *See* Doc. 62, p. 28, 31, 32, 42. Plaintiff claims that the Constitution demands irregular security checks of inmates every 30 minutes, 24 hours-a-day, for longer than a "brief glance."  Doc. 62, p. 28-31.  While it does not appear that any court has held that irregular security checks of inmates every 30 minutes, 24 hours-a-day is the minimum constitutional threshold, *see, e.g., Cagle v. Sutherland*, 334 F.3d 980, 985 (11th Cir. 2003), Plaintiff's reliance on the individual Defendants' alleged quickness or predictability of their security checks cannot be used to argue "deliberate indifference" of Sheriff Woods. *See Goodman*, 718 F.3d at 1335 (rejecting the argument that since officers violated written policies then the sheriff "had established customs and policies that resulted in deliberate indifference to constitutional violations.").  Further, the record evidence contains testimony that supervisors reviewed and issued discipline for correctional officers, including Miller and Kosinski, who violated Sheriff Woods' policies related to security checks or their supervision of inmates. *See* Doc. 50-18, McNeely Deposition, 44/24-45/22, 59/4-62/3, 68/6-69/9, 93/10-93/14, 99/22-100/22, 101/15-102/14, 127/4-127/6, 120/3-120/11.  And while Kosinski and Miller did mostly complete the hourly security checks in less than 10 minutes in the month preceding Lutterloah's assault, Plaintiff's reliance on

Captain McNeely as setting the minimum duration to complete a security check misrepresents his testimony and shows the lack of merit in Plaintiff's claims. As Captain McNeely later noted, simply because a correctional officer completes a security check in less than 10 minutes does not mean the officer did not complete the security check or that the security check was inadequate. *See* Doc. 50-18, McNeely Deposition, 127/19-129/8, 130/3-132/15. Nor did Plaintiff complete any type of analysis to determine just how long an officer should take to walk through Gulf Pod at night while the inmates were sleeping. Instead, Plaintiff relied on her expert witness to opine that since in his opinion it takes 5-10 seconds to look at every sleeping inmate in a 256-person pod, then it should take 21 minutes to adequately complete a security check at night. This is not the type of intellectual rigor necessary to show that correctional officers or the individual Defendants generally conducted inadequate security checks, or that the individual Defendants conducted an inadequate security check the night of Lutterloah's assault. *See also* Doc. 52, Defendants' *Daubert* Motion, Sec. 1.

Finally, Plaintiff asserts that the individual Defendants and their supervisors did not enforce the "lockdown policy," or that they exercised discretion that the policy did not allow. Doc. 62, p. 32-33. Yet Plaintiff again mischaracterizes the individual Defendants' testimony concerning lockdown and exaggerated the extent of how inmates behave during lockdown. Deputy Kosinski

did not testify that he permitted inmates to walk around and socialize with inmates away from their bunk, or play basketball or card games, or otherwise allow inmates to treat lockdown similar to a block of time in the day room or recreation yard during waking hours. Deputy Kosinski simply believed that he had discretion to issue discipline if an inmate violated the lockdown policy for being off their bunk. Doc. 50-21, Kosinski Deposition, 50/17-54/14. Even Plaintiff's expert agreed that correctional officers maintain some amount of discretion to enforce lockdown rules. Doc. 52-1, Adee Deposition, 86/12-88/3, 94/18-96/9. Thus, Plaintiff's alleged "systemic deficiencies," collectively or individually, did not deprive Merchant of any constitutional right.

3. <u>Plaintiff still has to prove a constitutional violation was committed against Merchant to hold Sheriff Woods liable under *Monell*.</u>

Plaintiff states that, "Defendant's contention that Plaintiff must prove an underlying constitutional violation to succeed on a *Monell* claim is contrary to Eleventh Circuit law as well as the consensus of its sister circuits." This is, of course, incorrect, but Plaintiff's citations contemplate situations where a plaintiff tried their claims against the individual defendants but the jury could not determine which individual defendant committed the constitutional violation or where the evidence supported the conclusion that a constitutional violation occurred but the individual defendants had little to no discretion to do anything differently. *See Barnett v. MacArthur*, 956 F.3d 1291, 1301-02 (11th Cir. 2020)

(collecting cases from sister circuits).  For example, in *Anderson v. City of Atlanta*, which Plaintiff cited, extensive testimony was taken at trial from the individual defendants who testified that the jail was so consistently understaffed, and short four to five officers that night, that it could not provide any medical staff to an arrestee who ingested enough drugs to cause his death, or provide the necessary checks to ensure his safety and security, and an expert witness testified that the arrestee likely would have lived with proper medical attention.  778 F.2d 678, 682-85 (11th Cir. 1985).  In *Barnett*, which Plaintiff also cited, the testimony at trial indicated that the deputies had no discretion to deviate from the sheriff's policy of holding DUI suspects regardless of whether probable cause existed to still detain the suspect.[8]

On the other hand, there was no testimony here that the individual Defendants, or even their supervisors, felt constrained by understaffing or that they committed constitutional violations because they lacked discretion. Plaintiff's strategy appears to acknowledge that, at worst, the individual Defendants may have committed negligence during the night of Lutterloah's

---

[8] *Barnett*, 956 F.3d at 1302-3.[8] ("the jury was asked to decide only whether Deputy MacArthur was personally responsible (due to 'intentionally committed acts') for any Fourth Amendment violations, and not whether Ms. Barnett suffered a Fourth Amendment violation due to her continued detention. Under the circumstances—including the evidence presented, the defense theory, the jury instructions, and the verdict form—the jury's verdict in favor of Deputy MacArthur does not insulate the Sheriff from a § 1983 claim under *Monell* for Ms. Barnett's continued detention pursuant to the eight-hour mandatory hold policy.")

assault on Merchant, but their acts did not exhibit deliberate indifference or cause Lutterloah to assault Merchant.  And because Plaintiff cannot prove a § 1983 violation under these circumstances, Plaintiff instead argues that Sheriff Woods' alleged policy of housing certain inmates charged with felony sex offenses in the same housing section actually caused Lutterloah to assault Merchant 515 days after his arrival into the Marion County Jail, or that the culture of violence was so pervasive inside Gulf-Alpha that the individual Defendants were impotent to do anything.  And all of this apparently was approved and with the knowledge of Sheriff Woods in order to be deliberately indifferent to the constitutional rights of Merchant.[9]  Yet Plaintiff's decision to forego showing that the individual Defendants' actions rose to a constitutional violation does not support application of *Barnett* and *Anderson* to the record evidence in this case.

     3.   <u>Plaintiff asks the court to inappropriately fashion damages while conceding liability</u>.

Plaintiff argues that her "access to a remedy hinges on little more than luck" because she has been unable to prove her entitlement to "survivor" damages under Florida's Wrongful Death Act.  Doc. 62, p. 51.   Plaintiff suggested that "[t]his Court has previously held that the FWDA is inconsistent with policies

---

[9] Other than Sheriff Woods making a public service announcement regarding Lutterloah, there is no evidence or testimony in the record that Sheriff Woods, as final policymaker, knew of any alleged issues in Gulf-Alpha, or that he allegedly instituted or approved a policy to confine inmates charged with felony sex offenses in the same housing section no matter the classification policy.

underlying § 1983." Doc. 62, p. 49, *citing Howard v. Wilkinson*, 379 F. Supp. 3d 1251 (M.D. Fla. 2019).  While Plaintiff at least recognized contrary authority in her Response, the facts in *Howard* are drastically different from what occurred here.  In *Howard*, the decedent suffered a fractured neck and spinal cord injuries after correctional officers slammed him headfirst into the ground.  *Id.* at 1253.  To make matters worse, despite his obvious injuries and apparent paralysis, the medical staff failed to take him to the hospital until he was found unresponsive in his cell several hours later.  *Id.* at 1254.  The medical examiner ruled his death a homicide. *Id.*  On the other hand, there is no evidence that Merchant suffered any pain as a result of Lutterloah's assault, or at least Plaintiff has not developed any testimony to support hedonic damages.  *See* Doc. 50-21, Kosinski Deposition, 33/8-35/7; *see also* Doc. 50-19, Dukes Deposition, 127/8-132/11.

Instead, Plaintiff asks the Court to find Florida's Wrongful Death Act inconsistent with § 1983 because the record evidence cannot show that Defendants committed a constitutional violation, acted with "deliberate indifference," or even with mere negligence to hold Sheriff Woods liable under Florida law.  Plaintiff should not be permitted to ask the Court to fashion a remedy when she concedes the argument on liability.

**WHEREFORE**, Defendants, BILLY WOODS, Sheriff of Marion County, Florida, in his official Capacity, Deputy JUSTIN KOSINSKI, Deputy DELLUN

MILLER, and Sergeant JEROME DUKES, respectfully request an Order granting summary judgment for each Defendant and against Plaintiff.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of August, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to counsel for Plaintiff, James M. Slater, Esquire, Slater Legal, PLLC, 113 South Monroe Street, Tallahassee, Florida 32301, Sam Harton, Esquire, Romanucci and Blandin, 321 North Clark Street, Chicago, Illinois 60654.

/s/ Bruce R. Bogan
Bruce R. Bogan, Esquire
Fla. Bar No. 599565
Brandon T. Byers, Esquire
Fla. Bar. No. 0119492
Hilyard, Bogan & Palmer, P.A.
Post Office Box 4973
Orlando, FL 32802-4973
Telephone: 407-425-4251
Facsimile:  407-841-8431
Email: bbogan@hilyardlawfirm.com
          bbyers@hilyardlawfirm.com
Attorneys for Defendant, Sheriff Woods